# 17-2371-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

JOSEPH VALERIO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 1 of 2 (Pages A1 to A227)

LOUIS M. FREEMAN
FREEMAN, NOOTER & GINSBERG
*Attorneys for Defendant-Appellant*
75 Maiden Lane, Suite 503
New York, New York 10038
(212) 608-0808

i

# TABLE OF CONTENTS

                                                           **Page**

District Court Docket Entries ..................................... A-1

Superseding Indictment, filed April 9, 2014.............. A-21

Letter from Leonard Lato to the Honorable Joseph
    F. Bianco, dated July 1, 2014................................. A-41

    Attached to Letter -
    Handwritten Statement of Joseph Valerio, dated
    June 22, 2014 ........................................................ A-44

Transcript of Proceedings held before the
    Honorable Joseph F. Bianco, dated July 31, 2014 . A-46

    Exhibits to Transcript –
    (i) Advice of Right ............................................. A-116

    (ii) E-mail from Joseph Valerio, dated
    July 17, 2012 ....................................................... A-117

    (iii) E-mail from Joseph Valerio, dated
    July 22, 2012 ....................................................... A-119

    (iv) Photograph of Dining Room ....................... A-121

Transcript of Proceedings held before the
    Honorable Joseph F. Bianco, dated
    September 3, 2014 ................................................ A-122

Excerpt from Transcript of Proceedings held before
    the Honorable Joseph F. Bianco, dated
    November 10, 2014 .............................................. A-141

Superseding Indictment, filed November 12, 2014 ... A-146

Excerpt from Transcript of Proceedings held before
    the Honorable Joseph F. Bianco, dated
    November 12, 2014 .............................................. A-160

ii

## Page

Excerpt from Transcript of Proceedings held before
the Honorable Joseph F. Bianco, dated
November 13, 2014 ................................................ A-170

Letter from Leonard Lato to the Honorable Joseph
F. Bianco, dated November 27, 2014.................... A-172

Memorandum and Order of the Honorable Joseph F.
Bianco, dated April 15, 2016 ................................ A-173

Transcript of Proceedings held before the
Honorable Joseph F. Bianco, dated July 25, 2016 . A-187

Transcript of Proceedings held before the
Honorable Joseph F. Bianco, dated
September 26, 2016 ................................................ A-228

Transcript of Proceedings held before the
Honorable Joseph F. Bianco, dated
March 6, 2017........................................................ A-259

Sentencing Memorandum, entered April 25, 2017
(omitted herein)

    Exhibit 1 to Sentencing Memorandum -
    Forensic-Psychiatric Evaluation of Joseph
    Valerio, dated December 7, 2016.......................... A-333

Transcript of Proceedings held before the
Honorable Joseph F. Bianco, dated
June 6, 2017.......................................................... A-349

Notice of Appeal, dated August 1, 2017 ................... A-407

A-1

Eastern District of New York - LIVE Database V6.2.1

2/23/18, 2:45 PM

APPEAL,CUSTAPP

# U.S. District Court
# Eastern District of New York (Central Islip)
# CRIMINAL DOCKET FOR CASE #: 2:14-cr-00094-JFB All Defendants

Case title: USA v. Valerio
Magistrate judge case number: 2:14-mj-00080-WDW

Date Filed: 02/26/2014
Date Terminated: 06/06/2017

Assigned to: Judge Joseph F. Bianco

**Defendant (1)**

**Joseph Valerio**
*TERMINATED: 06/06/2017*

represented by **Anthony M. LaPinta**
Reynolds, Caronia, Gianelli, Hagney,
LaPinta & Hargraves
200 Vanderbilt Motor Parkway
Suite C-17
Hauppauge, NY 11788
631-231-1199
Fax: 631-231-1344
Email: LaPintaEsq@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Leonard Lato**
Leonard Lato, Esq.
200 Motor Parkway
Suite C-17
Hauppauge, NY 11788
631-655-5008
Fax: 631-300-4380
Email: leonardlato@yahoo.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:2251(a), 2251(e), 2 and 3551 et seq. SEXUAL EXPLOITATION OF CHILDREN; 18:2253; 21:853(p) FORFEITURE ALLEGATION AS TO COUNT ONE (1) | dismissed on govts motiondismissed on govts motion |

A-2

18:2251(e) and 3551 et seq. SEXUAL EXPLOITATION OF CHILDREN; FORFEITURE ALLEGATION: 18:2253, 21:853(p)
(1rss)

The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.

18:2251(a), 2251(e), 2 and 3551 et seq. SEXUAL EXPLOITATION OF CHILDREN; FORFEITURE ALLEGATION: 18:2253, 21:853 (p)
(2rss)

The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.

18:2252(a)(1), 2252(b)(1), 2 and 3551 et seq. TRANSPORTATION OF CHILD PORNOGRAPHY; 18:2253; 21:853(p) FORFEITURE ALLEGATION AS TO COUNT THREE
(3)

dismissed on govts motiondismissed on govts motion

18:2251(c), 2251(e), 2 and 3551 et seq. SEXUAL EXPLOITATION OF CHILDREN; FORFEITURE ALLEGATION: 18:2253, 21:853 (p)
(3rss)

The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.

18:2252(a)(2), 2252(b)(1), 2 and 3551 et seq. RECEIPT OF CHILD PORNOGRAPHY; 18:2253; 21:853(p) FORFEITURE ALLEGATION AS TO COUNT FOUR
(4)

dismissed on govts motiondismissed on govts motion

A-3

18:2252(a)(1), 2252(b)(1), 2 and 3551 et
seq. SEXUAL EXPLOITATION OF
MINORS; FORFEITURE ALLEGATION:
18:2253, 21:853 (p)
(4rss)

The defendant is sentenced to:720 months
(60 years) Second Superseding Indictment.
To be followed by lifetime of supervised
release with Special conditions of
supervised release. see calendar. court
makes the following recommendation to
the Bureau of Prisons: That the defendant
be designated as close as possible to Long
Island. That the defendant receive
treatment in jail. Fine waived, SAF
$1000.00, counts 9-13 dismissed.

18:2252(a)(2), 2552(b)(1), 2 and 3551 et
seq SEXUAL EXPLOITATION OF
MINORS Forfeiture allegations 18:2253;
21:853p
(4s)

dismissed on govts motiondismissed on
govts motion

18:2252(a)(2), 2251(b)(1), 2 and 3551 et
seq. SEXUAL EXPLOITATION OF
MINORS; FORFEITURE ALLEGATION:
18:2253, 21:853 (p)
(5rss)

The defendant is sentenced to:720 months
(60 years) Second Superseding Indictment.
To be followed by lifetime of supervised
release with Special conditions of
supervised release. see calendar. court
makes the following recommendation to
the Bureau of Prisons: That the defendant
be designated as close as possible to Long
Island. That the defendant receive
treatment in jail. Fine waived, SAF
$1000.00, counts 9-13 dismissed.

18:2251(e), 2 and 3551 et seq. SEXUAL
EXPLOITATION OF CHILDREN;
FORFEITURE ALLEGATION: 18:2253,
21:853(p)
(6rss-8rss)

The defendant is sentenced to:720 months
(60 years) Second Superseding Indictment.
To be followed by lifetime of supervised
release with Special conditions of
supervised release. see calendar. court
makes the following recommendation to
the Bureau of Prisons: That the defendant
be designated as close as possible to Long
Island. That the defendant receive
treatment in jail. Fine waived, SAF
$1000.00, counts 9-13 dismissed.

18:2251(a), 2251(e), 2 and 3551 et seq.
SEXUAL EXPLOITATION OF
CHILDREN; FORFEITURE
ALLEGATION 18:2253, 21:853(p)
(14rss)

The defendant is sentenced to:720 months
(60 years) Second Superseding Indictment.
To be followed by lifetime of supervised
release with Special conditions of
supervised release. see calendar. court
makes the following recommendation to
the Bureau of Prisons: That the defendant
be designated as close as possible to Long

28:2252(a)(4)(B), 2252(b)(2) and 3551 et seq. SEXUAL EXPLOITATION OF MINORS; FORFEITURE ALLEGATION 18:2253, 21:853(p)
(15rss)

Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.

The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:2251(a),2251(e), 2 and 3551 et seq. SEXUAL EXPLOITATION OF CHILDREN Forfeiture allegations 18:2253; 21:853p (1s) | dismissed on govts motiondismissed on govts motion |
| 18:2251(C), 2251(e), 2 and 3551 et seq. SEXUAL EXPLOITATION OF CHILDREN; 18:2253; 21:853(p) FORFEITURE ALLEGATION AS TO COUNT TWO (2) | dismissed on govts motiondismissed on govts motion |
| 18:2251(c),2251(e), 2 and 3551 et seq. SEXUAL EXPLOITATION OF CHILDREN Forfeiture allegations 18:2253; 21:853p (2s) | dismissed on govts motiondismissed on govts motion |
| 18:2252(a)(1), 2252(b)(1), 2 and 3551 et seq. SEXUAL EXPLOITATION OF MINORS Forfeiture allegations 18:2253; 21:853p (3s) | dismissed on govts motiondismissed on govts motion |
| 18:2252(a)(4)(B), 2252(b)(2), 2 and 3551 et seq. POSSESSION OF CHILD PORNOGRAPHY; 18:2253; 21:853(p) FORFEITURE ALLEGATION AS TO | dismissed on govts motiondismissed on govts motion |

Eastern District of New York - LIVE Database V6.2.1

2/23/18, 2:45 PM

COUNT FIVE
(5)

18:2551(a), 2251(e) and 3551 et seq.
SEXUAL EXPLOITATION OF
CHILDREN Forfeiture allegations
18:2253; 21:853p
(5s)

dismissed on govts motiondismissed on
govts motion

18:2252(a)(4)(B), 2252(b)(2) and 3551 et
seq SEXUAL EXPLOITATION OF
MINORS Forfeiture allegations 18:2253;
21:853p
(6s)

dismissed on govts motiondismissed on
govts motion

18:2251(e), 2 and 3551 et seq. SEXUAL
EXPLOITATION OF CHILDREN;
FORFEITURE ALLEGATION: 18:2253,
21:853(p)
(9rss-13rss)

dismissed on govts motion

18:2251(e), 2 and 3551 et seq. SEXUAL
EXPLOITATION OF CHILDREN;
FORFEITURE ALLEGATION: 18:2253,
21:853(p)
(14ss)

dismissed on consent of all parties (on jury
trial calendar dtd. 11/4/14)

### Highest Offense Level (Terminated)

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:2251.F | |

### Plaintiff

**USA**     represented by **Allen Lee Bode**
United States Attorneys Office,Eastern
District of New York
610 Federal Plaza
Central Islip, NY 11722
631-715-7828
Fax: 631-715-7922
Email: allen.bode@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ameet B. Kabrawala**

A-6

United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6001
Fax: 718-254-6076
Email: ameet.kabrawala@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/28/2014 | 1 | COMPLAINT as to Joseph Valerio (1). (Gandiosi, Kristin) [2:14-mj-00080-WDW] (Entered: 02/03/2014) |
| 01/28/2014 | 2 | Minute Entry for proceedings held before Magistrate Judge William D. Wall:Arraignment as to Joseph Valerio (1) Count Complaint held on 1/28/2014. Defendant Joseph Valerio present in custody with retained Counsel Anthony LaPinta Present. AUSA Lara Gatz present for the Government. Donna Mackey present for pretrial. Case called. Counsel for all sides present. Preliminary Hearing is waived. Permanent Order of Detention is entered. (Tape #3:28-3:31.) (Gandiosi, Kristin) [2:14-mj-00080-WDW] (Entered: 02/03/2014) |
| 01/28/2014 | 3 | ORDER OF DETENTION as to Joseph Valerio. Ordered by Magistrate Judge William D. Wall on 1/28/2014. (Gandiosi, Kristin) [2:14-mj-00080-WDW] (Entered: 02/03/2014) |
| 02/03/2014 | 4 | Minute Entry for proceedings held before Magistrate Judge A. Kathleen Tomlinson:Bond Hearing as to Joseph Valerio held on 2/3/2014. Appearances: for Government: Lara Gatz for Allen Bode; for Defendant: Tony LaPinta (Ret); Court Reporter: Paul Lombardi; Pretrial: Donna Mackey; defendant present in custody. Government application to have their argument presented tomorrow. Application granted. Defendant presents his argument. Three suretors present in courtroom to sign bond. Court review conditions and advises risks of signing bond. Suretors acknowledge and sign bond understanding that no final decision will be rendered in defendant's release until tomorrow's continued bail hearing. Bail hearing to continue on 2/4/2014 at 12:30 p.m. before Magistrate Judge Tomlinson. Defendant remains in custody.(FTR: 1:03-1:37.) (Ryan, Mary) [2:14-mj-00080-WDW] (Entered: 02/20/2014) |
| 02/03/2014 | 8 | Letter to Judge Tomlinson in Support of Mr. Valerio's bail application by defendant's attorney, Mr. LaPinta. (Ryan, Mary) [2:14-mj-00080-WDW] (Entered: 02/20/2014) |
| 02/04/2014 | 5 | Minute Entry for proceedings held before Magistrate Judge A. Kathleen Tomlinson:Bond Hearing as to Joseph Valerio continued on 2/4/2014. Appearances: for Government: Allen Bode; for Defendant: Tony LaPinta (Ret); Court Reporter: Paul Lombardi; Pretrial: Donna Mackey; defendant present in custody. Bail application GRANTED. Order Setting Conditions of Release and Bond Entered. Special conditions apply. See bond for details. Government presents their argument. Confession of Judgment due by 2/19/2014. Defendant signs bond as suretor. |

| | | |
|---|---|---|
| | | Defendant to be released on or before 2/19/2014 after surveillance video is in place at defendant mother's home where defendant is residing. (FTR: 1:15-2:09) (Ryan, Mary) [2:14-mj-00080-WDW] (Entered: 02/20/2014) |
| 02/04/2014 | 6 | ORDER Setting Conditions of Release as to Joseph Valerio (1) Secured Appearance Bond. NOTE: Defendant to be released after surveillance video in place. See bond for additional conditions of release. Ordered by Magistrate Judge A. Kathleen Tomlinson on 2/4/2014. (Ryan, Mary) [2:14-mj-00080-WDW] (Entered: 02/20/2014) |
| 02/12/2014 | 7 | Minute Entry for proceedings held before Magistrate Judge A. Kathleen Tomlinson:Bond Hearing as to Joseph Valerio held on 2/12/2014. Appearances: for Government: Lara Gatz for Allen Bode; for Defendant: Tony LaPinta (Ret). defendant present in custody. Report by Mr. LaPinta that defendant's mother's home is ready for Mr. Valerio to reside in. No opposition by Government. Application by Mr. LaPinta to have defendant be allowed to go to his Smithtown home to close the premises prior to residing at his mother's home as part of the conditions of release. No opposition by Government. Application granted. Defdendant released on bond. (FTR: 2:00-2:02.) (Ryan, Mary) [2:14-mj-00080-WDW] (Entered: 02/20/2014) |
| 02/26/2014 | 9 | SEALED INDICTMENT as to Joseph Valerio (1) count(s) 1, 2, 3, 4, 5. (Attachments: #(1) Criminal Information Sheet) (Mahon, Cinthia) (Additional attachment(s) added on 3/4/2014: # 2 Sealing Cover Sheet) (Mahon, Cinthia). (Attachment 2 replaced on 3/4/2014) (Mahon, Cinthia). (Entered: 03/03/2014) |
| 02/28/2014 | 10 | Minute Entry for proceedings held before Judge Joseph F. Bianco: deft present in custody with retrained counsel Anthony LaPnta; AUSA Allen Bode; Michele Savona; order of detention entered; speedy trial x start 2/28/14 stop 3/6/14; Arraignment as to Joseph Valerio (1) Count 1,2,3,4,5 held on 2/28/2014, Initial Appearance as to Joseph Valerio held on 2/28/2014, Plea entered by Joseph Valerio Not Guilty on counts not guilty on all counts., ( Status Conference set for 3/6/2014 01:00 PM before Judge Joseph F. Bianco.) (Court Reporter D Tursi) (Bollbach, Jean) (Entered: 03/04/2014) |
| 02/28/2014 | 11 | ORDER TO CONTINUE - Ends of Justice as to Joseph Valerio Time excluded from 2/28/14 until 3/6/14.. Ordered by Judge Joseph F. Bianco on 2/28/14. (Bollbach, Jean) (Entered: 03/04/2014) |
| 02/28/2014 | 12 | ORDER OF DETENTION as to Joseph Valerio. Ordered by Judge Joseph F. Bianco on 2/28/14. (Bollbach, Jean) (Entered: 03/04/2014) |
| 03/05/2014 | 13 | SUPERSEDING INDICTMENT (S-1) as to Joseph Valerio (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s. (Bollbach, Jean) (Entered: 03/06/2014) |
| 03/06/2014 | 14 | Minute Entry for proceedings held before Judge Joseph F. Bianco: deft present in custody with retained counsel Anthony LaPinta; AUSA Allen Bode; Michele Savona; deft continued in custody; Arraignment as to Joseph Valerio (1) Count 1s,2s,3s,4s,5s,6s held on 3/6/2014, Initial Appearance as to Joseph Valerio held on 3/6/2014, Plea entered by Joseph Valerio Not Guilty on counts not guilty on all counts of superseding indictment., ( Jury Selection set for 5/12/2014 09:30AM before Judge Joseph F. Bianco., Jury Trial set for 5/12/2014 09:30 AM before Judge Joseph F. Bianco.) (Court Reporter O Wicker.) (Bollbach, Jean) (Entered: 03/07/2014) |

| 03/06/2014 | 15 | Order to Unseal Indictment as to Joseph Valerio. (Endorsed on Criminal Information Sheet). Ordered by Judge Joseph F. Bianco on 3/6/2014. cm/ecf. (Mahon, Cinthia) (Entered: 03/07/2014) |
| --- | --- | --- |
| 03/10/2014 | 16 | First MOTION for Release from Custody by Joseph Valerio. (Attachments: # 1 Exhibit Epic Security Proposal) (LaPinta, Anthony) (Entered: 03/10/2014) |
| 03/11/2014 | 17 | NOTICE OF ATTORNEY APPEARANCE Ameet B. Kabrawala appearing for USA. (Kabrawala, Ameet) (Entered: 03/11/2014) |
| 03/17/2014 | 18 | Letter *Enclosing Rule 16 Disclosures,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 03/17/2014) |
| 03/20/2014 | 19 | NOTICE OF ATTORNEY APPEARANCE: Leonard Lato appearing for Joseph Valerio (Lato, Leonard) (Entered: 03/20/2014) |
| 03/20/2014 | 20 | Second MOTION for Release from Custody by Joseph Valerio. (Lato, Leonard) (Entered: 03/20/2014) |
| 03/20/2014 | 21 | RESPONSE in Opposition re 20 Second MOTION for Release from Custody (Kabrawala, Ameet) (Entered: 03/20/2014) |
| 03/21/2014 | 22 | REPLY TO RESPONSE to Motion re 20 Second MOTION for Release from Custody (Lato, Leonard) (Entered: 03/21/2014) |
| 03/21/2014 | 23 | Minute Entry for proceedings held before Judge Joseph F. Bianco: deft present in custody with retained counsel Anthony LaPinta and Lenny Lato; AUSA Allen Bode; Michele Savona; deft continued in custody; jury selection and trial set for 5/12/14 at 9:30 am; decision made on the record. Written opinion to follow.Bond Hearing as to Joseph Valerio held on 3/21/2014, ( Status Conference set for 4/2/2014 01:15 PM in Courtroom 920 before Judge Joseph F. Bianco.) (Tape #ftr 1:30 - 2:06.) (Bollbach, Jean) (Entered: 03/24/2014) |
| 03/24/2014 | 25 | ORDER denying 20 Motion for Release from Custody as to Joseph Valerio (1); denying 16 Motion for Release from Custody as to Joseph Valerio (1). A detailed written memorandum and order will follow.. Ordered by Judge Joseph F. Bianco on 3/24/2014. (Bollbach, Jean) (Entered: 03/25/2014) |
| 03/25/2014 | 24 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Valerio held on 3/21/2014, before Judge Joseph F. Bianco. Transcriber Tracy Gribben's Transcription Service, Telephone number 732- 263-0044. Email address: TGribben@transcription.com. Transcript may be viewed at the court public terminal or purchased through the Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/15/2014. Redacted Transcript Deadline set for 4/25/2014. Release of Transcript Restriction set for 6/23/2014. (Cox, Dwayne) (Entered: 03/25/2014) |
| 03/27/2014 | 26 | NOTICE OF APPEAL (Interlocutory) by Joseph Valerio re: 25 Order (Lato, Leonard) Modified on 3/27/2014 to indicate order appealed from (Cox, Dwayne). (Entered: 03/27/2014) |
| 03/27/2014 | 27 | Letter *to defense counsel enclosing discovery,* as to Joseph Valerio (Kabrawala, |

A-9

| | | Ameet) (Entered: 03/27/2014) |
|---|---|---|
| 03/28/2014 | 28 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Joseph Valerio for dates of 3/6/14 before Judge Bianco, re 26 Notice of Appeal - Interlocutory Court Reporter/Transcriber O. Wicker, Telephone number 631 712 6102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/18/2014. Redacted Transcript Deadline set for 4/28/2014. Release of Transcript Restriction set for 6/26/2014. (Wicker, Owen) (Entered: 03/28/2014) |
| 03/28/2014 | 29 | MOTION in Limine by USA as to Joseph Valerio. (Kabrawala, Ameet) (Entered: 03/28/2014) |
| 04/01/2014 | 30 | ORDER as to Joseph Valerio re 20 Second MOTION for Release from Custody , 16 First MOTION for Release from Custody , 25 Order on Motion for Release from Custody. For the reasons set forth herein and the reasons set forth on the record on March 6, 2014, and March 21, 2014, the Court denies defendants motions for release from custody, and concludes (under a de novo standard of review) that the government has met its burden of demonstrating, by clear and convincing evidence on the issue of danger, and by a preponderance of the evidence on the issue of flight, that no condition or combination of conditions will reasonably assure the safety of the community or defendants appearance in court. Accordingly, the Court orders that defendant shall remain detained pending trial. SO ORDERED. Ordered by Judge Joseph F. Bianco on 4/1/2014. (Chipev, George) (Entered: 04/01/2014) |
| 04/01/2014 | 31 | Transmitted Supplemental Record on Appeal as to Joseph Valerio re 26 Notice of Appeal - Interlocutory (Cox, Dwayne) (Entered: 04/01/2014) |
| 04/02/2014 | 32 | Minute Entry for proceedings held before Judge Joseph F. Bianco: deft present in custody with retained counsel Anthony LaPinta and Lenny Lato; AUSA Allen Bode; Michele Savona; deft continued in custody; motions to be filed by 4/9/14; opposition due 4/14/14; reply by 4/18/14; Status Conference as to Joseph Valerio held on 4/2/2014, ( Jury Selection set for 4/28/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco., Jury Trial set for 5/5/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter ftr 2:11-2:20.) (Bollbach, Jean) (Entered: 04/02/2014) |
| 04/02/2014 | 33 | Letter *to defense counsel enclosing discovery* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 04/02/2014) |
| 04/07/2014 | 35 | MOTION for Victim Rights by USA as to Joseph Valerio. (Kabrawala, Ameet) (Entered: 04/07/2014) |
| 04/08/2014 | 36 | Letter *to defense counsel enclosing discovery* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 04/08/2014) |
| 04/09/2014 | 37 | INDICTMENT(s-2) as to Joseph Valerio (1) count(s) 1ss, 2ss, 3ss, 4ss, 5ss, 6ss-14ss, 15ss, 16ss. (Attachments: # 1 information sheet) (Bollbach, Jean) (Entered: 04/10/2014) |
| 04/09/2014 | | Minute Entry for proceedings held before Judge Joseph F. Bianco:Arraignment as to |

A-10

| | | |
|---|---|---|
| 04/09/2014 | 38 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Arraignment as to Joseph Valerio (1) Count 1ss,2ss,3ss,4ss,5ss,6ss-14ss,15ss,16ss held on 4/9/2014, Initial Appearance as to Joseph Valerio held on 4/9/2014, Plea entered by Joseph Valerio (1) Count 1ss,2ss,3ss,4ss,5ss,6ss-14ss,15ss,16ss Joseph Valerio (1) Guilty Count 1ss,2ss,3ss,4ss,5ss,6ss-14ss,15ss,16ss. Deft present in custody with retained counsel Anthony LaPinta and Leonard Lato; AUSA Allen Bode and Ameer Kabrawala; Michele Savona; deft continued in custdoy; speedy trial x start 4/9/14 stop 9/22/14 ( Jury Selection set for 9/22/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco., Jury Trial set for 9/22/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter P Auerbach.) (Bollbach, Jean) (Entered: 04/10/2014) |
| 04/09/2014 | 39 | ORDER TO CONTINUE - Ends of Justice as to Joseph Valerio Time excluded from 4/9/14 until 9/22/14.. Ordered by Judge Joseph F. Bianco on 4/9/2014. (Bollbach, Jean) (Entered: 04/10/2014) |
| 04/11/2014 | 40 | REPLY TO RESPONSE to Motion by USA as to Joseph Valerio re 35 MOTION for Victim Rights (Kabrawala, Ameet) (Entered: 04/11/2014) |
| 04/14/2014 | 41 | Letter *to defense counsel enclosing discovery* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 04/14/2014) |
| 04/15/2014 | | SCHEDULING ORDER: Conference with government and attorney for Jane Doe and her family, to address government's sealed motion for appointment of guardian as litem for Jane Doe, is hereby scheduled for April 17, 2014 at 1:00 p.m. Ordered by Judge Joseph F. Bianco on 4/15/2014. (Savona, Michele) (Entered: 04/15/2014) |
| 04/17/2014 | 42 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Status Conference for Jane Doe and family held on 4/17/2014; retained counsel William Wexler; AUSA Ameet Kabrawala and Raymond Tierney; Michele Savona (Bollbach, Jean) (Entered: 04/17/2014) |
| 05/09/2014 | 48 | Letter *Regarding Firewall Discovery Production* as to Joseph Valerio (Elbert, Lauren) (Entered: 05/09/2014) |
| 07/01/2014 | 49 | First MOTION to Suppress *Statements* by Joseph Valerio. (Attachments: # 1 Exhibit) (Lato, Leonard) (Entered: 07/01/2014) |
| 07/09/2014 | 50 | MANDATE of USCA (certified copy) as to Joseph Valerio. Stipulation to dismiss the appeal So Ordered. (Cox, Dwayne) (Entered: 07/10/2014) |
| 07/29/2014 | 51 | Letter *to defense counsel enclosing 3500 materials in advance of July 31, 2014 hearing,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 07/29/2014) |
| 07/31/2014 | 52 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Suppression Hearing as to Joseph Valerio held on 7/31/2014, deft present in custody with retained counsel AnthonyLaPinta and Lenny Lato; AUSA Allen Bode and Ameet Kabrawala; Michele Savona; def continued in custody ( Status Conference set for 9/3/2014 01:00 PM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter H Rapaport.) (Bollbach, Jean) (Entered: 07/31/2014) |
| 08/12/2014 | | |

| | 54 | Letter *to defense counsel enclosing discovery,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 08/12/2014) |
|---|---|---|
| 08/13/2014 | 55 | Letter *to defense counsel enclosing discovery* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 08/13/2014) |
| 08/20/2014 | 56 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Status Conference as to Valerio RE: Jane Doe held on 8/20/2014; court denied motion to appoint guardian (Court Reporter D Tursi.) (Bollbach, Jean) (Entered: 08/20/2014) |
| 08/22/2014 | 57 | Letter *to defense counsel transmitting the government's plea offer,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 08/22/2014) |
| 08/26/2014 | 58 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Bail Hearing as to Joseph Valerio held on 8/26/2014; deft continued in custody; bail denied (Court Reporter H $Rapaport.) (Bollbach, Jean) (Entered: 08/26/2014) |
| 08/27/2014 | 59 | Letter *to defense counsel regarding the government's plea offer,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 08/27/2014) |
| 09/02/2014 | 60 | Proposed Voir Dire by USA as to Joseph Valerio (Kabrawala, Ameet) (Entered: 09/02/2014) |
| 09/02/2014 | 61 | Letter *to defense counsel enclosing discovery,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 09/02/2014) |
| 09/03/2014 | 62 | ORDER TO CONTINUE - Ends of Justice as to Joseph Valerio Time excluded from 9/3/14 until 11/3/14.. Ordered by Judge Joseph F. Bianco on 9/3/2014. (Bollbach, Jean) (Entered: 09/04/2014) |
| 09/03/2014 | 127 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Status Conference as to Joseph Valerio held on 9/3/2014; deft present in custody with retained counsel Anthony LaPinta and Lenny Laro, AUSA Allen Bode and Amest Kabrawala, K McMorrow, speedy trial x start 9/3/14 stop 11/3/14; jury selection and trial adjourned to 11/3/14 at 9:30am; Motion to suppress (49) denied on the record, written opinion to follow. Defendant requests an adjournment of the 9/22/2014 jury selection in an attempt to locate an overseas witness; the government objects. Request granted. Defendant moves for recusal based on the governments 8/27/14 letter; argument heard - Motion denied.X DEFT. CONTINUED IN CUSTODY. (Court Reporter D Tursi.) (Bollbach, Jean) (Entered: 08/16/2016) |
| 09/07/2014 | 63 | NOTICE OF APPEAL (Interlocutory) of Conditions of Release 64 Order by Joseph Valerio (Lato, Leonard) Modified to indicate order appealed from on 9/9/2014 (Cox, Dwayne). (Entered: 09/07/2014) |
| 09/08/2014 | 64 | ORDER as to Joseph Valerio For the reasons set forth in detail on the record on August 26, 2014, as well as in the Memorandum and Order dated April 1, 2014 (and in the oral rulings on March 6, 2014 and March 21, 2014), the defendant's renewed oral motion for bail on August 26,2014 is denied. Ordered by Judge Joseph F. Bianco on 9/8/2014. (Bollbach, Jean) (Entered: 09/08/2014) |
| 09/09/2014 | | Electronic Index to Record on Appeal as to Joseph Valerio sent to US Court of |

| | | |
|---|---|---|
| | | Appeals 63 Notice of Appeal - Conditions of Release Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Cox, Dwayne) (Entered: 09/09/2014) |
| 09/09/2014 | | APPEAL FILING FEE DUE re 63 Notice of Appeal - Conditions of Release Please either come to the clerks office or mail the filing fee in the amount of $505.00. (Cox, Dwayne) (Entered: 09/09/2014) |
| 09/23/2014 | 66 | Letter *to defense counsel containing expert disclosure,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 09/23/2014) |
| 09/24/2014 | 67 | Second MOTION in Limine *to admit certain videos and images, and to preclude reference to penalties,* by USA as to Joseph Valerio. (Kabrawala, Ameet) (Entered: 09/24/2014) |
| 10/07/2014 | | USCA Appeal Fees received $ 505, receipt number 16206 as to Joseph Valerio re 63 Notice of Appeal - Conditions of Release : (Cox, Dwayne) (Entered: 10/07/2014) |
| 10/08/2014 | 68 | Proposed Jury Instructions by USA as to Joseph Valerio (Kabrawala, Ameet) (Entered: 10/08/2014) |
| 10/09/2014 | 69 | Third MOTION in Limine *to admit trade inscriptions on electronic/computer devices* by USA as to Joseph Valerio. (Kabrawala, Ameet) (Entered: 10/09/2014) |
| 10/15/2014 | | SCHEDULING ORDER as to Joseph Valerio: The Jury Selection is ADVANCED from 11/3/2014 to 10/20/2014 at 9:30 AM in Courtroom 840 before Magistrate Judge Gary R. Brown. Counsel for defendant shall submit proposed voir dire by close of business on 10/16/2014. Ordered by Magistrate Judge Gary R. Brown on 10/15/2014. (Posillico, Lauren) (Entered: 10/15/2014) |
| 10/17/2014 | | SCHEDULING ORDER as to Joseph Valerio: Pretrial Conference set for 10/23/2014 10:00 a.m. in Courtroom 920 before Judge Joseph F. Bianco. Ordered by Judge Joseph F. Bianco on 10/17/2014. (Savona, Michele) (Entered: 10/17/2014) |
| 10/20/2014 | 70 | Fourth MOTION in Limine *to admit invoice* by USA as to Joseph Valerio. (Kabrawala, Ameet) (Entered: 10/20/2014) |
| 10/20/2014 | 71 | Minute Entry for proceedings held before Judge Joseph F. Bianco: Jury Selection as to Joseph Valerio held on 10/20/2014, Voir Dire held on 10/20/2014 as to Joseph Valerio; deft present in custody with retained counsel Anthony LaPinta and Leonard Lato; AUSA Allen Bode and Ameet Kabrawala; L. Posillico; deft consent to select jury before Mag. Judge. ( Jury Trial set for 11/4/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter Harry Rapaport.) (Bollbach, Jean) (Entered: 10/21/2014) |
| 10/20/2014 | 75 | EXHIBIT - court exhibit 1 - deft waives any right to attend sidebars during jury selection (Bollbach, Jean) (Entered: 10/22/2014) |
| 10/20/2014 | 76 | ORDER ; consent to have jury selection proceed before a US Magistrate Judge as to Joseph Valerio. Ordered by Judge Joseph F. Bianco on 10/20/2014. (Bollbach, Jean) (Entered: 10/22/2014) |

| 10/21/2014 | 72 | Letter *to defense counsel renewing the government's request for expert disclosures* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 10/21/2014) |
| 10/21/2014 | 73 | Letter *pursuant to the Court's October 20, 2014 order, and under Title 18, U.S.C., Section 3509(d), identifying minor victims for the record,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 10/21/2014) |
| 10/21/2014 | 74 | Letter *enclosing witness statement and renewing request for discovery,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 10/21/2014) |
| 10/22/2014 | 77 | Proposed Jury Instructions by USA as to Joseph Valerio (Kabrawala, Ameet) (Entered: 10/22/2014) |
| 10/22/2014 | 78 | Letter *to defense counsel enclosing discovery* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 10/22/2014) |
| 10/23/2014 | 79 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Status Conference as to Joseph Valerio held on 10/23/2014, deft present in custody with retained counsel Anthony LaPinta and Lenny Lato; AUSA Allen Bode and Ameet Kabrawala; Michele Savona; deft continued in custody( Trial set for 11/4/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter P Auerbach.) (Bollbach, Jean) (Entered: 10/23/2014) |
| 10/28/2014 | 80 | Letter *to defense counsel enclosing trial exhibits and 3500 materials,* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 10/28/2014) |
| 10/29/2014 | 81 | Letter *dismissing Count Fourteen of the Superseding Indictment,* as to Joseph Valerio (Attachments: # 1 Indictment with foreperson signature) (Kabrawala, Ameet) (Entered: 10/29/2014) |
| 11/04/2014 | 82 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Jury Trial as to Joseph Valerio held on 11/4/2014, deft present in custody with counsel Leonard Lato and Anthony LaPinta; AUSA Ameet Kabrawala and Allen Bode; Michele Savona; jurors sworn; trial begins; govt opens; deft opens; witnesses sworn: Peter Angelina, Robert Egan, Cheryl Johnson and Deep Chopra; count 14 dismissed on consent ( Jury Trial set for 11/5/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter Harry Rapaport and Owen Wicker.) (Bollbach, Jean) (Entered: 11/05/2014) |
| 11/04/2014 | | DISMISSAL OF COUNT 14 on consent of all parties (jury calendar dtd. 11/4/14) (Bollbach, Jean) (Entered: 11/05/2014) |
| 11/05/2014 | 83 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Jury Trial as to Joseph Valerio held on 11/5/2014, deft present in custody with counsel Leonard Lato and Anthony LaPinta; AUSA Ameet Kabrawala and Allen Bode; Jasmine Torres; witness sworn Steven Troyd; ( Jury Trial set for 11/6/2014 09:45 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter Harry Rapaport and Owen Wicker.) (Bollbach, Jean) (Entered: 11/06/2014) |
| 11/06/2014 | 84 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Jury Trial as to |

| | | |
|---|---|---|
| | | Joseph Valerio held on 11/6/2014, deft present in custody with counsel Leonard Lato and Anthony LaPinta; AUSA Ammeet Kabrawala and Allen Bode; Jasmine Torres; witnesses sworn: Steven Troyd, Bernadette Imperiale, Det. Rory Forrestal( Jury Trial set for 11/10/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter Harry Rapaport and Owen Wicker.) (Bollbach, Jean) Modified on 11/12/2014 (Bollbach, Jean). Modified on 11/12/2014 (Bollbach, Jean). (Entered: 11/07/2014) |
| 11/06/2014 | | Incorrect Case-Document Information filed. Document #86 has been deleted and removed fromthe docket. It is a duplicate of document #84 (Bollbach, Jean) (Entered: 11/12/2014) |
| 11/10/2014 | 85 | Jury Instructions as to Joseph Valerio (Attachments: # 1 Forfeiture Instructions) (Street, Caitlin) (Entered: 11/10/2014) |
| 11/10/2014 | 88 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Jury Trial as to Joseph Valerio held on 11/10/2014, deft present in custody with counsel Leoanrd Lato and Anthony LaPinta; AUSA Ameet Kabrawala and Allen Bode; Michele Savona; govt rest ( Jury Trial set for 11/12/2014 09:15 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter Harry Rapaport and Owen Wicker.) (Bollbach, Jean) (Entered: 11/12/2014) |
| 11/12/2014 | 87 | Final Jury Instructions as to Joseph Valerio (Attachments: # 1 Forfeiture Instructions) (Street, Caitlin) (Entered: 11/12/2014) |
| 11/12/2014 | 89 | Letter *enclosing verdict sheets and redacted indictment,* as to Joseph Valerio (Attachments: # 1 Verdict Sheet, # 2 Forfeiture Verdict Sheet, # 3 Redacted Indictment) (Kabrawala, Ameet) (Entered: 11/12/2014) |
| 11/12/2014 | 90 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Jury Trial as to Joseph Valerio held on 11/12/2014, deft present in custody with retained counsel Leonard Lato and Anthony LaPinta; AUSA Ameet Kabrawala and Allen Bode; Michele Savona; govt summation, deft summationl govt rebuttal ( Jury Trial set for 11/13/2014 09:30 AM in Courtroom 920 before Judge Joseph F. Bianco.) (Court Reporter Harry Rapaport and Owen Wicker.) (Bollbach, Jean) (Entered: 11/13/2014) |
| 11/12/2014 | 91 | Redacted Indictment as to Joseph Valerio (1): Former count 1ss is now count 1rss. Former count 2ss is now count 2rss. Former count 3ss is now count 3rss. Former count 4ss is now count 4rss. Former count 5ss is now count 5rss. Former count 6ss-13ss is now count 16rss-13rss. Former count 15ss is now count 14rss. Former count 16ss is now count 15rss. (Mahon, Cinthia) (Entered: 11/18/2014) |
| 11/13/2014 | 92 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Jury Trial as to Joseph Valerio held on 11/13/2014; deft present in custody with retained counsel Leonard Lato and Anthony LaPinta; AUSA Ammeet Kabrawala and Allen Body; Michele Savona; jury trial ends; jury charged alts excused USM sworn and deliberations begin; GUILTY VERDICT on conts 1-15 on the redacted indictment; jurors polled; govt summation on forfeiture; deft summation of forfeiture; instructed on criminal forfeiture allegations and deliberations begin; forfeiture verdict returned; jurors polled and excused; sentencing date set for 5/15/25 at 1:30 pm (Court Reporter |

A-15

| | | |
|---|---|---|
| | | Harry Rapaport and Owen Wicker.) (Bollbach, Jean) (Entered: 11/18/2014) |
| 11/13/2014 | 93 | ORDER OF SUSTENANCE for 12 jurors for duration of trial (lunch) as to Joseph Valerio. Ordered by Judge Joseph F. Bianco on 11/13/2014. (Bollbach, Jean) (Entered: 11/18/2014) |
| 11/13/2014 | 94 | Court EXHIBIT LIST by Joseph Valerio (Attachments: # 1 A, # 2 D, # 3 E, # 4 F, # 5 G, # 6 H) (Bollbach, Jean) (Entered: 11/18/2014) |
| 11/13/2014 | 95 | JURY VERDICT as to Joseph Valerio (1) Guilty on Count 1rss,2rss,3rss,4rss,5rss,6rss-13rss,14rss,15rss. (Bollbach, Jean) (Entered: 11/18/2014) |
| 11/13/2014 | 96 | JURY VERDICT on Forfeiture as to Joseph Valerio (Bollbach, Jean) (Entered: 11/18/2014) |
| 11/18/2014 | 99 | MANDATE of USCA (certified copy) as to Joseph Valerio. USCA MANDATE CASE NUMBER 14-3376 (Gledhill, Rosemary) (Entered: 11/20/2014) |
| 11/20/2014 | 100 | PRELIMINARY ORDER DIRECTING FORFEITURE OF PROPERTY as to Joseph Valerio. See order for details.. Ordered by Judge Joseph F. Bianco on 11/20/2014. (Bollbach, Jean) copies forwarded by chambers (Entered: 11/21/2014) |
| 11/27/2014 | 101 | First MOTION for Acquittal *pursuant to rule 29(c)* by Joseph Valerio. (Lato, Leonard) (Entered: 11/27/2014) |
| 12/04/2014 | 102 | ORDER OF TRANSPORTATION for one juror for taxie. Ordered by Judge Joseph F. Bianco on 12/4/2014. (Bollbach, Jean) (Entered: 12/04/2014) |
| 02/20/2015 | 105 | NOTICE *AFFIDAVIT of PUBLICATION, legal notice was published for 30 consecutive days on the government website, www.forfeiture.gov* as to Joseph Valerio (Bode, Allen) (Entered: 02/20/2015) |
| 04/21/2015 | 106 | Proposed MOTION for Forfeiture of Property *PROPOSED AMENDED PRELIMINARY ORDER OF FORFEITURE.* by USA as to Joseph Valerio. (Bode, Allen) (Entered: 04/21/2015) |
| 04/24/2015 | 107 | STIP AND AMENDED PRELIMINARY ORDER OF FORFEITURE as to Joseph Valerio. Ordered by Judge Joseph F. Bianco on 4/24/2015. (Bollbach, Jean) certified copies sent by clerk (Entered: 04/28/2015) |
| 07/28/2015 | 108 | First MOTION to Continue Sentencing by Joseph Valerio. (Lato, Leonard) (Entered: 07/28/2015) |
| 07/30/2015 | 109 | ORDER granting 108 Motion to Continue Sentencing as to Joseph Valerio (1) Sentencing set for 9/30/2015 01:30 PM in Courtroom 1040 before Judge Joseph F. Bianco.. Ordered by Judge Joseph F. Bianco on 7/30/15. (Bollbach, Jean) (Entered: 08/03/2015) |
| 11/05/2015 | 111 | Second MOTION to Continue Sentencing by Joseph Valerio. (Lato, Leonard) (Entered: 11/05/2015) |
| 01/04/2016 | 112 | Third MOTION to Continue Sentencing by Joseph Valerio. (Lato, Leonard) (Entered: 01/04/2016) |

A-16

| | | |
|---|---|---|
| 01/08/2016 | 113 | ORDER Granting 112 Motion to Continue Sentencing as to Joseph Valerio(1). Sentencing set for 3/1/2016 at 10:00 AM in Courtroom 1040 before Judge Joseph F. Bianco. So Ordered by Judge Joseph F. Bianco on 1/8/2016. (Ortiz, Grisel) (Entered: 01/14/2016) |
| 03/05/2016 | 115 | Fourth MOTION to Continue Sentencing by Joseph Valerio. (Lato, Leonard) (Entered: 03/05/2016) |
| 03/07/2016 | 116 | ORDER terminating 111 Motion to Continue Sentencing as to Joseph Valerio (1); granting 115 Motion to Continue Sentencing as to Joseph Valerio (1) Sentencing set for 5/3/2016 10:00 AM in Courtroom 1020 before Judge Joseph F. Bianco.. Ordered by Judge Joseph F. Bianco on 3/4/2016. (Bollbach, Jean) (Entered: 03/08/2016) |
| 04/15/2016 | 119 | ORDER as to Joseph Valerio Follows oral order of 9/3/14.For the reasons set forth herein, defendant's motion to suppress is denied. SO ORDERED. Ordered by Judge Joseph F. Bianco on 4/15/2016. (Savona, Michele) (Entered: 04/15/2016) |
| 05/03/2016 | 120 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Status Conference as to Joseph Valerio held on 5/3/2016, deft present in custody with retained counsel Anthony LaPinta and Lenny Lato; AUSA Allen Bode; Michele;( hearing set for 7/25/2016 10:00 AM in Courtroom 1020 before Judge Joseph F. Bianco.) (Court Reporter E Combs.) (Bollbach, Jean) (Entered: 05/03/2016) |
| 07/11/2016 | 121 | Letter *concerning Fatico hearing scheduled for July 25, 2016* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 07/11/2016) |
| 07/15/2016 | 122 | Letter *requesting that the Court endorse the attached proposed protective order* as to Joseph Valerio (Attachments: # 1 Proposed Order) (Kabrawala, Ameet) (Entered: 07/15/2016) |
| 07/15/2016 | 123 | Protective Order as to Joseph Valerio. IT IS HEREBY ORDERED that all material produced by the government to defense counsel, pursuant to 18 U.S.C. § 3500 or marked as exhibits, in connection with the evidentiary hearing scheduled to commence on or about July 25, 2016 in the above-captioned case (the "Disclosures") may not be copied or disseminated to anyone other than the deft and members ofthe defense attorneys' staff, including support staff and any retained investigators. To the extent that defense counsel determine that it is necessary to disseminate any of the Disclosures to a staff member or investigator, such person must be advised of this Order, made aware of his or her obligation not to copy or disseminate such material, and be directed to return such material to defense counsel at upon completion of the sentencing or appeal in this case. Further, upon completion of the sentencing and any appeal in this case, all Disclosures and any copies thereof-whether in the possession of the deft, defense counsel or members of the legal staff of defense counsel-shall be returned to the government. IT IS FURTHER ORDERED that any violation of this Order, as determined by the Court, will require, in addition to any other sanction deemed appropriate by the Court, the immediate destruction of or return to the United States of the Disclosures and any copies thereof. Ordered by Judge Joseph F. Bianco on 7/15/2016. (Florio, Lisa) (Entered: 07/15/2016) |
| 07/18/2016 | 124 | Letter *to defense counsel enclosing pre-marked exhibits and Section 3500 materials in* |

| | | |
|---|---|---|
| | | *advance of Fatico hearing scheduled for July 25, 2016* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 07/18/2016) |
| 07/20/2016 | 125 | Letter *concerning witnesses for July 25, 2016 Fatico hearing* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 07/20/2016) |
| 07/25/2016 | 126 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Evidentiary Hearing as to Joseph Valerio held on 7/25/2016, deft continued in costody( Evidentiary Hearing set for 9/26/2016 10:00 PM in Courtroom 1020 before Judge Joseph F. Bianco.) (Court Reporter D Tursi.) (Bollbach, Jean) (Entered: 07/26/2016) |
| 09/19/2016 | 128 | Letter *to defense counsel enclosing supplemental disclosures in advance of Fatico hearing scheduled for September 26, 2016* as to Joseph Valerio (Kabrawala, Ameet) (Entered: 09/19/2016) |
| 09/26/2016 | 129 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Fatico Hearing as to Joseph Valerio held on 9/26/2016 - deft present in custody with retained counsel Anthony LaPinta and Lenny Lato; AUSA Allen Bode and Ameet Kabrawala, witnesses sworn, Written submission to be submitted by 11/30/16, Government response by 12/30/16. Sentencing to be submitted by 1/25/17 at 1:00 p.m. (Court Reporter O Wicker.) (Bollbach, Jean) (Entered: 09/26/2016) |
| 11/29/2016 | 132 | Letter MOTION for Extension of Time to File *Defendant's Sentencing Memorandum* by Joseph Valerio. (LaPinta, Anthony) (Entered: 11/29/2016) |
| 12/12/2016 | 133 | ORDER granting 132 Motion for Extension of Time to File as to Joseph Valerio (1). Ordered by Judge Joseph F. Bianco on 12/12/2016. (Bollbach, Jean) (Entered: 12/13/2016) |
| 12/15/2016 | 134 | Second MOTION for Extension of Time to File *sentencing memorandum* by Joseph Valerio. (Lato, Leonard) (Entered: 12/15/2016) |
| 12/15/2016 | 135 | ORDER Granting 134 Motion for Extension of Time to File sentencing memorandum as to Joseph Valerio (1). Ordered by Judge Joseph F. Bianco on 12/15/2016. (Ortiz, Grisel) (Entered: 12/16/2016) |
| 01/27/2017 | 136 | Fourth MOTION to Continue Sentencing by Joseph Valerio. (Lato, Leonard) (Entered: 01/27/2017) |
| 01/27/2017 | 137 | ORDER granting 136 Motion to Continue as to Joseph Valerio (1). March 6, at 10 a.m., for a sentencing-mitigation hearing, which will consist ofthe testimony of Dr. Alan Sasha Bardey and Ms. Maura Gordon.* March 8 for submission of Valerio's sentencing memorandum.* March 22 for the Government's response.* March 23 for Valerio's reply.* March 29, at 1 p.m., for sentencing.. Ordered by Judge Joseph F. Bianco on 1/27/2017. (Bollbach, Jean) (Entered: 01/30/2017) |
| 03/06/2017 | 138 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Evidentiary Hearing as to Joseph Valerio held on 3/6/2017, deft present in custody with retained counsel Lenny Lato, AUSA Allen Bode and Ameet Kabrawala, Michele, witnesses sworn, hearing held, DEFENDANTS PAPER TO BE FILED BY 3/27/2017. GOVERNMENT OPPOSITION DUE 4/10/2017. DEFENDANTS REPLY PAPERS, |

A-18

| | | |
|---|---|---|
| | | IF ANY, DUE 4/17/2017. DEFENDANT CONTINUED IN CUSTODY ( Sentencing set for 5/4/2017 10:30 AM in Courtroom 1020 before Judge Joseph F. Bianco.) (Court Reporter P Lombardi.) (Bollbach, Jean) (Entered: 03/06/2017) |
| 04/06/2017 | 139 | Fifth MOTION to Continue Sentencing by Joseph Valerio. (Lato, Leonard) (Entered: 04/06/2017) |
| 04/07/2017 | 140 | ORDER granting 139 Motion to Continue Sentencing (scheduling order)as to Joseph Valerio (1)April 17 for submission of Valerio's sentencing memorandum.* May 1 for the Government's response. (A USA Kabrawala had previously asked Mr. La Pinta and me for two weeks to respond to Valerio's submission.)* May 2 for Valerio's reply.. Ordered by Judge Joseph F. Bianco on 4/7/2017. (Bollbach, Jean) (Entered: 04/10/2017) |
| 04/21/2017 | 141 | Sixth MOTION to Continue Sentencing by Joseph Valerio. (Lato, Leonard) (Entered: 04/21/2017) |
| 04/25/2017 | 142 | SENTENCING MEMORANDUM by Joseph Valerio (Attachments: # 1 Exhibit Forensic-Psychiatric Evaluation, # 2 Exhibit Letter) (Lato, Leonard) (Entered: 04/25/2017) |
| 04/28/2017 | 143 | MOTION to Continue Sentencing by USA as to Joseph Valerio. (Kabrawala, Ameet) (Entered: 04/28/2017) |
| 05/04/2017 | 145 | ORDER granting 143 Motion to Continue Sentencing as to Joseph Valerio. Requet granted. Sentencing is adjourned to June 6, 2017 at 1:00 p.m. (Ordered by Judge Joseph F. Bianco on 5/4/2017.) (Fagan, Linda) (Entered: 05/09/2017) |
| 05/08/2017 | 144 | SENTENCING MEMORANDUM by USA as to Joseph Valerio (Kabrawala, Ameet) (Entered: 05/08/2017) |
| 06/01/2017 | 146 | MEMORANDUM OPINION as to Joseph Valerio. For the reasons stated herein and based on the Court's findings of fact, the Court intends to consider at sentencing the defendant's physical and sexual assaults of Kalichenko and A.D. in connection with the Section 3553(a) factors--namely, the defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public from further crimes of the defendant. SO ORDERED. Ordered by Judge Joseph F. Bianco on 6/1/2017. (Zbrozek, Alex) (Entered: 06/01/2017) |
| 06/06/2017 | 147 | SENTENCING MEMORANDUM SUPPLEMENT by Joseph Valerio (Lato, Leonard) (Entered: 06/06/2017) |
| 06/06/2017 | 149 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Sentencing held on 6/6/2017 for Joseph Valerio (1), Count(s) 1, 1s, 2, 2s, 3, 3s, 4, 4s, 5, 5s, 6s, 9rss-13rss, dismissed on govts motion; Count(s) 14rss, The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.; Count(s) 14ss, dismissed on consent of all parties (on jury trial calendar dtd. 11/4/14); Count(s) 15rss, The defendant is |

A-19

sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.; Count(s) 1rss, The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.; Count(s) 2rss, The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.; Count(s) 3rss, The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.; Count(s) 4rss, The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.; Count(s) 5rss, The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.; Count(s) 6rss-8rss, The defendant is sentenced to:720 months (60 years) Second Superseding Indictment. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.00, counts 9-13 dismissed.. (Court Reporter Paul Lombardi.) (Bollbach, Jean) (Entered: 07/21/2017)

| 06/06/2017 | 150 | JUDGMENT as to Joseph Valerio (1), The defendant is sentenced to:720 months consisting of the following: 30 years on counts 1,2,3,6,7,8 and 14 to run concurrently to each other; 20 years on counts 4 and 5, to run concurrently to each other and consecutively to the other remaining counts; 10 years to run consecutively to all other counts. To be followed by lifetime of supervised release with Special conditions of supervised release. see calendar. court makes the following recommendation to the Bureau of Prisons: That the defendant be designated as close as possible to Long Island. That the defendant receive treatment in jail. Fine waived, SAF $1000.. Ordered by Judge Joseph F. Bianco on 6/6/17. (Bollbach, Jean) (Entered: 08/01/2017) |

| 06/16/2017 | 148 | Letter *enclosing redacted filings* as to Joseph Valerio (Attachments: # 1 Trial Transcript, # 2 7/25/16 Transcript, # 3 9/26/16 Transcript, # 4 Gov. Sentencing Memorandum) (Kabrawala, Ameet) (Entered: 06/16/2017) |
| 07/31/2017 | 152 | FINAL ORDER OF FORFEITURE as to Joseph Valerio.. Ordered by Judge Joseph F. Bianco on 7/31/17. (Bollbach, Jean)copies distributed by chambers (Entered: 08/01/2017) |
| 08/01/2017 | 153 | NOTICE OF APPEAL by Joseph Valerio as to 150 Judgment (Lato, Leonard) Modified on 8/2/2017 (Landow, Concetta). (Entered: 08/01/2017) |
| 08/02/2017 | | APPEAL FILING FEE DUE re 153 Notice of Appeal - Judgment; Please either come to the clerks office or mail the filing fee in the amount of $505.00. (Landow, Concetta) (Entered: 08/02/2017) |
| 08/02/2017 | | Electronic Index to Record on Appeal as to Joseph Valerio sent to US Court of Appeals 153 Notice of Appeal -Judgment; Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Landow, Concetta) (Entered: 08/02/2017) |
| 08/23/2017 | 154 | Certificate of Service by USM285 form - final order upon USMA dtd 8/2117 (Bollbach, Jean) (Entered: 08/28/2017) |
| 08/28/2017 | 155 | USCA Appeal Fees received $ 505, receipt number 23467 as to Joseph Valerio re 153 Notice of Appeal - Final Judgment. (Landow, Concetta) (Entered: 08/28/2017) |
| 08/28/2017 | | First Supplemental Electronic Index to Record on Appeal as to Joseph Valerio sent to US Court of Appeals 153 Notice of Appeal - Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Landow, Concetta) (Entered: 08/28/2017) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 02/23/2018 14:28:17 | | |
| **PACER Login:** | lg1659:3202508:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:14-cr-00094-JFB |
| **Billable Pages:** | 28 | **Cost:** | 2.80 |

PSS:ALB/ABK
F.# 2014R00151

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against -

JOSEPH VALERIO,

          Defendant.

- - - - - - - - - - - - - - - - - -X

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ **APR 09 2014** ★
LONG ISLAND OFFICE

S U P E R S E D I N G
I N D I C T M E N T

Cr. No.<u>14-094 (S-2)</u>(JFB)
(T. 18, U.S.C., §§
2251(a), 2251(c), 2251(e),
2252(a)(1), 2252(a)(2),
2252(b)(1), 2252(a)(4)(B),
2252(b)(2), 2253, 2 and 3551
<u>et seq.</u>; T. 21, U.S.C., §
853(p))

THE GRAND JURY CHARGES:

<u>COUNT ONE</u>
(Conspiracy to Sexually Exploit a Child)

     1.   On or about and between April 1, 2012 and November
1, 2012, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant JOSEPH
VALERIO, together with others, did knowingly and intentionally
conspire to employ, use, persuade, induce, entice and coerce a minor,
to wit: Jane Doe #1, an individual whose identity is known to the
Grand Jury, to engage in sexually explicit conduct, for the purpose
of producing one or more visual depictions of such conduct, knowing
and having reason to know that such visual depictions would be
transported and transmitted using a means and facility of interstate
and foreign commerce and which were in and affecting interstate and

2

foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, to wit: one or more mobile telephones, digital cameras and digital media disks, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e) and 3551 et seq.)

<u>COUNT TWO</u>
(Sexual Exploitation of a Child)

2.   On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and

3

transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, to wit: one or more mobile telephones, digital cameras and digital media disks, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce.

(Title 18, United States Code, Sections 2251(a), 2251(e), 2 and 3551 et seq.)

COUNT THREE
(Sexual Exploitation of a Child)

3.    On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct outside of the United States, its territories and possessions, for the purpose of producing one or more visual depictions of such conduct, intending that such visual depictions would be transported and transmitted to the United States, its territories and possessions, using a means and facility of interstate and foreign commerce and mail, and which visual depictions were actually transported and transmitted to the

4

United States, its territories and possessions, using a means and
facility of interstate and foreign commerce and mail.

(Title 18, United States Code, Sections 2251(c), 2251(e),
2 and 3551 et seq.)

<u>COUNT FOUR</u>
(Transportation of Child Pornography)

4.   On or about and between April 1, 2012 and November
1, 2012, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant JOSEPH
VALERIO, together with others, did knowingly and intentionally
transport and ship, using a means and facility of interstate and
foreign commerce and in and affecting interstate and foreign
commerce, one or more visual depictions, to wit: images depicting
Jane Doe #1 engaged in sexually explicit conduct, the production of
such visual depictions having involved the use of a minor engaging
in sexually explicit conduct, and such visual depictions were of such
conduct.

(Title 18, United States Code, Sections 2252(a)(1),
2252(b)(1), 2 and 3551 et seq.)

<u>COUNT FIVE</u>
(Receipt of Child Pornography)

5.   On or about and between April 1, 2012 and November
1, 2012, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant JOSEPH

5

VALERIO, together with others, did knowingly and intentionally receive one or more visual depictions, to wit: images depicting Jane Doe #1 engaged in sexually explicit conduct, using a means and facility of interstate and foreign commerce and which visual depictions had been mailed, and shipped and transported in and affecting interstate and foreign commerce, the production of such visual depictions having involved the use of one or more minors engaging in sexually explicit conduct and such visual depictions were of such conduct.

(Title 18, United States Code, Sections 2252(a)(2), 2252(b)(1), 2 and 3551 et seq.)

<u>COUNT SIX</u>
(Attempted Sexual Exploitation of a Child)

6.   On or about January 23, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and

6

transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

## COUNT SEVEN
(Attempted Sexual Exploitation of a Child)

7.    On or about January 24, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras,

7

digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

## COUNT EIGHT
### (Attempted Sexual Exploitation of a Child)

8.   On or about March 28, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of

8

interstate and foreign commerce and which were in and affecting
interstate and foreign commerce, contrary to Title 18, United States
Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551
et seq.)

## COUNT NINE
### (Attempted Sexual Exploitation of a Child)

9.    On or about April 4, 2012, within the Eastern District
of New York and elsewhere, the defendant JOSEPH VALERIO, together
with others, did knowingly and intentionally attempt to employ, use,
persuade, induce, entice and coerce a minor, to wit: Jane Doe #1,
to engage in sexually explicit conduct, for the purpose of producing
one or more visual depictions of such conduct, knowing and having
reason to know that such visual depictions would be transported and
transmitted using a means and facility of interstate and foreign
commerce and which were in and affecting interstate and foreign
commerce, which visual depictions were produced and transmitted
using materials that had been mailed, shipped and transported in and
affecting interstate and foreign commerce by any means, including
by one or more mobile telephones, digital cameras, digital media
disks and computer, and such visual depictions were actually
transported and transmitted using a means and facility of interstate

9

and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

## COUNT TEN
### (Attempted Sexual Exploitation of a Child)

10.   On or about July 16, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate

10

and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT ELEVEN
(Attempted Sexual Exploitation of a Child)

11.   On or about July 22, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate

11

and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT TWELVE
(Attempted Sexual Exploitation of a Child)

12.  On or about September 6, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of

12

interstate and foreign commerce and which were in and affecting
interstate and foreign commerce, contrary to Title 18, United States
Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551
et seq.)

<u>COUNT THIRTEEN</u>
(Attempted Sexual Exploitation of a Child)

13.   On or about September 27, 2012, within the Eastern
District of New York and elsewhere, the defendant JOSEPH VALERIO,
together with others, did knowingly and intentionally attempt to
employ, use, persuade, induce, entice and coerce a minor, to wit:
Jane Doe #1, to engage in sexually explicit conduct, for the purpose
of producing one or more visual depictions of such conduct, knowing
and having reason to know that such visual depictions would be
transported and transmitted using a means and facility of interstate
and foreign commerce and which were in and affecting interstate and
foreign commerce, which visual depictions were produced and
transmitted using materials that had been mailed, shipped and
transported in and affecting interstate and foreign commerce by any
means, including by one or more mobile telephones, digital cameras,
digital media disks and computer, and such visual depictions were
actually transported and transmitted using a means and facility of

13

interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

<u>COUNT FOURTEEN</u>
(Attempted Sexual Exploitation of a Child)

14.   On or about December 12, 2013, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of



14

interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

 (Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

## COUNT FIFTEEN
### (Sexual Exploitation of a Child)

 15. On or about and between September 10, 2010 and January 19, 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #2, an individual whose identity is known to the Grand Jury, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, to wit: one or more digital cameras, memory cards and computer equipment, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce.

 (Title 18, United States Code, Sections 2251(a), 2251(e) and 3551 et seq.)

COUNT SIXTEEN
(Possession of Child Pornography)

16.   On or about January 28, 2014, within the Eastern District of New York, the defendant JOSEPH VALERIO did knowingly and intentionally possess matter containing one or more visual depictions, to wit: images in digital files, in and affecting interstate and foreign commerce, and which visual depictions had been mailed, and shipped and transported using a means and facility of interstate and foreign commerce, and which were produced using materials which had been mailed, and so shipped and transported, the production of such visual depictions having involved the use of one or more minors engaging in sexually explicit conduct, and such visual depictions were of such conduct.

(Title 18, United States Code, Sections 2252(a)(4)(B), 2252(b)(2) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

17.   The United States hereby gives notice to the defendant charged in Counts One through Sixteen that, upon his conviction of any of the charged offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 2253, of (a) any visual depiction described in Section 2251, 2251A, 2252, 2252A, 2252B, or 2260 of Title 18, United States Code, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported,

16

mailed, shipped or received in violation of such sections; (b) any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from the offense(s) of conviction; and (c) any property, real or personal, used or intended to be used to commit or to promote the commission of the offense(s) of conviction or any property traceable to such property, including, but not limited to:

     a.   One Apple Macbook Pro, serial number unknown;

     b.   One Dell laptop, serial number H7LQG31;

     c.   One V Premier desktop computer, serial number P80003011134;

     d.   One 4 gigabyte SD Card, no serial number; and

     e.   The real property and premises located at 3 High Gate Drive, Smithtown, New York 11787, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, designated as District 473400, Section 50, Block 5 and Lot 23 on the Suffolk County Tax Map, and all proceeds traceable thereto.

17

18.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 2253(b), to seek forfeiture of any other

18

property of the defendant up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 2253; Title 21,

United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

Case 2:14-cr-00094-JFB   Document 37   Filed 04/09/14   Page 19 of 19 PageID #: 246

F. #2014R00151

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

- *against* -

JOSEPH VALERIO,

Defendant.

## INDICTMENT

(T. 18, U.S.C., §§ 2251(a), 2251(c), 2251(e), 2252(a)(1), 2252(a)(2), 2252(b)(1), 2252(a)(4)(B), 2252(b)(2), 2253, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p))

*A true bill.*

_____
                                        *Foreman*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                        *Clerk*

*Bail, $* _____

_____

*Ameet B. Kabrawala, Assistant U.S. Attorney (718-254-6001)*

# INFORMATION SHEET

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 09 2014 ★

LONG ISLAND OFFICE

1.  Title of Case: United States v. Joseph Valerio, 14-CR-094 (JFB)

2.  Related Magistrate Docket Number(s): 14-MJ-080

3.  Arrest Date:  1/28/2014

4.  Nature of offense(s):  ☒  Felony
                          ☐  Misdemeanor

5.  Related Cases - Title and Docket No(s). (Pursuant to Rule 50.3.2 of the Local
    E.D.N.Y. Division of Business Rules):

6.  Projected Length of Trial:   Less than 6 weeks   ☒
                                 More than 6 weeks   ☐

7.  County in which crime was allegedly committed: Nassau/Suffolk
    (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.  Has this indictment/information been ordered sealed?   ☐ Yes  ☒ No

9.  Have arrest warrants been ordered?   ☐ Yes  ☒ No

10. Is there a capital count included in the indictment?   ☐ Yes  ☒ No

LORETTA E. LYNCH
UNITED STATES ATTORNEY

By: _____

Ameet B. Kabrawala
Allen L. Bode
Assistant U.S. Attorneys
(718) 254-6001 / (631) 715-7828

LEONARD LATO, ESQ.

35 ARKAY DRIVE, SUITE 200
HAUPPAUGE, NY 11788-3756

—————

TEL: (631) 655-5008
FAX: (631) 300-4380
EMAIL: leonardlato@yahoo.com

July 1, 2014

The Honorable Joseph F. Bianco
United States District Judge
Eastern District of New York
924 Federal Plaza
Central Islip, NY 11722

      Re:    *United States v. Joseph Valerio*
            14-CR-094-JFB

Dear Judge Bianco:

The defendant Joseph Valerio moves to suppress his in-custody statements to law-enforcement officers. Because Valerio has annexed an affidavit in which he states that he felt that he *had* to answer the officers' questions, the Court must hold an evidentiary hearing.

<u>The Valerio Affidavit</u>

According to Valerio, "On January 28, 2014, in the early morning, FBI agents and detectives entered [his] house" and searched it. Valerio states that, "[a]t the dining room table, the agents and the detectives questioned [him]." "Three of them were at the table" and "[t]wo others stood behind [him]," Valerio asserts, while "[s]till others . . . search[ed his] house." (Valerio Aff. ¶¶ 1-2.)

Valerio recounts how one of the officers "was in [his] face a lot" and at one point said that "[Valerio] was 'going to be in a very dark place.'" "Based on all the circumstances," Valerio contends, including having to answer questions "about emails," Valerio "felt pressured, meaning that [he] had to answer their questions." (Valerio Aff. ¶¶ 3-4.)

"It was only some time after the questioning began that one of the agents or detectives read [Valerio] an advice of rights form that [Valerio] signed." The advice of rights form came too late. According to Valerio, "Based on the atmosphere, how things had already progressed, [he] felt compelled to continue to answer their questions." (Valerio Aff. ¶¶ 4-5.)

A-42

<u>Applicable Law</u>

The Court must hold an evidentiary hearing on a motion to suppress statements where, as here, the defendant has submitted an affidavit that "creates a specific factual dispute." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998). *See also United States v. Fruchter*, 104 F. Supp. 2d 289, 308 (S.D.N.Y. 2000) (noting that "to create a factual dispute" the moving papers must contain "sworn factual allegations from an affiant with personal knowledge"). At the hearing, the government will have the burden of proving by a preponderance of the evidence that Valerio received his "advice of rights" prior to the onset of custodial interrogation and that he validly waived those rights and continued to answer questions. *See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986); *see also United States v. Richardson*, No. 09–CR–874 (JFB), 2010 WL 5437206, at *3 (E.D.N.Y. Dec. 23, 2010) (observing that "the government has the burden of proving by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver [of] the defendant's *Miranda* rights").

The custodial-interrogation test "is an objective one: whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Newton*, 369 F.3d 659, 671 (2d Cir. 2009) (internal quotation marks omitted). Law-enforcement officers seeking to question a person must "administer warnings whenever they place a person under formal arrest or apply restraints generally understood as comparable to those of a formal arrest." *Id.* at 672. Determining when "custody" begins "necessarily involves considering the circumstances surrounding the encounter with authorities." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). "Those circumstances," the Second Circuit has stated, include:

> [T]he interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion.

*Id.*

With respect to whether a defendant makes a valid waiver of his rights, *Richardson* is instructive:

> In *Miranda v. Arizona*, the Supreme Court determined that in order to combat [the pressures surrounding in-custody interrogations] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored. Accordingly, prior to the initiation of questioning, the government must inform a suspect of the [government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and

2

A-43

to have counsel present . . . if [he] so desires. Once an accused is apprised of these rights, he may waive them provided the waiver is made voluntarily, knowingly and intelligently.

. . . For a waiver to be voluntary, the waiver must have been the product of a free and deliberate choice rather than intimidation, coercion, or deception. In addition, for a defendant to make a knowing and intelligent waiver, he must have a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. However, the accused need not know and understand every possible consequence of a waiver of the Fifth Amendment privilege. Instead, the accused need only be aware that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.

Whether a waiver is knowing and voluntary is a question directed to a defendant's state of mind, which can be inferred from his actions and statements. [And] . . . the question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.

*Id.* at *3-4 (alterations in *Richardson* and internal quotation marks and citations omitted).

<u>Conclusion</u>

Valerio is entitled to a hearing.

Respectfully,

*Leonard Lato*
Leonard Lato

ec: AUSAs Allen L. Bode & Ameet B. Kabrawala

Anthony M. La Pinta, Esq.

3

Joseph Valerio, being duly sworn, deposes and says:

1. On January 28, 2014, in the early morning, FBI agents and detectives entered my house. They searched my house.

2. At the dining room table, the agents and the detectives questioned me. Three of them were at the table, seated with me. Two others stood behind me. Still others were searching my house.

3. An agent/detective who I believe to be a computer expert said, among other things, that I was "going to be in a very dark place." He was low key, in that he spoke in a soft voice, but he was in my face a lot.

4. The agents and detectives were asking me about emails. Based on all the circumstances, I felt pressured, meaning that I had to answer their questions.

5. It was only some time after the questioning began that one of the agents or ~~doctors~~ detectives read me an advice of rights form that I signed ~~initialed~~. Based on the atmosphere, how things had already progressed, I felt compelled

to continue to answer their questions

6. The agents and detectives became more accusatory as the questioning continued. I know that I refused to do certain things that they tried to get me to do, and at some point I asked for my attorney.

DATED: Brooklyn, NY
June 22, 2014

JOSEPH VALERIO

Sworn to me this 22nd day of June, 2014

NOTARY

ANTHONY M. LA PINTA
Notary Public, State of New York
Qualified in Suffolk County
No. 02LA5020787
Commission Expires November 29, 2017

A-46

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,          :     14 CR 0094

     v.                             :     U.S. Courthouse
                                    Central Islip, N.Y.
JOSEPH VALERIO,                     :
                                    TRANSCRIPT OF HEARING
          Defendant.      :
                                    July 31, 2014
------------------------------X     2:00 p.m.

BEFORE:

      HONORABLE JOSEPH F.  BIANCO, U.S.D.J.


APPEARANCES:

For the Government:  LORETTA E. LYNCH
                   United States Attorney
                   100 Federal Plaza
                   Central Islip, New York 11722
                   By:  AMEET B. KABRAWALA, ESQ.
                        ALLEN BODE, ESQ.
                       Assistants, U.S. Attorney


For the Defendant:   LEONARD LATO, ESQ.
                   ANTHONY LaPINTA, ESQ.


Court Reporter:      HARRY RAPAPORT, C.S.R.
                   United States District Court
                   100 Federal Plaza
                   Central Islip, New York 11722
                   (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

2

1          THE CLERK:  Calling case 14 CR 94, United States

2    v. Joseph Valerio.

3          Please state appearance for the record.

4          MR. KABRAWALA:  Ameet Kabrawala for the United

5    States, with Allen Bode.

6          Good morning.

7          THE COURT:  Good morning.

8          MR. LATO:  Leonard Lato and Anthony LaPinta for

9    Mr. Valerio.

10          Good morning.

11          THE COURT:  We scheduled today for a suppression

12    hearing.  Both sides ready to proceed?

13          MR. KABRAWALA:  Yes, your Honor.

14          MR. LATO:  Yes.

15          THE COURT:  By way of timing, may I ask how many

16    witnesses you anticipate today?

17          MR. KABRAWALA:  One witness.

18          THE COURT:  And do you anticipate to go as well

19    or you don't know whether you will have witnesses?

20          MR. LATO:  I do know, and we do not.

21          THE COURT:  All right, let's get started.

22          MR. KABRAWALA:  The government calls Steven

23    Troyd.

24          THE CLERK:  Please remain standing and raise

25    your right hand.

**Troyd-Direct/Kabrawala**

3

1   S T E V E N    T R O Y D,

2                called as a witness, having been first

3                duly sworn, was examined and testified

4                as follows:

5           THE CLERK:  Please state your name and spell it

6   for the record.

7           THE WITNESS:  My name is Steven Troyd,

8   S-T-E-V-E-N, T-R-O-Y-D.

9           THE COURT:  You may be seated.

10          Please pull your chair close to the microphone

11  and keep your voice up.

12          Thank you.

13

14  DIRECT EXAMINATION

15  BY MR. KABRAWALA:

16  Q    By whom are you employed?

17  A    I am employed with the Federal Bureau of

18  Investigation.

19  Q    What is your job title?

20  A    I'm a Special Agent.

21  Q    How long have you been a Special Agent with the FBI?

22  A    For approximately 19 years.

23  Q    Are you currently assigned to any particular unit or

24  squad?

25  A    I'm assigned to the violent crime squad C-41.

**Troyd-Direct/Kabrawala**

4

1   Q    Generally speaking, in January 2014 what were your

2   primary duties and responsibilities as a Special Agent on

3   that squad?

4   A    I was working the crimes against children

5   investigations.

6   Q    And as part of your duties and responsibilities, did

7   you execute search warrants?

8   A    Yes, I did.

9   Q    And approximately how many search warrants have you

10  executed or participated in executing during your tenure

11  with the FBI?

12  A    Dozens.

13  Q    Now, I would like to draw your attention to

14  January 28th, 2014.

15          Were you working that day?

16  A    Yes, I was.

17  Q    Did you have any particular assignment that day?

18  A    I was assigned to execute a search warrant.

19  Q    Where was the search warrant to be executed that day?

20  A    At 3 High Gate Drive.

21  Q    Two words.

22  A    3 High Gate Drive, Smithtown, New York.

23  Q    And what kind of location was that?

24  A    3 High Gate Drive is a residential building and in a

25  residential community in Smithtown, New York.

**Troyd-Direct/Kabrawala**

5

1  Q    And who resided, if anyone, who resided at that

2  residential house?

3  A    Mr. Joseph Valerio.

4  Q    And generally speaking, how did the search warrant

5  come about?

6  A    The legal attache office in Kiev, Ukraine had

7  received information from Olena Kalichenko, a Ukrainian

8  citizen, that she had been involved with an American

9  citizen named Joseph Valerio and she provided him child

10  pornography in exchange for cash.

11  Q    And did Kalichenko provide the FBI -- withdrawn.

12       Did Kalichenko meet with FBI agents stationed in

13  Ukraine?

14  A    Yes.

15  Q    Did she provide FBI agents stationed in the Ukraine

16  with any material?

17  A    Yes, she did.

18  Q    What did she provide them with?

19  A    She provided copies of email exchanges between

20  herself and Mr. Valerio.

21  Q    Anything else?

22  A    Yes.

23       She also provided a copy of a video that she had

24  sent to Mr. Valerio containing child pornography.

25  Q    And based upon Kalichenko's allegation, did you

Troyd-Direct/Kabrawala

6

1　obtain a search warrant to search Valerio's residence?

2　A　Yes, I did.

3　Q　When was that search warrant issued?

4　A　That search warrant was issued on January 27th, 2014

5　by Magistrate Judge William Wall.

6　Q　Of this courthouse?

7　A　Yes.

8　Q　What was the purpose of searching Valerio's

9　residence?

10　A　We were searching for evidence of child pornography.

11　Q　At that time was there a warrant for Valerio's

12　arrest?

13　A　No, there was not.

14　Q　Was Valerio under indictment or criminal complaint in

15　any way?

16　A　No, he was not.

17　Q　Now, did there come a time when you executed the

18　search of Valerio's residence?

19　A　Yes, there was.

20　Q　When was that again?

21　A　That was on January 28th, 2014.

22　Q　I want to show you what is marked as

23　Government's Exhibit 1.

24　　　　　(Handed to the witness.)

25　Q　Do you see that?

**Troyd-Direct/Kabrawala**

7

1   A    Yes, I do.

2   Q    What are we looking at?

3   A    It is the front door of 3 High Gate Drive in

4   Smithtown, New York.

5   Q    Is that a fair and accurate depiction of the front

6   door of that address as it looked on January 28th, 2014?

7   A    Yes, it is.

8   Q    Now, tell us, how did you arrive at that location?

9   A    That morning between 5:15 and 6:00 a.m. we gathered,

10  the team had gathered at St. Catherine of Sienna's

11  Hospital in Smithtown, the parking lot, where I briefed

12  the members of the team before proceeding to the location.

13  At approximately 6:00 a.m. we departed the parking lot at

14  St. Catherine's and drove to 3 High Gate Drive.

15  Q    You mentioned a team.  What do you mean by that?

16  A    They are a team of twelve of us, including detectives

17  from Nassau and Suffolk Counties, and Special Agents of

18  the FBI.

19  Q    And to clarify, what was the team's primary duty that

20  day?

21  A    To secure entrance into the location and execute a

22  search warrant.

23  Q    How were you dressed that day?

24  A    It was a very cold morning, it had snowed a lot

25  previous to that day.  So we were wearing jackets and we

**Troyd-Direct/Kabrawala**

8

1   had ballistic armor under the jackets and raid jackets

2   that displayed the insignia of FBI or police, depending

3   what department the people were from.

4   Q    Were other members of your search team generally

5   speaking dressed similarly that day?

6   A    Yes.

7   Q    And at some point did you approach the residence?

8   A    Yes, we did.

9   Q    What happened as you approached, if anything?

10  A    As we approached the residence, people went to their

11  assigned location, some in the front, some in the rear and

12  the sides.

13           Then we knocked on the front door.  As we

14  knocked on the front door, I telephonically contacted the

15  residence.

16  Q    So you called the home?

17  A    Yes.

18  Q    Did Mr. Valerio answer the phone?

19  A    Yes, he did.

20  Q    What was discussed during that telephone

21  conversation?

22  A    I advised Mr. Valerio that we were the FBI and we

23  were there to execute a search warrant and he should open

24  the door.

25  Q    By the way, what time of day was this?

**Troyd-Direct/Kabrawala**

9

1    A    This was at 6:00 a.m.

2    Q    Did anyone ultimately answer the door?

3    A    Yes.

4    Q    Who answered the door?

5    A    Mr. Valerio answered the door.

6    Q    And what happened when Mr. Valerio opened the door?

7    A    Mr. Valerio opened the door, and I entered and I

8    spoke to Mr. Valerio.  I advised him we were there to

9    execute a search warrant.

10             I walked with him to the rear of the hallway,

11   away from the entrance of the door.  Strongly by the

12   knocking of the door, entered the building behind me, and

13   other agents who were there entered as well.

14   Q    I will show you what is marked as

15   Government's Exhibit 2.

16             MR. KABRAWALA:  As a housekeeping matter, we ask

17   that Government's Exhibit 1 be entered into the record.

18             THE COURT:  Any objection?

19             MR. LATO:  No, your Honor.

20             THE COURT:  Government's Exhibit 1 is in

21   evidence.

22             (Whereupon, Government's Exhibit 1 was received

23   in evidence.)

24   Q    I'm showing you what is marked as Government's

25   Exhibit 2.

**Troyd-Direct/Kabrawala**

10

1          (At this time a document was exhibited on

2    courtroom screen.)

3    Q    What are we looking at?

4    A    It is a photograph of the hallway at 3 High Gate

5    Drive.

6    Q    And is this past the front door?

7    A    Yes.

8    Q    And it is a fair and accurate depiction of what the

9    hallway at 3 High Gate Drive looked like on January 28th,

10   2014?

11   A    Yes, it is.

12          MR. KABRAWALA:  We ask that

13   Government's Exhibit 2 be entered into evidence.

14          MR. LATO:  No objection.

15          THE COURT:  Government's Exhibit 2 is admitted.

16          (Whereupon, Government's Exhibit 2 was received

17   in evidence.)

18   Q    Can you point out -- withdrawn.

19          After you walked through the door and entered,

20   what happened immediately after that?

21   A    When Mr. Valerio opened the door, I entered.  I

22   walked with him to the end of the hallway, which is the

23   area next to the zebra skin rug at the end of that wall.

24          The next room there is what would be described

25   as a family room.  And we stood there at the base of the

Troyd-Direct/Kabrawala

11

1  stairway while the rest of the search team conducted a

2  sweep, a protective sweep of the rest of the residence.

3  Q    How was Valerio dressed when you opened the door?

4  A    Mr. Valerio was wearing pants, long pants, and a tank

5  top.

6  Q    Did law enforcement officers have their guns drawn

7  when they entered the door?

8  A    No.

9  Q    Did you have your gun drawn?

10  A    No, sir.

11  Q    Did you see anyone carrying a long gun or a rifle or

12  a shotgun?

13  A    No.

14  Q    Now, you said that there was a sweep done.  What do

15  you mean by that?

16  A    When we execute search warrants, we secure the

17  premises by sweeping the rooms and closets.  We are

18  looking for people that may be hiding or may be a danger

19  to us or themselves.

20  Q    How long did that sweep take?

21  A    Approximately ten minutes, because it is a pretty big

22  house.  There are multiple bedrooms upstairs.  There is

23  actually a finished basement that has different rooms or

24  closets.

25          The ground floor also has a separate movie room,

Troyd-Direct/Kabrawala

12

1  which is a very dark room, large, with large comfortable

2  seating.

3          Then there is also a whirlpool room off the

4  family room, and then there is the dining room and it

5  looks like more of a formal living room, you know, in

6  front of the house.

7  Q    Were you with Mr. Valerio that entire time during the

8  execution of the sweep?

9  A    Yes.  I would say he was my responsibility in the

10  execution of the search warrant.

11  Q    Was there anything that you two discussed during that

12  time?

13  A    As I stood with him at the end of the hall, I asked

14  him if there was anyone else in the house so I could

15  advise the other team members as they were making the

16  sweep.

17          He said, my girlfriend is upstairs.

18  Q    And ultimately was this other individual located in

19  the house?

20  A    Yes.

21          When he told me that his girlfriend was

22  upstairs, and the other agents were clearing those rooms,

23  he indicated he was uncomfortable with men being upstairs

24  with her alone.

25          They did in fact find his girlfriend, whose name

**Troyd-Direct/Kabrawala**

13

1   is Jarmila Bereskova, J-A-R-M-I-L-A, I believe the last

2   name is B-E-R-E-S-K-O-V-A.

3   Q   Did there come a time -- withdrawn.

4        Was there anybody else other than law

5   enforcement personnel and Ms. Bereskova and Mr. Valerio

6   present in the house that morning?

7   A   No.

8   Q   Did there come a time when the security sweep was

9   concluded?

10   A   Yes.

11   Q   What happened then?

12   A   At the conclusion of the security sweep I asked

13   Mr. Valerio if he would sit in the dining room and speak

14   to us.

15        He said he would.  And we walked into the dining

16   room and sat at the table where we began our interview.

17   Q   Okay.

18        Let me stop you right there and show you what is

19   marked as Government's Exhibit 3.

20        (At this time a document was exhibited on

21   courtroom screen.)

22   Q   Showing you what is marked as Government's Exhibit 3,

23   what is this an image of?

24   A   The photograph of the dining room where we conducted

25   our dining room interview on January 28th.

**Troyd-Direct/Kabrawala**

14

1   Q    Is this a fair and accurate depiction of what the

2   dining room looked like on January 28th, 2014?

3   A    Yes, it is.

4           MR. KABRAWALA:  The government asks that it be

5   moved in evidence.

6           MR. LATO:  No objection.

7           THE COURT:  Government's Exhibit 3 is admitted.

8           (Whereupon, Government's Exhibit 3 was received

9   in evidence.)

10  Q    So you said that -- withdrawn.

11          Who was in the dining room when you spoke with

12  Mr. Valerio during this initial contact with him?

13  A    It would be myself, sitting at the far end of the

14  table against the wall.

15          It would be Mr. Valerio at the head of the table

16  where the chairs are now.

17          Next to him would be Detective Rory Forrestal of

18  the Suffolk County Police Department.  And he was the

19  chair with the jacket on it.

20          In the chair next to it, Special Agent Danielle

21  Messineo was seated.

22          And another person, Detective Badalucco from

23  Nassau County, was standing in the corner to the left of

24  Agent Messineo.

25  Q    Okay.

Troyd-Direct/Kabrawala

15

1   Was there anybody else in the dining room at any

2   point during your initial meeting with Mr. Valerio?

3   A   No.

4   Q   You said that Detective Badalucco was also in the

5   room?

6   A   Yes.

7   Q   And was he seated or standing?

8   A   Standing in the corner.

9   Q   Was he standing behind you, where you identified the

10  chair in which Mr. Valerio was sitting?

11  A   He was not there.  He was standing to the left of

12  Agent Messineo seated with the back to us.

13  Q   So the bottom left-hand corner of the picture here?

14  A   Yes.

15  Q   Was Detective Badalucco interacting with Mr. Valerio

16  in any way?

17  A   They did have some conversation.

18  Q   Was there anybody else standing immediately outside

19  this dining room area?

20  A   My supervisor, Dawn Smallwood, she was responsible

21  for the safety of Ms. Bereskova, who was seated in the

22  family room, and she was standing in the hallway between

23  the family room and the dining room with an eye on

24  Ms. Bereskova, and intermittently she would walk past the

25  door, but she was not involved in the interview process.

**Troyd-Direct/Kabrawala**

16

1  Q    Did Agent Smallwood interact with the defendant in

2  any way?

3  A    No.

4  Q    Do you recall speaking -- her speaking with the

5  defendant in any way?

6  A    No, I do not.

7  Q    Now, during the meeting was anyone touching

8  Mr. Valerio?

9  A    No.

10  Q    Was Mr. Valerio restrained?

11  A    No.

12  Q    Was he handcuffed to either the table or any chair

13  there?

14  A    No, he was not.

15  Q    Was he clothed?

16  A    Yes, he was.

17  Q    Did any law enforcement personnel have any type of

18  weapon drawn on Mr. Valerio?

19  A    No.

20  Q    Was Mr. Valerio doing anything -- given anything to

21  eat or drink?

22  A    Yes.

23        At one point during the interview he requested

24  water.  He was provided with a coffee mug of water from

25  the kitchen.

**Troyd-Direct/Kabrawala**

17

1    Q    Can you see the mug in that picture?

2    A    Yes.

3         It is somewhat in front of the chair where

4    Mr. Valerio was sitting.  It is to the right of what looks

5    like a Dunkin Donuts coffee cup.

6    Q    And what happened during this initial meeting with

7    Mr. Valerio?

8    A    When we sat down, Mr. Valerio asked what this was

9    about.

10        We explained we were executing a search warrant

11   looking for evidence of child pornography.

12        Mr. Valerio explained that he was being extorted

13   by a woman named Olena Kalichenko, and he had received

14   Viber chat messages.

15   Q    How do you spell that?

16   A    V-I-B-E-R.

17   Q    All right.

18   A    He had received the messages from Ms. Kalichenko

19   where he was to negotiate paying some money because she

20   was going to the police.  And furthermore she couldn't be

21   prosecuted because she was in the -- wasn't in the country

22   and the police couldn't do anything for her.

23        He was dismayed of the fact that he didn't

24   understand how she got his email address on Viber.

25        I'm not really familiar with Viber, so I don't

**Troyd-Direct/Kabrawala**

18

1    know what kind of contact you use with respect to a Viber

2    message.  But he was dismayed she was able to find his

3    email address.

4    Q    In reference to Mr. Valerio's statement with respect

5    to Ms. Kalichenko, did he say anything else?

6    A    Yes.  He said he had contacted his attorney to speak

7    with him in reference to the extortion by Ms. Kalichenko.

8    Q    And did Mr. Valerio provide the name of that attorney

9    during that initial meeting?

10   A    Yes.  He told us he had contacted Anthony LaPinta.

11   Q    And did Mr. Valerio ask at that point to speak with

12   Mr. LaPinta?

13   A    No.

14   Q    And did he ask to speak with any lawyer at that

15   point?

16   A    No, he did not.

17   Q    Did he say he would like to make phone calls to a

18   lawyer?

19   A    No, he did not.

20   Q    What else, if anything, happened during that meeting?

21   A    Well, during the interview I took a copy of an email

22   exchange between him and Olena Kalichenko, and I read him

23   an excerpt from that email.

24   Q    How did you come to have that email?

25   A    This was a copy of an email that was provided to

**Troyd-Direct/Kabrawala**

19

1   Assistant Legal Attache Peter Angelini.  It was provided

2   to him by Olena Kalichenko.

3   Q    I'm showing you what is marked as

4   Government's Exhibit 4.  It is actually a two-page

5   document.

6         MR. KABRAWALA:  I would like to approach the

7   witness, your Honor.

8         THE COURT:  Fine.

9         (Counsel approaches the witness stand.)

10  Q    What is Government's Exhibit 4?

11  A    This is an email from Mr. Valerio to Olena Kalichenko

12  that was sent on July 22, 2012.  And this is the email --

13  copy of the email that I read an excerpt from to

14  Mr. Valerio.

15        MR. KABRAWALA:  We move to have this exhibit

16  introduced in evidence.

17        MR. LATO:  No objection.

18        THE COURT:  Government's Exhibit 4 is admitted.

19        (Whereupon, Government's Exhibit 4 was received

20  in evidence.)

21  Q    Now, with respect to this email, what, if anything,

22  did you say to Mr. Valerio?

23  A    In preparation for the interview, I had highlighted a

24  portion of this email so I could refer to it.  And I read

25  this section to Mr. Valerio.

**Troyd-Direct/Kabrawala**

20

1  Q    What section did you read to him?  Would you mind

2  reading that aloud to the Court, please.

3  A    Certainly.

4           I was actually able to see some girls cum in

5  their pantyhose.  Speaking of which, I want video of you

6  and Sofia.  Get her to play or eat, just eat your pussy.

7  Q    What, if anything, did Mr. Valerio say about this

8  email?

9  A    I asked Mr. Valerio if he had in fact directed

10 Ms. Kalichenko to produce child pornography.

11          He said he had.

12          I asked him if he had received that pornography

13 in email.  And he said he did.

14 Q    Did he say he received any other pornography from any

15 other method?

16 A    I asked him if he received a DHL package that

17 contained a disk that was sent by Ms. Kalichenko.

18          He claimed or admitted that he had in fact

19 received the package, but that he only recalled that it

20 contained bubble wrap.

21 Q    How did you know to ask him about a DHL package?

22 A    It was from the report written by

23 Special Agent Angelini who was interviewing

24 Ms. Kalichenko.

25 Q    That was based on Ms. Kalichenko's allegation?

**Troyd-Direct/Kabrawala**

21

1  A    Yes.

2  Q    Now, after that, what happened next?

3  A    After Mr. Valerio made those admissions, I decided,

4  and I conferred with Special Agent Messineo, to speak to

5  the U.S. Attorney's Office about authorizing a complaint

6  for Mr. Valerio.

7  Q    And what happened following that conversation with

8  the U.S. Attorney's Office?

9  A    I spoke to Assistant United States Attorney Allen

10  Bode and I advised him what occurred during the interview.

11  And he authorized the complaint.

12        At that point I conferred with Agent Messineo

13  again, and we decided at that point we need to advise

14  Mr. Valerio of his Miranda rights.

15  Q    Showing you what is marked as Government Exhibit 5.

16        (At this time a document was exhibited on

17  courtroom screen.)

18  Q    Can you tell us what this document is?

19  A    An FB advice of rights form signed by Mr. Valerio on

20  January 28th, 2014.

21  Q    Was it signed by anyone else?

22  A    Yes.  It was witnessed by myself and Detective Rory

23  Forrestal.

24  Q    And after the defendant was advised of his rights and

25  acknowledged his rights by signing this form which is

**Troyd-Direct/Kabrawala**

22

1    marked as Government's Exhibit 5, what happened next?

2    A    At that point I provided Mr. Valerio with copies of

3    two emails, one from July 17th and one from July 22nd,

4    2012, that were copies of email exchanges between him and

5    Ms. Kalichenko.

6          Mr. Valerio read those email exchanges and he

7    did admit he had sent those.

8          MR. KABRAWALA:  As a housekeeping matter, we ask

9    that Government's Exhibit 5 be entered as evidence.

10         MR. LATO:  No objection.

11         THE COURT:  Government's Exhibit 5 is admitted.

12         (Whereupon, Government's Exhibit 5 was received

13   in evidence.)

14   Q    Was Mr. Valerio asked to sign or acknowledge or

15   initial any of the emails?

16   A    Yes.

17         We asked him if he would sign the emails.  And

18   he declined.  And he explained that he wanted those videos

19   from Olena Kalichenko because he had sent her thousands of

20   dollars and he wanted something for his money.  And at one

21   point she had actually taken $1,600 from him for airline

22   tickets, which she never purchased, and she kept the

23   money.

24   Q    After that statement, generally speaking, what

25   happened next?

**Troyd-Direct/Kabrawala**

23

1   A    At that point I queued up a copy of the video that

2   was sent from the Ukraine that Olena Kalichenko had

3   provided, and I played a segment of the video on a laptop

4   for Mr. Valerio.

5   Q    What, if anything, happened when you played this

6   segment of the video for Mr. Valerio?

7   A    Mr. Valerio admitted that he recognized Olena

8   Kalichenko and the child in the video.

9          But he stated he had not seen this particular

10  video, and he knew that because he did not recognize the

11  background in the video, and he had not seen that

12  background in the other videos that Ms. Kalichenko had

13  sent to him.

14  Q    I want to show you what is now marked as

15  Government's Exhibit 7.  And I know it is out of order

16  numerically:

17          MR. KABRAWALA:  I will hand up a copy for the

18  Court, as well, as a courtesy copy.

19          May I approach?

20          (Handed to the Court.)

21  Q    Are you aware whether the defendant Joseph Valerio

22  filed an affidavit in connection with the proceedings here

23  today?

24  A    Yes.  I am aware.

25  Q    And I have given you what is marked as Government

**Troyd-Direct/Kabrawala**

24

1    Exhibit 7 for identification.

2            Have you reviewed this?

3    A    Yes, I have.

4    Q    What is this document?

5    A    This is Mr. Valerio's affidavit regarding what he

6    believes happened that day.

7    Q    Okay.

8            Referring to paragraph two, it says:  Quote, at

9    the dining room table the agents and the detective

10   questioned me.  Three of them were at the table seated

11   with me.  Two others stood behind me.  Still others were

12   searching my house.  Close quote.

13           Did I read that accurately?

14   A    Yes, you did.

15   Q    Were there two agents or officers or law enforcement

16   personnel standing immediately behind the defendant?

17   A    No, there were not.

18   Q    Was there anything physically in the dining room that

19   may have prevented that from occurring?

20   A    Prevented someone from standing behind him?

21   Q    Yes.

22   A    There was a table to his rear.  But there was an

23   opening to the kitchen directly behind him.

24           But no one had been standing behind him.

25   Q    I will show you again what is marked as

**Troyd-Direct/Kabrawala**

25

1  Government's Exhibit 3.  It is a picture of the dining

2  room that has been admitted in evidence, and the table

3  that you were referring to.

4           (At this time a document was exhibited on

5  courtroom screen.)

6  Q    Is that the table that looks like it has some bottles

7  on top of it?

8  A    Yes.  It is like a small minibar type of table.

9  Q    Turning back to Government's Exhibit 7 for

10 identification, referring to paragraph 3, I will read from

11 paragraph 3.

12          It says:  Quote, an agent/detective who I

13 believe to be a computer expert said, among other things,

14 that I was, quote, going to be in a very dark place, close

15 quote.  He was low key in that he spoke in a soft voice.

16 But he was in my face a lot, period.  Close quote.

17          Was there a computer expert present at the

18 dining room table during this initial meeting with the

19 defendant?

20 A    Yes.

21 Q    Who was that detective?

22 A    Detective Rory Forrestal from the Suffolk County

23 Police Department.

24 Q    Do you recall if Detective Forrestal said to

25 Mr. Valerio:  Quote, you are going to be in a very dark

**Troyd-Direct/Kabrawala**

26

1   place?

2   A    No, I do not.

3   Q    Anything to that effect?

4   A    No.

5   Q    Do you recall Detective Forrestal being in

6   Mr. Valerio's face?

7   A    No, not at all.

8   Q    How was Detective Forrestal's demeanor during the

9   meeting?

10  A    Very calm and poised, very friendly, developing a

11  rapport during the interview.  He was very professional.

12  Q    Can you describe Detective Forrestal's style of

13  questioning?

14          MR. LATO:  Objection.

15          THE COURT:  Sustained as to form.

16  Q    Can you describe how Detective Forrestal interacted,

17  if he interacted at all, with the defendant?

18  A    When Detective Forrestal interacted with Mr. Valerio

19  he was engaging and calm, discussing the facts of the case

20  with Mr. Valerio.

21  Q    Now, at some point -- you could put that exhibit

22  down.

23  A    Sure.

24  Q    At some point was the defendant advised he was being

25  placed under arrest?

**Troyd-Direct/Kabrawala**

27

1    A    Yes.

2    Q    And approximately -- I'm not looking for a time --

3    approximately when did that happen?

4    A    At the conclusion of the interview when he asked to

5    speak to an attorney, we decided to clean up the search

6    warrant materials and collected the evidence and load it

7    into the cars.

8         We didn't immediately tell him he was arrested

9    at the conclusion of the interview because we wanted him

10   to remain seated and calm.  But once we had everything

11   concluded as far as the search warrant, we told him we

12   were going to arrest him and asked him to stand up and

13   allow us to put handcuffs on him, which he complied.

14   Q    Let me back up.

15        Did you ask Mr. Valerio to sign any kind of

16   statement following that interview?

17   A    Yes.

18        We did ask Mr. Valerio if he would sign a sworn

19   statement or sign a written statement after that -- during

20   the interview.

21   Q    And how did the defendant react to that question?

22   A    He declined to sign a statement, and he requested to

23   speak to his attorney.

24   Q    Did you continue to question him or speak with him

25   about any of the allegations of Ms. Kalichenko after the

**Troyd-Direct/Kabrawala**

28

1   defendant asked to speak with a lawyer?

2   A    No.

3   Q    So at some point you advised him he was under arrest,

4   and that was after the search that was conducted?

5   A    Yes.

6   Q    And what happened next?

7   A    We transported Mr. Valerio -- we walked him out of

8   the house in a jacket because it was very cold and snow on

9   the ground.  We put him in the car and we proceeded to

10  drive to the Central Islip courthouse here.

11        And during that drive we stopped and we got

12  Mr. Valerio some juice to drink because it was still early

13  in the morning.

14  Q    Did you speak with Mr. Valerio in the car ride over

15  at all?

16  A    Yes.

17  Q    And how did that conversation come about?

18  A    When we asked him if he wanted something to drink, he

19  told us he did.

20        As we spoke, the conversation turned to his

21  preference for women from eastern Europe, particularly

22  Russian, Ukrainian.

23        He then began to tell me that Ukrainian women

24  are viewed negatively by other women in eastern Europe,

25  and women like his girlfriend, Jarmila Bereskova, is

**Troyd-Direct/Kabrawala**

29

1   Czechoslovakian and she is of a higher quality.  And the

2   woman who had been extorting him, Ms. Kalichenko, had

3   actually sent an email to him telling him she was talking

4   to the FBI.  And in that email there was an email address

5   that was supposedly belonging to an FBI agent he was

6   speaking to.

7          He told me he provided that email address to his

8   attorney, Anthony LaPinta, and Anthony LaPinta could not

9   find or authenticate that email address.

10  Q    And at the conclusion of that car ride, was the

11  defendant brought to the federal courthouse here in

12  Central Islip?

13  A    Yes.

14         Agent Messineo had purchased the juice and some

15  food for us.  When she came back to the car, we then

16  proceeded to drive directly to the courthouse and present

17  Mr. Valerio to the United States Marshal's Service.

18  Q    Now, I want to turn your attention to the next month,

19  February 2014.

20         Did there come a time when the defendant was

21  initially released on bail and arrested on a second

22  occasion?

23  A    Yes, there was.

24  Q    What date was the defendant arrested again?

25  A    Mr. Valerio was arrested on the afternoon of

Troyd-Direct/Kabrawala

30

1 February 24th, 2014.

2 Q    Where did the arrest take place?

3 A    We effected the arrest at a psychologist's office

4 located on Route 110 located in Farmingdale, New York.

5 Q    Upon arresting the defendant what, if anything,

6 occurred?

7 A    When I advised Mr. Valerio that he was being

8 arrested, he complied with the handcuffing.  And he asked

9 me what is this about,

10 Q    Did you tell him?

11 A    No, I did not.

12 Q    What happened immediately following the defendant's

13 arrest in February 2014?

14 A    At the office of the psychologist, two other agents

15 took custody of Mr. Valerio and drove him to the office so

16 that Agent Messineo and myself could speak to the

17 psychologist and let him know what happened, and then

18 traveled to the office to meet them.

19 Q    Was the defendant Mirandized?

20 A    Not at that point, no.

21 Q    Did there come a time he was Mirandized?

22 A    Yes, there was.

23 Q    And when was that?

24 A    When we arrived at the office, the Long Island

25 resident agency on Wellwood Street -- Wellwood Road --

**Troyd-Direct/Kabrawala**

31

1    sorry, Pinelawn Road.

2            We went into the interview room then where

3    Mr. Valerio was waiting and advised him of his rights.

4    Q    I'm showing you what is marked as

5    Government's Exhibit 6.

6            (At this time a document was exhibited on

7    courtroom screen.)

8    Q    Do you recognize this document?

9    A    Yes, I do.

10   Q    What is it?

11   A    This is the FB 395 advice of rights form that we use

12   to advise Mr. Valerio of his rights.

13   Q    Is it signed?

14   A    Yes.

15   Q    Who is it signed by?

16   A    It is signed by Mr. Valerio.

17   Q    Anyone else?

18   A    It is witnessed by myself and Special Agent Daniel

19   Messineo.

20   Q    Is it dated?

21   A    Yes.

22            It is dated February 24, 2014.

23            MR. KABRAWALA:  The government asks that this

24   exhibit be entered as evidence.

25            MR. LATO:  No objection.

Troyd-Direct/Kabrawala

32

1    THE COURT:  Government's Exhibit 6 admitted.

2    (Whereupon, Government's Exhibit 6 was received

3    in evidence.)

4    Q    After the defendant was Mirandized on this date,

5    February 24th, 2014, what happened, if anything?

6    A    Mr. Valerio asked me why he was being arrested.

7    Q    Did you tell him?

8    A    Yes, I did.

9    Q    And in sum and substance what did you say?

10    A    I said that we had found additional evidence of child

11    pornography in the search warrant that occurred on

12    January 18th, and that -- and then I told him who the

13    victim in that case was.

14    Q    And who did you say the victim was?

15    A    The victim was his niece.

16    Q    What, if anything, did Mr. Valerio say at that point?

17    A    Mr. Valerio at that point said, I want to kill

18    myself.  I no longer have a family.

19    Q    By the way, we have -- you have spoken a lot this

20    morning about Joseph Valerio.

21    Do you see that individual sitting in the

22    courtroom here today?

23    A    Yes, I do.

24    Q    Please point him out by identifying an article of

25    clothing he is wearing.

**Troyd-Cross/Lato**

33

1    MR. LATO:  We will stipulate.

2    THE COURT:  The defendant stipulates the

3 identification.

4    MR. KABRAWALA:  Nothing further.

5    MR. LATO:  Your Honor, may I have two minutes,

6 no more?

7    THE COURT:  Fine.

8    MR. LATO:  Thank you.

9    (Whereupon, at this time there was a pause in

10 the proceedings.)

11    MR. LATO:  I'm ready, your Honor.

12    THE COURT:  Go ahead.

13

14 CROSS-EXAMINATION

15 BY MR. LATO:

16 Q    Special Agent Troyd, good afternoon.

17 A    Good afternoon, sir.

18 Q    The first warrant that you executed at Mr. Valerio's

19 house, you remember that day?

20 A    Yes, I do, sir.

21 Q    Is it fair to say it was January 28th of this year?

22 A    Yes, sir.

23 Q    Now, prior to that day, is it fair to say that you

24 had executed in your FBI career dozens of search warrants?

25 A    Yes.

**Troyd-Cross/Lato**

34

1　Q　Is it fair to say the earliest you could have started

2　the execution of that warrant was at 6:00 a.m.?

3　A　Yes, sir.

4　Q　Is it fair to say that you in fact began the

5　execution at 6:00 a.m.?

6　A　Yes, it was 6:00 a.m.

7　Q　And based upon your experience in executing search

8　warrants, is it true that the earlier the better?

9　A　For safety procedures, yes.

10　Q　And is it also better if you want to get a suspect to

11　talk, to get him when he is half asleep or completely

12　asleep?

13　A　I don't think there is a way to tell if there is an

14　advantage with an individual.

15　Q　Based upon your experience in interviewing suspects,

16　has it been your experience that it is better not to give

17　them notice ahead of time?

18　A　Yes, there would be an advantage to that.

19　Q　Now, if you know the exact number, how many agents

20　arrived at Mr. Valerio's residence on January 28th to

21　execute that warrant?

22　A　Yes, I do know.

23　Q　How many?

24　A　There were a dozen agents -- a combination of agents

25　and detectives.

**Troyd-Cross/Lato**

35

1  Q   How many agents and detectives, and for simplicity

2  sake I will just say law enforcement officers, entered the

3  residence?

4  A   All twelve.

5  Q   Is it fair to say that Mr. Valerio opened the front

6  door to let everyone in?

7  A   Yes, he did.

8  Q   Were all of you, all officers, in plainclothes?

9  A   Yes.  There were no uniformed officers present.

10 Q   Was anyone wearing a vest that would say either FBI,

11 Suffolk County Police, or anything similar?

12 A   Yes.

13 Q   So it would be fair to say that it was immediately

14 observable that you were members of law enforcement?

15 A   Yes.

16      It is a very good policy that we have that we

17 identify ourselves when we execute arrests or warrants.

18 Q   If you can, please confine yourself to my questions,

19 sir.

20 A   I apologize.

21 Q   Were any of the officers wearing bullet-proof vests?

22 A   Yes.

23 Q   Were the vests on the inside or the outside of any

24 logo that said FBI or police?

25 A   There would be both.

Troyd-Cross/Lato

36

1    Q    Would it be fair to say that the vests were

2    observable by people -- by passersby, that the people were

3    wearing vests?

4    A    Yes.

5    Q    Now, was Mr. Valerio in the doorway or the vestibule

6    when you first entered?

7    A    When I entered he was standing at the doorway.  There

8    is no vestibule.  It is one continuous hallway.

9    Q    Did you or any other officer ask permission to enter,

10   or once he opened the door people or agents went to

11   wherever they wanted to go?

12   A    I immediately explained to Mr. Valerio that this was

13   a search warrant, and I walked with him to the end of the

14   hall so he would be out of the way of anyone entering the

15   house.

16   Q    So would it be fair to say that the other officers

17   proceeded without getting any permission from anyone in

18   the house?

19   A    No, we did not ask for Mr. Valerio's permission.

20   Q    Now, is it fair to say that the first thing, for

21   everyone's safety, the agents and the officers did was, it

22   was called a security sweep?

23   A    Yes.

24   Q    Do you remember about how long that security sweep

25   took?

**Troyd-Cross/Lato**

37

1    A    Approximately ten minutes.

2    Q    And would it be fair to say that the only thing of

3    interest in that sweep was a woman in the bedroom?

4    A    The only thing we found was a woman in the bedroom.

5    Q    At the time of the sweep I'm saying, sir.

6    A    Yes.  Everything was of interest from a safety

7    perspective.

8    Q    Did you find anything that could have been a

9    potential threat to anyone's safety in the house at that

10   time?

11   A    There was a shotgun --

12   Q    Yes or no.

13   A    Yes.

14   Q    All right.

15         In terms of the items did you find any firearms?

16   A    Yes.

17   Q    How many?

18   A    There was a shotgun.

19   Q    Where was it?

20   A    It was in an upstairs walk-in closet off the main

21   bedroom, the --

22   Q    Was it loaded or unloaded?

23   A    I don't know.  I didn't find it.

24   Q    Was there any other weapon or dangerous instrument,

25   according to your recollection, that you found in the

Troyd-Cross/Lato

38

1  house that day?

2  A    Aside from kitchen cutlery and things like that,

3  there are no other weapons that I can speak of.

4  Q    At any point did you or any of the other officers or

5  agents ask Mr. Valerio's consent to do anything in the

6  house?

7  A    No.

8  Q    And at some point you and other officers and

9  detectives went into the dining room with Mr. Valerio; is

10 that correct?

11 A    Yes.

12 Q    And do you remember about what time that was?

13 A    Probably around 6:10 or 6:15 after we entered the

14 residence and conducted a security sweep.

15 Q    So it is your testimony that essentially immediately

16 after the security sweep was done the interview began?

17 A    In essence, yes.

18 Q    Now, while the interview was being conducted in the

19 dining room, is it fair to say that the search was still

20 continuing in other parts of the house; is that correct?

21 A    Yes.

22 Q    Is it fair to say that approximately eight other

23 agents or officers were participating in that search?

24 A    Yes.  At least seven.  Because my supervisor, Agent

25 Smallwood, was assigned to make sure that Jarmila

**Troyd-Cross/Lato**

39

1  Bereskova was seated in the family room and not a danger

2  to herself or anyone else

3  Q    After the security sweep ended, was Jarmila allowed

4  to move around the house after the security sweep or

5  search was being conducted?

6  A    No.

7  Q    Was Mr. Valerio allowed to move around the house

8  while the search was being conducted?

9  A    No.

10  Q    Who took whom to the dining room?  Did Mr. Valerio

11  take you and the other officers, or did you and the other

12  officers take him?

13  A    No.

14        I just said to him would we be able to sit down

15  in your dining room and talk to you?

16        He consented and we walked together.  There was

17  no walking in there -- walking him in there.  He walked on

18  his own into the dining room.

19  Q    Is it fair to say it was your suggestion and he

20  consented; is that correct?

21  A    It was my request.

22  Q    Now, in terms of the arrangement in the dining room,

23  how many people were seated around the dining room table?

24  A    There were three of us seated with Mr. Valerio.

25  Q    How many chairs were there around the dining room

**Troyd-Cross/Lato**

1   where everyone was sitting?

2   A    I believe there were at least five chairs, but maybe

3   as many as six.

4   Q    Was there one agent or officer standing in the

5   general vicinity?

6   A    Yes.

7   Q    Do you know whether there was any reason why that

8   agent or officer didn't take one of the open seats?

9   A    No, I don't.

10  Q    At any point during the interview was there an

11  officer behind Mr. Valerio or next to him?

12  A    No.

13  Q    Which agent or officer did most of the questioning?

14  A    That would be me.

15  Q    Is it fair to say that you did 90 percent of the

16  questioning?

17  A    I would say it was more like 60 or 70 percent of the

18  questioning.

19  Q    Is there a reason why you had several other members

20  of law enforcement in addition to yourself doing the

21  interview?

22  A    Yes.

23  Q    As far as you knew, did they have information

24  unavailable to you so they can frame the questions that

25  you could not frame?

**Troyd-Cross/Lato**

41

1   A    They had experience in investigating this violation

2   that I thought would be valuable and of assistance to me

3   during the interview.

4   Q    Now, when did you tell him of the interview's

5   purpose?

6   A    When did I tell Mr. Valerio?

7   Q    Yes.

8   A    Immediately.

9   Q    Immediately upon entering the dining room, sir?

10  A    When we sat down and he inquired what this was about,

11  I explained to him it was a search warrant, looking for

12  evidence of child pornography.

13  Q    Now, at some point Mr. Valerio asked for some water;

14  is that correct?

15  A    Yes, he did.

16  Q    Now, this was his home; is that correct?

17  A    Yes.

18  Q    Yet he asked you if he could have some water; is that

19  correct?

20  A    Yes, he did.

21  Q    It would be fair to say that he was not free to leave

22  that dining room once that interview started; is that

23  correct?

24  A    Not fair to say.

25  Q    Well, while the search was being conducted, isn't it

Troyd-Cross/Lato

42

1   a fair statement that you don't want anyone interfering

2   with the search team?

3   A    It is fair to say I wouldn't want anyone interfering

4   with the search team.

5   Q    So was Mr. Valerio free to walk around the house

6   while the search was being conducted?

7   A    He was not free to walk around the house during the

8   search warrant.

9   Q    Was he free to go back and forth from the kitchen to

10  get his own water?

11  A    No, he was not.

12  Q    Is there any room he was free to enter as far as you

13  remember?

14  A    The hallway.

15  Q    And that is the hallway adjacent to the dining room,

16  correct?

17  A    Yes.

18  Q    And other than that, would it be a fair statement

19  that he was not free to move about; is that correct?

20  A    He was not free to move about during the execution of

21  the search warrant.

22  Q    Now, before conducting the interview, you were aware

23  of certain emails that Mr. Valerio and Ms. Olena

24  Kalichenko had exchanged with each other; is that correct?

25  A    Yes, sir.

**Troyd-Cross/Lato**

43

1    MR. LATO:  One moment, please.

2        (Whereupon, at this time there was a pause in

3    the proceedings.)

4        MR. LATO:  Your Honor, may I approach the

5    witness about an exhibit?

6        THE COURT:  Yes.

7        (Counsel approaches the witness stand.)

8  Q    Now, Special Agent Troyd, before conducting the

9  warrant, were you aware of emails that Ms. Kalichenko and

10 Mr. Valerio had exchanged on or about July 17th, 2012?

11 A    Yes.

12 Q    And is it fair to say that based upon what your

13 investigation had revealed, at that point Mr. Valerio had

14 said in an email:  Quote, the videos you sent me by cell

15 phone camera are perfect, and there is no need for the

16 expense of another camera when you have done a terrific

17 job.

18        Are you aware of that?

19 A    Yes, I'm aware of that.

20 Q    And are you aware that Mr. Valerio had also sent to

21 Ms. Kalichenko an email quoting, I want video of you

22 and -- the name is redacted -- Jane Doe.  Get her to play

23 for eat -- just eat your pussy.

24        You are aware of that?

25 A    I'm aware of that.

Troyd-Cross/Lato

44

1  Q    Special Agent Troyd, would it be fair to say that it

2  was your intent that day to arrest Mr. Valerio no matter

3  what the warrant revealed?

4  A    No.  That was not my intent.

5  Q    Based upon your experience, when you walked into that

6  house you already had probable cause to arrest him?  Yes

7  or no.

8  A    No.

9  Q    As far as you knew, the only thing you had probable

10 cause for was to search the house?

11 A    When we entered the house, the only thing we had

12 probable cause for was the search at that point.

13 Q    Were you aware prior to conducting the search of an

14 email or a text message on November 19th of 2013 -- let me

15 withdraw that.

16        Prior to executing the search, were you aware of

17 a video that Mr. Valerio had received with an adult woman

18 engaging in sexually explicit conduct with a minor, say

19 about three years old?

20 A    Yes.

21 Q    When you walked into that house, you believed that

22 Mr. Valerio had been the recipient of that video; is that

23 correct?

24 A    I suspected that he might be.

25 Q    And that was based upon Agent Angelini's interview

**Troyd-Cross/Lato**

45

1   with Kalichenko in the Ukraine?

2   A    Yes.

3   Q    And did you have any evidence that in fact

4   Mr. Valerio had received that video at that point?

5   A    The emails that I had suggested that he had received

6   it.

7   Q    Is it a fair statement that you wanted the warrant to

8   see if in fact he had received that?

9   A    Yes.  The warrant would have seen evidence whether he

10  had received them or not received them.

11  Q    Special Agent Troyd, isn't it a fair statement that

12  once you sat down at the table with Mr. Valerio, he was

13  not free to leave?

14  A    That is not true.

15  Q    He was free to leave insofar as to enter the hallway;

16  is that correct?

17  A    He could have entered the hallway to exit the house.

18  Q    Now, at some point early in the interview did

19  Mr. Valerio mention the name of an attorney?

20  A    Yes.

21  Q    And the attorney he mentioned was Anthony LaPinta; is

22  that correct?

23  A    Yes.

24  Q    You recognize the name -- recognized the name of

25  Anthony LaPinta at that time; is that correct?

**Troyd-Cross/Lato**

46

1    A    Yes.

2    Q    Is it a fair statement that you knew Mr. LaPinta

3    practiced criminal law?

4    A    Yes, I did.

5    Q    Did you ask Mr. Valerio whether he wanted to speak to

6    Mr. LaPinta?

7    A    No, I did not.

8    Q    Now, at some point during your interview with

9    Mr. Valerio, did you read Mr. Valerio a portion of an

10   email that Olena Kalichenko had sent him?

11   A    Yes.

12   Q    About what time in the morning was that that you read

13   him that email?

14   A    I would say it was prior to the advice of rights.

15   Maybe 7:00 o'clock, 7:15.

16   Q    Well, it is a fair statement that the advice of

17   rights was about 7:55 a.m.; is that correct?

18   A    I would need to look at the document.

19   Q    I show you Government's Exhibit 5 in evidence.

20        (Handed to the witness.)

21   Q    Does that refresh your recollection of the time?

22   A    Yes, sir.

23   Q    What time was it?

24   A    7:55 a.m.

25   Q    Once again, the security sweep ended about 6:10,

**Troyd-Cross/Lato**

47

1  6:15; is that correct?

2  A    Yes.

3  Q    That is about when the interview started; is that

4  correct?

5  A    Yes.

6  Q    So it was a little over an hour and a half into the

7  interview that you first read Miranda warnings; is that

8  correct?

9  A    Yes.

10  Q    Is it fair to say that your FBI 302 report of the

11  interview does not contain everything that you and

12  Mr. Valerio talked about in that hour and a half?

13  A    It does not contain everything.

14  Q    Were you and the other officers talking to

15  Mr. Valerio most of the time during that hour and a half,

16  as opposed to there being long periods of silence?

17  A    We were speaking to him for most of that time.

18  Q    Then it would be a fair statement that your FBI 302

19  captured only a minority of the things that were discussed

20  in that hour and a half?

21  A    I would say it is a minority, yes.

22  Q    Now, the email you read to Mr. Valerio before

23  advising him of his Miranda warnings, is it fair to say

24  that you read this to him, and I quote:  I was actually

25  able to see some girls cum in their pantyhose, speaking of

Troyd-Cross/Lato

48

1  which I want video of you and Sofia.  Get her to play or

2  just eat your pussy.

3          Was that -- is it your statement that after

4  reading that, Mr. Valerio was still free to leave?

5  A    Yes, yeah.

6  Q    After you read that video did Mr. Valerio admit --

7          THE COURT:  Read the email.

8          MR. LATO:  Yes, sorry.

9  Q    After you read that email, did Mr. Valerio admit he

10  had sent the email to Ms. Kalichenko?

11  A    Yes.

12  Q    Did his admission come spontaneously or did you ask

13  him if he had sent it?

14  A    I asked him if he had directed Ms. Kalichenko to

15  produce the child pornography and whether he received it

16  by email, and he said yes.

17  Q    At that point with that admission did you have

18  probable cause to arrest Mr. Valerio?

19          MR. KABRAWALA:  Objection.

20          THE COURT:  What grounds?

21          MR. KABRAWALA:  It is a legal conclusion and not

22  relevant to a fact finding determination.

23          THE COURT:  I agree that it is a legal

24  conclusion.  But I think he is trying to explore the

25  witness' state of mind at the time and his actions based

Troyd-Cross/Lato

49

1  on his state of mind.  So I will let him testify as to

2  what he understands, but it is up to the Court --

3          MR. KABRAWALA:  Whether or not there is probable

4  caution to arrest at that point doesn't bear on the

5  defendant's state of mind or the circumstances.

6          THE COURT:  Not the defendant's state of mind.

7  But he is trying to explore what the agent was doing and

8  when, and that can potentially be impacted on whether he

9  believed he had the authority to arrest at that point.  So

10 I will allow it.

11 Q    Do you remember the question, sir?

12 A    Yes.

13         I believe at that point I decided I needed to

14 speak with the U.S. Attorney's Office and advise them as

15 to what Mr. Valerio had stated.

16 Q    Is it fair to say that after Mr. Valerio answered and

17 admitted that he had sent the email, it was now time to

18 contact the U.S. Attorney's Office; is that correct?

19 A    Yes.

20 Q    However, before contacting the U.S. Attorney's

21 Office, did you ask a followup question to Mr. Valerio

22 about a DHL package?

23 A    I would have to look at my 302 to refresh my

24 recollection.

25 Q    I will show you 3500-ST-4, and ignore my remarks,

**Troyd-Cross/Lato**

50

1    please.

2    A    Yes.

3    Q    And see if that refreshes your recollection.

4              (Handed to the witness.)

5    A    Yes.  He did admit he received the DHL package from

6    Ms. Kalichenko.

7    Q    My question to you, sir, is whether you asked him

8    about the DHL package after you decided to call the U.S.

9    Attorney's Office.

10   A    Well, the line of questioning was all one line of

11   questioning, and at the conclusion of the answer about the

12   DHL package is when I decided to speak to

13   Special Agent Messineo and then contact the

14   U.S. Attorney's Office.

15   Q    A moment ago, correct me if I'm wrong, you said it

16   was after his response to the email that you decided to

17   contact the U.S. Attorney's Office.

18              Are you now saying it was after the discussion

19   about the DHL package?

20   A    The DHL package -- what I'm saying is the DHL package

21   conversation is all part of the conversation prior to

22   that.  And when we concluded that conversation, I decided

23   to contact the U.S. Attorney's Office.

24   Q    So if I understand the chronology, sir, Mr. Valerio

25   admits to having sent the sexually explicit email, the

Troyd-Cross/Lato

51

1    interview continued about the DHL package, and then you

2    decided to contact the U.S. Attorney's Office; is that

3    correct?

4    A    Yes.

5    Q    And in fact you did contact the U.S. Attorney's

6    Office at that point?

7    A    Yes, I did.

8    Q    About what time was that?

9    A    That would be prior to 7:55 a.m.

10        I actually went upstairs and made the phone call

11   because there was some issue of a lock box and a key.

12        The lock box, I believe, was in the closet, and

13   Mr. Valerio told us that the key was hidden under some

14   sports memorabilia.  And I needed to let them know the key

15   was there while they were searching.

16        I went upstairs and told them where that was.

17   And I was on the phone speaking to AUSA Allen Bode.  And

18   then I returned.

19        So it was a space of time from 7:55 that I had

20   been out of the room doing other things.  Maybe ten,

21   fifteen minutes.

22   Q    After you read Mr. Valerio the advice of rights, did

23   he continue talking?

24   A    Yes, he did.

25   Q    And after that did you show him any emails that you

**Troyd-Cross/Lato**

52

1   believed he had sent?

2   A    Yes, I did.

3   Q    And were these the same as the emails you had read to

4   him earlier?

5   A    One of the emails was the same email.  And another

6   one was in the same timeframe as it was sent.

7   Q    Which was the same that you recall?

8   A    Do you mean which date?

9   Q    No.

10        Which of the emails that you showed him was the

11  same as the one you had read earlier in the interview?

12  A    I would have to look at the date of the email to

13  confirm.  One was the 17th of July.  One was the 22nd of

14  July.  But I would have to look.

15        I believe -- I'm sorry, I can't say for sure

16  which is which.

17  Q    Would something refresh your recollection?

18  A    Yes.  If you showed me the email from the 17th, I can

19  tell you, or the 22nd.

20  Q    Would your complaint or the 302 help you, or the

21  search warrant in the case?

22  A    I would have to review the 302 to see if I designated

23  which one I read previously, but I don't believe that I

24  did.

25  Q    Well, I will show you 3500-ST-4 again and see if this

**Troyd-Cross/Lato**

53

1   helps.

2                  (Handed to the witness.)

3                  MR. LATO:  About another five minutes, your

4   Honor.

5                  THE COURT:  Okay.

6   A    This doesn't designate which email I read to him,

7   sir.

8   Q    Is it fair to say that Mr. Valerio declined to sign

9   parts of the Miranda form?

10  A    Parts of the Miranda form?

11  Q    In other words, did he decline to initial it?

12  A    I don't believe we asked him to initial the Miranda

13  form, sir.

14  Q    Did he decline to sign or initial the emails that you

15  had shown him?

16  A    Yes.  He did decline to initial the email.

17  Q    When you say he declined, does that mean that you

18  asked him and he said no?

19  A    That's correct.

20  Q    At some point he said he didn't want to talk anymore;

21  is that correct?

22  A    He said he would like to speak to his attorney.

23  Q    Is that before or after he said he never saw that

24  video of Olena Kalichenko and the child?

25  A    That was after.

**Troyd-Cross/Lato**

54

1  Q    On the way to the courthouse did he make any

2  additional statements?

3  A    Yes, he did.

4  Q    Were they in response to questioning?

5  A    Just conversation, not questioning.

6  Q    What conversation was it in response to?

7  A    We were speaking about his preference for Ukrainian

8  and Russian women, or east European.

9  Q    Is it fair to say that it was not in response to,

10 say, pedigree information?

11 A    Not at that point.

12 Q    As an experienced law enforcement officer, you know

13 that it is good to keep a person talking; is that correct?

14        MR. KABRAWALA:  Objection.

15        THE COURT:  Sustained as to form.

16 Q    Based upon your experience, did you want to continue

17 the conversation with Mr. Valerio in the car?

18 A    I don't see any negatives in it.  But if he wanted to

19 remain silent, it wouldn't have been a problem.

20 Q    Did Mr. Valerio say he liked Ukrainian women but that

21 Czechoslovakian women were of a higher quality?

22 A    I think he was implying he learned a lesson that

23 Ukrainian women were not as good as say -- even the

24 Russian women looked down at the Ukrainian women.  And the

25 Czechoslovakian women really don't like the Ukrainian

**Troyd-Cross/Lato**

55

1   women.

2   Q   Did he say anything about children?

3   A   I don't believe he said anything about children.

4   Q   Do you remember the second arrest of Mr. Valerio?

5   A   Yes.

6   Q   And once again he was advised of his Miranda rights?

7   A   Yes, sir.

8   Q   And you were aware, however, that he was already

9   represented by counsel on the first arrest; is that

10   correct?

11   A   Yes, sir.

12   Q   And you nevertheless asked him questions?

13   A   The only questions we asked him were for booking,

14   processing questions.

15   Q   Didn't Mr. Valerio ask you a question why he was

16   being arrested?

17   A   Yes.

18   Q   And you answered him, correct?

19   A   Yes, I did.

20   Q   And you told him what it was for; is that correct?

21   A   Yes, I did.

22   Q   He said in substance that he was going to kill

23   himself; is that correct?

24   A   He said, I want to kill myself.

25   Q   Was that in response to something you said to him?

Troyd-Redirect/Kabrawala

56

1   A    Yes.

2   Q    What did you say to him?

3   A    I told him that we had obtained additional evidence

4   through the search warrant on January 28th, and that we

5   had identified the victim.  And I told him who the victim

6   was.

7            MR. LATO:  Nothing further.

8            MR. KABRAWALA:  Very briefly, your Honor.

9

10  REDIRECT EXAMINATION

11  BY MR. KABRAWALA:

12  Q    You testified on cross-examination that Mr. Valerio

13  was not free to leave -- withdrawn.

14           You testified on cross that Mr. Valerio was not

15  free to move about his house; is that correct?

16  A    That's correct.

17  Q    Why is that?

18  A    It is a safety concern when we are effecting a search

19  warrant, that no one can run around in the house.

20           Number one, you can't let them walk into the

21  kitchen and take cutlery.  We also can't let them touch

22  evidence.  At that point the house is being seized, and we

23  are searching it.

24  Q    Did you ever tell the defendant that he was not free

25  to leave?

Troyd-Redirect/Kabrawala

57

1   A    No.  I never did tell him.

2   Q    Did the defendant ask to move around his house

3   freely?

4   A    Only at one point in the initial entry did

5   Mr. Valerio attempt to walk up the stairs when the agents

6   were clearing the rooms.

7           And I asked him to stay downstairs with me

8   because it was not safe to do so.

9   Q    Did Mr. Valerio indicate why he was wanting to go

10  upstairs at that time?

11  A    He was concerned with having his girlfriend alone

12  with the men that were upstairs.

13  Q    Was the defendant ever restrained in any way on

14  January 28th, 2014 while in the house prior to the

15  handcuffs being put on him?

16  A    No, he was not.

17  Q    Prior to being Mirandized -- withdrawn.

18          On January 28th, 2014, after the defendant was

19  Mirandized, did you learn anything about whether or not he

20  had previously been arrested?

21  A    Yes.

22  Q    What did you learn?

23  A    That Mr. Valerio had been arrested previously for

24  forcible touching.

25  Q    Do you recall when that arrest was approximately, or

**Troyd-Redirect/Kabrawala**

58

1  where it took place?

2  A    I don't remember the date.  But I remember it took

3  place at Splish Splash, the water park in the east end of

4  the Island.

5  Q    If I show you your 302, would that refresh your

6  recollection as to when Mr. Valerio had stated he had been

7  previously arrested?

8  A    Yes.

9  Q    I'm showing you what is marked as 3500-ST-4.  It is a

10  two-page report.

11         (Handed to the witness.)

12  Q    After you have taken a look at that report, can

13  you -- do you recall when the defendant had indicated he

14  had previously been arrested?

15  A    Yes.

16         He stated he had been arrested in 2005.

17         MR. KABRAWALA:  Nothing further.

18         THE COURT:  Anything further?

19         MR. LATO:  No, your Honor.

20         THE COURT:  You may step down, detective.

21         THE WITNESS:  Thank you, your Honor.

22         (Whereupon, the witness leaves the witness

23  stand.)

24         THE COURT:  Does the government rest?

25         MR. KABRAWALA:  The government rests.

**Troyd-Redirect/Kabrawala**

59

1  THE COURT:  Does the defendant rest?

2  MR. LATO:  Yes, your Honor.

3  THE COURT:  My usual practice is to hear both

4  sides if they wish.  I'm not requesting it.  But if you

5  wish to have a post trial submission after the hearing,

6  does the government wish to do that?

7  MR. KABRAWALA:  Your Honor, it is the

8  defendant's motion.  And we ask they respond first.

9  THE COURT:  Mr. Lato, do you wish to put in

10  something in writing?

11  MR. LATO:  Not necessary, your Honor, unless

12  your Honor is requesting it, we rest on what we have done.

13  MR. KABRAWALA:  We will follow suit, Judge.

14  THE COURT:  All right.

15  As you know, we are scheduled for trial in

16  December and we are all prepared to proceed on that date?

17  MR. LATO:  Yes.

18  MR. KABRAWALA:  Yes.

19  THE COURT:  Do you wish to schedule a conference

20  then a couple of weeks from now?  Do you wish to have

21  early in September?

22  MR. KABRAWALA:  Earlier September, your Honor,

23  please.

24  September 3rd, your Honor, in the afternoon?

25  THE COURT:  In the afternoon?

60

1          MR. KABRAWALA:  Yes.

2          THE COURT:  1:00 p.m.

3          MR. KABRAWALA:  That will work, your Honor.  It

4     is acceptable.

5          MR. LATO:  Excellent.  Thank you, your Honor.

6          THE COURT:  I'm reserving decision on the

7     motion, and I will probably issue a written decision

8     before that date or enter it formally perhaps on the

9     record on that date.

10          Obviously if there are any issues that come up

11     prior to that date, you can always request a conference

12     with the Court.

13          Anything else for today?

14          MR. KABRAWALA:  Not from the government.  Thank

15     you.

16          MR. LATO:  No, your Honor, thank you.

17          THE COURT:  All right.

18          Have a good day.

19

20          (End of the proceedings.)

21

22

23

24

25

61

**I-N-D-E-X**

**W-I-T-N-E-S-S-E-S**

S T E V E N   T R O Y D                          3

DIRECT EXAMINATION                              3

BY MR. KABRAWALA

CROSS-EXAMINATION                              33

BY MR. LATO

REDIRECT EXAMINATION                           56

BY MR. KABRAWALA


**E-X-H-I-B-I-T-S**

Government's Exhibit 1 was received in          9

evidence

Government's Exhibit 2 was received in         10

evidence

Government's Exhibit 3 was received in         14

evidence

Government's Exhibit 4 was received in         19

evidence

Government's Exhibit 5 was received in         22

evidence

Government's Exhibit 6 was received in         32

evidence

A-107

62

**$**

**$1,600** [1] - 22:21

**0**

**0094** [1] - 1:3

**1**

**1** [5] - 6:23; 9:17, 20, 22; 61:13
**10** [1] - 61:15
**100** [2] - 1:13, 21
**110** [1] - 30:4
**11722** [2] - 1:14, 21
**14** [3] - 1:3; 2:1; 61:17
**17th** [4] - 22:3; 43:10; 52:13, 18
**18th** [1] - 32:12
**19** [2] - 3:22; 61:19
**19th** [1] - 44:14
**1:00** [1] - 60:2

**2**

**2** [6] - 9:15, 25; 10:13, 15-16; 61:15
**2005** [1] - 58:16
**2012** [3] - 19:12; 22:4; 43:10
**2013** [1] - 44:14
**2014** [16] - 1:7; 4:1, 14; 6:4, 21; 7:6; 10:10; 14:2; 21:20; 29:19; 30:1, 13; 31:22; 32:5; 57:14, 18
**22** [2] - 19:12; 61:21
**22nd** [3] - 22:3; 52:13, 19
**24** [1] - 31:22
**24th** [2] - 30:1; 32:5
**27th** [1] - 6:4
**28th** [12] - 4:14; 6:21; 7:6; 10:9; 13:25; 14:2; 21:20; 33:21; 34:20; 56:4; 57:14, 18
**2:00** [1] - 1:7

**3**

**3** [17] - 4:20, 22, 24; 7:3, 14; 10:4, 9; 13:19, 22; 14:7; 25:1, 10-11; 61:3, 17
**302** [6] - 47:10, 18; 49:23; 52:20, 22; 58:5
**31** [1] - 1:7
**32** [1] - 61:23
**33** [1] - 61:6

**3500-ST-4** [3] - 49:25; 52:25; 58:9
**395** [1] - 31:11
**3rd** [1] - 59:24

**4**

**4** [5] - 19:4, 10, 18-19; 61:19

**5**

**5** [7] - 21:15; 22:1, 9, 11-12; 46:19; 61:21
**56** [1] - 61:8
**5:15** [1] - 7:9

**6**

**6** [4] - 31:5; 32:1; 61:23
**60** [1] - 40:17
**631** [1] - 1:22
**6:00** [6] - 7:9, 13; 9:1; 34:2, 5
**6:10** [2] - 38:13; 46:25
**6:15** [2] - 38:13; 47:1

**7**

**7** [3] - 23:15; 24:1; 25:9
**70** [1] - 40:17
**712-6105** [1] - 1:22
**7:00** [1] - 46:15
**7:15** [1] - 46:15
**7:55** [4] - 46:17, 24; 51:9, 19

**9**

**9** [1] - 61:13
**90** [1] - 40:15
**94** [1] - 2:1

**A**

**a.m** [9] - 7:9, 13; 9:1; 34:2, 5-6; 46:17, 24; 51:9
**able** [4] - 18:2; 20:4; 39:14; 47:25
**acceptable** [1] - 60:4
**according** [1] - 37:25
**accurate** [3] - 7:5; 10:8; 14:1
**accurately** [1] - 24:13
**acknowledge** [1] - 22:14
**acknowledged** [1] - 21:25
**actions** [1] - 48:25

**addition** [1] - 40:20
**additional** [3] - 32:10; 54:2; 56:3
**address** [6] - 7:6; 17:24; 18:3; 29:4, 7, 9
**adjacent** [1] - 42:15
**admission** [2] - 48:12, 17
**admissions** [1] - 21:3
**admit** [4] - 22:7; 48:6, 9; 50:5
**admits** [1] - 50:25
**admitted** [9] - 10:15; 14:7; 19:18; 20:18; 22:11; 23:7; 25:2; 32:1; 49:17
**adult** [1] - 44:17
**advantage** [2] - 34:14, 18
**advice** [5] - 21:19; 31:11; 46:14, 16; 51:22
**advise** [4] - 12:15; 21:13; 31:12; 49:14
**advised** [9] - 8:22; 9:8; 21:10, 24; 26:24; 28:3; 30:7; 31:3; 55:6
**advising** [1] - 47:23
**affidavit** [2] - 23:22; 24:5
**afternoon** [5] - 29:25; 33:16; 59:24
**agency** [1] - 30:25
**Agent** [19] - 3:20; 4:2; 14:20, 24; 15:12; 16:1; 20:23; 21:4, 12; 30:16; 31:18; 33:16; 38:24; 43:8; 44:1, 25; 45:11; 50:13
**agent** [6] - 29:5, 14; 40:4, 8, 13; 49:7
**agent/detective** [1] - 25:12
**agents** [16] - 5:12, 15; 9:13; 12:22; 24:9, 15; 30:14; 34:19, 24; 35:1; 36:10, 21; 38:5, 23; 57:5
**Agents** [1] - 7:17
**ago** [1] - 50:15
**agree** [1] - 48:23
**ahead** [2] - 33:12; 34:17
**airline** [1] - 22:21
**allegation** [2] - 5:25; 20:25
**allegations** [1] - 27:25

**Allen** [3] - 2:5; 21:9; 51:17
**ALLEN** [1] - 1:15
**allow** [2] - 27:13; 49:10
**allowed** [2] - 39:3, 7
**alone** [2] - 12:24; 57:11
**aloud** [1] - 20:2
**AMEET** [1] - 1:14
**Ameet** [1] - 2:4
**AMERICA** [1] - 1:3
**American** [1] - 5:8
**Angelini** [2] - 19:1; 20:23
**Angelini's** [1] - 44:25
**answer** [3] - 8:18; 9:2; 50:11
**answered** [2] - 9:4; 49:16; 55:18
**Anthony** [6] - 2:8; 18:10; 29:8; 45:21, 25
**ANTHONY** [1] - 1:17
**anticipate** [2] - 2:16, 18
**apologize** [1] - 35:20
**appearance** [1] - 2:3
**APPEARANCES** [1] - 1:11
**approach** [4] - 8:7; 19:6; 23:19; 43:4
**approached** [1] - 8:9
**approaches** [2] - 19:9; 43:7
**area** [2] - 10:23; 15:19
**armor** [1] - 8:1
**arrangement** [1] - 39:22
**arrest** [15] - 6:12; 26:25; 27:12; 28:3; 30:2, 13; 44:2, 6; 48:18; 49:4, 9; 55:4, 9; 57:25
**arrested** [12] - 27:8; 29:21, 24-25; 30:8; 32:6; 55:16; 57:20, 23; 58:7, 14, 16
**arresting** [1] - 30:5
**arrests** [1] - 35:17
**arrive** [1] - 7:8
**arrived** [2] - 30:24; 34:20
**article** [1] - 32:24
**aside** [1] - 38:2
**asleep** [2] - 34:11
**assigned** [5] - 3:23, 25; 4:18; 8:11; 38:25

assignment [1] - 4:17
assistance [1] - 41:2
Assistant [2] - 19:1;
21:9
Assistants [1] - 1:15
assisted [1] - 1:24
attache [1] - 5:6
Attache [1] - 19:1
attempt [1] - 57:5
attention [2] - 4:13;
29:18
attorney [8] - 18:6,
8; 27:5, 23; 29:8;
45:19, 21; 53:22
Attorney [3] - 1:13,
15; 21:9
Attorney's [11] -
21:5, 8; 49:14, 18, 20;
50:9, 14, 17, 23; 51:2,
5
AUSA [1] - 51:17
authenticate [1] -
29:9
authority [1] - 49:9
authorized [1] - 21:11
authorizing [1] - 21:5
aware [12] - 23:21, 24;
42:22; 43:9, 18-20,
24-25; 44:13, 16; 55:8

**B**

B-E-R-E-S-K-O-V-A [1]
- 13:2
background [2] - 23:11
Badalucco [3] - 14:22;
15:4, 15
bail [1] - 29:21
ballistic [1] - 8:1
base [1] - 10:25
based [9] - 5:25;
20:25; 34:7, 15; 43:12;
44:5, 25; 48:25; 54:16
basement [1] - 11:23
bear [1] - 49:4
bedroom [3] - 37:3, 21
bedrooms [1] - 11:22
BEFORE [1] - 1:8
began [4] - 13:16;
28:23; 34:4; 38:16
behind [8] - 9:12;
15:9; 24:11, 16, 20,
23-24; 40:11
believes [1] - 24:6
belonging [1] - 29:5
Bereskova [6] - 13:1,
5; 15:21, 24; 28:25;

39:1
better [3] - 34:8, 10,
16
between [5] - 5:19;
7:9; 15:22; 18:22; 22:4
BIANCO [1] - 1:9
big [1] - 11:21
Bode [3] - 2:5; 21:10;
51:17
BODE [1] - 1:15
booking [1] - 55:13
bottles [1] - 25:6
bottom [1] - 15:13
box [2] - 51:11
briefed [1] - 7:11
briefly [1] - 56:8
brought [1] - 29:11
bubble [1] - 20:20
building [2] - 4:24;
9:12
bullet [1] - 35:21
bullet-proof [1] -
35:21
Bureau [1] - 3:17
BY [6] - 3:15; 33:15;
56:11; 61:5, 7, 9

**C**

C-41 [1] - 3:25
C.S.R [1] - 1:20
calm [3] - 26:10, 19;
27:10
camera [2] - 43:15
captured [1] - 47:19
car [5] - 28:9, 14;
29:10, 15; 54:17
career [1] - 33:24
carrying [1] - 11:11
cars [1] - 27:7
case [4] - 2:1; 26:19;
32:13; 52:21
cash [1] - 5:10
Catherine [1] - 7:10
Catherine's [1] - 7:14
caution [1] - 49:4
cell [1] - 43:14
Central [5] - 1:5, 14,
21; 28:10; 29:12
certain [1] - 42:23
certainly [1] - 20:3
chair [6] - 3:10;
14:19; 15:10; 16:12;
17:3
chairs [3] - 14:16;
39:25; 40:2

chat [1] - 17:14
child [10] - 5:9, 24;
6:10; 17:11; 20:10;
23:8; 32:10; 41:12;
48:15; 53:24
children [3] - 4:4;
55:2
chronology [1] - 50:24
circumstances [1] -
49:5
citizen [1] - 5:8
claimed [1] - 20:18
clarify [1] - 7:19
clean [1] - 27:5
clearing [2] - 12:22;
57:6
CLERK [3] - 2:1, 24;
3:5
close [4] - 3:10;
24:12; 25:14, 16
closet [2] - 37:20;
51:12
closets [2] - 11:17, 24
clothed [1] - 16:15
clothing [1] - 32:25
coffee [2] - 16:24;
17:5
cold [2] - 7:24; 28:8
collected [1] - 27:6
combination [1] -
34:24
comfortable [1] - 12:1
community [1] - 4:25
complaint [4] - 6:14;
21:5, 11; 52:20
completely [1] - 34:11
complied [2] - 27:13;
30:8
computer [3] - 1:24;
25:13, 17
computer-assisted [1]
- 1:24
concern [1] - 56:18
concerned [1] - 57:11
concluded [3] - 13:9;
27:11; 50:22
conclusion [7] -
13:12; 27:4, 9; 29:10;
48:21, 24; 50:11
conduct [1] - 44:18
conducted [9] - 11:1;
13:24; 28:4; 38:14, 18;
39:5, 8; 41:25; 42:6
conducting [3] -
42:22; 43:8; 44:13
conference [2] -

59:19; 60:11
conferred [2] - 21:4,
12
confine [1] - 35:18
confirm [1] - 52:13
connection [1] - 23:22
consent [1] - 38:5
consented [2] - 39:16,
20
contact [8] - 14:12;
18:1; 49:18; 50:13, 17,
23; 51:2, 5
contacted [3] - 8:14;
18:6, 10
contacting [1] - 49:20
contain [1] - 47:11, 13
contained [2] - 20:17,
20
containing [1] - 5:24
continue [3] - 27:24;
51:23; 54:16
continued [1] - 51:1
continuing [1] - 38:20
continuous [1] - 36:8
conversation [11] -
8:21; 15:17; 21:7;
28:17, 20; 50:21; 54:5,
17
copies [3] - 5:19;
22:2, 4
copy [7] - 5:23; 18:21,
25; 19:13; 23:1, 17
corner [3] - 14:23;
15:8, 13
correct [30] - 38:10,
20; 39:20; 41:14, 16,
19, 23; 42:16, 19, 24;
44:23; 45:16, 22, 25;
46:17; 47:1, 4, 8;
49:18; 50:15; 51:3;
53:19, 21; 54:13;
55:10, 18, 20, 23;
56:15
Counsel [2] - 19:9;
43:7
counsel [1] - 55:9
Counties [1] - 7:17
country [1] - 17:21
County [4] - 14:18, 23;
25:22; 35:11
couple [1] - 59:20
COURT [38] - 1:1; 2:7,
11, 15, 18, 21; 3:9;
9:18, 20; 10:15; 14:7;
19:8, 18; 22:11; 26:15;
32:1; 33:2, 7, 12;
43:6; 48:7, 20, 23;

63

49:6; 53:5; 54:15;
58:18, 20, 24; 59:1, 3,
9, 14, 19, 25; 60:2, 6,
17
**Court** [7] - 1:20; 20:2;
23:18, 20; 49:2; 60:12
**courtesy** [1] - 23:18
**courthouse** [5] - 6:6;
28:10; 29:11, 16; 54:1
**Courthouse** [1] - 1:4
**courtroom** [6] - 10:2;
13:21; 21:17; 25:5;
31:7; 32:22
**CR** [2] - 1:3; 2:1
**crime** [1] - 3:25
**crimes** [1] - 4:4
**criminal** [2] - 6:14;
46:3
**CROSS** [2] - 33:14; 61:6
**cross** [2] - 56:12, 14
**CROSS-EXAMINATION** [2]
- 33:14; 61:6
**cross-examination** [1]
- 56:12
**cum** [2] - 20:4; 47:25
**cup** [1] - 17:5
**custody** [1] - 30:15
**cutlery** [2] - 38:2;
56:21
**Czechoslovakian** [3] -
29:1; 54:21, 25

**D**

**danger** [2] - 11:18;
39:1
**dangerous** [1] - 37:24
**Daniel** [1] - 31:18
**Danielle** [1] - 14:20
**dark** [3] - 12:1; 25:14,
25
**date** [9] - 29:24; 32:4;
52:8, 12; 58:2; 59:16;
60:8, 11
**dated** [2] - 31:20, 22
**Dawn** [1] - 15:20
**December** [1] - 59:16
**decided** [9] - 21:3, 13;
27:5; 49:13; 50:8, 12,
16, 22; 51:2
**decision** [2] - 60:6
**decline** [3] - 53:11,
14, 16
**declined** [4] - 22:18;
27:22; 53:8, 17
**Defendant** [2] - 1:6,
17

**defendant** [23] - 16:1,
5; 21:24; 23:21; 24:16;
25:19; 26:17, 24;
27:21; 28:1; 29:11, 20,
24; 30:5, 19; 32:4;
33:2; 56:24; 57:2, 13,
18; 58:13; 59:1
**defendant's** [4] -
30:12; 49:5; 59:8
**demeanor** [1] - 26:8
**departed** [1] - 7:13
**Department** [2] -
14:18; 25:23
**department** [1] - 8:3
**depiction** [3] - 7:5;
10:8; 14:1
**describe** [2] - 26:12,
16
**described** [1] - 10:24
**designate** [1] - 53:6
**designated** [1] - 52:22
**Detective** [12] -
14:17, 22; 15:4, 15;
21:22; 25:22, 24; 26:5,
8, 12, 16, 18
**detective** [3] - 24:9;
25:21; 58:20
**detectives** [4] - 7:16;
34:25; 35:1; 38:9
**determination** [1] -
48:22
**developing** [1] - 26:10
**DHL** [10] - 20:16, 21;
49:22; 50:5, 8, 12,
19-20; 51:1
**different** [1] - 11:23
**dining** [25] - 12:4;
13:13, 15, 24-25; 14:2,
11; 15:1, 19, 23; 24:9,
18; 25:1, 18; 38:9, 19;
39:10, 15, 18, 22-23,
25; 41:9, 22; 42:15
**DIRECT** [2] - 3:14; 61:4
**directed** [2] - 20:9;
48:14
**directly** [2] - 24:23;
29:16
**discussed** [3] - 8:20;
12:11; 47:19
**discussing** [1] - 26:19
**discussion** [1] - 50:18
**disk** [1] - 20:17
**dismayed** [2] - 17:23;
18:2
**displayed** [1] - 8:2
**DISTRICT** [2] - 1:1
**District** [1] - 1:20

**document** [10] - 10:1;
13:20; 19:5; 21:16, 18;
24:4; 25:4; 31:6, 8;
46:18
**Doe** [1] - 43:22
**dollars** [1] - 22:20
**done** [4] - 11:14;
38:16; 43:16; 59:12
**Donuts** [1] - 17:5
**door** [20] - 7:3, 6;
8:13, 24; 9:2, 4-7,
11-12; 10:6, 19, 21;
11:3, 7; 15:25; 35:6;
36:10
**doorway** [2] - 36:5, 7
**down** [7] - 17:8; 26:22;
39:14; 41:10; 45:12;
54:24; 58:20
**downstairs** [1] - 57:7
**dozen** [1] - 34:24
**dozens** [2] - 4:12;
33:24
**draw** [1] - 4:13
**drawn** [3] - 11:6, 9;
16:18
**dressed** [3] - 7:23;
8:5; 11:3
**drink** [3] - 16:21;
28:12, 18
**drive** [3] - 28:10;
29:16
**Drive** [7] - 4:20, 22,
24; 7:3, 14; 10:5, 9
**drove** [2] - 7:14; 30:15
**duly** [1] - 3:3
**Dunkin** [1] - 17:5
**during** [24] - 4:10;
8:20; 12:7, 11; 14:12;
15:2; 16:7, 23; 17:6;
18:9, 20-21; 21:10;
25:18; 26:8, 11; 27:19;
28:11; 40:10; 41:3;
42:7, 20; 46:8; 47:15
**duties** [2] - 4:2, 6
**duty** [1] - 7:19

**E**

**earliest** [1] - 34:1
**early** [3] - 28:12;
45:18; 59:21
**east** [2] - 54:8; 58:3
**EASTERN** [1] - 1:1
**eastern** [1] - 28:21, 24
**eat** [6] - 16:21; 20:6;
43:23; 48:2
**effect** [1] - 26:3

**effected** [1] - 30:3
**effecting** [1] - 56:18
**eight** [1] - 38:22
**either** [2] - 16:12;
35:10
**email** [39] - 5:19;
17:24; 18:3, 21, 23-25;
19:11-13, 21, 24; 20:8,
13; 22:4, 6; 29:3, 7,
9; 43:14, 21; 44:14;
46:10, 13; 47:22; 48:7,
9-10, 16; 49:17; 50:16,
25; 52:5, 12, 18; 53:6,
16
**emails** [11] - 22:3, 15,
17; 42:23; 43:9; 45:5;
51:25; 52:3, 5, 10;
53:14
**employed** [2] - 3:16
**End** [1] - 60:20
**end** [6] - 10:22; 12:13;
14:13; 36:13; 58:3
**ended** [2] - 39:3; 46:25
**enforcement** [8] -
11:6; 13:5; 16:17;
24:15; 35:2, 14; 40:20;
54:12
**engaging** [2] - 26:19;
44:18
**enter** [4] - 36:9;
42:12; 45:15; 60:8
**entered** [16] - 9:7,
12-13, 17; 10:13, 19,
21; 11:7; 22:9; 31:24;
35:2; 36:6; 38:13;
44:11; 45:17
**entering** [2] - 36:14;
41:9
**entire** [1] - 12:7
**entrance** [2] - 7:21;
9:11
**entry** [1] - 57:4
**ESQ** [4] - 1:14, 17
**essence** [1] - 38:17
**essentially** [1] -
38:15
**Europe** [2] - 28:21, 24
**European** [1] - 54:8
**evidence** [29] - 6:10;
9:21, 23; 10:13, 17;
14:5, 9; 17:11; 19:16,
20; 22:9, 13; 25:2;
27:6; 31:24; 32:3, 10;
41:12; 45:3, 9; 46:19;
56:3, 22; 61:14, 16,
18, 20, 22, 24
**exact** [1] - 34:19

64

**EXAMINATION** [6] -
3:14; 33:14; 56:10;
61:4, 6, 8
**examination** [1] -
56:12
**examined** [1] - 3:3
**excellent** [1] - 60:5
**excerpt** [2] - 18:23;
19:13
**exchange** [2] - 5:10;
18:22
**exchanged** [2] - 42:24;
43:10
**exchanges** [3] - 5:19;
22:4, 6
**execute** [8] - 4:7, 18;
7:21; 8:23; 9:9; 11:16;
34:21; 35:17
**executed** [5] - 4:10,
19; 6:17; 33:18, 24
**executing** [4] - 4:10;
17:10; 34:7; 44:16
**execution** [5] - 12:8,
10; 34:2, 5; 42:20
**exhibit** [4] - 19:15;
26:21; 31:24; 43:5
**Exhibit** [36] - 6:23;
9:15, 17, 20, 22, 25;
10:13, 15-16; 13:19,
22; 14:7; 19:4, 10,
18-19; 21:15; 22:1, 9,
11-12; 23:15; 24:1;
25:1, 9; 31:5; 32:1;
46:19; 61:13, 15, 17,
19, 21, 23
**exhibited** [5] - 10:1;
13:20; 21:16; 25:4;
31:6
**EXHIBITS** [1] - 61:12
**exit** [1] - 45:17
**expense** [1] - 43:16
**experience** [6] - 34:7,
15-16; 41:1; 44:5;
54:16
**experienced** [1] -
54:12
**expert** [2] - 25:13, 17
**explained** [5] - 17:10,
12; 22:18; 36:12; 41:11
**explicit** [2] - 44:18;
50:25
**explore** [2] - 48:24;
49:7
**extorted** [1] - 17:12
**extorting** [1] - 29:2
**extortion** [1] - 18:7
**eye** [1] - 15:23

**F**

**face** [2] - 25:16; 26:6
**fact** [9] - 12:25;
17:23; 20:9, 18; 34:4;
45:3, 8; 48:22; 51:5
**facts** [1] - 26:19
**fair** [34] - 7:5; 10:8;
14:1; 33:21, 23; 34:1,
4; 35:5, 13; 36:1, 16,
20; 37:2; 38:19, 22;
39:19; 40:15; 41:21,
24; 42:1, 3, 18; 43:12;
44:1; 45:7, 11; 46:2,
16; 47:10, 18, 23;
49:16; 53:8; 54:9
**familiar** [1] - 17:25
**family** [6] - 10:25;
12:4; 15:22; 32:18;
39:1
**far** [5] - 14:13; 27:11;
40:23; 42:12; 44:9
**Farmingdale** [1] - 30:4
**FB** [2] - 21:19; 31:11
**FBI** [15] - 3:21; 4:11;
5:11, 15; 7:18; 8:2,
22; 29:4; 33:24; 35:10,
24; 47:10, 18
**February** [5] - 29:19;
30:1, 13; 31:22; 32:5
**Federal** [3] - 1:13, 21;
3:17
**federal** [1] - 29:11
**fifteen** [1] - 51:21
**filed** [1] - 23:22
**fine** [2] - 19:8; 33:7
**finished** [1] - 11:23
**firearms** [1] - 37:15
**first** [7] - 3:2; 33:18;
36:6, 20; 47:7; 55:9;
59:8
**five** [2] - 40:2; 53:3
**floor** [1] - 11:25
**follow** [1] - 59:13
**following** [3] - 21:7;
27:16; 30:12
**follows** [1] - 3:4
**followup** [1] - 49:21
**food** [1] - 29:15
**forcible** [1] - 57:24
**form** [8] - 21:19, 25;
26:15; 31:11; 53:9, 13;
54:15
**formal** [1] - 12:5
**formally** [1] - 60:8
**Forrestal** [7] - 14:17;
21:23; 25:22, 24; 26:5,

16, 18
**Forrestal's** [2] -
26:8, 12
**forth** [1] - 42:9
**frame** [2] - 40:24
**free** [13] - 41:21;
42:5, 7, 9, 12, 19-20;
45:13, 15; 48:4; 56:13,
15, 24
**freely** [1] - 57:3
**friendly** [1] - 26:10
**front** [9] - 7:3, 5;
8:11, 13-14; 10:6;
12:6; 17:3; 35:5
**furthermore** [1] -
17:20

**G**

**Gate** [7] - 4:20, 22,
24; 7:3, 14; 10:4, 9
**gathered** [2] - 7:9
**general** [1] - 40:5
**generally** [4] - 4:1;
5:4; 8:4; 22:24
**girlfriend** [5] -
12:17, 21, 25; 28:25;
57:11
**girls** [2] - 20:4; 47:25
**given** [2] - 16:20;
23:25
**Government** [3] - 1:12;
21:15; 23:25
**government** [7] - 2:22;
14:4; 31:23; 58:24;
59:6; 60:14
**Government's** [34] -
6:23; 9:15, 17, 20, 22,
24; 10:13, 15-16;
13:19, 22; 14:7; 19:4,
10, 18-19; 22:1, 9,
11-12; 23:15; 25:1, 9;
31:5; 32:1; 46:19;
61:13, 15, 17, 19, 21,
23
**ground** [2] - 11:25;
28:9
**grounds** [1] - 48:20
**gun** [2] - 11:9, 11
**guns** [1] - 11:6

**H**

**half** [5] - 34:11; 47:6,
12, 15, 20
**hall** [2] - 12:13; 36:14
**hallway** [10] - 9:10;
10:4, 9, 22; 15:22;
36:8; 42:14; 45:15, 17

**hand** [3] - 2:25; 15:13;
23:17
**handcuffed** [1] - 16:12
**handcuffing** [1] - 30:8
**handcuffs** [2] - 27:13;
57:15
**Handed** [6] - 6:24;
23:20; 46:20; 50:4;
53:2; 58:11
**HARRY** [1] - 1:20
**head** [1] - 14:15
**hear** [1] - 59:3
**hearing** [2] - 2:12;
59:5
**HEARING** [1] - 1:6
**help** [1] - 52:20
**helps** [1] - 53:1
**herself** [2] - 5:20;
39:2
**hidden** [1] - 51:13
**hiding** [1] - 11:18
**High** [7] - 4:20, 22,
24; 7:3, 14; 10:4, 9
**higher** [2] - 29:1;
54:21
**highlighted** [1] -
19:23
**himself** [1] - 55:23
**home** [2] - 8:16; 41:16
**Honor** [19] - 2:13;
9:19; 19:7; 33:5, 11;
43:4; 53:4; 56:8;
58:19, 21; 59:2, 7,
11-12, 22, 24; 60:3, 5,
16
**HONORABLE** [1] - 1:9
**Hospital** [1] - 7:11
**hour** [4] - 47:6, 12,
15, 20
**house** [29] - 5:2;
11:22; 12:6, 14, 19;
13:6; 24:12; 28:8;
33:19; 36:15, 18; 37:9;
38:1, 6, 20; 39:4, 7;
42:5, 7; 44:6, 10-11,
21; 45:17; 56:15, 19,
22; 57:2, 14
**housekeeping** [2] -
9:16; 22:8

**I**

**identification** [3] -
24:1; 25:10; 33:3
**identified** [2] - 15:9;
56:5
**identify** [1] - 35:17
**identifying** [1] -

65

32:24
**ignore** [1] - 49:25
**image** [1] - 13:23
**immediately** [10] - 10:20; 15:18; 24:16; 27:8; 30:12; 35:13; 36:12; 38:15; 41:8
**impacted** [1] - 49:8
**implying** [1] - 54:22
**including** [1] - 7:16
**INDEX** [1] - 61:1
**indicate** [1] - 57:9
**indicated** [2] - 12:23; 58:13
**indictment** [1] - 6:14
**individual** [3] - 12:18; 32:21; 34:14
**information** [3] - 5:7; 40:23; 54:10
**initial** [11] - 14:12; 15:2; 17:6; 18:9; 22:15; 25:18; 53:11, 14, 16; 57:4
**inquired** [1] - 41:10
**inside** [1] - 35:23
**insignia** [1] - 8:2
**insofar** [1] - 45:15
**instrument** [1] - 37:24
**intent** [2] - 44:2, 4
**interact** [1] - 16:1
**interacted** [1] - 26:16
**interacting** [1] - 15:15
**interest** [2] - 37:3, 6
**interfering** [2] - 42:1, 3
**intermittently** [1] - 15:24
**interview** [28] - 13:16, 25; 15:25; 16:23; 18:21; 19:23; 21:10; 26:11; 27:4, 9, 16, 20; 31:2; 38:16, 18; 40:10, 21; 41:3, 22; 42:22; 44:25; 45:18; 46:8; 47:3, 7, 11; 51:1; 52:11
**interview's** [1] - 41:4
**interviewing** [2] - 20:23; 34:15
**introduced** [1] - 19:16
**investigating** [1] - 41:1
**investigation** [2] - 3:18; 43:13
**investigations** [1] -

4:5
**involved** [2] - 5:8; 15:25
**Island** [2] - 30:24; 58:4
**Islip** [5] - 1:5, 14, 21; 28:10; 29:12
**issue** [2] - 51:11; 60:7
**issued** [2] - 6:3
**issues** [1] - 60:10
**items** [1] - 37:15

---

**J**

**jacket** [2] - 14:19; 28:8
**jackets** [3] - 7:25; 8:1
**Jane** [1] - 43:22
**January** [15] - 4:1, 14; 6:4, 21; 7:6; 10:9; 13:25; 14:2; 21:20; 32:12; 33:21; 34:20; 56:4; 57:14, 18
**Jarmila** [4] - 13:1; 28:25; 38:25; 39:3
**JARMILA** [1] - 13:1
**job** [2] - 3:19; 43:17
**JOSEPH** [2] - 1:5, 9
**Joseph** [5] - 2:2; 5:3, 9; 23:21; 32:20
**Judge** [2] - 6:5; 59:13
**juice** [2] - 28:12; 29:14
**July** [7] - 1:7; 19:12; 22:3; 43:10; 52:13

---

**K**

**Kabrawala** [1] - 2:4
**KABRAWALA** [32] - 1:14; 2:4, 13, 17, 22; 3:15; 9:16; 10:12; 14:4; 19:6, 15; 22:8; 23:17; 31:23; 33:4; 48:19, 21; 49:3; 54:14; 56:8, 11; 58:17, 25; 59:7, 13, 18, 22; 60:1, 3, 14; 61:5, 9
**Kalichenko** [29] - 5:7, 11-12; 17:13, 18; 18:5, 7, 22; 19:2, 11; 20:10, 17, 24; 22:5, 19; 23:2, 8, 12; 27:25; 29:2; 42:24; 43:9, 21; 45:1; 46:10; 48:10, 14; 50:6; 53:24
**Kalichenko's** [2] - 5:25; 20:25
**keep** [2] - 3:11; 54:13

**kept** [1] - 22:22
**key** [4] - 25:15; 51:11, 13
**Kiev** [1] - 5:6
**kill** [3] - 32:17; 55:22, 24
**kind** [3] - 4:23; 18:1; 27:15
**kitchen** [5] - 16:25; 24:23; 38:2; 42:9; 56:21
**knocked** [2] - 8:13
**knocking** [1] - 9:12

---

**L**

**LaPinta** [10] - 1:17; 2:8; 18:10, 12; 29:8; 45:21, 25; 46:2, 6
**laptop** [1] - 23:3
**large** [2] - 12:1
**last** [1] - 13:1
**Lato** [2] - 2:8; 59:9
**LATO** [28] - 1:17; 2:8, 14, 20; 9:19; 10:14; 14:6; 19:17; 22:10; 26:14; 31:25; 33:1, 5, 8, 11, 15; 43:1, 4; 48:8; 53:3; 56:7; 58:19; 59:2, 11, 17; 60:5, 16; 61:7
**law** [9] - 11:6; 13:4; 16:17; 24:15; 35:2, 14; 40:20; 46:3; 54:12
**lawyer** [3] - 18:14, 18; 28:1
**learn** [2] - 57:19, 22
**learned** [1] - 54:22
**least** [2] - 38:24; 40:2
**leave** [6] - 41:21; 45:13, 15; 48:4; 56:13, 25
**leaves** [1] - 58:22
**left** [3] - 14:23; 15:11, 13
**left-hand** [1] - 15:13
**Legal** [1] - 19:1
**legal** [3] - 5:6; 48:21, 23
**Leonard** [1] - 2:8
**LEONARD** [1] - 1:17
**lesson** [1] - 54:22
**line** [2] - 50:10
**living** [1] - 12:5
**load** [1] - 27:6
**loaded** [1] - 37:22
**located** [3] - 12:18;

30:4
**location** [5] - 4:23; 7:8, 12, 21; 8:11
**lock** [2] - 51:11
**logo** [1] - 35:24
**look** [5] - 46:18; 49:23; 52:12, 14; 58:12
**looked** [4] - 7:6; 10:9; 14:2; 54:24
**looking** [6] - 7:2; 10:3; 11:18; 17:11; 27:2; 41:11
**looks** [3] - 12:5; 17:4; 25:6
**LORETTA** [1] - 1:12
**low** [1] - 25:15
**LYNCH** [1] - 1:12

---

**M**

**Magistrate** [1] - 6:5
**main** [1] - 37:20
**marked** [13] - 6:22; 9:14, 24; 13:19, 22; 19:3; 21:15; 22:1; 23:14, 25; 24:25; 31:4; 58:9
**Marshal's** [1] - 29:17
**material** [1] - 5:16
**materials** [1] - 27:6
**matter** [3] - 9:16; 22:8; 44:2
**mean** [4] - 7:15; 11:15; 52:8; 53:17
**mechanical** [1] - 1:24
**meet** [2] - 5:12; 30:18
**meeting** [7] - 15:2; 16:7; 17:6; 18:9, 20; 25:18; 26:9
**members** [5] - 7:12; 8:4; 12:15; 35:14; 40:19
**memorabilia** [1] - 51:14
**men** [2] - 12:23; 57:12
**mention** [1] - 45:19
**mentioned** [2] - 7:15; 45:21
**message** [2] - 18:2; 44:14
**messages** [2] - 17:14, 18
**Messineo** [9] - 14:21, 24; 15:12; 21:4, 12; 29:14; 30:16; 31:19; 50:13
**method** [1] - 20:15

66

microphone [1] - 3:10
might [1] - 44:24
mind [5] - 20:1; 48:25;
49:1, 5
minibar [1] - 25:8
minor [1] - 44:18
minority [2] - 47:19,
21
minutes [5] - 11:21;
33:5; 37:1; 51:21; 53:3
Miranda [7] - 21:14;
47:7, 23; 53:9, 12;
55:6
Mirandized [5] -
30:19, 21; 32:4; 57:17,
19
moment [2] - 43:1;
50:15
money [3] - 17:19;
22:20, 23
month [1] - 29:18
morning [9] - 2:6, 10;
7:9, 24; 13:6; 28:13;
32:20; 46:12
most [3] - 40:13;
47:15, 17
motion [2] - 59:8; 60:7
move [7] - 19:15; 39:4,
7; 42:19; 56:15; 57:2
moved [1] - 14:5
movie [1] - 11:25
MR [58] - 2:4, 8,
13-14, 17, 20, 22;
3:15; 9:16, 19; 10:12,
14; 14:4, 6; 19:6, 15,
17; 22:8, 10; 23:17;
26:14; 31:23, 25; 33:1,
4-5, 8, 11, 15; 43:1,
4; 48:8, 19, 21; 49:3;
53:3; 54:14; 56:7, 11;
58:17, 19, 25; 59:2, 7,
11, 13, 17-18, 22;
60:1, 3, 5, 14, 16;
61:5, 7, 9
mug [2] - 16:24; 17:1
multiple [1] - 11:22

N

N.Y [1] - 1:5
name [9] - 3:5, 7;
12:25; 13:2; 18:8;
43:22; 45:19, 24
named [2] - 5:9; 17:13
Nassau [2] - 7:17;
14:23
necessary [1] - 59:11
need [3] - 21:13;

43:15; 46:18
needed [2] - 49:13;
51:14
negatively [1] - 28:24
negatives [1] - 54:18
negotiate [1] - 17:19
never [3] - 22:22;
53:23; 57:1
nevertheless [1] -
55:12
NEW [1] - 1:1
New [6] - 1:14, 21;
4:22, 25; 7:4; 30:4
next [10] - 10:23;
14:17, 20; 21:2; 22:1,
25; 28:6; 29:18; 40:11
niece [1] - 32:15
nothing [3] - 33:4;
56:7; 58:17
notice [1] - 34:17
November [1] - 44:14
number [2] - 34:19;
56:20
numerically [1] -
23:16

O

o'clock [1] - 46:15
objection [9] - 9:18;
10:14; 14:6; 19:17;
22:10; 26:14; 31:25;
48:19; 54:14
observable [2] -
35:14; 36:2
obtain [1] - 6:1
obtained [1] - 56:3
obviously [1] - 60:10
occasion [1] - 29:22
occurred [3] - 21:10;
30:6; 32:11
occurring [1] - 24:19
OF [3] - 1:1, 3, 6
Office [11] - 21:5, 8;
49:14, 18, 21; 50:9,
14, 17, 23; 51:2, 6
office [6] - 5:6; 30:3,
14-15, 18, 24
officer [6] - 36:9;
40:4, 8, 11, 13; 54:12
officers [14] - 11:6;
24:15; 35:2, 8-9, 21;
36:16, 21; 38:4, 8, 23;
39:11; 47:14
old [1] - 44:19
Olena [11] - 5:7;
17:13; 18:22; 19:2, 11;

22:19; 23:2, 7; 42:23;
46:10; 53:24
once [6] - 27:10;
36:10; 41:22; 45:12;
46:25; 55:6
one [20] - 2:17; 16:23;
22:3, 20; 24:24; 36:8;
40:4, 8; 43:1; 50:10;
52:5, 11, 13, 23;
56:19; 57:4
open [2] - 8:23; 40:8
opened [6] - 9:6;
10:21; 11:3; 35:5;
36:10
opening [1] - 24:23
opposed [1] - 47:16
order [2] - 23:15
ourselves [1] - 35:17
outside [2] - 15:18;
35:23
own [2] - 39:18; 42:10

P

p.m [2] - 1:7; 60:2
package [11] - 20:16,
19, 21; 49:22; 50:5, 8,
12, 19-20; 51:1
page [2] - 19:4; 58:10
pants [2] - 11:4
pantyhose [2] - 20:5;
47:25
paragraph [3] - 24:8;
25:10
park [1] - 58:3
parking [2] - 7:11, 13
part [2] - 4:6; 50:21
participated [1] -
4:10
participating [1] -
38:23
particular [3] - 3:23;
4:17; 23:9
particularly [1] -
28:21
parts [3] - 38:20; 53:9
passersby [1] - 36:2
past [2] - 10:6; 15:24
pause [2] - 33:9; 43:2
paying [1] - 17:19
pedigree [1] - 54:10
people [7] - 8:3, 10;
11:18; 36:2, 10; 39:23
percent [2] - 40:15, 17
perfect [1] - 43:15
perhaps [1] - 60:8
period [1] - 25:16

periods [1] - 47:16
permission [3] - 36:9;67
17, 19
person [2] - 14:22;
54:13
personnel [3] - 13:5;
16:17; 24:16
perspective [1] - 37:7
Peter [1] - 19:1
phone [5] - 8:18;
18:17; 43:15; 51:10, 17
photograph [2] - 10:4;
13:24
physically [1] - 24:18
picture [3] - 15:13;
17:1; 25:1
Pinelawn [1] - 31:1
place [5] - 25:14;
26:1; 30:2; 58:1, 3
placed [1] - 26:25
plainclothes [1] -
35:8
play [3] - 20:6; 43:22;
48:1
played [2] - 23:3, 5
Plaza [2] - 1:13, 21
point [36] - 8:7;
10:18; 15:2; 16:23;
18:11, 15; 21:12; 22:2,
21; 23:1; 26:21, 24;
28:3; 30:20; 32:16, 24;
38:4, 8; 40:10; 41:13;
43:13; 44:12; 45:4, 18;
46:8; 48:17; 49:4, 9,
13; 51:6; 53:20; 54:11;
56:22; 57:4
poised [1] - 26:10
police [5] - 8:2;
17:20, 22; 35:11, 24
Police [2] - 14:18;
25:23
policy [1] - 35:16
pornography [10] -
5:10, 24; 6:10; 17:11;
20:10, 12, 14; 32:11;
41:12; 48:15
portion [2] - 19:24;
46:9
post [1] - 59:5
potential [1] - 37:9
potentially [1] - 49:8
practice [1] - 59:3
practiced [1] - 46:3
preference [2] -
28:21; 54:7
premises [1] - 11:17

**preparation** [1] - 19:23

**prepared** [1] - 59:16

**present** [4] - 13:6; 25:17; 29:16; 35:9

**pretty** [1] - 11:21

**prevented** [2] - 24:19

**previous** [1] - 7:25

**previously** [5] - 52:23; 57:20, 23; 58:7, 14

**primary** [2] - 4:2; 7:19

**probable** [5] - 44:6, 9, 12; 48:18; 49:3

**problem** [1] - 54:19

**procedures** [1] - 34:9

**proceed** [2] - 2:12; 59:16

**proceeded** [3] - 28:9; 29:16; 36:17

**proceeding** [1] - 7:12

**Proceedings** [1] - 1:24

**proceedings** [4] - 23:22; 33:10; 43:3; 60:20

**process** [1] - 15:25

**processing** [1] - 55:14

**produce** [2] - 20:10; 48:15

**produced** [1] - 1:24

**professional** [1] - 26:11

**proof** [1] - 35:21

**prosecuted** [1] - 17:21

**protective** [1] - 11:2

**provide** [4] - 5:11, 15, 18; 18:8

**provided** [9] - 5:9, 19, 23; 16:24; 18:25; 19:1; 22:2; 23:3; 29:7

**psychologist** [2] - 30:14, 17

**psychologist's** [1] - 30:3

**pull** [1] - 3:10

**purchased** [2] - 22:22; 29:14

**purpose** [2] - 6:8; 41:5

**pussy** [3] - 20:6; 43:23; 48:2

**put** [5] - 26:21; 27:13; 28:9; 57:15; 59:9

### Q

**quality** [2] - 29:1; 54:21

**questioned** [1] - 24:10

**questioning** [8] - 26:13; 40:13, 16, 18; 50:10; 54:4

**questions** [5] - 35:18; 40:24; 55:12

**queued** [1] - 23:1

**quote** [9] - 24:8, 12; 25:12, 14-16, 25; 43:14; 47:24

**quoting** [1] - 43:21

### R

**raid** [1] - 8:1

**raise** [1] - 2:24

**RAPAPORT** [1] - 1:20

**rapport** [1] - 26:11

**react** [1] - 27:21

**read** [20] - 18:22; 19:13, 24; 20:1; 22:6; 24:13; 25:10; 46:9, 12; 47:7, 22, 24; 48:6, 9; 51:22; 52:3, 11, 23; 53:6

**reading** [2] - 20:2; 48:4

**ready** [2] - 2:12; 33:11

**really** [2] - 17:25; 54:25

**rear** [3] - 8:11; 9:10; 24:22

**reason** [2] - 40:7, 19

**recalled** [1] - 20:19

**received** [27] - 5:7; 9:22; 10:16; 14:8; 17:13, 18; 19:19; 20:12, 14, 16, 19; 22:12; 32:2; 44:17; 45:4, 8, 10; 48:15; 50:5; 61:13, 15, 17, 19, 21, 23

**recipient** [1] - 44:22

**recognize** [2] - 23:10; 31:8; 45:24

**recognized** [2] - 23:7; 45:24

**recollection** [6] - 37:25; 46:21; 49:24; 50:3; 52:17; 58:6

**record** [4] - 2:3; 3:6; 9:17; 60:9

**recorded** [1] - 1:24

**redacted** [1] - 43:22

**REDIRECT** [2] - 56:10; 61:8

**refer** [1] - 19:24

**reference** [2] - 18:4,

7

**referring** [3] - 24:8; 25:3, 10

**refresh** [4] - 46:21; 49:23; 52:17; 58:5

**refreshes** [1] - 50:3

**regarding** [1] - 24:5

**released** [1] - 29:21

**relevant** [1] - 48:22

**remain** [3] - 2:24; 27:10; 54:19

**remarks** [1] - 49:25

**remember** [8] - 33:19; 36:24; 38:12; 42:13; 49:11; 55:4; 58:2

**report** [4] - 20:22; 47:10; 58:10, 12

**Reporter** [1] - 1:20

**represented** [1] - 55:9

**request** [2] - 39:21; 60:11

**requested** [2] - 16:23; 27:22

**requesting** [2] - 59:4, 12

**reserving** [1] - 60:6

**resided** [2] - 5:1

**residence** [10] - 6:1, 9, 18; 8:7, 10, 15; 11:2; 34:20; 35:3; 38:14

**resident** [1] - 30:25

**residential** [3] - 4:24; 5:2

**respect** [3] - 18:1, 4; 19:21

**respond** [1] - 59:8

**response** [5] - 50:16; 54:4, 6, 9; 55:25

**responsibilities** [2] - 4:2, 6

**responsibility** [1] - 12:9

**responsible** [1] - 15:20

**rest** [5] - 11:1; 58:24; 59:1, 12

**restrained** [2] - 16:10; 57:13

**rests** [1] - 58:25

**returned** [1] - 51:18

**revealed** [2] - 43:13; 44:3

**review** [1] - 52:22

**reviewed** [1] - 24:2

**ride** [2] - 28:14; 29:10

**rifle** [1] - 11:11

**rights** [11] - 21:14, 19, 24-25; 31:3, 11-12; 46:14, 17; 51:22; 55:6

**Road** [2] - 30:25; 31:1

**room** [39] - 10:24; 11:25; 12:1, 3-5; 13:13, 16, 24-25; 14:2, 11; 15:1, 5, 19, 22-23; 24:9, 18; 25:2, 18; 31:2; 38:9, 19; 39:1, 10, 15, 18, 22-23, 25; 41:9, 22; 42:12, 15; 51:20

**rooms** [4] - 11:17, 23; 12:22; 57:6

**Rory** [3] - 14:17; 21:22; 25:22

**Route** [1] - 30:4

**rug** [1] - 10:23

**run** [1] - 56:19

**Russian** [3] - 28:22; 54:8, 24

68

### S

**safe** [1] - 57:8

**safety** [6] - 15:21; 34:9; 36:21; 37:6, 9; 56:18

**sake** [1] - 35:2

**sat** [4] - 13:16; 17:8; 41:10; 45:12

**saw** [1] - 53:23

**schedule** [1] - 59:19

**scheduled** [2] - 2:11; 59:15

**screen** [5] - 10:2; 13:21; 21:17; 25:5; 31:7

**search** [43] - 4:7, 9, 18-19; 5:4; 6:1, 3-4, 18; 7:22; 8:4, 23; 9:9; 11:1, 16; 12:10; 17:10; 27:5, 11; 28:4; 32:11; 33:24; 34:7; 36:13; 38:19, 23; 39:5, 8; 41:11, 25; 42:2, 4, 6, 8, 21; 44:10, 12-13, 16; 52:21; 56:4, 18

**searching** [5] - 6:8, 10; 24:12; 51:15; 56:23

**seated** [10] - 3:9; 14:21; 15:7, 12, 21; 24:10; 27:10; 39:1, 23

**seating** [1] - 12:2

**seats** [1] - 40:8

**second** [2] - 29:21;

55:4

**section** [2] - 19:25; 20:1

**secure** [2] - 7:21; 11:16

**security** [9] - 13:8, 12; 36:22, 24; 38:14, 16; 39:3; 46:25

**see** [11] - 6:25; 11:11; 17:1; 20:4; 32:21; 45:8; 47:25; 50:3; 52:22, 25; 54:18

**segment** [2] - 23:3, 6

**seized** [1] - 56:22

**sent** [17] - 5:24; 19:12; 20:17; 22:7, 19; 23:2, 13; 29:3; 43:14, 20; 46:10; 48:10, 13; 49:17; 50:25; 52:1, 6

**separate** [1] - 11:25

**September** [3] - 59:21, 24

**Service** [1] - 29:17

**seven** [1] - 38:24

**several** [1] - 40:19

**sexually** [2] - 44:18; 50:25

**shotgun** [3] - 11:12; 37:11, 18

**show** [10] - 6:22; 9:14; 13:18; 23:14; 24:25; 46:19; 49:25; 51:25; 52:25; 58:5

**showed** [2] - 52:10, 18

**showing** [6] - 9:24; 13:22; 19:3; 21:15; 31:4; 58:9

**shown** [1] - 53:15

**sides** [3] - 2:12; 8:12; 59:4

**Sienna's** [1] - 7:10

**sign** [8] - 22:14, 17; 27:15, 18-19, 22; 53:8, 14

**signed** [5] - 21:19, 21; 31:13, 15

**signing** [1] - 21:25

**silence** [1] - 47:16

**silent** [1] - 54:19

**similar** [1] - 35:11

**similarly** [1] - 8:5

**simplicity** [1] - 35:1

**sit** [2] - 13:13; 39:14

**sitting** [5] - 14:13; 15:10; 17:4; 32:21; 40:1

**six** [1] - 40:3

**skin** [1] - 10:23

**small** [1] - 25:8

**Smallwood** [3] - 15:20; 16:1; 38:25

**Smithtown** [4] - 4:22, 25; 7:4, 11

**snow** [1] - 28:8

**snowed** [1] - 7:24

**Sofia** [2] - 20:6; 48:1

**soft** [1] - 25:15

**someone** [1] - 24:20

**somewhat** [1] - 17:3

**sorry** [3] - 31:1; 48:8; 52:15

**space** [1] - 51:19

**speaking** [12] - 4:1; 5:4; 8:5; 16:4; 20:5; 22:24; 29:6; 47:17, 25; 51:17; 54:7

**Special** [13] - 3:20; 4:2; 7:17; 14:20; 20:23; 21:4; 31:18; 33:16; 43:8; 44:1; 45:11; 50:13

**spell** [2] - 3:5; 17:15

**Splash** [1] - 58:3

**Splish** [1] - 58:3

**spoken** [1] - 32:19

**spontaneously** [1] - 48:12

**sports** [1] - 51:14

**squad** [3] - 3:24; 4:3

**St** [2] - 7:10, 14

**stairs** [1] - 57:5

**stairway** [1] - 11:1

**stand** [4] - 19:9; 27:12; 43:7; 58:23

**standing** [13] - 2:24; 14:23; 15:7-9, 11, 18, 22; 24:16, 20, 24; 36:7; 40:4

**started** [4] - 2:21; 34:1; 41:22; 47:3

**state** [6] - 2:3; 3:5; 48:25; 49:1, 5

**statement** [14] - 18:4; 22:24; 27:16, 19, 22; 42:1, 18; 45:7, 11; 46:2, 16; 47:18; 48:3

**statements** [1] - 54:2

**STATES** [2] - 1:1, 3

**States** [6] - 1:13, 20; 2:1, 5; 21:9; 29:17

**stationed** [2] - 5:12, 15

**stay** [1] - 57:7

**stenography** [1] - 1:24

**step** [1] - 58:20

**Steven** [2] - 2:22; 3:7

**STEVEN** [1] - 3:8

**still** [4] - 24:11; 28:12; 38:19; 48:4

**stipulate** [1] - 33:1

**stipulates** [1] - 33:2

**stood** [3] - 10:25; 12:13; 24:11

**stop** [1] - 13:18

**stopped** [1] - 28:11

**Street** [1] - 30:25

**strongly** [1] - 9:11

**style** [1] - 26:12

**submission** [1] - 59:5

**substance** [2] - 32:9; 55:22

**Suffolk** [4] - 7:17; 14:18; 25:22; 35:11

**suggested** [1] - 45:5

**suggestion** [1] - 39:19

**suit** [1] - 59:13

**sum** [1] - 32:9

**supervisor** [2] - 15:20; 38:24

**supposedly** [1] - 29:5

**suppression** [1] - 2:11

**suspect** [1] - 34:10

**suspected** [1] - 44:24

**suspects** [1] - 34:15

**Sustained** [2] - 26:15; 54:15

**sweep** [17] - 11:2, 14, 20; 12:8, 16; 13:8, 12; 36:22, 24; 37:3, 5; 38:14, 16; 39:3; 46:25

**sweeping** [1] - 11:17

**sworn** [2] - 3:3; 27:18

---

**T**

**T-R-O-Y-D** [1] - 3:8

**table** [13] - 13:16; 14:14; 16:12; 24:9, 22; 25:2, 6, 8, 18; 39:23; 45:12

**tank** [1] - 11:4

**team** [9] - 7:10, 12, 15-16; 8:4; 11:1; 12:15; 42:2, 4

**team's** [1] - 7:19

**telephone** [1] - 8:20

**telephonically** [1] - 8:14

**ten** [3] - 11:21; 37:1; 51:20

**tenure** [1] - 4:10

**terms** [2] - 37:15; 39:22

**terrific** [1] - 43:16

**testified** [3] - 3:3; 56:12, 14

**testify** [1] - 49:1

**testimony** [1] - 38:15

**text** [1] - 44:14

**THE** [42] - 2:1, 7, 11, 15, 18, 21, 24; 3:5, 7, 9; 9:18, 20; 10:15; 14:7; 19:8, 18; 22:11; 26:15; 32:1; 33:2, 7, 12; 43:6; 48:7, 20, 23; 49:6; 53:5; 54:15; 58:18, 20-21, 24; 59:1, 3, 9, 14, 19, 25; 60:2, 6, 17

**themselves** [1] - 11:19

**thousands** [1] - 22:19

**threat** [1] - 37:9

**three** [3] - 24:10; 39:24; 44:19

**tickets** [1] - 22:22

**timeframe** [1] - 52:6

**timing** [1] - 2:15

**title** [1] - 3:19

**today** [5] - 2:11, 16; 23:23; 32:22; 60:13

**together** [1] - 39:16

**took** [6] - 18:21; 30:15; 36:25; 39:10; 58:1

**top** [2] - 11:5; 25:7

**touch** [1] - 56:21

**touching** [2] - 16:7; 57:24

**TRANSCRIPT** [1] - 1:6

**transcript** [1] - 1:24

**transcription** [1] - 1:24

**transported** [1] - 28:7

**traveled** [1] - 30:18

**trial** [2] - 59:5, 15

**Troyd** [6] - 2:23; 3:7; 33:16; 43:8; 44:1; 45:11

**true** [2] - 34:8; 45:14

**trying** [2] - 48:24; 49:7

**turn** [1] - 29:18

**turned** [1] - 28:20

**turning** [1] - 25:9

**twelve** [2] - 7:16; 35:4

**two** [10] - 4:21; 12:11;

69

19:4; 22:3; 24:8, 11, 15; 30:14; 33:5; 58:10

**two-page** [2] - 19:4; 58:10

**type** [2] - 16:17; 25:8

**U**

**U.S** [13] - 1:4, 15; 21:5, 8; 49:14, 18, 20; 50:8, 14, 17, 23; 51:2, 5

**U.S.D.J** [1] - 1:9

**Ukraine** [5] - 5:6, 13, 15; 23:2; 45:1

**Ukrainian** [8] - 5:7; 28:22; 54:7, 20, 23

**ultimately** [2] - 9:2; 12:18

**unavailable** [1] - 40:24

**uncomfortable** [1] - 12:23

**under** [5] - 6:14; 8:1; 26:25; 28:3; 51:13

**uniformed** [1] - 35:9

**unit** [1] - 3:23

**UNITED** [2] - 1:1, 3

**United** [6] - 1:13, 20; 2:1, 4; 21:9; 29:17

**unless** [1] - 59:11

**unloaded** [1] - 37:22

**up** [9] - 3:11; 23:1, 17; 27:5, 12, 14; 49:2; 57:5; 60:10

**upstairs** [9] - 11:22; 12:17, 22-23; 37:20; 51:10, 16; 57:10, 12

**usual** [1] - 59:3

**V**

**V-I-B-E-R** [1] - 17:16

**VALERIO** [1] - 1:5

**Valerio** [118] - 2:2, 9; 5:3, 9, 20, 24; 6:14; 8:18, 22; 9:5-8; 10:21; 11:3; 12:7; 13:5, 13; 14:12, 15; 15:2, 10, 15; 16:8, 10, 18, 20; 17:4, 7-8, 12; 18:8, 11; 19:11, 14, 22, 25; 20:7, 9; 21:3, 6, 14, 19; 22:2, 6, 14; 23:4, 6-7, 21; 25:25; 26:18, 20; 27:15, 18; 28:7, 12, 14; 29:17, 25; 30:7, 15; 31:3, 12, 16; 32:6, 16-17, 20; 35:5;

36:5, 12; 38:9; 39:7, 10, 24; 40:11; 41:6, 13; 42:5, 23; 43:10, 13, 20; 44:2, 17, 22; 45:4, 12, 19; 46:5, 9; 47:12, 15, 22; 48:4, 6, 9, 18; 49:15, 21; 50:24; 51:13, 22; 53:8; 54:17, 20; 55:4, 15; 56:12, 14; 57:5, 9, 23; 58:6

**Valerio's** [11] - 6:1, 8, 11, 18; 18:4; 24:5; 26:6; 33:18; 34:20; 36:19; 38:5

**valuable** [1] - 41:2

**vest** [1] - 35:10

**vestibule** [2] - 36:5, 8

**vests** [4] - 35:21, 23; 36:1, 3

**Viber** [4] - 17:14, 24-25; 18:1

**vicinity** [1] - 40:5

**victim** [5] - 32:13-15; 56:5

**video** [15] - 5:23; 20:5; 23:1, 3, 6, 8, 10-11; 43:21; 44:17, 22; 45:4; 48:1, 6; 53:24

**videos** [3] - 22:18; 23:12; 43:14

**viewed** [1] - 28:24

**violation** [1] - 41:1

**violent** [1] - 3:25

**voice** [2] - 3:11; 25:15

**W**

**waiting** [1] - 31:3

**walk** [6] - 15:24; 37:20; 42:5, 7; 56:20; 57:5

**walk-in** [1] - 37:20

**walked** [10] - 9:10; 10:19, 22; 13:15; 28:7; 36:13; 39:16; 44:5, 21

**walking** [2] - 39:17

**wall** [3] - 6:5; 10:23; 14:14

**warnings** [2] - 47:7, 23

**warrant** [29] - 4:18; 5:4; 6:1, 3-4, 11; 7:22; 8:23; 9:9; 12:10; 17:10; 27:6, 11; 32:11; 33:18; 34:2, 21; 36:13; 41:11; 42:8, 21; 43:9;

44:3; 45:7, 9; 52:21; 56:4, 19

**warrants** [6] - 4:7, 9; 11:16; 33:24; 34:8; 35:17

**water** [6] - 16:24; 41:13, 18; 42:10; 58:3

**weapon** [2] - 16:18; 37:24

**weapons** [1] - 38:3

**wearing** [6] - 7:25; 11:4; 32:25; 35:10, 21; 36:3

**weeks** [1] - 59:20

**Wellwood** [2] - 30:25

**whirlpool** [1] - 12:3

**William** [1] - 6:5

**wish** [6] - 59:4-6, 9, 19

**withdraw** [1] - 44:15

**withdrawn** [6] - 5:11; 10:18; 13:3; 14:10; 56:13; 57:17

**witness** [13] - 2:17; 3:2; 6:24; 19:7, 9; 43:5, 7; 46:20; 50:4; 53:2; 58:11, 22

**WITNESS** [2] - 3:7; 58:21

**witness'** [1] - 48:25

**witnessed** [2] - 21:22; 31:18

**witnesses** [2] - 2:16, 19

**WITNESSES** [1] - 61:2

**woman** [5] - 17:13; 29:2; 37:3; 44:17

**women** [12] - 28:21, 23-25; 54:8, 20-21, 23-25; 55:1

**words** [2] - 4:21; 53:11

**wrap** [1] - 20:20

**writing** [1] - 59:10

**written** [3] - 20:22; 27:19; 60:7

**Y**

**year** [1] - 33:21

**years** [2] - 3:22; 44:19

**YORK** [1] - 1:1

**York** [6] - 1:14, 21; 4:22, 25; 7:4; 30:4

**yourself** [2] - 35:18; 40:20

**Z**

**zebra** [1] - 10:23

70

**A-116**

FD-395 (Rev. 11-5-02)

## ADVICE OF RIGHTS

Place: ~~Hemp~~ Smithtown, NY

Date: 1/28/14

Time: _____

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed _____

Witness: _____

Witness: _____

Time: 7:55 AM

VALERIO 00015

A-117

**Angelini, Peter M**

| | |
|---|---|
| From: | Angelini, Peter M. Jr. <Peter.Angelini@ic.fbi.gov> |
| Sent: | Tuesday, November 12, 2013 1:02 PM |
| To: | Angelini, Peter M |
| Subject: | FW: Annas passport |
| Attachments: | 1 001.jpg |

From: Elena Kalichenko [kalichenkoes@mail.ru]
Sent: Friday, November 08, 2013 7:48 PM
To: Angelini, Peter M. Jr.
Subject: FW: Annas passport

From: joe valerio [mailto:joeval5@optonline.net]
Sent: Tuesday, July 17, 2012 4:40 AM
To: kalichenkoes@mail.ru
Subject: FW: Annas passport

### *** T*MOBILE *** MESSAGE ****

Helena how are you doing?....im glad your safe in Kiev and I had sent you a text mesg earlier
today. Did you get that?. I got your videos which were very DELICIOUS!...I just didn't
see the rooms and bedroom, especially" when you stood in Turkey. Not a problem,
im trusting that YOU WERE CLEAN IN TURKEY"?...REMEMBER" its the man that delivers the disease
and the women harbors - carrys and stores the disease like food in the pantry!
You know how clean of a man I am" and especially my habits in front of women ,
im as clean as a man         can be.
So I will trust that you didn't come in contact with anything Helena.
I glad you have scheduled everything to perfection.
It will be a relief to you im sure when you see █████
and your Mother with a smiling face when they greet you.
Its tough to take the time to send mesgs from
the Resort Hotel room...not like sitting on the beach text emails...but I have
found the time.
I see your making a valiant effort which shows and tells me alot more about you in your devo
tion. That will be key to our success.


The videos you sent by cell phone camera are PERFECT" and there is NO need for the expense
of another camera, when you have done a terrific job with the cell phone camera. I have
a new cell phone which allows me to transfer your video to my email and the screen is bigger
to view. Plus you can have endless video time per session with a cell phone camera. As
far as the SCRIPT"...do the same with our little S███'s DELICIOUS LITTLE PUSSY" -
you know in the tub!
the way you would eat her so sweet...of course PANTYHOSE AND TIGHTS....AS

1

she will get when she turns 16 in winter according to the general laws in Ukraine, It will be better for her to start travelling when she gets her passport cause currently she is a child afterwards she will be making decisions by her own, I can get you her birth certificate if you want and a number if she still is a matter of your interest.

B1-B2 visa type and tourist, business and pleasure is the same visa type, the one I had before which is issued for 5 years and the officer at the customs determines the period one is allowed to stay in the US without leaving the country and true, its usually 6 months, at least it was always in my case when I was crossing the border. But the visa by itself is given for 5 years, US Embassy doesnt issue visas for less period.

Joseph, I went to the pool yesterday, phones are supposed to be left in the lockers and are not allowed to take either in the changing room or the swimming area, its forbidden! If I try to bring it over secretly I risk to get into the jail by spying naked people which obviously is not my target to achieve! The videos I made on my new cell I have to connect to the com and then send them to you, I need a com with Bluetooth, Internet cafes here dont have this option but I can do it from Turkey, my laptop has Bluetooth function, I made them which means that I will send them to you of course.

Joseph, I really dont understand, you have expressed intentions to adopt my child and to bring her asap to New York which I have successfully agreed on and have provided you an agreement, right, I can even get you a signed one by me and scanned to your mail, no problem......but I do have strong doubts that you actually need us.......! You were willing to wire me $1500 for my trip to Kiev which I initially thought was not crutial from my point of view and didnt express my burning desire to fly here but of course I did cause I accepted your condition......why did you ask me to fly in here, Joseph? Just to make erotic videos for you, thats it???? What is the purpose you need us? To build the future with me and my daughter, you are constantly saying that you want to adopt S████ or you would use us for making erotis videos and cash them out.....? I sincerely hope that I not!!!!!! The money you have spent so far on my trip to Kiev was exactly enough to put on my account to show to the Embassy and get my visa which was exactly what I have asked you for and the trip to Miami, I dont need a trip to Miami by itself, this is just an occasion to get visa, olus this money will be used to purchase a ticket anyway after I recieve the cash. Instead you are choosing to spend exactly the same ammount to send me over to Ukraine to produce erotic videos for you, whats the point, I dont understand? Joseph, I dont want to play any games with anybody and you espesially, you see that I am not after the small cash from you or free trips to Kiev, I am looking for a man to build my future with and the future of my daughter, I really thought that you are the right guy but am I mistaken????? How can you tell me that you dont need me and S████ anymore just because I couldnt get you the pool videos? Whta is that you are after, just tell me honestly.......

By the way, I have managed to get a data base of few hundred Ukr ladies for dating bus but I guess you dont need it.......

Looking forward for your final decision.

Kisses
Helena
God bless you!!!!!



GOVERNMENT
EXHIBIT
302
14 CR 94 (JFB)

A-122

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
UNITED STATES OF AMERICA      :  14-CR-094

        -against-                 US District Court
                                  Central Islip, NY
JOSEPH VALERIO,
              Defendant. :  September 3, 2014
- - - - - - - - - - - - - X  1:30 pm

        TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:

                        BRIDGET M. ROHDE
                        United States Attorney
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                        By:  AMEET KABRAWALA, ESQ.
                             ALLEN BODE, ESQ.
                        Assistant US Attorneys


For the Defense:        ANTHONY LaPINTA, ESQ.
                        LEONARD LATO, ESQ.






Court Reporter:         Dominick M. Tursi, CM, CSR
                        US District Courthouse
                        1180 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6108  Fax:  712-6124
                        DomTursi@email.com




        Proceedings recorded by mechanical stenography.
        Transcript produced by CAT.

2

1          (Call to Order of the Court.  Appearances noted

2     as indicated above.)

3          THE COURT:  Good afternoon.  I will note that

4     Mr. Valerio is present.

5          MR. KABRAWALA:  I am sorry about the delay, your

6     Honor.  It had to do with scheduling.  We were supposed to

7     be first --

8          THE COURT:  That's okay.  Judge Wexler let us

9     know you were delayed, so it is not your fault.

10          We had scheduled this is a status conference.  I

11     wanted to clarify a couple of things with respect to the

12     motion to suppress.

13          I have had a chance to review the transcript and

14     some of the issues from the hearing so why don't we deal

15     with that first.  We can address any other issues you want

16     to address after that.

17          I want to clarify, because I didn't make the

18     lawyers put in supplemental submissions after the hearing,

19     but the initial motion was to suppress the statements in

20     the home by Mr. Valerio, and then obviously at the hearing

21     there were statements that were made in the car after the

22     arrest and there were statements made on the subsequent

23     date, February 24.

24          The defense moved to suppress all those

25     statements.  Correct?

3

1          MR. LaPINTA:  Yes.

2          THE COURT:  And the government I guess --

3          MR. LATO:  I'm sorry.

4          THE COURT:  My question to the government

5   relates specifically to the statement in the car.  But I

6   guess I have two questions.  The first is, I'm not sure

7   what the probative value would be of, this is referring to

8   statements, the alleged statements regarding preference

9   for Eastern European women and I guess some discussion

10  about contacting the FBI by Miss Kalachenko.

11          But putting aside the issue of whether they are

12  probative or not, I understand that the government is

13  seeking to utilize those statements.  And if they are, it

14  is unclear to me what legal theory you would be arguing,

15  because clearly the defendant had invoked at that point,

16  and the only conceivable theory would be a spontaneous

17  theory.

18          But I don't think there was any basis at the

19  hearing to conclude it was spontaneous because the agent

20  testified they were in conversation.  I think he didn't

21  say anything more than that.  So I don't know how the

22  government could argue it was spontaneous when the agent

23  simply said we were in conversation.

24          MR. KABRAWALA:  Your Honor, with respect to the

25  statements that were made in the car.  We are not relying

4

1  upon that statement at trial.  The reason that statement

2  came out is, if you look carefully at the defendant's

3  declaration, the government at first understood the

4  declaration to be challenging the statement that was made

5  in the home, but out of an abundance of caution what we

6  did was, we introduced evidence about, not only the

7  statements that were made in the home and the car, but

8  also the subsequent date, the February arrest.

9          The government does intend to elicit testimony

10  with respect to the statements made by the defendant in

11  his home on January 28, 2014, and the subsequent arrest,

12  in February of 2014, but not the statements that were made

13  in the car on the date of -- on the January date.

14          THE COURT:  Okay.  That is what I thought.

15  Thank you for clarifying that.

16          So is there anything else anyone wants to say

17  with respect to that motion?

18          MR. LATO:  No, your Honor.

19          THE COURT:  The government?

20          MR. KABRAWALA:  No, your Honor.

21          THE COURT:  I'm going to give you my ruling, the

22  bottom line ruling, because I have a jury waiting.  We

23  will issue a written opinion spelling out the reasons for

24  it.

25          But the motion to suppress the statements in the

5

1   home on January 28 is denied, as well as the motion to

2   suppress the February 24 statement.

3        And as I said, we will issue a written opinion

4   with respect to that, but I want to give you the ruling so

5   you have time obviously to prepare for purposes of trial.

6        Any other issues we need to address today?

7        MR. LATO:  Yes, there are.

8        MR. LaPINTA:  Thank you, judge.

9        Your Honor, there are just a few things that

10  need to be addressed.

11       First and foremost, we are requesting an

12  adjournment of this trial.  We are requesting a one-month

13  adjournment for the following reasons.

14       Our investigation and dealings with the

15  defendant, over the past couple of weeks in particular and

16  most recently in the past week, have revealed that there

17  is a very viable potential witness that is overseas that

18  we have been unable to communicate with and make

19  arrangements for that person's availability at this trial.

20  We believe that that person would be a material witness.

21       I cannot tell the court with any specificity at

22  this point whether we have made a decision to call her or

23  him or not.  I don't want the court to understand that

24  this is a witness that will definitely be available for

25  trial or not be available for trial, but I want the court

6

1   to understand that the relevance and significance of this

2   potential witness is compelling and, in our due diligence

3   in representing Mr. Valerio, we are going to need more

4   time to further investigate that witness.

5           THE COURT:  What are you asking for, then?

6   October 20?  27?  What are you asking for?

7           MR. LaPINTA:  Well, in speaking to your clerk, I

8   understand that you are starting a trial in October.  I

9   know that because I was originally part of that case.  I

10  don't know what your availability is in October.

11  Actually, late October or November.  So I guess it depends

12  upon when the court is available.

13          THE COURT:  Let me see.  What is the

14  government's availability?

15          MR. KABRAWALA:  Your Honor, there is an

16  insufficient basis to adjourn the trial for the period of

17  time that has been requested.

18          This matter has been scheduled for the past five

19  months.  If you will recall, late April we scheduled the

20  trial for September 22.  As of last week, the parties were

21  prepared to move forward on that date.  Certainly, defense

22  has had ample opportunity to speak to its potential

23  witness, and there has been no representation that the

24  defendant actually will call this witness at the opportune

25  time.

7

1    THE COURT:  Well, look.  I have no reason to

2  doubt the representation made by Mr. LaPinta that they

3  believe this witness may be material and that they need

4  the testimony.  They have no incentive to postpone the

5  trial for no reason.

6    Mr. Valerio is sitting in jail, it is a

7  relatively brief adjournment that they are requesting, so

8  I don't think this is being done for any reason other than

9  they need additional time to prepare his defense.  So I'm

10  going to grant the adjournment.

11    I just want to know from the government if you

12  have a trial conflict with another judge for late October

13  or early November.

14    MR. KABRAWALA:  No, judge.

15    THE COURT:  So why don't we put it down for

16  October 27.

17    MR. LaPINTA:  Yes.

18    THE COURT:  Okay.  If you could, fill out the

19  waiver until that date and say witness preparation is the

20  reason.

21    MR. LATO:  Yes, your Honor.  And to be specific,

22  if it is all right with your Honor, I'm actually putting

23  down, *"securing a federal witness for the defense."*

24    THE COURT:  That's fine.

25    Please have your client sign it.

8

```
 1              MR. LaPINTA:  Your Honor, I have another issue,
 2     if I may.
 3              THE COURT:  Sure.
 4              MR. LaPINTA:  Judge, there was a -- I'm sorry.
 5              (There was a pause in the proceedings.)
 6              MR. LATO:  Your Honor?  Because of my schedule,
 7     is there any chance we could actually start the testimony
 8     on the 3d?  I'm okay to pick the jury on the 27th, but
 9     could we start on November 3?
10              My understanding, in speaking with the
11     government this case, if we open on the 3d, we will
12     probably be concluded that week.
13              THE COURT:  We don't need to pick the jury ahead
14     of time.  That just creates logistical problems for
15     jurors.  So just have the jury selection starting on the
16     3d.
17              MR. LaPINTA:  November 3.
18              THE COURT:  Yes.
19              MR. LATO:  Thank you, your Honor.
20              THE COURT:  Just change the waiver.
21              MR. LATO:  Thank you.
22              MR. LaPINTA:  I want to refer to a letter that
23     was filed --
24              THE COURT:  Have your client initial the change
25     and the date.
```

9

1    Go ahead.

2    MR. LaPINTA:  Thank you.

3    I want to make reference to a letter dated

4 August 27, 2014, by Mr. Kabrawala that was filed ECF and

5 actually deliberately cc'd to the court.  The letter

6 addresses plea negotiations that we have engaged in.

7    My position is, this letter filed and cc'd to

8 the court, filed ECF and cc'd to the court, is a violation

9 of Rule 11 in terms of the court's, for lack of a better

10 word, *involvement* in plea negotiations.

11    I am asking the court to consider, in light of

12 what is discussed in the letter, the fact that Mr. Valerio

13 is willing to avail himself to a plea, and it also

14 particularly addresses a term of incarceration that is

15 being contemplated regarding a plea.  We feel that that

16 information, that has been shared to the court at this

17 juncture, is a violation of Rule 11.

18    And in discussing this matter with our client,

19 our client has requested, and we respectfully request the

20 court to consider recusing yourself in light of your

21 knowledge of this information, the argument being that:

22 We are on the eve of trial; knowing that at this juncture

23 Mr. Valerio is willing to plead guilty and willing to

24 submit to a substantial term of incarceration will perhaps

25 make this court not the most suitable judge to oversee

10

1   this proceeding that is about to happen.

2          And I think more important and relevant is that

3   in the event of a possible conviction, how is the court

4   going to consider the knowledge that a 20-year determinate

5   sentence being contemplated by Mr. Valerio, how would that

6   be considered by the court when delivering a just sentence

7   in your opinion.

8          So we discussed this with the government this

9   morning.  They have given us 5, 10 minutes ago a Second

10  Circuit case that has interpreted that particular rule.

11  The case is *United States v Paul*.

12          MR. BODE:  I'm handing up a copy to the court as

13  well.

14          MR. LaPINTA:  I don't know if the court is aware

15  of the case offhand.  You are probably just getting it for

16  the first time in front of you.

17          The Paul case is factually completely different

18  from this scenario.  That is a case that involved the

19  court making comments on a bail application regarding

20  certain considerations of sentencing and how long a plea

21  offer should be outstanding, and it basically involves a

22  judge's statements and the allegation that the court was

23  coercing the defendant into taking a plea.  And it also

24  involved a defendant pleading guilty pursuant to a

25  bargained-for plea agreement.

11

1      That is not the case here.  This case is slated

2  for trial.  This case will most definitely proceed to

3  trial.  And this looming issue, regarding whether the

4  court is potentially impacted by the contents of this

5  letter, is of concern to Mr. Valerio and has prompted this

6  request that I'm making now.

7           THE COURT:  Mr. Bode.

8           MR. BODE:  Yes, your Honor.

9           Your Honor, the government's rejection of a plea

10  entreaty by the defendant, the government is required to

11  create a record we believe pursuant to the recent Supreme

12  Court cases.

13           This is not filing it on ECF and providing the

14  court a courtesy copy.  It is not participation.

15           Mr. LaPinta indicated *involvement* by the court.

16  That is not what the rule says.  The rule specifically

17  prohibits the court's *participation* in these discussions.

18           The Paul case is the leading Second Circuit case

19  on this.  Paul discusses the reason for the rule against

20  the court participating in the discussions.  That is the

21  quote on page 671 of Paul, that inevitably carries with it

22  the high and unacceptable risk of coercing a defendant to

23  accept a proposed agreement and plead guilty.

24           Her are a number of problems with the defense

25  argument here, one of which is, there is no plea offer.

12

1   This is the government rejecting a plea entreaty.  The

2   government has indicated the defendant has until this

3   Friday, which is our current plea agreement offer

4   outstanding, which is simply the defendant pleading guilty

5   to one count.  And I don't ask the court to participate in

6   these discussions.

7          And I would ask the court to refrain from

8   indicating an opinion one way or the other, and I know

9   your Honor would do that in any event.  But that is the

10  only record that is available until Friday.

11          The defendant made a -- defense made an entreaty

12  to the government about this.  The government wanted to

13  place that rejection clearly on the record so that, after

14  the case is over, should Mr. Valerio be convicted at

15  trial, he can't come forward and say I wanted this

16  disposition, I asked my attorneys to go to the government

17  with this, they didn't do so.  It is to protect all the

18  parties pursuant to the recent Supreme Court cases.

19          When this was raised to the government, the

20  government, via email prior to the filing of the letter,

21  informed the defense that we were not authorized to enter

22  into such an agreement as the defense was proposing and

23  that we indicated by the email, Mr. Kabrawala indicated I

24  will file a letter formally memorializing this email.

25          The government then waited until the next day

13

1   and filed the very letter that defense counsel is

2   complaining about.  So we indicated to the defense we were

3   going to memorialize this to protect the parties.

4          I would submit there is clearly no basis for

5   recusal, your Honor.  The recusal standard, in Section 455

6   of Title 28, indicates that the court should disqualify

7   itself from a proceeding where impartiality might

8   reasonably be questioned.  Clearly, the memorialization of

9   the rejection of this in no way affects the court's

10  impartiality.

11         That is no different, I submit, than last week

12  in the bail application where the court reiterated its

13  findings regarding the strength of the government's case.

14  No different than that.

15         All the case law -- there is no case law -- I

16  have only looked for ten minutes because the defense just

17  raised this; there is no case law we can find whatsoever

18  that informing the court where parties stood is court

19  participation.  Rather, all the cases that I could see are

20  cases where courts are exhorting defendants to plead

21  guilty or to accept a plea, inquiring about the plea,

22  participating in the plea.  Simply informing the court is

23  not sufficient, is not violative of the rule, and we think

24  it is required under the cases.

25         THE COURT:  This is not a difficult issue for

14

1   the court to address.

2       First of all, prior to the Supreme Court's

3   decision last year, the government typically wouldn't file

4   these types of letters, but they have, as a result of that

5   case, in number of my cases been either filing letters or

6   placing on the record orally what the plea offers have

7   been and what the defendant's response to those offers

8   have been, for precisely the reason that Mr. Bode

9   indicated, which is that defendants are now claiming on

10  habeas petitions that they should receive a hearing or

11  some type of relief because an offer or a counteroffer was

12  not communicated by their lawyer to them, or to the

13  government for that matter.

14      So that is why the government is doing this in a

15  number of their cases.  And I don't think it is improper,

16  in light of what the Supreme Court has said, to

17  memorialize it, place it on the record, so that there

18  can't be any claim that that something has been not been

19  communicated by the lawyer to the defendant.

20      In terms of their impact on the court, having

21  the government place on the record their offer or response

22  to that offer has absolutely no impact on the court in

23  this case or any case.  It does not affect my ability to

24  be fair and impartial in any way, including at the end.

25  That means absolutely nothing to me.  They are sending it

15

1  to me, but I think they are doing it so that there is a

2  clear record, and I don't think there is anything improper

3  about that.

4           But to the extent your client is worried that it

5  will affect my ability to be fair and impartial in the

6  case, or, if he is convicted, at sentencing, he can rest

7  assured that it swill have zero impact because I have no

8  interest in it at all.  I am not participating in it in

9  any way.  I'm aware of it but it has no impact on me.  It

10  means nothing.  Okay?

11          MR. LaPINTA:  Thank you, your Honor.

12          I think all I will say with regard to that is,

13  and I am sure you appreciate this very much, as advocates

14  sometimes we are put in difficult situations and awkward

15  situations to make certain arguments.

16          THE COURT:  I don't mind you raising it.  That's

17  fine.  I understand you have someone not familiar with the

18  system and with why things are done.  I understand that he

19  may have questions as to why things are being done.

20          That is the reason.  The government is not doing

21  anything improper but they are doing things in response to

22  the law.

23          MR. LaPINTA:  Your Honor, I have one last item

24  to address.  I know you have a trial that is pending

25  before you.

16

1          I just want to state for the record so that the

2   record is totally clear and amply articulates the fact

3   that there has been a plea offer that has been delivered

4   to the defense regarding this matter.

5          The plea agreement that is proposed was sent to

6   us on August 22.  That plea agreement indicates a desire,

7   or willingness, I should say, for Mr. Valerio to plead

8   guilty to Count One of the indictment in full satisfaction

9   of the remaining count.

10          The estimated guideline calculation in the plea

11   agreement throws off a 360-month-to-life sentence in light

12   of the particular facts involved in this case and certain

13   enhancements that are triggered factually.

14          There is a statutory cap of 30 years on that

15   particular charge and a statutory minimum period of 15

16   years.

17          I want the record to reflect that we have

18   discussed this with our client on numerous occasions, both

19   myself and with Mr. Lato.  He is aware of this plea offer.

20   He has asked questions regard the plea offer.  We have

21   answered those questions.  We have gone into depth

22   regarding the benefits of taking a plea, the benefits of

23   going to trial, the pitfalls of both.  And I can tell the

24   court quite clearly that those discussions were done

25   intelligently, knowingly, and I have no doubt whatsoever

17

1    that Mr. Valerio understands the situation that he is in

2    now.

3            I also want the record to be clear that that

4    plea offer is going to expire this Friday and we are not

5    going to be able to articulate any further on the record

6    before Friday our position regarding the discussions of

7    plea agreements and Mr. Valerio's decision not to accept

8    the plea agreement at this time on this date.

9            May that change in two days?  If so, obviously

10   this issue is moot.  I don't expect it will but I want the

11   record to totally reflect the dealings we have had with

12   Mr. Valerio and the fact that he is going forward

13   intelligently, with knowledge, and with the assistance of

14   thorough and competent counsel.

15           THE COURT:  Okay.  Thank you.

16           MR. BODE:  And if I can put one thing on the

17   record, which I'm sure Mr. LaPinta would agree with, and I

18   just want to make sure it is on the record; that the

19   government advised the defendant in its cover letter, as

20   we always do, that should the defendant be convicted at

21   trial of more than one count, he faces a greater

22   sentencing exposure because he won't be limited to one

23   count with a 30-year cap.  The court could -- is not

24   required to but could -- implement consecutive sentencing.

25           So the government has already made the defendant

18

1    aware that he faces more time should he elect to go to

2    trial, and I just want to make sure that is on the record.

3              MR. LaPINTA:  And let's be even more thorough

4    than that, to indicate that statutorily if the court

5    should choose to run these sentences consecutively, that

6    the maximum consecutive statutory sentence would be 60

7    years and a minimum of 15 years.

8              THE COURT:  Okay.  Thank you.  So let me

9    confirm --

10             MR. KABRAWALA:  Judge, I'm sorry.  And I'm not

11   doing this to go back and forth but it is actually higher

12   than 60 because technically all the counts could be

13   stacked.

14             THE COURT:  Okay.  I just want to cover the

15   waiver with Mr. Valerio.

16             Mr. Valerio, I have a waiver before me, that you

17   signed, indicating that you are willing to waive the time

18   until November 3, to adjourn the trial to November 3, that

19   you are waiving the time under the Speedy Trial Act so

20   that your attorneys, as you heard, can potentially secure

21   a material witness to your defense and further prepare for

22   the trial.

23             By signing the waiver, you are agreeing to

24   exclude time under the Speedy Trial Act until November 3

25   for that reason.

A-140

19

1        Is that what you want to do?

2        THE DEFENDANT:  Yes, your Honor.

3        THE COURT:  Okay.  So that request is granted.

4  The trial is adjourned to November 3, at 9:30, for jury

5  selection.

6        I exclude the time until November 3 under Title

7  18 United States Code, Section 3161H7A, in order to allow

8  the defense time to obtain a potentially material witness

9  and to prepare the case for trial.  I find that the ends

10  of justice served by granting the continuance outweigh the

11  best interests of both the public and the defendant in a

12  speedier trial and I have so-ordered the waiver.

13        Anything else today?  From the government?

14        MR. BODE:  Nothing.  Thank you, your Honor.

15        THE COURT:  From the defense?

16        MR. LaPINTA:  No, sir.  Thank you.

17        THE COURT:  Have a good day.

18        (Proceedings adjourned at 2:35 pm.)

19

20        CERTIFICATE OF COURT REPORTER

21  I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

22

23

24        _____

          Dominick M. Tursi, CM, CSR

25

A-141

871

1          Do not discuss the case.

2          (Whereupon, at this time the jury leaves the

3     courtroom.)

4          THE COURT:  Please be seated.

5          Is there a motion by the defense?

6          MR. LATO:  Yes, your Honor.

7          Your Honor, Rule 29, I'm making a general motion

8     for a judgment of acquittal based on the government's

9     failure to make out a case that would convince a

10    reasonable jury that the defendant is guilty of the crimes

11    charged in the indictment.

12         Specifically, though, I want to address some of

13    the other counts, and this has to do with the attempt

14    counts.

15         Counts 9 through 13 charge the attempted

16    exploitation of a child.  However, those attempt counts in

17    terms of the dates also fall within count two, which is

18    the actual sexual exploitation of the same child.

19         Count two lists a beginning date and a start

20    date.  It does not break out count two to an individual

21    date or individual acts of exploitation of a child.

22         However, what happened in counts 9 through 13,

23    it appears that what the government has done is that it is

24    arguing to the jury that count two, the actual

25    exploitation, occurred between April 1st, 2012 and

872

1    November 1st of 2012.  And then with respect to counts 9

2    through 13, cherry picking individual dates within that

3    same period as to four attempts.

4           It seems to me if it is unclear as to whether it

5    is an attempt and/or a complete count, the attempt should

6    caret the subsequent count.

7           Beyond that, counts six through eight, also the

8    attempt count with respect to the same child that fall

9    outside the date or the period alleged in count two.

10          This is what it really comes down to with

11   respect to an attempt.  There is a distinction between an

12   attempt and an overt act in furtherance of the conspiracy.

13          By all accounts it would seem that everything

14   that would qualify as an attempt would also qualify as an

15   overt act.  But not everything that qualifies as an overt

16   act would qualify as an attempt.

17          To be an attempt, your Honor, it has to have the

18   mens rea to complete the crime by the defendant, and a

19   substantial step to complete the crime.

20          With respect to the attempt counts, all of them,

21   is there a substantial step each time to commit the same

22   crime?  By way of an example, I think it is clear that

23   many videos were in fact made.  And the defense really

24   comes down to, is it really Joseph Valerio who had them

25   made?

873

1            By way of analogy, a person wants another person

2    to commit a bank robbery and sends the person to a bank on

3    five separate occasions, and for whatever reason the

4    person goes to the bank and doesn't do a robbery that day.

5    And each time the person goes to the bank it is certainly

6    an overt act in terms of the actual bank robbery.  But at

7    the end when the person commits a bank robbery, it would

8    seem unfair to categorize the five trips to the bank as

9    five separate attempts.  It is better to say attempt to a

10   bank robbery and leave it to the jury as to whether it was

11   one attempt or one completion of a crime.  And that

12   completes my presentation, your Honor.

13           MR. BODE:  Does your Honor wish to hear from us?

14           THE COURT:  Yes.

15           MR. BODE:  Your Honor, the defense argument is

16   insufficient for Rule 29.

17           The defense has clearly been hinting at arguing

18   that some of these images were pre-made by Ms. Kalichenko

19   prior to the defendant coming in contact with her, and as

20   such he could not have committed the crime of exploitation

21   because they were already made at that point.

22           Clearly, however, where he sends an email, each

23   one of those attempts count to a particular email that is

24   in evidence where he asks that specific acts be done to

25   the child.  He even calls it a script in one of the

A-144

874

1    emails, clearly providing a script for the child to be

2    used and asking the child to be abused would constitute as

3    an attempt at child pornography.

4            Moreover, here it is even stronger because he

5    receives videos and acknowledges in the emails he got them

6    and asks for more videos.

7            So clearly there is a substantial attempt.  The

8    email is a substantial step in an attempt, your Honor.

9            Bank robbery is a poor example, with due respect

10   to Mr. Lato.  If we wanted to use a bank robbery as an

11   example, because he obtained it over a period of time and

12   sent the emails over a period of time, it is more that he

13   robbed the bank on one day and got a thousand dollars, and

14   comes back a week later the for another thousand dollars

15   and a week later another.  I don't think that example

16   works in this case.

17           For all those reasons and the light most

18   favorable to the government, we believe the Rule 29 motion

19   should be denied.

20           MR. LATO:  Can I have the last word since it is

21   my motion, your Honor?

22           THE COURT:  Sure.  This is your reply.

23           MR. LaPINTA:  Because according to the

24   government's case, Mr. Valerio is going through an

25   intermediary, Ms. Kalichenko, who was the actual principal

875

1   doing the child pornography and Mr. Valerio sharing the

2   same mens rea, aiding and abetting and by supplying the

3   money and ordering it, and for Mr. Valerio to be guilty of

4   an attempt, I believe Ms. Kalichenko as an intermediary

5   must have the mens rea to complete the substantive crime.

6           There is no question that there is evidence here

7   that Ms. Kalichenko did intend to make videos.  My

8   objection is breaking everything up into individual

9   attempts.

10          Because if Ms. Kalichenko cannot be guilty of

11  individual attempts, I don't know that Mr. Valerio can

12  either.

13          THE COURT:  All right.

14          I will reserve decision and place the decision

15  on the record later.  I just want to get through your

16  witness today.  And I wanted to get that done.

17          Let's take a break and then get started.  All

18  right?

19

20          (Whereupon, a recess was taken.)

21

22

23

24

25

PSS:ALB/ABK
F.# 2014R00151

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JOSEPH VALERIO,

          Defendant.

- - - - - - - - - - - - - - - -X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 14-094 (S-2)(JFB)
(T. 18, U.S.C., §§
2251(a), 2251(c), 2251(e),
2252(a)(1), 2252(a)(2),
2252(b)(1), 2252(a)(4)(B),
2252(b)(2), 2 and 3551
et seq.)

THE GRAND JURY CHARGES:

COUNT ONE
(Conspiracy to Sexually Exploit a Child)

    1.   On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally conspire to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, an individual whose identity is known to the Grand Jury, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and

2

foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, to wit: one or more mobile telephones, digital cameras and digital media disks, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e) and 3551 et seq.)

COUNT TWO
(Sexual Exploitation of a Child)

2.    On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and

3

transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, to wit: one or more mobile telephones, digital cameras and digital media disks, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce.

(Title 18, United States Code, Sections 2251(a), 2251(e), 2 and 3551 et seq.)

COUNT THREE
(Sexual Exploitation of a Child)

3.    On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct outside of the United States, its territories and possessions, for the purpose of producing one or more visual depictions of such conduct, intending that such visual depictions would be transported and transmitted to the United States, its territories and possessions, using a means and facility of interstate and foreign commerce and mail, and which visual depictions were actually transported and transmitted to the

4

United States, its territories and possessions, using a means and facility of interstate and foreign commerce and mail.

(Title 18, United States Code, Sections 2251(c), 2251(e), 2 and 3551 et seq.)

COUNT FOUR
(Transportation of Child Pornography)

4.   On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally transport and ship, using a means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, one or more visual depictions, to wit: images depicting Jane Doe #1 engaged in sexually explicit conduct, the production of such visual depictions having involved the use of a minor engaging in sexually explicit conduct, and such visual depictions were of such conduct.

(Title 18, United States Code, Sections 2252(a)(1), 2252(b)(1), 2 and 3551 et seq.)

COUNT FIVE
(Receipt of Child Pornography)

5.   On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH

5

VALERIO, together with others, did knowingly and intentionally receive one or more visual depictions, to wit: images depicting Jane Doe #1 engaged in sexually explicit conduct, using a means and facility of interstate and foreign commerce and which visual depictions had been mailed, and shipped and transported in and affecting interstate and foreign commerce, the production of such visual depictions having involved the use of one or more minors engaging in sexually explicit conduct and such visual depictions were of such conduct.

(Title 18, United States Code, Sections 2252(a)(2), 2252(b)(1), 2 and 3551 et seq.)

COUNT SIX
(Attempted Sexual Exploitation of a Child)

6.   On or about January 23, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and

6

transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT SEVEN
(Attempted Sexual Exploitation of a Child)

7.    On or about January 24, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras,

digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT EIGHT
(Attempted Sexual Exploitation of a Child)

8.   On or about March 28, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of

A-153

8

interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT NINE
(Attempted Sexual Exploitation of a Child)

9.     On or about April 4, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate

9

and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT TEN
(Attempted Sexual Exploitation of a Child)

10.  On or about July 16, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate

A-155

10

and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT ELEVEN
(Attempted Sexual Exploitation of a Child)

11.   On or about July 22, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate

**A-156**

11

and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

   (Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT TWELVE
(Attempted Sexual Exploitation of a Child)

   12.   On or about September 6, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of

                                                                   12

interstate and foreign commerce and which were in and affecting
interstate and foreign commerce, contrary to Title 18, United States
Code, Section 2251(a).

        (Title 18, United States Code, Sections 2251(e), 2 and 3551
et seq.)

                            COUNT THIRTEEN
                (Attempted Sexual Exploitation of a Child)

        13.  On or about September 27, 2012, within the Eastern
District of New York and elsewhere, the defendant JOSEPH VALERIO,
together with others, did knowingly and intentionally attempt to
employ, use, persuade, induce, entice and coerce a minor, to wit:
Jane Doe #1, to engage in sexually explicit conduct, for the purpose
of producing one or more visual depictions of such conduct, knowing
and having reason to know that such visual depictions would be
transported and transmitted using a means and facility of interstate
and foreign commerce and which were in and affecting interstate and
foreign commerce, which visual depictions were produced and
transmitted using materials that had been mailed, shipped and
transported in and affecting interstate and foreign commerce by any
means, including by one or more mobile telephones, digital cameras,
digital media disks and computer, and such visual depictions were
actually transported and transmitted using a means and facility of

13

interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT FOURTEEN
(Sexual Exploitation of a Child)

14.   On or about and between September 10, 2010 and January 19, 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #2, an individual whose identity is known to the Grand Jury, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, to wit: one or more digital cameras, memory cards and computer equipment, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce.

(Title 18, United States Code, Sections 2251(a), 2251(e) and 3551 et seq.)

14

### COUNT FIFTEEN
(Possession of Child Pornography)

15.   On or about January 28, 2014, within the Eastern District of New York, the defendant JOSEPH VALERIO did knowingly and intentionally possess matter containing one or more visual depictions, to wit: images in digital files, in and affecting interstate and foreign commerce, and which visual depictions had been mailed, and shipped and transported using a means and facility of interstate and foreign commerce, and which were produced using materials which had been mailed, and so shipped and transported, the production of such visual depictions having involved the use of one or more minors engaging in sexually explicit conduct, and such visual depictions were of such conduct.

(Title 18, United States Code, Sections 2252(a)(4)(B), 2252(b)(2) and 3551 et seq.)

1068

1    notes.  I was going start to put my Rule 29 ruling on the

2    record.  I may finish that tomorrow.

3            (Pause)

4            THE COURT:  I will put at least part of the

5    Court's ruling on the record.  If I don't finish in the

6    next 15 minutes or so, I will complete it tomorrow while

7    the jury is deliberating.

8            As I said before, I am denying the Rule 29

9    motion by the defense and I want to state the reasons for

10   that now.

11           First, with respect to the motion, the standard

12   is well settled for Rule 29 the Court should grant the

13   motion if it concludes that no rational trier of fact will

14   find the defendant guilt beyond a reasonable doubt based

15   on the evidence presented at the trial.  It's in the rule

16   itself as well as United States v. Jackson, 335 F. 3d,

17   170, page 180, Second Circuit 2003.  And the standard for

18   evaluating that conviction must be upheld under Rule 29 or

19   allowed to go to the jury after viewing the evidence in

20   the light most favorable to the government and drawing all

21   reasonable inferences in its favor, any rationale trier of

22   fact could have found the essential element of the crime

23   beyond a reasonable doubt; United States v. Medina, 944 F.

24   2d, 60, page 66, Second Circuit 1991.

25           Quoting in Supreme Court:

A-161

1069

1     In analyzing the efforts, the Second Circuit

2   emphasizes, pieces of evidence must be viewed not in

3   isolation but in conjunction and the jury's verdict may be

4   based on circumstantial evidence; United States v.

5   D'Amato, 39 F.3d, 1249, at page 1256, Second Circuit 1954.

6   And also Second Circuit emphasized, credibility of

7   witnesses with the jury rather than the Court to

8   determine; United States v. Strauss, 999, F.2d 692, page

9   696, Second Circuit 1993.

10     That is the standard the Court has applied here

11   and concludes that for each of the counts of the

12   indictment, there is more than sufficient evidence for the

13   jury, if the government's evidence is credited and all

14   reasonable inferences are drawn in favor of the government

15   from that evidence, to rationally convict the defendant on

16   each and every count of the indictment.

17     I won't go through all the details of the

18   evidence.  In summary, the two searches of the defendant's

19   home, including the SD card in the computer hard drive,

20   the Western Union records, the e-mails and defendant's

21   statements to law enforcement in terms of the major

22   categories of proof that the government offered are

23   sufficient if the jury credits that evidence for the jury

24   to rationally find that the defendant possessed child

25   pornography on his computer and on the SD card and that

1070

1    they were his.  They could rationally find e-mails were

2    sent to him, to Ms. Kalichenko and that the child

3    pornography involving Sophia was received by him.  They

4    could similarly conclude based upon that evidence that as

5    was noted by the government in the summation, specific

6    e-mail conspiracy issues, that there is an agreement

7    between Kalichenko and the defendant that she would

8    exploit, sexually exploit, Sophia in videotapes sent to

9    the defendant in exchange for money.

10          The jury can also rationally find based on

11   e-mails and other evidence in the case that by paying for

12   the videos and providing the script for the videos that he

13   aided and abetted the exploitation of Sophia in the

14   Ukraine outside the United States.  The issue obviously

15   that was raised by the defense with respect to whether or

16   not the videos were preexisting, again, if the evidence is

17   construed most favorably to the government in terms of

18   what was being requested in the e-mails, what was received

19   back in those e-mails in therms of the videos, the timing

20   of the videos, all the evidence, the circumstantial

21   evidence viewed most favorably to the government can

22   support a rational finding those videos were not

23   preexisting but were made only after the defendant made

24   the request for the videos to be produced.

25          In terms of the charge involving the niece, the

1071

 1    jury could rationally find based upon the location of the

 2    images and the control over the house, the camera and the

 3    other circumstantial evidence presented with respect to

 4    that, the circumstance surrounding the image, the

 5    testimony of the sister, not the images themselves but

 6    defendant's involvement for filming the daughter for

 7    modeling purposes, if all that circumstantial evidence is

 8    taken together, the jury viewed those favorably to the

 9    government, the jury can certainly rationally find Mr.

10    Valerio sexually exploited his niece and produced the

11    images found on the SD card and adduced the niece to

12    engage in sexually-explicit conduct and can rationally

13    find in the government's favor on that count as well.

14            I want to focus more particular on Mr. Lato's

15    specific argument as relates to whether or not there is

16    sufficient proof for each of the attempt counts

17    constituting an attempt and whether or not those counts

18    are multiplicitous of a sexual exploitation count which I

19    understand is your argument.

20            MR. LATO:  Yes, your Honor.

21            THE COURT:  First I want to focus on whether or

22    not there is sufficient proof of attempt, sufficient proof

23    on each charge for there to be attempt as that is defined

24    under the law.

25            And I spent some time yesterday going through

1072

1    each e-mail that is the subject of a separate count to

2    review it, to see whether or not a jury could rationally

3    conclude that each e-mail constituted a separate attempt

4    to commit the crime.  And my conclusion is that they

5    could.

6            Just with respect to the standard for attempt, I

7    read the instruction to the jury and, obviously, that is

8    the law but let me state there are two cases that I

9    reviewed in particular on this issue that set out what the

10   law requires in the Second Circuit for attempt.  One is

11   United States v. Desposito, 704, F.3d 221, Second Circuit,

12   2013.  In summary, the government has to show that the

13   defendant took a substantial step toward committing the

14   crime that was strongly corroborative, firmness of the

15   defendant's criminal intent.  And that case cites to

16   another case, a terrorism case, United States v. Farhane,

17   634, F.3d 127, Second Circuit 2011, which is a very long

18   discussion about the substantial step requirement for

19   attempt.

20           Again, I will not repeat it here.  I want the

21   record clear I have reviewed that standard in applying it

22   to the evidence presented before me.

23           I also note there are a number of cases out

24   there that discuss, not in this circuit, but informative

25   on this issue of whether or not a solicitation to commit a

1073

1  crime itself can be an attempt. There are two cases that

2  discuss this and conclude that it can -- don't conclude

3  always an attempt but they certainly conclude that a

4  solicitation under certain circumstances can itself

5  constitute an attempt. One is United States v. American

6  Airlines, Inc. which was an anti-trust case, 743 F.2d

7  1114, Fifth Circuit, 1984, and United States v. Rovetuso,

8  768, F.2d 809, Seventh Circuit, 1985, which discusses the

9  fact a solicitation depending upon the circumstances can

10  constitute in and of itself an attempt.

11       Here, I want to make clear although I cited the

12  case of the e-mails that I reviewed in connection with

13  each of those counts, it's more than just a solicitation

14  where, for example, an e-mail said could you send me child

15  pornography, as the government pointed out during

16  summations or trial. Each of those e-mails give specific

17  direction. One e-mail refers to a script. So it's a

18  solicitation combined with specific directions on how it

19  is to be carried out, often when it should be carried out

20  and in many instances providing money in the form of MTCN

21  number references, money that is provided, has been

22  provided, will be provided. So many of these also include

23  an element of payment or promise of payment.

24       I conclude that each one of these e-mails

25  separately could constitute an attempt because a

1074

1   substantial step could be found by the jury with respect

2   to each one of these e-mails to assist in the exploitation

3   of the child in the Ukraine, sexual exploitation of the

4   child in the Ukraine and the e-mails are strongly

5   corroborative of criminal intent based on the details of

6   what is to be done and the discussion of money and other

7   things that will be provided or not be provided depending

8   on whether the instructions are followed.

9           I want to make clear also this is not multiple

10  discussions about one video being produced and there is

11  multiple discussions about directions regarding that

12  video.  If the evidence is construed most favorably to the

13  government, the jury could find certainly that a number of

14  videos are being created as a result of the direction and

15  then more directions being given for additional videos to

16  be done.  And there are numerous references in the videos

17  to having received the videos, wanting more videos.  And

18  as I will go through tomorrow, there are a couple of

19  instances that I looked at very carefully because the

20  e-mails were in one instance a day apart, in another

21  instance six or seven days apart.  I wanted to ensure that

22  the two e-mails didn't relate to the same request for some

23  type of exploitation to be done.  And I think, again, when

24  those e-mails are construed most favorably to the

25  government, the jury could find even in one of those is

A-167

1075

1    miles away, even the ones close together the defendant was

2    seeking additional new videos of Sophia, not one that he

3    previously requested in a prior e-mail that's the subject

4    of a separate count.

5                I will briefly go through that tomorrow and I

6    will deal with the multiplicity issue, if there are

7    convictions on each count; that can be dealt with at

8    sentencing.

9                Why don't we stop for now it's 4:30 and we will

10   get started at 9:30.  I did want to mention a couple of

11   objections during the summation.  One I sustained because

12   the government made reference to Ms. Kalichenko not being

13   able to testify.  I sustained that objection because I

14   don't think that's something that the jury should

15   speculate about or should be commented on by the

16   government.  The other two I overruled.  One Mr. LaPinta

17   made early on to the government referring to e-mails,

18   that's an attempt charge.  There was an objection I

19   overruled.  The government can argue whether an e-mail

20   constitutes an attempt.  And one in the rebuttal the

21   government suggested to -- I believe what the defense said

22   you have to believe the agents -- law enforcement

23   witnesses were lying.  It is true that certainly Mr.

24   LaPinta focused on aspects if you believe what was said

25   suggests other things -- claim other things they had done

1076

1 that they had not admitted to. At least during the
2 cross-examination I believe based on the fact no notes
3 were taken at the time of the interview that was done many
4 days later certainly there could be implication
5 potentially, I guess, the agents made up at least maybe
6 not the second statement regarding the niece but that made
7 up the admission regarding the admission -- admitting that
8 the e-mails were sent by Mr. Valerio. I think, obviously,
9 I told the jury it's all argument whether or not the
10 evidence would support that or whether or not that was
11 exactly what the defense was arguing is up to the jury to
12 decide.

13         I think the government objected to something.
14 You objected and it was overruled.

15         Anything else we need to address then today?

16         MR. BODE: No, your Honor.

17         THE COURT: I do want to compliment both sides
18 regardless of the verdict. I believe the lawyers on both
19 sides did an excellent job for their clients, very
20 civilized in dealing with the Court trying to make the
21 trial run smoothly. I appreciate that.

22         MR. LATO: Before you leave, your Honor, with
23 respect to the multiplicity that you touched upon, if
24 there is a conviction, from the defense standpoint, we
25 don't need to go into tit; assuming conviction on the

1077

1  substantive counts, the attempts occur within the same

2  time frame would have to be merged at sentencing.  No

3  reason to go into that.

4       THE COURT:  The theory would be if he was

5  convicted of the substantive count and the attempt counts,

6  I would not be sentencing on attempts, just the

7  substantive.  There is actually -- I have to look at it

8  more carefully.  I didn't mean to deal with it yesterday.

9  Some Courts suggest vacating attempt convictions.  Some

10  say as long as you don't sentence, you don't have to

11  vacate.

12       MR. LATO:  They talk about merging.  There is no

13  merge mechanism.  What it means, I assume, to vacate some

14  of the counts but the reality is if there is conviction on

15  the substantive counts, the attempts in the same time

16  period are superfluous and the government I guess won't

17  object at that point because if the Second Circuit were to

18  reverse with respect to the substantive, they could

19  restore the counts.

20       THE COURT:  I agree but we will address that if

21  we need to.

22       Have a good night.

23       (The trial was adjourned to Thursday, November

24  13, 2013 at 9:30 a.m.)

25

Proceedings

1208

1   A F T E R N O O N   S E S S I O N

2

3       THE COURT:  While the jury is deliberating, the

4   record should reflect the lawyers and Mr. Valerio are

5   present.

6       I want to complete the Rule 29 ruling and place

7   a couple of other rulings, to supplement other rulings

8   with respect to the cases.

9       To supplement the Rule 29 ruling, I was

10  discussing why each e-mail constitute a separate attempt

11  in the light most favorable to the Government.

12      With respect to the solicitation and itself

13  being an attempt, the trial I had a few years ago

14  Abdallah, 528 Fed appx. 79 (2nd Cir. 2013).  In that case

15  one of the attempted wire fraud charges was the defendant

16  calling up somebody and placing a buy order with respect

17  to a stock market and I ruled and the Second Circuit

18  affirmed that that act of calling up and asking someone

19  else to place an order through an intermediary constituted

20  in light of the prior dealings and the circumstances

21  surrounding it a substantial step toward the commission of

22  fraud.

23      And I think it is analogous to the circumstances

24  that we have here for the reasons already indicated.

25      I did go through each of the e-mails each and of

Proceedings

1209

1   themselves could be separate attempts and weren't

2   connected in a way that made them merge.  I'll go through

3   the details but very briefly.

4       Count 6, and I believe it is Exhibit 558,

5   January 23, 2012, a discussion in that e-mail about videos

6   with Sofiia, specific sex acts with Sofiia, referenced to

7   sending some money.  Today I will send out some money, you

8   will follow these steps.

9       That certainly would be sufficient.

10      There's a discussion that popped up in there.

11      Count 7, January 24, 2012, Exhibit 559, again,

12  references to specific sex acts with Sofiia, references to

13  picking up money on Wednesday.  The MTCN number is

14  provided in that one, and again on this issue of the fact

15  of Count 6 or 7 are one day apart.  If you actually look

16  at the e-mails, Count 6 was on Monday, Count 7 was on

17  Tuesday.

18      On Tuesday there is a reference to Wednesday on

19  the e-mail and the January 23rd e-mail.  This is not

20  word-for-word, you only go to the internet place Monday,

21  Wednesday, Friday.  When you're there you start with an

22  e-mail to there and when you leave before dark you send me

23  one when you leave.

24      And there is a discussion on certain acts of

25  Sofiia each night before bed -- there's an earlier e-mail

Proceedings

1210

1   that day referenced being one hour on the internet a day.

2   There's reference to give me some really racy cell phone

3   videos with your daughter tonight:

4       The jury certainly concluded based on the

5   substance of the e-mails an attempt was made on January 23

6   that Kalichenko received that and whether or not, you

7   know, whether or not the videos were on the shelf already,

8   or that she had the videos, she sent them.

9       And then on the 24th, Count 7, more requests are

10  being made.  So even though they are a day apart they are

11  referencing future action and it is also referencing

12  something will be done on a multiday basis.

13      Count 8, March 28, 2012, Exhibit 211-A, again

14  there is a direction on specific sex acts, reference to

15  money, I'll send out $100.  To who and where do you want

16  me to send it?

17      So that can constitute a separate attempt.

18      Count 1, April 4, 2012, Exhibit 560, reference

19  to seeking pictures of Sofiia.  And there's a reference to

20  sending Kalichenko from Turkey to Moscow.  That could

21  constitute a separate attempt.

22      Count 10, July 16, 2012, Exhibit 205, referenced

23  the videos you sent me, perfect.  That's the one that

24  references a script and requests specific sex acts.

25      And there's reference to money.  Tomorrow I'll

Proceedings

1211

1   wire you more cash in the day.  Especially in the context

2   of all the other e-mails can constitute an attempt.

3       Count 11, July 22, 2012, Exhibit 205.

4       July 22nd, as I said, it seems to be an inquiry to a

5   July 16th memo by Kalichenko referencing having made five

6   other videos for you.  We'll send the videos today.

7   References going to the pool.  I think this is in the

8   context of July 21st e-mail from the joeval5@optonline.net

9   saying I got the videos of you and Sofiia, send the rest

10  to my e-mail.

11      You didn't follow my instruction directions.

12      Didn't get to the pool, shower, etcetera.

13      Although Count 10 was July 16th, Count 11 is

14  July 22nd, the jury could certainly find that additional

15  video in the July 16th was an attempt to create some

16  videos or obtain some videos, in this situation to create

17  videos, and having received some videos in the interim,

18  Count 11, July 22nd, is an attempt to receive and have

19  more videos created.

20      Count 12, September 6, 2012, Exhibit 229, send

21  me the usual videos of you and sweet Sofiia, and then

22  again specific sex acts are requested where $1,000 is

23  provided.  That e-mail could certainly constitute a

24  separate attempt.

25      Finally Count 13, Exhibit 206, referencing

Proceedings

1212

1 having given $1200, produced nothing for me, and this one,
2 again, consistent with the other e-mails request each
3 morning and night you will send me a cell phone video of
4 you waking up with your daughter and there are references
5 to sexual acts. "If I don't see this each day," and he
6 makes certain comments.
7        So it's clear based upon the e-mail the jury can
8 rationalize this, there are ongoing videos being requested
9 and attempts for additional videos on each and every one
10 of these counts. So I don't believe the counts are
11 multiplicitas between each other.
12        On the final issue that we've already discussed,
13 and again I'll put the case law on the record of whether
14 or not these counts, the attempt counts are multiplicitas
15 and overlap with Count 2, the sexual exploitation count.
16        This argument -- there is nothing improper about
17 charging the way Count 3 is charged with multiple --
18 excuse me, Count 2, that basically even though the
19 Government is alleging there are multiple acts of sexual
20 exploitation that period they charge it as one
21 substantive count.
22        In the case of United States versus Anson, 304
23 Fed.Appx. 1 (2d Cir. 2008) made clear, and this is called
24 duplicitous counts, counts that join two or more distinct
25 crimes in a single count. In this case it's a child

Proceedings

1213

1 pornography case and that criminal charges may aggravate
2 multiple individual actions that otherwise could be
3 charged as discrete offenses as long as all the actions
4 are a part of a single scheme. Citing U.S. v. Maloney,
5 287 F.34d 282, Second Circuit 2002. Here certainly the
6 Government's proof could support a finding this is one
7 single scheme creating multiple child pornography videos
8 involving Sofiia and, therefore, the sexual exploitation
9 charge could be charged in the aggregate even though the
10 Government is alleging there are multiple acts of sexual
11 exploitation during that time period so there is no
12 duplicitous.
13        In terms of Mr. Lato's objection to
14 multiplicity, first it is not waived because it was not
15 raised as part of the trial, that defects in the
16 indictment, US v. Chacko, 169 F.3d 140, Second Circuit
17 1999, said that if you don't assert at all at the district
18 court level, there's a double jeopardy exception which
19 essentially is what it is. If you don't raise it all at
20 the district court level it could be waived, but it
21 doesn't have to be necessarily a pretrial motion. That
22 case was made after the jury rendered its verdict.
23        The circuits held it was not waived here, it was
24 made at the end of the Government's case but certainly was
25 not waived. But on the substantive issue, first as I

Proceedings

1214

1 noted, the Government is allowed all theories in the case
2 because the evidence could support one theory and not the
3 other if the jury concluded that Ms. Kalichenko had the
4 videos already made, they could find attempts for each of
5 those counts without finding any sexual exploitation of
6 Sofiia.
7        So there is evidence that supports both
8 theories.
9        In terms how you deal with that, there's a case
10 called U.S. v. Zvi, 168 F.3d 49 (2d Cir. 1999) and in that
11 case the Second Circuit discusses this in detail and says
12 ordinarily the appropriate remedy, if you have that
13 situation, that's with respect to a money laundering case,
14 but if there is this multiplicitas count, the appropriate
15 remedy to remand the multiplicitas counts and to adjust
16 the sentence accordingly.
17        Certainly I think Mr. Lato is correct, the
18 Government might even concede this if there were a
19 conviction on the sexual exploitation counts. Certainly
20 an attempt to commit a crime and a completed crime would
21 create a double jeopardy problem if someone were sentenced
22 on both. If there is any doubt on that, U.S. v. Rust,
23 Eighth Circuit case, 650 F.2d, a 1981 case, where they
24 said it is also clear that defendant may not be convicted
25 in both the attempt and the completed crime because all

Proceedings

1215

1 the elements of the attempt were included in the completed
2 offense and a dual conviction would amount to double
3 jeopardy.
4        Based upon the Second Circuit decision in Zvi, I
5 think the appropriate remedy here if there were a
6 conviction on both the substantive crimes and the
7 attempted counts would be to vacate the attempted accounts
8 to avoids a double jeopardy problem but we'll deal with
9 that if that occurs.
10        That's the Court's ruling with respect to the
11 Rule 29 motion. I did want to place some cases on the
12 record.
13        Mr. LaPinta did an expert sidebar and came up
14 with a 10th Circuit case.
15        MR. LAPINTA: 9th.
16        THE COURT: I'm talking about the subscriber
17 issue.
18        MR. LAPINTA: Foundation.
19        THE COURT: I thought it was a 10th Circuit. I
20 did look it up and I looked at Second Circuit case law on
21 that issue and I think the rulings that I made -- your
22 objection was correct to some extent and the rulings I
23 made are completely consistent with the Second Circuit
24 cases.
25        So, there were two objections. The first one

# LEONARD LATO, ESQ.

35 ARKAY DRIVE, SUITE 200
HAUPPAUGE, NY 11788-3756

———

TEL:  (631) 655-5008
FAX:  (631) 300-4380
EMAIL:  leonardlato@yahoo.com

November 27, 2014

The Honorable Joseph F. Bianco
United States District Judge
Eastern District of New York
924 Federal Plaza
Central Islip, NY 11722

      Re:    *United States v. Joseph Valerio*
             14-CR-094-JFB

Dear Judge Bianco:

      The defendant Joseph Valerio writes to inform the Court that, to preserve the sufficiency issue for appeal, he moves for a judgment of acquittal pursuant to Rule 29(c).

      Valerio first moved for a judgment of acquittal "[a]fter the government close[d] its evidence." Fed. R. Crim. P. 29(a).  Valerio placed his reasons on the record.  (Trial Tr. 870-75.)  The Court denied the motion and placed its reasons on the record.  (Trial Tr. 924-25, 1068-75, 1208-12.)  Valerio renews his motion solely to preserve the sufficiency issue for appeal.  *See, e.g.*, *United States v. Allen*, 127 F.3d 260, 264 (2d Cir. 1997) ("To preserve the sufficiency issue . . . , a defendant must have moved for judgment of acquittal either at the close of all the evidence pursuant to Rule 29(a) *or* post-trial in a motion pursuant to Rule 29(c)").  Valerio declined to renew his motion "at the close of all the evidence" and instead opted to renew it only after reviewing the trial transcripts.

      After reviewing the transcripts, Valerio rests on his trial arguments and, thus, is not asking the Court to supplement its decision.  He renews his motion solely to preserve the issue.

              Respectfully,

              *Leonard Lato*
              Leonard Lato

ec:     AUSAs Allen L. Bode & Ameet B. Kabrawala

A-173

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 14-CR-94 (JFB)
_____

UNITED STATES OF AMERICA,

VERSUS

JOSEPH VALERIO,

Defendant.
_____

**MEMORANDUM AND ORDER**
April 15, 2016
_____

JOSEPH F. BIANCO, District Judge:

On March 5, 2014, a grand jury charged defendant Joseph Valerio ("defendant" or "Valerio") in a superseding indictment with three counts of sexually exploiting a child, in violation of 18 U.S.C. §§ 2251(a), 2251(c), and 2251(e); one count of transporting child pornography, in violation of 18 U.S.C. §§ 2252(a)(1) and 2252(b)(1); one count of receiving child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1); and one count of possessing child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). A grand jury first indicted Valerio on February 26, 2014, with two counts of sexual exploitation of a child, one count of transportation of child pornography, one count of receipt of child pornography, and one count of possession of child pornography.

On July 1, 2014, Valerio moved to suppress statements made to law enforcement officers on January 28, 2014, during the execution of a search warrant at his home in Smithtown, New York. He asserts that any incriminating statements were the product of a custodial interrogation conducted in the absence of *Miranda* warnings, because he did not receive his "advice of rights" before the onset of custodial interrogation, and that any wavier of these rights was invalid because he felt compelled to continue to answer law enforcement's questions. The Court conducted an evidentiary hearing on July 31, 2014, to address the admissibility of statements he made to law enforcement officers after he formally was arrested on January 28, 2014, and after his second arrest on February 24, 2014 (after the Magistrate Judge released defendant on bond).[1] On September 3, 2014, the Court orally denied the motion to suppress, and stated that a written decision would follow containing the

_____

[1] Although the defendant also made statements in the car after his arrest on January 28, 2014, the government made clear at the conference on September 3, 2014 that it would not be seeking to introduce those statements at trial. Thus, any motion as to the statements in the car was rendered moot.

A-174

Court's analysis. The Court now issues this Memorandum and Order memorializing the basis for the Court's ruling on September 3, 2014.[2]

For the following reasons, having conducted an evidentiary hearing, the motion to suppress is denied. First, the Court concludes that the pre-*Miranda* statements defendant made during an interview at his home on January 28, 2014, were not the result of a custodial interrogation and were voluntarily given to law enforcement. Specifically, the Court finds that a reasonable person in defendant's situation would have understood that he was free to end the interview and leave the house and, in any event, his freedom of action was not curtailed to a degree associated with formal arrest. Thus, the motion to suppress the defendant's pre-*Miranda* statements made at the residence on January 28, 2014, is denied.

Second, the Court finds that, after his *Miranda* rights were read on January 28, 2014, the subsequent statements at his residence were made after the defendant voluntarily, intelligently, and knowingly waived his *Miranda* rights. Thus, defendant's motion to suppress the post-*Miranda* statements made at the residence on January 28, 2014, is denied.

Finally, the Court also concludes that defendant's statement following his second arrest on February 28, 2014, was a volunteered, spontaneous statement after being told about the new charge against him and, thus, was not the product of interrogation for purposes of *Miranda*. In any event, that statement was made after he had knowingly and voluntarily waived his *Miranda* rights in connection with the new arrest. Accordingly, the motion to suppress the February 28, 2014 statement is denied.

I.    FINDINGS OF FACT

The charged crimes arise from defendant's alleged production of child pornography involving a then three-year-old female victim in Ukraine, and his production of child pornography involving a then six-year-old female victim at his Smithtown, New York residence. *See generally United States v. Valerio*, 9 F. Supp. 3d 283 (E.D.N.Y. 2014). At the evidentiary hearing, the Court heard testimony from Federal Bureau of Investigation ("FBI") Special Agent Steven Troyd ("Agent Troyd"). The government also introduced in evidence seven exhibits: three photographs of the residence, an email between defendant and a third party, two "Advice of Rights" forms, and defendant's June 22, 2014 affidavit. After evaluating the credibility and demeanor of Agent Troyd; the documentary evidence produced at the hearing; and defendant's June 22, 2014 affidavit, the Court fully credits the testimony of Agent Troyd, discredits defendant's contrary assertions in his affidavit, and makes the following findings of fact.[3]

---

[2] On April 9, 2014, the grand jury returned a second superseding indictment charging the defendant in sixteen counts: conspiracy to sexually exploit a child (Count One), sexual exploitation of a child (Counts Two, Three, and Fifteen), transportation of child pornography (Count Four), receipt of child pornography (Count Five), attempted sexual exploitation of a child (Counts Six through Fourteen), and possession of child pornography (Count Sixteen). The government subsequently voluntarily dismissed Count Fourteen. On November 13, 2014, after a jury trial, the jury returned guilty verdicts on all of the remaining fifteen counts. The defendant is awaiting sentencing.

[3] Defendant did not testify at the evidentiary hearing, and his affidavit does not specifically address events after his arrest on January 28, 2014. As set forth *infra*, to the extent the affidavit conflicts with Agent Troyd's testimony, the Court finds defendant's version of events not to be credible in light of the

2

A. January 28, 2014 Statements

On January 28, 2014, Agent Troyd and a team of twelve FBI special agents and detectives from Nassau and Suffolk Counties executed a search warrant at defendant's residence at 3 High Gate Drive in Smithtown, New York. (Tr. 4, 7.)[4] The FBI's legal attaché office in Kiev, Ukraine, had received information about defendant from Olena Kalichenko ("Kalichenko"), a Ukrainian citizen, who claimed that she had been involved with Valerio and provided him child pornography in exchange for cash. (Tr. 5.) Kalichenko gave the FBI copies of email exchanges with defendant, as well as a video containing child pornography that she claimed she sent to Valerio. (Id.) Based upon the allegations, Agent Troyd obtained a search warrant, which was issued by Magistrate Judge William Wall on January 27, 2014. (Tr. 6.) At the time the warrant was executed, defendant was not under indictment or criminal complaint. (Id.)

Between 5:15 and 6:00 a.m. on January 28, 2014, law enforcement officers gathered at St. Catherine of Sienna's Hospital in Smithtown, and Agent Troyd briefed the team before proceeding to Valerio's residence at approximately 6:00 a.m.[5] (Tr. 7.) The agents and detectives were not uniformed; instead, they were wearing jackets, ballistic armor underneath, and raid jackets that displayed FBI or police insignia. (Tr. 7–8, 35.) As agents knocked on the front door, Agent Troyd called the home, and Valerio answered. (Tr. 8.) Agent Troyd

advised Valerio that the FBI was there to execute a search warrant and that he should open the door. (Id.) Valerio complied. (Tr. 9.) Agent Troyd entered, walked with Valerio to the end of the entrance hallway, and repeated that the FBI was executing a search warrant. (Id.) Defendant, who was wearing long pants and a tank top, did not protest, and he stood with Agent Troyd at the base of the stairway while the search team conducted a protective sweep of the sizeable home. (Tr. 10–11.) None of the officers had guns drawn, and Agent Troyd did not see anyone carrying a long gun, rifle, or shotgun. (Tr. 11.) He remained with defendant during the sweep, which took approximately ten minutes because of the size of the home. (Tr. 11–12.) The agents ultimately located one other individual, who defendant identified as his girlfriend, upstairs. (Tr. 12–13.)

Once the sweep ended at approximately 6:15 a.m., Agent Troyd asked Valerio if he would sit in the dining room and speak to the FBI and the detectives. (Tr. 13, 38.) Valerio agreed and walked with Agent Troyd to the dining room. (Tr. 13, 39.) Those present were arranged as follows: Agent Troyd sat at the far end of the table, against the wall; defendant sat at the head of the table; Suffolk County Police Department Detective Rory Forrestal ("Detective Forrestal"), a computer expert, sat to Valerio's left;[6] Special Agent Danielle

---

totality of the evidence, including the Court's evaluation of Agent Troyd's credibility.

[4] "Tr" refers the July 31, 2014 evidentiary hearing transcript.

[5] Agent Troyd testified that, for safety, it is preferable to execute searches earlier in the day, and he agreed that it would be advantageous not to give advance notice to a suspect. (Tr. 34.)

---

[6] Defendant claims that Detective Forrestal said, among other things, that defendant was "going to be in a very dark place." (Valerio Aff. ¶ 3.) Detective Forrestal allegedly "was low key, in that he spoke in a soft voice, but he was in [Valerio's] face a lot." (Id.) Agent Troyd did not recall Detective Forrestal making any such statement or being in Valerio's face. (Tr. 25–26.) He described Detective Forrestal's demeanor as "[v]ery calm and poised, very friendly, developing a rapport during the interview," and "very professional." (Id.) The Court, having evaluated Agent Troyd's credibility and the totality of the

3

Messineo ("Agent Messineo") sat to Detective Forrestal's left; and Nassau County Police Department Detective Badalucco stood in the corner to Agent Messineo's left.[7] (Tr. 14–15.) Nobody else was present during this interview.[8] (Tr. 15.) Defendant was not touched, restrained, or handcuffed to either the table or any chair. (Tr. 16.) He was clothed, and no one drew a weapon on him. (*Id.*) At one point during the interview, he requested water and was given a coffee mug of water from the kitchen.[9] (Tr. 16–17.)

After sitting down, Agent Troyd explained that the officers were looking for evidence of child pornography. (Tr. 17, 41.) Valerio responded "that he was being extorted by" Kalichenko and had received Viber chat messages from her negotiating for money. (Tr. 17.) According to Agent Troyd, defendant was "dismayed

---

[7] A fair and accurate depiction of the dining room during the interview was admitted into evidence as Government Exhibit 3. (Tr. 14.) Defendant claims that three officers were seated, while two stood behind him. (Valerio Aff. ¶ 2.) The photograph shows a minibar to Valerio's rear, and Agent Troyd testified that "no one had been standing behind" defendant or in the opening to the kitchen directly behind him. (Tr. 24–25, 40.) Again, the Court fully credits Agent Troyd's version of the events.

[8] Agent Troyd's supervisor, Dawn Smallwood, stood in the hallway between the dining room and the family room, where defendant's girlfriend was seated. (Tr. 15.) Agent Smallwood did not interact with Valerio. (Tr. 16.)

[9] During the search, neither Valerio nor his girlfriend, who was seated in the family room, could move around the house. (Tr. 39.) Agent Troyd testified, however, that it was not "fair to say" that defendant "was not free to leave the dining room once that interview started." (Tr. 41.) According to Agent Troyd, although Valerio was not free to walk around the house or to go back and forth from the kitchen to get water, he was free to enter the hallway adjacent to the dining room and to leave the house. (Tr. 42, 45.)

[Kalichenko] was able to find his email address" to communicate via Viber, and defendant "said he had contacted his attorney," Anthony LaPinta ("LaPinta"), "to speak with him in reference to the extortion by Ms. Kalichenko." (Tr. 17–18.) Defendant did not ask to speak with LaPinta or any other lawyer at this point, or say that he wanted to call a lawyer. (Tr. 18.)

Agent Troyd then showed defendant an excerpt of a July 22, 2012 email exchange between him and Kalichenko that the FBI received from Kalichenko. (Tr. 18–19.) At about 7:15 a.m. (Tr. 46), Agent Troyd read an excerpt from the email. (Gov. Ex. 4, at 2; Tr. 20.) Agent Troyd then asked Valerio "if he had in fact directed Ms. Kalichenko to produce child pornography." (Tr. 20.) Defendant said he had. (*Id.*) Agent Troyd then asked defendant "if he had received that pornography in email." (*Id.*) Defendant said he had. (*Id.*) Agent Troyd also asked defendant whether he had received a DHL package from Kalichenko that contained a disk (information which was gleaned from the report of FBI Special Agent Peter Angelini's interview of Kalichenko in Ukraine). (Tr. 20–21.) Defendant "claimed or admitted that he had in fact received the package, [b]ut that he only recalled that it contained bubble wrap." (Tr. 20.)

After defendant made these statements, Agent Troyd conferred with Agent Messineo and decided to speak to the United States Attorney's Office about authorizing a complaint against Valerio. (Tr. 21.) Agent Troyd called Assistant United States Attorney Allen Bode, who authorized the complaint. (*Id.*) Agent Troyd and Messineo then agreed to advise defendant of his *Miranda* rights.[10] (*Id.*) At 7:55 a.m., Valerio

---

[10] On cross-examination, Agent Troyd testified that, despite his awareness of Kalichenko's allegations and the documentary evidence, he did not intend to arrest defendant regardless of whether the search warrant

signed an "Advice of Rights" form, acknowledging: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."[11] (Gov. Ex. 5; Tr. 21.)

Agent Troyd then continued the interview, first providing defendant with copies of two email exchanges between him and Kalichenko, dated July 17 and July 22, 2012. (Tr. 22.) Defendant admitted that he had sent these emails, but he declined Agent Troyd's request to sign them. (*Id.*) Defendant then explained that he wanted the videos from Kalichenko because he had sent her thousands of dollars and "wanted something for his money." (*Id.*) Agent Troyd then played a segment of a video provided by Kalichenko. (Tr. 23.) Defendant admitted that he recognized Kalichenko and the child in the video, but stated that he had not seen this particular video, because he did not recognize the background in it as the

---

revealed evidence of child pornography. (Tr. 44.) Agent Troyd did not believe he had probable cause to arrest at the time he entered the house (*id.*), and he only decided to contact prosecutors after defendant answered these questions. (Tr. 48–51.)

[11] The "Advice of Rights" form reads:

**YOUR RIGHTS**

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

same background in other videos sent to him by Kalichenko. (*Id.*)

Agent Troyd asked defendant to sign a written statement. (*See* Tr. 27.) Defendant declined and asked to speak to his attorney. (*Id.*) Agent Troyd stopped questioning defendant or speaking with him about Kalichenko's allegations. (Tr. 27–28.) He did not immediately tell defendant that he was arrested, because he wanted Valerio to remain seated and calm. (Tr. 27.) Once the officers had cleaned up the search warrant materials, collected the evidence, and loaded it in their cars, Agent Troyd told defendant that he was under arrest and asked him to stand up to be handcuffed. (*Id.*) Defendant complied. (*Id.*) The agents walked Valerio outside in a jacket and proceeded to drive towards the courthouse in Central Islip, New York. (Tr. 28.)

B.   February 24, 2014 Statements

Defendant was released on bond on February 12, 2014. *Valerio*, 9 F. Supp. 3d at 286. During the afternoon on February 24, 2014, Agent Troyd arrested defendant on new charges at a psychologist's office in Farmingdale, New York. (Tr. 29–30.) At that point, Agent Troyd did not tell defendant why he was being arrested again. (Tr. 30.) Two other agents took custody of Valerio and drove him to an FBI office; Agents Troyd and Messineo followed shortly thereafter. (*Id.*)

Once in the interview room at the FBI office, Agent Troyd advised defendant of his rights. (Tr. 31.) Defendant signed an "Advice of Rights" form at 3:35 p.m. (Gov. Ex. 6.) He again asked why he was being arrested. (Tr. 32.) Agent Troyd responded that they had found additional evidence of child pornography through the search on

January 28, 2014,[12] and that the victim was a family member. (*Id.*) According to Agent Troyd, defendant then said, "I want to kill myself. I no longer have a family." (*Id.*) Agent Troyd, who knew that defendant was represented by counsel, did not ask him non-booking-related questions. (Tr. 55.)

## II. LEGAL STANDARD

The Fifth Amendment of the United States Constitution provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Recognizing that a custodial interrogation creates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," the Supreme Court held in *Miranda v. Arizona* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444, 467 (1966). "In particular, prior to the initiation of questioning, [law enforcement] must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (alteration in original) (quoting *Miranda*, 384 U.S. at 468–70). The purpose of the warnings is to "ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007).

"*Miranda*'s warning requirements, however, apply only to 'custodial interrogation.'" *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (citation omitted). "This determination has two parts: (a) there must be an interrogation of the defendant, and (b) it must be while she is in 'custody.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011). Where a defendant "has alleged police custodial interrogation in the absence of *Miranda* warnings, the burden shifts to the government to prove *Miranda* voluntariness, either because there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or because [the defendant] was properly *Mirandized* and waived his rights." *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991)); *accord United States v. Taylor*, No. 11-CR-310 (PGG), 2011 WL 4357350, at *5 (S.D.N.Y. Sept. 19, 2011).

The Supreme Court defined interrogation for purposes of *Miranda* in *Rhode Island v. Innis. See* 446 U.S. 291, 300–01 (1980). In *Innis*, the Court held that

the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know

---

[12] The transcript indicates that Agent Troyd referred to "the search warrant that occurred on January 18th." (Tr. at 32.) However, because it is undisputed that the search took place on January 28, 2014, it is clear that Agent Troyd was referring to the January 28, 2014 search.

A-179

are reasonably likely to elicit an incriminating response from the suspect.

*Id.* An "incriminating response" is "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* at 301 n.5. Accordingly, "[w]here statements are spontaneous—that is, where they are not the result of questioning or its functional equivalent—*Miranda* warnings are not necessary and the statements are not protected." *United States v. Noble*, No. 07-CR-284 (RJS), 2008 WL 1990707, at *7 (S.D.N.Y. May 7, 2008); *see, e.g.*, *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *Wolfrath v. LaVallee*, 576 F.2d 965, 973 n.6 (2d Cir. 1978) ("[S]ince the statement which was litigated below was a gratuitously volunteered statement, *Miranda* itself is inapplicable, for spontaneous statements which are not the result of 'official interrogation' have never been subject to its strictures.").

Whether a person is in "custody" for purposes of *Miranda* "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). Specifically, the test "depends on how a *reasonable person* in the suspect's position would view the situation." *FNU LNU*, 653 F.3d at 151. The court must ask (1) "whether a reasonable person would have thought he was free to leave," *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004); and, if not, (2) whether there has been a formal arrest or a reasonable person in defendant's position would have understood himself or herself "to be subjected to the restraints comparable to those associated with a formal arrest," *id.* at 671 (citation and internal quotation marks omitted).[13] Determining whether one is in "custody" "necessarily involves considering the circumstances surrounding the encounter with authorities." *FNU LNU*, 653 F.3d at 153. According to the Second Circuit,

> [t]hose circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion.

*Id.* The circumstances also include the nature of the questions asked. *Id.*

When a defendant moves to suppress a statement claimed to be obtained in violation of *Miranda*, the government must prove by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of the defendant's *Miranda* rights. *United States v. Guzman*, 879 F. Supp. 2d 312, 320 (E.D.N.Y. 2012); *see also Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Anderson*, 929 F.2d at 99. For a waiver to be voluntary, the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In addition, for a defendant to make a knowing and intelligent waiver, he or she must have "a full awareness of both the

---

[13] "Only if the answer to this second question is yes was the person 'in custody' for practical purposes and entitled to the full panoply of protections prescribed by *Miranda*." *Newton*, 369 F.3d at 672 (citation and internal quotation marks omitted).

nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* However, the accused need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Instead, the accused need only be aware that he or she "may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* "Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993). The court must consider "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

## III. DISCUSSION

According to defendant, "[b]ased on all the circumstances, I felt pressured, meaning that I had to answer their questions" once the interview began. (Valerio Aff. ¶ 4.) He asserts that he felt compelled, "[b]ased on the atmosphere" and "how things had already progressed," to continue to answer questions even after receiving the *Miranda* warning. (*Id.* ¶ 5.) Lastly, he claims that the agents "became more accusatory as the questioning continued." (*Id.* ¶ 6.) In response, the government offered the testimony of Agent Troyd. In light of all the evidence in the record and the evaluation of Agent Troyd's demeanor, the Court finds Agent Troyd's testimony regarding the facts to be wholly credible and, to the extent the defendant's affidavit conflicts with Agent Troyd's testimony, the Court finds the defendant's testimony not credible.

Applying the above-referenced standard to the facts of this case, the Court concludes, based on the totality of the circumstances, that (1) defendant's pre-*Miranda* statements in the residence on January 28, 2014, were non-custodial, and thus did not require a *Miranda* warning, and were voluntary; (2) defendant's post-*Miranda* statements in the residence on January 28, 2014, were voluntarily given following a valid waiver of defendant's *Miranda* rights; and (3) that defendant's post-arrest statements on February 24, 2014, were not the product of an "interrogation" and also followed a valid waiver of defendant's rights. Accordingly, the motion to suppress is denied.

### A. Statements on January 28, 2014

#### 1. Pre-*Miranda* Statements at the Residence

With respect to the pre-*Miranda* statements on January 28, 2014, having carefully reviewed the evidence, the Court concludes, at step one of the *Newton* analysis, that a reasonable person in defendant's situation would have understood that he was free to end the interview and leave the house during the search based upon the following facts: (1) the interview took place in the familiar surroundings of defendant's home; (2) defendant knew the agents were there to conduct a search, and agents never told him that he was under arrest, or that he was not free to terminate the interview and leave the house; (3) agents did not brandish their weapons or handcuff defendant or touch him in any way; (4) agents were not blocking the defendant from leaving the house; and (5) agents did not say or do anything threatening, but rather conducted the interview of the defendant in a calm manner.

In any event, the Court concludes in the alternative that, even assuming *arguendo* that a reasonable person would not have

understood he was free to end the interview and leave the house, the defendant's freedom of action was not curtailed to a degree associated with formal arrest. Thus, no pre-arrest *Miranda* warnings were necessary and the statements were voluntarily given. A detailed analysis of the Court's reasoning with regard to this ultimate conclusion of law is set forth below.

As the Second Circuit has explained, "[a]bsent a formal arrest, interrogations in the 'familiar surroundings of one's home [are] generally not deemed custodial,' but under certain circumstances may be." *United States v. Falso*, 293 F. App'x 838, 839 (2d Cir. 2008) (quoting *Newton*, 369 F.3d at 675); *see also United States v. Craighead*, 539 F.3d 1073, 1083–84 (9th Cir. 2008) (listing factors relevant to determining whether there was "police-dominated atmosphere" in home); *United States v. Vado*, 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) ("Only in extreme or unusual circumstances have courts held that suspects interrogated in their homes were restricted to a degree comparable to that of an individual placed under formal arrest") (collecting cases). In the instant case, given the totality of the circumstances, the Court concludes that this is not one of those situations where the interview in the familiar surroundings of defendant's home was transformed into a custodial setting (prior to the formal arrest).

First, after Valerio was told that the law enforcement agents were there to conduct a search, no direction was given to Valerio that he must go to the dining room and/or be interviewed; rather, he was asked and walked together with Agent Troyd into the dining room. (*See* Tr. at 13 ("At the conclusion of the security sweep I asked Mr. Valerio if he would sit in the dining room and speak to us. He said he would. And we walked into the dining room and sat at the

table where we began our interview.").) No display of force, or coercion of any kind, was utilized in walking with Valerio to the dining room for questioning.

Second, Valerio was not directed to or ordered to remain in the dining room, there is no credible evidence that any agents blocked his path to an exit from the dining room or residence, defendant was not ordered to answer any questions, and there is no evidence that any officer ever brandished a weapon during the interview or the search. Moreover, there is no credible evidence that the officers (who were in plainclothes) ever said or did anything threatening; rather, the Court finds the interview was conducted in a calm manner. *See, e.g., United States v. Quilter*, No. 2:11-CR-150, 2012 WL 1410322, at *3 (D. Vt. Apr. 23, 2012) ("Hallmarks of seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980))).

Third, Agent Troyd never told defendant he was not free to leave, was under arrest, or was to be arrested upon the completion of the search, and defendant was never handcuffed, or otherwise physically restrained or touched in any way.[14] *See, e.g.,*

---

[14] Agent Troyd testified that, at the time of the interview, he had no intention of arresting Valerio because he did not believe probable cause existed, and would have let Valerio leave, if Valerio had decided he wanted to leave. (*See* Tr. 44-45.) However, the *Miranda* inquiry is not dependent upon "the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. Therefore, defendant's subjective belief regarding his right to leave, and the agents' intentions with regard to the defendant have no bearing on the "custody" analysis,

*United States v. Akapo*, 420 F. App'x 42, 44 (2d Cir. 2011) (summary order) ("As the district court found, the interview occurred just outside of [defendant's] apartment, he was not handcuffed or frisked, he consented to a search of his apartment, he never indicated he wanted to leave, and was not told he could not leave. Although two of the agents asked [defendant] to stand near the doorway while three other agents searched the apartment, this was a reasonable request given the small size of his apartment, and on balance did not result in a custodial situation.").

Fourth, although twelve law enforcement officers entered the house during the execution of the search, the sheer number of officers would not lead a reasonable person, especially in light of the other circumstances, to believe that he or she was under arrest or not free to leave the house. For example, the testimony was that there were only four law enforcement officers in the dining room at the time of the interview, and the rest of the officers were in other areas of the house conducting the search. (*See* Tr. 14–15, 38.) Moreover, as noted above, there is no credible evidence that any officers impeded Valerio's attempt at movement at any point during the interview. *See, e.g.*, *United States v. Sergi*, No. 5:12-CR-100, 2013 WL 1285865, at *6 (D. Vt. Mar. 26, 2013) ("[W]hile eleven law enforcement officers were present for the search, the evidence reveals that only four to five apparently entered Defendant's residence. There is no evidence before the

court regarding how long they remained there. With respect to law enforcement escort, Agent Emmons testified that it was for the purpose of preventing destruction of evidence and maintaining officer safety. There is no evidence of how closely law enforcement accompanied Defendant during these escorts, and there is no evidence that the officers touched, restrained, or otherwise impeded Defendant's freedom of movement."); *see also United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) ("The mere fact that [suspect] was told he would be accompanied by an IRS agent when he moved about the [place of interrogation] did not place him in custody within the meaning of *Miranda*[.]"). In short, given that Valerio was clearly aware that the agents were there to execute a search warrant, a reasonable person in Valerio's position would have understood that the large number of agents in the residence related to the need to search his entire residence, and that they were not there to place him in custody. *See, e.g.*, *Vado*, 87 F. Supp. 3d at 480 ("In this case, the factors upon which [defendant] seizes must also be considered in the context of an interview conducted during the execution of a search warrant – a fact which [defendant] was well aware. The number of agents, and the agents' actions in guiding [defendant] from room to room, had the obvious benign purpose of enabling the agents to safely and efficiently complete the search, as opposed to being undertaken to intimidate or coerce [defendant]."); *see also United States v. Harris*, 548 F. App'x 679, 681 (2d Cir. 2013) (summary order) ("[W]e conclude that [the defendant] failed to allege to the district court any facts supporting the conclusion that he was 'in custody' when officers questioned him. In [defendant's] motion, his attorney simply asserted in an affidavit that [defendant] had not wanted officers to enter his home and that [defendant] was 'kept in the living room'

---

although each may shed light on the tenor of the encounter. *Accord Brekemer v. McCarthy*, 468 U.S. 420, 442 (1984) (holding that defendant was not in custody before formal arrest, although investigating officer had decided to take defendant into custody, because officer did not communicate this decision and "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time").

while the officers searched his apartment. In his reply, [defendant] averred only that he had not permitted the officers entry, had not been informed of his *Miranda* rights, and 'was not free to leave' during the search. Nowhere does [defendant] dispute the facts in the investigation report and submitted by the government that [defendant's] roommate voluntarily permitted the officers entry to the home, the officers did not draw their weapons, [defendant] was not restrained, and the officers did not tell [defendant] that he was required to answer their questions. As such, no hearing was required.").

Fifth, Valerio was cooperative, willingly divulged information in response to Agent Troyd's questions despite knowing the officers were searching for evidence of child pornography, and remained calm throughout the interview—both before and after he signed the "Advice of Rights" form. *See United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (finding defendant was not in custody during interview where defendant was interviewed in home, freely answered questions from EPA representative, remained calm throughout interview, and conceded that no verbal threats or intimidating gestures were directed at him).

Although Agent Troyd addressed Kalichenko's allegations, he and the other agents and officers engaged in no speech or actions which reasonably could be taken as intimidating, coercive, or restricting defendant's freedom of action or freedom to terminate the interview. *See, e.g.*, *United States v. Weisinger*, 586 F. App'x 733, 736 (2d Cir. 2014) (summary order) ("To be sure, the questions posed by the police indicated that [defendant] was suspected of criminal activity. This alone, however, is not enough to manifest custody where, as here, the objective circumstances of the interrogation overall would not have led a reasonable person to think that he was not at

liberty to terminate the interrogation or that he was otherwise restrained to a degree associated with a formal arrest." (citations omitted)). There is no credible evidence that verbal threats or intimidating physical gestures were directed at him.[15] Nor is there credible evidence that the agents questioned defendant in anything but "a conversational manner and did not raise their voice, accuse him of lying, or otherwise engage in trickery or deceit." *Sergi*, 2013 WL 1285865, at *7; *compare United States v. Bassignani*, 575 F.3d 879, 884–85 (9th Cir. 2009) (in concluding that defendant was not in custody, noting that "nearly the entire two and a half hour interview was conducted in an open, friendly tone," and the "questioning was not confrontational"), *with Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (finding suspect was in custody, the court noted that "detectives had accused him of showing insufficient grief, had said that his story was 'ridiculous' and 'absurd,' and had added that they simply 'could not accept' his explanations"); *see also United States v. Simmonds*, -- F. Appx. --, 2016 WL 929736, at *3 (2d Cir. March 11, 2016) ("[T]he fact that the interview then took place in the living room supports a conclusion that it was not a custodial setting. In contrast to cases finding custody because of a 'police-dominated atmosphere,' [the agent] was dressed in plain clothes, his weapon was holstered and concealed by his jacket, he was not positioned between [the defendant] and the apartment's exit, no other officers were involved in the interview, and the tone of the interview was conversational in nature." (internal citations omitted)); *United*

---

[15] Defendant's statements about Detective Forrestal (which the Court does not credit), even if true, are insufficient to establish the existence of custody under *Miranda*. *See, e.g.*, *Mitchell*, 966 F.2d at 99 (defendant's testimony "that he was intimidated by the facial features of [the agent], particularly the 'coldness' of his eyes, is clearly insufficient to establish the existence of custody under *Miranda*").

States v. Awan, 384 F. App'x 9, 14–15 (2d Cir. 2010) (affirming finding that defendant's statements were voluntary based on, *inter alia*, district court's finding that government showed that no threatening statements were made during interviews, and investigators tried to maintain friendly atmosphere); *United States v. Benedict*, 104 F. Supp. 2d 175, 180 (W.D.N.Y. 2000) ("[Defendant's] allegations that the search team entered his home by prying open the door with a steel bar, which [an officer] allegedly carried with him during the search, and that one officer 'bumped' defendant, do not show coercive behavior on the part of any members of the search team. Obviously a person whose house is being searched for child pornography is likely to be under some stress during the search (especially if he knows that pornographic materials are in fact present), but here the record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements allegedly made by [the defendant]. To accept defendant's argument would mean virtually any statements made by a suspect during the execution of a search warrant at his home would be rendered involuntary by the mere presence of law enforcement officers." (quotation marks and internal citation omitted)).

Finally, the interview during the search lasted approximately 90 minutes and, thus, the duration of the encounter in the home did not transform it into a custodial setting. *See, e.g.*, *Beckwith v. United States*, 425 U.S. 341, 342–44 (three-hour interview in home did not trigger need for *Miranda*); *United States v. Sayer*, No. 2:11-CR-113-(DBH), 2012 WL 2180577, at *4 (D. Me. June 13, 2012) (interview during search not custodial where "the search lasted a relatively short time too, roughly 60 to 90 minutes, and the defendant was questioned only intermittently throughout the search"); *see also United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011) ("The relatively short duration of the interview, which lasted roughly ninety minutes, and the twenty minutes' pause taken to summon an EMT to minister to the defendant when he suffered a panic attack are also consistent with the finding that the interview was not custodial.").

Given all of these facts and the totality of the circumstances, the Court concludes that a reasonable person in the defendant's situation would understand: (1) that the law enforcement agents were there to conduct a search, and he was not under arrest; (2) he did not have to consent to be interviewed in the dining room; and (3) he could not interfere with the law enforcement officers conducting the search, but he was free to leave the house. Although Agent Troyd did not affirmatively advise Valerio that he was free to leave and was not under arrest, no such affirmative statement is required by law where the officers never said or did anything indicating otherwise. *See Mitchell*, 966 F.2d at 98 ("Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave."); *Sergi*, 2013 WL 1285865, at *5 ("Although Defendant was not initially affirmatively advised of his right to leave, the law enforcement officers never 'act[ed] or sp[oke] in a manner that conveys the message that they would not permit the accused to leave[.]'" (alterations in original) (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989))).

In short, the Court finds that a reasonable person in Valerio's situation would have understood that he was free to leave his residence during the search. In any event, the Court finds in the alternative that, even if a reasonable person would not believe he or she was free to leave, Valerio's

freedom of action was certainly not curtailed to a degree associated with formal arrest. In sum, the Court concludes that the government has shown, by a preponderance of the credible evidence, that defendant was not in "custody" before his arrest on January 28, 2014. *See United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (stating that custodial setting is one providing "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak"). Thus, the motion to suppress the pre-*Miranda* statements by Valerio at the residence on January 28, 2014 is denied.

### 2. Post-*Miranda* Statements at the Residence

Defendant Valerio also challenges the post-*Miranda* statements at the residence. However, as discussed below, the Court finds that the defendant voluntarily, intelligently, and knowingly waived his *Miranda* rights.[16]

Defendant is an adult male, and there is no evidence that he has developmental issues. He was not physically restrained or threatened before or after he received his advice of rights, and there is no evidence that the officers prohibited him from standing up and leaving. The evidence

adduced at the evidentiary hearing also indicates that none of the agents who interviewed defendant engaged in "repeated and prolonged . . . questioning" designed or intended to overcome the defendant's free will. *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988). Moreover, despite immediately being informed of the nature of the search warrant and learning of some of the evidence in the FBI's possession, defendant never requested that his lawyer be contacted. His demeanor remained calm throughout the interview, and he did not indicate that he did not understand the warnings or the nature of the rights at issue. Thus, under the totality of the circumstances, the Court concludes that the government has met its burden of demonstrating that defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

Accordingly, the Court denies the motion to suppress the post-*Miranda* statements on January 28, 2014.

### B. Statement on February 24, 2014

With respect to the post-arrest statement made on February 24, 2014, although it is undisputed that defendant was in custody when he made the statement at issue, the Court determines that the statement was not the product of interrogation. As is evident from the Court's findings of fact, defendant volunteered that statement absent any question posed by law enforcement agents and after he received his *Miranda* warnings and signed the "Advice of Rights" form acknowledging he was willing to answer questions without his lawyer present. Under such circumstances, in simply answering Valerio's question about why he was being arrested again, Agent Troyd did nothing reasonably likely to elicit an incriminating response, and the exchange was one normally attendant to custody—namely, explaining the basis for the custody. *See,*

---

[16] The Court notes that, although Agent Troyd determined at the time of the *Miranda* warnings that the defendant would be placed under arrest at the conclusion of the interview, he did not communicate that intent to the defendant until the end of the interview. As discussed *supra*, a "police officer's subjective intent in detaining an individual is irrelevant so long as that intent is not conveyed to the individual in a way that results in the individual believing that he or she is not free to leave." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007). However, even assuming *arguendo* that defendant reasonably understood that he was under arrest at the time of the *Miranda* warnings, the Court finds that he voluntarily, intelligently and knowingly waived his *Miranda* rights.

13

*e.g.*, *United States v. Henderson*, 770 F.2d 724, 728 (8th Cir. 1985) ("When [defendant] initiated conversation by requesting that [the law enforcement officer] specify the charges, the ensuing verbal exchange was nothing more than a conversation 'normally attendant to arrest and custody'" and, thus, was not interrogation under *Miranda* (quoting *Innis*, 446 U.S. at 301)); *see also United States v. Fleck*, 413 F.3d 883, 892–93 (8th Cir. 2005) (police request for key to bedroom during search did not constitute interrogation for *Miranda* purposes); *United States v. Lockett*, 393 F.3d 834, 838 (8th Cir. 2005) (statements made after defendant asked why police were in his apartment, and was told reason, were not in response to interrogation); *United States v. Martin*, 238 F. Supp. 2d 714, 719 (D. Md. 2003) ("[S]tatements of agents about evidence which are not designed to elicit an incriminating response are not interrogation."); *United States v. Henry*, 940 F. Supp. 342, 346 (D.D.C. 1996) (officer's response to defendant's inquiry about nature of charges was not "interrogation" for purposes of *Miranda*). Thus, defendant's voluntary spontaneous statement on February 24, 2014, is admissible.

In any event, even assuming *arguendo* that the statement was in response to interrogation, the Court finds that it was made after the defendant had knowingly, intelligently, and voluntarily waived his *Miranda* rights. There is no evidence that defendant was coerced into waiving his rights, or that his waiver and statement was anything other than the product of a "rational intellect and free will." *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).

In short, the government has met its burden as to the statement on February 24, 2014. Accordingly, the motion to suppress the statement on February 24, 2014 is denied.

## IV.   CONCLUSION

For the foregoing reason, defendant's motion to suppress is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 15, 2016
        Central Islip, NY

* * *

The government is represented by Robert L. Capers, United States Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201, and 610 Federal Plaza, Central Islip, NY 11722, by Allen Lee Bode and Ameet B. Kabrawala. Defendant is represented by Anthony M. LaPinta of Reynolds, Caronia, Gianelli, Hagney, LaPinta & Hargraves, 35 Arkay Drive, Hauppauge, NY 11788; and Leonard Lato, 320 Carleton Avenue, Central Islip, NY 11722.

The redactions herein are consistent with the order of the District Court
requesting that children's names be redacted as well as the name of the woman
from South Africa who testified at the Fatico hearing.

1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

         - - - - - - - - - - - - - X
         UNITED STATES OF AMERICA    :  14-CR-094

                 -against-             US District Court
                                       Central Islip, NY
         JOSEPH VALERIO,
                        Defendant. :  July 25, 2016
         - - - - - - - - - - - - - X   11 am

                 TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE JOSEPH F. BIANCO
                 UNITED STATES DISTRICT JUDGE

         APPEARANCES:

         For the Government:
                                 ROBERT L. CAPERS
                                 United States Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York 11201
                                 By:  ALLEN BODE, ESQ.
                                      AMEET KABRAWALA, ESQ.
                                 Assistant US Attorney

         For the Defense:        ANTHONY LaPINTA, ESQ.
                                 LEONARD LATO, ESQ.




         Court Reporter:         Dominick M. Tursi, CM, CSR
                                 US District Courthouse
                                 1180 Federal Plaza
                                 Central Islip, New York 11722
                                 (631) 712-6108  Fax:  712-6124
                                 DomTursi@email.com



                 Proceedings recorded by mechanical stenography.
                        Transcript produced by CAT.
```

2

1   (Call to Order of the Court.  Appearances stated
2   as indicated above.)
3       THE COURT:  Good morning.
4   Mr. Valerio is present as well.
5       As you know, this is a scheduled date for the
6   Fatico hearing.  I did receive the government's letter
7   late last week, indicating there was an issue with one of
8   the witnesses from South Africa.
9       Is that correct?
10      MR. KABRAWALA:  That's correct, Judge.  She is
11  not available but we are scheduling her testimony.  We
12  have consulted with defense counsel and will certainly
13  propose a date after conferring with your Honor's deputy.
14      THE COURT:  In terms of the order of witnesses
15  today, how do you wish to proceed?
16      MR. KABRAWALA:  We are first going to call Lucy
17  Down.  She is an au pair who was hired to work for
18  Mr. Valerio.  That will be followed by Jolene Leonardo,
19  who worked for the au pair agency.
20      The third witness will be Olena Kalichenko, who
21  we understand is here today.  The government is not
22  technically calling her.  We will be happy to direct her
23  testimony to get the relevant facts out that are relevant
24  to the proceeding, but we are open to suggestion from the
25  court as to how the court wants to handle Miss

3

1   Kalichenko's testimony, given that the government is not
2   calling her, per se.
3       THE COURT:  Yes.  I would expect the government
4   would do the direct examination.
5       MR. KABRAWALA:  Perfect.
6       THE COURT:  I saw that Mr. LaRusso was here
7   before.  Is he gone now?
8       MR. KABRAWALA:  Mr. LaRusso is here.
9       MR. LaPINTA:  Do you want me to get him?
10      THE COURT:  Is he out there?  I just want to
11  make sure he understands, because he wasn't here when I
12  initially extended that invitation.
13      (Robert LaRusso, Esq., enters the courtroom.)
14      THE COURT:  Good morning, Mr. LaRusso.
15      I saw you sitting back there before.  I just
16  asked the government who the witnesses are for today.
17      You weren't part of the discussion when we were
18  scheduling this Fatico hearing.  You probably have already
19  spoken to both sides, but I invited Ms. Kalichenko to
20  testify in connection with the issues at this Fatico
21  hearing.
22      As you know from the government's letters, they
23  are not intending to make any motion in connection with
24  her sentence, under 5K1.1 or 3553e, but I also want you
25  and Ms. Kalichenko, and I will explain this to her when we

4

1   get to that point, I am not compelling her testimony in
2   this case.  This is voluntary.  I am not ordering her to
3   testify at this hearing.
4       If she wishes to testify, I am willing to hear
5   her testimony based upon some of the things that she said,
6   as you know, at the time she was considering her guilty
7   plea, with regard to alleged treatment by Mr. Valerio.
8   But I'm not compelling her to testify.
9       So I just wanted you to be aware.  I don't want
10  there to be a miscommunication that the judge is ordering
11  her to testify, because that is not the posture we are in.
12      MR. LaRUSSO:  Your Honor, to the contrary.
13  Weeks and weeks ago I received the exact same information
14  from the government, almost line for line the way you just
15  described it.  I have gone over that with my client.  She
16  understands that there are no promises being made
17  anywhere; that the government is not going to be writing
18  the 5K letter.
19      We went over it at least two or three times, and
20  she is well aware that her appearance here today is
21  strictly voluntary.  You can inquire of her and she will
22  answer the questions I hope in the same way she has been.
23      THE COURT:  They have indicated that she is the
24  third witness today, so obviously you don't have to hang
25  around the whole day.  I don't know how long the other

5

1   witnesses are going to take.
2       MR. KABRAWALA:  The other witnesses will be
3   relatively brief.  I expect Ms. Down and Ms. Leonardo will
4   be finished within the hour, depending upon how much cross
5   there would be.  And I don't expect there to be much
6   cross.  Of course I leave that to the defense.
7       THE COURT:  All right.  So you are free,
8   obviously, to hang around if you want, Mr. LaRusso.
9       MR. LaRUSSO:  Under those circumstances, I will.
10      The only question that I have, and I don't know,
11  and I have spoken to both sides regarding it, how the
12  court would like to proceed relative to the questioning of
13  Ms. Kalichenko.
14      THE COURT:  I mentioned to the government that
15  even though they are not calling her, I'm going to ask
16  that they conduct the direct examination.  Okay?
17      MR. LaRUSSO:  Very good.  Thank you, your Honor.
18      THE COURT:  All right.  Does the defense have
19  anything they wish to raise with me before we have the
20  first witness?
21      MR. LaPINTA:  No.  Thank you.
22      MR. KABRAWALA:  Judge, one housekeeping matter.
23      The government asks that Exhibits 5A, 6 and 7,
24  they are records related to the InterExchange company, the
25  au pair agency, be admitted.  There is a record

6

1  declaration that is Government Exhibit 8 that covers those
2  forgoing exhibits. We ask that those be admitted into
3  evidence.
4         THE COURT: Any objection to that?
5         MR. LATO: May I have a minute to confer with
6  Mr. Kabrawala?
7         THE COURT: Sure.
8         (There was a pause in the proceedings.)
9         MR. LATO: Your Honor, as there is no jury here,
10  this is my proposal.
11         I will consent subject to connection. I know
12  the rules of evidence are relaxed here, but it still has
13  to have some indicia of reliability that basically it is
14  what it purports to be.
15         So if in fact the government meets the burden --
16  and I presume that they will in the end -- I will say we
17  consent. So at this point, let's go forward. I can't
18  make the argument now. My guess is they will lay the
19  proper foundation.
20         So let's proceed as if it is in, but I reserve
21  my right at the end to say the documents lack sufficient
22  indicia of reliability to be admitted even at a Fatico
23  hearing.
24         THE COURT: All right. I will let you reserve
25  any objections, but obviously we will use them in

7

1  connection with this hearing.
2         MR. KABRAWALA: To accelerate the process, with
3  the court's indulgence, may I please leave a binder of the
4  exhibits up on the podium?
5         THE COURT: Yes.
6         Is Ms. Down here?
7         MR. KABRAWALA: Yes, your Honor. I will call
8  her.
9         And for the record, we are also joined by Agents
10  Troy and Messineo of the FBI, and Ms. Langone of
11  Probation.
12         THE COURT: Miss Down, if you could, come up to
13  the witness stand here and remain standing for the oath.
14
15  **LUCY DOWN**
16         called by the Government, having been first duly
17         sworn/affirmed, was examined and testified as
18         follows:
19         THE COURT: Go ahead, Mr. Kabrawala.
20         MR. KABRAWALA: Thank you, your Honor.
21
22  DIRECT EXAMINATION
23  BY MR. KABRAWALA:
24  **Q.** Good morning.
25  **A. Hi.**

8

1         THE COURT: Could you just pull a little closer
2  to the mic.
3         Thank you.
4  BY MR. KABRAWALA:
5  **Q.** Miss Down, where are you from?
6  **A. England.**
7  **Q.** Did you travel here pursuant to a subpoena for your
8  testimony?
9  **A. Yes.**
10  **Q.** And how old are you?
11  **A. I'm 22.**
12  **Q.** Would you please speak up a little bit.
13  **A. Sorry. Yes.**
14  **Q.** Thank you so much.
15         What is your highest level of education?
16  **A. I have an extended diploma in business studies.**
17  **Q.** How old were you when you obtained that degree?
18  **A. 18 years old.**
19  **Q.** And are you currently employed?
20  **A. Yes. In the UK.**
21  **Q.** What do you do?
22  **A. I'm a service advisor for a Land Rover dealership.**
23  **Q.** I want to speak to you today about your interactions
24  with an individual named Joseph Valerio.
25         Do you see Mr. Valerio in this courtroom here

9

1  today?
2  **A. Yes.**
3  **Q.** Can you please point out Mr. Valerio by identifying
4  him by an article of clothing he's wearing.
5  **A. There, with the gray jumpsuit on.**
6         MR. KABRAWALA: Your Honor, we would ask the
7  record to please reflect that the witness has identified
8  Mr. Valerio.
9         THE COURT: Yes.
10  BY MR. KABRAWALA:
11  **Q.** Now, Ms. Down, it is my understanding that you were
12  going to serve as an au pair for Mr. Valerio. Is that
13  correct?
14  **A. Yes, that's correct.**
15  **Q.** Can you please tell us how and approximately when you
16  decided to become an au pair.
17  **A. I finished college at the age of 18, in May of 2012,**
18  **and decided to travel and was always interested in the**
19  **United States, so I applied to the GAP company.**
20  **Q.** Had you visited the United States before that?
21  **A. No.**
22  **Q.** So this was to be your first time in the US.
23  **A. Yes.**
24  **Q.** Is there any particular agency that coordinated your
25  au pair employment?

10

1   A.   Yes.  InterExchange.
2   Q.   InterExchange.  Was that known by any other name in
3   the United States?
4   A.   In the UK it was called GAP 360.
5   Q.   How did you find them?
6   A.   I found them on line.
7   Q.   How long did you expect the au pair program to last?
8   A.   It's a year, and you get, and you work for the eleven
9   months for your chosen family, and then you have a month
10  of travel at the end by choice.
11  Q.   Can you please describe how the au pair matching
12  program works.
13  A.   So you have a database on line that the InterExchange
14  set up, and GAP 306, they set up so families can view your
15  profile as an au pair.
16  Q.   And are you able to review profiles of potential host
17  families?
18  A.   I couldn't.  I can once they want to see my profile.
19       So once they see my information, then I can view
20  theirs.
21  Q.   Now, did there come a time when you connected with
22  Mr. Valerio in an effort to prospectively serve as an au
23  pair in his household?
24  A.   Yes.  So he viewed my profile and then requested an
25  interview.

11

1   Q.   How did that request come about?
2   A.   So it comes through the database.  So firstly you get
3   information that he's viewing, and then you get
4   information that he's going to view your, he's requesting
5   a Skype interview with yourself.
6   Q.   How did you communicate with Mr. Valerio in order to
7   set up an interview?
8   A.   On the InterExchange website, they have like an email
9   messenger that you can correspond with.
10  Q.   Do you see the giant binder in front of you?
11  A.   Yes.
12  Q.   Could you please turn to Exhibit 5A.
13       (Mr. LaPinta and Mr. Kabrawala confer.)
14  BY MR. KABRAWALA:
15  Q.   Do you see that?
16       Why don't you thumb through it for a moment, and
17  I'm going to be directing your attention to the 10th page.
18       The page numbers are actually marked at the
19  bottom.  And starting from that page, if you can.
20       So thumb through the rest of that exhibit, and
21  let me know when you are done.
22  A.   Okay.
23  Q.   Do you recognize this document?
24  A.   Yes.
25  Q.   What is this, generally?

12

1   A.   So this is the messages from myself and Joe Valerio
2   on the InterExchange website arranging the interview.
3   Q.   And to the best of your knowledge, does this fairly
4   and accurately represent the conversations that you had
5   via this email program built into the InterExchange
6   website?
7   A.   Yes.
8        MR. KABRAWALA:  The government moves to admit
9   Government Exhibit 5A into evidence.
10       MR. LaPINTA:  I object only insofar as a number
11  of the emails seem to pertain to other people besides this
12  witness.
13       I understand that he's offering them presumably
14  as a business record, but a number of the these emails do
15  not pertain to these emails.
16       THE COURT:  In 5?
17       MR. LaPINTA:  5A.
18       THE COURT:  You have no objection to the ones
19  that pertain to this witness.  Correct?
20       MR. LaPINTA:  I do not.
21       THE COURT:  So I'm going admit the ones that
22  pertain to this witness.
23       Again, as Mr. Lato said earlier, I will reserve
24  your ability to object to the other ones.  Okay.
25       MR. LaPINTA:  Yes.

13

1        (Government Exhibit 5A in evidence.)
2   BY MR. KABRAWALA:
3   Q.   Now, is it fair to say that email exchanges between
4   you and Mr. Valerio in this exhibit essentially pertain to
5   scheduling an interview and coordinating your arrival in
6   the United States?
7   A.   Yes.
8        MR. LaPINTA:  I'm going to object to the form of
9   the question, your Honor.
10       THE COURT:  Sustained as to form.
11  BY MR. KABRAWALA:
12  Q.   What are these emails about?
13  A.   Organizing the initial interview and then
14  corresponding regarding information for when I'm due to
15  arrive in the United States.
16  Q.   On InterExchange email page 10, the bottom email.  Do
17  you see where I'm looking?
18  A.   Page 10.  Yes.
19  Q.   The bottom email.
20  A.   Yes.
21  Q.   It talks about the program Skype?
22  A.   Yes.
23  Q.   That is the video conferencing application?
24  A.   Yes.
25  Q.   Did you in fact have an interview with Mr. Valerio

14

1 via Skype?

2 **A. Yes.**

3 **Q.** Approximately when did you speak to Mr. Valerio via

4 Skype?

5 **A. I can't remember specifically, but going by the**

6 **information, I'm assuming it was the 17th at 8 pm.**

7 **Q.** Of September 2012?

8 **A. Yes.**

9 **Q.** Now, can you please describe what you and Mr. Valerio

10 discussed during this Skype interview.

11 **A. We discussed like my upbringing, where I live,**

12 **regarding myself.**

13 **I asked him questions regarding the daughter,**

14 **the child care, what I would have to do, where he lives,**

15 **information about the surroundings. We just found what I**

16 **do, hobbies, et cetera.**

17 **Q.** You mentioned a daughter. Did Mr. Valerio tell you

18 that he had a daughter?

19 **A. Yes.**

20 **Q.** What did Mr. Valerio say his daughter's name was?

21 **A. Sylvia.**

22 **Q.** Sylvia. Did Mr. Valerio tell you what Sylvia's age

23 was at that time?

24 **A. I remember it being 8 years old.**

25 **Q.** Did Mr. Valerio tell you what Sylvia's interests

15

1 were, during this Skype interview?

2 **A. From what I remember, she was into dancing. That's**

3 **all I remember.**

4 **Q.** During that Skype interview with Mr. Valerio, did

5 Mr. Valerio tell you what you would be doing in connection

6 with your duties and responsibilities as an au pair within

7 his household?

8 **A. Yes. So I would be looking after his daughter.**

9 **Driving. I would be able to drive the vehicle. I would**

10 **drive the vehicle to various hobbies. And weekends as**

11 **well. So I would be doing basic child care for her.**

12 **Q.** Did Mr. Valeria tell you anything about the child's

13 mother?

14 **A. Yes. So he said, gave me brief details. She isn't**

15 **around, they were separated, but she would have Sylvia at**

16 **certain times so I would drive Sylvia to the mother's if**

17 **need be.**

18 **Q.** Did Mr. Valerio tell you anything else about the

19 mother or her condition or her life circumstances?

20 **A. He did say something from, I have a bad memory of**

21 **this, but that she was ill. But that's all I can**

22 **remember.**

23 **Q.** I want you to please turn to page 12.

24 I'm showing it to counsel.

25 And I'm referring to the bottom message.

16

1 **A. Umm-hmm.**

2 **Q.** Just reading this aloud, it appears to be to Lucy

3 Down, September 18, 2012, at 10:34 am. Joseph Valerio to

4 Lucy Down.

5 Let me know if I don't read it correctly.

6 *Yes, it would be brilliant 4,* as in the number

7 four, *sure,* exclamation mark, *like a diamond in the sky.*

8 *I think it's more than just a maybe. It's*

9 *something to try. With all the good we spoke about, it's*

10 *very quite possible you should be the one because you*

11 *happen to be a lot of fun.*

12 *Shall I confirm our match? And we'll get it*

13 *done. Joe.*

14 Did I read that correctly?

15 **A. Yes.**

16 **Q.** What's he talking about here, to your understanding?

17 **A. To my understanding, that the Skype interview went**

18 **well and he was willing to match as an au pair.**

19 **Q.** So is it fair to say after your match -- withdrawn.

20 What happened after you two were matched?

21 **A. So InterExchange and GAP 360 gathered the details,**

22 **and then they corresponded with me regarding getting my**

23 **visa, flight, when I would be going to the US.**

24 **Q.** Approximately when did you travel to the United

25 States and where did you land?

17

1 **A. I believe it was the 22nd of October 2012. And I**

2 **arrived at JFK Airport.**

3 **Q.** What happened next?

4 **A. They got me to the New Yorker Hotel, where I stayed**

5 **with other au pairs on the same kind of program.**

6 **Q.** How long did you stay at the New Yorker Hotel with

7 the other au pairs?

8 **A. Five days.**

9 **Q.** What did you do during that five-day period, in

10 general?

11 **A. It was coordination. So various training child-care**

12 **information. Obviously, emergencies in the United States.**

13 **Various details about child care and the US.**

14 **Q.** So is it fair to say you had like an orientation

15 program for five days?

16 **A. Yes.**

17 **Q.** How many au pairs generally, approximately, were

18 there during that training?

19 **A. I'd say altogether about 18 of us.**

20 **Q.** Now, during that training program, were you told what

21 to do in case of an emergency?

22 **A. Yes.**

23 **Q.** And what do you remember about that?

24 **A. They gave us details about the InterExchange office**

25 **and the emergency number of the United States.**

18

1  Q.  What happened at the end of the training period?
2  A.  So we finished the orientation in au pair, and we all
3  got collected by our families at the end of the week.
4  Q.  Who came to get you?
5  A.  Mr. Valerio.
6  Q.  And what happened next?
7  A.  So he picked me up in the evening, and we got in the
8  car.  And we were driving to get something to eat and he
9  was asking about what I had done in the week regarding
10  orientation.
11  Q.  How was he behaving toward you, either physically or
12  verbally?
13  A.  Just, we were just talking.  I was asking questions
14  regarding Sylvia, and he was asking questions regarding
15  how my week was in New York.
16  Q.  What if anything did Mr. Valerio tell you about
17  Sylvia, during that car trip?
18  A.  That she wasn't his child.
19  Q.  Was not his child?
20  A.  No.
21  Q.  And what did you say or how did you react to that?
22  A.  I was shocked, because I was wondering why I was
23  there for.
24  Q.  Did you ask him that?
25  A.  Yes.

19

1  Q.  What did he say?
2  A.  He said that he would explain further when we got
3  back to, when we were done with our meal, but he needed
4  someone at the house.  That's what I remember in that
5  conversation.
6  Q.  Did you in fact have a meal before you went back to
7  Long Island?
8  A.  Yes.
9  Q.  And at some point that evening, did you get back to
10  his house in Long Island?
11  A.  Yes.
12  Q.  What happened once you got there?
13  A.  To his house?
14  Q.  Correct.
15  A.  So we went back to his house.  It was quite late at
16  night, I remember.  Took my bags in.  Walking through the
17  house.  Took my bags straight upstairs into, he showed me
18  where my bedroom would be, and so I put my bags in there.
19      He then offered me a drink.  So I went back
20  downstairs, into a media room, I guess.
21  Q.  Let me stop you right there.  On the car ride back,
22  did you two discuss anything about what plans, if any,
23  there he might be for you in the United States?
24  A.  So I was asking back to what he would need me for, et
25  cetera, in the same conversation.  He mentioned a party

20

1  that we were going to go to.
2  Q.  What sort of party?
3  A.  I believe it was a Halloween party, in my memory.
4  Q.  Did he tell you what kind of costume he wanted you to
5  wear?
6  A.  Yes.  He mentioned me wearing panty hose with nothing
7  else.
8  Q.  Do they use that term, *panty hose,* in the United
9  Kingdom?
10  A.  No.  I didn't know what it was.
11  Q.  So accelerating to the house again.  Sounds like you
12  got a tour of the house.
13  A.  Yes.
14  Q.  What happened next?  Or what happened during the tour
15  of the house.
16  A.  So he showed me obviously my room.
17  Q.  By the way, what did your room look like?
18  A.  It was a bit rundown room.  There was a --
19      MR. LaPINTA:  I'm sorry.  I didn't understand.
20      Could you repeat that, please?
21      THE WITNESS:  What?  About the room?
22      MR. LaPINTA:  Yes.  Please.
23  BY MR. KABRAWALA:
24  Q.  Yes.
25  A.  It was like a rundown room.

21

1      You walk in.  On the left there was a glass-door
2  wardrobe that was, I remember, being slightly broken.  The
3  bed wasn't made.  And it had a make-up vanity on the
4  right, from what I remember.
5  Q.  What was going through your mind at that time?
6      MR. LATO:  Objection.
7      THE COURT:  Overruled.
8  BY MR. KABRAWALA:
9  Q.  What was going through your mind at that time?
10  A.  I was scared.  I didn't know why I was there.  I was
11  a bit nervous.  I was nervous anyway, but, you know, I was
12  scared.
13  Q.  Did you have a mobile phone?
14  A.  No.
15  Q.  Did you have any ability to contact the police?
16  A.  No.
17  Q.  What happened next?
18  A.  So I went downstairs, got a drink, and I sat in the
19  media room.  And then Mr. Valerio came in.
20  Q.  How was he dressed?
21  A.  He was he in, he was then in boxers and a wife beater
22  tanktop.
23  Q.  What happened after that?
24  A.  So he sat next to me.  And I sat there for about five
25  minutes and then I wanted to go to bed.

22

1 Q.   At any point up until that moment, had Mr. Valerio
2 touched you in any way?
3 A.   Yes, like various trying to touch my hand.  Just
4 trying to, but just touched my hand.  But I got myself a
5 distance.
6 Q.   What happened after that?  Did you go to bed at all?
7 A.   Yes.  I went straight up to bed then.
8 Q.   And did you sleep the entire night?
9 A.   I was still, had jet lag and had a long week so I was
10 pretty tired so I went to bed.
11          Mr. Valerio brought up like a cover, because the
12 bed wasn't made, but I didn't bother making it.  I just
13 went, just closed the door and I just fell asleep, and
14 then woke up about 4 am, I'd say.
15 Q.   What did you do when you woke up?
16 A.   So I had my laptop.  So I obviously didn't have
17 anything else to contact anyone.  I walked downstairs to
18 see if I could use the phone line, but it didn't work or I
19 didn't know how to work it but I couldn't call.
20          So I went back upstairs and there was an office
21 opposite my room.  I went in to see if there was like a
22 Wi-Fi password, and I couldn't find one anywhere.  So I
23 just went back to my laptop, opened it up, and I got the
24 Wi-Fi and started emailing my dad in the UK.
25 Q.   What happened after that?

23

1 A.   Just continuously emailing my dad to see if he would
2 pick up, because it would have been about 9 am in UK time.
3 Q.   Did your dad respond?
4 A.   It took about an hour, but yes.
5 Q.   What was his reaction?
6 A.   Well, the first, initial email was obviously
7 questioning why I was emailing about a hundred times.
8 Excuse me.  And then obviously he replied saying: *Please
9 get on Skype.*  And that's when I called him on Skype.
10 Q.   What did you say?
11 A.   How any father would react.  Like what do I do?  He
12 wasn't anywhere near me.
13 Q.   What did you --
14          MR. LaPINTA:  I'm sorry.  I didn't understand.
15          Can you repeat that last answer, please.
16          THE WITNESS:  Okay.  What, how my dad reacted?
17          So he was obviously asking what to do.  What do
18 I do?  He was really panicking.
19 BY MR. KABRAWALA:
20 Q.   What did you do?
21 A.   I just explained the situation I was in.  Where I
22 was.  And then he said he tried to get hold of the GAP 360
23 in the UK.
24 Q.   Did you ultimately connect with somebody at GAP 360
25 in the UK or InterExchange?

24

1 A.   Once my dad got hold of them, I then got a Skype call
2 from a lady called Emma Larby, who was in the UK GAP 360.
3 Q.   What did you and Ms. Larby talk about?
4 A.   Just spoke about my situation.  What happened.  What
5 I was doing.  From what I remember, she was talking me
6 through what she would then do.
7 Q.   What did she tell you to do?
8 A.   She said:  Sit tight.  Someone will be coming to get
9 you shortly.
10 Q.   Did Mr. Valerio come into your room or otherwise
11 interact with you during this period of time that you were
12 speaking either to your father via Skype or Ms. Larby?
13 A.   Yes.  So he came in and opened the door.  He was
14 asking me what was wrong, because I'd obviously been
15 crying.  So he asked what was wrong.  What was going on.
16          I just explained, obviously I'd been on Skype
17 with my parents, just home sick, not to make, not to let
18 him know what the situation was for calling Skype to GAP
19 360.
20 Q.   What happened after that?
21 A.   Then he left again.  So I was speaking to Emma, and
22 she said pack your bags.
23          I'm trying to remember this.  She said the
24 coordinator for the area for the au pairs will be coming
25 to get you.  We are in contact with her now.

25

1 Q.   What happened after that?
2 A.   From my memory, when I started to get my things
3 together, and then carried, had my laptop on my lap, had
4 everything together.
5          So I'm going downstairs.  Then Mr. Valerio was
6 questioning what I was doing.  I'm assuming no one had got
7 in contacted with him at this point from InterExchange.
8 And I said I'm getting picked up.
9          It's hard to remember this, but I stayed on
10 Skype to Emma Larbu, the GAP 360 representative.
11 Q.   How was Mr. Valerio behaving or acting during this
12 time period while you were waiting to be picked up?
13          MR. LaPINTA:  Objection.
14          THE COURT:  Overruled.
15          THE COURT:  You can answer.
16          THE WITNESS:  Okay.
17 A.   He was acting quite shocked and just asking questions
18 and telling me to grow up, quite aggressively.
19 Q.   Anything else?
20 A.   Saying various things like I could offer you such a
21 lot of money.  He's going into this sort of thing.
22 Storming around the house.
23 Q.   How did you feel?
24 A.   Intimidated.
25 Q.   About how much time passed between you coming

26

1    downstairs and then you being picked up?
2    **A.   It probably felt longer than it actually was. I**
3    **would say 20 minutes, tops. It might be less than that.**
4    **Q.**   Do you recall getting picked up?
5    **A.   Yes.**
6    **Q.**   And what happened? Who picked you up and what
7    happened when they picked you up?
8    **A.   Jolene Leonardo came and picked me up. Sh knocked on**
9    **the door. I got up; went to answer it.**
10            **And then she tried to ask Mr. Valerio what went**
11   **on: What's going on? What's happened? And he said I'm**
12   **not answering anything, and just slammed the door.**
13   **Q.**   All right. Did you go back to the United Kingdom
14   shortly thereafter?
15   **A.   I was in the United States for about a week after**
16   **that.**
17   **Q.**   Where did you stay?
18   **A.   At Jolene Leonardo's house.**
19   **Q.**   Do you connect with any other family to work for
20   them?
21   **A.   I was looking into a family in California, but there**
22   **was a hurricane so there was no way to travel. So after**
23   **that I decided to go home.**
24   **Q.**   There was a hurricane? Hurricane Sandy?
25   **A.   Umm-hmm.**

27

1    **Q.**   Is that yes?
2    **A.   Yes.**
3    **Q.**   So you stayed with Ms. Leonardo's family during that
4    hurricane time period?
5    **A.   Yes.**
6    **Q.**   And then you returned to the United Kingdom after
7    that?
8    **A.   Yes.**
9    **Q.**   You saw Miss Leonardo right outside today?
10   **A.   Yes.**
11   **Q.**   You were reunited with her?
12   **A.   Yes**
13   **Q.**   Had you seen or spoken with Miss Leonardo before your
14   reunion just a few minutes ago?
15   **A.   No.**
16           MR. KABRAWALA: Your Honor, the government
17   doesn't have anything further at this time.
18           THE COURT: Cross-examination.
19           MR. LaPINTA: One moment please.
20           (There was a pause in the proceedings.)
21
22   CROSS-EXAMINATION
23   BY MR. LaPINTA:
24   **Q.**   Good morning, Ms. Down.
25   **A.   Hi.**

28

1    **Q.**   Ms. Down, my name is Mr. LaPinta. I represent
2    Mr. Valerio. I'm going to ask you some questions about
3    your testimony and about what happened to you during this
4    time period.
5            Do you understand?
6    **A.   Yes.**
7    **Q.**   Okay. I'm not going to yell at you. I'm not going
8    to scream at you. I'm not going to pound my fist. I'm
9    just going to ask particular questions. Okay?
10   **A.   Yes.**
11   **Q.**   So please be as comfortable as you can in light of
12   the circumstances. Okay?
13   **A.   Okay. Yes.**
14   **Q.**   All right. If you don't understand my question,
15   please let me know and I will either reask it or rephrase
16   it for you. Okay?
17   **A.   Okay. Thank you.**
18   **Q.**   You're welcome.
19           Ms. Down, a few times when you were answering
20   questions before, you had alluded to the fact about your
21   memory.
22   **A.   Yes.**
23   **Q.**   Okay? And it is clear that this incident took place
24   around four years ago. Correct?
25   **A.   Yes.**

29

1    **Q.**   Actually, more -- a little less than four years ago.
2    Right?
3    **A.   Yes.**
4    **Q.**   Would you agree with me obviously that due to the
5    passage of time, you have certain problems remembering
6    certain things? Correct?
7    **A.   Yes.**
8    **Q.**   And your testimony that you just gave is the best
9    shot at your recollection of what happened. Correct?
10   **A.   Yes.**
11   **Q.**   But it may not be precisely what happened. Right?
12   **A.   Yes.**
13   **Q.**   And what was said may not be precisely what was said.
14   Right?
15   **A.   Yes.**
16   **Q.**   And what you said may not be precisely what you said.
17   Right?
18   **A.   Yes.**
19   **Q.**   Okay. Now, before taking the witness stand this
20   morning, did you look over any documents to refresh your
21   recollection of what happened four years ago?
22   **A.   Yes.**
23   **Q.**   What documents did you review, Miss Down?
24   **A.   My statement from two years ago.**
25   **Q.**   Okay. And that would be the statement that you made

30

1  to the authorities in the UK two years ago. Correct?
2  **A. Yes.**
3  **Q.** Now let's talk a little bit about that statement.
4  Okay?
5  **A. Okay.**
6  **Q.** Now, we just established that this event happened
7  close to four years ago. Right?
8  **A. Yes.**
9  **Q.** And you gave the statement to the UK authorities two
10  years after the incident. Right?
11  **A. Yes.**
12  **Q.** And would it be fair to say that when you left
13  Mr. Valerio's home the day that you described, you didn't
14  contact the police then? Right?
15  **A. Right.**
16  **Q.** And you didn't make any police reports then. Right?
17  **A. Right.**
18  **Q.** And when you were back at the home of the
19  administrator that you had stayed at a week after relaxing
20  and coming to terms with what happened, you didn't notify
21  any authorities then. Right?
22  **A. Right.**
23  **Q.** And then two years later you suddenly contacted the
24  authorities. Correct?
25  **A. No. They contacted me.**

31

1  **Q.** Okay. Well, you then write the report. Right?
2  **A. Yes.**
3  **Q.** So let's talk about them contacting you. All right?
4  **A. Okay.**
5  **Q.** The authorities in the UK reached out to you about
6  this incident. Right?
7  **A. Yes.**
8  **Q.** Would it be fair to stay, based upon what happened
9  afterward, that you had no intention of reaching out to
10  the authorities at any time after this? Is that right?
11  **A. Right.**
12  **Q.** And when you did meet with the authorities, they
13  explained to you that Mr. Valerio had been arrested here
14  in the United States?
15  **A. Yes.**
16  **Q.** And did the authorities then ask you to give this
17  statement?
18  **A. Yes.**
19  **Q.** And you complied and gave a statement. Right?
20  **A. Yes.**
21  **Q.** Let me take you back to when you first applied to be
22  an au pair. All right?
23  **A. Umm-hmm.**
24  **Q.** You explained to Judge Bianco that you did some
25  research on the internet. Correct?

32

1  **A. Yes.**
2  **Q.** And that I believe that was at a point in time in
3  your life when you had just graduated from college, I
4  believe?
5  **A. Yes.**
6  **Q.** So obviously you are well versed at the internet.
7  Right?
8  **A. Yes.**
9  **Q.** And you had done due diligence in terms of finding an
10  agency that you felt comfortable with. Right?
11  **A. Yes.**
12  **Q.** And part of the factors that you considered when
13  picking an agency was how well established the agency was.
14  Right?
15  **A. Yes, of course.**
16  **Q.** How complete their application process was with
17  potential host families. Right?
18  **A. Yes.**
19  **Q.** And that was an important factor for you in choosing
20  an au pair agency.
21  **A. Yes, of course.**
22  **Q.** And you chose this 360 agency, I believe, because you
23  had a keen ability to learn and understand facts about the
24  host family. Right?
25  **A. Yes.**

33

1  **Q.** You were able to see photographs. Right?
2  **A. Yes.**
3  **Q.** You were able even to view their application.
4  Correct?
5  **A. Yes.**
6  **Q.** So when you had made contact initially with
7  Mr. Valerio, you knew about what was said on the
8  application. Right?
9  **A. Yes.**
10  **Q.** And based on that, you took the next step, to engage
11  with him with the prospect of working for him. Correct?
12  **A. Yes.**
13  **Q.** Now let's talk about the exchange that you had with
14  him.
15      I believe you said it was on Skype. Right?
16  **A. Yes.**
17  **Q.** Now, there is nothing that was said on Skype that was
18  alarming to you. Right?
19  **A. Yes.**
20  **Q.** In fact, I believe in one of your reports or
21  interviews you said that he was actually very much a
22  gentleman. Right?
23  **A. Yes.**
24  **Q.** And you had researched and done some diligence
25  regarding his circumstances. Right? Prior to the Skype.

34

1 **A. On the database.**
2 **Q.** Correct.
3 **A. Yes.**
4 **Q.** And you had an ability to ask him any questions you
5 wanted to, at that point. Right?
6 **A. Yes.**
7 **Q.** And you did. Right?
8 **A. Yes.**
9 **Q.** You asked him questions that you felt you needed
10 answers for. Right?
11 **A. Yes.**
12 **Q.** You asked him questions in order to find a comfort
13 level with him that you were satisfied with. Right?
14 **A. Yes.**
15 **Q.** And to find a safety level with him that you were
16 satisfied with. Right?
17 **A. Yes.**
18 **Q.** And when you asked particular questions, he never
19 refused to answer those questions, did he?
20 **A. No.**
21 **Q.** And when you Skyped with him, he never became angry
22 with you during the Skype, did he?
23 **A. No.**
24 **Q.** Now, there came a time when you said there was a
25 match. Right? You agreed --

35

1 **A. Yes.**
2 **Q.** -- to work with him, and he agreed to invite you to
3 the home. Right?
4 **A. Yes.**
5 **Q.** And one of the reasons why you selected this agency
6 company is because they actually did a home study previous
7 to this. Right?
8 **A. Yes.**
9 **Q.** They went to Mr. Valerio's home and they looked
10 around. Right?
11 **A. Yes.**
12 **Q.** And you were satisfied with that investigation that
13 they did. Right?
14 **A. Yes.**
15 **Q.** And if you weren't satisfied, you were able to ask
16 your own questions about stuff. Right?
17 **A. Yes.**
18 **Q.** But you didn't. Right?
19 **A. Umm-hmm.**
20 **Q.** When you went through -- there was a time that you
21 arrived here in New York. Right? A very exciting time, I
22 would think. Right?
23 **A. Yes.**
24 **Q.** And you went through a two-week training program at
25 the New Yorker Hotel. Right?

36

1 **A. Yes.**
2 **Q.** And Mr. Kabrawala asked you questions about being
3 trained regarding emergency circumstances. Right?
4 **A. Yes.**
5 **Q.** They gave you particular instructions as to what to
6 do if you found yourself in harm's way. Right?
7 **A. Yes.**
8 **Q.** And you remember those instructions. Right?
9 **A. Yes.**
10 **Q.** Now, you didn't bring a phone with you then. Is that
11 right?
12 **A. Umm-hmmm.**
13 **Well, we get provided a phone once we are with**
14 **the host family.**
15 **Q.** Okay. So the host family was to provide you with a
16 phone. Is that what you are saying?
17 **A. Yes.**
18 **Q.** But you did have your computer with you. Right?
19 **A. Yes.**
20 **Q.** Now, when you first met Mr. Valerio, he picked you up
21 I believe at the hotel. Is that right?
22 **A. Yes.**
23 **Q.** And then I believe you said that you kind of drove
24 around a bit?
25 **A. Yes.**

37

1 **Q.** And when you met him for the first time, you engaged
2 in a conversation with him. Right?
3 **A. Yes.**
4 **Q.** And it was then that he told you that his
5 circumstances had changed. Is that correct?
6 Did he say the circumstances had changed, do you
7 recall?
8 **A. Not changed.**
9 **Q.** Did he ever explain to you in the car ride that his
10 circumstances regarding his daughter had changed?
11 **A. No.**
12 **Q.** Yes or no?
13 **A. No.**
14 **Q.** Did he explain to you in the car ride that his
15 daughter that he intended to be home with him was not home
16 because she was in the UK?
17 **A. No.**
18 **Q.** Do you remember that?
19 **A. No.**
20 **Q.** Do you remember any information from Mr. Valerio
21 about having a daughter in the UK?
22 **A. No.**
23 **Q.** I'm sorry. South Africa. My mistake.
24 **A. No.**
25 **Q.** Have you since learned that Mr. Valerio has a

38

1  daughter in South Africa?
2  **A.  Since Friday.**
3  **Q.**  Now, during that ride, I believe that you said you
4  had dinner?
5  **A.  Yes.**
6  **Q.**  But prior to dinner, you had a normal conversation
7  with him.  Right?  Yes?
8  **A.  Yes.**
9  **Q.**  And there was nothing that was apparent to you that
10  was a problematic situation then.  Right?  In terms of how
11  he was speaking about himself?  Let me withdraw the
12  question.
13  **A.  Yes.**
14  **Q.**  Regarding his demeanor to you?
15  **A.  Umm-hmmm.**
16  **Q.**  During the ride to the restaurant, there was nothing
17  alarming during that segment of time, was there?
18  **A.  Well, a bit before, he said he didn't actually have**
19  **any children.**
20  **Q.**  Right.
21  **A.  Yes.**
22  **Q.**  So I guess what you are explaining is, the fact that
23  he said he didn't have any children was alarming to you.
24  **A.  Yes.**
25  **Q.**  Right?

39

1          Besides that, his demeanor toward you was not
2  alarming.  Is that fair to say?  At that juncture.
3  **A.  Not in the car ride.**
4  **Q.**  So in the car ride, besides him explaining his
5  daughter was not there, he was otherwise --
6  **A.  Before the restaurant, yes.**
7  **Q.**  Before the restaurant.  Okay.  So let's talk about
8  the restaurant.
9  **A.  Okay.**
10  **Q.**  He took you to dinner?
11  **A.  Yes.**
12  **Q.**  And it was the two of you that ate together.  Right?
13  **A.  Yes.**
14  **Q.**  He didn't force any alcohol upon you, did he?
15  **A.  He did ask.  He bought me alcohol but I declined.**
16  **Q.**  But you didn't, you know, do shots with him or have
17  drinking games with him or otherwise attempt to intoxicate
18  you; did he?
19  **A.  No.**
20  **Q.**  He bought you a drink and you respectfully declined
21  to drink it.  Correct?
22  **A.  Umm-hmmm.**
23  **Q.**  Yes?
24  **A.  Yes.**
25  **Q.**  And would you agree that during the dinner, that his

40

1  demeanor was respectful and polite?
2  **A.  What do you mean?**
3  **Q.**  Well, he wasn't angry with you at the dinner, was he?
4  **A.  No.**
5  **Q.**  He wasn't threatening you at the dinner, was he?
6  **A.  No.**
7  **Q.**  He wasn't saying anything verbally to you that in
8  your opinion was inappropriate.  Right?
9  **A.  Not saying, no.**
10  **Q.**  This was a public restaurant.  Right?
11  **A.  Yes.**
12  **Q.**  And there were people dining in that area.  Correct?
13  **A.  Yes.**
14  **Q.**  You weren't alone with him there.  Right?
15  **A.  Yes.**
16  **Q.**  And is it fair to say that at this point in time you
17  didn't feel any danger at all; did you?
18  **A.  I did.**
19  **Q.**  Okay.  Well, you felt danger but you didn't reach out
20  to anyone that was there to be reached out to.  Right?
21  **A.  Right.**
22  **Q.**  And there were people that were all around there.
23  Right?
24  **A.  Right.**
25  **Q.**  When you left --

41

1  **A.  Yes.**
2  **Q.**  -- you could have spoken to someone on your way out.
3  Right?
4  **A.  Right.**
5  **Q.**  You could have gone to the ladies' room and spoken to
6  the manager.  Right?
7  **A.  Right.**
8  **Q.**  You could have asked to use the phone.  Right?
9  **A.  Right.**
10  **Q.**  But you didn't, did you?
11  **A.  Right.**
12  **Q.**  There came a time when you drove back to the home.
13  Correct?
14  **A.  Right.**
15  **Q.**  And during the conversation at that time, certain
16  things happened.  I believe you said in one of the reports
17  that he would touch your hand.  Is that right?
18  **A.  Right.**
19  **Q.**  Would he grab your hand and squeeze your hand?  Would
20  he touch the top of your hand?
21          Describe how he would touch your hand.
22  **A.  Touched the top.**
23  **Q.**  Okay.  During that ride, he didn't touch any other
24  area of your body.  Right?
25  **A.  No.**

42

1  **Q.** He didn't attempt to touch any other area of your
2  body. Right?
3  **A. Right.**
4  **Q.** And was it at that time when he explained to you
5  about this Halloween party?
6  **A. In the car.**
7  **Q.** Okay.
8  **A. Not in the house.**
9  **Q.** Well, we haven't reached the house yet. We are in
10  the car.
11  **A. Sorry.**
12  **Q.** So in the car, to the house --
13  **A. Yes.**
14  **Q.** -- is when he spoke to you about the Halloween party?
15  **A. Yes.**
16  **Q.** And when he told you about this party, did you tell
17  him that you weren't interested in going?
18  **A. I was just trying -- I didn't say anything.**
19  **Q.** And did he, when he explained that he had this
20  costume, did you tell him that you weren't interested in
21  wearing such a costume?
22  **A. I didn't say anything.**
23  **Q.** You had no reaction to any of this?
24  Is that yes or no?
25  **A. No.**

43

1  **Q.** Ms. Down, at any time before arriving at the home,
2  did Mr. Valerio explain to you that his sister had a
3  daughter that he was looking to have an au pair care for?
4  **A. That I remember.**
5  **Q.** And again, this is four years ago. He could have
6  said it but you don't remember. Is that right?
7  **A. Right.**
8  **Q.** Because, as we said before, you don't remember
9  exactly what was said. Right?
10  **A. Right.**
11  **Q.** When you arrived at Mr. Valerio's home, you pulled up
12  in the driveway of the home. Right?
13  **A. Yes.**
14  **Q.** And it was at night. Right?
15  **A. Yes.**
16  **Q.** But you were able to see that were other homes in
17  that area. Right?
18  **A. Yes.**
19  **Q.** I don't know how it is where you live, but is it fair
20  to say that the homes next to him were relatively close?
21  Right?
22  **A. Right.**
23  **Q.** There was a home to the left of him. Right?
24  **A. I don't remember.**
25  **Q.** Was there a home to the right of him? Do you recall?

44

1  **A. No.**
2  **Q.** How about across the street from him?
3  **A. Yes.**
4  **Q.** Okay. And when you got out of the car, you didn't go
5  to any of the homes for help. Right?
6  **A. No.**
7  **Q.** And is it fair to say that you didn't go to any of
8  the homes because at that point you didn't particularly
9  feel as though you were in danger? Is that fair to say?
10  **A. No.**
11  **Q.** So you consciously decided not --
12  THE COURT: I just want to understand the
13  answer.
14  No, that is not fair to say? Or no, you didn't
15  feel any danger?
16  THE WITNESS: I did feel danger but I, yes, I --
17  BY MR. LaPINTA:
18  **Q.** So you felt -- well, danger is my word.
19  Would you agree that you felt uncomfortable?
20  **A. Uncomfortable.**
21  **Q.** But not in danger. Right?
22  **A. I didn't know at this point.**
23  **Q.** When you were taught what to do in an emergency
24  setting --
25  **A. Yes.**

45

1  **Q.** -- one of the things that you were taught would be to
2  run away, if you are capable of running away?
3  **A. No.**
4  **Q.** Were you taught to continue to be in a dangerous,
5  perilous situation without resisting? Is that what you
6  were taught?
7  **A. No, we weren't taught.**
8  **Q.** You arrived inside the home. Right?
9  **A. Right.**
10  **Q.** And you explained on direct examination that
11  Mr. Valerio gave you a tour of the home. Right?
12  **A. Right.**
13  **Q.** He showed you the entire home. Right?
14  **A. Yes. Downstairs and upstairs.**
15  **Q.** Sorry?
16  **A. Downstairs and upstairs. Yes.**
17  **Q.** Well, was there anything more to the house than
18  downstairs and upstairs?
19  **A. No, not that I know of.**
20  **Q.** He didn't hide any portions of the home from you or
21  say you can't see that area or not. Right?
22  **A. Not that I know of, no.**
23  **Q.** And if you had an interest in seeing a certain area,
24  you would have asked him. Right?
25  **A. Right.**

46

1   **Q.**   But you didn't feel a need to do that.  Right?
2   **A.**   No.
3   **Q.**   When you arrived in the home, did he then show you
4   your room?
5   **A.**   Yes.
6   **Q.**   Now, when you testified on direct examination, you
7   stated that the room was *rundown*, your words were.  Right?
8   **A.   Right.**
9   **Q.**   Well, isn't it a fact that you had an opportunity to
10  speak to someone about that room before you even agreed to
11  go there?  Right?
12  **A.   What do you mean?**
13  **Q.**   Well, the au pair service conducted a home study
14  before.  Right?
15  **A.   Right.**
16  **Q.**   Do you know that they took photographs of the room?
17  **A.   No.**
18  **Q.**   Did you ask to see photographs of the room?
19  **A.   No.**
20  **Q.**   At this juncture, when he introduced you to the room
21  where you are staying, would you agree that, besides
22  feeling uncomfortable, that he had not done anything
23  perilous or dangerous to you?  Would you agree with that?
24  **A.   Yes.**
25  **Q.**   I believe you said that, after you brought your

47

1   belongings to the room, you went downstairs and sat on the
2   couch with him.  Correct?
3   **A.   Yes.**
4   **Q.**   And you testified that he came downstairs wearing
5   boxer shorts.  Right?
6   **A.   Yes.**
7   **Q.**   I didn't quite understand what you said after boxer
8   shorts.  What else was he wearing?
9   **A.   He was wearing a tanktop.**
10  **Q.**   Tanktop.  Like a wife-beater top?
11  **A.   Yes.**
12  **Q.**   *Wife beater*:  Is that your words or something that
13  someone told you?
14  **A.   No.  A wife beater.  A tanktop.**
15  **Q.**   Now let's be clear of something here.  The term *wife*
16  *beater* is your term.  Right?
17  **A.   Yes.**
18  **Q.**   Your words that you decided to use to describe that
19  shirt.  Right?
20  **A.   Yes.**
21  **Q.**   He never described that shirt as a wife beater shirt.
22  Right?
23  **A.   No.**
24  **Q.**   Nor did anybody that you spoke to --
25  **A.   No.**

48

1   **Q.**   -- about this investigation.  Correct?
2   **A.   Correct.**
3   **Q.**   Regarding his boxer shorts.  Were they, are you
4   saying that they were underwear that he was wearing?  Or
5   it appeared to look as though they were boxer shorts?
6   **A.   They appeared to be boxer shorts.**
7   **Q.**   Okay.  Do you know whether those were the underwear
8   that he was wearing at the time?
9   **A.   I wouldn't know.**
10  **Q.**   Do you know whether he was wearing anything under his
11  boxer shorts?
12  **A.   I don't know.**
13  **Q.**   Could have been but you don't know.  Right?
14  **A.   Right.**
15  **Q.**   And it was then when you described to Judge Bianco
16  that he once again touched your hand.  Right?
17  **A.   Right.**
18  **Q.**   And that would be the top of your hand?
19  **A.   The top.**
20  **Q.**   With his hand.  Correct?
21  **A.   Right.**
22  **Q.**   Let's be clear, Ms. Down.  He didn't touch you
23  anywhere else, did he?
24  **A.   No.**
25  **Q.**   He didn't try to touch your breasts, did he?

49

1   **A.   No.**
2   **Q.**   He didn't try to touch any other private area of your
3   body.  Correct?
4   **A.   No.  Correct.**
5   **Q.**   Nor did he ever try to kiss you.  Is that correct?
6   **A.   Right.**
7   **Q.**   But nevertheless you felt a little intimidated by
8   him.  Correct?
9   **A.   Right.**
10  **Q.**   And as a result, you decided to remove yourself from
11  that situation and to go upstairs and go to bed.  Right?
12  **A.   Right.**
13  **Q.**   He didn't stop you from going to bed, did he?
14  **A.   No.**
15  **Q.**   He didn't pull your hand or throw you back onto the
16  sofa, did he?
17  **A.   No.**
18  **Q.**   He didn't even try to convince you not to go to bed.
19  Right?
20  **A.   Right.**
21  **Q.**   And because you felt uncomfortable --
22  **A.   Right.**
23  **Q.**   -- you then made attempts to reach out to your
24  parents.  Right?
25  **A.   Right.**

50

1   **Q.**   And you did in fact email your dad a number of times,
2   as you explained?
3   **A.   Yes.**
4   **Q.**   And eventually you made contact?
5   **A.   Yes.**
6   **Q.**   So let's talk about the night that you spent there
7   prior to being picked up in the morning.  All right?
8   **A.   Okay.**
9   **Q.**   You were in the room alone.  Right?
10  **A.   Right.**
11  **Q.**   At no time during that night when you were in the
12  room did Mr. Valerio come into that room, did he?
13  **A.   No.**
14  **Q.**   At no time did he try to get you out of the room.
15  Right?
16  **A.   No.**
17  **Q.**   At no time did he try to entice you to come into his
18  bed, did he?
19  **A.   No.**
20  **Q.**   And you had, at that point and throughout the entire
21  night, you had access to the entire house.  Right?
22  **A.   Right.**
23  **Q.**   In fact you could have left the house in the middle
24  of the night if you wanted to.  Right?
25  **A.   Right.**

51

1   **Q.**   He didn't lock the door of the room and keep you in
2   the room, did he?
3   **A.   No.**
4   **Q.**   Nor did he lock any of the doors to the outside of
5   the house.  Correct?
6   **A.   To the outside?**
7   **A.**   Yes.
8   **A.   I'm not sure.**
9   **Q.**   Okay.  But as far as you were aware, you could have
10  left that house at any time during the night, while he was
11  even sleeping.  Right?
12  **A.   Right.**
13  **Q.**   And if you did so, he wouldn't have even known that
14  you left, maybe.  Right?
15  **A.   Right.**
16  **Q.**   You were picked up the next morning.  Right?
17  **A.   Right.**
18  **Q.**   Prior to being picked up, Mr. Valerio had asked you
19  if you were okay.  Right?
20  **A.   Right.**
21  **Q.**   He had asked you -- and I believe these are the words
22  that you used -- *Is everything okay?*, quote-unquote.
23  Right?
24  **A.   Right.**
25  **Q.**   He expressed concern about your wellbeing, didn't he?

52

1   **A.   Yes.**
2   **Q.**   Okay.  You were then picked up.
3   **A.   Right.**
4   **Q.**   You got your belongings and you left the house.
5   Right?
6   **A.   Right.**
7   **Q.**   And you ended up staying for a week with presumably
8   the administrator or the representative from the company.
9   Right?
10  **A.   Right.**
11  **Q.**   Right?
12  **A.   Yes.**
13  **Q.**   You stayed at her house?
14  **A.   Yes.**
15  **Q.**   And I believe you then explained to Judge Bianco it
16  was at that time that you were actually considering going
17  to another family.  Right?
18  **A.   Yes.**
19  **Q.**   And that is, after experiencing what you just
20  described, you were willing to go and try it again with
21  someone else.  Right?
22  **A.   Right.**
23  **Q.**   But due to Hurricane Sandy, I believe, you weren't
24  able to do so.  Right?
25  **A.   Right.**

53

1   **Q.**   Lastly, Miss Down.  Is it fair to say that besides
2   touching the top portion of your hands, Mr. Valerio did
3   not make any other advances toward you?
4   **A.   Right.**
5          MR. LaPINTA:  One moment, please.
6          (There was a pause in the proceedings.)
7          MR. LaPINTA:  Thank you, Miss Down.
8          THE COURT:  Redirect.
9          MR. KABRAWALA:  I will be very brief, your.
10         Honor.
11
12  REDIRECT EXAMINATION
13  BY MR. KABRAWALA:
14  **Q.**   Miss Down, if you could, please turn to Exhibit No. 5
15  in the binder, and specifically the penultimate page, the
16  second-to-last page.
17         THE COURT:  5 or 5A?
18         MR. KABRAWALA:  5, Judge.  The second-to-last
19  page.  The photos.
20  **A.   Okay.**
21  BY MR. KABRAWALA:
22  **Q.**   Do you recognize the photo?
23  **A.   Yes.**
24  **Q.**   And where do you recognize the photo from?
25  **A.   The InterExchange database.**

54

1 **Q.** Is that a true depiction of the photo that you recall
2 seeing on the InterExchange database?
3 **A. Yes.**
4     MR. KABRAWALA: Your Honor, the government moves
5 to admit the second-to-last page of Government Exhibit 5.
6     I will separately mark it for the record at the
7 break.
8     MR. LaPINTA: No objection.
9     THE COURT: That one page of Exhibit 5 is
10 admitted.
11     (Government Exhibit 5 in evidence.)
12 BY MR. KABRAWALA:
13 **Q.** Is that the photo that you saw of Mr. Valerio on the
14 InterExchange website?
15 **A. Yes.**
16 **Q.** Who did you understand that young girl to be, in the
17 picture?
18 **A. His daughter.**
19 **Q.** Sylvia?
20 **A. Yes.**
21 **Q.** You were asked earlier, in essence, whether you ever
22 notified any authorities either while in the United States
23 or after. Do you recall those questions?
24 **A. Right.**
25 **Q.** And you were asked whether you reported this activity

55

1 in the United Kingdom once you were back. Do you recall
2 that?
3 **A. Yes.**
4 **Q.** Is there a reason you never reported this to the
5 authorities, yourself?
6 **A. I just wanted nothing to do with it. I think I was**
7 **just too scared to do anything.**
8 **Q.** You were also asked whether you could have left the
9 restaurant or Mr. Valerio's home.
10     Do you recall those series of questions?
11 **A. Yes.**
12 **Q.** Is there a reason why you didn't leave from the
13 restaurant on your own or leave from Valerio's house on
14 your own?
15 **A. I was too scared. Where am I going to go?**
16 **Q.** Had you been in the United States before?
17 **A. No.**
18 **Q.** Had you been in New York City before?
19 **A. No.**
20 **Q.** Had you been in Long Island before?
21 **A. No.**
22 **Q.** Did you have a car or any mode of transportation?
23 **A. No.**
24 **Q.** Was it late at night?
25 **A. Yes.**

56

1 **Q.** In the middle of the night?
2 **A. Yes.**
3 **Q.** With respect to your car ride from New York City to
4 Long Island, you were asked about the request that you
5 wear a costume, a Halloween costume.
6 **A. Right.**
7 **Q.** Do you recall that?
8 **A. Yes.**
9 **Q.** Panty hose, I believe?
10 **A. Yes.**
11 **Q.** And you were asked what your reaction was or your
12 response was to that request.
13 **A. Right.**
14 **Q.** And I believe your response was that you didn't
15 respond.
16 **A. Right.**
17 **Q.** Why not? Why didn't you respond to Mr. Valerio and
18 tell him that you weren't going to wear that?
19 **A. I'm scared. It could have made it worse.**
20 **Q.** It would have made it worse?
21 **A. Yes.**
22 **Q.** You were asked about your memory of these events
23 generally and how it was a number of years ago.
24     Do you recall that?
25 **A. Yes.**

57

1 **Q.** As you sit here today, is there any doubt in your
2 mind that Joseph Valerio, that man that you pointed out,
3 told you that he had a daughter?
4 **A. Sorry. Repeat the question?**
5 **Q.** Is there any doubt in your mind that Joseph Valerio
6 before you came to the United States told you that he had
7 a daughter?
8 **A. No.**
9 **Q.** Is there any doubt in your mind that he told you his
10 daughter's name was Sylvia?
11 **A. No.**
12 **Q.** Is there any doubt in your mind that he repeatedly
13 touched your hand?
14 **A. No.**
15 **Q.** Is there any doubt in your mind that he ordered you a
16 drink?
17 **A. No.**
18 **Q.** Is there any doubt in your mind that as you were
19 leaving he was aggressive and stormed around the house?
20 **A. No.**
21 **Q.** Is there any doubt in your mind that he was
22 aggressive and told you that he paid a lot of money for
23 you?
24 **A. No.**
25     MR. KABRAWALA: Your Honor, there is nothing

58

1  further.
2          THE COURT:  Anything further, Mr. LaPinta?
3          MR. LaPINTA:  No.  Thank you.
4          THE COURT:  You can step down, Ms. Down.  Thank
5  you.
6          (The witness was excused.)
7          THE COURT:  How long is your next witness?
8          MR. KABRAWALA:  About 20 minutes, Judge.
9          THE COURT:  Why don't we take a 10-minute break,
10  then.
11          (Recess taken from 12:15 pm until 12:40 pm.)
12          THE COURT:  Please call your next witness.
13          MR. KABRAWALA:  The government calls Jolene
14  Leonardo.
15
16  **JOLENE LEONARDO**
17          called by the Government, having been first duly
18          sworn/affirmed, was examined and testified as
19          follows:
20
21  DIRECT EXAMINATION
22  BY MR. KABRAWALA:
23  Q.    Good afternoon, Ms. Leonardo.
24          Were you subpoenaed to testify here today?
25  **A.    Yes.**

59

1  Q.    What is your current occupation?
2  **A.    I'm a Catholic school math teacher.**
3  Q.    Catholic school math teacher?
4  **A.    Yes.**
5  Q.    What grade?
6  **A.    Seventh.  Eighth.  And I teach ninth grade, too.**
7  Q.    And have you previously been affiliated or employed
8  with an organization called InterExchange Incorporated?
9  **A.    Yes.**
10  Q.    What was your role there?
11  **A.    I was a local coordinator.**
12  Q.    Would you mind speaking --
13  **A.    Local coordinator.**
14  Q.    -- a little louder?
15          What were your primary duties and
16  responsibilities as a local coordinator?
17  **A.    Mostly, I'm liaison between the au pair and the host**
18  **family.  I interview the host families.  I have the au**
19  **pairs at my home and coordinate monthly activities and**
20  **social events for them.**
21  **        I'm like their person in the United States other**
22  **than their host family.**
23  Q.    Were you assigned to any particular region or county?
24  **A.    Yes.  I was Long Island Suffolk County.  I covered**
25  **Suffolk County.**

60

1  Q.    Drawing your attention to the year 2012.
2          Did you, in the course of your employment with
3  InterExchange, come to meet an individual named Joseph
4  Valerio?
5  **A.    Yes.**
6  Q.    Do you see Joseph Valerio in the courtroom here
7  today?
8  **A.    I believe that's him.**
9  Q.    Can you please point him out by identifying an
10  article of clothing that he's wearing.
11  **A.    Light green khaki shirt.**
12  Q.    Is he seated next to these two gentlemen on my right?
13  **A.    I don't know.  I don't -- I don't know.  I don't**
14  **know.  I don't remember.**
15  Q.    Okay.  That's fair.
16  **A.    I'm sorry.**
17  Q.    Can you please describe how you met Mr. Valerio.
18  **A.    I interviewed him at his home.**
19  Q.    And what was the purpose of that interview?
20  **A.    He applied to our agency.  So I go to see that -- I**
21  **interview the family, ask what their expectations are, so**
22  **that we can find a workable match with an au pair; if they**
23  **have one child or three children; and we try to match them**
24  **with an au pair that prefers one child, three children.**
25  **Pets; no pets.**

61

1  **        So I gather information based on what the host**
2  **family's expectations are in the program and their au**
3  **pair.**
4  **        I also check the home.  And I have to physically**
5  **see a bedroom for the au pair that's an appropriate living**
6  **space.  It has to have its own separate door, entrance.**
7  **If it just has -- it can't be just a part of another room.**
8  **It can't be shared.  They have to have their own private**
9  **space in the house.**
10  **        So I have to physically see that.  And I have to**
11  **write down that there is a bed and a window.  And it can't**
12  **be a basement apartment, because that's not legal.  It**
13  **just has to be a room.**
14  **        And then just answer any questions the host**
15  **family has about the program.**
16  Q.    What did Mr. Valerio tell you about his family
17  situation?
18  **A.    He told me that him and his wife share custody, he's**
19  **a single dad, with his daughter.  And at that date he had**
20  **told me that she was in school and she had spent time**
21  **during the week with him.  And at that time she was in**
22  **school.**
23  Q.    Did Mr. Valerio tell you anything about the mother of
24  his child?
25  **A.    Just that they had joint custody.**

**62**

1 **Q.** Did he tell you where the mother lived?
2 **A. No.**
3 **Q.** What did Mr. Valerio say was his daughter's name?
4 I'm sorry. His child's name?
5 **A. Sylvia. It was a daughter and it was Sylvia. I**
6 **believe he said she was 7.**
7 **Q.** I would like to show you, in the binder that is in
8 front of you, Exhibit No. 15. So if you could, please
9 turn to tab No. 15.
10 **A. Yes.**
11 **Q.** Do you recognize this document?
12 **A. Yes. It --**
13 **Q.** You can take it out of the binder --
14 **A. -- is the interview sheets that -- the form that I**
15 **fill out.**
16 **It is an online form that we fill in the**
17 **information.**
18 **Q.** Well, is this a form that you fill out, or is this a
19 form that is filled out by Mr. Valerio?
20 **A. I fill this out.**
21 **Wait. Maybe this isn't the one. Hold on.**
22 **Q.** Okay. And this is an application?
23 **A. This, yes. This is not my interview form. This is**
24 **something that the host family would fill out before**
25 **meeting me, to initiate the process, saying this is what I**

**63**

1 want.
2 **When I go, I try to verify this information:**
3 *Okay. You said you want this kind of au pair. You want*
4 *them to do this.*
5 **And this is what we use to have the**
6 **face-the-face interview.**
7 **Q.** So this facilitates your interview?
8 **A. Correct.**
9 **Q.** The information that is contained in this report, who
10 is that provided by?
11 **A. The family. The host family.**
12 **Q.** And is that information obtained in the regular
13 course of InterExchange's business, to your knowledge?
14 **A. Yes. This is their first application that -- yes,**
15 **that they submit to InterExchange.**
16 **This doesn't go to me, it goes to the company,**
17 **and then I receive this and I read this and that's how I**
18 **conduct my interview.**
19 **Q.** And is the information contained in this report
20 obtained and maintain in the regular course of
21 InterExchange's business?
22 **A. Do they keep this on file, you mean?**
23 **Q.** Correct.
24 **A. Yes.**
25 MR. KABRAWALA: Your Honor, the government moves

**64**

1 to introduce Government Exhibit 5 into the record.
2 THE COURT: Objection?
3 MR. LaPINTA: No objections.
4 THE COURT: Government Exhibit 5 is admitted.
5 (Government Exhibit 5 in evidence.)
6 BY MR. KABRAWALA:
7 **Q.** I would like for you to turn to the second-to-last
8 page of Government Exhibit 5.
9 **Is this a photograph?**
10 **A. Yes.**
11 **Q.** Do you recall ever seeing that photograph before?
12 **A. Well, it was in that. And I think it was also, on**
13 **one of the shelves in the den there was a picture like**
14 **that.**
15 **Q.** In the den of Mr. Valerio's house?
16 **A. Yes.**
17 **Q.** And who did you believe the little girl to be?
18 **A. It's his daughter.**
19 **Q.** Sylvia?
20 **A. Yes.**
21 **Q.** I would like to draw your attention to Exhibit No. 6.
22 It is also in the binder.
23 **A. Okay.**
24 **Q.** What is this document?
25 **A. This is my host family interview that I fill out when**

**65**

1 I see him.
2 **Q.** You filled out this report?
3 **A. Yes.**
4 **Q.** How did you obtain the information that was
5 contained, that is contained in this host family interview
6 report?
7 **A. This is what I bring with me when I physically meet**
8 **the host family. And this is what I filled out after**
9 **meeting with Mr. Valerio.**
10 **Q.** And did you fill out the information shortly after
11 you spoke with Mr. Valerio?
12 **A. Yes. I write it and then I go home and type it.**
13 **Q.** And to your knowledge is this host family interview
14 report kept on file with InterExchange?
15 **A. Yes.**
16 MR. KABRAWALA: Your Honor, the government moves
17 to introduce Government Exhibit 6 into the record.
18 THE COURT: Any objection?
19 MR. LaPINTA: No.
20 THE COURT: Government Exhibit 6 is admitted.
21 (Government Exhibit 6 in evidence.)
22 BY MR. KABRAWALA:
23 **Q.** Let's look at the first page, referring to the very
24 top under the title Instructions to Local Coordinator.
25 **What do you understand your instructions to be?**

66

1  **A.**  As far as filling this out?

2  **Q.**  Correct.

3  **A.**  Similar to what I just said, as far as getting his

4  information.

5          The first thing here, where it says regulations

6  and policies, they ask us to read them each time we

7  interview, even if it is the same family, just so that the

8  procedures are clear.

9          Then I have a conversation with them about how

10  many au pairs are in the area and types of activities that

11  we will offer the au pair. Just gathering, I use this to

12  gather information so that we get the best match so that

13  whatever the au pair is looking for fits with what the

14  type of au pair the family wants.

15  **Q.**  When you interviewed Mr. Valerio, you went to his

16  house?

17  **A.**  Yes, I did.

18  **Q.**  Do you recall where his house is?

19  **A.**  Yes. It's in Smithtown.

20  **Q.**  And tell us about the interview.

21  **A.**  It was like most interviews. We sat in his den. I

22  believe I sat on the couch and he sat on a cushioned

23  chair. He told me his daughter was at school. We talked

24  about her.

25          He told me that he had properties; like that he

67

1  owned different properties, and he did very well for

2  himself and he was looking forward to showing Lucy

3  different places.

4          And that's important in our program, that it is

5  not just the au pair coming in as hired help. We want

6  them to be part of the family. So he said that he

7  traveled a lot and he would anticipate the au pair

8  traveling with him and his daughter.

9          And he showed me the au pair's room, and then I

10  filled out whatever it had, that it had a window and there

11  was a separate room in the house for her. That it just

12  looked like a regular house. I feel like I remember it

13  being sparse, maybe not a lot of color.

14          I remember there being brickwork, like the

15  driveway was being bricked and it was halfway done. So it

16  just looked like a single dad's fixing up a house, living

17  with his kid.

18  **Q.**  What time of day did you interview Mr. Valerio at his

19  home?

20  **A.**  It was in the afternoon, around noon. I can't tell

21  you the exact time. I know it was during school hours,

22  obviously.

23  **Q.**  Was there any requirement to your knowledge that at

24  that time you would have to meet the child?

25  **A.**  There was not, but there since is.

68

1  **Q.**  Why is that now a requirement?

2          MR. LaPINTA: Objection.

3          THE COURT: Sustained.

4  **A.**  It's absolutely --

5          THE COURT: It was sustained. If I sustain the

6  objection, he is going to ask another question. You can't

7  answer it.

8          THE WITNESS: Okay.

9  BY MR. KABRAWALA:

10  **Q.**  To your knowledge why is that now required?

11          MR. LaPINTA: Objection.

12          THE COURT: It doesn't matter what they are

13  doing now. I don't need to know what they are doing now.

14  Okay?

15          THE WITNESS: Okay.

16  BY MR. KABRAWALA:

17  **Q.**  Now referring to page 4, so it is the last page, and

18  I'm going to be referring to question number 5. It is a

19  check list and it reads as follows.

20          *"Please check all adjectives you feel describe*

21  *the host family."*

22          There are a number of check boxes. There are

23  four checked boxes. Correct?

24  **A.**  Yes.

25  **Q.**  Can you read aloud the boxes that are checked.

69

1  **A.**  *Organized. Easy going. Patient. Intellectual.*

2  **Q.**  And what do you recall about your interview that

3  caused you to check those boxes; that is, why did you

4  check those boxes, of the options available?

5  **A.**  Mr. Valerio just felt very relaxed compared to host

6  families. Like sometimes they are all nervous and, I

7  don't know, talkative, and whatever. And he was just very

8  relaxed. So he appeared to be decent. He spoke slowly.

9          I don't know. Just that's how he -- he just

10  seemed very -- he didn't ask a lot of questions about all

11  the things the au pair can do or wouldn't do. So it just

12  seemed to me that he was easy going.

13          And I believe I would write organized because

14  there wasn't a lot of stuff everywhere. Just, you know,

15  just the first impression.

16  **Q.**  Turning back to page 3.

17          I'm sorry. If you could, go back one page.

18  Question No. 4.

19          *Question: The general condition of the house at*

20  *the time of the interview can best be described as.* And

21  then there is one of four options that are checked. I

22  will read aloud the options.

23          *Very neat and clean.*

24          *Normal lived-in home with children.*

25          *Extremely casual.*

70

1    *Other.*
2         Which box is checked?
3    **A.   *"A normal lived-in home with children."***
4    **Q.**   Why did you check that box?
5    **A.   Basically, we use this question to like determine the**
6    **presentation of the house.**
7         **To be perfectly honest, if it is very neat and**
8    **clean, sometimes it is not realistic.  If a family has**
9    **three kids and it is all perfectly in order, you want to**
10   **know is the au pair going to be responsible for keeping it**
11   **in a certain order.**
12        **It is really just to gauge what the expectations**
13   **are of the home.  If it is extremely casual and it is very**
14   **sloppy and then in two months I get a call that the au**
15   **pair is not keeping the house tidy, hopefully it sparks**
16   **like a memory:  Your house wasn't perfectly in order.  So**
17   **it's really not the au pair's job to all of a sudden give**
18   **them an immaculate house.**
19        **So this is kind of just to gauge what it looks**
20   **like, the typical living arrangement.**
21        **So there was no real extreme, so if it's not**
22   **perfectly in order where the kids' shoes are lying under**
23   **the doors, which is completely a fact which we see**
24   **sometimes, and it is not a terrific match, basically the**
25   **other option is a normal lived-in home.**

71

1    **Q.**   So you want to gauge what the condition is and
2    capture it in a form somehow?
3    **A.   Yes.  How do they live, so that it doesn't change**
4    **with the expectations down the road of what the host**
5    **family expects of the au pair to maintain for them.**
6    **Q.**   You don't want the au pair to come and be a maid.
7    **A.   Exactly.**
8    **Q.**   Okay.  So flipping forward again to page 4 of 4, to
9    question No. 6.  It is a yes-or-no check box.  And then,
10   if it is yes, please explain.
11        The question is:  *"Do you have any doubt or*
12   *reservation as to the suitability of this home?"*
13   **A.   And I checked *No.***
14   **Q.**   Why did you check that?
15   **A.   Because I had no reason to have doubts about him at**
16   **the time of my interview.**
17   **Q.**   Did you have any reservations about Mr. Valerio's
18   suitability to participate in the InterExchange au pair
19   program?
20   **A.   Personally, I thought he was he creepy, but I cannot,**
21   **I can't decline a family because they give me the creeps.**
22   **There was something just weird.  But that doesn't seem**
23   **like a viable -- it's just not appropriate.**
24        **So my choices are yes or no.  And I have to give**
25   **everybody a chance because he didn't demonstrate any**

72

1    **concrete evidence of not being appropriate.**
2    **Q.**   Did you believe he was telling you the truth about
3    his daughter Sofia and the custody arrangement?
4    **A.   Sylvia?**
5    **Q.**   Yes.  Sophia.
6    **A.   Yes.**
7    **Q.**   If you believed that he was lying to you, what if
8    anything would you have done?
9         MR. LaPINTA:  Objection.
10        THE COURT:  Sustained.
11   **A.   I would have --**
12        THE COURT:  Sustained.
13        THE WITNESS:  Oh.  Okay.
14   BY MR. KABRAWALA:
15   **Q.**   Did there come a time when you went to Mr. Valerio's
16   house to collect Ms. Down?
17   **A.   Yes.**
18   **Q.**   Can you describe what happened and what your role
19   was.
20   **A.   I received a call from Lucy's international**
21   **cooperator saying that she was very upset and felt**
22   **uncomfortable in the home and wanted to leave the home.**
23   **So I -- something about there being no child there.**
24        **And I went and I picked her up.  And when I got**
25   **to the house, Lucy was at the door.  She had her laptop**

73

1    **open.  She was Skyping with her coordinator at the door,**
2    **with her bag backed.**
3         **Mr. Valerio was standing next to her.  And I**
4    **opened the front door, saw her holding her laptop, and**
5    **then she went to grab her bag and he was closing the door.**
6    **And I think her luggage got caught in the door because he**
7    **was like literally closing the door on her back.  And she**
8    **pulled it and held her laptop, I think -- I don't -- I**
9    **think I took the bag from her.  I took the bag and I put**
10   **the bag back in my truck.  And he just shut the door and I**
11   **put the bag in my car and Lucy drove home with me.**
12   **Q.**   Did you speak to Mr. Valerio or did he speak to you?
13   **A.   No.  I think he just said I don't understand what's**
14   **going on, or I don't know what this is, and that was it.**
15   **There wasn't anything.**
16   **Q.**   How was his demeanor or tone?
17   **A.   Just chilled.  Like relaxed.  Not anxious.  Didn't**
18   **explain himself.  Had nothing.  Just weirdly calm.**
19   **Q.**   Did Mr. -- sorry.  Withdrawn.  Did Lucy ever tell you
20   what happened?
21   **A.   Yes.**
22   **Q.**   What did she say?
23        MR. LaPINTA:  Objection.
24        THE COURT:  Sustained.
25   BY MR. KABRAWALA:

74

1  **Q.** Did you ever learn what happened and what caused Lucy
2  to leave so abruptly?
3  **A. Yes.**
4          MR. LaPINTA: Objection.
5          THE COURT: Sustained. Hearsay.
6  BY MR. KABRAWALA:
7  **Q.** Did you ever come to speak to Mr. Valerio ever again?
8  **A. No.**
9  **Q.** Had you ever heard of a similar situation ever
10 occurring?
11 **A. Never.**
12         MR. LaPINTA: Objection.
13 **A. Never.**
14         MR. LaPINTA: Objection.
15         THE COURT: Sustained.
16         MR. KABRAWALA: Just one moment, your Honor.
17         (Prosecutor counsel confer .)
18         MR. KABRAWALA: Nothing further at this time,
19 judge.
20         THE COURT: Cross-examination.
21         MR. LaPINTA: Yes, sir.
22
23 CROSS-EXAMINATION
24 BY MR. LaPINTA:
25 **Q.** Good afternoon, Miss Leonardo.

75

1  **A. Hi.**
2  **Q.** My name is Anthony LaPinta. I'm just going to ask
3  you a few questions about your testimony.
4  **A. Okay.**
5  **Q.** If I don't ask a clear question in your view, or it
6  is unclear in any way, please let me know and I will
7  either reask or rephrase it. Is that okay?
8  **A. Sure.**
9  **Q.** You may be nervous. I will just try my best not to
10 confuse you in any way. Okay?
11 **A. Umm-hmm.**
12 **Q.** Ms. Leonardo, before taking the witness stand this
13 afternoon, did you review any documents to refresh your
14 recollection?
15 **A. Yes. I saw just a tracking sheet of when he,**
16 **Mr. Valerio, the dates of when he entered the program and**
17 **the dates that I interviewed him. Just like a timeline**
18 **list of the material.**
19 **Q.** Would that be in a report that was generated by
20 either your company or the 360 company?
21 **A. Yes. My company.**
22 **Q.** Is that a report that you developed?
23 **A. No. I don't work for the company any more so this**
24 **is, I just saw these today.**
25 **Q.** All right. But you had mentioned a particular report

76

1  that mentioned chronology of events. Is that right?
2  **A. Yes.**
3  **Q.** Did you develop that report with that chronology?
4  **A. My boss did based on my paper work and their paper**
5  **work. It's two separate, when he originally --**
6  **Q.** Ms. Leonardo, it's really simple.
7  **A. Okay.**
8  **Q.** Did you write the report or not?
9  **A. I did not write the report.**
10 **Q.** Now, I thought on your direct testimony you indicated
11 a bit that you don't remember certain things. Is that
12 right?
13 **A. If you refresh my memory of what I didn't remember.**
14 **Q.** It is either yes or no. Do you remember everything
15 about this event? Yes or no?
16 **A. I think I do. I don't know what I said I didn't**
17 **know.**
18 **Q.** Well --
19 **A. I'm sorry.**
20 **Q.** -- you were asked to pick out Mr. Valerio in court
21 here. Right?
22 **A. Yes.**
23 **Q.** And you said you weren't sure who he was.
24         Isn't that what you said? Yes or no?
25 **A. Yes.**

77

1  **Q.** So is it fair to say that you don't have --
2  **A. I actually -- like I just got flustered. I really --**
3  **Q.** Stop. Let's do it this way. Let me ask a simple
4  question.
5  **A. Okay.**
6  **Q.** Miss Leonardo --
7  **A. Yes.**
8  **Q.** -- I'm not looking to confuse you.
9  **A. Okay.**
10 **Q.** I just want to be clear.
11 **A. Okay.**
12 **Q.** Okay?
13         Let me ask a simple question --
14 **A. Okay.**
15 **Q.** -- and then you can give a simple answer.
16 **A. Okay.**
17 **Q.** Fair?
18 **A. Yes.**
19 **Q.** Isn't it fair to say that on your direct testimony
20 you were not able to identify Mr. Valerio in this
21 courtroom? Yes or no?
22 **A. I identified him, yes, and then I got flustered and I**
23 **don't know why I said that. I do know that he's sitting**
24 **right here.**
25 **Q.** So is it your testimony that you remember totally

78

1  everything that transpired exactly how it did?  Is that
2  what you are saying?
3  **A.  I feel like --**
4  Q.  If you can, answer it yes or no.
5  **A.  Yes.  I feel like, yes, I do.**
6  Q.  All right.  Is there any particular portion of your
7  experience with this situation that you don't remember too
8  well?
9  **A.  I don't know.  You would have to ask me the question.**
10  Q.  Okay.  Let's talk about --
11  **A.  Lucy lived in my house --**
12  Q.  Stop.  Stop.
13  **A.  -- a long time so we talked about this for a long**
14  **time, so I feel like --**
15  Q.  Miss Leonardo --
16  **A.  Yes.**
17  Q.  -- all I'm asking you to do is to answer my
18  questions --
19  **A.  Okay.**
20  Q.  -- yes or no --
21  **A.  Okay.**
22  Q.  -- and if you are not able to answer yes or no --
23  **A.  Okay.**
24  Q.  -- just tell me you can't answer it yes or no.
25  **A.  Okay.**

79

1  Q.  Fair?
2  **A.  Yes.**
3  Q.  Okay.  So let's start with when you first came to
4  know of the Valerio application.  Remember that time
5  period?
6  **A.  Yes.**
7  Q.  Okay.  Now, is it fair to say that you relied on
8  certain information that was entered into a computer
9  program?
10  **A.  Yes.**
11  Q.  Okay.  And that as part of your responsibilities as a
12  coordinator for this region, that you looked at that
13  material closely.  Yes?
14  **A.  Yes.**
15  Q.  And upon your review of that information, there was
16  nothing that was suspicious about it.  Yes?
17  **A.  Correct.  Yes.**
18  Q.  Now, as a match was made and an au pair was selected,
19  it was then your duty as the regional coordinator to
20  investigate that application.  Right?
21  **A.  Yes.**
22  Q.  As you have done many times prior to that.
23  **A.  Correct.**
24  Q.  Right?
25  **A.  Yes.**

80

1  Q.  So at the time that you did the Valerio home
2  inspection, you had conducted numerous prior home
3  inspections.  Correct?
4  **A.  Correct.**
5  Q.  And were you trained to do home inspections?
6  **A.  Yes.**
7  Q.  Did you take classes and instructions to do so?
8  **A.  I don't know if --**
9  Q.  You can answer it yes or no.
10  **A.  I don't know if you would consider it a class or not**
11  **so I don't know whether I should answer it yes or no.**
12  Q.  So you are not able to answer it yes or no.
13  **A.  Sure.**
14  Q.  Okay.  Now, when you did the Valerio home inspection,
15  you had dealt with Mr. Valerio, yourself, on the phone to
16  make the appointment.  Correct?
17  **A.  Yes.**
18  Q.  And prior to going there, you did your own review of
19  the documents that you were furnished.  Correct?
20  **A.  Correct.**
21  Q.  Did you do any other investigation, besides the
22  review of the application, at that juncture?
23  **A.  No.**
24  Q.  I believe you had explained that when you do the home
25  inspection, that there is a check list, so to speak?

81

1  **A.  Yes.**
2  Q.  Or an application that you follow.  Correct?
3  **A.  A form, yes.**
4  Q.  So it is a structured --
5  **A.  Yes.**
6  Q.  -- type of thing.  Correct?
7  **A.  Yes.**
8  Q.  So you went into the house.  Right?
9  **A.  Yes.**
10  Q.  Prior to that you looked around the outside of the
11  house.  Right?
12  **A.  Yes.**
13  Q.  And it purported (sic) to be what it was made out to
14  be on the application.  Right?
15  **A.  Correct.**
16  Q.  Nothing alarming, suspicious, or dangerous --
17  **A.  No.**
18  Q.  -- in your view at that point.
19  **A.  Correct.**
20  Q.  You then went into the house.  Right?
21  **A.  Yes.**
22  Q.  And you met Mr. Valerio.  Right?
23  **A.  Yes.**
24  Q.  And you did a home inspection.  Right?
25  **A.  Correct.**

82

1   Q.   You asked to see the inside of the home, and he
2   showed you the inside of the home.
3   A.   I asked --
4   Q.   Just listen.  Yes or no or you are not able to answer
5   it yes or no.
6   A.   I'm not able to answer it yes or no.
7   Q.   Did you ask to do an inspection of the home?
8   A.   I asked to do an inspection of the au pair's bedroom.
9   Q.   Did you ask -- yes or no - to see any other areas of
10  the home?
11  A.   No.
12  Q.   You could have if you wanted to.  Is that correct?
13  A.   Yes.
14  Q.   And that is in your sole discretion to do so.
15  Correct?
16  A.   Yes.
17  Q.   But at the time, you didn't feel a need to see any
18  other area of the home.  Right?
19  A.   Correct.
20  Q.   You felt comfortable, then and there, that it was an
21  appropriate setting for a young, 18-year-old au pair to be
22  in.  Correct?
23  A.   Yes.
24  Q.   And when you looked into the room designated to be
25  the au pair's room, you went inside the room.  Right?

83

1   A.   Yes.
2   Q.   You looked around.  Right?
3   A.   Yes.
4   Q.   And you were comfortable that it was an appropriate
5   room.  Right?
6   A.   Yes.
7   Q.   Would you agree with me that when you saw it then and
8   there, that that room it was not run down; was it?
9   A.   No.
10  Q.   If it were run down, you would have made notations of
11  that and presumably this process would have halted there.
12  Correct?
13  A.   Correct.
14  Q.   Then you had a dialogue with Mr. Valerio about
15  certain aspects of his family life.  Correct?
16  A.   Right.  Well, I made the check list, you know.
17  Oftentimes the rooms are sparse.
18  Q.   Just answer yes or no at this point.
19  A.   Okay.  Go ahead.
20  Q.   Did you ever then have a dialog with Mr. Valerio
21  about his qualifications to be a host to the au pair?
22  A.   His qualifications?  No.  Mostly, his expectations.
23  So no.
24  Q.   Okay.  Did you engage him regarding certain aspects
25  of the relationship with the au pair that you felt

84

1   necessary to inquire of?
2   A.   What?  Could you repeat that question?
3   Q.   Okay.
4   A.   I'm having a little difficulty.
5   Q.   Sure.  Did you ask him certain questions about the
6   expected relationship with the au pair?
7   A.   Yes.
8   Q.   You asked him about the family dynamic.  Correct?
9   A.   Correct.
10  Q.   Besides the application that you hand-wrote and then
11  downloaded, did you take any notes during this process?
12  A.   That downloaded that note:  What do you mean?
13  Q.   Besides the handwriting -- one second.
14  A.   Did I know --
15  Q.   Let's do it this way.  If you give me a moment to
16  finish my question, you will then be in a better position
17  to answer.
18  A.   I'm sorry.  I thought you were finished.
19  Q.   Thank you.  So besides the application that you had
20  written notes on, did you write, on anything else, any
21  notes that you may have written that day?
22  A.   No.
23           It is an interview report.  I just want to be
24  clear that it wasn't an application.
25  Q.   You had checked off certain things on your evaluation

85

1   regarding the home.  Correct?
2   A.   Yes.
3   Q.   And you were asked on direct examination the
4   appropriateness of the setting.  Correct?
5   A.   Yes.
6   Q.   And you indicated that it was an appropriate setting.
7   Right?
8   A.   Correct.
9   Q.   And not only that, it looked like a child had lived
10  there.  Correct?
11  A.   Correct.
12  Q.   Because in your view of the home, you saw indications
13  that a child was there.  Right?  Yes or no?
14  A.   Yes.
15  Q.   And when you were complete with this home study, you
16  approved that residence to be qualified to host an au
17  pair.  Correct?
18  A.   Right.  Yes.
19  Q.   You felt it was a safe environment.  Right?
20  A.   Yes.
21  Q.   You felt that it was an appropriate environment.
22  Right?
23  A.   Yes.
24  Q.   And you felt that it was an environment for a child.
25  Correct?

86

1  **A.  Yes.**
2  **Q.**  But here today you are indicating to Judge Bianco
3  that you had a creepy, weird feeling.
4  **A.  Not about --**
5  **Q.**  Stop.  I'm not finished yet.
6  **A.  Okay.  Sorry.**
7  **Q.**  You indicated that you had a creepy, weird feeling
8  about Mr. Valerio.
9  **A.  Correct.**
10 **Q.**  Was that your testimony?
11 **A.  Yes.**
12 **Q.**  And despite having a creepy, weird feeling, you
13 approved him to host an 18-year-old au pair.
14 **A.  Correct.**
15 **Q.**  Is that your testimony?
16 **A.  Yes.**
17 **Q.**  You didn't indicate anywhere on any of your documents
18 that you had this weird, creepy feeling.  Right?
19 **A.  Correct.**
20 **Q.**  Do you have a weird, creepy feeling about him right
21 now?
22 **A.  Very, sir.**
23 **Q.**  Now, you explained very carefully that from the
24 handwritten items that you wrote on this form, you
25 downloaded that on a computer.  Correct?

87

1  **A.  Yes.**
2  **Q.**  And you entered that information in a system.
3  Correct?
4  **A.  Correct.**
5  **Q.**  And that is Exhibit 6.  You have it before you, don't
6  you?
7  **A.  Yes.**
8  **Q.**  Turn to page 3, please, Miss Leonardo.  Actually,
9  page 4.  I'm sorry.
10      See that page?
11 **A.  Yes.**
12 **Q.**  Where it says:  Local Coordinator Jolene Leonardo?
13 **A.  Yes.**
14 **Q.**  You never signed that document.  Is that right?
15      The document before you is not signed.  Is that
16 right?
17 **A.  It is a --**
18 **Q.**  The document before you is not signed?
19 **A.  You can't physically sign it.  It's an electronic**
20 **thing.**
21 **Q.**  Did you ever sign off on this document?
22 **A.  I would consider this signed off.**
23 **Q.**  By having your name typed there?
24 **A.  Correct.**
25 **Q.**  You had made reference to the point where you had

88

1  picked up Miss Down.  Do you remember that portion of your
2  testimony?
3  **A.  Yes, I do.**
4  **Q.**  And when you went there, you said that Mr. Valerio
5  had stated, in sum and substance, that he didn't
6  understand what was wrong.  Right?
7  **A.  Correct.**
8  **Q.**  And you described him as not anxious.  Right?
9  **A.  No.**
10 **Q.**  And I believe you had used the word *calm*.  Is that
11 right?
12 **A.  Yes.**
13 **Q.**  He wasn't loud or abusive, was he?
14 **A.  No.**
15 **Q.**  He wasn't threatening in any way, was he?
16 **A.  No.  He just pulled the door.**
17 **Q.**  Yes or no?
18 **A.  No.**
19 **Q.**  Because if he were, you would have made note of that.
20 Right?
21 **A.  Correct.**
22 **Q.**  During the course of your dealings, from beginning to
23 end, with Mr. Valerio, had he had mentioned the fact that
24 his sister had a young daughter?
25 **A.  No.**

89

1  **Q.**  Have you since learned that?
2  **A.  I don't really know what I know about that.**
3  **Q.**  It's either yes or no.  Have you since --
4  **A.  No, I don't -- no, I don't.  There seems to be a lot**
5  **of confusion.**
6  **Q.**  So either yes or no.  Have you since learned that he
7  has a daughter?
8  **A.  No.**
9  **Q.**  His sister has a daughter?
10 **A.  No.**
11      **(Defense counsel confer.)**
12      MR. LaPINTA:  I have nothing further.  Thank
13 you, Miss Leonardo.
14      THE COURT:  Redirect?
15      MR. KABRAWALA:  Very brief, judge.
16
17 REDIRECT EXAMINATION
18 BY MR. KABRAWALA:
19 **Q.**  Miss Leonardo?
20 **A.  Yes.**
21 **Q.**  In your experience with InterExchange, have you ever
22 experienced a host family who misrepresented the presence
23 of a child at home?
24      MR. LaPINTA:  Objection.
25 **A.  Never.**

90

1    THE COURT:  Sustained.

2    I don't care about other families.  Okay?  Just

3  focus on this situation.

4    MR. KABRAWALA:  There is nothing further.

5    THE COURT:  Okay.  You can step down, Ms.

6  Leonardo.  Thank you.

7    (The witness was excused.)

8    THE COURT:  So we will take the lunch break.

9    And you just have Ms. Kalichenko, right?

10    MR. KABRAWALA:  For today.

11    THE COURT:  I will discuss this with her when

12  she arrives after lunch.

13    I know I asked you to do the direct, but I

14  obviously know there is a long relationship between her

15  and Mr. Valerio, from the trial and from the hearing that

16  she had in connection with her case.

17    I don't want the government to go from start to

18  finish with the relationship.  I really just want to hear

19  from her -- at least on direct; obviously, the defense can

20  focus on whatever they wish to focus on.  I will hear any

21  objection, obviously.

22    But in terms of the direct, I just want to focus

23  on any threats of violence or acts of violence that

24  Mr. Valerio made toward her in their relationship, if any.

25    Again, the reason I invited her to testify is, I

91

1  believe at some point in the hearing she made such an

2  allegation.  But I don't want you to start from the

3  beginning of her interactions with him.

4    MR. KABRAWALA:  Understood.

5    MR. LATO:  And for scheduling, since your Honor

6  is obviously familiar with both Mr. Valerio's case and

7  Miss Kalichenko's, my cross will be focused precisely as

8  to her credibility with respect to the allegations, and I

9  am not going to get into all of this other stuff that I

10  know you already are familiar with.

11    THE COURT:  Great.  Why don't we say 2:15.

12    Thank you.

13    (Lunch recess taken at 1:15 pm.)

14

15

16

17

18

19

20

21

22

23

24

25

92

1    A F T E R N O O N   S E S S I O N

2    2:35 PM

3

4    THE COURT:  Please bring Miss Kalichenko out.

5    MR. KABRAWALA:  I have one housekeeping issue.

6    I know the court had requested that certain

7  topics be covered.  There is a specific topic that was not

8  specifically addressed by the court; that is, adoption of

9  a child.  I think that those are germane to the issues

10  that are before the court.  We will move quickly through

11  them toward the end of the direct.

12    THE COURT:  Yes.  I understand why that may

13  potentially be relevant, so that is fine.

14    (Miss Kalichenko enters the courtroom.)

15    THE COURT:  Good afternoon, Miss Kalichenko.

16    In a minute I am going to have you take the

17  oath.  But first, I don't know if this was communicated to

18  you during the lunch break, but I have asked the

19  government to focus on any allegations -- actually, let's

20  swear in the interpreters.

21    (Interpreters Nelly Alishaev and Nina Adar Tkach

22  were sworn by the courtroom deputy.)

23    THE COURT:  Miss Kalichenko, as with the other

24  conferences, we have the interpreters here, standing by if

25  you need them.

93

1    Do you understand that?

2    THE WITNESS:  Yes, your Honor, I do.

3    THE COURT:  So what I was saying was, I want the

4  government to focus on any allegations of any violence or

5  threats of violence as relates to Mr. Valerio.  And he may

6  also cover any discussions regarding adopting the child.

7    I know that there are other aspects of your

8  interactions with Mr. Valerio that you have testified

9  about at the hearing that we had and maybe you want to

10  bring to my attention for purpose of your own sentencing,

11  but at least for purposes of direct examination, those are

12  the issues that I want focused on today.  Okay?

13    THE WITNESS:  Okay.  I understand.

14    MR. LATO:  Your Honor, just before beginning, do

15  you have defense exhibit stickers so we can save time once

16  we begin?

17    THE COURT:  Let's have the witness sworn.

18

19  **OLENA KALICHENKO**

20    called by the Government, having been first duly

21    sworn/affirmed, was examined and testified as

22    follows:

23

24  DIRECT EXAMINATION

25  BY MR. KABRAWALA:

94

1    Q.   Good afternoon.
2         You are here to testify against Joseph Valerio?
3    A.   Yes.
4    Q.   You are testifying voluntarily and of your own free
5    will?
6    A.   Yes, I am.
7    Q.   The government has not compelled you to testify.
8    Correct?
9    A.   Correct.
10   Q.   No one is forcing to testify.  Correct?
11   A.   No.
12   Q.   And you do not have any sort of agreement with the
13   government to testify.
14   A.   No, I don't.
15   Q.   You haven't been promised anything in exchange for
16   your testimony here today?
17   A.   No.
18   Q.   You are testifying here in the hopes of obtaining
19   leniency at your own sentencing.  Correct?
20   A.   Correct.
21   Q.   And you have pleaded guilty to a host of federal
22   crimes.  Correct?
23   A.   Correct.
24   Q.   You pleaded guilty to child exploitation, to child
25   pornography, transmission of child pornography, and

95

1    related child pornography offenses?
2    A.   Yes.
3    Q.   And you didn't plead guilty pursuant to any kind of
4    agreement with the government.  Correct?
5    A.   Correct.
6    Q.   I want to draw your attention to an individual named
7    Joseph Valerio.
8         Do you see Joseph Valerio sitting in the
9    courtroom here today?  And if so, I ask you to please
10   point him out by identifying an article of clothing that
11   he is wearing.
12   A.   Yes, I do.  I see him.  He's wearings the green
13   clothes.
14        MR. KABRAWALA:  Your Honor, may the record
15   please reflect that witness has identified Joseph Valerio?
16        THE COURT:  Which chair is he sitting at?
17        THE WITNESS:  Next to his attorneys.  He is the
18   only person there who is defendant.
19        THE COURT:  Is that sufficient for the defense?
20        MR. LATO:  Yes.
21        THE COURT:  The identification has been made.
22   BY MR. KABRAWALA:
23   Q.   I want to briefly talk about your relationship with
24   Mr. Valerio and how it developed.
25        Could you please tell us how you first came to

96

1    meet Mr. Valerio and how your relationship developed.
2    A.   Yes.  I remember I met him first through the website,
3    basically where I had my profile and he had his profile as
4    well, mostly for, you know, the communication.
5         And I was looking for a marriage, for a man to,
6    I was, you know, for a husband, a future husband, and a
7    future.  I had a child and I was looking for a person who
8    would be like a father for my daughter as well.
9         So that was the reason why I actually started
10   with Mr. Valerio a relationship.
11   Q.   You were in the Ukraine at this time when you made
12   contact with Mr. Valerio?
13   A.   No.  I arrived to the US in June and I contacted him
14   late in June.  So I was in the US at that time when I
15   first contacted him.
16   Q.   And it was over a website.
17   A.   Yes.
18   Q.   UkranianDate.com? (Sic)
19   A.   I think so.  I think so.  I think so.
20   Q.   You were looking for a husband and somebody who would
21   be a good father to your daughter.
22   A.   That's what he was looking for as well, according to
23   his profile.  Yes.
24   Q.   And you two decided to meet.  Correct?
25   A.   That's correct.

97

1    Q.   That was sometime in the summer of 2011?
2    A.   Yes.  I think it was very, very end of June 2011.
3    Q.   Where were you at the time in the United States?
4    A.   I was in Dallas, Texas.
5    Q.   How did you -- withdrawn.  Did you come to meet
6    Mr. Valerio here in Long Island?
7    A.   Yes, I came to meet him.  He wanted me to come, and I
8    came to meet him in Long Island.  Yes.
9    Q.   Who paid for your trip?
10   A.   Mr. Valerio paid.
11   Q.   And when you came to Long Island, did he pick you up
12   at the airport?  Did you meet him somewhere?
13   A.   Yes.  He picked me up at the airport.  Yes.  I
14   remember.  Yes, he picked me up at the airport.
15   Q.   Let's back up for a moment.
16        You and I haven't talked about your testimony.
17   Correct?
18   A.   This testimony?  No.
19   Q.   You and I haven't?
20   A.   No.
21   Q.   We haven't prepared for your testimony?
22   A.   No.  I didn't talk to you, no.
23   Q.   I want the record to be clear that you and I have not
24   talked before today other than in court when I questioned
25   you previously.  Right?

98

1    A.   Yes.  That's correct.

2    Q.   By the way, have you seen Mr. Valerio before today's

3    date, such as in the prison?

4    A.   I have seen him twice, yes.

5    Q.   Have you spoken with Mr. Valerio?

6    A.   No, I haven't spoken to him.  It was because they

7    have the visitors room.

8         It is the same room for when the attorneys come.

9    So just when his attorneys came and my attorneys came

10   simultaneously, that was the only reason.  But I didn't

11   talk to him, no.  Never.

12   Q.   Other than seeing him in the prison this couple of

13   times in the attorney visiting room, you didn't interact

14   with him in any way?

15   A.   No.

16   Q.   So going back to that summer of 2011 when you came to

17   visit Mr. Valerio.

18        Tell us about your hopes for that meeting and

19   tell us about that summer, the time that you spent with

20   Mr. Valerio that summer.

21   A.   Yes.

22        I came, I remember, like very late, very late in

23   2011, to his house.  I stayed at Smithtown, Long Island.

24   Basically I stayed, this time I didn't stay for a long

25   time.  I stayed like, for the first time, like ten days,

99

1    close to two weeks.  But I remember that I was celebrating

2    the Independence Day with him and in his house.

3         And basically so we, at that point we were, you

4    know, at the point of establishing a relationship.  And I

5    remember that I met his son, as well, and I also met his

6    mother.  So from my point of view, like basically he

7    seemed to be a credible person to me.  Because I saw the

8    relationship with his son and I didn't see absolutely

9    nothing that I can say is wrong about his relationship

10   with his own child, like there was, you know.  So I stayed

11   for close to 10 days.

12        But my own family at that time, like my mother,

13   she has put my daughter at the orphanage in the Ukraine at

14   that particular time.  So basically, because we had no

15   place to live and she lives by herself, they went for

16   Eastern Ukraine but she was living in a shelter.  So

17   basically, when I was staying at Mr. Valerio's house, like

18   my own family was like, you know, in a situation where

19   they didn't even have a place to, you know, to go to or

20   whatever.

21        And she just, my mom, she just told me that she

22   put my daughter at the orphanage.  And it was a shock for

23   me.  You know, I didn't, like I was completely shocked.

24   And I mentioned to Mr. Valerio about it briefly during the

25   first, you know, when I first stayed with him briefly I

100

1    mentioned it.  But I decided like to continue to develop

2    the relationship with him.  And he sent me back to Ukraine

3    in August with the intention to come back to him again and

4    to continue to build the relationship, it was the purpose

5    of my visit.

6    Q.   I'm going to stop you right there.

7         While you were with Mr. Valerio for those

8    approximate couple of weeks in July --

9    A.   Yes, sir.

10   Q.   -- of 2011, did you have a romantic relationship with

11   him?

12   A.   Yes.  Yes, of course.

13   Q.   Did you have a sexual relationship with him?

14   A.   Yes, I had.  Yes.

15   Q.   At any point in time during that first visit in July

16   of 2011, did Mr. Valerio physically abuse you in any way?

17   A.   During my first trip, I couldn't say so, no.

18        Like I noticed that he had, you know, like he

19   had this issue that, like his mood would change.  He would

20   be a normal person, normal person like a few days, and

21   just in the middle of sudden, his temper would change,

22   like click.  I couldn't explain why.  But that was the

23   only issue that I noticed during my first stay.

24   Q.   What did you observe about his mood swings?  What do

25   you mean by his temper would change?

101

1    A.   He would become angry with no reason.  Like angry

2    with no reason, which I couldn't understand why.  But I

3    thought that, you know, I thought that maybe because he

4    has like he's Italian, I thought maybe it was like a hot

5    blooded or something like that.  So it was my first

6    impression.

7    Q.   Did that, other than anger -- withdrawn.

8         How would that anger play out?  What would he

9    do, specifically?

10        And I'm talking only about that first time, in

11   July of 2011, when you were with him.

12   A.   He would becomes like jealous with no reason.  He

13   would become suspicious.  Like this is something that I

14   would have noticed that at the first.  But the first time,

15   I spent like ten days with him.  That was the only time

16   that I spent.

17        But still we got committed that to continue the

18   relationship.  And he sent me back to the Ukraine

19   specifically like I didn't have absolutely like no, no,

20   you know, funds of my own at all.  He purchased the ticket

21   for me and he would support me and we would communicate.

22        When I was in the Ukraine, we would constantly

23   communicate.  He would ask me how am I doing.  Like it was

24   a relationship.  It was a relationship which continued.

25        And he would send money to me also, like in

A-213

102

1   August, and he would tell me that I'm expecting you to
2   come.  Like I'm waiting and waiting for you to come like
3   in September.  And we were just building a relationship at
4   that point.
5   Q.   And to be clear.  Your daughter was not with you in
6   the United States that summer.  Correct?
7   A.   No.  My daughter never was in the United States.  And
8   at that time she was specifically at the orphanage.  Yes.
9   Q.   While you were traveling here, looking for a husband?
10  A.   I didn't put her in the orphanage.  My mother did,
11  without my knowing, while I was already over there because
12  she was afraid.
13        Like the place, we don't have our own place in
14  Ukraine.  We were always renting.  Like I don't have a
15  house like.  And I have a history of basically being a
16  homeless person since 2008.  But that's another story, but
17  I'm just telling you.
18  Q.   Did you tell Mr. Valerio that you had a daughter?
19  A.   Yes, I told him.  Yes.
20  Q.   Did Mr. Valerio indicate to you one way or the other
21  whether he want to adopt the child?  And I'm talking about
22  July of 2011.
23  A.   No, he didn't tell me immediately that he want to
24  adopt.  No, he didn't tell me immediately.
25  Q.   So you had returned to the Ukraine after Mr. Valerio

103

1   paid for your trip.  Did you later return to the United
2   States that year?
3   A.   Yes, I did.  Yes.
4   Q.   And when was that?
5   A.   I remember it was September 2.
6   Q.   September 2 of 2011?  And what made you return?
7   A.   We were still in the process of building the
8   relationship and that was like it was up to him to pick up
9   the date.  Like he was, you know, had some issues and he
10  told me that I'm expecting you to come specifically on
11  this date.  And I arrived, I arrived September 2.
12        But I also remember that in August I was staying
13  here.  But my child, she wasn't here.  She was in
14  Stroganovka Crimea in the orphanage.  And I remember that
15  I couldn't even go.  I couldn't even go visit her.  Like I
16  couldn't even get her back by my own because, you know, I
17  couldn't, I didn't have funds in order for me to get her
18  back.
19        I had to, according to the requirement of our
20  government, I had to secure another residence for her,
21  which I couldn't do.  I didn't even have enough money even
22  to see her, you know, at the time when I was in Kiev.  And
23  I didn't even have a place to live in Kiev also.  I was
24  just staying with my friends, basically.
25  Q.   So you returned to the United States.  What was your

104

1   primary purpose for returning to the United States?
2   A.   Basically, I returned to continue it.  I was
3   determined to build serious relationship with this man
4   specifically for the marriage.  That's all that I was
5   looking for.
6   Q.   Now, upon your return in September of 2011, did your
7   relationship with Mr. Valerio change?  Remain the same?
8   Can you please describe your relationship when you
9   returned in September.
10  A.   Yes.  I returned in -- Mr. Valerio, I think that he
11  has, you know, like a dual personality.  So he would be
12  normal and, you know, you know, a caring person and a good person at
13  one point.  But at the other point, he would just,
14  something happen and he would completely change into
15  opposite person.
16  Q.   Are you looking at something?
17  A.   No.  I just have some notes for myself which I made.
18  Q.   Okay.  Can we just mark that for the sake of our
19  record here?
20        THE COURT:  Yes.  Let's mark that as Court
21  Exhibit 1, her notes.
22        MR. KABRAWALA:  May I just have a very brief
23  moment to look at it?  I have never seen it.
24        THE COURT:  Sure.
25        MR. KABRAWALA:  May I approach, your Honor?

105

1        THE COURT:  Yes.  And Mr. Lato may look at it as
2   well.
3        (There was a pause in the proceedings.)
4        THE COURT:  Miss Kalichenko, if you need to
5   refresh your memory about something, including any notes
6   that you have, you just need to let the record and me know
7   that you are referring to your notes.
8        So you should testify from your memory.  If you
9   can't remember something and need to refer to notes, say:
10  Judge, I need to refer to my noes.
11        THE WITNESS:  Okay.  So far I have read nothing
12  yet.
13        THE COURT:  Fine.
14        MR. KABRAWALA:  That appears to be the case.
15  BY MR. KABRAWALA:
16  Q.   So let's talk about your visit in September.  During
17  that time did -- I'm sorry.  Withdrawn.
18        Approximately how long did you stay following
19  your visit in September?  During the visit how long were
20  you in the United States for?
21  A.   I stayed, during that trip to the United States I
22  stayed since September 2 and till the very, very end of
23  October.  But not all of this time I stayed at
24  Mr. Valerio's house.  Only some period of time I stayed at
25  his house.

106

1  Q.  About how long did you stay at Mr. Valerio's house?

2  A.  **Starting from September 2, like around three weeks, I**

3  **believe. Close to three weeks. Close. Approximately**

4  **three weeks. 20 days. Three weeks.**

5  Q.  After that approximate three-week period of time, did

6  you return to Mr. Valerio's house?

7  A.  **Yes, I do.**

8  Q.  During the same trip?

9  A.  **To the US, yes. To the US? Yes. I was still in the**

10  **country. I didn't leave the country.**

11  Q.  Okay. Where did you go after three weeks,

12  approximately? I just want to get the time frame that we

13  are dealing with.

14  A.  **Okay. I had to, I had to go to Seattle because he**

15  **kicked me out from his house, basically. And that is the**

16  **instance that I wanted to talk about.**

17  Q.  Let's talk about that. During the time when you

18  visited Mr. Valerio in September of 2011, did Mr. Valerio

19  ever sexually or physically, or both, assault you in any

20  way?

21  A.  **Yes, he did.**

22  Q.  Can you describe -- well, how many --

23  A.  **I mentioned two.**

24  Q.  So there were two instances?

25  A.  **I mentioned two. Yes.**

107

1  Q.  When you say -- okay. Withdrawn. Tell us about the

2  first instance.

3  A.  **It happened as I was staying at Mr. Valerio's house**

4  **and, you know, he suddenly like became mad. I don't even**

5  **know, like out of no reason. And he just told me, he just**

6  **told me that he wanted me to leave his house.**

7  **You know, like he just, he literally told me**

8  **that I have to leave. Like, I have to leave? He just**

9  **told me that I have to leave his house and that's it.**

10  **Like it wasn't his concern where or why, you**

11  **know, because I didn't know no people in the US. I had**

12  **absolutely no funds. I couldn't go back to my country. I**

13  **couldn't even purchase a ticket back to my country. I**

14  **didn't even have a place to go. He just, you know, he**

15  **just like just put the condition to leave the house.**

16  Q.  Around when was this?

17  A.  **Approximately three weeks after my second arrival.**

18  Q.  So sometime in September of 2011.

19  A.  **Yes. 20-something.**

20  Q.  What happened? Where were you? What time of day was

21  this? And tell us what happened.

22  A.  **Okay. I think it was close to, it was during the**

23  **day. It was during the day. I remember he was expecting**

24  **me to leave his house like immediately. But I didn't**

25  **know, you know, where to go.**

108

1  **And I just simply, I remember that he was in his**

2  **kitchen, okay? And I remember that I came downstairs to**

3  **the kitchen. I literally, I remember how I was dressed.**

4  **I remember that I had a bathrobe on top of myself. The**

5  **black one. And I remember how he was dressed. He had**

6  **also like he was casually dressed. And he had, you know,**

7  **also like a bathrobe, the one he was wearing at his home,**

8  **and like a casual pants or shorts. Something like that.**

9  **Very casual. Very casual. Okay?**

10  **And so he was in the kitchen and I just started**

11  **to, you know, I approached and I didn't know what to do.**

12  **I just asked him, I started to beg him if I could stay at**

13  **least, you know, one or two more days in his house until I**

14  **find out, you know, the place where I can go. But he**

15  **didn't want it. He just wanted me to leave. You know, he**

16  **just wanted me to leave.**

17  **And I literally started to beg him, you know?**

18  **And what he did is, he just, you know, he, like he pulled**

19  **me out, I remember, from the kitchen towards the cinema.**

20  **He has this control.**

21  Q.  Cinema?

22  A.  **Yes.**

23  Q.  Like a theater?

24  A.  **Yes, like a theater room.**

25  Q.  What happened next?

109

1  A.  **Yes. So he pulled me out to the room, like a cinema**

2  **room. And, you know, he just took my clothes off and he**

3  **forced me, me told me to crawl on the floor, okay? He**

4  **told me to crawl on the floor.**

5  **And he would start calling me different, you**

6  **know, like insulting names. I can't repeat how he would**

7  **call me but this is like not a proper language.**

8  Q.  You can. I'm asking you to testify truthfully and

9  completely, so the language that was used, I want you

10  to -- I'm asking you to repeat it even if it is not

11  appropriate language.

12  A.  **Okay. So he would call me like, you know, like he**

13  **would say a dirty whore, a bitch, and, you know, he would**

14  **use language like this. And sentences like this. And he**

15  **would, he would, you know, he would just constantly insult**

16  **me, humiliate me, would start calling me like this.**

17  **And he wanted me to reply in the same way, so I**

18  **had to tell, agree with him and I had to reply to him**

19  **like:** *Yes, my master.* **That's what he, you know, always**

20  **wanted to hear from me as a response. Okay.**

21  **And after that, so he asked me to crawl on the**

22  **floor. And I would. I had like no clothes on myself.**

23  **Okay? And he would use his hand like, I don't know how to**

24  **say in English when you do like this. Slap, is it? You**

25  **know, he would slap me, I think, if it's the proper word**

110

1   to say.
2           THE COURT:  Let the record indicate the witness
3   made a slapping motion with her left hand.
4           Go ahead.
5           THE WITNESS:  And then he would, you know, he
6   would use his hand.  And he would just, you know, he would
7   just go like inside of me with his hand.  And he would
8   like continuously do it, which was painful for me.
9   Q.  I'm sorry.  Let me stop you right there.
10          Slapping.  Where did Mr. Valerio slap you?
11  A.  On my body.  Like, you know, like this.
12  Q.  Pointing to your rear end?  You are pointing to your
13  rear end?
14  A.  Like this.
15          (Confering with interpreter.)
16          THE INTERPRETER:  My behind.
17  BY MR. KABRAWALA:
18  Q.  And approximately how many times?
19  A.  He would constantly do it.  He would, like would
20  do it.  And he would insult me, use this language.  And he
21  would ask me to crawl on the floor.  And he would just,
22  you know, use his hand and just insert, you know, inside
23  of me.  And he would literally hurt me.  I ask him to stop
24  it but he just did it.  Like he didn't care.
25  Q.  Was his hand motion?

111

1   A.  Yes.  His hands were always in motion.
2   Q.  Okay.  And was it forceful?  Gentle?  Something else?
3   A.  It was forceful.  And I remember that it hurt me.  I
4   remember that he hurt me like really, really badly.
5   Really badly.  And I had to crawl, you know, on the floor
6   doing all of that.  And he would constantly like humiliate
7   me.
8   Q.  Did he have anything in his hand or was he using his
9   hand?
10  A.  I think he had.  I think he had, yes.
11  Q.  What do you think he had?
12  A.  Just it is from, you know, is my recollection.  If he
13  had, he had like a stick.
14  Q.  A stick?  Did he use his hand in a closed hand, like
15  a closed fist, or an open hand?
16  A.  I think he did both.
17  Q.  Okay.  And you said that he put his hand inside you.
18  Was it in your --
19  A.  Yes.
20  Q.  -- mouth?  Vagina?
21  A.  In the vagina.  He would put it in the vagina.  But
22  he would also try, you know, to put it in the other area
23  as well.
24  Q.  In your anus?
25  A.  Yes.

112

1   Q.  Was his hand closed?  Open?  Can you please describe
2   the -- I know it's uncomfortable, but I'm trying to get
3   the details for the record.
4   A.  He would move his hand.  It would be like open and
5   closed.  He would move his hand.
6   Q.  Now, did he do anything other than what you have
7   described?
8   A.  Yes.  He would like, you know, he would, at that time
9   I had long hair, the black long hair at that time I had,
10  and he would pull me like, you know, with the hair also.
11          And also I remember he would ask me to -- I'm
12  going to ask the interpreter how to say it.
13  Q.  Please take your time.
14          (Witness and interpreter confer.)
15          THE INTERPRETER:  It's very hard to tell me
16  that, but he would ask me to use the like oral sex.
17  A.  Like, you know, with my mouth to specifically perform
18  on his, how do you, you know, the male organ.  How do you
19  call it?
20  Q.  Penis.  Did you perform oral sex on his penis?
21  A.  I told him that it is disgusting and I told him that
22  I don't want to do it, you know.  But he would, he would,
23  he would force me to do it.  Specifically, like he would
24  pull me, you know, through my hair.  That's what he would
25  do.  I told him that.

113

1           And I know that for me it is disgusting.  Okay?
2   For me, it's disgusting.  And I told him it was disgusting
3   for me.
4   Q.  Just so the record is clear.  Did you perform oral
5   sex on him?  And I will ask you follow-up about whether
6   you wanted to or not.  But did you?  Yes or no?
7   A.  Yes, I did.
8   Q.  Now, did you want to perform oral sex on him?
9   A.  No.
10  Q.  Did you resist, or tell him no?
11  A.  I told no.  Yes.
12  Q.  Did you resist, or tell him no, that you did not want
13  to be slapped?
14  A.  Yes, I told no, because I didn't want to be slapped.
15  I told him that I don't want to crawl on the floor.  Of
16  course I did.
17  Q.  Did you resist or tell him no, that you don't want
18  any of part of his body inside your body?
19  A.  Yes.  I told him.  I couldn't fight him, you know,
20  but I told him no.  Yes, of course I did.
21  Q.  Were you subdued in any physical way such as a
22  restraint?
23  A.  What is it?
24  Q.  Were your hands tied?  Were you pinned down?  How
25  were you restrained, if at all?

114

1          (Witness and interpreter confer.)
2     A.   Yes.  I remember he would hold my hands like this, on
3     the back.
4          THE COURT:  The witness is indicating with her
5     hands behind her back.
6     A.   Yes.  Like this, I remember.
7     BY MR. KABRAWALA:
8     Q.   Were they tied in any manner or restrained in any
9     way?
10    A.   He would just hold.  He didn't use anything specific.
11    He would just hold with using his own, you know, using his
12    own hand.
13    Q.   Was he standing above you, to the side of you, on the
14    floor?  Describe how he, where he was in relation to you
15    during this occasion.
16    A.   I remember that I was on the floor.  Okay?  And he
17    would be like, not a position, like not laying down, but
18    in a position like crawling; you know, when you are about
19    to crawl?
20         And the hands would be like this.  And he would
21    hold them like this.  And he would be, like he would be
22    like almost on top, like sitting on my, you know, on my
23    back.
24         MR. KABRAWALA:  The witness gestured, for the
25    record, behind her back, when she was describing that.

115

1          THE COURT:  Yes.
2     BY MR. KABRAWALA:
3     Q.   Approximately how long did this encounter last?
4     A.   It wasn't a short encounter.  I would say it would be
5     between one hour and two hours.  Something like that.
6     Between.  Because it only stopped after, you know, like I
7     was suffering.
8          But for him it didn't really matter.  It stopped
9     after he received his satisfaction.  So basically until he
10    received whatever he was looking for.  Then, only after
11    that, like after he was like completely discharged.  You
12    know.
13    Q.   Discharged?
14    A.   Yes.  Like completely discharged.  After he discharge
15    himself.  Like even after he had like even no energy left.
16    Q.   You mean ejaculated or --
17    A.   Yes.
18    Q.   Okay.  At any point during that encounter, did you
19    have sexual intercourse with Mr. Valerio?
20    A.   Yes.  He would try, he would do it.  He would do it.
21    If that's what you mean, yes, he would do it.
22    Q.   Just so we are talking about the same thing.  Did he
23    insert his penis in you?
24    A.   Yes, he did.  Umm-hmm.
25    Q.   And again, did you say no or resist in any way?

116

1     A.   I told him no.  I couldn't otherwise resist but I
2     told him no way.
3     Q.   Did you have the opportunity to -- withdrawn.  After
4     this was over, what happened?
5     A.   After this was over, I remember that I just, I cried.
6     I was crying.  And I just went upstairs to the room where
7     I was staying.
8          And then I just stayed, you know, I just stayed
9     till I left.  I didn't even talk to him much.  I only told
10    him that I'm ready to leave this day and then he drove me
11    to the airport.
12    Q.   Did you observe any marks on your body of any kind?
13    A.   I felt pain inside.  It was painful for me to walk,
14    you know.  And I think that it was definitely painful for
15    me to walk.
16    Q.   To walk?
17    A.   To walk.  Like this.
18    Q.   Oh.  To walk?
19    A.   To walk.  And I remember that I was bleeding as well
20    inside.
21    Q.   You were bleeding inside your vagina?
22    A.   I had, yes, I have had blood.  Yes.
23    Q.   Did you observe any red marks anywhere on your body?
24    A.   That I cannot say for sure.  That I cannot say.
25    Q.   Just to be clear.  Were you menstruating during this

117

1     time period?
2     A.   No.
3     Q.   So you, at some point after that, you told him you
4     were leaving.  Correct?
5     A.   It is not that I wanted.  You know, it is just I had
6     no other choice.
7          I had to go somewhere because I didn't, like I
8     couldn't, he didn't want me to stay in his house, and I
9     couldn't obviously be on the street.  So I just contacted
10    a person, who I didn't even know.  He was like a very, you
11    know, cold contact.  Just a person who I just barely knew
12    in Seattle.  He invited me to come and stay with his
13    family.  I would stay with his family.
14    Q.   Was this another romantic --
15    A.   It wasn't romantic.  It was more of a, you know, kind
16    of a friend connection.  Because I was staying with his
17    barracks, they all stay over there.
18    Q.   The person that took you in in Seattle, did you meet
19    that person on any kind of dating website?
20    A.   Yes.  But -- yes.  But it was like a very, you know,
21    contact -- I even contacted him two days like prior to my
22    arrival to him just because I had no other choice.  I
23    didn't want to go over there to be with a stranger.  I
24    didn't want to but I had no other choice.
25    Q.   Did you, at any point in time following this first

118

1  instance, report Mr. Valerio to any sort of legal
2  authorities?
3  A.   I was considering.  I was considering.  Specifically
4  after that incident, when I was in Seattle I was
5  considering to maybe contact the police.  I was
6  considering.
7  Q.   Why didn't you?
8  A.   I was hesitant because, first of all, this is a
9  foreign country to me.  Like this is not my country.  I
10 never dealt with no American police or whatever and I
11 didn't know what their reaction would be.
12      And also, like my, you know, my primary concern
13 at that point was about my family and the reunion with my
14 family because like, for instance from Mr. Valerio's
15 house, I remember that I called to the orphanage, like
16 every other day I would call back home, I would call back
17 home, and I would check on my daughter, how she's doing,
18 how she's doing.
19      And they, you know, like this principal of the
20 orphanage in the Ukraine, they wouldn't, they would even
21 refuse to tell me how she was.  They were very rude.  They
22 told me they have so many kids, we don't know how your
23 daughter is.  They just didn't want to even talk to me.
24      But I was -- so my priority was to reunite with
25 my family, to get my daughter out of the orphanage to make

119

1  sure that she is okay.  That was my priority.  And he was
2  like, you know, regarding the kids.
3      And I want you to know, because it's important,
4  regarding the kids he was, and my daughter specifically,
5  he was very receptive.  Like he really wanted her to be
6  part of the family.  Okay?
7      And he told me, like he told me about his
8  previous relationship with this woman I believe from South
9  Africa.  A_____ I believe her name is.  And he told me
10 that he has a daughter with her.  Her name is A___, his
11 daughter with this woman.  And I remember that he was
12 showing me this picture of his daughter when she was
13 staying with him like at his house.  He would show me the
14 pictures of his daughter.  And he would tell me that he
15 was like very happy.
16      And I could see that he was very sincere, that
17 he had love for the child.  And I could see that he was,
18 you know, really missed the child, you know.  And he would
19 also like tell me that he would complain that the daughter
20 wasn't with him; that this woman took her away from him.
21      And so I could see that basically, you know, that
22 he would be -- and he would also encourage me to
23 bring my own daughter to live with him.  So I saw that he
24 would be, you know, a suitable, a very good person as a
25 father.

120

1  Q.   So you didn't call the police because you still held
2  out hope that --
3  A.   Yes, I hold out hope.
4  Q.   May I finish the question so the record is clear.
5      You didn't call the police on Mr. Valerio
6  following this incident of September 2011 because you,
7  essentially you still held out hope that Mr. Valerio would
8  be a good father to your child?
9  A.   Exactly.  Exactly.  I saw him as a father to his own
10 son and I saw his sincere concern to his daughter with
11 this woman A_____.
12      And he also told me this woman, she had a son,
13 which wasn't his son, from the previous relationship of
14 her.  But he would tell me that he would, like he would
15 see no difference, you know, between a boy and between his
16 own daughter and he would accept the son as his own one.
17 Q.   Okay.
18 A.   He would also tell me about this.
19 Q.   I want to talk about your second trip to
20 Mr. Valerio's house.
21 A.   Okay.
22 Q.   That trip in that time, in the fall of 2011.  What
23 made you come back after Seattle?
24 A.   First of all, I realized that there was no place for
25 me in Seattle.  And there never was.  Like simply, like I

121

1  was simply, like there never was.
2      And Mr. Valerio, after this incident he
3  contacted me through the email.  He contacted me and he
4  was completely in a different tone.  Completely like
5  nothing happened, you know.  He contacted me.  And he
6  would ask me how am I doing, if I'm all right.  And he
7  would, you know, the purpose of reestablish the
8  relationship, you know, in a softer way, a nice way, a
9  gentle way, and he would advise me to come back to him.
10      And I decided to give it a chance because I was,
11 in my mind I was like, in my mind I was after being in a
12 family, and I decided to give him a chance of building the
13 family with him.
14 Q.   So you came back to him, hoping to build a family
15 with him.  He paid for your flight.  Correct?
16 A.   Yes, he did.
17 Q.   This second time when you stayed with Mr. Valerio,
18 how long was that visit?
19 A.   The second time I came back, it was, I think it was
20 second week of October, and stayed till the end of
21 October.
22 Q.   During that second visit in the fall of 2011, did
23 Mr. Valerio ever sexually or physically assault you in any
24 way?
25 A.   I remember that, you know, when he was about to pick

122

1 me up from the airport so he -- I was communicate -- he
2 bought me a cell phone before. So I had a cell phone with
3 an American sim card. So I still, like it was activated.
4 So I was communicating with him through the cell
5 phone at that time. And he would ask me that he wanted me
6 to come. Like I came from the airport. I flew. And then
7 he would tell me from the airport to take a taxi and to go
8 to the Central Park, Manhattan, and there he was going to
9 pick me up in Central Park. Not in the airport but in
10 Central Park.
11 And he was specifically, I remember, telling me
12 in the task of how he would like me to be dressed. Okay.
13 Q. How was that?
14 A. Yes. He would tell me that he wanted me specifically
15 to have like a mini dress or a mini skirt to put on. And
16 he would tell me to wear the panty hose. Right, in
17 English? Panty hose. And he would tell me not to put,
18 like no underwear. That was his --
19 Q. And you did it.
20 A. I did it. But I didn't understand why he asked me,
21 but I just did it.
22 Q. So -- withdrawn. Around what time was this that you
23 arrived into New York City?
24 Was it late? Was it during the day?
25 A. No. I arrived during the day. And it took me a

123

1 while to drive from the airport to Manhattan also. But
2 Mr. Valerio I met around from, it was between 4 to 5 pm in
3 Central Park.
4 Q. Okay. What happened once you met him?
5 A. He picked me up. I was waiting there, waiting in a
6 taxi. I was waiting in a taxi in the Central Park. And
7 he arrived. He arrived in his car. I remember the Range
8 Recover, the one that he has, the black one. Okay? So he
9 picked me up in that car. He paid for the fee that I was
10 supposed to pay to drive me to the airport.
11 Q. The taxi fare.
12 A. Yes, the taxi fare. And I came. Whatever small
13 luggage I had, I put in his car and I came into his car.
14 And he was like he was very happy to see me. He
15 was, you know, he asked me how was I doing. He was in the
16 car. He was like talking nice to me, like very happy that
17 I came, you know.
18 And then we started to drive from the Central
19 Park all the way back to his house to Long Island. Okay?
20 And so I remember we were driving. And like everything
21 was okay during the initial ride through the town. But we
22 were like already in the Long Island. I don't remember
23 where it was because I'm not very familiar with the area.
24 Like I can describe how it looks but I cannot tell where
25 the specific location.

124

1 Q. Okay. Go ahead. Describe, in as much detail as you
2 can, where you were and what happened.
3 A. So I remember it was already a long drive. And the
4 road from Manhattan to Long Island takes like a couple of
5 hours to drive. So I remember that we are in Long Island
6 already, so it was already dark. It was already dark. It
7 wasn't night but it was like, I don't know, like 8, 9 pm.
8 Something like that. It wasn't like very dark but it was
9 like a twilight, a twilight.
10 So he just, he suddenly stopped the car and he
11 pulled over. He pulled over from the road. Just pulled
12 over to the side. And he just pulled over.
13 And he, you know, he was sitting with the
14 driver's area place and I was sitting next to him. And he
15 would just, he would just, you know, use his hand and just
16 like, so he just, like an animal, like attacked me, you
17 know, like using his hands.
18 Q. What do you mean?
19 A. Using his hand, he would put it like under my
20 clothes. He wouldn't take the panty hose off. He would
21 just, you know, go inside of it with his hands, through
22 the clothes, you know.
23 And it was very painful because like, I don't
24 know, a woman will probably understand, like with your
25 hand through the clothes. He didn't take it off. And he

125

1 just started, you know, to use his hand like inside of me
2 and he was just -- and I just, like I was shocked. I was
3 shocked. You know, I didn't understand why he did it or,
4 like, just absolutely like no explanation. No, just, you
5 know, he did it. And he kept doing it till he, you know,
6 till he relieved himself.
7 Q. So to get this straight. He was driving and he
8 pulled over on some road. You don't know exactly where
9 that was.
10 A. On the Long Island. I remember that there was like,
11 for instance, like a road you drive and he would pull over
12 to the side where there was like no cars.
13 Q. Okay. So you were on the road somewhere in Long
14 Island. And in the moments before, did you have any
15 warning that he was going to do this to you?
16 A. No. We was just listening to the music. We was just
17 listening to the music.
18 Q. And it is your testimony that he pulled over and took
19 his hand and put it up your vagina?
20 A. Yes.
21 Q. While you were still wearing panty hose?
22 A. Yes.
23 Q. And it was painful?
24 A. It was very painful. Because it was not only the,
25 you know, the pain of the hand, it was also the clothes,

126

1    you know, when it is, like how do you say it?
2            (Witness and interpreter confer.)
3            THE INTERPRETER:  When it's rubbing against.
4    A.   Yes, when it's like rubbing the skin it was also
5    painful, you know.
6    BY MR. KABRAWALA:
7    Q.   Did your clothing tear in any way?  Your panties.
8    A.   Yes.  He completely, like he made like a hole, you
9    know, over there.  And I think it was, for him it was
10   giving him some kind of a drive, you know, when a woman
11   like no, no underwear but the panty hose and mini skirt;
12   that, you know, it was really like driving him crazy, you
13   know.
14   Q.   Were you resisting in any way?
15   A.   I was shocked.  I didn't.  I wasn't like out of the
16   car.  Like it was locked completely.  It was his car.  The
17   car was locked.  I couldn't go nowhere.
18   Q.   Why --
19   A.   Like I couldn't --
20   Q.   Didn't you -- I'm sorry.  Go ahead.
21   A.   I couldn't go.  I couldn't open the car.  There were
22   no people around.  It was just in the middle of nowhere.
23   And it was dark.  I didn't even know the area.
24   Q.   Was he saying anything to you at this time?
25   A.   You know?  He was, after he finished like doing what

127

1    he was doing, like, you know, satisfying himself and after
2    his discharge, like he felt this relief and he turned to
3    me and said that he was sorry.  He turned to me and said
4    that he was sorry.
5    Q.   How --
6    A.   He turned to me and said that he was sorry.
7            But I remember that he, you know, like when I
8    was trying to get myself out of here, I remember that I
9    hurt my head in the car, in the car, you know, trying to
10   turn around away from him.
11   Q.   So while Mr. Valerio was penetrating you with his
12   hand, you turned to move away and you hit your head?
13   A.   Yes.  With the car.
14   Q.   Did he say anything to you while he was physically
15   assaulting you?
16   A.   No.  He was just, and I remember he also tried to
17   kiss me, you know, like kiss and simultaneously to use his
18   hand.
19   Q.   You did gesture.  It sounds like you were testifying
20   that Mr. Valerio was masturbating while he was doing this
21   to you.
22   A.   Yes, he was.
23   Q.   Did you -- withdrawn.
24   A.   He told me he was sorry after he finished, you know,
25   after he said.  That was like, you know, after he, like

128

1    something wild came out of him, you know.  And then he
2    turned and then he did like this even.  Maybe he even felt
3    sorry, I don't know, but --
4    Q.   You're slumping.
5    A.   That was his gesture trying to show.  Maybe he even
6    felt sorry, I don't know, but he said, he told me that he
7    was sorry.
8    Q.   Did you call the police or notify any sort of
9    authorities about the interaction?
10   A.   No.  I didn't call to nobody.  Because I just, I
11   didn't.  No.  I didn't call.  I didn't call.  I thought --
12   I couldn't understand why he was doing this.  He wasn't
13   like this all the time.  He was just, you know, it was
14   like some kind of madness, you know, coming on him.
15           And I was, I wanted desperately to reunite with
16   my daughter.  And he would encourage me.  Like he would
17   encourage me constantly to get her out and to bring her,
18   you know, as a family, to live together with him.
19   Q.   So despite this second event, you wanted to give him
20   another chance because you saw him as a good father
21   figure.
22   A.   Yes.  And also I was thinking that he lived in the
23   marriage with this Russian lady, his wife.  Natalia, I
24   believe.  He lived for over ten years, since '11 or '12,
25   something like that, from what he told me, his first

129

1    marriage.
2            And it was, from my point of view it was kind of
3    successful, his marriage with his wife.  And he had a kid.
4    And I saw the kid.  I saw his mother.  And I thought that
5    maybe he is, you know, maybe he is a normal person.  Maybe
6    he is a good person; like, if she lived with him for more
7    than 10 years, this Russian lady, his first wife.  So I
8    guess, you know, that's how I saw it.
9            And also his attitude with his other kids, like
10   A███.  I believed him he was concerned about her.  Like
11   he truly loved her, his daughter.  And even the kid.  I
12   think that the other one that she had, the boy, I forget
13   his name, he was sincerely concerned about them like I
14   could see from him.
15   Q.   I want to show you a few documents.
16           May I approach the witness?
17           THE COURT:  Yes.
18   BY MR. KABRAWALA:
19   Q.   I will have you turn to some exhibits here.  The
20   first exhibit I'm showing you is Exhibit No. 9.
21           Do you recognize this document, Exhibit 9?  It
22   is a one-page.  Looks like some sort of contract.
23   A.   Yes, I do.
24   Q.   Is that your signature?
25   A.   Yes.

130

1   **Q.   Is this a true and correct copy of the document that**
2   **you signed?**
3   **A.   Yes, it is.**
4            MR. KABRAWALA:  Your Honor, the government moves
5   into evidence Government Exhibit 9.
6            THE COURT:  Any objection?
7            MR. LATO:  No, your Honor.
8            THE COURT:  Government Exhibit 9 admitted.
9            (Government Exhibit 9 in evidence.)
10  BY MR. KABRAWALA:
11  **Q.   Can you describe what that document is.**
12  **A.   It is a contract that he came out with and he asked**
13  **me to sign.**
14  **Q.   And I see that it is dated, the email on which it is**
15  printed, a date from October 18, 2011.  This is at the end
16  of your stay approximately.
17  **A.   Close to the end.**
18  **Q.   Close to the end of your stay with him.  Correct?**
19  **A.   Yes.**
20  **Q.   Is it fair to say that this is some sort of,**
21  quote-unquote, contract where you are promising to
22  quote -- withdraw that.
23            Is it true that this is some sort of contract
24  where you are entering into a, quote, multiple partner
25  relationship, close quote, with Mr. Valerio?

131

1   **A.   That's what he, this is what he wrote, yes, contract.**
2   **Q.   I want to focus your attention to the last few**
3   sentences.  And I'm going to read it.  Just tell me if I'm
4   reading it correctly and then I will ask you a couple of
5   follow-up questions about it.
6            So it is the fifth line from the bottom.  It
7   reads in boldface print:
8            *"I,"* meaning you, *"always obey his commands and*
9   *provide the support for our strong partnership.*
10           *"Joseph,"* meaning Mr. Valerio, *"promises to be a*
11  *good man and a gentle man with his partner when not*
12  *engaging in consensual rough sexual intercourse which I,*
13  *Helena,* meaning you, *also enjoy.  Therefore, in balanced*
14  *harmony, Joseph will treat me as an equal when I'm obeying*
15  *him thoroughly."*  Close quote.
16           Did I read that correctly?
17  **A.   Yes.**
18  **Q.   To be clear.  The instances that you described of**
19  Mr. Valerio sexually assaulting you, did you consider that
20  to be consensual intercourse?
21  **A.   No, I don't.**
22  **Q.   Why not?**
23  **A.   First of all, during the first, you know, incident, I**
24  **was literally begging him to allow me to stay in his house**
25  **at least until I would be able to find a way to go**

132

1   **somewhere.  I was literally begging him.**
2            **At the end, you know, at the end of the sexual**
3   **assault, he would tell me -- this is, I forgot to say**
4   **it -- he would tell me after, you know, he got his**
5   **satisfaction, he got discharged, he told me this is how**
6   **you earn your additional like two days.**
7            **This I clearly, I remember what he said.  It was**
8   **kind of a, you know, how I earned, according to him, the**
9   **additional two days to stay in his place.**
10  **Q.   So just to be clear.  After the first time, in**
11  September of 2011, when he had asked you to leave, you
12  told us about that assault that took place.  And following
13  the assault, Mr. Valerio said, in effect, this is how you
14  had earned an additional two days?
15  **A.   Yes.  I remember he said that.**
16  **Q.   I notice here in this purported contract it says that**
17  you will never mention the word police in his home because
18  *he is my provider and my leader as well as my guard.*
19           This language about police?
20  **A.   Yes.**
21  **Q.   To your knowledge why is that in this purported**
22  contract?
23  **A.   I never told him, you know, I never told him that I**
24  **would openly, that I was considering the contact, the**
25  **police or whatever.  But I think that this is his**

133

1   subconscious fear.  I think that he was afraid.  He was
2   afraid.  And this is, and he wanted to, you know, secure
3   himself.  He would think that I would make because I would
4   told him that this is, you know, like; but I never openly
5   told him I'm calling the police right now.  That situation
6   never happened.  But it was in his, you know, I think he
7   was scared that I might do it.  That's why he did it.
8   **Q.   Other than the two instances that you described in**
9   the fall of 2011, were there any other instances of sexual
10  assault, nonconsensual sexual assault, that Mr. Valerio
11  perpetrated on you?
12  **A.   I left.  I left in October.  Close to end of October.**
13  **Q.   So the answer is no?**
14  **A.   No.**
15  **Q.   After you left, did you ever come back to Mr.**
16  Valerio?
17  **A.   No.**
18           **(Continued on the following page.)**

**134**

1 DIRECT EXAMINATION (Continuing)
2 BY MR. KABRAWALA:
3 Q   I want to have you jump ahead to number 13.
4       Do you recognize this two page document?
5 A   Yes.
6 Q   Is this an e-mail that Mr. Valerio sent to your
7 e-mail address?
8 A   Can I look at it?
9 Q   Pardon?
10 A   Can I read it?
11 Q   Oh please, please, take your time.
12       That is an e-mail that you received from
13 Mr. Valerio, correct?
14 A   Yes, this is.
15 Q   Is it a true and correct copy of that e-mail?
16 A   Yes, it is.
17       MR. KABRAWALA:  Your Honor, the government moves
18 Government Exhibit 13 into evidence.
19       MR. LATO:  No objection.
20       THE COURT:  Government Exhibit 13 admitted.
21       (Government Exhibit 13 in evidence.)
22 BY MR. KABRAWALA:
23 Q   I'm going to read a portion of the fourth paragraph
24 down from Mr. Valerio.
25       Quote:  I wanted to ask if you would also help

**135**

1 me with an adoption of a child from your country.  Can you
2 help me just by saying we are a couple looking to adopt.
3 I will give you a sold commission for your help, that you
4 know.
5       Can you briefly describe what is being discussed
6 here.
7 A   Yes.  He asked me, he asked me at this point to help
8 him out to adopt a child from my country.  Specifically
9 this is a request he want me to help him to adopt a child
10 from my country.  And he, like he is understanding, okay.
11 This understanding he wanted us like me and him to pose as
12 a couple in front of the -- so is thought that he could do
13 it.  He would take his chances of getting a child from my
14 country.
15 Q   Please take a look at number 14, Government 14.  And
16 this will be my last series questions.
17       I'll ask you again whether this is a true and
18 correct copy of the e-mail that got from Mr. Valerio?
19       For the record Government 14 is dated 2013/7/8.
20 So that is July 8, 2013.
21 A   Yes.
22       MR. KABRAWALA:  Your Honor, the government moves
23 Government Exhibit 14 into the record.
24       MR. LATO:  No objection.
25       THE COURT:  Government 14 is admitted.

**136**

1       (Government Exhibit 14 in evidence.)
2 BY MR. KABRAWALA:
3 Q   I'm going to read from the second paragraph on.
4       I want to be able to teach my new daughter all
5 the talents I have passed onto my son and daughter.  There
6 will be an au-pair with me as well to tend to a little
7 girl's needs.  I have a girl here now that's qualified.
8 If not her later on there will be some other qualified
9 helper or woman with me.  The won't only be for me to
10 enjoy and raise.  When I plan an action I think it
11 through.  As far as going to meet with authorities in the
12 Ukraine, that's no problem as you will accompany me there
13 posing as my girlfriend.
14       Tell us what's going on in there?
15 A   He was, there he was -- after first request to help
16 him with adoption I became concerned.  I'm saying that
17 after his second request for an adoption, specifically to
18 help him to adopt a child from Ukraine, so I became
19 extremely concerned.  Extremely concerned.  And I
20 immediately like, I responded to him.  But if you will go
21 look at my letter.  There was a response.
22       And I was trying to find out what was his plan.
23 I wanted to know what was, what he was planning to do.
24 Okay.  And he basically, he is telling me what his plan
25 is.  Like he explains to me how his plan to take the girl,

**137**

1 that um, that, this is what he says.  He will teach her
2 this and this and this.  And there will be an au-pair and
3 etcetera.  And he told me that he was going to come.  So
4 he is basically tell me what his intentions are.
5 Q   Did you help him -- withdrawn.
6       Did you ever help Mr. Valerio adopt some other
7 child from the Ukraine per his e-mail request?
8 A   No.  I sent a letter to the consulate, American
9 consulate make sure he will never adopt anyone from my
10 country or from anywhere in the world.
11 Q   Thank you.  There is nothing further.
12       THE COURT:  Okay, we'll take a ten minute break
13 before the cross.
14       (A recess was taken.)
15       (After recess the following occurred.)
16 CROSS-EXAMINATION
17 BY MR. LATO:
18 Q   Good afternoon, Ms. Kalichenko.
19 A   Good afternoon.
20 Q   I'm going to ask you questions for about 15 minutes.
21       Most of my questions will call for a yes or no
22 answer.  If you don't understand my question or can't
23 answer it yes or no, please tell me and I'll rephrase the
24 question.  Okay?
25 A   Yes.

**138**

1 Q  Do you understand me now?

2 A  **Yes.**

3 Q  Did you meet Mr. Valerio in July of 2011?

4 A  **Was the very --**

5 Q  I'm sorry. I can't hear you.

6 A  **Was the very end of June, like very end of June.**

7 Q  Did you meet him in the United States?

8 A  **Yes.**

9 Q  Was it in Long Island?

10 A  **Um, I came to New York. Which airport I don't --**

11 Q  When were you --

12 A  **In New York. It would have been, um I don't remember**

13 **which airport it was.**

14 Q  How long did you stay with Mr. Valerio?

15 A  **The first time?**

16 Q  Yes.

17 A  **The first time ten days.**

18 Q  Did you have sex with him during those ten days?

19 A  **Yes, I have.**

20 Q  Did he have a bad temper at any point within those

21 ten days?

22 A  **I know just that he would have changes in his mood,**

23 **yes.**

24 Q  And that is the first ten days you were with him you

25 already noticed that, right?

**139**

1 A  **I notice that he has --**

2 Q  Yes or no?

3 A  **Yes, I know he has.**

4 Q  Did you thereafter go back to the Ukraine?

5 A  **Yes, I went back to the Ukraine.**

6 Q  In September of the same year did you come back and

7 spend time with Mr. Valerio?

8 A  **Yes, I came back.**

9 Q  Did you want to build your relationship with him?

10 A  **Yes.**

11 Q  Did you have sex with him?

12 A  **I had sex with him, yes, at that time.**

13 Q  In September of 2011 was your daughter about one year

14 old?

15 A  **September, yes.**

16 Q  Now the second time you were with Mr. Valerio in

17 September, did he show that he had a bad temper?

18 A  **I could say that he showed more of his character.**

19 Q  Well, were there times that he was good to you and

20 times that he was bad to you?

21 A  **Kind of, yes.**

22 Q  Some days he was good Joe and bad Joe, right?

23 A  **Yes. It was, yes, yes. I never said that there was**

24 **no good part.**

25 Q  Okay, please. I just want a yes-or-no question.

**140**

1      Now is it a fair statement that Joe acted like

2 he had a dual personality?

3 A  **It's so --**

4 Q  Let me withdraw that.

5      When you testified about an hour ago, did you

6 say that Mr. Valerio had a dual personality?

7 A  **I said he has dual personality, yes. I said that he**

8 **had dual personality.**

9 Q  Now in September of 2011 did he assault you? Was he

10 forceful with you against your will?

11 A  **I just described, yes.**

12 Q  But I'm going to ask you a few more questions about

13 that.

14      Just so you know, now it's my turn to ask

15 questions. I know it's not familiar to you, but

16 Mr. Kabrawala asked you questions and now I have a chance

17 to ask you the same questions even though you may have

18 said it earlier. Okay?

19 A  **Okay.**

20 Q  Do you understand?

21 A  **Yes, I do.**

22 Q  Now the first time Mr. Valerio assaulted you, right

23 before he did that he told you to leave his house,

24 correct?

25 A  **Yes, that is what he did.**

**141**

1 Q  You begged him to stay, right?

2 A  **Yes.**

3 Q  And what he did was he ripped your clothes off,

4 right?

5 A  **First he dragged me from the kitchen to, it was a --.**

6 **And then that same room that's where he took my clothes**

7 **off.**

8 Q  And he made you crawl on the floor, right?

9 A  **Yes, he did.**

10 Q  And he slapped your behind, correct?

11 A  **Yes.**

12 Q  In fact he inserted his hand into your vagina, right?

13 A  **Yes.**

14 Q  He called you a whore, right?

15 A  **He would, he would use different insultive (sic)words**

16 **including this one.**

17 Q  Did it occur to you during this while he was doing

18 this, that maybe he wasn't the right guy for you?

19 A  **I don't think I was thinking about at this point. I**

20 **just um, are you talking about during the incident**

21 **specifically?**

22 Q  Yes. Right.

23      In other words, while he was assaulting you and

24 putting his hand inside you, did you come to the opinion

25 that maybe this is the wrong guy for me?

142

1  A   I didn't make exactly opinion.
2  Q   Please just yes or no?
3  A   I was just --
4  Q   Please.  Once again --
5      THE COURT:  Ms. Kalichenko, if you could just
6  answer the question yes or no or just tell him you can't
7  answer it yes or no.
8      THE WITNESS:  If I can answer yes or no, I just
9  have to tell him.
10     THE COURT:  You can't tell him.
11     THE WITNESS:  I can't answer this yes or no.
12 BY MR. LATO:
13 Q   Did he want you to perform oral sex on him?
14 A   Yes, he wanted.
15 Q   You did not do that at first, correct?
16 A   During that incident he forced me to do it.
17 Q   But you refused, right, you didn't want to?
18 A   I didn't want, no.  I didn't want.
19 Q   But once later you performed oral sex on your infant
20 daughter, correct?
21 A   I won't answer that.  I don't want to answer.  I
22 refuse to answer.
23 Q   You can't refuse to answer anything unless the judge
24 says so.
25 A   You want me answer yes or no, and I can't say yes or

143

1  no.
2      MR. LATO:  Your Honor, given that she is a
3  defendant, I'm going to defer to the Court what she can
4  not do, and I withdraw my question what she can and can
5  not do.
6      THE COURT:  You can't answer yes or no?
7      THE WITNESS:  I don't want to answer yes or no
8  because it wouldn't be my answer to this question.
9      THE COURT:  Okay.  I think the government will
10 concede that fact in any event based upon the evidence in
11 the case.  Right?
12     MR. KABRAWALA:  Your Honor, the videos certainly
13 speak for themselves.
14     THE COURT:  So you can stipulate to that.
15 BY MR. LATO:
16 Q   Now Mr. Valerio assaulted you a second time in a car,
17 right?
18 A   Yes, he did.
19 Q   And that time when he assaulted you it was with your
20 pantyhose still on, correct?
21 A   Yes.
22 Q   And he actually put his hand through your pantyhose
23 into your vagina, correct?
24 A   Yes.
25 Q   And it hurt, right?

144

1  A   Yes.
2  Q   Well at this point did you say, This is not the right
3  guy for me.  I should get away from this guy?
4  A   He apologized.  He said he was sorry.
5  Q   Well, it's not like he spilled coffee on you, right?
6  A   It's not.
7  Q   Right, okay.  He actually shoved his hand into your
8  vagina and said to you he was sorry after masturbating,
9  and you were okay with that?
10 A   I would prefer not to answer that question.
11 Q   I'll move on.
12     Now when you were in the United States in June,
13 July or September of 2011, did you see any other American
14 men?  I'm not asking you what happened, just whether you
15 saw them?
16 A   (Inaudible).
17 Q   You say September of 2011, did you see men other than
18 Mr. Valerio in the United States?
19 A   The person who I has to go to, and that's it.
20 Q   Well did you think maybe he was a better choice?
21 A   I wasn't looking for him for this point of view at
22 all.  I just had a place to go.
23 Q   Now even after Mr. Valerio did these things to you,
24 in the -- room and in the car, was it still your hope that
25 he would be nicer to you in the future?

145

1  A   Yes, it was still my hope, yes.  It was still my
2  hope.
3  Q   Now on or about October 18 of 2011, did you and
4  Mr. Valerio enter into a contract that has previously been
5  introduced here as Government Exhibit 9?
6  A   He drafted the contract, yeah.  It was his
7  initiation.  It came out of his mind, you know, this
8  contract, and I did sign it.  It wasn't my initiative.  I
9  just know he wanted me to sign it.  It just came from his
10 mind.
11 Q   On October 18th, 2011, did you send Mr. Valerio an
12 e-mail in which you agreed to enter into a contract with
13 him and agreed to have rough sex and do cooking with him,
14 your words?
15 A   In October 18 I sent an e-mail.  This is not what
16 happened.
17 Q   Wait, hold on.  I want to show you Defense Exhibit A
18 for identification.
19     Please tell me if you recognize it.  And use the
20 interpreter if you have trouble reading it.
21 A   Yes.  So that was out of more my words.  And the
22 other one was his words.  This was my words here.  He
23 wanted me to --
24 Q   Is Defense Exhibit A for identification an e-mail you
25 sent to Mr. Valerio, yes or no?  Did you send this to him?

146

1  **A**  I sent, I sent, but that is not how at the time.  But
2  I sent.
3          MR. LATO:  Your Honor, at this time I offer
4  Defense Exhibit A.
5          MR. KABRAWALA:  No objection.
6          THE COURT:  Defendant's Exhibit a admitted.
7          (Defense Exhibit A in evidence.)
8  BY MR. LATO:
9  **Q**  Now is it fair to say that you wrote to Mr. Valerio
10  on October 18, 2011:  I, Olena Kalichenko promise to
11  Joseph Valerio to enter into a multiple partner
12  relationship where I, as being one of his partners, agree
13  on having rough sex with him, do cooking from the
14  groceries, provided preferably in Ukrainian style, clean
15  the house, go out with him, travel together, be nice and
16  clean and affectionate things to him.  Joseph Valerio
17  being a -- is to take care her and her child.
18          Did you write that to him?
19  **A**  Yes, was that.
20  **Q**  And this is on the same day that he sent you what you
21  signed, the contract, correct?
22  **A**  I'm sorry, which same day?  I don't understand.
23  **Q**  On October 18th of 2011 you sent Mr. Valerio a signed
24  contract?
25  **A**  No, this is not what this is.

147

1  **Q**  Please.
2  **A**  But can I tell --
3  **Q**  No, you can't.
4          THE COURT:  Mr. Kabrawala can get up after he is
5  done and ask you to explain what happened.
6          THE WITNESS:  But I just can not agree.  This 24
7  is not what happened.  I don't want to agree.  This is not
8  what happened.
9          THE COURT:  If you just say, no, that is not
10  what happened.  Don't try to explain, just say, no, that
11  is not what happened.
12          THE WITNESS:  This is not what happened the way
13  he --
14          THE COURT:  Ms. Kalichenko, the question is just
15  whether or not that e-mail is the same day that you signed
16  the contract.  That is the only question.  Yes or no?
17          Was it the same day, or was it not the same day?
18          THE WITNESS:  October is, yes, it was the same
19  day.
20  BY MR. LATO:
21  **Q**  Now I'm going to show you Government Exhibit 9
22  previously introduced into evidence.
23          Is this the contract?
24  **A**  This is the contract that he made, yes.  That he
25  wanted me to sign.

148

1  **Q**  Did you sign it?
2  **A**  That is my signature.
3  **Q**  And you in this contract that you signed, agreed that
4  Joseph promises to be a good man and a gentleman with his
5  partner when not engaged in consensual rough sexual
6  intercourse, which I, Olena, also enjoy.
7          Did you put your name to that?
8  **A**  He is talking about consensual, yes.
9  **Q**  But you actually signed a document where it said you
10  enjoyed rough sex?
11  **A**  No, that is not how this happened.
12  **Q**  Now you returned, I should say in -- let me rephrase
13  it.
14          When you sent an e-mail on October 18 you were
15  already back in the Ukraine, correct?
16  **A**  No.  I was in his house.  I was in his house.
17  **Q**  When did you go back to the Ukraine?
18  **A**  I have to check with my passport history, but it
19  would be very end of October.  Not totally the day.  But I
20  have to check my passport.  But I remember this contract
21  was -- I remember, because he printed it out and I signed
22  a copy.  I remember signing the copy at his house.
23  **Q**  By December of 2011 you were back in the Ukraine,
24  correct?
25  **A**  December, yes.

149

1  **Q**  Now did you send Mr. Valerio an e-mail on December 23
2  of 2011 in which you told him that you want to move
3  forward with him and commit you, yourself and your child
4  tomorrow.
5          Did you tell him that in an e-mail?
6  **A**  Yes.  I told him this --
7  **Q**  Okay, that's it.  That is the question.  You
8  answered.
9          Now at some point he started making videos of
10  you and your daughter engaging in sexual acts, correct?
11  **A**  You mean I started to make?
12  **Q**  Yes.
13  **A**  I started to make of my own will?  That is what
14  you're saying?  I wanted to make something to me --
15  **Q**  I understand what you're saying --
16  **A**  That is what you're asking me questions --
17  **Q**  Mr. Valerio asked you to make video of you and your
18  daughter?
19  **A**  He was demanding, yes, of course.
20  **Q**  And when he demanded them, were you in the Ukraine
21  when he made the demand?
22  **A**  I was in Ukraine, yes.
23  **Q**  Mr. Valerio was in the United States, correct?
24  **A**  He was in the United States, yes.
25  **Q**  About how many videos did you make of you and your

**150**

1 daughter engaging in immoral acts, about 20 or 30?
2 **A    I told you -- different days, so, yes.**
3 **Q**    On April 29, 2012, did you send Mr. Valerio an e-mail
4 that you wanted the relationship with him to continue.
5 And I think Sophia, your infant daughter, will love you,
6 and that you, Mr. Valerio, could be a great father to her?
7 **A    When was April 29th you say?**
8 **Q**    Yes.  And if you don't remember, I'll show you a
9 document maybe it will refresh your recollection.
10          Would you like me to show you the document?
11 **A    No, that's okay.  That's okay.**
12 **Q**    Yes or no.  I'm sorry, do you want me to show it to
13 you?  Just say, no, and I'll stop walking forward.
14 **A    No, you don't have it.**
15 **Q**    Okay, so, did you send Mr. Valerio such an e-mail;
16 yes or no?  Do you remember?
17 **A    I did, yes.  But I had no visa --**
18 **Q**    Okay --
19 **A    -- my visa was being cancelled, so --**
20 **Q**    Okay.  So now, did you feel that Mr. Valerio was
21 blackmailing you?
22 **A    Yes, I felt, yes.**
23 **Q**    And the reason you felt he was blackmailing you was
24 because he threatened not to continue to send you money if
25 you ceased making videos of you and your daughter,

**151**

1 correct?
2 **A    That's not how he exactly was saying.  I wouldn't say**
3 **that.  I wouldn't say that.**
4 **Q**    Well, did you ever try to negotiate with Mr. Valerio?
5          You know what the word, negotiate, means?  I
6 don't know if the translator -- well, could you please
7 translate that?
8 **A    I know what the word is.**
9 **Q**    I just wasn't sure.
10          Did you ever negotiate with Mr. Valerio?
11 **A    Negotiate what?**
12 **Q**    Well, on anything?  I'll get to what if you say, yes.
13 **A    It's not, it's how you mean the word, okay?  I will**
14 **say, yes, okay, I would say yes, uh-huh.**
15 **Q**    In fact in December of 2013, did you tell Mr. Valerio
16 that if he didn't give you, or continue to give you money,
17 you were going to report him to the police?
18 **A    No, I didn't say that.  This I didn't say that, no,**
19 **didn't say that.  I didn't say if you don't give me I'm**
20 **going to.  That's not what I said.  I never said that.**
21 **Q**    Well specifically, on December 30, 2013, did you
22 actually send Mr. Valerio what is called a viber message
23 in which you said, You know, you are really damned.  You
24 could have negotiated with me before the criminal case
25 against you was being opened.

**152**

1          Do you remember sending him that message?
2 **A    I remember the conversation and the content of the**
3 **conversation.  I remember.**
4 **Q**    You actually sent that to him, right?
5 **A    I sent, yes.  I remember the conversation.**
6 **Q**    Now on December 11 of 2013, you also sent him a viber
7 message in which you stated; Joseph, I now have eight
8 different video I made for you, not counting the one sent
9 through G H L.  FBI is asking me every single day, either
10 I'm sending them additional evidence to them.  I don't
11 think you really understand how serious a matter it is.
12 I'm asking you for the last time, would you like me to
13 provide the police everything I have, or would you like to
14 negotiate?
15          Did you send him that message?
16 **A    When did it happen, which date?**
17 **Q**    December 11th?
18 **A    And when did I leave the --**
19 **Q**    I'm not here to answer your questions.  My question
20 to you is.  Did you send him that message.
21          If you're not sure, I'll show you something that
22 might refresh your recollection.
23 **A    I remember the conversation, yes.**
24 **Q**    But you were attempting to negotiate with him, is it
25 a fair statement?  You wanted him to send you more money,

**153**

1 correct?
2 **A    I wouldn't say it this way.  If you go further in**
3 **this conversation there are also statements which can also**
4 **be included --**
5 **Q**    Were you asking him to negotiate?  You were looking
6 for something from him?
7 **A    I was.  I was.  And I told him openly that I would,**
8 **that I plan to file this case for damages because of my**
9 **daughter, the damages that he cost.  And I told him the**
10 **same conversation, that I'm hiring a lawyer specifically**
11 **to file a civil lawsuit against him.  This is included in**
12 **the conversation.  I told him openly.**
13 **Q**    Did you want money from him; yes or no?
14 **A    I didn't --**
15 **Q**    Excuse me.  Yes or no?  Did you want money from him?
16 **A    From behalf of my daughter, yes, I believe she is**
17 **entitled to.**
18 **Q**    So what you were telling Mr. Valerio in these
19 messages, you wanted to negotiate, send money on behalf of
20 my daughter or I'm going to the FBI and turning you in.
21          That's what you were doing, right?
22 **A    First of all --**
23 **Q**    Yes or no, or I can't answer yes or no.  Those are
24 the only choices.
25 **A    No.  No.**

**154**

1      MR. LATO:  Just a couple of more questions, your
2  Honor.
3  **Q**   Do you remember being arrested by Special Agent Troyd
4  and Special Agent Messineo in this country at the airport?
5  **A**   I do.
6  **Q**   When they arrested you did you tell them, well let me
7  go back?  Did you speak to them?
8  **A**   Yes, I spoke to them, yes.
9  **Q**   How long did you speak to them?  Say a half hour?
10  **A**   Maybe a little bit more at the office, close to an
11  **hour.**
12  **Q**   At any time during your conversation with Special
13  Agent Troyd and Special Agent Messineo did you say to them
14  that Mr. Valerio had sexually or otherwise assaulted you
15  in 2011; yes or no?  Did you tell them that?
16  **A**   They never asked me.
17  **Q**   Did you volunteer it?
18  **A**   No, I didn't tell.  I don't know.  I would say I
19  **don't remember, but I think, no.  I don't remember.  I**
20  **don't know if I told them.  I don't remember, seriously,**
21  **if I told them.  I remember I told some agent at one**
22  **point, but to them I don't remember, honestly.**
23      MR. LATO:  One moment, your Honor, I just want
24  to make sure.
25      (There was a pause in the proceedings.)

**155**

1  BY MR. LATO:
2  **Q**   Ms. Kalichenko, you realize you're facing a mandatory
3  minimum of 15 years imprisonment?
4  **A**   I do.
5  **Q**   You hope for leniency?
6  **A**   Excuse me?
7  **Q**   Are you hoping for leniency from the judge?
8  **A**   What does that mean?
9  **Q**   Are you hoping to get as little time as possible?
10  **A**   No, I'm not.
11  **Q**   You're hoping to get as much time in jail as
12  possible?
13  **A**   What?  I don't --
14  **Q**   Maybe you don't understand me.
15      Are you trying to get the lowest sentence
16  possible?
17  **A**   No, I'm not.  It's just a request from the judge was
18  **surprising from me.  I didn't ask for him to ask me --**
19  **Q**   About an hour ago did you tell Mr. Kabrawala that you
20  were hoping for leniency?
21  **A**   Excuse me?
22  **Q**   About an hour ago when you testified, when
23  Mr. Kabrawala was asking you questions, did you say you
24  were hoping for leniency?
25  **A**   He asked me if I had any agreement with them, if they

**156**

1  promise me anything.  And I said that they never promised
2  me.
3  **Q**   Did he also ask you whether you were hoping for
4  leniency, and did you answer, yes?
5      Maybe you don't remember.
6  **A**   I don't remember if he asked me for that.
7      MR. LATO:  Nothing further.
8      THE COURT:  Redirect?
9      MR. KABRAWALA:  No, your Honor.
10      THE COURT:  Step down, Ms. Kalichenko.
11      Did you discuss a potential date to continue the
12  hearing?
13      MR. KABRAWALA:  We did, judge.
14      We have the other foreign national witnesses'
15  availability.  We have also spoken with defense counsel
16  and we're proposing September 26th, that week if it's
17  clear.  It appears to work for everyone.
18      MR. LATO:  Your Honor, it may not work for you,
19  but those dates can change.
20      MR. KABRAWALA:  And also I want to say I haven't
21  been able to connect with a witness.  But the witness did
22  provide me with her schedule before today.  And I'm going
23  from that schedule presuming nothing has changed in the
24  intervening few days.
25      THE COURT:  The 26th then?

**157**

1      MR. LATO:  Thank you, your Honor.
2      THE COURT:  And again, as I said previously,
3  that was the hearing date.  And we'll set a sentencing
4  date on the 26th.
5      Okay, thank you.
6      (The proceedings were concluded at 4:24 p.m.)

1

2               I N D E X

3    **LUCY DOWN**
     DIRECT EXAMINATION                        7
4      BY MR. KABRAWALA
     CROSS-EXAMINATION                         27
5      BY MR. LaPINTA
     REDIRECT EXAMINATION                      53
6      BY MR. KABRAWALA

7    **JOLENE LEONARDO**
     DIRECT EXAMINATION                        58
8      BY MR. KABRAWALA
     CROSS-EXAMINATION                         74
9      BY MR. LaPINTA
     REDIRECT EXAMINATION                      89
10     BY MR. KABRAWALA

11   **OLENA KALICHENKO**
     DIRECT EXAMINATION                        93
12     BY MR. KABRAWALA
     CROSS-EXAMINATION                         137
13     BY MR. LATO

14

15              E X H I B I T S

     Government Exhibit 13 in evidence        134
16   Government Exhibit 14 in evidence        136
     Defense Exhibit A in evidence            146
17   Government Exhibit 9 in evidence         130
     Government Exhibit 5A in evidence        13
18   Government Exhibit 5 in evidence         54
     Government Exhibit 5 in evidence         64
19   Government Exhibit 6 in evidence         65

20

21

22

23

24

25