# 17-2371-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JOSEPH VALERIO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX
## Volume 2 of 2 (Pages A228 to A407)

LOUIS M. FREEMAN
FREEMAN, NOOTER & GINSBERG
*Attorneys for Defendant-Appellant*
75 Maiden Lane, Suite 503
New York, New York 10038
(212) 608-0808

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Superseding Indictment, filed April 9, 2014.............. A-21

Letter from Leonard Lato to the Honorable Joseph
    F. Bianco, dated July 1, 2014................................. A-41

    Attached to Letter -
    Handwritten Statement of Joseph Valerio, dated
    June 22, 2014 ........................................................ A-44

Transcript of Proceedings held before the
    Honorable Joseph F. Bianco, dated July 31, 2014 . A-46

    Exhibits to Transcript –
    (i) Advice of Right ............................................. A-116

    (ii) E-mail from Joseph Valerio, dated
    July 17, 2012 ....................................................... A-117

    (iii) E-mail from Joseph Valerio, dated
    July 22, 2012 ....................................................... A-119

    (iv) Photograph of Dining Room ....................... A-121

Transcript of Proceedings held before the
    Honorable Joseph F. Bianco, dated
    September 3, 2014 ................................................ A-122

Excerpt from Transcript of Proceedings held before
    the Honorable Joseph F. Bianco, dated
    November 10, 2014 ............................................... A-141

Superseding Indictment, filed November 12, 2014 ... A-146

Excerpt from Transcript of Proceedings held before
    the Honorable Joseph F. Bianco, dated
    November 12, 2014 ............................................... A-160

ii

**Page**

Excerpt from Transcript of Proceedings held before
    the Honorable Joseph F. Bianco, dated
    November 13, 2014 ................................................ A-170

Letter from Leonard Lato to the Honorable Joseph
    F. Bianco, dated November 27, 2014.................... A-172

Memorandum and Order of the Honorable Joseph F.
    Bianco, dated April 15, 2016 ................................ A-173

Transcript of Proceedings held before the
    Honorable Joseph F. Bianco, dated July 25, 2016 . A-187

Transcript of Proceedings held before the
    Honorable Joseph F. Bianco, dated
    September 26, 2016 ................................................ A-228

Transcript of Proceedings held before the
    Honorable Joseph F. Bianco, dated
    March 6, 2017........................................................ A-259

Sentencing Memorandum, entered April 25, 2017
    (omitted herein)

    Exhibit 1 to Sentencing Memorandum -
    Forensic-Psychiatric Evaluation of Joseph
    Valerio, dated December 7, 2016.......................... A-333

Transcript of Proceedings held before the
    Honorable Joseph F. Bianco, dated
    June 6, 2017 .......................................................... A-349

Notice of Appeal, dated August 1, 2017 ................... A-407

A-228

**The redactions herein are consistent with the order of the District Court requesting that children's names be redacted as well as the name of the woman from South Africa who testified at the Fatico hearing.**

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
    ----------------------------X
 3
    UNITED STATES OF AMERICA,           CR 14-0094
 4

 5        -against-
                                        U.S. Courthouse
 6                                      Central Islip, NY

    JOSEPH VALERIO,
 7                                      September 26, 2016
         Defendant.                     1:45 p.m.
 8
    ----------------------------X
 9

10                  TRANSCRIPT OF FATICO HEARING
              BEFORE THE HONORABLE JOSEPH F. BIANCO
11                 UNITED STATES DISTRICT JUDGE

12
    APPEARANCES:
13
    For the Government:        ROBERT L. CAPERS
14                             United States Attorney
                               100 Federal Plaza
15                             Central Islip, NY 11722
                               By:  AMEET KABRAWALA, ESQ.
16                                   ALLEN BODE, ESQ.
                                     Assistant U.S. Attorneys
17
    For the Defendant:         LEONARD LATO, ESQ.
18                             ANTHONY LAPINTA, ESQ.

19

20  Court Reporter:           Owen M. Wicker, RPR
                               100 Federal Plaza
21                             Central Islip, NY 11722
                                 (631) 712-6102
22

23

24  Proceedings recorded by mechanical stenography; transcript
    produced by computer transcription.
25
```

**2**

1          (Case called.)
2          MR. KABRAWALA:  Good afternoon, Judge, Ameet
3  Kabrawala and Allen Bode for the United States.
4          THE COURT:  Good afternoon.
5          MR. LATO:  Leonard Lato and Anthony LaPinta for
6  Mr. Valerio.
7          THE COURT:  Good afternoon.
8          We scheduled this as a continuation of the
9  Fatico hearing, so are we ready to proceed.
10         MR. KABRAWALA:  Yes, your Honor.  The government
11 has one witness who is here.
12         THE COURT:  I apologize we moved the time from
13 the trial that went over from last week so I appreciate
14 everybody changing their schedule.
15         Who are you calling?
16         MR. KABRAWALA:  The witness' name is A███
17 D███, D███████ and she is entering the courtroom
18 now.
19         MR. LATO:  Your Honor, just in terms of your
20 Honor's schedule, Mr. Kabrawala tells me he will be about
21 an hour.  I figure I will be about a half hour, no more
22 than that.  If we can have ten minutes between the direct
23 and cross so I can confer with Mr. Valerio?
24         THE COURT:  Absolutely.
25         THE CLERK:  Please remain standing and raise

**3**

D███ - Direct/Kabrawala

1  your right hand.
2  A█████████, D███████,
3          called as a witness, having been first
4          duly sworn, was examined and testified
5          as follows:
6          THE WITNESS:  A█████, A████████
7  D███, D███████.
8          THE COURT:  You may be seated.  If you can pull
9  your chair up.
10         Go ahead, Mr. Kabrawala.
11         MR. KABRAWALA:  Thank you, Judge.
12 DIRECT EXAMINATION
13 BY MR. KABRAWALA:
14 Q   Good afternoon.
15 A   **Good afternoon.**
16 Q   Where are you from?
17 A   **Johannesburg in South Africa.**
18 Q   Are you lived there your entire life?
19 A   **Born and raised there.**
20 Q   When were you born?
21 A   **In 1979.**
22 Q   Did you receive a subpoena to testify here today?
23 A   **Yes, I did.**
24 Q   Did you travel here with anyone?
25 A   **No, my children are at home.**

D███ - Direct/Kabrawala

**4**

1  Q   How many children do you have?
2  A   **I've got two.  I have a son who is nine years old and**
3  **a daughter seven.**
4  Q   What are their names?
5  A   **L███, and daughter is A███.**
6  Q   Can you briefly describe your eduational background?
7  A   **I studied finance in 2000 while I got my degree in**
8  **2000.  It's called E.comm.  And I've done a number of**
9  **other courses but I got it.**
10 Q   The spelling of it is E.comm?
11 A   **Yes.**
12 Q   It's Doctoral in Commerce?
13 A   **Yes.**
14 Q   You got that around 2000?
15 A   **Correct.**
16 Q   Have you ever been to the United States before?
17 A   **Yes, I've made a number of trips.**
18 Q   How many times have you been in the United States?
19 A   **I've been here now five times, five trips.**
20 Q   Can you please tell us approximately the month and
21 years you've been in the United States starting with your
22 first trip to the U.S.?
23 A   **The first time I came here was in February of 2008.**
24 **I stayed around about the end of May of '08.  Then I went**
25 **home to visit my mother for a couple weeks and I returned**

D███ - Direct/Kabrawala

**5**

1  **again the end of June, somewhere there, stayed until**
2  **around about October-November and I went home to visit my**
3  **family.  Then I came back.  I think it was shortly before**
4  **Christmas, if I remember correctly.**
5          **And the last time I left I actually stayed for**
6  **an extended period.  I overstated my permitted stay and**
7  **left in March of 2010.**
8  Q   So generally speaking, approximately you were here
9  from February of '08 until May of '08, and then from June
10 of '08 until approximate October, November of '08, and you
11 came back in -- toward the end of the year in 2009 and
12 stayed about 14 months until March of 2010?
13 A   **Correct.**
14 Q   That just give us some bookends in terms of your
15 prior stays here.
16         Now on all occasions that you visited the United
17 States, did you come to Long Island, New York?
18 A   **Yes, I did.**
19         **When I first stayed here, I moved into a home in**
20 **Water Mill that Joseph owned and I stayed there for my**
21 **first trip.**
22         **When I came back on my second trip I stayed for**
23 **a couple of weeks in the house in Smithtown and that's**
24 **where I was staying.**
25 Q   Are you referring to Joseph Valerio when you say

D███████ - Direct/Kabrawala

6

1 "Joseph"?
2 **A   Yes.**
3 **Q**   Do you see Mr. Valerio in the courtroom today?
4 **A   Yes, I do.**
5 **Q**   Could you please identify Mr. Valerio by pointing him
6 out and describing an article of clothing he's wearing?
7 **A   A khaki green shirt.**
8 **Q**   A khaki green shirt.
9        MR. KABRAWALA:  May the record reflect the
10 witness has identified Mr. Valerio.
11       THE COURT:  Yes.
12 **Q**   Can you please tell us how you came to know
13 Mr. Valerio?
14 **A   I met Joseph on line on a dating website called**
15 **christiansingles.com.**
16 **Q**   Around when was that?
17 **A   Around about July or August of '07 and I was seven**
18 **months pregnant with my son at the time.**
19       **We started communicating on line and he gave me**
20 **his personal e-mail address and started to communicate**
21 **through private e-mail, and he used to phone me.  And this**
22 **continued for some time.**
23       **Around about when my son was 3 months old, he**
24 **asked me to come to the United States.**
25 **Q**   When, is it fair to say, you were developing a

D███████ - Direct/Kabrawala

7

1 romantic relation with Mr. Valerio and on the phone?
2 **A   Yes.**
3 **Q**   This was around 2007?
4 **A   Correct.**
5 **Q**   At some point you two decided to meet?
6 **A   In February of '08, I came to the United States for**
7 **the first time and that's when I met him in person for the**
8 **first time.**
9 **Q**   When he collected you at the airport?
10 **A   Yes.**
11 **Q**   By the way, who paid for your plane ticket?
12 **A   Joe did.**
13 **Q**   Did you have a child at this point?
14 **A   I had my son who was about three or four months old**
15 **at the time because he was born in October, so I brought**
16 **him with me.**
17 **Q**   That was your first time in the United States?
18 **A   Yes.**
19 **Q**   You said that you lived in Water Mill?
20 **A   Yes, when he fetched me from the airport he took me**
21 **to his home in Water Mill and I was thrilled to be here.**
22       **He treated me very well.  He greeted me with a**
23 **beautiful bouquet of roses, went to the home, enormous box**
24 **of chocolates, brought a beautiful gift to my son and made**
25 **me feel very welcome and pleased that I was here, and I**

D███████ - Direct/Kabrawala

8

1 looked forward to develop the relationship.
2 **Q**   Tell us how the relationship progressed in the first
3 few months?
4 **A   In the beginning it was really good, had a lot of**
5 **fun, treated me very, very well, and then he started to**
6 **become a little angry.  If he had a bad day, and that**
7 **became two bads days in the week.  The bad week would come**
8 **a bad month.  And his frustrations and anger became a**
9 **regular occasion.**
10      **I was downstairs and I put my son in for a nap**
11 **and I wet to fetch him a bottle of formula and he tripped**
12 **me and started to laugh, and said to me you should be less**
13 **clumsy.  It was a little bit of affront because I knew it**
14 **was deliberate.  I didn't know how to respond.  That was**
15 **the first incident that I recalled.**
16      **After that I remember an incident where we've**
17 **been to the beach for the morning and we came back and**
18 **preparing lunch.  Joe had been preparing something, I was**
19 **preparing something, and I thanked him for the trip, and I**
20 **said I enjoyed my day and he said he didn't like my**
21 **response the way I thanked him and I couldn't understand**
22 **what he met but he became very angry.**
23      **I remember he became quite irate and he through**
24 **me down to the kitchen floor and started choking me and**
25 **hitting me and I screamed.**

D███████ - Direct/Kabrawala

9

1      **I remember hearing a teenaged boy next door,**
2 **mom, there's a woman screaming.  And I don't know if it**
3 **was a neighbor, but I heard Joe saying something to them**
4 **and they left.  And I just stayed in the room for the rest**
5 **of the morning --**
6        MR. KABRAWALA:  I'm sorry for cutting you off.
7 **Q**   How did Mr. Valerio behave toward L███, your son?
8 **A   He treated him very well in the beginning, very**
9 **loving, affectionate and I felt good about that.**
10      **He treated him well.  He did everything that**
11 **L███ needed.  He would buy him a walking ring, buy him all**
12 **things that children need, gifts, things like that, and**
13 **treated him very well in the beginning.**
14 **Q**   Did that continue?
15 **A   No.  As the relationship went on he made me feel my**
16 **son was a burden, didn't want him around.  I felt that he**
17 **began to resent him.**
18 **Q**   What did Mr. Valerio say to you about your son?
19 **A   Well, there was a time I remember when my son was**
20 **crying because he was an infant and Joe would say he**
21 **didn't sign up for this and if L███ continued to cry maybe**
22 **he should be locked in the basement.  Things like that**
23 **really upset me a lot.**
24      **If I used my son and gave him a lot of affection**
25 **-- no, you are coddling, he is a boy, he needs to**

▮ - Direct/Kabrawala

10

1 toughen up.
2 Q    Did Mr. Valerio tell you about any other women he was
3 involved with or was involved in his life?
4 A    When I started to communicate with on line, he told
5 me about his cousin's daughter by the name of Valeria.
6 The way he spoke about her, he talked about her like she
7 was any other family member.
8        Then as time went on, after I met Joe and I was
9 living with him, I saw that his affections towards her
10 were just more than family and he spoke about her, how
11 wonderful she was, why I should be more like her.  I was
12 never good enough, and he always used to compare
13 everything I did, everything I said, the way I dressed,
14 always compared to her and told me how she was the love of
15 his life and he was the woman he really wanted to be with.
16 Q    During the first few months at Mr. Valerio's Water
17 Mill home, did you come to meet any of his family members?
18 A    Yes, when my son was six months old, we decided to
19 meet his parents and I was staying at the Water Mill home
20 because Joseph had a 12 or 13-year old son at the time and
21 because he would been recently divorced, he didn't want to
22 upset his son by introducing a new woman and son into his
23 in-laws, and I respected that, and I thought that was
24 fair.
25        By then when my son was six months old we

▮ - Direct/Kabrawala

11

1 thought it was a good idea to meet his parents.  I was
2 uncomfortable with the situation that he didn't want his
3 parents to know that my son wasn't his son, and he wanted
4 to introduce myself to his parents as his child, as a
5 newborn child, but my child was six months old at the
6 time, he was a big child, so this didn't make any sense to
7 me and I knew it wasn't believable.
8        I wouldn't confront him about it.  I didn't
9 understand the feelings, just leave it, and surely the
10 truth will come out.
11        So at that point I went to meet his parents, his
12 mother, father and sister and sister's husband at the
13 house in Massapequa.
14 Q    You introduced L▮ as your child with Mr. Valerio?
15 A    He introduced L▮ as his son.
16 Q    Now, during your first trip -- withdrawn.
17        At any time after you met Mr. Valerio's family,
18 did you tell them about Mr. Valerio's mistreatment of you?
19 A    No, never.
20 Q    Why not?
21 A    In the beginning I felt that it was perhaps something
22 that would disappear, perhaps I could do something more or
23 do something better or change something to make the
24 relationship better.  I thought I could fix it.  I thought
25 it was something that would be mended somehow, and I

▮ - Direct/Kabrawala

12

1 didn't want anyone to be upset about the things that
2 happened and create unnecessary issues.
3 Q    You mentioned earlier you left the United States in
4 approximately May of 2008.  Did you go back home to South
5 Africa?
6 A    Yes, I was missing my mother very much and I knew
7 because my son was so young and the children grow up
8 quickly, she would want to see my son again.  So I asked
9 Joe if I could please visit my mother.
10        During that time in May he had mentioned that he
11 was involved in some kind of fashion show, I don't know if
12 he had arranged it or he was just involved, but he was
13 doing something with it and he asked me to be a part of
14 it, but the details that he gave about it made me
15 extremely uncomfortable and I thought it was a good
16 opportunity for me before this fashion show so I wouldn't
17 have to do anything about it.  And he had told me that
18 there were people that designed a dress, a particular
19 dress they wanted me to wear and he started to tell me how
20 in the back room we would be wearing nothing but panty
21 hose and the girl would feed me a glass of champagne and
22 somebody would slip a finger inside me, and I thought I
23 would with be very uncomfortable and it would be a good
24 time to visit my mother so he could go to the fashion show
25 without me.

▮ - Direct/Kabrawala

13

1 Q    Did you return -- withdrawn.  How long approximately
2 did you spend in South Africa on that return?
3 A    It was a couple weeks.  I remember leaving around
4 about the end of May, I think, and I think it was four or
5 six weeks that I came back.
6 Q    When you came back, who picked you up at the airport?
7 A    Joseph came to fetch me the airport.
8 Q    What was that reunion like?
9 A    I came with two suitcases and my child and my
10 stroller and my hands were quite full.  There was a
11 gentleman at the airport who very kindly offered his help
12 and asked if he could take my bags so I could carry my son
13 and I was very grateful for the help.  And I walked
14 through and I met Joseph in the waiting area and he hugged
15 me and he greeted me and he was happy to see us and then
16 he was surprised I didn't have my bags with me and he
17 asked me where is my bags?
18        I turned around and pointed to the gentleman
19 behind me.  I said this gentleman is helping me with my
20 bags and Joe suddenly became angry and dragged the bag
21 from the man and stormed off and I apologized to the
22 gentleman, and Joe didn't speak to me the rest of the way
23 in the car and he was angry.
24        I was concerned about what would happen when we
25 got home and we were travelling on our way back to Water

**D█████ - Direct/Kabrawala**

14

1  Mill where I would be staying for a further few weeks.
2        When he got to the house he told me to go
3  upstairs. I said I'm putting my son down for a nap. I
4  went to put h███ in his crib and gave him formula in the
5  kitchen and he when to sleep, and after I put him down I
6  did come back downstairs and Joe was waiting for me in the
7  lounge.
8        He grabbed me and he pushed me down on to a
9  suede couch that he had in the lounge and pushed my face
10 down in the pillow and started ripping my clothes off.
11 Oh, you like attention? I'll show you who is in charge.
12 He very aggressively had his way with me and he tore my
13 clothes and when he was done with me he got up and walked
14 away and he left me there. I gathered my clothes and I
15 was crying.
16        I had taken a shower. I didn't know how to
17 react, how to confront him, what to do. Got dressed and
18 went into the room.
19        MR. KABRAWALA: May I approach the witness to
20 give her some water?
21        THE COURT: Yes.
22 Q  Did you tell anyone about this incident?
23 A  Excuse me?
24 Q  Did you tell anyone about this incident?
25 A  No.

**Davidse - Direct/Kabrawala**

15

1  Q  Why not?
2  A  For someone like me, I feel that I was concerned
3  about what people would think, my family or my friend or
4  somebody because I'm supposed to be an educated woman who
5  should know better. If someone treats me badly, why
6  wouldn't I leave, and I was embarrassed. I felt
7  embarrassed that I didn't make a proper decision, but I
8  also didn't know what else to do.
9        There's some things I can't explain, but I was
10 ashamed to tell people what was happening to me. I didn't
11 want them to think badly of me or how could she let this
12 happen? Why doesn't she leave? I thought nobody would
13 understand.
14 Q  I want to show you what has been marked as
15 Government's Exhibit 3-A, and I'll bring you the original
16 and I'll put on the overhead projector a copy of it.
17        THE COURT: Hold on a second. Any objection to
18 this?
19        MR. LATO: Oh, no, your Honor.
20        THE COURT: 3-A is admitted.
21        (Whereupon, Government Exhibit 3-A was received
22 in evidence.)
23 Q  Showing you what is in evidence as 3-Alpha, do you
24 recognize that document?
25 A  Yes, I do.

**D█████ - Direct/Kabrawala**

16

1  Q  What is that piece of paper?
2  A  It's a note that was left on my computer keyboard one
3  afternoon. He had gone grocery shopping and he came back
4  and I helped him take the groceries out of the car. I
5  don't recall what he said to me or what it was about, and
6  we had an argument, and the neighbors were in their front
7  door because the back door faces onto the neighbor's front
8  garden.
9        That afternoon or shortly thereafter, I went
10 downstairs to the computer and I found this note left on
11 the keyboard for me.
12        MR. LATO: Your Honor, may I just have one
13 moment, please.
14        THE COURT: Yes.
15 Q  Do you have an approximate time frame when this note
16 was left for you?
17 A  I can't remember the exact date.
18 Q  Was this at Water Mill or Smithtown?
19 A  Smithtown.
20 Q  At some point as you described earlier you moved from
21 the Water Mill residence to the Smithtown house?
22 A  Yes, I remember it was around about his son's
23 birthday. He felt it was a good time to introduce me to
24 his son and that was a good time for me to move into the
25 Smithtown house, around then.

**Davidse - Direct/Kabrawala**

17

1  Q  This was on your second trip?
2  A  Second trip, yes.
3  Q  Now did this note influence your decision whether or
4  not to talk to neighbors about what had been happening to
5  you?
6  A  I didn't want to tell anybody what was going on. I
7  was embarrassed. I didn't know how to tell people, didn't
8  know what to say. I didn't think anyone would think well
9  of it.
10 Q  Now, at some point during your second visit to Long
11 Island, did you become pregnant with Mr. Valerio's child?
12 A  Yes. Around about July 2008, I think it was, I fell
13 pregnant with my daughter A███████
14 Q  Did you tell Mr. Valerio that you were pregnant?
15 A  Yes, I did.
16 Q  At some point during your second trip, did you tell
17 Mr. Valerio that you intended to return to South Africa?
18 A  Yes, I had asked him if I could please go see my
19 mother again and he began to complain: I didn't want to
20 spend the money, and if I was missing my family it was my
21 tough luck. I just had to deal with it.
22 Q  Did you ultimately get Mr. Valerio's permission to go
23 to South Africa?
24 A  Yes, eventually he agreed. He said to me I could go
25 but he made it very clear to me if I did not come back he

A-233

D███████ - Direct/Kabrawala

18

1 was going to fetch me, send somebody after me and he would
2 do me in, and I had to make sure that I was going to come
3 back or he was going to hurt me.
4 Q   Did you believe that to be true?
5 A   I did, yes.
6 Q   So you returned to South Africa in I think you
7 testified October, November of 2009, thereabouts?
8 A   Yes.
9 Q   And you came back shortly thereafter.  Was it before
10 or after Christmas in '08?
11 A   If I remember correctly, I think it was before
12 Christmas.  I know I did give specific dates to the
13 authorities because it was in my passport, but it was
14 around about then.
15 Q   How long were you permitted to return to the United
16 States for?
17 A   I would say six months at a time, even though my visa
18 was valid for ten years, unfortunately the situation was
19 such that when I gave birth to my daughter in April of
20 '09, Joe refused to let me leave the country and I wasn't
21 going to leave my daughter behind, and I knew that if I
22 had stayed or overstated my permitted stay it was going to
23 cause penalties to me to not be aloud to come back.
24       But as much as I fought with Joe to please let
25 me leave he wouldn't.

D███████ - Direct/Kabrawala

19

1 Q   I want to go back to the third time you came to the
2 United States.  Presumably you were pregnant?
3 A   Yes.
4 Q   And then did you bring your son L████ with you at the
5 time?
6 A   Yes, I did.  There was a period in time, I can't
7 recall the exact date where I actually asked my mother to
8 please come and fetch my son.  I didn't tell her what was
9 going on but I think she knew and she didn't want to ask,
10 but I asked her to please come and fetch my son.  I didn't
11 tell her this, but I felt it necessitated to have him in a
12 safe place and I didn't feel he was safe in Joe's home
13 with a lot of the things that was happening to me.
14       There was oftentimes Joe was teasing me and my
15 son was in the room and I didn't want my son around that.
16 My mother came to fetch my son and he stayed with her for
17 a couple months until a period thereafter.  My mother
18 wasn't coping, so she had to bring him back.
19 Q   While you were pregnant in Long Island, how did
20 Mr. Valerio treat you?
21 A   I found during my pregnancy the abuse got worse.  He
22 would say things to me like why don't you get an abortion,
23 or why don't you fall downstairs and die.
24       And during my pregnancy I remember two
25 incidents.  One was when I was seven months pregnant where

D███████ - Direct/Kabrawala

20

1 he was sleeping in the spare room because I wasn't having
2 sex with him and that frustrated him and he came into the
3 room one night and the ripped covers off and started to
4 scream obscenities and went back to the spare room.  So I
5 followed him to try to speak with him.  I got back into
6 the room, and I don't recall what was said, but he got up
7 and slapped me across the face I fell to the floor and I
8 split the inside of my lip open and I ran back and got
9 back to the room.
10       There was an incident a month thereafter where I
11 was sleeping and he came into the room and he just climbed
12 on top of me and tried to force me to have sex with him
13 and I asked him to stop and I was crying, was telling him
14 to please stop and he had his hand on my throat choking me
15 and started punching me and hitting me.  I told him to
16 stop and eventually he stopped and got off me and left the
17 room.  I didn't know what to do about that.  I was scared.
18 So I just stayed in the room.
19 Q   You gave birth to A████ about a month later?
20 A   Yes, in April of '09.
21 Q   After A████ was born, did Mr. Valerio's treatment get
22 any better?
23       Did he treat you better?
24 A   Not at all, no.
25       I remember there was a time when I was laying in

D███████ - Direct/Kabrawala

21

1 bed with A████ in my arms and Joseph came into the room
2 and there was a bassinet next to the bed.  When I saw him
3 coming for me my first instinct was to put my child out of
4 the way not to get her hurt.  Joe jumps on top of me and
5 started to bang my head against the headboard and hit me
6 in the head and tried to rape me, telling me I must open
7 my legs.
8       And when I was breast feeding my child in the
9 lounge one evening, he always made it very clear to me
10 from the beginning, before A████ was born, he said to me
11 you will bottle feed the child; you will not breast feed.
12 I said no, I believe that breast feeding is best for the
13 child, but he was very averse to it.  He didn't want me to
14 breast feed my child, but I did.
15 Q   Did he say why?
16 A   No.
17 Q   Did you have an understanding as to why?
18 A   Not really.  I felt that perhaps he was jealous of me
19 giving that kind of attention to my child, but as a mother
20 I feel it is necessary and I'll do what is best for my
21 child.
22       I remember one evening I was sitting on the
23 couch in the lounge breast feeding my daughter and he was
24 sitting in the chair next to me and he had a coke can in
25 his hand and he had a very angry look in his eye.  For no

D█████ - Direct/Kabrawala

22

1  reason he stood up and threw the coke can in my head which
2  was still full and it splashed all over the wall and
3  splashed over me, so I ducked and it didn't hit my head
4  but the wall behind me. He picked it up and he threw it
5  back again and it made a big dent in the wall, saying he
6  didn't sign up for this and he stormed upstairs into his
7  office and he stayed there.
8  Q   Other than what you've described -- withdrawn.
9       That summer, a few months after A████ was born,
10 did Mr. Valerio's mistreatment of you continue?
11 A   Yes, it did. There were many, many incidents. There
12 are only some that I can recall in more detail than
13 others.
14      I remember that he had taken his son to karate
15 one evening and A███ was at home with me and I was in the
16 kitchen when he came home and he started to argue with me
17 about me wanting to go home and see my mother. And so I
18 went and put A███ down and I went downstairs to the
19 computer because I thought there must be a way for me to
20 get out of this, there must be a way for me to leave, and
21 he followed me downstairs. As I sat down, he pulled the
22 chair under me and I fell out on the floor and he tried to
23 grab me. I figured he would hurt me. He took me up the
24 stairs and I was trying to get away, and I did.
25      I went upstairs to the office and I grabbed one

D█████ - Direct/Kabrawala

23

1  of the house phones and as I was running down the passage,
2  he grabbed the phone out of my hand. I don't know if the
3  phone fell apart or broke. I remember the pieces came
4  out, the battery fell out.
5       I was trying to call 911. The call didn't go
6  through.
7       I ran into the bedroom. And then he didn't
8  follow me, except shortly thereafter he saw me coming in
9  the room and saw me packing my suitcase. He saw I was
10 packing my bag. He came to apologize. He said he was
11 very sorry, he didn't mean it. He wants me to stay. If I
12 want to go, I can go. And then there was a knock on the
13 door.
14      I went downstairs to answer and I thought it was
15 the police. I realized the 911 call went through, even
16 though I didn't speak to anybody. And he came downstairs
17 and he went into the TV room where A███ was.
18      I let the police into the door and I walked into
19 the kitchen with him, and Joe came into the kitchen. We
20 were all standing there together.
21      There were two policemen. And the one who never
22 said a word, the one who didn't speak to anybody about
23 anything, and there was the other one who did all the
24 talking.
25      He asked me what is the problem? Why did I

D█████ - Direct/Kabrawala

24

1  call? I said well, I was afraid that our argument was
2  going to escalate into something worse, which it did.
3  Then the policeman said you probably provoked it and did
4  you make him do something that made him angry. I was
5  stunned.
6       Joe, although he always told me nobody was going
7  to care, nobody was going to help me, now this policeman
8  is standing there accusing me like I deserved this or I
9  had done something to deserve this and what was he going
10 to do with me, and I was stunned. I didn't think what he
11 said was true: No one would care. Nobody was going to
12 help me.
13 Q   That summer, was Mr. Valerio's mistreatment of you
14 limited to incidents within the home itself or were there
15 other incidents outside of the home?
16 A   Well, there was always a situation where you know if
17 I wanted to leave he would threaten me. If I wanted to go
18 home, he would always tell me no, you can't leave, and if
19 you do and you don't come back, I'll send someone after
20 you. I believed him. I didn't.
21      He had the financial means to do that and I was
22 terrified of him.
23 Q   Was there any incident outside of the home that
24 specifically stands out in your mind from that summer?
25 A   This was now on my third trip. My daughter was, I

D█████ - Direct/Kabrawala

25

1  would say, very, very young, can't say how old she was,
2  and his son decided he wanted to go to some kind of a
3  concert. So he thought, okay, let's take A███ to stay
4  with his mother, Joe's mother, and we'll have an evening
5  out. So we took the child to his mother and we got into
6  the car and we left, and down the road he changed his
7  mind. We hadn't gone a few blocks. No, he has to fetch
8  A███, his daughter.
9       So he turned around, went to fetch A███ and put
10 her in the car. We left. I was upset. I was really
11 looking forward to go out. We didn't go out often and he
12 got so angry with me and told me I was an ungrateful
13 bitch. Another woman would be more grateful.
14      He hit me, and I put my arm up to move his arm
15 away, and I hit his hand back, and he just grabbed my hair
16 because I had very long hair at the time and hit my head
17 against the window and dashboard and he was screaming at
18 me, screaming at me, insulting me.
19      We ended up driving. I didn't know the places
20 very well at the time because I didn't go to these places
21 before, and we were driving down this very long road which
22 seems like there was a beach and a lot of bushes on one
23 side and beach on the other side, and we drove up this
24 long, long road. There was a tall building on the end of
25 the road, looks like a needle of a tall building, and we

D█████ - Direct/Kabrawala

26

1  continued back down the road in the opposite direction.
2  He pulled over into this dark parking area,
3  looks like a parking space but it was very bushy with a
4  lot of growth.  He said to me this is a nice dark place to
5  leave you.  Tonight you are going to die.  And he said
6  that with such conviction, I really believed him.
7  When he stopped the car I opened up my seat belt
8  and jumped out.  I didn't know where I was going to run to
9  but I had to leave.  I went to the back of the car to open
10  the door for my daughter and as I was doing that the front
11  door of the car was open and the car door knocked me over
12  and I fell into the ground and I was a little disoriented.
13  And I stood up and I saw the car reverting towards me, and
14  I looked over to my right and I saw there was a car parked
15  in the bushes and the back lights were very dim so I
16  thought somebody was in the car and I started screaming
17  for help.
18  Joe came and he had put his hand on my mouth.
19  Just shut up, shut up.  He threw me in the front of the
20  car, closed the door, and he got in the car and he drove
21  off.
22  I didn't know what to say.  Didn't know what to
23  do, and he just drove me home.
24  Q    Did you stay at Mr. Valerio's house or did you move
25  out that summer?

D█████ - Direct/Kabrawala

27

1  A    I stayed at his house.  The only time I moved out was
2  when I when to the shelter, the women's shelter.  After
3  the police incident I left.  What I did was I actually
4  went downstairs to find a place to go and I found this
5  women's shelter and I phoned them, and they said to me
6  pack a bag, we'll send the police to fetch you.
7  The next morning when Joe left, I don't know
8  where he went, he went to work, these people came to fetch
9  me and took me away.  After that he convinced me to come
10  back.
11  The conditions were where I was were not
12  comfortable.  I've never been in a situation like this.  I
13  didn't feel safe or comfortable, and he was very
14  convincing.
15  Things would change, things would be better, and
16  I wanted to believe him.  He said all right, if I feel
17  safe, I can live in the house in Water Mill again.  So I
18  had two lady friends from the shelter, one had a car that
19  drove my daughter and I back to the house in Water Mill
20  and I stayed there for a while.  That was the only time I
21  moved out, but he convinced me to move back from the house
22  in Water Mill to Smithtown because in Water Mill I was
23  isolated, I didn't have the car, didn't have the amenities
24  we had in Smithtown.  The mall was so far away, if I
25  wanted to walk, it would take me an hour or an hour and a

D█████ - Direct/Kabrawala

28

1  half to get food or something.  That's where I stayed for
2  the remainder of the time.
3  Q    So our record is clear, it sounds to me like right
4  after that police incident you described, shortly
5  thereafter, you moved out?
6  A    Yes, that next day I moved out into the shelter, it
7  was the next morning.
8  Q    What was the name of the shelter you moved to?
9  A    Brighter Tomorrows.
10  Q    How did you find it?
11  A    Found it on the internet.  I was looking for a way to
12  find help for women, abused women, and this shelter came
13  up and I found this.
14  Q    How long did you spend at Brighter Tomorrows'
15  shelter?
16  A    Couple weeks at most.
17  By that time Joe contacted me and convinced me
18  to go back to the house in Water Mill.
19  Q    Now, then you went from the house in Water Mill to
20  the house in Smithtown?
21  A    Correct.
22  Q    Did you have during the time that you were living
23  with Mr. Valerio, whether it was the Water Mill residence
24  or the Smithtown residence, did you have regular access to
25  communication, vehicle, that sort of thing, outside

D█████ - Direct/Kabrawala

29

1  contact?
2  A    No.  You see he kind of wouldn't let me have any
3  contact with people.  I wanted to try to make friends.  I
4  wanted to join a gym or go to a book club or go to the
5  library or partake in some kind of social activity, meet
6  people, play tennis, or do the things I enjoy doing but he
7  wouldn't allow it.
8  There was an incident where he said to me, you
9  know, maybe you should find a site on line where couples
10  can meet couples and I found that strange where he
11  wouldn't let me have my own friends.  "That isn't what I
12  want to do." "Then you don't deserve to have any friends,"
13  he said.
14  At one point in time when I was still living at
15  the Water Mill home, he said he was going to buy me a car.
16  So he bought a Mercedes, black Mercedes, and told me it
17  was my car but he controlled it.  He wouldn't let me drive
18  when I wanted to drive it.  If I wanted to go someone he
19  would ask me how long I was going to be.
20  There were a few times I recall him writing down
21  the mileage and checking it to see how far I would be and
22  time me to see how long I had been away.
23  There were phones in the house.  I was able to
24  call my mother but he would monitor that, monitor who I
25  called, how long I spoke to them for, and there was a

- Direct/Kabrawala
30

1  point in time where he gave me use of the cell phone but
2  he would always take it away again.
3      I remember he gave me a Samsung phone to use but
4  I received a call from a girl in Romania, she was looking
5  for Joseph. I'm sorry, this is his phone, but this is my
6  number, can I help you? And she put the phone down. So I
7  did a search on the number to see where the number had
8  come from and I saw it was from Romania.
9      I asked Joe about it. He became very defensive
10 and he took the cell phone away from me and didn't give me
11 the use of the cell phone until sometime after that.
12     Eventually he bought me a BlackBerry. It was
13 only in use for a short period of time and then he
14 wouldn't pay the account and they would connect it and
15 disconnect it.
16     If he left the house he would take the car keys
17 with him so I couldn't take the car and go anywhere.
18 Sometimes he would take the phones with him and I would be
19 left without a phone. He would lock me in the house. I
20 remember both at the Water Mill house and the
21 Smithtown home, the blinds were always closed, bedroom
22 door always had to stay closed because he didn't want
23 anybody to see anything going on in the house.
24     So the blinds in the lounge, for example, had to
25 face a certain way. If they faced the other way the

- Direct/Kabrawala
31

1  neighbors might see something in the house. If there was
2  a noise in the house nobody could hear because he wanted
3  me to keep the doors close.
4      There were occasions I wanted lights in the
5  house so I opened the blinds and opened the doors and he
6  would become very angry at me closing the doors and
7  blinds.
8  Q  Shortly before you departed the United States on your
9  third trip, were there any incidents that you could recall
10 that caused you to leave?
11 A  Yes, there were two in particular.
12 Q  Tell us about that?
13 A  The one was, we had gone out for an evening. I was
14 all dressed up, beautiful dress on, fur coat. I know he
15 loved the evening out and it was all going very well.
16     On our return home he pulled into a gas station
17 to put fuel in the car. As he drove out he drove out
18 going the wrong way down a one way. It was a very short
19 way, okay, he could zip out and go to the main road.
20 There were two police officers and they pulled him over,
21 two female police officers. They stopped him. One came
22 to his window the other came to my window shining the
23 lights in the car. I could see from the look on her face
24 she was concerned. She didn't know what the situation
25 was, but I was uncomfortable because I in the back of my

- Direct/Kabrawala
32

1  mind knew this was going to upset Joe and I was concerned
2  what would happen when we got home. Even though I didn't
3  do anything, the situation would anger him.
4      I recall him saying something about these two
5  lesbians and it made him very angry when they were done.
6  I'm not sure whether they gave him a ticket or not, I
7  think they did, and we left. He didn't speak to me, but
8  he kept driving down this long road which again had a
9  beach on the one side and homes on the other. He made a
10 U-turn through the middle island, turned around, and
11 pulled over into a parking lot where I remember seeing
12 like a beach area. There was a building but not houses.
13 I could just see water. And he got out of the car and
14 while we were driving there, I remembered he grabbed my
15 hair. I was wearing my hair down, and he grabbed a
16 handful of my hair and he was screaming at me and
17 insulting me and smashing my head on the dashboard and
18 wouldn't stop and pulled out hand fulls of my hair.
19     When we got to the beach area he let go and came
20 out and came around to my side of the car and ripped my
21 dress to pieces. I was wear stockings at the time and he
22 ripped those and raped me. He was screaming at me as he
23 was doing that. I was crying and when he was done I just
24 gathered my dress and coat and scrambled back into the
25 vehicle and he went around to the front side of the car

- Direct/Kabrawala
33

1  where the driver's side is and he just sat there for a
2  good five minutes, said nothing. He started the car and
3  we drove home.
4      I remember his mom and sister and family were
5  there baby-sitting because the children were there, and I
6  just went up into the room with my torn dress and hair,
7  and he went and he cleaned the house, and I didn't see him
8  until the next day.
9  Q  You mentioned there was another incident as well that
10 caused you to leave?
11 A  Yes, I think it was November of '09. Joe was in his
12 office. He spent a lot of time in his office, and when he
13 is he leaves the door is always closed. Sometimes it was
14 small opened, but not enough that I could see what was
15 going on in there. I would always have to knock.
16 Q  -- The home office?
17 A  It's a home office in the Smithtown home.
18     MR. KABRAWALA: Continue. I'm sorry.
19     THE WITNESS: Okay.
20     And I remember knocking on the door. I brought
21 him something. I don't remember if it was something to
22 drink or eat, but I knocked and pushed the door open. He
23 quickly stood up from his computer and switched the screen
24 off and got right in my face and stood very, very close to
25 me and asked me what is it that I want? I said I brought

D███████ - Direct/Kabrawala

34

1  you something, and then the next thing he put his hand
2  around my throat and started choking me.  I said you're
3  choking me.  He said something to me, and I remember
4  saying you are behaving with an animal.
5          The next thing I remember I was laying on the
6  floor face down in the passage.  And he was sitting next
7  to me saying, owe, God, what have I done.  What have I
8  done.
9  Q    What had happened?
10  A    He punched me in my face and I lost consciousness and
11  I felt pan in my mouth.  In the passage there is a glass
12  cupboard with lozenges and I turned around and looked what
13  had happened and there was blood in my mouth and I saw he
14  punched my teeth.  He had punched my teeth into my mouth.
15  They were broken.
16          I stood up and went to the bathroom and I was in
17  so much pain, all I knew I had to save my teeth.  It was
18  so painful I tried to bear it.  I tried to push my teeth
19  back as much as I could and I went back to the bedroom.  I
20  was so scared I didn't know what to do.
21          Joe left me alone the rest of the night.
22          The next morning, I said, please, I need to go
23  to see a dentist.  He said.  He said to me, let me
24  make it clear to you, if you tell somebody what happened
25  and if I go to prison for what I did, I'll get out and

D███████ - Direct/Kabrawala

35

1  I'll kill you.  He said, what you will tell them, you will
2  tell them that you were playing with the children in the
3  house and somebody was waiting around the corner with a
4  baseball bat and accidentally hit you in the face.  That's
5  what I did.
6          He took me to the dentist and she couldn't help
7  me.  You need to go to a surgeon.
8          So she referred me to a surgeon in Commack and
9  we went there, and Joe gave me a blank check and said to
10  me, just get your teeth fixed.  So the surgeon helped, put
11  some kind of brace on, pushed the teeth back in for me,
12  and I went into the reception to write out the check and
13  said it would cost $2,000.  So I told Joe, to let him know
14  and he said that's a lot of money, I'm not paying that to
15  fix your face, and I wrote the check out anyway and I gave
16  her the check, and then I went home.
17          So when I went home, about two weeks later I had
18  to go for a follow-up visit, but Joe didn't want me to go
19  back to the same surgeon, so he found a family dentist out
20  in Smithtown and I went there and he took the braces off
21  for me and did a check-up to make sure everything was
22  okay.
23          My teeth have never been the same.  I'm been
24  struggling with episodes where I would have to be on
25  antibiotics medication and I've asked, you know, Joe and

D███████ - Direct/Kabrawala

36

1  his mom to please help to fix my teeth properly because my
2  dentist said I need root canals done and crowns on my
3  teeth, otherwise the problem will never go away.  It was
4  very expensive and I never had that done.  That was the
5  point I realized if I didn't leave I didn't know what
6  would happen to me next.
7          I had to think about my children.  If something
8  happened to me, they will be left without a mother.
9  Q    Before you left, did you seek custody of your
10  daughter A███?
11  A    I did, yes.
12          When I was in the women's shelter they stated to
13  me, they advised me to get a restraining order and seek
14  custody of my daughter.  I went through the process of
15  applying for that, but what happened was because Joe had
16  convinced me to come back and because of my experience
17  with the law, with the police, it didn't help me.  I
18  didn't think that I stood a chance of ever being able it
19  get away or to get custody of my daughter because Joe was
20  telling me, no, he'll get the best attorneys and he'll
21  take the best attorneys, and I'm not working.
22          I felt the best option was to go home with my
23  child, which I did.
24  Q    And I just want to show you a copy of what has been
25  marked at 3500-AD-3 as in alpha delta-3.

D███████ - Direct/Kabrawala

37

1          Do you recognize this document as a custody
2  petition that you submitted to a court in Long Island?
3  A    Yes.
4  Q    And why don't you thumb through it and a tell me if
5  that is an accurate copy that you provided to the
6  government?
7  A    Yes, it is.
8          MR. KABRAWALA:  Your Honor, the government moves
9  to introduce Government's Exhibit 3500 AD-3 into evidence.
10          MR. LATO:  No objection.
11          THE COURT:  AD-3 is admitted.
12          (Whereupon, Government Exhibit AD-3 was received
13  in evidence.)
14  Q    Is it fair to say that you documented instances of
15  abuse in this family court petition?
16  A    Yes, I did.
17  Q    Now, I want to turn back to -- withdrawn.
18          At some point you went back home to South Africa
19  and that was in March of 2010?
20  A    Yes, I did.  It was the 9th of March.  I went back
21  home.
22  Q    The 9th of March?
23  A    Correct.
24  Q    You went back and -- withdrawn.
25          Did you tell Mr. Valerio that you would be back?

D██████e - Direct/Kabrawala

38

1  A   Yes.
2         What had happened was I wasn't allowed to leave
3  the country with my daughter without Joe's permission
4  because he's on her birth certificate and I know according
5  to the International Hague Convention you can't take a
6  child out of the country without the parent's permission
7  because of the child abduction laws, and I knew I wouldn't
8  be able to leave with her without his permission.  I
9  didn't have a choice but to stay.
10        Eventually he did let me leave but made me
11 promise I would come back.  He threatened me.  I've got
12 people there.  They will come and fetch you.
13        At this point I pretty much believed a lot of
14 what he told me, and in March he let me leave with my
15 child and I went back home.
16        I had, however, told Joe I was going to come
17 back and I knew I had to tell him that because he would
18 send somebody after me or come after me, something would
19 happen.  I really didn't want to come back.  I had to tell
20 him I was and I had to make him believe that because I was
21 terrified of him sending somebody off and coming back to
22 me hurting my family or hurting somebody.
23 Q   I want to show you what has been marked as
24 Government's Exhibit 15.  You could probably see it on
25 your screen up there.  There is a screen right to your

D██████ - Direct/Kabrawala

39

1  right over there.
2  A   Oh, yes.
3         THE COURT:  Any objection to Government's
4  Exhibit 15.
5         MR. LATO:  No, your Honor.
6         THE COURT:  Government's Exhibit 15 is admitted.
7         (Whereupon, Government Exhibit 15 was received
8  in evidence.)
9  Q   Can you please read it to yourself and let me know
10 when you are done reading it?
11 A   I'm done.
12 Q   I want to ask what impact, if any, the following --
13 withdrawn.
14        Is it fair to say this is an e-mail from the
15 e-mail address joeval5@optonline.net to your e-mail
16 address?
17 A   Yes.
18 Q   And it is from October 4, 2010?
19 A   Yes.
20 Q   So at this point you would have been back in South
21 Africa?
22 A   I was at home with my mother.
23 Q   You were testifying about statements that Mr. Valerio
24 had made to you.
25        Tell me what impact, if any, the following

D██████ - Direct/Kabrawala

40

1  statements had on your decision to tell Mr. Valerio that
2  you would come back, but in fact you had no intention of
3  coming?
4         "I will come get my daughter, you fuck.  Watch
5  what will happen.  All your fucking games you will play
6  for her.  She'll be taken from you, cunt.
7         What impact did that have on you?
8  A   It reaffirmed everything that was said before and it
9  made me aware he would come after me.  I had to convince
10 him that I was coming back so he wouldn't come after me
11 and take my child away from me.
12 Q   You did come back at some point in January of 2016,
13 correct?
14 A   Correct.
15 Q   And when you came back, you were met by my colleague,
16 Special Agent Steven Troyd of the FBI, correct?
17 A   Yes, he met me at the airport when I arrived.  Met me
18 at Secondary in Customs.
19        THE WITNESS:  It's the pronunciation thing.
20 Q   You mean like an interview room at the airport?
21 A   Yes, yes.
22 Q   I want to show you what has been marked as
23 Government's Exhibit 1.  It has what we call Bates
24 numbers.  Basically just numbered at the bottom and it is
25 D██████ e-mail 001 through D██████ e-mail 155.

D██████ - Direct/Kabrawala

41

1         Just thumb through that and let me know if this
2  is a set of e-mails you provided to Special Agent Troyd
3  when you arrived in the United States in January of 2016
4  at his office at the FBI?
5  A   Yes, these are e-mails that I had saved on my e-mail
6  account that Joe had sent to me over the years that I
7  kept, and I had printed these for Agent Troyd at his
8  office.
9  Q   Are those all true and correct copies of the e-mails
10 you printed for Special Agent Troyd?
11 A   Yes.
12        MR. KABRAWALA:  The government moves to admit
13 Government's Exhibit 1.
14        MR. LATO:  Just one question.  May I have one
15 moment, please?
16        (Counsel confer.)
17        MR. LATO:  Your Honor, no objection.
18        The only thing I mention, given it is about 150
19 pages, we'll not go through all of it here, but
20 technically it's in evidence, so this may require either a
21 summary witness or for us to write about it after the
22 fact, but no objection.
23        THE COURT:  You can talk about that later.
24        Exhibit 1 is admitted.
25        (Whereupon, Government Exhibit 1 was received in

D███ - Direct/Kabrawala

42

1  evidence.)
2          MR. KABRAWALA:  Thank you.  Just one moment,
3  your Honor, with the Court's indulgence.
4          (Counsel confer.)
5          MR. KABRAWALA:  May I stand next to the witness
6  and go through the binder with her?
7          THE COURT:  Yes.
8          MR. KABRAWALA:  Thank you.
9  Q    I want you to take a look at Government's Exhibit 2.
10         Actually, before I show it to you, do you recall
11 the name of the dentist that you visited here on Long
12 Island?
13 A    I remember the first one when I went to a Deborah
14 Adams.  After that I don't recall the name.
15         The third dentist, the followup visit, it was a
16 family dentistry in Smithtown, I don't recall the name
17 offhand but I did provide the information to the FBI
18 because I had found a dental card, a medical card that I
19 had and when I followed up on the details the dentist's
20 information was there.
21 Q    Now I'm showing you what has been marked as
22 Government's Exhibit 2.  Thumb through this and let me
23 know whether this is familiar and whether they are your
24 statements and whether this is Deborah Adams that you are
25 referring to.  Not the first page which is a declaration.

D███e - Direct/Kabrawala

43

1  A    (Perusing.)
2          Yes, this is a form, one of these admission
3  forms, and what I told her happened to me.
4          MR. KABRAWALA:  Your Honor, given the witness'
5  corroboration of the statements in the document and given
6  the declaration of the custodian of records, the
7  government moves to admit this document into evidence as
8  self-authenticating.
9          MR. LATO:  No objection.
10         THE COURT:  Exhibit 2 is admitted.
11         (Whereupon, Government Exhibit 2 was received in
12 evidence.)
13 Q    I'm showing you now what has been marked as
14 Government's Exhibit 3.  It is a multipage document.
15         Take a look at it and let me know whether it
16 looks familiar to you or whether it refreshes your memory
17 about where you went to seek dental care.
18 A    I recognize the name of the doctor that I went to
19 see, Eric Baum.
20         Yes, this is a form, again, an admission form I
21 filled in when I went to the dentist for a follow-up visit
22 in Smithtown, the family dentist.
23 Q    Do the statements contained in that record reflect
24 what you told the doctor in connection with your dental
25 care?

D███ - Cross/Lato

44

1  A    Yes, the medications I got from the surgery,
2  penicillin, the hydrocodone, yes.
3          MR. KABRAWALA:  The government moves to admit
4  Government's Exhibit 3 for the same reasons it outlined
5  for Government's Exhibit 2.
6          MR. LATO:  No objection, for the same reason.
7          THE COURT:  Government's Exhibit 3 is admitted.
8          (Whereupon, Government Exhibit 3 was received in
9  evidence.)
10         MR. KABRAWALA:  Your Honor, the government --
11 there's nothing further at this time.
12         THE COURT:  Okay.  Why don't we take a 15-minute
13 break.
14         MR. LATO:  Thank you.
15         (Whereupon, a recess was taken.)
16         THE COURT:  Please be seated.
17         Go ahead, Mr. Lato.
18 CROSS-EXAMINATION
19 BY MR. LATO:
20 Q    Good afternoon.  Is it Ms. D███? I don't know if
21 I'm pronouncing it correctly.
22 A    D███.
23 Q    D███?
24 A    Yes.
25 Q    Now, Ms. D███, were you in the United States,

D███ - Cross/Lato

45

1  specifically in Long Island, in January of this year?
2  A    Yes, I was.
3  Q    And did you go to the house of Frances Valerio, who
4  is in the courtroom?
5  A    Yes, I did.
6  Q    Do you remember that night something to the effect
7  that additional child pornography was found?
8  A    Yes, something came to light about this.
9  Q    At this point you knew that Mr. Joseph Valerio had
10 been convicted and was in jail, correct?
11 A    Correct.
12 Q    And in fact sometime this year did you go visit him
13 at the Metropolitan Correctional Center?
14 A    Yes, I did.
15 Q    Do you remember when that was?
16 A    That was shortly after I arrived.  I think it was the
17 next day, if I remember correctly, but it was on my trip
18 here to see Frances Valerio and the next morning I went to
19 visit Joseph in prison.
20 Q    This was in January of this year?
21 A    Yes.
22 Q    Was that before or after the new child porn was found
23 that you visited him in prison?
24 A    I'm not sure.  I mean I remember when I came to see
25 him, it was on my trip here, second day.

D█████ - Cross/Lato

**46**

1 Q   Did you go alone to the MDC or did someone go with
2 you?
3 A   **No, I went with Frances and my daughter.**
4 Q   Did you actually bring your daughter, is that
5 A   **--**
6 A   **A█████.**
7 Q   -- In the MDC to see Joseph?
8 A   **Yes, I did.**
9 Q   How old was A████ at the time?
10 A   **She's seven.**
11 Q   And you were aware of the charges that Mr. Valerio
12 had been convicted of and you brought your daughter in,
13 correct?
14 A   **To some degree, yes.**
15 Q   Now, is there a reason that you came to the United
16 States to see Frances Valerio?
17 A   **Yes.**
18 Q   Is there a reason that you went to the jail to see
19 Joseph Valerio in January of this year?
20 A   **Yes, there is.**
21 Q   Was the reason, that you wanted to get money out of
22 Frances Valerio?
23 A   **No, absolutely not.**
24 Q   In the year 2015, did Frances Valerio wire transfer
25 you money at any time?

D█████ - Cross/Lato

**47**

1 A   **Yes.  Yes, she did.**
2 Q   Is it fair to say that she wire transferred money to
3 you several times during 2015?
4 A   **Yes.**
5 Q   It would be a fair statement she wire transferred you
6 approximately $31,265 in 2015.  Is that a fair estimate?
7 A   **That sounds fair, yes.**
8 Q   Okay.  Now, given all the terrible things that
9 Mr. Valerio did to you, you still wanted to go visit him,
10 correct?
11 A   **I didn't want to but I did go, yes.**
12 Q   Well, did anyone force you to go visit him at the
13 jail?
14 A   **No, not really.  No.**
15 Q   When you say not really, was there a little bit of
16 force or there wasn't any at all?
17 A   **There was a little bit.**
18 Q   Now, did anyone force you to visit Frances Valerio?
19 A   **No, not really.  Again, just a little bit.  That's**
20 **it.**
21 Q   Throughout 2015, were you e-mailing Frances Valerio
22 and was she e-mailing you?
23 A   **Yes, we were in communication via e-mail, yes.**
24 Q   Now, remember about an hour or so ago, the government
25 introduced an exhibit, 3-D.  Do you remember seeing this

D█████ - Cross/Lato

**48**

1 about an hour ago?
2 A   **Yes.**
3 Q   And do you remember when Joe Valerio wrote this to
4 you, right?
5 A   **I remember the events.  I just don't remember the**
6 **date.**
7 Q   Basically, it speaks for itself how he said that you
8 fucked up big time.  Now I see the neighbor in their
9 backyard and you put on a show, motherfucker.  That's what
10 he wrote to you?
11 A   **Yes.**
12 Q   And you saved this note?
13 A   **Yes, I did.**
14 Q   And without telling me the reason, was there a reason
15 that you saved it?
16 A   **Yes.**
17 Q   Now, do you remember speaking to Special Agent Troyd
18 this year a couple of times?
19 A   **Yes.**
20 Q   Did you tell him in substance that when Joe wrote
21 this note or something to the effect, that you found this
22 odd, his behavior odd?
23 A   **Yes.**
24 Q   Now, did this note come before or after he had raped
25 you?

D█████ - Cross/Lato

**49**

1 A   **Before.**
2 Q   Now, did you think it was odd that Mr. Valerio
3 thought that you were putting on a show for the neighbors,
4 given what he had already done to you?
5 A   **I'm sorry?**
6 Q   Prior to him writing this note, he had raped you
7 before?
8 A   **Correct.**
9 Q   Did it seem odd that a guy who had done this would
10 write this note?
11 A   **Not really, no.**
12 Q   Now, it would be fair to say that before you lived
13 with Joe, you dated a few times, correct?
14 A   **No, because --**
15 Q   Go ahead.
16 A   **I only met him when I arrived at the United States**
17 **the first time, so I had to live with him from when I**
18 **arrived in the United States in February of '08.**
19 Q   Now, you met him through an on-line dating site?
20 A   **Yes.**
21 Q   Were you looking specifically for American men?
22 A   **No.**
23 Q   Is this the first American man that you met?
24 A   **Yes.**
25 Q   Now, was he nice to you the day you met?

**█████ - Cross/Lato**

50

1 **A** Yes, it he very nice.
2 **Q** So is it fair to say he was nice to you at least a
3 little bit?
4 **A** Yes.
5 **Q** And he started to change; is that correct?
6 **A** Yes.
7 **Q** Would it be fair to say in the course of a day or
8 week he would be good and suddenly bad, correct?
9 **A** Yes.
10 **Q** By the way, was this the only American man that you
11 had met when you came to the U.S. and stayed with
12 Mr. Valerio?
13 **A** When I stayed with him, yes.
14 **Q** Now, after Mr. Valerio was in prison in this case,
15 how often did you and Frances Valerio, his mother, write
16 each other through e-mail?
17 **A** I think it would be fair to say twice a week, maybe
18 once a week.
19 **Q** In spite of everything that Mr. Valerio had done to
20 you, did you write to Mrs. Valerio, the mother: I think
21 of Joe every day and pray for your, Mrs. Valerio's,
22 comfort?
23 **A** Yes.
24 **Q** Now, during this period of time she was sending you
25 money, correct?

**█████ - Cross/Lato**

51

1 **A** Correct.
2 **Q** Were you also sending her pictures of kids?
3 **A** Of me and my children, yes.
4 **Q** Now you needed this money from her, correct?
5 **A** For child support.
6 **Q** And for rent also, correct?
7 **A** Yes.
8 **Q** And basically what you were really doing was that you
9 were trying to convince them that you actually cared for
10 her and Joe and to get money out of her, and not that they
11 were stupid?
12 **A** No.
13             MR. KABRAWALA: Objection.
14             THE COURT: Sustained.
15 **Q** Did you write to Mr. Valerio while he was in jail
16 through e-mail?
17 **A** I did, yes.
18 **Q** Did you write to him to keep this line of
19 communication open?
20 **A** Yes.
21 **Q** While you were writing to him, was Frances Valerio
22 also sending you money?
23 **A** Yes.
24 **Q** When was the last time you e-mailed Frances Valerio?
25 **A** From what I recall, in January of this year.

**█████ - Cross/Lato**

52

1 **Q** When was the last time she sent you money?
2 **A** I think it was February, January or February of this
3 year.
4 **Q** Of this year?
5 **A** Yes.
6 **Q** More or less the ending of the e-mails and the ending
7 of the money happened about the same time or a month
8 apart?
9 **A** Yes, that would be correct.
10 **Q** In December of 2010, were you in the United States or
11 were you in South Africa?
12 **A** 2010. I left in March of 2010.
13 **Q** Were you and Joseph Valerio e-mailing each other?
14 **A** I think so, yes.
15 **Q** And in fact on or about December 1st of 2010, while
16 you were in South Africa, did Joseph Valerio send you an
17 e-mail saying in substance, you fucking obey me, bound in
18 chains before me. Hail, Cesar.
19 **A** Yes, he did.
20 **Q** At this point did you say there is something
21 seriously wrong with this guy?
22 **A** I did, yes.
23 **Q** And you continued to e-mail him after that, correct?
24 **A** Correct.
25 **Q** And during this time was Frances Valerio sending you

**█████ - Cross/Lato**

53

1 money a month or so before or after?
2 **A** In 2010?
3 **Q** Yes.
4 **A** No.
5 **Q** Now, notwithstanding the Hale Caesar e-mail every now
6 and then Joe Valerio would send you a nice e-mail,
7 correct?
8 **A** Yes, he did.
9 **Q** So he had go back and forth between good Joe and bad
10 Joe, correct?
11 **A** Yes.
12 **Q** Now, about how many months in the Water Mill house
13 was it before Mr. Valerio tripped you?
14 **A** It was very early on. I would say within a couple of
15 weeks.
16 **Q** Did you find that odd that this guy who is so nice to
17 you, all of a sudden tripped you?
18 **A** I did, yes.
19 **Q** Is there a reason why at that point you just didn't
20 get up and leave and go back to South Africa and go
21 somewhere else?
22 **A** Yes, there is a reason.
23 **Q** Now, was L███ living with you at the time?
24 **A** L███ was with us, yes.
25 **Q** Was Joe still good to L███ at that point when he

D█████ - Cross/Lato

**54**

1  tripped you?
2  **A   Yes, he was.**
3  **Q**   At some point he was bad to L█ too, correct?  He
4  would insult him, correct?
5  **A   Yes.**
6  **Q**   But at times he was still good to you and L█?
7  **A   Yes, he was.**
8  **Q**   But the bad Joe was coming out more and more as time
9  went on, correct?
10 **A   Correct.**
11 **Q**   Now, remember at some point after Water Mill, did you
12 return to South Africa before moving into the Smithtown
13 residence?
14 **A   Yes.**
15 **Q**   And at this point had he ever done anything
16 physically abusive to you other than tripping you?
17 **A   Yes.**
18 **Q**   He punched you, threw you on the floor?
19 **A   Yes.**
20 **Q**   Once you were away from this guy, is there a reason
21 you came back to live with him again?
22 **A   Yes, there is.**
23 **Q**   Is the reason Mr. Valerio said he would come get you
24 if you didn't come back?
25 **A   One of the reasons.**

D█████ - Cross/Lato

**55**

1  **Q**   To your knowledge, was Mr. Valerio in the Marines?
2  **A   No.**
3  **Q**   Was he in the CIA?
4  **A   No.**
5  **Q**   The FBI?
6  **A   No.**
7  **Q**   Was he even a cop?
8  **A   No.**
9  **Q**   Did you actually believe he had the power to actually
10 send people to South Africa to come get you?
11 **A   Yes, I did.**
12 **Q**   Now, you came back and you lived with him in
13 Smithtown, correct?
14 **A   Yes, first Water Mill and then we moved to Smithtown.**
15 **Q**   And in Smithtown the abuse continued?
16 **A   Yes.**
17 **Q**   Were you surprised given what he had done before?
18 **A   No.**
19 **Q**   Do you remember, finally you called the police one
20 day after an argument?
21 **A   Yes.**
22 **Q**   Would it be fair to say that that was the only time
23 you ever called the police, correct?
24 **A   Yes.**
25 **Q**   And the argument was verbal only, correct, no

D█████ - Cross/Lato

**56**

1  physical abuse?
2  **A   Yes.**
3  **Q**   Yet prior to that argument, Mr. Valerio had
4  physically abused you many times, correct?
5  **A   Yes.**
6  **Q**   Yet on those prior occasions you never called the
7  police, correct?
8  **A   I tried, but no.**
9  **Q**   When you say you tried, did you actually pick up the
10 phone?
11 **A   Yes, I did.  I would pick up the phone and he would**
12 **take the phone out of my hand.**
13 **Q**   When the police were finally there, did they give you
14 an opportunity to write a statement about what had
15 happened?
16 **A   I don't recall that, but they did ask me what**
17 **happened.**
18        MR. KABRAWALA:  No objection.
19        MR. LATO:  Well, okay.
20 **Q**   Let me just show you Exhibit 3-A.  Please look at
21 that for a minute and let me know when you are done?
22 **A   Yes, I'm done.**
23 **Q**   Okay.  May I have it back, please.
24        Thank you.
25        THE COURT:  Did you say 3-A.

D█████ - Cross/Lato

**57**

1        MR. LATO:  Yes, your Honor.
2        Oh, I'm sorry.  It's 3-B.
3        THE COURT:  Okay.
4        MR. LATO:  All right.  I'm showing everyone
5  Exhibit 3-B.
6        THE COURT:  So the record is clear, we'll admit
7  this into evidence.
8        MR. LATO:  Yes, your Honor.
9        MR. KABRAWALA:  No objection.
10       MR. LATO:  Before I even move to admit,
11 Mr. Kabrawala said there is no objection, if it's okay
12 with the Court.
13       THE COURT:  3-B is admitted.
14       (Whereupon, Defendant's Exhibit 3-B was received
15 in evidence.)
16 **Q**   Ms. D█████e, did I get it, right?
17 **A   Yes.**
18 **Q**   Is Exhibit 3-B the police report that was filled out
19 when the police came to your house that night?
20 **A   Yes, correct.**
21 **Q**   I'm going to turn over to page 2.
22       Do you see where it says on the screen, it might
23 be easier for you, Statement of Allegation Supporting
24 Deposition and No Statement?
25 **A   Correct.**

D█████e - Cross/Lato

58

1   Q   It's a fair statement now, you had the opportunity to
2   give the police a statement but you declined?
3   A   Yes.
4   Q   Now, you testified on direct examination, please
5   correct me if I'm wrong, that one of the reasons you
6   didn't leave him is that you were embarrassed what you
7   would tell people?
8   A   No, that's not the reason I didn't leave.  That's the
9   reason I didn't tell anybody.
10  Q   Okay.  Could you have left him at any one of these
11  times?
12  A   In hindsight, yes.
13  Q   And you could have left him and told no one, friend
14  or anyone, just I don't like the guy, I'm done with him,
15  correct?
16  A   Correct.
17  Q   And moved back to South Africa?
18  A   Yes.
19  Q   And ultimately that's what you did?
20  A   Eventually, yes.
21  Q   Now, was there an incident on a road by the beach
22  where Joe was physically abusive towards you?
23  A   Yes.
24  Q   And in fact that happened twice, is that correct?
25  A   Yes.

D█████e - Cross/Lato

59

1   Q   On one of the occasions, did you actually get out of
2   the car and grabbed a child from the back seat?
3   A   Yes.
4   Q   A████?
5   A   Yes.
6   Q   How old was she?
7   A   I don't recall the age but she was small enough to
8   fit into a car seat.
9   Q   And while you were reaching in the back did
10  Mr. Valerio move the vehicle before he knocked you over?
11  A   I hadn't been able to.  The back door wasn't opened.
12  The front door was opened.  So I hadn't been able to open
13  the door yet before the car knocked me over.
14  Q   Was it on this occasion or a subsequent occasion that
15  he said he was going to kill you?
16  A   On that occasion.
17  Q   And you believed him, correct?
18  A   I did.
19  Q   Even though you believed he was going to kill you,
20  you stayed with him, right?
21  A   I did.
22  Q   Now, when you were pregnant with A████, was it
23  planned or was it an accident?
24  A   No, it was unplanned.
25  Q   Did he say some bad things to you when he found out

D█████ - Cross/Lato

60

1   that you were pregnant?
2   A   He did, yes.
3   Q   Did he say something to the effect or ask you why
4   didn't you have an abortion?
5   A   Yes, he said that to me.
6   Q   Did you answer him?
7   A   No, I didn't.
8   Q   You didn't say anything like yes, you have a polluted
9   gene pool but I'm not getting rid of this baby?
10  A   No, I didn't want to provoke him.
11  Q   When was the last time you e-mailed Mr. Valerio?
12  A   Probably before I came to the United States on my
13  previous trip in January.
14  Q   Of this year?
15  A   Yes, I think so.
16  Q   And did you say things to him, for instance, in terms
17  of his sentence, it's in God's hand now, I forgive you?
18  A   Yes.
19  Q   You really forgive him?
20  A   I do.
21      MR. LATO:  One second, please.
22      (Counsel confer.)
23      MR. LATO:  Just about five more minutes.
24      THE WITNESS:  Sure.
25  Q   I wanted to confer with counsel to make sure I

D█████ - Cross/Lato

61

1   wouldn't leave anything out.
2   A   Yes.
3   Q   You testified on cross-examination over the last few
4   minutes that there would be a good Joe and a bad Joe,
5   remember?
6   A   Yes.
7   Q   Now, was there -- would it be a fair statement that
8   anything could just set him off, correct?
9   A   Yes.
10  Q   In terms of the good things, even over the last few
11  months of your relationship, was he good to you at times?
12  A   Yes, there was.  There were good days, yes.
13  Q   For instance, one of the nights on the road to the
14  beach beforehand, you had gone out to dinner, correct?
15  A   We had gone on somewhere, yes.
16  Q   The date he said something about the lesbian cop?
17  A   Yes.
18  Q   And you had a nice time at dinner, correct?
19  A   Yes, we did.
20  Q   And then all of a sudden, he just turned bad,
21  correct?
22  A   Yes.
23  Q   Do you know what the types of things were, if there
24  were any, that would just set him off to go from good to
25  bad?

---

**D█████e - Cross/Lato**

62

1  A   No, I didn't.  I couldn't explain it at any time what
2  was making him angry.  I never had an answer.
3  Q   Well, in terms of going places, did you ever go
4  anywhere alone?
5  A   The only time I went somewhere alone, if I went to
6  the store to get some groceries now and then or if I took
7  my son for a walk at the Smithtown house, is the only time
8  I was alone, as I recall.
9  Q   Most of the time you were with him, if you were in or
10 out of the house?
11 A   Yes.
12 Q   Well, did you ever think to yourself while you were
13 living there, I'm not suggesting anything, what am I doing
14 wrong?  Why is he like this?
15 A   Yes, I did think that sometimes.
16 Q   Did you ever ask him what's going on here?  What am I
17 doing?  Why do you treat me this way?
18 A   Yes, I did ask him.
19 Q   What did he say?
20 A   He said to me I should do better.  I should try
21 harder.
22 Q   Did he tell you try harder doing what?
23 A   He didn't specify.
24          MR. LATO:  One moment.
25          (Counsel confer.)

---

**D█████ - Redirect/Kabrawala**

63

1          MR. LATO:  Just a few more questions.
2  Q   Is it a fair statement this mood could change
3  from good to bad within a matter of seconds?
4  A   Yes.
5  Q   In other words, he would be happy and then all of a
6  sudden he would be nasty?
7  A   That happened a few times, yes.
8  Q   To this day, you don't have any idea what set him
9  off, correct?
10 A   No, I don't.
11         MR. LATO:  Nothing further.
12         MR. KABRAWALA:  Very brief redirect, Judge.
13 REDIRECT EXAMINATION
14 BY MR. KABRAWALA:
15 Q   Ms. D█████, you were asked about a police incident
16 report?
17 A   Yes.
18 Q   That was Exhibit 3-B.
19         I'm showing it to you again.
20 A   Yes.
21 Q   You were also asked about the note statement on the
22 second page?
23 A   Yes.
24 Q   Where was Mr. Valerio in relation to you when you
25 were asked to give a statement to the police?

---

**D█████ - Redirect/Kabrawala**

64

1  A   He was with me in the kitchen with the two police
2  officers.
3  Q   And did Mr. Valerio's physical presence impact your
4  decision to give or not give a statement to the police?
5  A   Absolutely, yes.
6  Q   Why?
7  A   Because I was afraid that if I had given a statement,
8  I didn't know what would happen to me later if I was at
9  home with him.  I thought it was better to leave it and
10 pretend it didn't happen.
11 Q   Ms. D█████, you were asked about your journey here
12 to the United States in January of this year.
13 A   Yes.
14 Q   And why did you come back in January?
15 A   For some time Frances had been e-mailing me asking me
16 to please come and visit her with the children.  She
17 wanted to see the grandchildren.
18 Q   Is it fair to say that series of correspondence
19 lasted approximately a year?
20 A   Yes.
21 Q   Continue.
22 A   I was in a situation where I have my two children at
23 home with me.  It's not easy for me to just pick up and
24 leave and come here.  I have to arrange for my kids to
25 leave school for a certain period of time, to make

---

**D█████ - Redirect/Kabrawala**

65

1  arrangements for someone to care for the house when I was
2  not there.
3          It was a process, because my daughter as part of
4  South African law is required to travel on two passports,
5  a U.S. and South African passport.  There is a new law
6  coming into effect.  Certain documents have to be carried
7  with me, originals, with an apostle attached, and I
8  required those documents to travel with her.  So all this
9  takes time.  I wasn't able to get up and leave and I
10 explained this to Frances that it would take time.  And
11 the pressure became more apparent until eventually she
12 told me while she doesn't have a year to wait, if the kids
13 do not come now, she may not be around.  So I thought she
14 may be sick, she was dying or something.  So that made me
15 make more of an effort to come and see her.
16 Q   While you were in the United States in January of
17 this year, did you visit Mr. Valerio in prison?
18 A   Yes, I did.
19 Q   Why did you go?
20 A   Well, my daughter was with me, A█████, and she said to
21 me, mommy, can I just see my father once because she never
22 met him because when I left she was just under a year old
23 so she has never known him.  And my best friend at home
24 has grown up her whole life never knowing what he looked
25 like and I didn't want my daughter growing up like that.

D■■■ - Redirect/Kabrawala

66

1    I thought if she could meet him just once in her
2  life, that might be all she needs and also if something
3  would happen to him.
4    I made the decision at the time it would be best
5  for her to meet her father if she wanted.  I made that
6  decision.
7  Q  Briefly, tell us about that encounter with
8  Mr. Valerio at the prison.
9  A  Frances and I and my daughter went into the waiting
10  area where you visit and we were sitting down and Joseph
11  and the other prisoners came in.  And there is some kind
12  of a card they have to hand into an officer there, I don't
13  know what it is, but Joe didn't hand the card in and he
14  made a beeline to hug me, and one of the officers grabbed
15  him back and reprimanded him and he had to hand his card
16  back.
17    Everybody sat down at the table and he greeted
18  us and A■■■ looked at him and then she buried her face in
19  my lap during the visit, didn't want to look up or speak
20  to him.
21    One of the prison officers was looking up and
22  down as if there was something wrong, if everything was
23  okay.  I nodded my had as if everything was fine.  I just
24  kept rubbing her back trying it keep her relaxed.
25    Joe's mom spoke a lot.  Joe and I really didn't

D■■■ - Redirect/Kabrawala

67

1  converse much.  He just felt it was necessary for him to
2  tell me his reason why this happened and why he was there
3  because nobody at this point had really spoken to me and
4  told me what was really going on.  And he gave his version
5  of what had happened, and the rest of the time he spoke
6  with his mother.
7  Q  You were asked about payments that the Valerio family
8  has made to you over the last period of time.
9    Have you used any portion of that money to
10  support your children?
11  A  Yes, that's all been to pay for the rent, help for
12  the school fees, whatever I would pay for, it was for
13  child support.
14  Q  Including the daughter you have together with
15  Mr. Valerio?
16  A  Yes, correct.
17  Q  You were asked about the termination of e-mail
18  correspondence with Mrs. Valerio.
19  A  Yes.
20  Q  And I think there was a suggestion that the money
21  also stopped coming around that time?
22  A  That's correct, yes.
23  Q  Is it true that in January of 2016, you told the FBI
24  about some videos and other materials that were found from
25  the Valerio household?

D■■■ - Redirect/Kabrawala

68

1  A  Yes, I didn't know what they were.  I just know there
2  was a white plastic bag containing objects that looked
3  like DVD covers that he had brought to the house that I
4  found in a set of drums that he had collected from
5  Smithtown.
6    I mentioned the bag, but I didn't know what was
7  in it.
8  Q  Did you actually see any of the materials that were
9  in the bags or view them?
10  A  No.
11  Q  You got in touch with Special Agent Troyd because he
12  had given you his number, presumably, at the airport?
13  A  Yes, and he asked to please meet with me so they can
14  tell me the facts of what had happened because nobody had
15  really told me the whole story what was going on.
16  Q  And instead of communicating with him for that
17  reason, you called them and told them there was this bag
18  of material that was recovered from the Valerio household?
19  A  Yes.
20  Q  And is it fair to say that your relationship with the
21  Valerios terminated after you turned in evidence against
22  Mr. Valerio?
23  A  Yes, it did.
24    MR. KABRAWALA:  Just one moment, your Honor.
25    (Counsel confer.)

D■■■ - Redirect/Kabrawala

69

1    MR. KABRAWALA:  Judge, there is nothing further
2  at this time.
3    THE COURT:  Mr. Lato?
4    MR. LATO:  One moment, please.
5    Nothing further, your Honor.
6    THE COURT:  Ms. D■■■■, thank you.
7    THE WITNESS:  Thank you.
8    THE COURT:  So the government rests.
9    MR. KABRAWALA:  Your Honor, the government rests
10  for purposes of the Fatico hearing, subject to any
11  rebuttal that might be necessary to the extent the
12  defendant puts on a case.
13    THE COURT:  I know there are other sentencing
14  issues, but in terms of the Fatico hearing with respect to
15  these other witnesses, the defense wants to put on a case?
16    MR. LATO:  No, your Honor.  We're not going to
17  put on a case.  In other words, there may be some
18  documents that we want to put in, but there's a good
19  chance that the documents are already in evidence that the
20  government put in.
21    I think I mentioned at the beginning of the
22  hearing when the government introduced an exhibit that
23  consists of 150 or so pages, there is a good chance some
24  of the material in there I'll want to highlight as well as
25  Mr. Kabrawala may want to highlight for the government.

D——e - Redirect/Kabrawala

70

1  There's a potential there could be other documents, but
2  right now I don't foresee them.
3          THE COURT:  How do you want to continue?  Dr.
4  Bardet was doing a report.  Do you have that report now?
5          MR. LATO:  One second, Judge.
6          Your Honor, it's an ongoing thing with Dr.
7  Bardet by virtue of what happened at the beginning of the
8  Fatico hearing and what happened today is what basically
9  Mr. LaPinta and I predicted and we believe that some of
10  the testimony told and the last part of the hearing gives
11  Dr. Bardet a reason to see Mr. Valerio again.  So we hope
12  to make that arrangement within the next two weeks subject
13  to his availability to get him to evaluate Mr. Valerio
14  again based on some things that happened here today.
15          THE COURT:  What I would like to do is set a
16  date.
17          MR. LATO:  For sentencing?
18          THE COURT:  First, a sentencing date but also
19  just a date by which if you want to put a written
20  submission in.
21          MR. LATO:  Yes.
22          THE COURT:  A sentencing submission, if you want
23  to put in Dr. Bardet's report, if you want to point to
24  other documents or e-mails or highlight things in the
25  e-mail the government submitted.  I want to set a date for

D—— - Redirect/Kabrawala

71

1  sort of an omnibus memorandum and then a sentencing date.
2  Tell me when you think you would get that in.
3          I'll set a government response date and a
4  sentencing date.
5          MR. LATO:  Let me just confer with Mr. LaPinta,
6  your Honor.
7          Your Honor, how about the last week of November
8  for all defense sentencings.  In other words a sentencing
9  memorandum plus anything related to this hearing.
10  Everything.
11          THE COURT:  That's fine.
12          November 30th?
13          MR. LATO:  That's fine, your Honor.  That's just
14  for an appearance or just for the submission?
15          THE COURT:  Just for the written submission.
16          How long does the government want to respond.
17          MR. KABRAWALA:  I think we'll need at least
18  three weeks because we'll probably want to evaluate the
19  forensic report.
20          THE COURT:  Okay.
21          MR. KABRAWALA:  With the Court's indulgence,
22  we'd ask until the end of the year, of course.
23          THE COURT:  That's fine.  December 30th.
24          MR. KABRAWALA:  12/30.
25          THE COURT:  And then how about the sentencing

72

1  January 25, 1:00 p.m.
2          MR. BODE:  It's possible I'll be on trial, but
3  as long as it is 1:00 p.m., Mr. Kabrawala is primary on
4  this.
5          MR. LATO:  I'm sorry, what time?
6          THE COURT:  1:00 p.m. on January 25th.
7          MR. LATO:  That's fine, your Honor.
8          THE COURT:  Is there anything else for today?
9          MR. LATO:  No, your Honor.  Not from us.
10          MR. KABRAWALA:  Not from the government, your
11  Honor.
12          THE COURT:  All right.  Thank you.
13          (Proceeding adjourned.)
14
15
16
17
18
19
20
21
22
23
24
25

73

I-N-D-E-X

W-I-T-N-E-S-S-E-S

A——— D———                                    3
DIRECT EXAMINATION                           3
BY MR. KABRAWALA
CROSS-EXAMINATION                            44
BY MR. LATO
REDIRECT EXAMINATION                         63
BY MR. KABRAWALA


E-X-H-I-B-I-T-S

Defendant's Exhibit 3-B was received in      57
evidence


Government Exhibit 3-A was received in       15
evidence
Government Exhibit AD-3 was received in       37
evidence
Government Exhibit 15 was received in        39
evidence
Government Exhibit 1 was received in evidence 41
Government Exhibit 2 was received in evidence 43
Government Exhibit 3 was received in evidence 44

**A-247**

**$**

**$2,000** [1] - 35:13
**$31,265** [1] - 47:6

**'**

**'07** [1] - 6:17
**'08** [8] - 4:24; 5:9; 7:6; 18:10; 49:18
**'09** [3] - 18:20; 20:20; 33:11

**0**

**001** [1] - 40:25

**1**

**1** [5] - 40:23; 41:13, 24-25; 73:23
**100** [2] - 1:14, 20
**11722** [2] - 1:15, 21
**12** [1] - 10:20
**12/30** [1] - 71:24
**13-year** [1] - 10:20
**14** [1] - 5:12
**14-0094** [1] - 1:3
**15** [6] - 38:24; 39:4, 6-7; 73:17, 21
**15-minute** [1] - 44:12
**150** [2] - 41:18; 69:23
**155** [1] - 40:25
**1979** [1] - 3:21
**1:00** [3] - 72:1, 3, 6
**1:45** [1] - 1:7
**1st** [1] - 52:15

**2**

**2** [7] - 42:9, 22; 43:10; 44:5; 57:21; 73:24
**2000** [3] - 4:7, 14
**2007** [1] - 7:3
**2008** [3] - 4:23; 12:4; 17:12
**2009** [2] - 5:11; 18:7
**2010** [9] - 5:7, 12; 37:19; 39:18; 52:10, 12, 15; 53:2
**2015** [4] - 46:24; 47:3, 6, 21
**2016** [4] - 1:7; 40:12; 41:3; 67:23
**25** [1] - 72:1
**25th** [1] - 72:6

**26** [1] - 1:7

**3**

**3** [8] - 6:23; 43:14; 44:4, 7-8; 73:4, 25
**3-A** [6] - 15:15, 20-21; 56:20, 25; 73:17
**3-Alpha** [1] - 15:23
**3-B** [7] - 57:2, 5, 13-14, 18; 63:18; 73:13
**3-D** [1] - 47:25
**30th** [2] - 71:12, 23
**3500** [1] - 37:9
**3500-AD-3** [1] - 36:25
**37** [1] - 73:19
**39** [1] - 73:21

**4**

**4** [1] - 39:18
**41** [1] - 73:23
**43** [1] - 73:24
**44** [2] - 73:7, 25

**5**

**57** [1] - 73:13

**6**

**63** [1] - 73:9
**631** [1] - 1:21

**7**

**712-6102** [1] - 1:21

**9**

**911** [2] - 23:5, 15
**9th** [2] - 37:20, 22

**A**

**abduction** [1] - 38:7
**able** [6] - 29:23; 36:18; 38:8; 59:11; 65:9
**abortion** [2] - 19:22; 60:4
**absolutely** [3] - 2:24; 46:23; 64:5
**abuse** [4] - 19:21; 37:15; 55:15; 56:1
**abused** [2] - 28:12; 56:4
**abusive** [2] - 54:16;

58:22
**access** [1] - 28:24
**accident** [1] - 59:23
**accidentally** [1] - 35:4
**according** [1] - 38:4
**account** [2] - 30:14; 41:6
**accurate** [1] - 37:5
**accusing** [1] - 24:8
**activity** [1] - 29:5
**AD-3** [4] - 37:9, 11-12; 73:19
**Adams** [2] - 42:14, 24
**additional** [1] - 45:7
**address** [3] - 6:20; 39:15
**adjourned** [1] - 72:13
**admission** [2] - 43:2, 20
**admit** [5] - 41:12; 43:7; 44:3; 57:6, 10
**admitted** [7] - 15:20; 37:11; 39:6; 41:24; 43:10; 44:7; 57:13
**advised** [1] - 36:13
**affection** [1] - 9:24
**affectionate** [1] - 9:9
**affections** [1] - 10:9
**affront** [1] - 8:13
**afraid** [2] - 24:1; 64:7
**Africa** [14] - 3:17; 12:5; 13:2; 17:17, 23; 18:6; 37:18; 39:21; 52:11, 16; 53:20; 54:12; 55:10; 58:17
**African** [2] - 65:4
**afternoon** [8] - 2:2, 4, 7; 3:14; 16:3, 9; 44:20
**age** [1] - 59:7
**Agent** [6] - 40:16; 41:2, 7, 10; 48:17; 68:11
**aggressively** [1] - 14:12
**ago** [2] - 47:24; 48:1
**agreed** [1] - 17:24
**ahead** [3] - 3:10; 44:17; 49:15
**airport** [8] - 7:9, 20; 13:6, 11; 40:17, 20; 68:12
**A██** [20] - 4:5; 17:13; 20:19, 21; 21:1, 10; 22:9, 15, 18;

23:17; 25:3, 9; 36:10; 46:5, 9; 59:4, 22; 65:20; 66:18
**Allegation** [1] - 57:23
**ALLEN** [1] - 1:16
**Allen** [1] - 2:3
**allow** [1] - 29:7
**allowed** [1] - 38:2
**alone** [5] - 34:21; 46:1; 62:4, 8
**aloud** [1] - 18:23
**alpha** [1] - 36:25
**Ameet** [1] - 2:2
**AMEET** [1] - 1:15
**amenities** [1] - 27:23
**AMERICA** [1] - 1:3
**American** [3] - 49:21, 23; 50:10
**A██** [1] - 25:8
**A██E** [1] - 3:6
**A██** [2] - 2:16; 3:6
**anger** [2] - 8:8; 32:3
**angry** [10] - 8:6, 22; 13:20, 23; 21:25; 24:4; 25:12; 31:6; 32:5; 62:2
**animal** [1] - 34:4
**answer** [3] - 23:14; 60:6; 62:2
**Anthony** [1] - 2:5
**ANTHONY** [1] - 1:18
**antibiotics** [1] - 35:25
**anyway** [1] - 35:15
**apart** [2] - 23:3; 52:8
**apologize** [1] - 23:10
**apologized** [1] - 13:21
**apostle** [1] - 65:7
**apparent** [1] - 65:11
**appearance** [1] - 71:14
**APPEARANCES** [1] - 1:12
**applying** [1] - 36:15
**appologize** [1] - 2:12
**appreciate** [1] - 2:13
**approach** [1] - 14:19
**approximate** [2] - 5:10; 16:15
**April** [2] - 18:19; 20:20
**argue** [1] - 22:16
**argument** [5] - 16:6; 24:1; 55:20, 25; 56:3
**arm** [2] - 25:14

**1**

arms [1] - 21:1
arrange [1] - 64:24
arranged [1] - 12:12
arrangement [1] - 70:12
arrangements [1] - 65:1
arrived [5] - 40:17; 41:3; 45:16; 49:16, 18
article [1] - 6:6
ashamed [1] - 15:10
Assistant [1] - 1:16
attached [1] - 65:7
attention [2] - 14:11; 21:19
Attorney [1] - 1:14
attorneys [2] - 36:20
Attorneys [1] - 1:16
August [1] - 6:17
authenticating [1] - 43:8
authorities [1] - 18:13
availability [1] - 70:13
averse [1] - 21:13
aware [2] - 40:9; 46:11

**B**

baby [2] - 33:5; 60:9
baby-sitting [1] - 33:5
background [1] - 4:6
backyard [1] - 48:9
bad [12] - 8:6-8; 50:8; 53:9; 54:3, 8; 59:25; 61:4, 20, 25; 63:3
badly [2] - 15:5, 11
bads [1] - 8:7
bag [6] - 13:20; 23:10; 27:6; 68:2, 6, 17
bags [5] - 13:12, 16-17, 20; 68:9
bang [1] - 21:5
Bardet [3] - 70:4, 7, 11
Bardet's [1] - 70:23
baseball [1] - 35:4
based [1] - 70:14
basement [1] - 9:22
bassinet [1] - 21:2
bat [1] - 35:4
Bates [1] - 40:23
bathroom [1] - 34:16

battery [1] - 23:4
Baum [1] - 43:19
beach [8] - 8:17; 25:22; 32:9, 12, 19; 58:21; 61:14
bear [1] - 34:18
beautiful [3] - 7:23; 31:14
became [7] - 8:7, 22-23; 13:20; 30:9; 65:11
become [3] - 8:6; 17:11; 31:6
bed [2] - 21:1
bedroom [3] - 23:7; 30:21; 34:19
beeline [1] - 66:14
BEFORE [1] - 1:10
beforehand [1] - 61:14
began [2] - 9:17; 17:19
beginning [7] - 8:4; 9:8, 13; 11:21; 21:10; 69:21; 70:7
behave [1] - 9:7
behaving [1] - 34:4
behavior [1] - 48:22
behind [3] - 13:19; 18:21; 22:4
believable [1] - 11:7
belt [1] - 26:7
best [7] - 21:12, 20; 36:20-22; 65:23; 66:4
better [8] - 11:23; 15:5; 20:22; 27:15; 62:20; 64:9
between [2] - 2:22; 53:9
BIANCO [1] - 1:10
big [3] - 11:6; 22:5; 48:8
binder [1] - 42:6
birth [3] - 18:19; 20:19; 38:4
birthday [1] - 16:23
bit [5] - 8:13; 47:15, 17, 19; 50:3
bitch [1] - 25:13
black [1] - 29:16
BlackBerry [1] - 30:12
blank [1] - 35:9
blinds [4] - 30:21, 24; 31:5, 7
blocks [1] - 25:7
blood [1] - 34:13
Bode [1] - 2:3
BODE [2] - 1:16; 72:2

book [1] - 29:4
bookends [1] - 5:14
born [6] - 3:19; 7:15; 20:21; 21:10; 22:9
bottle [2] - 8:11; 21:11
bottom [1] - 40:24
bought [2] - 29:16; 30:12
bound [1] - 52:17
bouquet [1] - 7:23
box [1] - 7:23
boy [2] - 9:1, 25
brace [1] - 35:11
braces [1] - 35:20
break [1] - 44:13
breast [2] - 21:8, 11-12, 14, 23
brief [1] - 63:12
briefly [2] - 4:6; 66:7
brighter [1] - 28:9
Brighter [1] - 28:14
bring [4] - 15:15; 19:4, 18; 46:4
broke [1] - 23:3
broken [1] - 34:15
brought [6] - 7:15, 24; 33:20, 25; 46:12; 68:3
building [3] - 25:24; 32:12
burden [1] - 9:16
buried [1] - 66:18
bushes [3] - 25:22; 26:15; 32:9
bushy [1] - 26:3
buy [3] - 9:11; 29:15
BY [6] - 3:13; 44:19; 63:14; 73:6, 8, 10

**C**

Caesar [1] - 53:5
canals [1] - 36:2
CAPERS [1] - 1:13
car [28] - 13:23; 16:4; 25:6, 10; 26:7, 9, 11, 13-14, 16, 20; 27:18, 23; 29:15, 17; 30:16; 31:17, 23; 32:13, 20, 25; 33:2; 59:2, 8, 13
card [5] - 42:18; 66:12, 15
care [5] - 24:7, 11; 43:17, 25; 65:1
cared [1] - 51:9
carried [1] - 65:6

carry [1] - 13:12
Case [1] - 2:1
case [4] - 50:14; 69:12, 15, 17
caused [2] - 31:10; 33:10
cell [3] - 30:1, 10
Center [1] - 45:13
Central [3] - 1:6, 15, 21
certain [3] - 30:25; 64:25; 65:6
certificate [1] - 38:4
Cesar [1] - 52:18
chains [1] - 52:18
chair [3] - 3:9; 21:24; 22:22
champagne [1] - 12:21
chance [3] - 36:18; 69:19, 23
change [4] - 11:23; 27:15; 50:5; 63:2
changed [1] - 25:6
changing [1] - 2:14
charge [1] - 14:11
charges [1] - 46:11
check [5] - 35:9, 12, 15-16, 21
check-up [1] - 35:21
checking [1] - 29:21
child [26] - 7:13; 11:4-6, 14; 13:9; 17:11; 21:3, 8, 11, 13-14, 19, 21; 25:5; 36:23; 38:6, 15; 40:11; 45:7, 22; 51:5; 59:2; 67:13
children [11] - 3:25; 4:1; 9:12; 12:7; 33:5; 35:2; 36:7; 51:3; 64:16, 22; 67:10
chocolates [1] - 7:24
choice [1] - 38:9
choking [4] - 8:24; 20:14; 34:2
christiansingles.com [1] - 6:15
Christmas [3] - 5:4; 18:10, 12
CIA [1] - 55:3
cleaned [1] - 33:7
clear [5] - 17:25; 21:9; 28:3; 34:24; 57:6
CLERK [1] - 2:25
climbed [1] - 20:11
close [2] - 31:3; 33:24

closed [4] - 26:20; 30:21; 33:13
closing [1] - 31:6
clothes [3] - 14:10, 13
clothing [1] - 6:6
club [1] - 29:4
clumsy [1] - 8:13
coat [2] - 31:14; 32:24
coddling [1] - 9:25
coke [2] - 21:24; 22:1
colleague [1] - 40:15
collected [2] - 7:9; 68:4
comfort [1] - 50:22
comfortable [1] - 27:12
coming [8] - 21:3; 23:8; 38:21; 40:3, 10; 54:8; 65:6; 67:21
Commack [1] - 35:8
Commerce [1] - 4:12
communicate [2] - 6:20; 10:4
communicating [2] - 6:19; 68:16
communication [3] - 28:25; 47:23; 51:19
compare [1] - 10:12
compared [1] - 10:14
complain [1] - 17:19
computer [5] - 1:24; 16:2, 10; 22:19; 33:23
concerned [4] - 13:24; 15:2; 31:24; 32:1
concert [1] - 25:3
conditions [1] - 27:11
confer [8] - 2:23; 41:16; 42:4; 60:22, 25; 62:25; 68:25; 71:5
confront [2] - 11:8; 14:17
connect [1] - 30:14
connection [1] - 43:24
consciousness [1] - 34:10
consists [1] - 69:23
contact [2] - 29:1, 3
contacted [1] - 28:17
contained [1] - 43:23
containing [1] - 68:2
continuation [1] - 2:8
continue [9] - 9:14; 22:10; 33:18; 64:21; 70:3
continued [5] - 6:22;

9:21; 26:1; 52:23; 55:15
controlled [1] - 29:17
Convention [1] - 38:5
converse [1] - 67:1
convicted [2] - 45:10; 46:12
conviction [1] - 26:6
convince [2] - 40:9; 51:9
convinced [4] - 27:9, 21; 28:17; 36:16
convincing [1] - 27:14
cop [2] - 55:7; 61:16
copies [1] - 41:9
coping [1] - 19:18
copy [3] - 15:16; 36:24; 37:5
corner [1] - 35:3
correct [49] - 4:15; 5:13; 7:4; 28:21; 37:23; 40:13, 16; 41:9; 45:10; 46:13; 47:10; 49:8, 13; 50:5, 8, 25; 51:1, 4, 6; 52:9, 23-24; 53:7, 10; 54:3, 9-10; 55:13, 23, 25; 56:4, 7; 57:20, 25; 58:5, 15-16, 24; 59:17; 61:8, 14, 18, 21; 63:9; 67:16, 22
Correctional [1] - 45:13
correctly [4] - 5:4; 18:11; 44:21; 45:17
correspondence [2] - 64:18; 67:18
corroboration [1] - 43:5
cost [1] - 35:13
couch [2] - 14:9; 21:23
counsel [6] - 41:16; 42:4; 60:22, 25; 62:25; 68:25
country [3] - 18:20; 38:3, 6
couple [7] - 4:25; 5:23; 13:3; 19:17; 28:16; 48:18; 53:14
couples [1] - 29:9
course [2] - 50:7; 71:22
courses [1] - 4:9
COURT [41] - 1:1; 2:4, 7, 12, 24; 3:8; 6:11; 14:21; 15:17, 20; 16:14; 37:11; 39:3, 6;

41:23; 42:7; 43:10; 44:7, 12, 16; 51:14; 56:25; 57:3, 6, 13; 69:3, 6, 8, 13; 70:3, 15, 18, 22; 71:11, 15, 20, 23, 25; 72:6, 8, 12
court [2] - 37:2, 15
Court [2] - 1:20; 57:12
Court's [2] - 42:3; 71:21
Courthouse [1] - 1:5
courtroom [3] - 2:17; 6:3; 45:4
cousin's [1] - 10:5
covers [2] - 20:3; 68:3
CR [1] - 1:3
create [1] - 12:2
crib [1] - 14:4
CROSS [2] - 44:18; 73:7
cross - 2:23; 61:3
CROSS-EXAMINATION [2] - 44:18; 73:7
cross-examination [1] - 61:3
crowns [1] - 36:2
cry [1] - 9:21
crying [4] - 9:20; 14:15; 20:13; 32:23
cunt [1] - 40:6
cupboard [1] - 34:12
custodian [1] - 43:6
custody [4] - 36:9, 14, 19; 37:1
Customs [1] - 40:18
cutting [1] - 9:6

**D**

D-A-V-I-D-S-E [1] - 3:7
dark [2] - 26:2, 4
dashboard [2] - 25:17; 32:17
date [11] - 16:17; 19:7; 48:6; 61:16; 70:16, 18-19, 25; 71:1, 3
dated [1] - 49:13
dates [1] - 18:12
dating [2] - 6:14; 49:19
daughter [24] - 4:3, 5; 10:5; 17:13; 18:19, 21; 21:23; 24:25; 25:8; 26:10; 27:19; 36:10, 14, 19; 38:3; 40:4; 46:3, 12; 65:3, 20, 25;

66:9; 67:14
D███████ [12] - 2:17; 3:7; 40:25; 44:20, 22-23, 25; 57:16; 63:15; 64:11; 69:6
D██████ [1] - 2:17
days [2] - 8:7; 61:12
deal [1] - 17:21
Deborah [2] - 42:13, 24
December [3] - 52:10, 15; 71:23
decided [3] - 7:5; 10:18; 25:2
decision [6] - 15:7; 17:3; 40:1; 64:4; 66:4, 6
declaration [2] - 42:25; 43:6
declined [1] - 58:2
Defendant [2] - 1:7, 17
defendant [1] - 69:12
Defendant's [2] - 57:14; 73:13
defense [2] - 69:15; 71:8
defensive [1] - 30:9
degree [2] - 4:7; 46:14
deliberate [1] - 8:14
delta-3 [1] - 36:25
dent [1] - 22:5
dental [3] - 42:18; 43:17, 24
dentist [8] - 34:23; 35:6, 19; 36:2; 42:11, 15; 43:21
dentist's [1] - 42:19
dentistry [1] - 42:16
departed [1] - 31:8
Deposition [1] - 57:24
describe [1] - 4:6
described [3] - 16:20; 22:8; 28:4
describing [1] - 6:6
deserve [2] - 24:9; 29:12
deserved [1] - 24:8
designed [1] - 12:18
detail [1] - 22:12
details [2] - 12:14; 42:19
develop [1] - 8:1
developing [1] - 6:25
die [2] - 19:23; 26:5
dim [1] - 26:15
dinner [2] - 61:14, 18

3

**direct** [2] - 2:22; 58:4
**DIRECT** [2] - 3:12; 73:5
**direction** [1] - 26:1
**disappear** [1] - 11:22
**disconnect** [1] - 30:15
**disoriented** [1] - 26:12
**DISTRICT** [3] - 1:1, 11
**divorced** [1] - 10:21
**doctor** [2] - 43:18, 24
**Doctoral** [1] - 4:12
**document** [5] - 15:24; 37:1; 43:5, 7, 14
**documented** [1] - 37:14
**documents** [6] - 65:6, 8; 69:18; 70:1, 24
**done** [19] - 4:8; 14:13; 24:9; 32:5, 23; 34:7; 36:2, 4; 39:10; 49:4, 9; 50:19; 54:15; 55:17; 56:21; 58:14
**door** [16] - 9:1; 16:7; 23:13, 18; 26:10, 20; 30:22; 33:13, 20, 22; 59:11
**doors** [3] - 31:3, 5
**down** [20] - 8:24; 14:3, 5, 8, 10; 22:18, 21; 23:1; 25:6, 21; 26:1; 29:20; 30:6; 31:18; 32:8, 15; 34:6; 66:10, 17, 22
**downstairs** [9] - 8:10; 14:6; 16:10; 19:23; 22:18, 21; 23:14, 16; 27:4
**Dr** [4] - 70:3, 6, 11, 23
**dragged** [1] - 13:20
**dress** [6] - 12:18; 31:14; 32:21, 24; 33:6
**dressed** [3] - 10:13; 14:17; 31:14
**drink** [1] - 33:22
**drive** [2] - 29:17
**driver's** [1] - 33:1
**driving** [4] - 25:19, 21; 32:8, 14
**drove** [7] - 25:23; 26:20, 23; 27:19; 31:17; 33:3
**drums** [1] - 68:4
**ducked** [1] - 22:3
**duly** [1] - 3:4
**during** [12] - 10:16; 11:16; 12:10; 17:10,

16; 19:21, 24; 28:22; 47:3; 50:24; 52:25; 66:19
**DVD** [1] - 68:3
**dying** [1] - 65:14

### E

**e-mail** [17] - 6:20; 39:14; 40:25; 41:5; 47:23; 50:16; 51:16; 52:17, 23; 53:5; 67:17; 70:25
**e-mailed** [2] - 51:24; 60:11
**e-mailing** [4] - 47:21; 52:13; 64:15
**e-mails** [5] - 41:2, 5, 9; 52:6; 70:24
**E.comm** [2] - 4:8, 10
**early** [1] - 53:14
**easier** [1] - 57:23
**EASTERN** [1] - 1:1
**easy** [1] - 64:23
**eat** [1] - 33:22
**eduational** [1] - 4:6
**educated** [1] - 15:4
**effect** [4] - 45:6; 48:21; 60:3; 65:6
**effort** [1] - 65:15
**either** [1] - 41:20
**embarrassed** [4] - 15:6; 17:7; 58:6
**encounter** [1] - 66:7
**end** [6] - 4:24; 5:1, 11; 13:4; 25:24; 71:22
**ended** [1] - 25:19
**ending** [2] - 52:6
**enjoy** [1] - 29:6
**enjoyed** [1] - 8:20
**enormous** [1] - 7:23
**entering** [1] - 2:17
**entire** [1] - 3:18
**episodes** [1] - 35:24
**Eric** [1] - 43:19
**escalate** [1] - 24:2
**ESQ** [4] - 1:15
**estimate** [1] - 47:6
**evaluate** [2] - 70:13; 71:18
**evening** [6] - 21:9, 22; 22:15; 25:4; 31:13, 15
**events** [1] - 48:5
**eventually** [6] - 17:24; 20:16; 30:12; 38:10; 58:20; 65:11

**evidence** [21] - 15:22; 37:9, 13; 39:8; 41:20; 42:1; 43:7, 12; 44:9; 57:7, 15; 68:21; 69:19; 73:14, 18, 20, 22
**exact** [2] - 16:17; 19:7
**EXAMINATION** [6] - 3:12; 44:18; 63:13; 73:5, 7, 9
**examination** [2] - 58:4; 61:3
**examined** [1] - 3:4
**example** [1] - 30:24
**except** [1] - 23:8
**excuse** [1] - 14:23
**exhibit** [2] - 47:25; 69:22
**Exhibit** [33] - 15:15, 21; 37:9, 12; 38:24; 39:4, 6-7; 40:23; 41:13, 24-25; 42:9, 22; 43:10, 14; 44:4, 7-8; 56:20; 57:5, 14, 18; 63:18; 73:13, 17, 19, 21, 23
**EXHIBITS** [1] - 73:12
**expensive** [1] - 36:4
**experience** [1] - 36:16
**explain** [2] - 15:9; 62:1
**explained** [1] - 65:10
**extended** [1] - 5:6
**extent** [1] - 69:11
**extremely** [1] - 12:15
**eye** [1] - 21:25

### F

**face** [10] - 14:9; 20:7; 30:25; 31:23; 33:24; 34:6, 10; 35:4, 15; 66:18
**faced** [1] - 30:25
**faces** [1] - 16:7
**fact** [5] - 40:2; 41:22; 45:12; 52:15; 58:24
**facts** [1] - 68:14
**fair** [18] - 6:25; 10:24; 37:14; 39:14; 47:2, 5-7; 49:12; 50:2, 7, 17; 55:22; 58:1; 61:7; 63:2; 64:18; 68:20
**fall** [1] - 19:23
**familiar** [2] - 42:23; 43:16
**family** [14] - 5:3;

10:7, 10, 17; 11:17; 15:3; 17:20; 33:4; 35:19; 37:15; 38:22; 42:16; 43:22; 67:7
**far** [2] - 27:24; 29:21
**fashion** [3] - 12:11, 16, 24
**father** [3] - 11:12; 65:21; 66:5
**Fatico** [4] - 2:9; 69:10, 14; 70:8
**FATICO** [1] - 1:10
**FBI** [5] - 40:16; 41:4; 42:17; 55:5; 67:23
**February** [6] - 4:23; 5:9; 7:6; 49:18; 52:2
**Federal** [2] - 1:14, 20
**feed** [4] - 12:21; 21:11, 14
**feeding** [3] - 21:8, 12, 23
**feelings** [1] - 11:9
**fees** [1] - 67:12
**fell** [6] - 17:12; 20:7; 22:22; 23:3; 26:12
**felt** [10] - 9:9, 16; 11:21; 15:6; 16:23; 19:11; 21:18; 34:11; 36:22; 67:1
**female** [1] - 31:21
**fetch** [11] - 8:11; 13:7; 18:1; 19:8, 10, 16; 25:7, 9; 27:6, 8; 38:12
**fetched** [1] - 7:20
**few** [11] - 8:3; 10:16; 14:1; 22:9; 25:7; 29:20; 49:13; 61:3, 10; 63:1, 7
**figure** [1] - 2:21
**figured** [1] - 22:23
**filled** [2] - 43:21; 57:18
**finally** [2] - 55:19; 56:13
**finance** [1] - 4:7
**financial** [1] - 24:21
**fine** [5] - 66:23; 71:11, 13, 23; 72:7
**finger** [1] - 12:22
**first** [19] - 3:3; 4:22; 5:19, 21; 7:7, 17; 8:2, 15; 10:16; 11:16; 21:3; 42:13, 25; 49:17, 23; 55:14; 70:18
**fit** [1] - 59:8
**five** [4] - 4:19; 33:2;

**4**

A-251

60:23

**fix** [3] - 11:24; 35:15; 36:1
**fixed** [1] - 35:10
**floor** [5] - 8:24; 20:7; 22:22; 34:6; 54:18
**follow** [3] - 23:8; 35:18; 43:21
**follow-up** [2] - 35:18; 43:21
**followed** [3] - 20:5; 22:21; 42:19
**following** [2] - 39:12, 25
**follows** [1] - 3:5
**followup** [1] - 42:15
**food** [1] - 28:1
**force** [4] - 20:12; 47:12, 16, 18
**forensic** [1] - 71:19
**foresee** [1] - 70:2
**forgive** [2] - 60:17, 19
**form** [3] - 43:2, 20
**forms** [1] - 43:3
**formula** [2] - 8:11; 14:4
**forth** [1] - 53:9
**forward** [2] - 8:1; 25:11
**fought** [1] - 18:24
**four** [2] - 7:14; 13:4
**frame** [1] - 16:15
**Frances** [15] - 45:3, 18; 46:3, 16, 22, 24; 47:18, 21; 50:15; 51:21, 24; 52:25; 64:15; 65:10; 66:9
**friend** [3] - 15:3; 58:13; 65:23
**friends** [4] - 27:18; 29:3, 11
**front** [6] - 16:6; 26:10, 19; 32:25; 59:12
**frustrated** [1] - 20:2
**frustrations** [1] - 8:8
**fuck** [1] - 40:4
**fucked** [1] - 48:8
**fucking** [2] - 40:5; 52:17
**fuel** [1] - 31:17
**full** [2] - 13:10; 22:2
**fulls** [1] - 32:18
**fun** [1] - 8:5
**fur** [1] - 31:14

## G

**games** [1] - 40:5
**garden** [1] - 16:8
**gas** [1] - 31:16
**gathered** [2] - 14:14; 32:24
**gene** [1] - 60:9
**generally** [1] - 5:8
**gentleman** [4] - 13:11, 18-19, 22
**gift** [1] - 7:24
**gifts** [1] - 9:12
**girl** [2] - 12:21; 30:4
**given** [8] - 41:18; 43:4; 47:8; 49:4; 55:17; 64:7; 68:12
**glass** [2] - 12:21; 34:11
**God** [1] - 34:7
**God's** [1] - 60:17
**government** [17] - 2:10; 37:6, 8; 41:12; 43:7; 44:3, 10; 47:24; 69:8, 20, 22, 25; 70:25; 71:3, 16; 72:10
**Government** [13] - 1:13; 15:21; 37:12; 39:7; 41:25; 43:11; 44:8; 73:17, 19, 21, 23
**Government's** [13] - 15:15; 37:9; 38:24; 39:3, 6; 40:23; 41:13; 42:9, 22; 43:14; 44:4, 7
**grab** [1] - 22:23
**grabbed** [8] - 14:8; 22:25; 23:2; 25:15; 32:14; 59:2; 66:14
**grandchildren** [1] - 64:17
**grateful** [2] - 13:13; 25:13
**green** [2] - 6:7
**greeted** [3] - 7:22; 13:15; 66:17
**groceries** [2] - 16:4; 62:6
**grocery** [1] - 16:3
**ground** [1] - 26:12
**grow** [1] - 12:7
**growing** [1] - 65:25
**grown** [1] - 65:24
**growth** [1] - 26:4
**guy** [5] - 49:9; 52:21; 53:16; 54:20; 58:14

**gym** [1] - 29:4

## H

**Hague** [1] - 38:5
**hail** [1] - 52:18
**hair** [7] - 25:15; 32:15, 18; 33:6
**Hale** [1] - 53:5
**half** [2] - 2:21; 28:1
**hand** [13] - 3:1; 20:14; 21:25; 23:2; 25:15; 26:18; 32:18; 34:1; 56:12; 60:17; 66:12, 15
**handful** [1] - 32:16
**hands** [1] - 13:10
**happy** [2] - 13:15; 63:5
**harder** [2] - 62:21
**head** [6] - 21:5; 22:1, 3; 25:16; 32:17
**headboard** [1] - 21:5
**hear** [1] - 31:2
**heard** [1] - 9:3
**HEARING** [1] - 1:10
**hearing** [8] - 2:9; 9:1; 69:10, 14, 22; 70:8, 10; 71:9
**help** [11] - 13:11, 13; 24:7, 12; 26:17; 28:12; 30:6; 35:6; 36:1, 17; 67:11
**helped** [2] - 16:4; 35:10
**helping** [1] - 13:19
**highlight** [3] - 69:24; 70:24
**hindsight** [1] - 58:12
**hit** [6] - 21:5; 22:3; 25:14-16; 35:4
**hitting** [2] - 8:25; 20:15
**hold** [1] - 15:17
**home** [37] - 3:25; 4:25; 5:2, 19; 7:21, 23; 10:17, 19; 12:4; 13:25; 19:12; 22:15-17; 24:14, 18, 23; 26:23; 29:15; 30:21; 31:16; 32:2; 33:3, 16-17; 35:16; 36:22; 37:18, 21; 38:15; 39:22; 64:9, 23; 65:23
**Honor** [23] - 2:10, 19; 15:19; 16:12; 37:8; 39:5; 41:17; 42:3; 43:4; 44:10; 57:1, 8; 68:24; 69:5, 9, 16;

70:6; 71:6, 13; 72:7, 9, 11
**Honor's** [1] - 2:20
**HONORABLE** [1] - 1:10
**hope** [1] - 70:11
**hose** [1] - 12:21
**hour** [6] - 2:21; 27:25; 47:24; 48:1
**house** [31] - 5:23; 11:13; 14:2; 16:21, 25; 23:1; 26:24; 27:1, 17, 19, 21; 28:18-20; 29:23; 30:16, 19-20, 23; 31:1, 5; 33:7; 35:3; 45:3; 53:12; 57:19; 62:7, 10; 65:1; 68:3
**household** [2] - 67:25; 68:18
**houses** [1] - 32:12
**hug** [1] - 66:14
**hugged** [1] - 13:14
**hurt** [3] - 18:3; 21:4; 22:23
**hurting** [2] - 38:22
**husband** [1] - 11:12
**hydrocodone** [1] - 44:2

## I

**idea** [2] - 11:1; 63:8
**identified** [1] - 6:10
**identify** [1] - 6:5
**impact** [4] - 39:12, 25; 40:7; 64:3
**in-laws** [1] - 10:23
**incident** [12] - 8:15; 14:22, 24; 20:10; 24:23; 27:3; 28:4; 29:8; 33:9; 58:21; 63:15
**incidents** [5] - 19:25; 22:11; 24:14; 31:9
**including** [1] - 67:14
**INDEX** [1] - 73:1
**indulgence** [2] - 42:3; 71:21
**infant** [1] - 9:20
**influence** [1] - 17:3
**information** [2] - 42:17, 20
**inside** [2] - 12:22; 20:8
**instance** [2] - 60:16; 61:13
**instances** [1] - 37:14
**instead** [1] - 68:16

instinct [1] - 21:3
insult [1] - 54:4
insulting [2] - 25:18; 32:17
intended [1] - 17:17
intention [1] - 40:2
International [1] - 38:5
internet [1] - 28:11
interview [1] - 40:20
introduce [3] - 11:4; 16:23; 37:9
introduced [4] - 11:14; 47:25; 69:22
introducing [1] - 10:22
involved [4] - 10:3; 12:11
irate [1] - 8:23
island [1] - 32:10
Island [6] - 5:17; 17:11; 19:19; 37:2; 42:12; 45:1
Islip [3] - 1:6, 15, 21
isolated [1] - 27:23
issues [2] - 12:2; 69:14
itself [2] - 24:14; 48:7

**J**

jail [4] - 45:10; 46:18; 47:13; 51:15
January [14] - 40:12; 41:3; 45:1, 20; 46:19; 51:25; 52:2; 60:13; 64:12, 14; 65:16; 67:23; 72:1, 6
jealous [1] - 21:18
Joe [45] - 7:12; 8:18; 9:3, 20; 10:8; 12:9; 13:20, 22; 14:6; 18:20, 24; 19:14; 21:4; 23:19; 24:6; 26:18; 27:7; 28:17; 30:9; 32:1; 33:11; 34:21; 35:9, 13, 18, 25; 36:15, 19; 38:16; 41:6; 48:3, 20; 49:13; 50:21; 51:10; 53:6, 9-10, 25; 54:8; 58:22; 61:4; 66:13, 25
Joe's [4] - 19:12; 25:4; 38:3; 66:25
joeval5@optonline.net [1] - 39:15
Johannesburg [1] -

3:17
join [1] - 29:4
Joseph [16] - 5:20, 25; 6:1, 14; 10:20; 13:7, 14; 21:1; 30:5; 45:9, 19; 46:7, 19; 52:13, 16; 66:10
JOSEPH [2] - 1:6, 10
journey [1] - 64:11
JUDGE [1] - 1:11
Judge [5] - 2:2; 3:11; 63:12; 69:1; 70:5
July [2] - 6:17; 17:12
jumped [1] - 26:8
jumps [1] - 21:4
June [2] - 5:1, 9

**K**

Kabrawala [6] - 2:3, 20; 3:10; 57:11; 69:25; 72:3
KABRAWALA [32] - 1:15; 2:2, 10, 16; 3:11, 13; 6:9; 9:6; 14:19; 33:18; 37:8; 41:12; 42:2, 5, 8; 43:4; 44:3, 10; 51:13; 56:18; 57:9; 63:12, 14; 68:24; 69:1, 9; 71:17, 21, 24; 72:10; 73:6, 10
karate [1] - 22:14
keep [3] - 31:3; 51:18; 66:24
kept [3] - 32:8; 41:7; 66:24
keyboard [2] - 16:2, 11
keys [1] - 30:16
khaki [2] - 6:7
kids [3] - 51:2; 64:24; 65:12
kill [3] - 35:1; 59:15, 19
kind [7] - 12:11; 21:19; 25:2; 29:2, 5; 35:11; 66:11
kindly [1] - 13:11
kitchen [6] - 8:24; 14:5; 22:16; 23:19; 64:1
knock [2] - 23:12; 33:15
knocked [4] - 26:11; 33:22; 59:10, 13
knocking [1] - 33:20
knowing [1] - 65:24

knowledge [1] - 55:1
known [1] - 65:23

**L**

lady [1] - 27:18
lap [1] - 66:19
LAPINTA [1] - 1:18
LaPinta [3] - 2:5; 70:9; 71:5
last [10] - 2:13; 5:5; 51:24; 52:1; 60:11; 61:3, 10; 67:8; 70:10; 71:7
lasted [1] - 64:19
Lato [3] - 2:5; 44:17; 69:3
LATO [34] - 1:17; 2:5, 19; 15:19; 16:12; 37:10; 39:5; 41:14, 17; 43:9; 44:6, 14, 19; 56:19; 57:1, 4, 8, 10; 60:21, 23; 62:24; 63:1, 11; 69:4, 16; 70:5, 17, 21; 71:5, 13; 72:5, 7, 9; 73:8
laugh [1] - 8:12
law [3] - 36:17; 65:4
laws [2] - 10:23; 38:7
laying [2] - 20:25; 34:5
least [2] - 50:2; 71:17
leave [26] - 11:9; 15:6, 12; 18:20, 25; 22:20; 24:17; 26:5, 9; 31:10; 33:10; 36:5; 38:2, 8, 10, 14; 53:20; 58:6, 8; 61:1; 64:9, 24-25; 65:9
leaves [1] - 33:13
leaving [1] - 13:3
left [23] - 5:5, 7; 9:4; 12:3; 14:14; 16:2, 10, 16; 20:16; 25:6, 10; 27:3, 7; 30:16, 19; 32:7; 34:21; 36:8; 52:12; 58:10, 13; 65:22
legs [1] - 21:7
LEONARD [1] - 1:17
Leonard [1] - 2:5
lesbian [1] - 61:16
lesbians [1] - 32:5
less [2] - 8:12; 52:6
L▆▆▆▆ [13] - 4:5; 9:7, 11, 21; 11:14; 14:4; 19:4; 53:23-25; 54:3, 6
library [1] - 29:5

life [5] - 3:18; 10:3, 15; 65:24; 66:2
light [1] - 45:8
lights [3] - 26:15; 31:4, 23
limited [1] - 24:14
line [6] - 6:14, 19; 10:4; 29:9; 49:19; 51:18
lip [1] - 20:8
live [3] - 27:17; 49:17; 54:21
lived [4] - 3:18; 7:19; 49:12; 55:12
living [5] - 10:9; 28:22; 29:14; 53:23; 62:13
lock [1] - 30:19
locked [1] - 9:22
look [6] - 21:25; 31:23; 42:9; 43:15; 56:20; 66:19
looked [6] - 8:1; 26:14; 34:12; 65:24; 66:18; 68:2
looking [5] - 25:11; 28:11; 30:4; 49:21; 66:21
looks [3] - 25:25; 26:3; 43:16
lost [1] - 34:10
lounge [5] - 14:7, 9; 21:9, 23; 30:24
love [1] - 10:14
loved [1] - 31:15
loving [1] - 9:9
lozenges [1] - 34:12
luck [1] - 17:21
lunch [1] - 8:18

**M**

mail [17] - 6:20; 39:14; 40:25; 41:5; 47:23; 50:16; 51:16; 52:17, 23; 53:5; 67:17; 70:25
mailed [2] - 51:24; 60:11
mailing [4] - 47:21; 52:13; 64:15
mails [5] - 41:2, 5, 9; 52:6; 70:24
main [1] - 31:19
mall [1] - 27:24
man [3] - 13:21; 49:23; 50:10

6

March [7] - 5:7, 12; 37:19, 22; 38:14; 52:12
Marines [1] - 55:1
marked [6] - 15:14; 36:25; 38:23; 40:22; 42:21; 43:13
Massapequa [1] - 11:13
material [2] - 68:18; 69:24
materials [2] - 67:24; 68:8
matter [1] - 63:3
MDC [2] - 46:1, 7
mean [3] - 23:11; 40:20; 45:24
means [1] - 24:21
mechanical [1] - 1:24
medical [1] - 42:18
medication [1] - 35:25
medications [1] - 44:1
meet [10] - 7:5; 10:17, 19; 11:1, 11; 29:5, 10; 66:1, 5; 68:13
member [1] - 10:7
members [1] - 10:17
memorandum [2] - 71:1, 9
memory [1] - 43:16
men [1] - 49:21
mended [1] - 11:25
mention [1] - 41:18
mentioned [5] - 12:3, 10; 33:9; 68:6; 69:21
Mercedes [1] - 29:16
met [15] - 6:14; 7:7; 8:22; 10:8; 11:17; 13:14; 40:15, 17; 49:16, 19, 23, 25; 50:11; 65:22
Metropolitan [1] - 45:13
middle [1] - 32:10
might [4] - 31:1; 57:22; 66:2; 69:11
mileage [1] - 29:21
Mill [20] - 5:20; 7:19, 21; 10:17, 19; 14:1; 16:18, 21; 27:17, 19, 22; 28:18, 23; 29:15; 30:20; 53:12; 54:11; 55:14
mind [3] - 24:24; 25:7; 32:1
minute [1] - 56:21
minutes [4] - 2:22; 33:2; 60:23; 61:4

missing [2] - 12:6; 17:20
mistreatment [3] - 11:18; 22:10; 24:13
mom [4] - 9:2; 33:4; 36:1; 66:25
moment [6] - 16:13; 41:15; 42:2; 62:24; 68:24; 69:4
mommy [1] - 65:21
money [14] - 17:20; 35:14; 46:21, 25; 47:2; 50:25; 51:4, 10, 22; 52:1, 7; 53:1; 67:9, 20
monitor [2] - 29:24
month [6] - 4:20; 8:8; 20:10, 19; 52:7; 53:1
months [15] - 5:12; 6:18, 23; 7:14; 8:3; 10:16, 18, 25; 11:5; 18:17; 19:17, 25; 22:9; 53:12; 61:11
mood [1] - 63:2
morning [6] - 8:17; 9:5; 27:7; 28:7; 34:22; 45:18
most [2] - 28:16; 62:9
mother [20] - 4:25; 11:12; 12:6, 9, 24; 17:19; 19:7, 16-17; 21:19; 22:17; 25:4; 29:24; 36:8; 39:22; 50:15, 20; 67:6
motherfucker [1] - 48:9
mouth [4] - 26:18; 34:11, 13
move [6] - 16:24; 25:14; 26:24; 27:21; 57:10; 59:10
moved [10] - 2:12; 5:19; 16:20; 27:1, 21; 28:5, 8; 55:14; 58:17
moves [4] - 37:8; 41:12; 43:7; 44:3
moving [1] - 54:12
MR [65] - 2:2, 5, 10, 16, 19; 3:11, 13; 6:9; 9:6; 14:19; 15:19; 16:12; 33:18; 37:8, 10; 39:5; 41:12, 14, 17; 42:2, 5, 8; 43:4, 9; 44:3, 6, 10, 14, 19; 51:13; 56:18; 57:1, 4, 8-10; 60:21, 23; 62:24; 63:1, 11-12, 14; 68:24; 69:1, 4, 9, 16; 70:5, 17, 21; 71:5, 13, 17,

21, 24; 72:2, 5, 7, 9-10; 73:6, 8, 10
multipage [1] - 43:14
must [3] - 21:6; 22:19

**N**

name [7] - 2:16; 10:5; 28:8; 42:11, 14, 16; 43:18
names [1] - 4:4
nap [2] - 8:10; 14:3
nasty [1] - 63:6
necessary [3] - 21:20; 67:1; 69:11
necessitated [1] - 19:11
need [5] - 9:12; 34:22; 35:7; 36:2; 71:17
needed [2] - 9:11; 51:4
needle [1] - 25:25
needs [2] - 9:25; 66:2
neighbor [2] - 9:3; 48:8
neighbor's [1] - 16:7
neighbors [4] - 16:6; 17:4; 31:11; 49:3
never [12] - 10:12; 11:19; 23:21; 27:12; 35:23; 36:3; 56:6; 62:2; 65:21, 23
New [1] - 5:17
NEW [1] - 1:1
new [3] - 10:22; 45:22; 65:5
newborn [1] - 11:5
next [16] - 9:1; 21:2, 24; 27:7; 28:6; 33:8; 34:1, 5-6, 22; 36:6; 42:5; 45:17; 70:12
nice [7] - 26:4; 49:25; 50:1; 53:6, 16; 61:18
night [4] - 20:3; 34:21; 45:6; 57:19
nights [1] - 61:13
nine [1] - 4:2
nobody [7] - 15:12; 24:6, 11; 31:2; 67:3; 68:14
noise [1] - 31:2
note [10] - 16:2, 10, 15; 17:3; 48:12, 21, 24; 49:6, 10; 63:21
nothing [6] - 12:20; 33:2; 44:11; 63:11; 69:1, 5
notwithstanding [1] -

53:5
November [6] - 5:2, 10; 18:7; 33:11; 71:7, 12
number [6] - 4:8, 17; 30:6; 68:12
numbered [1] - 40:24
numbers [1] - 40:24
NY [3] - 1:6, 15, 21

**O**

obey [1] - 52:17
objection [11] - 15:17; 37:10; 39:3; 41:17, 22; 43:9; 44:6; 51:13; 56:18; 57:9, 11
objects [1] - 68:2
obscenities [1] - 20:4
occasion [4] - 8:9; 59:14, 16
occasions [4] - 5:16; 31:4; 56:6; 59:1
October [5] - 5:2, 10; 7:15; 18:7; 39:18
October-November [1] - 5:2
odd [5] - 48:22; 49:2, 9; 53:16
OF [3] - 1:1, 3, 10
offered [1] - 13:11
offhand [1] - 42:17
office [8] - 22:7, 25; 33:12, 16-17; 41:4, 8
officer [1] - 66:12
officers [5] - 31:20; 64:2; 66:14, 21
often [2] - 25:11; 50:15
oftentimes [1] - 19:14
old [11] - 4:2; 6:23; 7:14; 10:18, 20, 25; 11:5; 25:1; 46:9; 59:6; 65:22
omnibus [1] - 71:1
on-line [1] - 49:19
once [4] - 50:18; 54:20; 65:21; 66:1
one [39] - 2:11; 16:2, 12; 19:25; 20:3; 21:9, 22; 22:15, 25; 23:21-23; 24:11; 25:22; 27:18; 29:14; 31:13, 18, 21; 32:9; 41:14; 42:2, 13; 43:2; 54:25; 55:19; 58:5, 10, 13; 59:1; 60:21; 61:13;

7

A-254

62:24; 66:14, 21;
68:24; 69:4; 70:5
**ongoing** [1] - 70:6
**open** [7] - 20:8; 21:6;
26:9, 11; 33:22; 51:19;
59:12
**opened** [6] - 26:7;
31:5; 33:14; 59:11
**opportunity** [3] -
12:16; 56:14; 58:1
**opposite** [1] - 26:1
**option** [1] - 36:22
**order** [1] - 36:13
**original** [1] - 15:15
**originals** [1] - 65:7
**otherwise** [1] - 36:3
**outlined** [1] - 44:4
**outside** [3] - 24:15,
23; 28:25
**overhead** [1] - 15:16
**overstated** [2] - 5:6;
18:22
**owe** [1] - 34:7
**owen** [1] - 1:20
**own** [1] - 29:11
**owned** [1] - 5:20

**P**

**p.m** [4] - 1:7; 72:1, 3,
6
**pack** [1] - 27:6
**packing** [1] - 23:9
**page** [3] - 42:25;
57:21; 63:22
**pages** [2] - 41:19;
69:23
**paid** [1] - 7:11
**pain** [1] - 34:17
**painful** [1] - 34:18
**pan** [1] - 34:11
**panty** [1] - 12:20
**paper** [1] - 16:1
**parent's** [1] - 38:6
**parents** [5] - 10:19;
11:1, 3-4, 11
**parked** [1] - 26:14
**parking** [3] - 26:2;
32:11
**part** [3] - 12:13; 65:3;
70:10
**partake** [1] - 29:5
**particular** [2] -
12:18; 31:11
**passage** [3] - 23:1;
34:6, 11

**passport** [2] - 18:13;
65:5
**passports** [1] - 65:4
**pay** [3] - 30:14; 67:11
**paying** [1] - 35:14
**payments** [1] - 67:7
**penalties** [1] - 18:23
**penicillin** [1] - 44:2
**people** [10] - 12:18;
15:3, 10; 17:7; 27:8;
29:3, 6; 38:12; 55:10;
58:7
**perhaps** [3] - 11:21;
21:18
**period** [7] - 5:6; 19:6,
17; 30:13; 50:24;
64:25; 67:8
**permission** [4] -
17:22; 38:3, 6, 8
**permitted** [3] - 5:6;
18:15, 22
**person** [1] - 7:7
**personal** [1] - 6:20
**Perusing** [1] - 43:1
**petition** [2] - 37:2,
15
**phone** [14] - 6:21; 7:1;
23:2; 30:1, 3, 5-6,
10-11, 19; 56:10
**phoned** [1] - 27:5
**phones** [3] - 23:1;
29:23; 30:18
**physical** [2] - 56:1;
64:3
**physically** [3] -
54:16; 56:4; 58:22
**pick** [3] - 56:9, 11;
64:23
**picked** [2] - 13:6; 22:4
**pictures** [1] - 51:2
**piece** [1] - 16:1
**pieces** [2] - 23:3;
32:21
**pillow** [1] - 14:10
**place** [3] - 19:12;
26:4; 27:4
**places** [3] - 25:19;
62:3
**plane** [1] - 7:11
**planned** [1] - 59:23
**plastic** [1] - 68:2
**play** [2] - 29:6; 40:5
**playing** [1] - 35:2
**Plaza** [2] - 1:14, 20
**pleased** [1] - 7:25
**plus** [1] - 71:9

**point** [22] - 7:5, 13;
11:11; 16:20; 17:10,
16; 29:14; 30:1; 36:5;
37:18; 38:13; 39:20;
40:12; 45:9; 52:20;
53:19, 25; 54:3, 11,
15; 67:3; 70:23
**pointed** [1] - 13:18
**pointing** [1] - 6:5
**police** [19] - 23:15,
18; 27:3, 6; 28:4;
31:20; 36:17; 55:19,
23; 56:7, 13; 57:18;
58:2; 63:15, 25; 64:1,
4
**policeman** [2] - 24:3,
7
**policemen** [1] - 23:21
**polluted** [1] - 60:8
**pool** [1] - 60:9
**porn** [1] - 45:22
**pornography** [1] - 45:7
**portion** [1] - 67:9
**possible** [1] - 72:2
**potential** [1] - 70:1
**power** [1] - 55:9
**pray** [1] - 50:21
**predicted** [1] - 70:9
**pregnancy** [1] - 19:21,
24
**pregnant** [9] - 6:18;
17:11, 13-14; 19:2, 19,
25; 59:22; 60:1
**preparing** [1] - 8:18
**presence** [1] - 64:3
**pressure** [1] - 65:11
**presumably** [2] - 19:2;
68:12
**pretend** [1] - 64:10
**pretty** [1] - 38:13
**previous** [1] - 60:13
**primary** [1] - 72:3
**printed** [2] - 41:7, 10
**prison** [7] - 34:25;
45:19, 23; 50:14;
65:17; 66:8, 21
**prisoners** [1] - 66:11
**private** [1] - 6:21
**problem** [2] - 23:25;
36:3
**proceed** [1] - 2:9
**proceeding** [1] - 72:13
**Proceedings** [1] - 1:24
**process** [2] - 36:14;
65:3
**produced** [1] - 1:24

**progressed** [1] - 8:2
**projector** [1] - 15:16
**promise** [1] - 38:11
**pronouncing** [1] - 44:21
**pronunciation** [1] - 40:19
**proper** [1] - 15:7
**properly** [1] - 36:1
**provide** [1] - 42:17
**provided** [2] - 37:5;
41:2
**provoke** [1] - 60:10
**provoked** [1] - 24:3
**pull** [1] - 3:8
**pulled** [6] - 22:21;
26:2; 31:16, 20; 32:11,
18
**punched** [4] - 34:10,
14; 54:18
**punching** [1] - 20:15
**purposes** [1] - 69:10
**push** [1] - 34:18
**pushed** [4] - 14:8;
33:22; 35:11
**put** [20] - 8:10; 14:4;
15:16; 21:3; 22:18;
25:9, 14; 26:18; 30:6;
31:17; 34:1; 35:10;
48:9; 69:15, 17-18, 20;
70:19, 23
**puts** [1] - 69:12
**putting** [2] - 14:3;
49:3

**Q**

**questions** [1] - 63:1
**quickly** [2] - 12:8;
33:23
**quite** [2] - 8:23; 13:10

**R**

**raise** [1] - 2:25
**raised** [1] - 3:19
**ran** [2] - 20:8; 23:7
**rape** [1] - 21:6
**raped** [3] - 32:22;
48:24; 49:6
**reaching** [1] - 59:9
**react** [1] - 14:17
**read** [1] - 39:9
**reading** [1] - 39:10
**ready** [1] - 2:9
**reaffirmed** [1] - 40:8

8

**realized** [2] - 23:15; 36:5

**really** [17] - 8:4; 9:23; 10:15; 21:18; 25:10; 26:6; 38:19; 47:14, 19; 49:11; 51:8; 60:19; 66:25; 67:3; 68:15

**reason** [16] - 22:1; 44:6; 46:15, 18, 21; 48:14; 53:19, 22; 54:20, 23; 58:8; 67:2; 68:17; 70:11

**reasons** [3] - 44:4; 54:25; 58:5

**rebuttal** [1] - 69:11

**recalled** [1] - 8:15

**receive** [1] - 3:22

**received** [15] - 15:21; 30:4; 37:12; 39:7; 41:25; 43:11; 44:8; 57:14; 73:13, 17, 19, 21, 23

**recently** [1] - 10:21

**reception** [1] - 35:12

**recess** [1] - 44:15

**recognize** [3] - 15:24; 37:1; 43:18

**record** [4] - 6:9; 28:3; 43:23; 57:6

**recorded** [1] - 1:24

**records** [1] - 43:6

**recovered** [1] - 68:18

**redirect** [1] - 63:12

**REDIRECT** [2] - 63:13; 73:9

**referred** [1] - 35:8

**referring** [2] - 5:25; 42:25

**reflect** [2] - 6:9; 43:23

**refreshes** [1] - 43:16

**refused** [1] - 18:20

**regular** [2] - 8:9; 28:24

**related** [1] - 71:9

**relation** [2] - 7:1; 63:24

**relationship** [6] - 8:1; 9:15; 11:24; 61:11; 68:20

**relaxed** [1] - 66:24

**remain** [1] - 2:25

**remainder** [1] - 28:2

**remember** [36] - 5:4; 8:16, 23; 9:1, 19;

13:3; 16:17, 22; 18:11; 19:24; 20:25; 21:22; 22:14; 23:3; 30:3, 20; 32:11; 33:4, 20-21; 34:3, 5; 42:13; 45:6, 15, 17, 24; 47:24; 48:3, 5, 17; 54:11; 55:19; 61:5

**remembered** [1] - 32:14

**rent** [2] - 51:6; 67:11

**report** [6] - 57:18; 63:16; 70:4, 23; 71:19

**Reporter** [1] - 1:20

**reprimanded** [1] - 66:15

**require** [1] - 41:20

**required** [2] - 65:4, 8

**resent** [1] - 9:17

**residence** [4] - 16:21; 28:23; 54:13

**respect** [1] - 69:14

**respected** [1] - 10:23

**respond** [2] - 8:14; 71:16

**response** [2] - 8:21; 71:3

**rest** [4] - 9:4; 13:22; 34:21; 67:5

**restraining** [1] - 36:13

**rests** [2] - 69:8

**return** [6] - 13:1; 17:17; 18:15; 31:16; 54:12

**returned** [2] - 4:25; 18:6

**reunion** [1] - 13:8

**reverting** [1] - 26:13

**rid** [1] - 60:9

**ring** [1] - 9:11

**ripped** [3] - 20:3; 32:20, 22

**ripping** [1] - 14:10

**road** [9] - 25:6, 21, 24-25; 26:1; 31:19; 32:8; 58:21; 61:13

**ROBERT** [1] - 1:13

**Romania** [2] - 30:4, 8

**romantic** [1] - 7:1

**room** [17] - 9:4; 12:20; 14:18; 19:15; 20:1, 3-4, 6, 9, 11, 17-18; 21:1; 23:9, 17; 33:6; 40:20

**root** [1] - 36:2

**roses** [1] - 7:23

**RPR** [1] - 1:20

**rubbing** [1] - 66:24

**run** [1] - 26:8

**running** [1] - 23:1

**S**

**safe** [4] - 19:12; 27:13, 17

**Samsung** [1] - 30:3

**sat** [3] - 22:21; 33:1; 66:17

**save** [1] - 34:17

**saved** [3] - 41:5; 48:12, 15

**saw** [9] - 10:9; 21:2; 23:8; 26:13; 30:8; 34:13

**scared** [2] - 20:17; 34:20

**schedule** [2] - 2:14, 20

**scheduled** [1] - 2:8

**school** [2] - 64:25; 67:12

**scrambled** [1] - 32:24

**scream** [1] - 20:4

**screamed** [1] - 8:25

**screaming** [6] - 9:2; 25:17; 26:16; 32:16, 22

**screen** [4] - 33:23; 38:25; 57:22

**search** [1] - 30:7

**seat** [3] - 26:7; 59:2, 8

**seated** [2] - 3:8; 44:16

**second** [10] - 5:22; 15:17; 17:1, 10, 16; 45:25; 60:21; 63:22; 70:5

**Secondary** [1] - 40:18

**seconds** [1] - 63:3

**see** [30] - 6:3; 12:8; 13:15; 17:18; 22:17; 29:2, 21-22; 30:7, 23; 31:1, 23; 32:13; 33:7, 14; 34:23; 38:24; 43:19; 45:18, 24; 46:7, 16, 18; 48:8; 57:22; 64:17; 65:15, 21; 68:8; 70:11

**seeing** [2] - 32:11; 47:25

**seek** [3] - 36:9, 13; 43:17

**seem** [1] - 49:9

**self** [1] - 43:8

**self-authenticating** [1] - 43:8

**send** [7] - 18:1; 24:19; 27:6; 38:18; 52:16; 53:6; 55:10

**sending** [5] - 38:21; 50:24; 51:2, 22; 52:25

**sense** [1] - 11:6

**sent** [2] - 41:6; 52:1

**sentence** [1] - 60:17

**sentencing** [8] - 69:13; 70:17, 22; 71:1, 4, 8, 25

**sentencings** [1] - 71:8

**September** [1] - 1:7

**series** [1] - 64:18

**seriously** [1] - 52:21

**set** [8] - 41:2; 61:8, 24; 63:8; 68:4; 70:15, 25; 71:3

**seven** [4] - 4:3; 6:17; 19:25; 46:10

**several** [1] - 47:3

**sex** [2] - 20:2, 12

**shelter** [9] - 27:2, 5, 18; 28:6, 8, 12, 15; 36:12

**shining** [1] - 31:22

**shirt** [2] - 6:7

**shopping** [1] - 16:3

**short** [2] - 30:13; 31:18

**shortly** [7] - 5:3; 16:9; 18:9; 23:8; 28:4; 31:8; 45:16

**show** [12] - 12:11, 16, 24; 14:11; 15:14; 36:24; 38:23; 40:22; 42:10; 48:9; 49:3; 56:20

**shower** [1] - 14:16

**showing** [5] - 15:23; 42:21; 43:13; 57:4; 63:19

**shut** [2] - 26:19

**sick** [1] - 65:14

**side** [6] - 25:23; 32:9, 20, 25; 33:1

**sign** [2] - 9:21; 22:6

**sister** [2] - 11:12; 33:4

**sister's** [1] - 11:12

**site** [2] - 29:9; 49:19

**sitting** [5] - 21:22, 24; 33:5; 34:6; 66:10

**situation** [7] - 11:2;

9

18:18; 24:16; 27:12; 31:24; 32:3; 64:22
**six** [5] - 10:18, 25; 11:5; 13:5; 18:17
**slapped** [1] - 20:7
**sleep** [1] - 14:5
**sleeping** [2] - 20:1, 11
**slip** [1] - 12:22
**small** [2] - 33:14; 59:7
**smashing** [1] - 32:17
**Smithtown** [20] - 5:23; 16:18, 21, 25; 27:22, 24; 28:20, 24; 30:21; 33:17; 35:20; 42:16; 43:22; 54:12; 55:13-15; 62:7; 68:5
**social** [1] - 29:5
**someone** [6] - 15:2, 5; 24:19; 29:18; 46:1; 65:1
**sometime** [2] - 30:11; 45:12
**sometimes** [3] - 30:18; 33:13; 62:15
**somewhere** [4] - 5:1; 53:21; 61:15; 62:5
**son** [33] - 4:2; 6:18, 23; 7:14, 24; 8:10; 9:7, 16, 18-19, 24; 10:18, 20, 22, 25; 11:3, 15; 12:7; 13:12; 14:3; 16:24; 19:4, 8, 10, 15-16; 22:14; 25:2; 62:7
**son's** [1] - 16:22
**sorry** [7] - 9:6; 23:11; 30:5; 33:18; 49:5; 57:2; 72:5
**sort** [2] - 28:25; 71:1
**sounds** [2] - 28:3; 47:7
**South** [16] - 3:17; 12:4; 13:2; 17:17, 23; 18:6; 37:18; 39:20; 52:11, 16; 53:20; 54:12; 55:10; 58:17; 65:4
**space** [1] - 26:3
**spare** [2] - 20:1, 4
**speaking** [2] - 5:8; 48:17
**speaks** [1] - 48:7
**Special** [5] - 40:16; 41:2, 10; 48:17; 68:11
**specific** [1] - 18:12
**specifically** [3] - 24:24; 45:1; 49:21

**specify** [1] - 62:23
**spelling** [1] - 4:10
**spend** [3] - 13:2; 17:20; 28:14
**spent** [1] - 33:12
**spite** [1] - 50:19
**splashed** [2] - 22:2
**split** [1] - 20:8
**spoken** [1] - 67:3
**stairs** [1] - 22:24
**stand** [1] - 42:5
**standing** [3] - 2:25; 23:20; 24:8
**stands** [1] - 24:24
**started** [16] - 6:19; 8:5, 12, 24; 10:4; 12:19; 14:10; 20:3, 15; 21:5; 22:16; 26:16; 33:2; 34:2; 50:5
**starting** [1] - 4:21
**Statement** [2] - 57:23
**statement** [10] - 47:5; 56:14; 58:1; 61:7; 63:2, 21, 25; 64:4, 7
**statements** [5] - 39:23; 40:1; 42:24; 43:5, 23
**STATES** [3] - 1:1, 3, 11
**States** [22] - 1:14; 2:3; 4:16, 18, 21; 5:17; 6:24; 7:6, 17; 12:3; 18:16; 19:2; 31:8; 41:3; 44:25; 46:16; 49:16, 18; 52:10; 60:12; 64:12; 65:16
**station** [1] - 31:16
**stay** [7] - 5:6; 18:22; 23:11; 25:3; 26:24; 30:22; 38:9
**stayed** [18] - 4:24; 5:1, 5, 12, 19-20, 22; 9:4; 18:22; 19:16; 20:18; 22:7; 27:1, 20; 28:1; 50:11, 13; 59:20
**staying** [3] - 5:24; 10:19; 14:1
**stays** [1] - 5:15
**stenography** [1] - 1:24
**Steven** [1] - 40:16
**still** [5] - 22:2; 29:14; 47:9; 53:25; 54:6
**stockings** [1] - 32:21
**stood** [6] - 22:1; 26:13; 33:23; 34:16; 36:18

**stop** [4] - 20:13, 16; 32:18
**stopped** [4] - 20:16; 26:7; 31:21; 67:21
**store** [1] - 62:6
**stormed** [2] - 13:21; 22:6
**story** [1] - 68:15
**strange** [1] - 29:10
**stroller** [1] - 13:10
**struggling** [1] - 35:24
**studied** [1] - 4:7
**stunned** [2] - 24:5, 10
**stupid** [1] - 51:11
**subject** [2] - 69:10; 70:12
**submission** [4] - 70:20, 22; 71:14
**submitted** [1] - 37:2; 70:25
**subpoena** [1] - 3:22
**subsequent** [1] - 59:14
**substance** [1] - 48:20; 52:17
**sudden** [3] - 53:17; 61:20; 63:6
**suddenly** [2] - 13:20; 50:8
**suede** [1] - 14:9
**suggesting** [1] - 62:13
**suggestion** [1] - 67:20
**suitcase** [1] - 23:9
**suitcases** [1] - 13:9
**summary** [1] - 41:21
**summer** [4] - 22:9; 24:13, 24; 26:25
**support** [3] - 51:5; 67:10, 13
**Supporting** [1] - 57:23
**supposed** [1] - 15:4
**surely** [1] - 11:9
**surgeon** [4] - 35:7, 10, 19
**surgery** [1] - 44:1
**surprised** [2] - 13:16; 55:17
**sustained** [1] - 51:14
**switched** [1] - 33:23
**sworn** [1] - 3:4

---

**T**

**table** [1] - 66:17
**tall** [2] - 25:24
**teasing** [1] - 19:14

**technically** [1] - 41:20
**teenaged** [1] - 9:1
**teeth** [9] - 34:14, 17-18; 35:10, 23; 36:1, 3
**ten** [2] - 2:22; 18:18
**tennis** [1] - 29:6
**terminated** [1] - 68:21
**termination** [1] - 67:17
**terms** [6] - 2:19; 5:14; 60:16; 61:10; 62:3; 69:14
**terrible** [1] - 47:8
**terrified** [2] - 24:22; 38:21
**testified** [4] - 3:4; 18:7; 58:4; 61:3
**testify** [1] - 3:22
**testifying** [1] - 39:23
**testimony** [1] - 70:10
**thanked** [2] - 8:19, 21
**THE** [47] - 1:10; 2:4, 7, 12, 24-25; 3:6, 8; 6:11; 14:21; 15:17, 20; 16:14; 33:19; 37:11; 39:3, 6; 40:19; 41:23; 42:7; 43:10; 44:7, 12, 16; 51:14; 56:25; 57:3, 6, 13; 60:24; 69:3, 6-8, 13; 70:3, 15, 18, 22; 71:11, 15, 20, 23, 25; 72:6, 8, 12
**thereabouts** [1] - 18:7
**thereafter** [6] - 16:9; 18:9; 19:17; 20:10; 23:8; 28:5
**third** [4] - 19:1; 24:25; 31:9; 42:15
**threaten** [1] - 24:17
**threatened** [1] - 38:11
**three** [2] - 7:14; 71:18
**threw** [4] - 22:1, 4; 26:19; 54:18
**thrilled** [1] - 7:21
**throat** [2] - 20:14; 34:2
**throughout** [1] - 47:21
**thumb** [3] - 37:4; 41:1; 42:22
**ticket** [2] - 7:11; 32:6
**today** [5] - 3:22; 6:3; 70:8, 14; 72:8
**together** [2] - 23:20; 67:14

10

**Tomorrows** [1] - 28:9
**Tomorrows'** [1] - 28:14
**tonight** [1] - 26:5
**took** [8] - 7:20; 22:23; 25:5; 27:9; 30:10; 35:6, 20; 62:6
**top** [2] - 20:12; 21:4
**tore** [1] - 14:12
**torn** [1] - 33:6
**touch** [1] - 68:11
**tough** [1] - 17:21
**toughen** [1] - 10:1
**toward** [2] - 5:11; 9:7
**towards** [3] - 10:9; 26:13; 58:22
**transcript** [1] - 1:24
**TRANSCRIPT** [1] - 1:10
**transcription** [1] - 1:24
**transfer** [1] - 46:24
**transferred** [2] - 47:2, 5
**travel** [3] - 3:24; 65:4, 8
**travelling** [1] - 13:25
**treat** [3] - 19:20; 20:23; 62:17
**treated** [5] - 7:22; 8:5; 9:8, 10, 13
**treatment** [1] - 20:21
**treats** [1] - 15:5
**trial** [2] - 2:13; 72:2
**tried** [7] - 20:12; 21:6; 22:22; 34:18; 56:8
**trip** [13] - 4:22; 5:21; 8:19; 11:16; 17:1, 16; 24:25; 31:9; 45:17, 25; 60:13
**tripped** [4] - 8:11; 53:13, 17; 54:1
**tripping** [1] - 54:16
**trips** [2] - 4:17, 19
**Troyd** [6] - 40:16; 41:2, 7, 10; 48:17; 68:11
**true** [4] - 18:4; 24:11; 41:9; 67:23
**truth** [1] - 11:10
**try** [4] - 20:5; 29:3; 62:20, 22
**trying** [4] - 22:24; 23:5; 51:9; 66:24
**turn** [3] - 32:10; 37:17; 57:21
**turned** [6] - 13:18;

25:9; 32:10; 34:12; 61:20; 68:21
**TV** [1] - 23:17
**twice** [2] - 50:17; 58:24
**two** [16] - 4:2; 7:5; 8:7; 13:9; 19:24; 23:21; 27:18; 31:11, 20-21; 32:4; 35:17; 64:1, 22; 65:4; 70:12
**types** [1] - 61:23

---

**U**

**U-turn** [1] - 32:10
**U.S** [5] - 1:5, 16; 4:22; 50:11; 65:5
**ultimately** [2] - 17:22; 58:19
**uncomfortable** [4] - 11:2; 12:15, 23; 31:25
**under** [2] - 22:22; 65:22
**unfortunately** [1] - 18:18
**ungrateful** [1] - 25:12
**UNITED** [3] - 1:1, 3, 11
**United** [22] - 1:14; 2:3; 4:16, 18, 21; 5:16; 6:24; 7:6, 17; 12:3; 18:15; 19:2; 31:8; 41:3; 44:25; 46:15; 49:16, 18; 52:10; 60:12; 64:12; 65:16
**unnecessary** [1] - 12:2
**unplanned** [1] - 59:24
**up** [38] - 3:9; 9:21; 10:1; 12:7; 13:6; 14:13; 20:6; 22:1, 4, 6, 23; 25:14, 19, 23; 26:7, 13, 19; 28:13; 31:14; 33:6, 23; 34:16; 35:18, 21; 38:25; 42:19; 43:21; 48:8; 53:20; 56:9, 11; 64:23; 65:9, 24-25; 66:19, 21
**upset** [5] - 9:23; 10:22; 12:1; 25:10; 32:1
**upstairs** [3] - 14:3; 22:6, 25

---

**V**

**Valeria** [1] - 10:5
**Valerio** [61] - 2:6, 23; 5:25; 6:3, 5, 10, 13;

7:1; 9:7, 18; 10:2; 11:14; 17:14, 17; 19:20; 28:23; 37:25; 39:23; 40:1; 45:3, 9, 18; 46:11, 16, 19, 22, 24; 47:9, 18, 21; 48:3; 49:2; 50:12, 14-15, 19-20; 51:15, 21, 24; 52:13, 16, 25; 53:6, 13; 54:23; 55:1; 56:3; 59:10; 60:11; 63:24; 65:17; 66:8; 67:7, 15, 18, 25; 68:18, 22; 70:11, 13
**VALERIO** [1] - 1:6
**Valerio's** [11] - 10:16; 11:17; 17:11, 22; 20:21; 22:10; 24:13; 26:24; 50:21; 64:3
**Valerios** [1] - 68:21
**valid** [1] - 18:18
**vehicle** [3] - 28:25; 32:25; 59:10
**verbal** [1] - 55:25
**version** [1] - 67:4
**via** [1] - 47:23
**videos** [1] - 67:24
**view** [1] - 68:9
**virtue** [1] - 70:7
**visa** [1] - 18:17
**visit** [17] - 4:25; 5:2; 12:9, 24; 17:10; 35:18; 42:15; 43:21; 45:12, 19; 47:9, 12, 18; 64:16; 65:17; 66:10, 19
**visited** [3] - 5:16; 42:11; 45:23

---

**W**

**wait** [1] - 65:12
**waiting** [4] - 13:14; 14:6; 35:3; 66:9
**walk** [2] - 27:25; 62:7
**walked** [2] - 13:13; 14:13
**walking** [1] - 19:21; 24:2
**wall** [3] - 22:2, 4
**wants** [2] - 23:11; 69:15
**watch** [1] - 40:4
**water** [2] - 14:20; 32:13
**Water** [20] - 5:20; 7:19, 21; 10:16, 19; 13:25; 16:18, 21; 27:17, 19, 22; 28:18,

23; 29:15; 30:20; 53:12; 54:11; 55:14
**wear** [2] - 12:19; 32:21
**wearing** [3] - 6:6; 12:20; 32:15
**website** [1] - 6:14
**week** [7] - 2:13; 8:7; 50:8, 17-18; 71:7
**weeks** [10] - 4:25; 5:23; 13:3, 5; 14:1; 28:16; 35:17; 53:15; 70:12; 71:18
**welcome** [1] - 7:25
**wet** [1] - 8:11
**white** [1] - 68:2
**whole** [2] - 65:24; 68:15
**Wicker** [1] - 1:20
**window** [3] - 25:17; 31:22
**wire** [3] - 46:24; 47:2, 5
**withdrawn** [6] - 11:16; 13:1; 22:8; 37:17, 24; 39:13
**WITNESS** [5] - 3:6; 33:19; 40:19; 60:24; 69:7
**witness** [6] - 2:11; 3:3; 6:10; 14:19; 41:21; 42:5
**witness'** [2] - 2:16; 43:4
**witnesses** [1] - 69:15
**WITNESSES** [1] - 73:2
**woman** [5] - 9:2; 10:15, 22; 15:4; 25:13
**women** [3] - 10:2; 28:12
**women's** [3] - 27:2, 5; 36:12
**wonderful** [1] - 10:11
**word** [1] - 23:22
**words** [3] - 63:5; 69:17; 71:8
**worse** [2] - 19:21; 24:2
**write** [8] - 35:12; 41:21; 49:10; 50:15, 20; 51:15, 18; 56:14
**writing** [3] - 29:20; 49:6; 51:21
**written** [2] - 70:19; 71:15
**wrote** [4] - 35:15; 48:3, 10, 20

**11**

A-258

**12**

| Y |
|---|

**year** [17] - 5:11; 45:1,
12, 20; 46:19, 24;
48:18; 51:25; 52:3;
60:14; 64:12, 19;
65:12, 17, 22; 71:22
**years** [4] - 4:2, 21;
18:18; 41:6
**York** [1] - 5:17
**YORK** [1] - 1:1
**young** [2] - 12:7; 25:1
**yourself** [2] - 39:9;
62:12

| Z |
|---|

**zip** [1] - 31:19

A-259

1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------X
     UNITED STATES OF AMERICA,
4                                :   CR-14-94
                                     (JFB)
5        -against-              :   United States Courthouse
                                     Central Islip, New York
6    JOSEPH VALERIO,
                                :   March 6, 2017
7                Defendant.          10:30 a.m.
     ------------------------------X
8
                  TRANSCRIPT OF FATICO HEARING
9        BEFORE THE HONORABLE JOSEPH F. BIANCO
             UNITED STATES DISTRICT COURT JUDGE
10

11   APPEARANCES:

12   For the Government:     ROBERT L. CAPERS, ESQ.
                             UNITED STATES ATTORNEY
13                           BY: AMEET KABRAWALA, AUSA
                                 ALLEN BODE, AUSA
14                           100 Federal Plaza
                             Central Islip, New York 11722
15

16
     For the Defendant:     LEONARD LATO, ESQ.
17

18

19

20

21   Official Court Reporter:   Paul J. Lombardi, RMR, FCRR
     Ph. (631) 712-6106         100 Federal Plaza - Suite 1180
22   Fax (631) 712-6122         Central Islip, New York 11722

23

24
                  Proceedings recorded by mechanical stenography.
25                     Transcript produced by CAT.

2

1          THE CLERK:  Calling case USA v Joseph Valerio.

2   Counsel please state your appearance for the record.

3          MR. KABRAWALA:  Good morning, Judge, Ameet

4   Kabrawala and Allen Bode for the United States.

5          THE COURT:  Good morning.

6          MR. LATO:  Leonard Lato for Mr. Valerio.

7          Good morning, your Honor.  I am not joined by

8   Mr. La Pinta who is on trial today.  I cleared it with

9   Mr. Valerio before today.

10          THE COURT:  Let me just confirm that and

11   Mr. Valerio is present.

12          Are you satisfied with proceeding with Mr. Lato

13   here today, Mr. Valerio?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  We had scheduled this for another

16   part of the Fatico hearing relating to psychological

17   evidence that you intend to offer through Dr. Bardey.

18          Is that correct?

19          MR. LATO:  It is, your Honor.

20          THE COURT:  You are ready to go?

21          MR. LATO:  Yes.

22          THE COURT:  Dr. Bardey, if you would come up for

23   the oath.

24   **ALEXANDER BARDEY**,

25          having been duly sworn, was examined

Bardey - Direct/Lato

3

1    and testified as follows:

2        THE CLERK:  Please state your name and spell it

3    for the record.

4        THE WITNESS:  Alexander, A-L-E-X-A-N-D-E-R, S,

5    Bardey, B-A-R-D-E-Y, M.D.

6        THE COURT:  Go ahead, Mr. Lato.

7    DIRECT EXAMINATION

8    BY MR. LATO:

9    Q.   Good morning, Dr. Bardey.

10   A.   Good morning.

11   Q.   Is it a fair statement that an attorney Anthony M.

12   La Pinta asked you to perform some type of evaluation on

13   Mr. Valerio?

14   A.   It is.

15   Q.   And what type of evaluation were you asked to form?

16   A.   A psychological and psychosexual evaluation.

17   Q.   What does that mean, what type of evaluations are

18   they?

19   A.   They are evaluations to assess an individual's

20   psychological and psychiatric makeup, especially as it

21   pertains to sexual behavior, usually done in the context

22   of a sexual offense.

23   Q.   In your evaluation, was there any focus on any part

24   of Mr. Valerio's life as it affected his present day

25   psychological makeup?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Bardey - Direct/Lato

4

1    A.    There was.

2          There was a focus on his early life experiences,

3    specifically allegations that he had been sexually and

4    physically abused by his father from the age of five until

5    about the age of 11.

6    Q.    How many times did you visit Mr. Valerio?

7    A.    I examined Mr. Valerio over the course of six

8    sessions starting in December of 2014, then I saw him in

9    February of 2015, in March of 2015, twice in June of 2015

10   and then the last time in November of 2016.

11         The examinations were over the course of

12   approximately ten hours.

13   Q.    That's total of all six exams, correct?

14   A.    Yes, sir.

15   Q.    Where did each of these take place?

16   A.    At the Metropolitan Detention Center in Brooklyn.

17   Q.    Before we get into what you did, just tell the court

18   briefly about your background that makes you qualified to

19   testify what you are going to testify about.

20   A.    Certainly.

21         After graduating from Harvard with a bachelor's

22   in biology, I attended SUNY Stony Brook Medical School.

23         After completing medical school I then did a

24   four-year accredited internship and residency program in

25   psychiatry at NYU.

**Bardey - Direct/Lato**

5

1    I then remained on the faculty at NYU and

2  eventually earned my board certification in psychiatry and

3  then in forensic psychiatry.

4  Q.   Now, when you examined Mr. Valerio at the MDC, and

5  conducted examinations or evaluations, specifically what

6  type of examinations or evaluations did you conduct?

7  A.   Initially I obtained a history, which is the standard

8  operating procedure.  I start with the day he was born and

9  go through his life in as much detail as possible, up

10  until the present.

11    I focused on various elements of his life, his

12  psychiatric history, his sexual development, his

13  experiences with the sexual abuse he claims to have been

14  victimized by, his education, his professional life, the

15  offense conduct.

16    I then focused on his mental status which is an

17  assessment of the way he presents, the form of his

18  thought, his intelligence, the way he strings together

19  concepts and thinking.

20    And then I administer a series of psychological

21  tests.

22  Q.   What kind of tests are they?

23    I want to interrupt you so we prevent a

24  continuing narrative.

25  A.   Sure.

Bardey - Direct/Lato

6

1  Q.   What type of tests did you administer to Mr. Valerio?

2  A.   I administered several tests.

3       The first is a test called PAI, the Personality

4  Assessment Inventory.  That's a pen and paper test that

5  Mr. Valerio takes himself answering a series, several

6  hundred questions.

7       The results of that questionnaire are then fed

8  into proprietary software owned by the company that then

9  generates a report and a summary of that report is

10  included in the report that I wrote myself.

11       The other three tests I administered are

12  actuarial tests to assess the risks of violence and sexual

13  violence.  That's the HCR 20, the SVR 20 and the Static

14  99 R.  Those are all actuarial tests, in other words, they

15  take information about the individual's history, about his

16  current status, and about attitudes about the future or

17  about situations about his future and generate a risk

18  assessment based on his answers as compared to answers of

19  a normal population.

20  Q.   Did you also interview other persons in connection

21  with your evaluation of Mr. Valerio?

22  A.   I did.

23       I evaluated his mother, his sister and his

24  uncle.

25  Q.   And you recall their names just for the record?

Bardey - Direct/Lato

7

1    A.    Frances Valerio, Bernadette Imperiale and Joseph

2    Tusso.

3    Q.    Frances is the mother?

4    A.    Yes.

5    Q.    And Bernadette the sister?

6    A.    Yes.

7    Q.    And the remaining name?

8    A.    The uncle, the mother's brother.

9    Q.    Now, the mother's brother, John Tusso, does he have

10   some type of degree?

11   A.    He is a licensed social work therapist.

12   Q.    Over the course of your examination and evaluations

13   did you also look at court documents to determine what

14   Mr. Valerio is charged with now and any criminal history

15   he might have?

16   A.    Yes.

17          I reviewed the accusatory instrument, the

18   indictment, the superseding indictment.

19          I reviewed the presentence investigation report.

20   I reviewed updates of that report.  I reviewed the minutes

21   of various hearings, specifically the Fatico hearings that

22   had occurred later in 2016.

23          I can refresh my recollection, I think I have

24   forgotten a few things but that's essentially the universe

25   of data that I reviewed.

Bardey - Direct/Lato

8

1   Q.   Just tell me if this refreshes your recollection, did

2   you also look at the criminal complaint in this case?

3   A.   I did.

4   Q.   What about Mr. Valerio's prior criminal history, did

5   you look at anything, say any other probation department

6   complaint from the state?

7   A.   Yes, I did.

8        There was a 2005 arrest for inappropriate

9   touching at Splish Splash out in Riverhead and the results

10  and outcome of that investigation.

11  Q.   Did you also speak with another professional in this

12  case, a Dr. Maura Gordon?

13  A.   Yes.

14       I spoke with Maura Gordon who is a licensed

15  social work therapist as well who was in the process of

16  treating both the mother and the sister and then provided

17  a psychological or psychosocial evaluation of better than

18  debt at the request of their mother.

19  Q.   Now, did you actually refer the case to Maura Gordon,

20  in other words suggest that Mr. La Pinta retain

21  Ms. Gordon?

22  A.   Yes.

23  Q.   Did you also speak with any of the persons that

24  Ms. Gordon spoke with such as Bernadette Imperiale?

25  A.   Yes, I had Bernadette in my office as well as the

Bardey - Direct/Lato

9

1   mother and John.

2          That was before I referred her to Maura and, in

3   fact, that is why I referred her to Maura because I saw in

4   my office that she was in need of having psychotherapeutic

5   services so I made that referral.

6   Q.   Which she, which one?

7   A.   I'm sorry, Bernadette Imperiale.

8   Q.   How many times did you speak with Bernadette, Frances

9   or John?

10  A.   Just once.

11  Q.   Now, focusing on Mr. Valerio -- let me backtrack one

12  thing.

13         Did Ms. Gordon actually generate a report based

14  upon her interviews of Ms. Imperiale and Frances Valerio?

15  A.   She did and I reviewed it.

16  Q.   Turning to Mr. Valerio, did you talk about his

17  upbringing, such as his focusing mainly on life under his

18  father?

19  A.   Yes, I did.

20  Q.   Please tell us what you and he said to each other,

21  tests you performed and so forth.

22  A.   Sure.

23         Mr. Valerio stated that his father was a very

24  abusive man, abusive physically, emotionally and sexually,

25  that he had witnessed his father be emotionally and

Bardey - Direct/Lato

10

1   physically abusive toward his mother and then himself had
2   been the victim of physical, emotional and sexual abuse.
3   Q.   Did he give details over the course of your
4   examinations of Mr. Valerio over the six times?
5   A.   He did.
6          He said that starting around the age of five,
7   his father who had been a diamond setter and then who
8   owned a pizzeria would come home late, come into his room
9   and sodomize him on a repeated basis.
10  Q.   Just stop one second.
11         (Pause in the proceedings.)
12  Q.   Please continue.
13  A.   He would come into his room sometimes on a weekly
14  basis, sometimes less frequently and would then sodomize
15  him.
16  Q.   Did he give specifics of what that sodomy consisted
17  of?
18  A.   It consisted of the father inserting his penis into
19  Mr. Valerio.  It was a sodomy.
20         It also consisted of inappropriate touching.
21  Mr. Valerio said that his father would often fondle him in
22  the shower while he was naked and aroused, but it was
23  especially those evening visits that were harrowing to the
24  members of the family.
25         Mr. Valerio said that their mother would

Bardey - Direct/Lato

11

1    sometimes try to intervene but oftentimes the door was

2    locked.  If the door was not locked, the father would then

3    push and punch and shove the mother out that he could

4    continue what he was doing to his son.

5    Q.   Now, did he say anything about his father other than

6    the sexual abuse that he withstood, either Mr. Valerio or

7    Frances Valerio telling you or Ms. Imperiale telling you?

8    A.   You mentioned those other individuals.

9         I mean, one of the things that I look for when

10   I'm doing a forensic evaluation is corroboration.  Anyone

11   can say anything.  It was important to speak to the family

12   members and to get their open-ended answers to what they

13   had experienced as children in terms of Bernadette or Fran

14   as mother of both Joe and Bernadette.

15        And, independently, they gave versions of the

16   abuse that were strikingly similar and consistent with

17   what Joe had said.  When I got a chance to review

18   Ms. Gordon's report and discuss it with her, it seemed

19   that the history that Bernadette Imperiale gave to Maura

20   Gordon was also consistent with the abuse that Joe had

21   described to me.

22        So all of these accounts seemed to corroborate

23   with each other, and Bernadette's account corroborated

24   with what she had told the probation officer who was

25   conducting the presentence investigation in a manner that

Bardey - Direct/Lato

12

1    was significantly consistent with what she had told me.

2         All of that, in my opinion, made this history

3    credible.  There were certainly issues of doubt in my

4    mind.  The fact that this history had been revealed really

5    around the circumstances of sentencing, after trial,

6    rather than years before was certainly suspect.

7         The fact that there had been allegations that

8    Frances Valerio and Bernadette Imperiale had written I

9    think a letter that seemed to be less than credible raised

10   in my mind some significant concerns.

11   Q.   So we can just know what you are talking about, what

12   letter that was less than credible are you referring to?

13   A.   I believe it was a letter sent regarding the fact

14   that the photos of Jane Doe two had been done by someone

15   other than Joe and, in fact, that Bernadette had an alibi

16   that put them in a different country thereby putting to

17   doubt the veracity statements that Frances Valerio and

18   Bernadette Imperiale had made.

19        So that raised my index of suspicion.  Clearly

20   there is a lot at stake here and such a history of abuse

21   might be considered mitigating.  So I had to consider

22   that, and -- which is why it was important to speak to the

23   various parties involved, and in my professional opinion,

24   having heard all of these versions of the events that were

25   consistent, it raised my index of credibility sufficiently

Bardey - Direct/Lato

13

1    that to a reasonable degree of medical certainty I took

2    that history to be genuine.

3    Q.    So if I understand you correctly, notwithstanding the

4    false letter from Imperiale and Frances Valerio which

5    raises suspicion, you still believe based on consistency

6    and other factors that the history you were getting about

7    the abuse is a true one?

8    A.    Correct.

9    Q.    Now, did Mr. Valerio talk to you about sexual abuse

10   that any other family member may have endured at the hands

11   of the father?

12   A.    He spoke of his sister also experiencing sexual

13   abuse, very consistent with the abuse he had experienced

14   himself, yes.

15   Q.    Did he say whether he knew it at the time or learned

16   it only later?

17   A.    No, he said he knew it at the time.

18   Q.    Now, with respect to Mr. Valerio's childhood life

19   other than the father, for instance, education, friends

20   and so forth, did you discuss that with him and how it

21   affected him turning out to be the person that he is

22   today?

23   A.    Yes.

24   Q.    Please tell us about that.

25   A.    Certainly.

Bardey - Direct/Lato

14

1    Mr. Valerio had difficulties academically as a

2  child.  He had to repeat the first grade.  He was

3  diagnosed as dyslexic.  He continued to be fairly poor

4  academically for years thereafter, although he was able to

5  graduate high school and attend some college.

6    He very early on became sexualized, by the age of

7  of 11 he was masturbating.  By the age of 12 he was trying

8  to engage others in sexual behavior.

9  Q.   Well, based upon your expertise, was that early or is

10  that a normal age or do most boys start masturbating

11  earlier, later, or about at 11?

12  A.   That seemed a little young.

13    Typically boys start to masturbate a little bit

14  later in life.  So that seemed young.

15    Certainly attempting to engage others in sexual

16  physical contact around the age of 11 or 12 is also very

17  young and that's a piece that would be consistent with

18  someone who has been exposed early on to some sort of

19  inappropriate sexual behavior.

20  Q.   Upon what do you base that conclusion?

21  A.   My own experience and that in the literature as well,

22  that the normalization of the sexual experience in a young

23  child usually heralds earlier sexual behavior for several

24  reasons.

25    One, because at some level the physical

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Bardey - Direct/Lato

15

1  stimulation involved in the abuse is pleasurable and it's

2  a feeling that the individual wants to reproduce, even if

3  it's done in an inappropriate and abusive context.

4           And, second, it serves to sort of normalize that

5  as a behavior that should occur in the house among people

6  that care for each other.  By almost sort of mimicking the

7  behavior that they themselves experienced the, young child

8  will start to get involved in more sexual activity.

9  Q.   Did Mr. Valerio give you any specifics with respect

10 to others that he experimented with, boys, girls, ages,

11 the type of sexual acts that he was experimenting with?

12 A.   No.

13 Q.   When Mr. Valerio became a little older, did he tell

14 you about having used any type of drug, and by that I mean

15 either alcohol or some illicit substance?

16 A.   I think by around middle school early high school he

17 had begun to abuse various drugs and alcohol, marijuana

18 and alcohol.

19          He then very rapidly moved on to other drugs

20 like cocaine, other kinds of pills and stimulants,

21 hallucinogens.  He became a fairly significant substance

22 abuser from that point on to the point I think eventually

23 he sought some assistance from his uncle to try to get a

24 handle on the severity of his drug use.

25          Paralleling the evolution of his substance use

Bardey - Direct/Lato

16

1  was his interest in various sexual behaviors, specifically

2  internet pornography that grew more and more violent,

3  getting more involved in S&M and bondage and that type

4  of -- that jar of pornography and when he got older that

5  also translated into what he was looking for in sexual

6  partners, where he began to seek out more fetish type of

7  behavior with the people he was with.

8  Q.    Now, with respect to the substance abuse, did

9  Mr. Valerio or his sister or his mother discuss whether

10 the father also abused either alcohol or any illicit

11 substance?

12 A.    My recollection is that the father drank.

13 Q.    Now, did Mr. Valerio tell you that at some point the

14 sexual abuse stopped at the hands of his father?

15 A.    Yes.

16 Q.    Did he tell you how that came about?

17 A.    At a certain point Mr. Valerio grew big enough and

18 strong enough to fight off his father's sexual advances.

19        The emotional and verbal abuse continued

20 thereafter well, I think, into Mr. Valerio's 20s, but the

21 sexual abuse stopped at 11.

22 Q.    Did he say about what age he became strong enough and

23 big enough because -- did he, for instance, say how big

24 his father was?

25 A.    He said his father was a larger man than he was.

Bardey - Direct/Lato

17

1    My recollection was that it was at the age of 11

2  when he was large enough to push his father away, 11 or

3  12.

4  Q.   But did he give any idea just in terms of large as

5  the father is say as large as Steve Troy?

6        MR. KABRAWALA:  Objection.

7        THE COURT:  Sustained.

8  BY MR. LATO:

9  Q.   Did he give you some idea, my size, just comparative

10  sizes between the two?

11  A.   If it's in my report I can check.

12        I have no recollection specifically how big he

13  said his father was.

14  Q.   Now, did he say anything about how he withstood it?

15        Did he push his father away?  Did he yell at

16  him?  Did he give any indication?

17  A.   Well, he pushed his father away and that's something

18  that both his mother, Frances, and his sister, Bernadette,

19  corroborated was that there were a lot of physical

20  altercations between his father and Joseph from that point

21  forward and that lasted for a number of years.

22  Q.   Now, what happened next in terms of his development?

23        He's now at the age where he's resisting his

24  father.  About how old is he now?

25  A.   He's getting to be into his teens, and thereafter, at

Bardey - Direct/Lato

18

1    that point he really starts to focus on other people and

2    starts to look elsewhere.

3            I think his involvement with cocaine starts to

4    become more significant as does his interest in

5    pornography, going to clubs, getting involved with, you

6    know, various sort of kinky sexual behaviors, threesomes

7    and social gatherings involving sex and things like that.

8    Q.   Did he finish high school?

9    A.   Yes.

10   Q.   Did he take any courses after that, say college

11   courses?

12   A.   He took I think some college courses.

13           I don't think he finished college.

14   Q.   Was he working at all when he was a young man say his

15   late teens, early 20s?

16   A.   He worked throughout.  He eventually worked for his

17   father's tile business.  He did that many years.

18           He also began to get involved in real estate and

19   made some money either buying properties to be used as

20   rental properties or flipping homes, buying damaged

21   houses, fixing them up and selling them for a profit.

22           He then ran a kind of credit, I guess a credit

23   cleaning company where he would work with agencies to try

24   to improve their credit, had numerous clients in

25   Long Island, a lot of them in the social businesses which

Bardey - Direct/Lato

19

1   then got him even more involved with drugs and sexual

2   behavior.

3   Q.   Was he successful in any of these endeavors?

4   A.   He was.

5         He ended up owning several expensive properties

6   and cars and boats and -- so he reached some measure of

7   success.

8   Q.   Then how do you reconcile his success with his

9   otherwise inappropriate behavior?

10  A.   Well, intelligence and psychological or even social

11  behaviors can run very independently.

12        He's someone who was very adept at negotiating

13  deals and meeting people and was social.  There is an

14  aspect of him that's fairly manipulative, that he sees

15  people and relationships as a means to an end, and was

16  able to use those psychological aspects of his personality

17  to his own benefit.

18        In fact, I would argue that those same qualities

19  also made it possible for him to get involved with women

20  and attract women and have women around him.  He can be a

21  very charming, conversant, social being.

22  Q.   Now, at some point in his early 20s, did he tell you

23  about some type of accident that got him depressed and

24  more into drugs?

25  A.   He was involved in a motor vehicle accident, suffered

Bardey - Direct/Lato

20

1   a neck injury, whiplash, I believe.

2           He then went out on a Workers' Compensation

3   leave, was prescribed painkillers to which he became

4   addicted to.  Being idle at home he ended up spending a

5   lot more time watching pornography and then his substance

6   abuse deepened at that point.

7   Q.   Is there any correlation between say a person who is

8   depressed, getting involved with this type of other

9   behavior such as pornography or other deviant acts?

10  A.   There can be.

11          I mean, there is no specific correlation.

12  Q.   Did he talk to you about his interests in pornography

13  as he grew older, whether it was consistent, I see always

14  grew stronger, less important, did he talk about it?

15  A.   Yes.

16          His interest in pornography kept getting

17  stronger and stronger and always toward more deviant

18  bondage, S&M kind of scenarios.

19  Q.   Did he talk to you about other than the S&M and

20  bondage the age of the participants, did that matter to

21  him?

22  A.   Child pornography did not seem to have been a

23  prominent aspect of what he was interested in at that

24  point in his life, no.

25  Q.   Well, let's dispense with the adjective prominent,

Bardey - Direct/Lato

21

1   was it an interest of his at all when he was talking about

2   it?

3   A.   Not to my knowledge.

4   Q.   What about not children, but younger women, say women

5   who might be the age of majority but say in their late

6   teens or very early 20s, was that of interest to him?

7   A.   Yes.

8   Q.   What about older women dressing up as younger women?

9   A.   Absolutely.

10          And that was borne out of the objective testing

11  that I did.  What he's really interested in are young

12  women, not under the age of 14, but from that age upward

13  really was his chief focus of sexual attention.

14  Q.   Now, in evaluating Mr. Valerio, did you consider that

15  abnormal that he had an interest in, say, either older

16  women trying to look young or younger women like

17  teenagers?

18  A.   Well, objectively most heterosexual, quote-unquote,

19  normal men are attracted to both adult women and

20  adolescent women.  It becomes pathological if the

21  individual begins to act on their attraction to these

22  younger women if they are below the age of 18.

23          But if there isn't that kind of behavior that is

24  considered a normal profile.

25  Q.   In other words it's normal to have the fantasy of the

22

1  younger women, say the teenagers, but not actually act on

2  it?

3  A.    Correct.

4  Q.    Is that why, for instance, some men fantasize about

5  having women of age dress up as, say, cheerleaders?

6  A.    Yes.

7  Q.    What else happened over the course of your, for

8  instance, evaluation and tests of Mr. Valerio, again

9  focusing on is he making all of this up?

10  A.    No.

11        I mean the issue of credibility, malingering is

12  what we call it in our field, is something that is part of

13  every forensic evaluation.

14        Every evaluation that is done in a forensic

15  setting, there is a lot at stake, either it's a financial

16  issue or someone's liberty.  So there is a motivation, an

17  inherent motivation for the individual to lie or

18  exaggerate on their own behalf.

19        Over the course of the sessions that I had with

20  Mr. Valerio, I did not find him to be lying or

21  exaggerating.  He was very open about behaviors that were

22  fairly reprehensible.  He was very open about discussing

23  these and discussing his interests in them, which I found

24  to be honest and credible.

25        And he was also honest and this evolved over

Bardey - Direct/Lato

23

1    time in that early on in our meetings he really had very

2    little understanding that what he had done was wrong.  He

3    really did not manifest much in the way of remorse or

4    guilt about what he had done.  He was very much trying to

5    minimize or use what we call cognitive distortions.

6           In other words, individuals use a distortion in

7    their thinking to justify something, and typically when I

8    evaluate someone who, say, into child pornography or been

9    accused of a sexual offense toward a minor they will say,

10   oh, it was consensual, this young woman wanted this.

11   Those are the kind of distortions that people use to

12   justify their criminal behavior and initially Mr. Valerio

13   used a great deal of those.

14          He was minimizing.  He was deflecting

15   responsibility.  Over time --

16   Q.   How was he deflecting responsibility?

17   A.   That, you know, it was -- he was trapped by his

18   codefendant and coerced into doing this, that he was not

19   the one who put this forward.

20          But over time I saw an evolution and over time

21   by November of 2016 he was much more remorseful, was

22   tearful, was talking about himself as someone who needed

23   to change, said at some point that he was a monster that

24   had to change, that something had to be done.

25          And I mean maybe he was a very good actor and

Bardey - Direct/Lato

24

1   fooled me, but it seemed credible to me that he had gone

2   from what is called a state of egosyntonic reaction to

3   egodystonic reaction and I'll explain what I mean.

4          Egosyntonic means you are engaged in a behavior

5   that sits well with you.  It's syntonic with your ego.  It

6   feels right.

7          Egodystonic is you are involved in a behavior

8   that doesn't feel right to you, it feels alien, that you

9   are conflicted about and that's an important transition in

10  evaluating whether someone can be rehabilitated or whether

11  they might be a good candidate for sex offender treatment.

12  Q.   Is that progression, or that evolution normal, for

13  instance, in other areas of psychology where the person

14  might be angry or in denial and then ultimately

15  acceptance?

16         In other words, is this the type of thing that

17  you have seen before where people will evolve from this

18  minimization or denial to acceptance and remorse?

19  A.   The short answer is yes.

20         The longer answer is it's what you hope to see.

21  I mean, that's the goal of treatment, is to get someone to

22  recognize that certain behaviors and thought patterns are

23  wrong and that they want to change them, that they want to

24  get rid of that little -- that cancer inside of them.

25  Q.   In your expert opinion, was the evolution or change

Bardey - Direct/Lato

25

1   in Mr. Valerio a genuine one?

2   A.   I felt it was.

3   Q.   Now, did Mr. Valerio talk to you about any children

4   he may have had with one or more women?

5   A.   Yes.

6   Q.   What did he say?

7   A.   Well, he has a son from his first wife, and he has a

8   daughter from a second relationship that he was in.

9        He still has a relationship or had a

10  relationship with his son.  I'm not sure what it is today

11  as I sit here, and the relationship with his daughter

12  ceased when he -- when she moved back to her country.

13  Q.   Did you have any concern with respect to whether

14  Mr. Valerio may have done anything improper to either of

15  these two children when they were young?

16  A.   I have no evidence to suggest that.

17  Q.   Suggest that he did anything to them, correct?

18  A.   Correct.

19  Q.   Now, is that unusual for a person to, say, be

20  interested in child pornography with others but not his

21  own children?

22  A.   Yes, it can be -- I mean, it's hard to throw a

23  blanket over an entire varied population of individuals

24  who get involved in that kind of behavior.

25       Some people who are involved in child

Bardey - Direct/Lato

26

1    pornography do move on to date kids that are around them

2    even their own, others never do.

3          So I can't really answer that in a blanket way.

4    Q.   Now, how many times have you been asked to examine

5    people who have been involved in child pornography in

6    general?

7    A.   Probably 50 to a hundred.

8    Q.   Did you think it unusual that Mr. Valerio became

9    interested in very young children, only in the last few

10   years when he's in his 40s?

11   A.   I don't think that is necessarily that unusual, that

12   can happen.

13         It's more the context in which it occurs.  In

14   other words, when you start thinking about child

15   pornography the question you want to answer is, is this

16   person a pedophile or is this just someone who has a very

17   broad range of sexual interest and for whom child

18   pornography happens to be one little slice of the pie.

19         And in Mr. Valerio's case the child pornography

20   was one little slice.  I didn't see him as having a very

21   intense attraction to minors under the age of 13 which

22   would be the definition of pedophilia according to our

23   DSM V.

24         I see him as someone who has a broad range of

25   sexual interests who is more opportunistic and if an

Bardey - Direct/Lato

27

1  opportunity comes up for something sexual he will

2  gravitate toward it.

3  Q.    So to use your pizza metaphor for analogy, he may be

4  interested in one type of pizza but if there are other

5  slices he doesn't like as much that aren't available he'll

6  eat it?

7  A.    Correct.

8  Q.    Now, with respect to incidents in his life, did he

9  talk about, for instance, perhaps having an incestual

10 relationship or an improper relationship with a relative?

11 A.    I mean, other than the abuse that he talks about with

12 his father, no.

13 Q.    Let me modify what I just said rather than say it was

14 improper.

15         Did he ever say that he had an intimate

16 relationship with a distant cousin?

17 A.    Oh, sure, other, I wasn't thinking about that.

18 Q.    It was my fault?

19 A.    I think it was a woman named Valeria, he described it

20 as really falling in love with this woman who eventually

21 died while she was pregnant and he described that loss as

22 emotionally traumatic.

23 Q.    Did he tell you she was pregnant because of him or

24 some other man?

25 A.    He hinted at the fact that she may have been pregnant

**Bardey - Direct/Lato**

28

1    with his child.

2    Q.    Did he talk about with any of the women he was ever

3    involved with whether they had open relationships or an

4    open marriage or anything like that, meaning having sex

5    with persons other than the one they were supposed to be

6    faithful to?

7    A.    He claimed several of these relationships were open

8    relationships, but I had no corroborating evidence one way

9    or the other.

10    Q.    Now, is it a fair statement that over time

11    Mr. Valerio's interest in improper sexual acts grew worse

12    over time?

13    A.    Yes.

14    Q.    Now, based upon what's happened the last two years is

15    there any realistic way of reversing that trend?

16            Because one of the things you must talk about

17    and consider is the likelihood of recidivism.

18    A.    Sure.

19            My evaluation and the results of the various

20    actuarial risk assessment tools that I used show that

21    Mr. Valerio remains at moderate risk of reoffending.

22            The fact that he had progressed to where he

23    began to see his behavior as maladaptive, as wrong, felt

24    regret for what he had done indicated -- was a positive

25    prognostic sign that he would be potentially responsive to

**Bardey - Direct/Lato**

29

1   a course of sex offender based treatment.

2   Q.   What type of treatment?

3            In other words, either in prison or after

4   prison, what type of treatment could lower the risk of

5   recidivism?

6   A.   Well, to further explore these cognitive distortions

7   I'm talking about, to help him really understand the

8   impact of his behavior on other people, how traumatizing

9   it is, how wrong it is and over time through cognitive

10  behavior therapy and through the sex offender which is

11  usually a group based mode of treatment, to help him

12  internalize the behaviors that are adaptive and to reject

13  the impulses that are not, to develop behavioral

14  techniques to avoid situations and places that would

15  permit his engaging in this kind of behavior again and for

16  him to structure his life in a way that he would stay away

17  from those situations that would encourage that kind of

18  behavior.

19  Q.   You use the term moderate risk.

20           How many different risks are there?  For

21  instance, moderate presumably is in the middle somewhere.

22  What's above and below?

23  A.   High and low.

24  Q.   In a high risk, what does that actually mean about

25  recidivism, these people, practically it's hopeless to try

Bardey - Direct/Lato

1   to rehabilitate them?

2   A.   It's not necessarily hopeless and again it's hard to

3   make a blanket statement.

4           Two people -- risk is defined by elements in

5   your past that you can't change, right, the behaviors you

6   have done in the past, your level -- your intellectual

7   level, your level of education, whether you have worked or

8   not, whether you have had stable relationships, the number

9   of offenses you have committed.

10          Those all populate the historical portions of

11  many of these actuarial risk assessment tools, but things

12  can change.  If you have a mental illness, a substance

13  abuse problem, or other emotional problems that can be

14  addressed through meaningful therapeutic intervention,

15  that reduces risk.  And also if you can make interventions

16  for the future where the person lives, how they live,

17  whether they are employed, whether they have supportive

18  family, factors such as those can help reduce risk in the

19  future.

20          So there is a certain amount of plasticity to

21  risk, so two people who are both high risk now might in

22  five years remain high, move down to moderate or even low,

23  depending on the interventions.

24          In Mr. Valerio's case, I found him to be at

25  moderate risk, so he wasn't the highest risk category.

Bardey - Direct/Lato

31

1   Q.   Why?

2        In other words for the court it's important to

3   say why you believe he's a moderate and not high as

4   opposed to he just is.  Why?

5   A.   Sure.

6        In part because the static, the HCR 20 and the

7   VCR 20, using these actuarial tables, in other words they

8   compare his history to that of thousands of people, his

9   current situation to that of thousands of people and

10  compares his risk to others.

11       So I'm not relying solely on my own clinical

12  impression.  I'm relying on what the actuarial tables tell

13  us and given his history, he's functioned well in certain

14  areas.  He's maintained certain types of relationships.

15  He's maintained relationships with his family, factors

16  such as those that impact on his degree of risk and they

17  are all consistently defining him as being of moderate

18  risk.

19  Q.   Fair to say that you spoke with Bernadette Imperiale

20  and Frances Valerio on or about May 27th of 2015, and also

21  John Tusso that one day, right?

22  A.   Correct.

23  Q.   Now, specifically, what is it about, say, Bernadette

24  Imperiale that leads you to believe that this probably

25  happened?

**Bardey - Direct/Lato**

1    What is it, rather than say it's consistent,

2  what did she say that strikes you as consistent?

3  A.  Well, the details of the abuse, the timing --

4  Q.  Such as what?

5  A.  In terms of what her father did to her, when he came

6  into her room and sodomized her.

7  Q.  What did he do to her as far as you were told?

8  A.  He penetrated her with his penis on repeated

9  occasions.

10    He would be physically assaultive to her, push

11  her head down.  He put her down and assaulted her very

12  much in keeping with what Joe had described happening to

13  himself.

14    She also witnessed interactions between her

15  father and Joe where he was physically abusive and

16  emotionally abusive of Joe.  She too witnessed her mother

17  and the abuse her mother suffered.

18    Her psychological makeup, I mean, she was very

19  much -- she has various physical impairments, and she's

20  not able to cope with them well.  She very much has

21  remained kind of very much a victim in terms of how she

22  presents herself psychologically.

23    So her makeup, the way she spoke, the way she is

24  coping with the world is consistent with someone who's

25  been abused.  That raised my index of credibility in this

Bardey - Direct/Lato

33

1    case.

2    Q.    What about her intellectual capacity?

3          Is there something to the effect that, say, an

4    intelligent well educated person makes a more convincing

5    liar?

6          Did she strike you as somebody who's just

7    basically not smart enough to make all this stuff up?

8    A.    She is not -- I think she has some limitations

9    intellectually and I think it would be unusual for someone

10   to elaborate that kind of detailed lie.

11   Q.    Let's turn to Frances Valerio.

12         Anything about her that was either consistent or

13   inconsistent with either what Bernadette Imperiale or

14   Joseph Valerio had said?

15         And, please, discuss both.

16   A.    Right.

17         No.  The history that she provided in terms of

18   how she was treated, and in terms of what she witnessed

19   her does doing to the two children was consistent with

20   what each of them had reported.

21   Q.    Did she talk about what he had done to her, either

22   physical assault or sexual or both?

23   A.    Well, he had been physically abusive of her on

24   repeated occasions.

25         I mean, she explained that when they married he

Bardey - Direct/Lato

34

1  found out that she had had other previous boyfriends and

2  therefore in his mind was a tainted woman and then from

3  that point on treated her like she was less than and

4  became physically and emotionally abusive of her.

5  Q.    Did you speak with John Tusso?

6  A.    I did.

7  Q.    And anything that he could recount that was either

8  consistent or inconsistent with what you heard from the

9  others?

10 A.    Sure.

11        He had not witnessed firsthand the sexual abuse

12 that was described in terms of Bernadette Imperiale or

13 Joseph Valerio, but he did witness once at some early

14 function when Mr. Valerio was an infant saw their father

15 boasting about the size of his infant son's penis and then

16 reaching down with his mouth and putting the penis into

17 his mouth.

18 Q.    Did she -- did anybody other than Joseph Valerio --

19 let me just withdraw that.

20        The mother, did she say she ever did anything to

21 try to stop this, either directly to her husband or

22 through other sources, her uncle, the police, anything.

23 A.    You are not referring to the incident I just

24 described, you are referring to --

25 Q.    In general.

**Bardey - Direct/Lato**

35

1   A.    In general.

2         Right.  So she said she often physically tried

3   to stop her husband from doing this to her children, but

4   would be overpowered, beaten up, pushed.  She never went

5   to the police because she was dependent on her husband

6   because she described herself as a simple Italian woman

7   where you just don't do that.

8         So you just deal with it and turn the other

9   cheek.

10  Q.    In terms of overall, your diagnosis and formulation,

11  are those actual terms that are used in your profession?

12  A.    Yes.

13  Q.    Diagnosis I think we know.

14        What does formulation mean?

15  A.    Formulation is to try to put it all together, to try

16  to understand.

17        What I try to do in my job is to try to

18  understand why something has happened, what are the

19  psychological, psychiatric emotional underpinnings that

20  led someone to commit some sort of aborrent act.

21        So in my formulation I attempt to do that.

22  Q.    Let's break this down with respect to let's say the

23  diagnosis.

24        How many disorders is Mr. Valerio suffering

25  from?

Bardey - Direct/Lato

36

1  A.   Well, he suffered in my opinion from two what are

2  called paraphilias, which are sexual behavior disorders.

3  Q.   I just want to make sure you said paraphilia, not

4  pedophilia?

5  A.   Para, P-A-R-A.

6  Q.   Okay.

7  A.   In my opinion he is into frotteurism which is rubbing

8  up and touching strangers.

9       He's voyeuristic.  He enjoys watching women

10 unbeknownst to them in compromising positions.

11 Q.   With your frotteuristic disorder, does that stem in

12 part from the Splish Splash incident where he grabbed an

13 adult woman in a wave pool?

14 A.   Yes.

15 Q.   What about --

16 A.   And --

17 Q.   I'm sorry.

18 A.   No, go ahead.

19 Q.   Did you finish what you wanted to say?

20 A.   About that, you are asking about diagnoses.

21 Q.   Yes.

22 A.   There are two sexual diagnoses.

23      I also found him to have antisocial personality

24 traits.

25 Q.   What does that mean?

Bardey - Direct/Lato

37

1    A.    That describes a certain type of personality

2    organization that is characterized by a lack of empathy

3    for others, a manipulative manner, a tendency to use

4    people in a situation as a means to an end, to not be

5    particularly troubled by things like remorse or guilt in

6    terms of motivating factors in one's behavior.

7    Q.    Did you make progress with respect to these over time

8    with Mr. Valerio?

9    A.    Right.

10            As I said before there seemed to be some

11   evolution in his ability to manifest remorse and

12   understanding in terms of his conduct, and also

13   Mr. Valerio has a history, I'm speaking diagnostically

14   again, of cocaine and alcohol abuse that were significant

15   in his life.

16   Q.    Are they still ongoing or are they --

17   A.    No, no.

18            They are in what we call institutional

19   remission.  He's in an institution and he's separated from

20   these substances of abuse.

21   Q.    So, in other words, if Mr. Valerio, say, were to get

22   out on say some type of post-prison release, would he have

23   to have that type of treatment for drug and alcohol as

24   well?

25   A.    Absolutely.

Bardey - Direct/Lato

38

1   Q.   Is there a connection, do you think, between the
2   cocaine and/or alcohol with the other traits you
3   mentioned, either the antisocial personality trait or the
4   two disorders, the frotteuristic or the voyeuristic
5   disorder?
6   A.   Absolutely and in several ways.
7        One is going way back to his childhood.
8   Individuals who have been sexually abused as children
9   suffer a host of psychological problems, substance abuse
10  problems, even develop mental problems.
11       Early sexual abuse can have impact on the
12  development of your brain.  It can have an impact on your
13  emotional development.  It can have an impact on your
14  manifesting issues with drugs, alcohol and other
15  psychiatric disorders.
16       So that very history can increase the likelihood
17  of an individual having the kinds of diagnoses I'm talking
18  about.
19  Q.   Even today, for instance, let's assume he were to get
20  out of prison at some point in the future, would his
21  consumption of alcohol affect his ability to stay away
22  from this inappropriate behavior?
23  A.   Of course.
24       I was getting --
25  Q.   Why?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Bardey - Direct/Lato

39

1   A.   I was getting to that.

2   Q.   I'm sorry.

3   A.   Because alcohol and drugs are disinhibiting.

4        In other words, they quiet down parts of your

5   brain which serve as a break toward impulsive behavior.

6   Q.   Well, let me just break that down.

7        Alcohol, it would be fair to say, is a central

8   nervous system depressant, right?

9   A.   Yes.

10  Q.   And that basically lowers ones inhibitions?

11  A.   Right, it lowers your inhibitions.

12  Q.   But cocaine is not a depressant?

13  A.   No.

14       But cocaine it increases dopamine.  Dopamine is

15  a pleasure-seeking hormone, and as that specific

16  neurochemical when you have it in your brain you start to

17  engage in more pleasure-seeking behavior.

18  Q.   What about the combination, having this cocaine with

19  the increased dopamine release and consuming alcohol which

20  is a CNS depressant?

21  A.   You can think of it as having more gas and less

22  brake.

23  Q.   So in other words, Mr. Valerio would definitely need

24  that type of treatment with respect to keeping away from

25  cocaine and alcohol, correct?

**Bardey - Direct/Lato**

40

1   A.    Precisely.

2           MR. LATO:  May I have a moment to confer with

3   Mr. Valerio?

4           THE COURT:  Yes.

5           (There was a pause in the proceedings.)

6   BY MR. LATO:

7   Q.   Dr. Bardey, is there anything that we failed to cover

8   with respect to your evaluation and diagnosis of

9   Mr. Valerio that you feel feeds to be told to Judge Bianco

10  today?

11  A.   I don't believe so.

12          MR. LATO:  Nothing further, your Honor.

13          THE COURT:  Why don't we take a break.

14          I have a criminal matter I have to handle and we

15  have to clear the courtroom.  So you can leave your stuff

16  here if you want.

17          (Recess.)

18          (Continued on next page.)

19

20

21

22

23

24

25

Bardey - Cross/Kabrawala

41

1          (Following a recess.)

2          THE COURT:  Everyone can be seated.

3          Dr. Bardey, if you would resume the stand.

4          (Witness resumes the stand.)

5    CROSS-EXAMINATION

6    BY MR. KABRAWALA:

7    Q.   Dr. Bardey, you are aware that Mr. Valerio had a

8    prior sex offense prior to his conviction in the instant

9    case.

10   A.   Yes.

11   Q.   Is that incident involved him groping a woman's

12   genitals in a wave pool at Splish Splash?

13   A.   Correct.

14   Q.   You reviewed the probation department file in

15   connection with that offense, correct?

16   A.   Yes.

17   Q.   You saw that Mr. Valerio received treatment through

18   the Suffolk County probation department as a result of

19   that sex offense?

20   A.   Correct.

21   Q.   In fact, he received extensive treatment attending

22   regular counseling sessions with social worker.

23   A.   I'm not sure it's any more extensive than anyone else

24   receiving treatment for such circumstances.

25   Q.   You agree that notwithstanding the treatment that he

Bardey - Cross/Kabrawala

42

1   received through the Suffolk County probation department
2   he reoffended?
3   A.   Correct.
4   Q.   And notwithstanding the treatment, he still committed
5   another sexual offense?
6   A.   Well, yes.
7   Q.   In fact, multiple sexual offenses?
8   A.   Correct.
9   Q.   You also testified that Mr. Valerio has an interest
10  in sadomasochistic pornography?
11  A.   I did.
12  Q.   And he has an interest in violent internet
13  pornography?
14  A.   Correct.
15  Q.   Now, you would agree that viewing such materials
16  would increase his risk of recidivism?
17  A.   If he were to view this material in the future, yes.
18  Q.   Correct.
19          Now, you would agree that Mr. Valerio, if he
20  does recidivate, his conduct could be more violent than it
21  previously has been?
22  A.   It's a possibility.
23  Q.   You reviewed the testimony of the two prior Fatico
24  hearings -- withdrawn.
25          You reviewed the testimony of the prior hearings

Bardey - Cross/Kabrawala

43

1  in connection with this Fatico in this case, correct?

2  A.   I did.

3  Q.   And you reviewed the testimony of a number of

4  individuals, including Elena Kalchenko, Lucy Down and

5  Angelique Davidse?

6  A.   I did.

7  Q.   You are aware, then, that Ms. Davidse testified about

8  multiple violent rapes that she had -- withdrawn.

9        You reviewed the testimony of Angelique Davidse

10  who testified she was violently raped by Mr. Valerio?

11  A.   I did.

12  Q.   In fact, violently raped a number of times?

13  A.   On several occasions, yes.

14  Q.   And she spoke in detail about those instances?

15  A.   She did.

16  Q.   You also reviewed the transcript in which the

17  government had introduced corroborating medical

18  information?

19  A.   Yes.

20  Q.   Such as having her teeth knocked out by Mr. Valerio?

21  A.   Yes.

22  Q.   You also reviewed the testimony in which Mrs. Davidse

23  testified that the defendant told her that she would die

24  while he was raping her?

25  A.   Yes.

Bardey - Cross/Kabrawala

44

1    Q.    That he would kill her.

2    A.    Yes.

3    Q.    You have also reviewed Elena Kalchenko's testimony in

4    the case?

5    A.    I did.

6    Q.    And you would agree that the two women, Ms. Davidse

7    and Elena Kalchenko, testified in a strikingly similar

8    way?

9    A.    I'm not sure what way they were similar.

10   Q.    Well, they testified about the details of their own

11   rapes at the hands of Mr. Valerio.

12   A.    Yes.

13   Q.    And they both testified about specific locations

14   where the rapes were conducted.

15   A.    Well, as I recall one was more in his house, one was

16   in a car.

17             I mean, they were -- they weren't identical.  So

18   I'm not exactly sure if I can answer your question.

19   Q.    And they both testified about the things that

20   Mr. Valerio said to them while he was raping them?

21   A.    Yes.

22   Q.    And, by the way, you also saw this similar language

23   in the e-mail correspondence that Mr. Valerio had sent

24   both to Ms. Kalchenko and Ms. Davidse?

25   A.    I did.

Bardey - Cross/Kabrawala

45

1   Q.   And you also reviewed the testimony of Lucy Down who

2   was a British national?

3   A.   Right, the nanny, yes.

4   Q.   You are aware that she testified to having been lured

5   to the United States under the pretense that Mr. Valerio

6   had a child to take care of.

7   A.   Precisely.

8   Q.   And that's a fairly elaborate scheme, you would

9   agree?

10  A.   I would agree.

11  Q.   Not something, necessarily, that's impulsive?

12  A.   No, I mean very deliberate, thought through, many

13  steps involved.

14          It's not just an impulsive act.  No, I would

15  agree with that.

16  Q.   But you also agree that Mr. Valerio acts impulsively?

17  A.   As part of his psychological makeup.

18  Q.   Did you discuss these instances with Mr. Valerio?

19  A.   Yes.

20  Q.   And I see in your report of December 7, 2016, as well

21  as in the testimony that you gave, that the instances of

22  Mr. Valerio's rape of Elena Kalchenko and of Angelique

23  Davidse, they are not mentioned in any way.

24  A.   Correct.

25  Q.   Is there a reason --

Bardey - Cross/Kabrawala

46

1     MR. KABRAWALA:  Withdrawn.

2   BY MR. KABRAWALA:

3   Q.   What do you think about these --

4     MR. KABRAWALA:  Withdrawn.

5     (There was a pause in the proceedings.)

6   BY MR. KABRAWALA:

7   Q.   What did Mr. Valerio tell you about these instances?

8   A.   He -- I mean, as I recall because I don't have the

9   notes in front of me with regards to that, he described in

10  general terms minimizing the interactions compared to what

11  was testified to.

12  Q.   Did he admit to raping Ms. Kalchenko?

13  A.   Not as such, no.

14  Q.   What did he say?

15  A.   His argument was always that there was some version

16  of being consensual.

17  Q.   Did he admit to raping Angelique Davidse?

18  A.   He made the same type of argument there.

19  Q.   What did he say about knocking Angelique Davidse's

20  teeth out during a rape?

21  A.   That, I don't remember.

22  Q.   Was that part of --

23     MR. KABRAWALA:  Withdrawn.

24  BY MR. KABRAWALA:

25  Q.   Do you have the notes that you are referring to?

Bardey - Cross/Kabrawala

47

1   A.   No.

2   Q.   Would it surprise you to learn that the government

3   has asked for your notes?

4            MR. LATO:  Objection.

5            THE COURT:  Sustained.

6   BY MR. KABRAWALA:

7   Q.   You didn't bring the notes here today, did you?

8   A.   I only have my report.

9   Q.   We talked about this pizza pie analogy.

10           What part of the pie is Mr. Valerio's rape of

11  these two women, was that --

12           MR. KABRAWALA:  Withdrawn.

13  BY MR. KABRAWALA:

14  Q.   What part of your diagnosis of voyeuristic disorder

15  and frotteuristic disorder factors or considers

16  Mr. Valerio rape of these two women?

17  A.   Well, it doesn't really because he was not indicted

18  or found guilty of rape.

19           And other than the testimony that these women

20  provided, I did not have evidence that any rape had really

21  occurred, whereas, there was tremendous evidence of his

22  having had voyeuristic and frotteuristic tendencies.

23  Q.   So you found --

24           THE COURT:  Hold on one second.

25           (There was a pause in the proceedings.)

Bardey - Cross/Kabrawala

48

1    BY MR. KABRAWALA:

2    Q.   Would you agree that if these rapes occurred as the

3    witnesses testified about, would you agree that that is a

4    cause for concern here?

5    A.   Of course.

6    Q.   And would you agree that that is not accounted for in

7    your diagnosis of Mr. Valerio?

8    A.   A rape is not a diagnosis.

9         What is accounted for is his anger and violent

10   behavior to women, and I explained that in great detail in

11   my report.

12   Q.   But you do not credit, or have not credited in your

13   report the testimony of the two women who testified at the

14   Fatico hearings.

15   A.   It wasn't my role to credit or discredit the

16   testimony.

17        My role is to do a psychological and

18   psychosexual evaluation of Mr. Valerio which I did in

19   which I describe his propensity toward violent sexual

20   behavior toward women of which the rapes of which you

21   speak would be part of.

22   Q.   But you haven't factored -- you just testified that

23   you did not find -- you did conduct a credibility

24   determination but you didn't find their testimony to be

25   corroborated.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Bardey - Cross/Kabrawala

49

1   A.   I have no proof if they were raped or not.  I know

2   they testified to that.

3          But in terms of understanding Mr. Valerio's

4   propensity toward sexual violence, that I explain in great

5   detail in my report, and those rapes that you are

6   describing would fit under that, absolutely.

7   Q.   But there's no specific diagnosis and formulation

8   that accounts for his violent sexual rape of these two

9   women.

10  A.   I completely disagree with you.

11  Q.   Well --

12  A.   In the formulation -- please let me finish.  In the

13  formulation there is a description of why Mr. Valerio

14  harbors such anger toward women and acts out violently

15  toward them.

16          A rape would be one such act.  A rape is not a

17  diagnosis.  A rape is a fact.  It's a crime.  It's not a

18  diagnosis.  It wouldn't be listed as a diagnosis.

19          The closest you would get would be the

20  antisocial personality traits.  Individuals who have those

21  traits tend to commit violent acts or illegal acts of

22  which rape would be one.

23  Q.   Is it fair to say that Mr. Valerio did not admit to

24  raping Ms. Kalchenko?

25  A.   That's fair to say.

Bardey - Cross/Kabrawala

50

1  Q.   And it's fair to say that Mr. Valerio did not admit

2  to raping Angelique Davidse?

3  A.   Correct.

4  Q.   And is it fair to say that their rape is not included

5  in your actuarial calculations?

6  A.   Those instruments use convictions as a basis for

7  inclusion.

8        So if he wasn't convicted of something it

9  doesn't make its way into that actuarial table.

10 Q.   Did Mr. Valerio admit to sexually exploiting his

11 niece?

12 A.   No.

13 Q.   And you are aware that a jury convicted him of that

14 count?

15 A.   Yes.

16 Q.   You are also aware that the child's mother, that is

17 Bernadette, had testified in court at trial?

18 A.   Yes.

19 Q.   You didn't read the trial transcript, did you?

20 A.   I did not.

21 Q.   So you are unaware that she essentially blamed the

22 coconspirator, Elena Kalchenko, for the images of her

23 daughter.

24 A.   I think I testified to that on direct when I referred

25 to the letter that she had written blaming the codefendant

Bardey - Cross/Kabrawala

51

1    on taking those pictures.

2               So I am aware of that.

3    Q.   And I'm talking about the trial transcript --

4    A.   I know.

5    Q.   Because she was also sworn to tell the truth at

6    trial.

7    A.   I understand.

8               MR. BODE:  May we have just a moment, your

9    Honor.

10              MR. KABRAWALA:  Sorry, your Honor.

11              (There was a pause in the proceedings.)

12   BY MR. KABRAWALA:

13   Q.   Now, you testified earlier that normal heterosexual

14   men fantasize about younger girls from time to time.

15   A.   No, that was not my testimony.

16   Q.   Okay.

17              Well, why don't you tell us what your testimony

18   was.

19   A.   I said it was normal for normal heterosexual men to

20   feel attraction to adult women and adolescent women above

21   the age of 14.

22   Q.   And that failure to act on that is still --

23              MR. KABRAWALA:  Withdrawn.

24   BY MR. KABRAWALA:

25   Q.   And sometimes normal heterosexual men dress up older

Bardey - Cross/Kabrawala

52

1   women, that is, women that are above the age of majority,

2   in cheerleader-type outfits.

3   A.    Yes.

4   Q.    And that's still considered normal sexual behavior?

5   A.    Yes.

6   Q.    Are you aware that some of the images admitted at

7   trial showed a six year old niece of the defendant dressed

8   up as a cheerleader?

9   A.    I am.

10  Q.    You would agree that this is a heterosexual man

11  acting out his sexual fantasies in some way?

12  A.    Yes.

13        MR. KABRAWALA:  Your Honor, just one more

14  moment, please.

15        (There was a pause in the proceedings.)

16  BY MR. KABRAWALA:

17  Q.    Just to recap here, you agree that -- withdrawn.

18        Just to recap, Mr. Valerio denied raping Elena

19  Kalchenko?

20  A.    Yes.

21  Q.    Denied raping Angelique Davidse?

22  A.    Yes.

23  Q.    He's denied sexually exploiting his then six year old

24  niece?

25  A.    Yes.

Bardey - Redirect/Lato

53

1    Q.    And you would agree that he is still holding back

2    from true remorse.

3    A.    I testified that he's making progress in that

4    direction.

5          When I initially met with him, he had no

6    remorse, did not accept any responsibility, but that's

7    evolving and I'm finding at our last meeting that he was

8    much more remorseful and seemed genuinely troubled by his

9    behavior.

10   Q.    Thank you.

11         MR. KABRAWALA:   Thank you, Judge, nothing

12   further.

13         THE COURT:   Redirect?

14         MR. LATO:   Yes, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. LATO:

17   Q.    Do you recall being asked questions on

18   cross-examination about Mr. Valerio's having been on

19   probation in Suffolk County for a state court offense?

20   A.    Yes.

21   Q.    Be a fair statement that was the Splish Splash grab

22   offense, correct?

23   A.    It was.

24   Q.    Now, is there a reason why with treatment Mr. Valerio

25   could be more successfully treated now as opposed to when

Bardey - Redirect/Lato

54

1   he was on Suffolk County probation?

2   A.   Yes.

3   Q.   And why?

4   A.   Well, there's an evolution in my opinion in his

5   reaction to his offense.

6           The fact that he is now facing much more serious

7   charges, that he's in a lot more trouble, has brought him

8   a measure of reality in terms of the meaning of his

9   behavior and just how criminal, unethical, morally wrong

10  it is.  And I think it's helped him in the last three

11  years that he's been incarcerated to reflect on this and

12  to actually make some meaningful changes in his

13  understanding of his actions and their sort of

14  psychological underpinnings.

15          It's much like someone who suffers from

16  substance abuse problems.  They may need to go into a

17  rehab more than once before they, quote-unquote, get it

18  and are able to maintain some degree of abstinence.

19  Q.   It may be the case here with Mr. Valerio, and to use

20  your analogy of drug treatment, sometimes a person who is

21  getting outpatient may actually need inpatient, correct?

22  A.   That's correct.

23  Q.   And it's a fair statement Mr. Valerio needs intensive

24  treatment now?

25  A.   Oh, yes.

Bardey - Redirect/Lato

55

1    Q.    Now, do you recall being asked questions on

2    cross-examination about Mr. Valerio's potential for

3    committing even more violent acts in the future?

4    A.    Yes.

5    Q.    And you recall answering that it's a possibility?

6    A.    Sure.

7    Q.    Now, having a medical degree and having taken physics

8    and chemistry, would you say that anything consistent with

9    physical laws is possible?

10   A.    Correct.

11   Q.    Now, with respect to Angelique Davidse, you recall

12   being asked questions about her?

13   A.    I do.

14   Q.    And you recall being asked questions about Elena

15   Kalchenko?

16   A.    I do.

17   Q.    And Mr. Kabrawala saying according to the testimony

18   of those women they were raped, correct?

19   A.    Yes.

20   Q.    Now, if their allegations are true, let's assume for

21   this proceeding that they are true, how are we going to

22   try to prevent recidivism -- I don't mean we -- you, but

23   what is out there to try to prevent recidivism when you

24   factor in those rapes, if they occurred?

25   A.    Well, that kind of inappropriate sexual behavior

Bardey - Redirect/Lato

56

1    would be the focus of a targeted sex offender treatment.

2            And there are other measures that can be taken

3    as well.  There are various types of treatment, even

4    chemical castration which are options for individuals who

5    engage repeatedly in that kind of violent sexual behavior.

6    Q.   Now, in terms of your overall assessment of

7    Mr. Valerio, did he have this demeaning attitude toward

8    women in general?

9    A.   Yes.

10   Q.   Did that come in part from the way his father treated

11   his mother and his sister and him as he grew up?

12   A.   Very much so.

13   Q.   Now, although you didn't factor into these alleged

14   rapes specifically, did you account for this violence

15   towards women in general in your report and your

16   assessment and diagnosis?

17   A.   Yes.

18   Q.   How so?

19   A.   Well, throughout my report and formulation I describe

20   exactly the kind of the dominos that fell from his early

21   childhood experience, witnessing his mother being treated

22   as she was by their father.

23            And then how that translated into his own anger

24   toward women and then sexualized anger towards women.  So

25   it very much accounted for it.

Bardey - Redirect/Lato

57

1   Q.   Now, do you recall being asked questions about the

2   sexual exploitation of Mr. Valerio's niece?

3   A.   I do.

4   Q.   To be specific, that exploitation consisted of

5   dressing her or undressing her and taking photographs of

6   her as opposed to sexual contact, correct?

7   A.   Correct.

8   Q.   Did you ask Mr. Valerio about whether he did these

9   things?

10  A.   He denied it.

11  Q.   Is there a reason why he would admit to certain

12  things yet deny that, based upon your understanding having

13  evaluated him?

14  A.   Well, taking responsibility for his actions is not a

15  sudden curtain that opens up.

16       It can be in fits and starts.  It can be by

17  degree and the idea of doing something to his own family

18  maybe more reproachable and reprehensible to him and he

19  may take longer before he gets to the point where he may

20  be able to deal with that.

21       MR. LATO:  Your Honor, let me just check with

22  Mr. Valerio before I finish.

23       (There was a pause in the proceedings.)

24       MR. LATO:  Your Honor, if I may have a moment to

25  confer with Mr. Kabrawala.

Bardey - Recross/Kabrawala

58

1          THE COURT:  Yes.

2          MR. LATO:  Your Honor, I needed to confer

3     because this is technically beyond the scope of

4     cross-examination.

5          Mr. Valerio would like me to ask the following

6     question or series of questions.

7     BY MR. LATO:

8     Q.   Did Mr. Valerio divulge to you that at some point in

9     his life he had thyroid cancer?

10    A.   Yes.

11    Q.   Is there any connection between his having had cancer

12    to anything else that you did with respect to your

13    diagnosis and evaluation?

14    A.   No.

15         MR. LATO:  Nothing further.

16         MR. KABRAWALA:  Your Honor, briefly.

17    RECROSS-EXAMINATION

18    BY MR. KABRAWALA:

19    Q.   Doctor, if Mr. Valerio had been convicted of raping

20    Elena Kalchenko and Angelique Davidse, you would agree

21    that he would be in a higher risk of recidivism category

22    than he currently is?

23    A.   Likely, yes.

24         MR. KABRAWALA:  Thank you.  Nothing further,

25    Judge.

Gordon - Direct/Lato

59

1          THE COURT:  Anything further?

2          MR. LATO:  No, your Honor.

3          THE COURT:  You can step down.

4          Thank you, doctor.

5          THE WITNESS:  Thank you, your Honor.

6          (Witness steps down.)

7          THE COURT:  Does the defense have anything

8    further in connection with this issue?

9          MR. LATO:  Yes.

10          We call Maura Gordon.

11          THE CLERK:  Please remain standing and raise

12    your right hand.

13    **MAURA GORDON**,

14          having been duly sworn, was examined

15          and testified as follows:

16          THE CLERK:  Please state your name and spell it

17    for the record.

18          THE WITNESS:  Maura, M-A-U-R-A, Gordon,

19    G-O-R-D-O-N.

20          THE COURT:  Go ahead.

21    DIRECT EXAMINATION

22    BY MR. LATO:

23    Q.   Ms. Gordon, good afternoon.

24    A.   Good afternoon.

25    Q.   Did you conduct a psychosocial examination of

Gordon - Direct/Lato

60

1   Bernadette Imperiale?

2   A.   Yes, I did.

3   Q.   Please tell us briefly about your background that

4   makes you qualified to conduct such an examination and

5   give an opinion.

6   A.   I graduated from St. Joseph's College in Patchogue

7   with a BA in human relations.

8           I graduated from Long Island University with a

9   master's in public administration.  I graduated from

10  Fordham University with a master's in social work.

11          I also have a certification in trauma.

12  Q.   Have you ever testified in a court proceeding before?

13  A.   No, I have not.

14  Q.   Now, did you speak with both Ms. Imperiale and the

15  mother, Frances Valerio?

16  A.   I did.

17  Q.   About how many times since you first started speaking

18  with them have you spoken with them?

19  A.   I have met with them off and on through the course of

20  probably the last nine or ten months.

21  Q.   Now, with respect to your interviews of

22  Ms. Imperiale, did you conduct any type of testing or did

23  you just get a narrative from her?

24  A.   No.

25          At the request of Frances Valerio I did a

Gordon - Direct/Lato

61

1   psychosocial of Bernadette, which is to just gather

2   historical information.

3   Q.   Please tell the court briefly if you can, we will

4   elaborate if necessary, of what that history consists.

5   A.   That history consisted of physical, verbal and sexual

6   abuse by the father, Philip, of Bernadette through the

7   ages of four to eight.

8           She also stated that she witnessed abuse,

9   physical abuse of her mother by her father, Philip, and

10  she also saw physical abuse from her father, Philip,

11  towards Joseph Valerio, her brother.

12          She also had multiple medical complications

13  through the course of her life up until current day.  We

14  discussed her family makeup of her current family.  We

15  discussed her fear of her father, Philip, in the sense

16  that she, unlike Joseph Valerio, the testimony that

17  Dr. Bardey provided, she went in the different direction

18  of being very fearful of having any kind of sexual

19  activity with males in fear of her father hitting her or

20  getting very, very violent with her if she had any kind of

21  physical interaction with any of the boys that had been in

22  part of her life as she was progressing through her teens

23  and 20s.

24  Q.   Did she give you specifics with respect to what her

25  father had done to her when she was a child?

Gordon - Direct/Lato

62

1    A.   Yes.

2         She recalled occasions she stated it would be

3    about once a week, he would come into her room when she

4    was trying to fall asleep at night.  It would begin with

5    him fondling her with his fingers.

6         He would penetrate with his fingers and then he

7    moved on to attempt to penetrate her with his penis.  She

8    would cry and say it would hurt.  He would tell her that

9    he would harm her greatly if she told anybody or made any

10   kind of sounds.

11   Q.   In conducting your examination of Ms. Imperiale, did

12   you consider the possibility that she could be fabricating

13   everything to help her brother?

14   A.   I mean, that possibility exists because we are not

15   with these individuals when these acts occur.

16        Her affect which is very flat, the lack of

17   sensitivity or emotion while she was describing these

18   events speaks to the possibility of being very strong

19   these events did occur.

20        She seemed to be very removed from her emotions

21   when talking about her life and the violence that she

22   observed as well as the violence that she acquired

23   herself, which is the normal type of thing when there is

24   sexual abuse involved in a young person's life.

25   Q.   I know that you said it's a possibility, but we don't

Gordon - Direct/Lato

63

1    deal with possibilities here.

2           Do you actually have an opinion whether it was

3    more likely than not, if you have one --

4    A.   No, I feel it's more likely than not that it did

5    occur.

6    Q.   And, again, was it simply her flat affect or anything

7    else that leads you to believe these things occurred with

8    her?

9    A.   In the way she describes being very fearful of having

10   sex with young boys when it would be an appropriate time

11   in her life would fit to the history of having sexual

12   abuse.

13          A lot of folks go in the opposite direction of

14   being very fearful of having any kind of sex with anyone

15   else.  Again, in the way that she spoke about the events

16   that happened when she was younger, she was very detailed

17   about it.

18   Q.   So if I understand you correctly, it was the

19   supplying of the detail that leads you to believe that

20   this probably occurred with the fingers and the crying and

21   so forth?

22   A.   That and the collaboration of her mother saying she

23   had seen the father in bed with Bernadette once.

24   Q.   Well, did you actually have a specific conversation

25   with Frances Valerio about what she had witnessed?

Gordon - Direct/Lato

64

1          Yes?

2     A.   Yes, I did.

3     Q.   And what did she tell you?

4          Was it consistent or inconsistent with what

5     Bernadette was saying?

6     A.   Frances Valerio only told me about one occurrence

7     that she had actually seen Philip in bed with his

8     daughter.

9     Q.   And did she tell you or did you ask what Frances did

10    in reaction, or what was her reaction to what Philip had

11    done?

12    A.   No.

13         She stated she walked away because she was

14    fearful of Philip.  She didn't do anything.

15    Q.   Did she, being Frances, detail for you any physical

16    abuse she may have suffered at Philip's hands?

17    A.   Yes.

18         She said early on in the marriage there was a

19    lot of physical abuse as well as sexual abuse towards her.

20    She didn't go into detail, but she said he tried to use

21    objects with her in their sexual relations.

22    Q.   Did she discuss what kind of objects?

23         In other words, would they be like normal

24    objects to play with or objects that weren't supposed to

25    be used for sexual purposes?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Gordon - Direct/Lato

65

1    A.    She didn't go into detail.

2    Q.    Was there anything about Bernadette's history after

3    her father died that also suggests that these things

4    probably did happen to her as a child, either her

5    relationship with other men before her husband or with her

6    husband?

7    A.    No, there were no other things.

8    Q.    If I understand your testimony, she shied away from

9    boyfriends that did want to have sex because she was

10   fearful of her father?

11   A.    She had two serious relationships prior to her

12   husband, both of which did not involve sex.

13         She stated that there was no sex -- that she was

14   very fearful that she could become pregnant and her father

15   would kill her, as she would put it.

16   Q.    Are you still --

17         MR. LATO:  Let me withdraw that.

18   BY MR. LATO:

19   Q.    How many times did you meet with Bernadette

20   Imperiale?

21   A.    Over the course of three months from July until

22   September, late September.

23   Q.    Of which year?

24   A.    I'm sorry.  2016, excuse me.

25   Q.    And how many times have you met with Frances Valerio?

Gordon - Direct/Lato

66

1   A.    I continue to treat Frances.

2   Q.    And about how many times have you met with her?

3   A.    Probably about a year, weekly or biweekly within the

4   last year.

5   Q.    When you say you continue to treat her, what are you

6   treating her for?

7   A.    The stressors of this event in her life.

8         She struggles with, of course, her feelings

9   about her son being in prison, and what that all involves.

10  Her own physical ailments that she has, as well as having

11  a disabled adult daughter.

12  Q.    Did you ever discuss with Frances Valerio why she

13  never came forward until now with respect to the events

14  that her husband inflicted or I should say the criminal

15  conduct that her husband inflicted on her children and

16  her?

17  A.    She stated back in her day when you got married you

18  got married for better or for worse and you remained.

19        You did not leave your marriages and you kept

20  everything private within the family.

21  Q.    Did she discuss whether she had any feelings of guilt

22  of not having intervened when the children were young?

23  A.    Yes.

24        She would try and she said that she would try

25  and step in when Philip, the father, and Joseph would get

Gordon - Direct/Lato

67

1   into physical altercations in the household.  She tried to

2   get in between them or she tried to have Philip direct his

3   anger towards her in lieu of either of the children.

4   Q.   Now, in meeting with Frances Valerio, you are aware,

5   of course, of the possibility or the motivation she would

6   have to fabricating all of this, correct?

7   A.   Yes, I am aware.

8   Q.   Or at least fabricating parts of it, correct?

9   A.   Correct.

10  Q.   Do you have an opinion whether some of most of what

11  she told you is a genuine feeling or belief on her part?

12  A.   No.

13         It's my opinion that it most likely, yes, it

14  did, in fact, happen.

15  Q.   We already discussed with Bernadette Imperiale, but

16  why do you feel the same way with Frances Valerio?

17  A.   Again, with the detail of her description of the

18  physical altercations, she has a scar that goes into the

19  top of her lip.

20         She stated that that occurred during one of the

21  physical altercations with Philip.  During a separate

22  meeting with Bernadette, Bernadette also discussed that --

23  observing that altercation between her parents and she

24  also said that my mother has a scar above her lip from one

25  time when my father hit her.

68

1          MR. LATO:  One moment, please, your Honor.

2          (There was a pause in the proceedings.)

3          MR. LATO:  Nothing further.

4          THE COURT:  Okay.

5          Cross-examination.

6          MR. KABRAWALA:  No questions, Judge.

7          THE COURT:  You can step down.  Thank you.

8          (Witness steps down.)

9          THE COURT:  Anything further from the defense?

10         MR. LATO:  No, your Honor.

11         THE COURT:  Does the government have any

12    evidence they want to submit on this issue?

13         MR. KABRAWALA:  No, your Honor.

14         THE COURT:  Let me make clear, I don't have

15    those reports.

16         Are you intending to submit the reports

17    themselves or -- I'm not asking for you to submit them,

18    but I want you to understand I don't think I have them.

19    Are you submitting the reports or just the testimony?

20         MR. LATO:  Just the testimony, your Honor.

21         THE COURT:  All right.

22         I want to discuss moving forward.  Mr. Lato, my

23    recollection is before you requested this hearing you were

24    preparing the sentencing memorandum, but I don't believe

25    it was filed, correct?

69

1          MR. LATO:  That's correct, your Honor, because

2    your Honor at the last court appearance said you don't

3    want multiple submissions, you want one submission to

4    contain not only our sentencing -- the memoranda specific

5    to sentencing, but anything we have to say about the

6    Fatico hearing, either the one where the government

7    conducted or the one today.

8          I discussed this with Mr. Kabrawala on an

9    earlier date and he said that still makes sense.  There

10   should be one set of papers.

11         THE COURT:  That's fine.  That is what I said

12   and that continues to be my view.  So we can set a date

13   for that.

14         The only thing I want to make clear is with

15   respect to the prior Fatico hearing, my intention was once

16   I have those submissions, to make findings on that prior

17   to the sentencing so that everybody going into the

18   sentencing would understand what I am or am not

19   considering is relevant conduct.

20         So that's the progression I see.  In other

21   words, you will put in your written submission.  The

22   government will respond, either at a subsequent conference

23   or in a written opinion I will make findings on that

24   relevant conduct, and then we will proceed with the

25   sentencing.

70

1          Does that make sense?

2          MR. LATO:  Yes, your Honor.

3          Just so I'm clear, then, we'll have one set of

4    papers and then your Honor will issue a decision, but

5    there will be no further submissions after that point, and

6    I think I can do that by the following way.

7          When I put in my papers I will assume two

8    different outcomes, either your Honor will find by a

9    preponderance of the evidence that these things occurred,

10   or your Honor did not so find and I will address either

11   alternative in my papers so an additional submission won't

12   be necessary.

13         THE COURT:  Okay.  That's good.

14         You don't want to be heard orally on the prior

15   Fatico hearing.  In other words, you are satisfied with

16   relying on your written submission with that?

17         MR. LATO:  Yes, your Honor.

18         It would only be, your Honor, if based upon the

19   submissions had a question that was not addressed in the

20   papers that argument would be necessary.

21         THE COURT:  Okay.

22         Is that acceptable to the government?

23         MR. BODE:  That's fine, Judge.

24         I think we are on for March 29th now.  So would

25   that then be findings that day and then sentence to

71

1  follow?

2          THE COURT:  No.

3          MR. BODE:  I want to clarify how you want to do

4  it.

5          THE COURT:  What I'm anticipating is findings

6  prior to the date of the sentencing either, as I said, at

7  a conference, but first before we figure whether that's

8  the date or not the date let me ask Mr. Lato when can you

9  get your submission in by?

10          MR. LATO:  Three weeks, your Honor, and I just

11  want to tell you because Mr. La Pinta is on trial, his

12  input is obviously needed even though I'll be doing the

13  bulk of the writing.

14          Mr. Valerio has to see the writings before they

15  go in.  So I think March 29th for sentencing is

16  unrealistic especially with Mr. La Pinta being on trial

17  now.

18          THE COURT:  Three weeks sounds reasonable for

19  your submission.

20          So that would be March 27th.

21          MR. LATO:  Yes, your Honor.

22          THE COURT:  How long would the government need

23  to respond?

24          MR. KABRAWALA:  Two weeks, your Honor.

25          THE COURT:  April 10th.

72

1    I'm going to put it down for sentencing in early

2  May and that would be the actual sentencing.  As I said,

3  I'll do one of two things, I'll either issue written

4  findings on the Fatico hearing prior to the date I'm

5  setting for sentencing or, if I decide to do that orally,

6  we'll set a scheduled conference before the sentencing so

7  I can put those orally on the record.

8              MR. LATO:  One last thing before you leave, your

9  Honor.

10             THE COURT:  I'm not leaving.

11             I'm finding a date in early May.

12             MR. LATO:  I'm sorry.

13             MR. BODE:  If you can make it the first two

14  weeks, your Honor, I'm on trial that third week.

15             THE COURT:  May 4th at 10:30.

16             Does that work?

17             MR. BODE:  Yes, your Honor, that's fine.

18             MR. LATO:  Yes, your Honor.

19             What I was going to say was does the defense

20  have the right to have a reply to the government's

21  response?

22             THE COURT:  Yes.

23             MR. LATO:  And, if so, all I would need is one

24  week.

25             THE COURT:  That's fine.

1          I forgot what I gave the government.

2          MR. BODE:  It's April 17th for reply, then.

3          THE COURT:  April 17th for any reply.

4          Anything else?

5          MR. BODE:  Yes, your Honor.

6          I would just ask pursuant --

7          THE COURT:  I'm sorry.

8          Just so on this issue, today's Fatico hearing,

9     I'm not making any findings in advance of the sentencing

10    because you are submitting this as one of the mitigating

11    factors you want me to consider, right?

12         MR. LATO:  Agreed.  It's purely a sentencing

13    factor and that's it.

14         THE COURT:  Okay.  Go ahead.

15         MR. BODE:  I would ask your Honor pursuant to

16    Section 3509 of Title 18 that we seal the minutes except

17    to the parties since one of the sexual abuse victims is

18    still a minor, except to the parties and obviously the

19    parties when they are submitting the sentencing

20    submissions will take that into consideration.

21         THE COURT:  I don't know that we should seal the

22    whole thing.

23         We should just --

24         MR. BODE:  We can seal the minutes to the

25    parties until such time as they can be redacted for the

A-332

74

1    public, your Honor.

2          We will get the minutes and such appropriate

3    redactions and put that to the court.

4          THE COURT:  That's fine.

5          I won't release the transcript to anyone until

6    you have had a chance to redact out --

7          MR. BODE:  Identifying information, such as the

8    niece.

9          THE COURT:  Other than the niece, though, I

10   don't think there was anything else, right?

11         MR. BODE:  It's our position that the adult sex

12   abuse victims should have a right to have their names

13   taken out of the transcript so it's not found on a Google

14   search every time they are looking for a job.

15         THE COURT:  Okay.

16         MR. LATO:  Agreed.

17         THE COURT:  Okay.  Thank you.

18         MR. KABRAWALA:  Thank you.

19         MR. BODE:  Thank you, your Honor.

20         MR. LATO:  Thank you.

21         (The matter concluded.)

22

23

24

25

Official Court Reporter

A-333

**ALEXANDER SASHA BARDEY M.D.**
FORENSIC AND CLINICAL PSYCHIATRY

# FORENSIC-PSYCHIATRIC EVALUATION

## JOSEPH VALERIO
Cr, No. 14-094 (S-2) (JFB))

**December 7, 2016**

Anthony M. La Pinta, Esq.
Reynolds, Caronia, Gianelli & La Pinta, LLP.
35 Arkay Drive, Suite 200
Hauppauge, New York 11788

Dear Mr. La Pinta,

At your request, I performed a psychiatric and psychosexual evaluation of Joseph Valerio as an aide in sentencing with a specific eye towards assessing what impact, if any, Mr. Valerio's childhood had on his emotional and psychological development, especially as it relates to the offense conduct.

On November 2014, Mr. Valerio was found guilty at trial of all 15 counts he was charged with. Mr. Valerio was found guilty of inducing the production of child pornography, its transportation, its receipt, and of its possession.

Mr. Valerio was examined at the Metropolitan Detention Center located in Kings County, NY on December 3, 2014, February 2, 2915, March 20, 2015, June 5, 2015, June 25, 2015 and most recently November 9, 2016. In conducting this psychiatric examination, which consisted of a comprehensive psychiatric assessment, psychosexual evaluation, and a risk assessment, I reviewed his personal, social, educational, vocation, sexual and psychiatric histories, and I reviewed his understanding of the circumstances that led to his legal troubles. I performed a mental status examination in order to assess his intelligence, thought processes, cognitive functioning, memory, credibility, orientation, judgment, insight, and impulse control. The limits of confidentiality inherent to such an evaluation were explained to Mr. Valerio.

As part of my evaluation, I administered the *Abel Assessment for Sexual Interest-3* (AASI-3) for men, the STATIC-99R, the SVR-20, as well as completed the HCR-20. On May 27, 2015, I conducted a collateral interview with members of Mr. Valerio's family, including his sister, Bernadette Imperiale and his mother Frances Valerio, as

*Forensic-Psychiatric Examination*
*Joseph Valerio*

well as his uncle John Tusa, LCSW, and reviewed the following collateral sources of information in making my assessment:

1. The Criminal Complaint, dated 2/25/14
2. The Indictment, dated 2/26/14
3. The Superseding Indictment, dated 3/5/14
4. The Superseding Indictment, dated 4/9/15
5. Miscellaneous email correspondence
6. Records from Suffolk County Probation
7. MDC call log
8. Log of MDC money transfers
9. MDC visitor list
10. Affidavit in Support of Search Warrant, dated 1/27/14 and 2/10/14
11. Investigative Report (FD-302), dated 1/28/14
12. Grand Jury Transcript (redacted), dated 2/26/14
13. Presentence Investigation Report, dated 10/27/15
14. U.S. Probation Department Sentence Recommendation, dated 10/29/15
15. U.S. Probation Department Sentence Recommendation Revised, dated 3/4/16
16. U. S. District Court, Transcript of Proceedings, dated 7/25/16
17. U. S. District Court, Transcript of Fatico Hearing, dated 9/26/16
18. Psychological Examination of Bernadette Imperiale, dated 11/10/16

## PAST PERSONAL HISTORY

Mr. Joseph Valerio is a 50-year-old Italian-American male who was born on July 18, 1966 in New York. His father, Filippo Valerio, died in 2010 at the age of 74 as a result of complications secondary to his diabetes and cerebrovascular disease. His father was born in Italy and had immigrated to the U.S. in the 1920's. Mr. Valerio described his father as having come from poor conditions, "in the tenements on the lower east side," where life was difficult. He had been a diamond setter in Queens, New York, then worked as a jeweler in Massapequa, New York. He then was offered a partnership in a pizzeria in Long Island, New York where he worked long hours, often coming home at one or two o'clock in the morning. He added that his father experienced physical and verbal abuse from his own parents while growing up in Italy. Mr. Valerio characterized his father as "the dictator," in that he was physically, emotionally, and sexually abusive of his wife and children. He also reported that his father frequently abused alcohol.

His 71 year-old mother, Frances Valerio, currently resides in Massapequa, NY and is a homemaker. She is afflicted with various medical conditions, including hypertension, hyperlipidemia, end stage arthritis, and obesity. He indicated that his mother's role in their parents' relationship was a submissive one, compounded by not

*Forensic-Psychiatric Examination*
*Joseph Valerio*

only the physical abuse she was subjected to, but also the horrible sexual abuse her children experienced that she was powerless to stop.

Mr. Valerio has an older sister, Bernadette Imperiale, who is now 52 years old. She is married with two children and also resides in Massapequa, New York. Mr. Valerio described the relationship with his sister as close.

Mr. Valerio related that his mother was victim of both physical and emotional abuse at the hands of his father, Mr. Valerio, frequently witnessing his father yell and degrade his mother, and even being forced to witness his father physically abuse his mother. In addition to the abuse enacted on his mother, Mr. Valerio's father was sexually abusive towards both him and his sister. Mr. Valerio recounted, and his sister corroborated, that his father would return home from working at the pizzeria, enter one of his children's rooms, get into bed with them, and sodomize them. Mr. Valerio recalled his father speaking to him in Italian during these horrific events saying, "It's like a zucchini." The abuse started when he was about five years old and continued until he was 10 or 11, occurring almost weekly. He recalled at times his mother would try to enter the room to prevent the abuse from persisting, however, his father would scream at her, often "get out bitch." If she succeeded in entering the room he would become physically aggressive with her, slapping and pushing her, as she pleaded with her husband to stop. Such aggressive sexual assaults occurred almost weekly for years. In addition, Mr. Valerio reported, while he was in the shower, his father would inappropriately touch Mr. Valerio's genitals and would often also be naked at the time. The sexual abuse continued until Mr. Valerio grew strong enough to resist his father's inappropriate sexual advances. Following this, his father sought sexual satisfaction from Mr. Valerio's sister, as she then became the victim of his father's sexual assaults, something he continues to endorse guilt for.

In addition to experiencing such horrific abuse, he indicated that his father was very controlling in the actions of his family and often refused to allow his family to be independent of him. He frequently made decisions for them, often refusing to allow them to eat and wear what they wanted. His father often beat both Mr. Valerio and his sister with belts and threatened them. As his father aged, his health deteriorated as well as his hearing, which often resulted in louder verbal altercations. As a result of loud arguments, their neighbors, who heard the arguments, offered a refuge to Mr. Valerio and his sister.

Although Mr. Valerio became strong enough to fight off his father's sexual abuse as a youth, the emotional and verbal abuse persisted well into Mr. Valerio's twenties.

Likely a result of the ongoing trauma he was experiencing, Mr. Valerio manifested delays in various areas of his developing appropriate speech and learning capacity. As a result, Mr. Valerio was diagnosed with Dyslexia and was held back

*Forensic-Psychiatric Examination*
*Joseph Valerio*

multiple years in school, as he was falling behind.

Mr. Valerio moved with his family to Long Island, New York, where he attended the Alfred G. Lockhard Elementary School from first through sixth grades. Mr. Valerio recalled experiencing such a strong attachment to his mother, bordering on the inappropriate, that he often dreaded, or even feared leaving her. In retrospect, during my evaluation, he reflected that the knowing that his mother was likely to be abused in his absence caused him to complain of feeling too sick to attend school in order to protect her, even at an early age.

Mr. Valerio reported while in school his grades were barely adequate, often only passable. He described himself as social, with "lots of friends." He described developing an early interest, or obsession, with sexualized behaviors, as he began to masturbate at 11 years old, arguably triggered by his father's early sexualization of him. Early and repeated exposure to sexual behavior can cause a child to normalize the experience and prevent it from being considered "taboo," as it would a normally developed individual.

Mr. Valerio then attended Aimes Junior High School for seventh and eighth grades. There, he began to experiment with marijuana and his interest in music and girls blossomed, which resulted in his poor academic performance. By the age of 12, Mr. Valerio began engaging in odd sexual behavior with females, which only progressed with age and experience.

Mr. Valerio attended Alfred G. Burner High School, graduating in 1985 with a high school diploma. By graduation, Mr. Valerio was introduced to alcohol and barbiturates, and soon after, he began abusing cocaine. Mr. Valerio was driven by the hallucinations brought on by the use of barbiturates and believed the experience improved his music, as he utilized music as an outlet to escape the abuse at home.

Following his graduation from high school, Mr. Valerio was in a better position to stand up to his father, both physically and emotionally, however, his father remained taller and heavier than he, allowing for his father to continue the physical assaults on Mr. Valerio. To harness his anger and resentment for his father, Mr. Valerio participated in hockey, adding that he frequently got into fights during games as a form of release, as he was still not able to fully protect himself and his mother from his father's abuse. He recalled often intervening during instances his father was physically assaultive towards his mother; one example he reported was when his father held his mother's throat or threated her with a knife. As the abuse continued, Mr. Valerio, seeking alternate means to protect himself and his mother, purchased a BB gun.

Mr. Valerio, feeling compelled by his father to do so, entered the family tile and marble business, working as part of the sales and delivery teams. He remained

Case 2:14-cr-00094-JFB   Document 142-1   Filed 04/25/17   Page 5 of 16 PageID #: 984

*Forensic-Psychiatric Examination*
*Joseph Valerio*

employed with his family's business for a number of years. In 1988, at the age of 22, Mr. Valerio was involved in a motor vehicle accident while riding in a taxi and sustained a whiplash injury as a result. He was prescribed medication to alleviate his pain, but due to his psychological fragility and ongoing substance abuse, he soon became addicted. He ceased employment with his family's company as a result of the injury and received Worker's Compensation. Mr. Valerio, out of work, and experiencing ongoing pain and the sequelae of emotional and physical abuse, began to abuse alcohol more heavily, and soon grew depressed. He sought "treatment" from his uncle, Mr. John Tusa, who is a psychotherapist. He reportedly saw Mr. Tusa on a weekly basis and, with Mr. Tusa's assistance, worked toward overcoming his addiction to both alcohol and his prescription pain medications.

As Mr. Valerio worked to overcome one addiction, another quickly took its place. After he was injured and subsequently spent many hours at home alone, he began viewing and masturbating to adult pornography for up to several hours a day. His interests evolved to include various fetishes, not surprisingly, "S & M," and "Bondage." The extensive history of sexual abuse and being witness to physical abuse towards his mother blurred the boundaries between sex, violence, and normal interpersonal behaviors. He had never developed the normal boundaries and established the expected taboos and self-restrictions that he should have.

Over time, as he recovered from his neck injury, Mr. Valerio started a "credit repair" business. As the business began to flourish, thus occupying much of his time, the time he spent watching pornography waned. Mr. Valerio was able to save some money made through his credit repair business and bought various rental properties. Mr. Valerio then focused on earning his income from his real estate ventures.

Through the time of his real estate business his use of pornography ebbed and flowed. Whenever he became depressed or stressed his use would escalate, as would his general interest in sexual outlets. Mr. Valerio began frequenting sex clubs and even began hiring prostitutes; typically this sexually deviant behavior occurred simultaneously with an increase in cocaine and alcohol use. By 1990, Mr. Valerio reported, he was "heavy into drugs," with his drugs of choice being alcohol, marijuana, and cocaine. He related that his credit assistance business often put him in contact with bar and nightclub owners, which, during meetings with these clients, Mr. Valerio would often be offered cocaine and alcohol. As explained previously, Mr. Valerio has a predisposition to seek out unhealthy ways to cope with his abusive past, the introduction to these substances merely acted as a gateway to his addictions. This paved the way for his cocaine addiction, which frequently led to hypersexual behavior and the experimentation with odd sexual activity, as Mr. Valerio recalled, "a lot of S&M, bondage, and threesomes. Kinky stuff."

The abuse of cocaine grew problematic for Mr. Valerio who suffered headaches, bloody noses, and an overall loss of functioning, he began to "steer away

*Forensic-Psychiatric Examination*
*Joseph Valerio*

from the scene" in 1991 as a result. He denied any legal problems resulting from his substance use, such as DWI's, at that time. Continued conversations with Mr. Tusa were helpful to aid in gaining some control over his substance abuse.

Mr. Valerio married his first wife in 1994 after having known her for two years. Their son, Andre, was born in April of 1995. Throughout his marriage, his interest in pornography remained, in fact he shared his interest with his wife, often viewing pornography together. His sexual perversions escalated, as he recalled they would engage in role-playing behaviors and various sexual fetishes. Child pornography was reportedly never an aspect of their sexual play. Mr. Valerio became interested in the "entertainment business" and decided to create and launch a "lifestyle" magazine in Long Island. He engaged in extramarital sex promising photographs and interviews to be published in his magazine. During this marriage, Mr. Valerio employed nannies to care for his son whom he would record to "keep an eye on them." He often caught these women undressing while recording and admitted to having inappropriate sexual relationships with at least three of them. Over the course of their marriage, Mr. Valerio explained, his wife grew more interested in her work, gained a lot of weight, and lost her sexual drive, "she was not meeting my sexual needs." The couple separated around 2001.

The years following his separation from his wife saw his addiction to cocaine and pornography continue to intensify. Mr. Valerio stated, "I was very, very deep into bondage, I wanted to go into the porn industry as an actor, but I was too old." In 2005, Mr. Valerio was arrested for inappropriately touching a female adult in a pool at a waterpark, he pled guilty to the charge and was required to a complete sex offender treatment program as part of the requirements for his supervised release.

He and his wife legally divorced in 2007, sharing custody of their son. Soon after he met his second wife, who was already pregnant when they met. He reported raising her son as his own, and within the next two years had a daughter with his second wife. He added that they had an "open relationship," and that the two engaged in sexual relationships with other people. The relationship ended amicably when she was forced to leave the country as her visa had expired. He added that he had little "grasp on things" following that period of his life because of his heavy drug and alcohol abuse.

One experience remains a point of distress for Mr. Valerio to this day. In 2008, Mr. Valerio disclosed that he initiated a sexual relationship with his distant cousin, and were "on and off" until her tragic death in 2011. Following her death, he found out she was pregnant when she died, sending Mr. Valerio "into a tailspin." He began to abuse food and gained a tremendous amount of weight.

A-339

*Forensic-Psychiatric Examination*
*Joseph Valerio*

Mr. Valerio's sexual interests continued to escalate and become more perverse in nature as time went on, eventually leading to his conduct resulting in the instant offense, described in detail in relevant legal documents.

## COLLATERAL SOURCES

### Mrs. Frances Valerio, Bernadette Imperiale and Mr. John Tusa

On May 27, 2015, Mr. Valerio's mother, sister and uncle were interviewed as collateral sources to corroborate much of Mr. Valerio's history and reports of events relating to the instant offense. Frances Valerio related that her late husband was born in Sicily and always had "a different way of thinking." He never could accept that Mrs. Valerio ever had previous boyfriends and that he felt cheated since he had found out only after they had already been married. As a result, she added, "he took [his anger] out on the children" and became emotionally, physically, and sexually abusive. He would repeatedly tell Mr. Valerio that he was not his own son, but rather a bastard. He regularly beat both of his children, hitting them with a belt and buckle. Mrs. Valerio characterized her late husband's abuse of Mr. Valerio as his receiving the "beatings of an animal." She first caught her husband in bed naked with their son when he was five. She recalled his threatening, "If you say anything, I'll kill you." On different occasions, she saw her husband in bed with her children with a zucchini in hand. Mrs. Valerio, with no money and nowhere to go, felt trapped and helpless to witness the abuse her husband was perpetuating. Mrs. Valerio corroborated that her son began to fight back as he got older and stronger. She recalled that on several occasions, when her husband was beating her, her son would interpose himself and say "why don't you hit me instead of hitting mom?" Regarding the ongoing sexual abuse of her son, Mrs. Valerio stated that she saw her husband go into her son's room, maybe once a month, sometimes staying the entire night. She commented, "I was too frightened, I didn't say anything." She added that because of her husband's old world upbringing, "you don't call the police and you don't get a divorce." The sexual abuse went on from the age of five to about 13.

Because of the abuse he endured, according to Mrs. Valerio, her son never wanted to be home. He would often sneak away to stay with neighbors or just ride off for hours on his bicycle. She confirmed that her son, as he grew into adolescence, began to harbor a great deal of anger which she too attributed to the years of abuse her son had endured. She added that she grew to believe that her son grew to not trust women and "maybe felt a woman was just a sexual object."

Bernadette Imperiale, Mr. Valerio's sister, corroborated her own history of having been physically, emotionally, and sexually abused by their father. She also gave a few anecdotes of her father abusing her brother in sexual and non-sexual ways. She remembered her father forcing her brother to walk home from work in the snow

*Forensic-Psychiatric Examination*
*Joseph Valerio*

because the two had argued over a trifle. She recalled books and various objects being thrown at her brother's head. She recalled that from the age of five to eight, her father came into her room, on a weekly basis, and force himself on her sexually. Her mother added that she would hear her children scream when they were being sexually assaulted.

## Psychological Examination of Bernadette Imperiale, dated November 10, 2016

Mr. Valerio's sister, Ms. Imperiale, was evaluated by Ms. Maura Gordon as requested by his mother, Mrs. Valerio, as part of her treatment of her daughter. As indicated in the report, much of Mr. Valerio's reported upbringing was corroborated in that Ms. Imperiale detailed the physical abuse Mr. Valerio was subjected to during his developmental years. She described her brother as "very angry," and she reported "her father told both her and [Mr. Valerio] that his father hit him all the time because he loved them."[1] Further, Ms. Imperial related, despite a relationship of over a year with an engagement, she refrained from sexual activity for fear of repercussion from her father if she became pregnant. Once married and actively trying to become pregnant, she attributed her difficulty to becoming pregnant to her father's extensive sexual abuse.[2]

Ms. Imperiale detailed the sexual abuse, beginning at age five and continued to age eight or nine years old. As indicated in the report, she stated that Mr. Valerio's father would enter her room late at night and began with penetrating her with his fingers and progressed to sexual intercourse.[3] She described crying herself to sleep at night as a result of the traumatic abuse. She added that her father began physically abusing her by hitting her in the back of her head, he was frequently "putting me down, he would tell me I was stupid."[4]

Impacting Mrs. Valerio's relationship with both her husband and her children was her parents' relationship that was, as described in the report, extremely tumultuous. As indicated in the report, Mrs. Valerio's mother suffered from a mental illness, often was aggressive towards her children, and engaged in frequent extramarital affairs, one resulting in Mrs. Valerio's half-brother.[5] Further explained in the report was that Mr. Valerio's mother and father were second cousins and "share 25% of the same DNA."[6] His mother indicated that Mr. Valerio's father was a "very abusive and jealous man" from even the beginning of their relationship.[7] According to the report, his mother stated that Mr. Valerio's father controlled all aspects of her

---

[1] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[2] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[3] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[4] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[5] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[6] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[7] Psychological Examination of Bernadette Imperiale, dated 11/10/2016

*Forensic-Psychiatric Examination*
*Joseph Valerio*

life, finances included, and even refrained from speaking to another male for fear "her husband would assume she was going to have an affair."[8] As stated in the report, his mother disclosed both of her children witnessed Mr. Valerio's father hitting her.

Specifically regarding the sexual abuse that Mr. Valerio's father inflicted on both of his children, his mother recalled an occasion where his father was in Mr. Valerio's bed with him when he was approximately five years old. She stated that when she confronted his father about the situation he threatened, "if you tell anyone I will kill you," and as a result of genuine fear he would follow through with this threat, she laid witness to countless years of sexual abuse towards both Ms. Imperiale and Mr. Valerio.[9] Mr. Valerio's father appeared to maintain control over his family "using violence," as was described by both Ms. Imperiale and Mrs. Valerio, his mother.[10]

As opined in the report, Mr. Valerio's interactions with women are modeled after the hostile and tumultuous relationship between his parents, "watching the way his father treated his mother."[11] The childhood depicted by Mr. Valerio and his family clearly indicates a "very chaotic and violent upbringing," with the violence extending over multiple generations with a clear cultural component.[12]

## PSYCHO-SEXUAL TESTING

### *Personality Assessment Inventory (PAI)*

On April 10, 2014, Mr. Valerio was administered the *Personality Assessment Inventory* (PAI), authored by Leslie Morey, PhD. The *PAI* is a multi-scale pen and paper test of psychological functioning that assesses constructs relevant to personality and psychopathology evaluation in various contexts including psychotherapy, crisis/evaluation, and forensic assessment. The *PAI* has 22 non-overlapping scales, providing a comprehensive overview of psychopathology in adults. The PAI contains four kinds of scales, validity scales, which measure the respondent's approach to the test, including faking good or bad, exaggeration, or defensiveness; clinical scales, which correspond to psychiatric diagnostic categories; treatment consideration scales, which assess factors that may relate to treatment of clinical disorders or other risk factors but which are not captured in psychiatric diagnoses; and interpersonal scales, which provide indicators of interpersonal dimensions of personality functioning.

---

[8] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[9] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[10] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[11] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[12] Psychological Examination of Bernadette Imperiale, dated 11/10/2016

A-342

*Forensic-Psychiatric Examination*
*Joseph Valerio*

Mr. Valerio's results on the *PAI* confirmed that he attended to the assessment items appropriately and in a consistent fashion.[13]

Mr. Valerio's *PAI* clinical profile is marked by significant elevation on the mania (MAN) scale, indicating "that the content tapped by this scale may reflect a particular area of difficulty for the respondent." As such, the *PAI* Clinical Interpretative Report indicated Mr. Valerio is likely suffering from Relational Problem NOS (Family or Marital Problem) with a possible (rule-out) diagnosis of Bipolar I Disorder, Most Recent Episode Manic, Unspecified. Although a personality disorder was deferred, a rule-out diagnosis included Personality Disorder NOS (Mixed Personality Disorder with Borderline, Antisocial, Narcissistic, and Paranoid Features).

Mr. Valerio described having "significant problems frequently associated with aspects of a manic episode." According to the *PAI*, his clinical picture is characterized by grandiosity and a thought content marked by inflated self-esteem. The *PAI* predicted that others may see him as self-centered and narcissistic. He also reported difficulties consistent with "relatively mild or transient depressive symptomology," such as a change in physical functioning, disturbance in sleep pattern, and decrease in energy and level of sexual interest. He reported concerns about his physical functioning and health in general, likely related to his recent and ongoing health problems. According to the report, Mr. Valerio "describes himself as being more wary and sensitive in interpersonal relationships than the average adult."[14] He also reported a personality style "that involves a degree of adventurousness, risk-taking, and a tendency to be rather impulsive." As these problems are frequently associated with mania, as is substance abuse, the *PAI* report warned, "attention should be paid to the possibility of denial of problems with drinking or drug use." However, Mr. Valerio and his wife both reported limited involvement with substance abuse. Mr. Valerio's self-concept "appears to involve a generally positive, and, at times, perhaps uncritical self-evaluation."

The *PAI* report indicated that Mr. Valerio's interpersonal style is characterized as "pragmatic and independent." He is not likely to be perceived by others as "a warm and friendly person, although he is not necessarily lacking in social skills and he can be reasonably effective in social interactions." This may be, in part, because Mr. Valerio sees "relationships as a means to an end" and he allegedly does not believe his social relationships offer much support. Despite that, the report concluded that Mr. Valerio "views his environment as reasonably stable and predictable."[15]

Although Mr. Valerio endorsed "Critical Items" associated with traumatic stressors, it is not mentioned elsewhere in the report.

---

[13] Personality Assessment Inventory, Clinical Interpretive Report, administered 4/10/14, p. 6
[14] Personality Assessment Inventory, Clinical Interpretive Report, administered 4/10/14, p. 7
[15] Personality Assessment Inventory, Clinical Interpretive Report, administered 4/10/14, p. 8

*Forensic-Psychiatric Examination*
*Joseph Valerio*

### *Abel Assessment for Sexual Interest-3* (AASI-3)

On February 5, 2015, Mr. Valerio was administered the *Abel Assessment for Sexual Interest-3* (AASI-3) for males. The *Abel Assessment* is a psychological test designed to provide a self-report of a client's sexual arousal patterns as well as an objective measure of their sexual interests. While the subjective measure provides a summary of what the client wishes to tell you about his or her arousal patterns, the objective measure provides an independent assessment of the client's sexual interests that is obtained in a way that is beyond the client's awareness.

Results of the *AASI-3* show that Mr. Valerio obtained a Cognitive Distortion Score of 15%, indicating that he does not frequently use justifications for his illegal sexual behavior (0 to 25% is non-problematic). He obtained a Social Desirability Score of 65%, which is within the high range and indicates an unwillingness to admit to any violation of common social mores. However, it appears that Mr. Valerio was forthcoming and honest with the test as he did admit to several social norm violations, including having fantasies about sexual relationships with children.

Mr. Valerio, on the self-report section of the *AASI-3,* admitted to watching adult pornography since the age of 15 and Internet-based pornography since 29. He stated that he has engaged in Frottage (Rubbing up against or touching a stranger), on four occasions between the ages of 20 and 39, that he has engaged in Voyeurism (Secretly watching others) on 5 occasions between the ages of 19 and 46, that he has had 5 sexual affairs and that he has had sex with strangers on 6 occasions.

Mr. Valerio reported that he had been the victim of sexual abuse on 200 occasions between the ages of 5 and 11.

During the self-report section of the *AASI-3*, Mr. Valerio admitted to having "a few" sexual fantasies about Frottage, "a few" fantasies about Voyeurism, and "a few" fantasies about having affairs and having sex with strangers.

Mr. Valerio has not been accused of sexually abusing a child and denies that this behavior ever took place. He has never been investigated, arrested, or convicted for sexual or nonsexual crimes.

On the Emerick Sexual Victimization Scales (a measure of an individual's degree of Sexual Victimization Trauma, Mr. Valerio scored 83% on the trauma intrusive scale, indicating a high degree of intrusive thoughts about the child molestation he suffered. On the Trauma Symptomatology Scale, he scored a 78%, indicating also severe concerns and a tendency to have cognitive distortion about the abuse, justifications about violence, and faulty beliefs about the world in general.

A-344

*Forensic-Psychiatric Examination*
*Joseph Valerio*

Mr. Valerio admitted to finding the following behaviors "mildly arousing": using sexual magazines or movies excessively, becoming obsessively aroused by objects or parts of the body, and rubbing up against or touching strangers in a crowded place.

On the *AASI-3,* Mr. Valerio fit in the "Medium Risk Group" to re-offend, giving him a 4% actuarial risk of re-offending within the next 10 years.

The results of the *AASI-3* suggest that Mr. Valerio has a high sexual interest in Caucasian adolescents (fourteen to seventeen years old) and adult females. Of note, an attraction to adolescent females is not considered unusual in adult, heterosexual males so long as no actions are taken to satisfy that attraction. There was elevation of the Voyeurism S&M Adult White Male scales.

### HCR-20

The HCR-20, a widely used actuarial tool to assess the risk of dangerousness was completed, using elements of Mr. Valerio's prior history and his current psychiatric presentation. The HCR-20 evaluates 20 different factors divided into three groups. These are Historical, Clinical, and Risk Management Items. Based on this tool, Mr. Valerio scored in the Moderate range of Final Risk Judgement.

### SVR-20

The Sexual Violence Risk–20 (SVR-20) is a commonly used structured professional judgment guideline for sexual offender risk assessment and risk management planning. The SVR-20 assesses historical factors related to psychosocial adjustment, the specifics of the sexual offense, and the quality of future plans. Mr. Valerio also scored in the Moderate risk group.

### STATIC-99R

The Static-99 is a ten-item actuarial assessment instrument created by R. Karl Hanson, Ph.D. and David Thornton, Ph.D. for use with adult male sexual offenders who are at least 18 year of age at time of release to the community. It is the most widely used sex offender risk assessment instrument in the world, and is extensively used in the United States, Canada, the United Kingdom, Australia, and many European nations. The STATIC-99R also placed Mr. Valerio in the moderate risk pool of re-offending.

## MENTAL STATUS EXAMINATION

A-345

*Forensic-Psychiatric Examination*
*Joseph Valerio*

Mr. Joseph Valerio is a 50-year-old Italian male of short stature, who presented for his evaluation appropriately dressed in prison garb and well groomed. Mr. Valerio was well-related and made good eye contact. He was cooperative and friendly. Mr. Valerio was forthcoming and honest and discussed his involvement in the offense conduct willingly, openly, and initially, with little shame or remorse. There was evidence that he was initially attempting to minimize or lessen the severity of his actions or their consequences. Most recently, Mr. Valerio was apologetic and tearful when discussing his offense conduct and became agitated, nearing aggression, when discussing the details of his past abuse, evidencing the recent linkage between the offense conduct and his past sexual and physical abuse.

Mr. Valerio's speech was clear, relevant, and coherent while his thought processes were logical and goal-directed. There was no evidence of any perceptual disturbances including hallucinations and delusions of any kind. There was no indication of suicidal or homicidal ideation. Mr. Valerio's mood was normal and his affect was appropriate and full in range. He was alert and oriented in all spheres and did not appear to be suffering from any cognitive deficits. Mr. Valerio appeared to be of average intelligence.

During my initial evaluations of Mr. Valerio he evidenced little insight into the maladaptive nature of his involvement in the instant offense, however, more recently he presents as an individual who is connecting the dots, so to speak, between his traumatic past and the influence on his deviant sexual behaviors. He discussed more openly, with insight, the etiology of his distorted view of women and their relation to sex.

## DIAGNOSIS AND FORMULATION

**Voyeuristic Disorder**
**Frotteuristic Disorder**
**Antisocial Personality Traits**
**Alcohol Use Disorder, In Institutional Remission**
**Cocaine Use Disorder, In Institutional Remission**

Mr. Valerio is a 49-year-old Italian male with no significant prior psychiatric history. His early years are notable for having been raised in an abusive household. Significantly, he witnessed the physical abuse of his mother by his father, the sexual abuse of his sister by their father, and his own sexual victimization by his father, including repeated instances of anal rape, from the age of 5 until 11.

As a direct result of this abuse, Mr. Valerio was sexualized at a very young age, impacting his psychosexual development; he ultimately grew to experience hypersexual feelings and behaviors as a direct result of the abuse he was victim of.

A-346

*Forensic-Psychiatric Examination*
*Joseph Valerio*

The repeated abuse Mr. Valerio repeatedly experienced as a child molded his sexual behaviors as an adult. Various sexual behaviors, considered taboo to most individuals, became "normal" for Mr. Valerio and thus propelled him into his past and current sexual behaviors.

It is not unusual for a young male, once abused and repeatedly sexualized by his father, to develop inappropriate and distorted outlooks on sexual behaviors. Mr. Valerio lacked the guiding, safe, nurturing, and consistent upbringing to develop normally emotionally, socially, and sexually. Instead, he developed maladaptive sexual interests, though through no fault on his own. He was raised by a very dictatorial, sexually depraved, misogynistic, and abusive father, who terrorized his family sexually, emotionally, and physically. The father demanded his family's approval, fear, respect, and sexual subjugation. Despite being abused, Mr. Valerio was forced to strive for his father's approval and acceptance for much of his childhood and young adulthood, fearing physical repercussions and abuse.

As a result, Mr. Valerio grew angry, resentful, and self-loathing. His view of interpersonal relationship became modeled on what he had seen his father do. This fueled his desire to displace his authority through acts of sexual aggression, thus repeating the cycle of abuse perpetuated by his father. Mr. Valerio unfortunately learned to use sexual and aggressive behaviors as outlets for his negative feelings, as his father had before him.

In parallel, Mr. Valerio, as a child, grew to hate and resent his mother for not protecting him from the abuse the father was wielding. This anger turned to rage as he grew older and the abuse persisted. This rage then expanded to include all women and has thus colored his ongoing relationships with important women in his life, something he now very much regrets as he comes to terms with it. He recalled blaming his mother for the years of sexual abuse he endured at the hands of his own father, causing him feelings of abandonment and helplessness that he vowed never to experience again, resulting in his dominating personality in regards to his sexual activities. When this anger at women was then combined with the sexually depraved behavior his father had inculcated into him, he grew to believe that a woman was merely a sexual object. In the end, Mr. Valerio's interactions with women appear to be modeled after the hostile and tumultuous relationship between his parents, growing up believing it is acceptable, normal even, to physically and sexually abuse a significant other.

Gathering from current research that examined the correlation between experiencing physical abuse as a child and continuing on to commit a sexual offense, males who experience physical abuse, as Mr. Valerio did, are at an increased risk to

A-347

*Forensic-Psychiatric Examination*
*Joseph Valerio*

commit sexual offenses.[16] Mr. Valerio possessed another propensity to engage in sexual offenses as cited in current research, the existence of childhood sexual abuse. The presence, and persistence into adulthood, of symptoms of depression, anxiety, substance abuse and sexual dysfunction, all of which are well documented in Mr. Valerio's history, are associated with childhood sexual abuse.[17] Mr. Valerio was not born with an antisocial personality or characteristics that left him susceptible to commit such heinous sexual acts, on the contrary, Mr. Valerio was turned into a sexual offender through years of horrible acts of sexual and physical abuse at the hands of his father.

In addition to arrested and distorted psychosexual development, Mr. Valerio developed symptoms of anxiety and low self-esteem, which he self-medicated with various substances of abuse, usually alcohol and cocaine, which is not uncommon for victims of serial sexual abuse, as described previously in recent research. He also developed deviant sexual behaviors along two lines. He developed and has engaged in repeated instances of Frottage, as evidenced by his prior arrest, but also by his self-reported interest in the activity. He also developed an interest in Voyeurism, both in terms of viewing real females, but also through the videotaping of women without their knowledge, or by viewing videos that he had made during sexual activity, or as requested, as in the instant offense.

Mr. Valerio's psychosexual texting revealed that Mr. Valerio is sexually attracted to adolescent and adult women. This profile, in light of his history, does not support a diagnosis of pedophilia. On the contrary, those categories of sexual interest are considered normal in adult, heterosexual males. In my opinion, Mr. Valerio is not a pedophile. He does not have an interest in having sex with minors. His offense conduct was driven by his voyeuristic needs and his hypersexual nature, rather than a specific interest in having sex with minors.

In assessing Mr. Valerio's risk of dangerousness to the community, I considered a number of psychological features and historical data. In Mr. Valerio's case, the presence of manipulative, impulsive, and antisocial personality traits place him in the moderate risk of dangerousness and risk of re-offending. In addition, the presence of a history of substance abuse, of legal entanglements, of impulsive acting-out, and of interpersonal chaos further aggravates his risk of endangering others. This finding is corroborated by the actuarial risk-assessment tools used.

---

[16] Widom CS, Massey C. A Prospective Examination of Whether Childhood Sexual Abuse Predicts Subsequent Sexual Offending. *JAMA Pediatr.* 2015;169(1):e143357. doi:10.1001/jamapediatrics.2014.3357.

[17] Blanco, L., Nydegger, L., Camarillo, G., Trinidad, D., Schramm, E., & Ames, S. (2015, October). Neurological changes in brain structure and functions among individuals with a history of childhood sexual abuse: A review. *Neuroscience and Biobehavioral Reviews, 57,* 63-69.

A-348

*Forensic-Psychiatric Examination*
*Joseph Valerio*

On the other hand, Mr. Valerio's capacity to sustain an intimate relationship with his family members, as well as his ability to sustain himself professionally speak to his capacity and desire to maintain legitimate relationships, which are mitigating of his dangerousness. The fact that he has not used weapons, threatened the lives of his victims, caused his victims physical harm, or manifested a recent escalation in the behaviors also mitigate his risk, and keeps him out of a higher risk level. In sum, there is evidence that Mr. Valerio is of moderate risk to the community at this time.

I found Mr. Valerio not to be deeply troubled by his offense conduct during my initial evaluations with him. His behavior appeared *ego-syntonic,* i.e. not disturbing to himself. In other words, he was not deeply troubled by this aspect of his sexuality and was not motivated to deal with it. That has evolved over time and through our repeated examinations. Presently, in my recent reevaluation of Mr. Valerio, he manifested significant remorse and guilt. As such, his offense conduct is becoming *ego-dystonic,* i.e. uncomfortable for him. This internal conflict heralds the presence of an internal motivation to change. This is a good prognostic factor in assessing Mr. Valerio's receptivity to sexual offender treatment. A successful bout of such treatment would decrease the chance of recidivism and increase the likelihood of success for treatment. As evidenced through his recent improvement of insight into his past behaviors, Mr. Valerio is a good candidate for treatment in a sex offender program, as he has displayed awareness of the importance of overcoming the impact of his own past sexual victimization.

Though Mr. Valerio still has much therapeutic work to do to truly understand the psychological underpinnings of his actions and his underlying personality and substance-abuse issues, the Court may choose to consider his difficult early life and specifically the years of brutal sexual abuse he suffered as a child during important formative years as mitigating factors in meting out an appropriate sentence for Mr. Valerio. Mr. Valerio did not choose to be victimized or to see his normal psychological and psychosexual development be derailed by a monstrous father. The sexual trauma he suffered had a significant impact on his sexual behavior and attitudes and impacted on the degree to which he could freely choose his sexual outlets. His free will was influenced by his early experiences and should warrant consideration by the Court at sentencing.

Respectfully submitted,


Alexander Sasha Bardey, M.D.
Diplomate in Psychiatry, American Board of Psychiatry and Neurology
Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology
Clinical Faculty, Department of Psychiatry, New York University Medical Center
Adjunct Assistant Professor, Department of Psychiatry and Behavioral Sciences
        The New York Medical College

A-349

1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------X
     UNITED STATES OF AMERICA,
4                               :    CR-14-94
                                     (JFB)
5         -against-            :    United States Courthouse
                                     Central Islip, New York
6    JOSEPH VALERIO,
                                :    June 6, 2017
7                  Defendant.        1:15 p.m.
     ------------------------------X
8
                    TRANSCRIPT OF SENTENCING
9         BEFORE THE HONORABLE JOSEPH F. BIANCO
               UNITED STATES DISTRICT COURT JUDGE
10

11   APPEARANCES:

12   For the Government:        BRIDGET M. ROHDE, ESQ.
                                UNITED STATES ATTORNEY
13                                   AMEET KABRAWALA, AUSA
                                BY: ALLEN BODE, AUSA
14                              100 Federal Plaza
                                Central Islip, New York 11722
15

16

17   For the Defendant:        ANTHONY LA PINTA, ESQ.
                                LEONARD LATO, ESQ.
18

19

20

21   Official Court Reporter:   Paul J. Lombardi, RMR, FCRR
     Ph. (631) 712-6106         100 Federal Plaza - Suite 1180
22   Fax (631) 712-6122         Central Islip, New York 11722

23

24

25             Proceedings recorded by mechanical stenography.
                    Transcript produced by CAT.
```

2

1          THE CLERK:  Calling case United States of

2     America v Joseph Valerio.

3          Counsel please state your appearance for the

4     record.

5          MR. KABRAWALA:  Good afternoon, Judge.  Ameet

6     Kabrawala for the United States.  I'm joined by AUSA Allen

7     Bode.

8          MR. BODE:  Good afternoon.

9          THE COURT:  Good afternoon.

10         MR. LA PINTA:  Good afternoon, your Honor.

11         Appearing for Mr. Valerio, Anthony La Pinta and

12    Leonard Lato.  Mr. Valerio is seated to my right.

13         THE COURT:  Good afternoon.

14         As you know, we are here for sentencing.  Are

15    both sides ready to proceed?

16         MR. KABRAWALA:  Yes, Judge.

17         MR. LA PINTA:  Yes.

18         THE COURT:  I want to review what documentation

19    I have because I want to make sure I have everything

20    that's been submitted by the parties and also make sure

21    you have a copy of everything that's before the court.

22         I have the presentence investigation report, the

23    initial probation department recommendation, the addendum

24    to the presentence report, which led to the Fatico

25    hearing, I have the revised probation department

3

1    recommendation which is a total of 60 years imprisonment.

2    I have the government's May 8th sentencing submission

3    which has various attachments.

4          In terms of what I have from the defense, I have

5    the initial sentencing memorandum of April 25th with

6    attachments which include Dr. Barday's report and letter

7    on Mr. Valerio's behalf, and earlier today I reviewed

8    Mr. Lato's supplemental letter of June 6th which attaches

9    various letters including a letter from Mr. Valerio.  I

10   believe that's all I have in terms of documentation, and

11   also I did receive a stipulation with respect to the

12   forfeiture which I signed several months ago.

13         Is there anything else I should have in

14   connection with the sentencing?

15         MR. KABRAWALA:  There is one other document that

16   we handed up to the court today, defense counsel has been

17   provided a copy.  It's entitled final order of forfeiture.

18         It should be attached to the judgment once it's

19   signed, Judge.

20         THE COURT:  I assume based upon the stipulation

21   that the defendants agree to this final order of

22   forfeiture as part of the judgment in this case?

23         MR. LA PINTA:  Yes, sir.

24         THE COURT:  Is that correct, Mr. Valerio?

25         THE DEFENDANT:  Yes, your Honor.

4

1        THE COURT:  I will order the forfeiture as

2   contained in the final order of forfeiture.

3        MR. LA PINTA:  You should be aware, your Honor,

4   that today moments before you took the bench a payment in

5   the amount of that money was given over by the form of an

6   attorney escrow check to the government.

7        THE COURT:  That's $75,000?

8        MR. LA PINTA:  Yes.

9        MR. KABRAWALA:  I can confirm receipt of a

10  payment for the amount of $75,000, it's check No. 1418,

11  and I'm in possession of it to the United States Marshal's

12  Office.

13       THE COURT:  Again, so the record is clear, I

14  did, as we had discussed after receiving the submissions,

15  issue a June 1st opinion which Mr. Lato referenced in his

16  supplement where I made findings of fact as it related to

17  the testimony of the various witnesses that the government

18  put forth at the Fatico hearing and I won't repeat those

19  findings here, but I found the government witnesses to be

20  fully credible in every respect with respect to their

21  testimony and I intend to consider those facts as part of

22  the history and characteristics of the defendant, as well

23  as on the issue of dangerousness under the 3553(a)

24  factors.

25       I would just ask, I know things have been

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

5

1   submitted to me under seal because they contain names of

2   children.  I would just ask that redacted versions of the

3   documents be prepared taking out the names of the children

4   because I don't think all the filings should be under seal

5   and obviously if you want to maintain Dr. Barday's report

6   that would be fine, but if you could do that in the next

7   week or so that would be helpful.

8                 MR. LA PINTA:  Yes, sir.

9                 THE COURT:  Mr. La Pinta, has Mr. Valerio

10  received the presentence report, the two recommendations

11  and the addendum?

12                MR. LA PINTA:  Yes, your Honor.

13                If I may just take a brief moment and spread on

14  the record in detail what we have done in that regard.

15                Mr. Lato and I have met with Mr. Valerio

16  probably in excess of 25 to 30 times since he's been

17  incarcerated in the MDC.  We have spent numerous hours

18  going over the initial presentence investigation report,

19  the addendum, and the recommendations and most recently

20  this weekend, this past weekend, Mr. Lato, himself, went

21  to see Mr. Valerio and did go over your memorandum opinion

22  dated June 1st with him.

23                He's asked numerous questions about all the

24  documents.  We have answered those questions.  We have

25  taken a lot of time and detail in explaining not only the

6

1    factual assertions contained therein, but in our opinion

2    the significance and meaning of each and every document,

3    in particular your memorandum and order dated June 1st.

4            I'm of the opinion that Mr. Valerio is quite

5    capable of understanding the facts and circumstances of

6    his case.  When it comes to legal matters that maybe a

7    layperson is not aware of he's asked appropriate questions

8    and we have taken the time to explain to him the

9    sentencing guidelines, how it works and all of the 3553(a)

10   factors that the court is now going to consider and render

11   in a sentence.

12           So I state on the record without any hesitation

13   or doubt that Mr. Valerio has been given much time, much

14   attention and much detail regarding each and every

15   document that the court is relying on in imposing

16   sentence, not just that but as you are obviously aware

17   through the Fatico hearing conducted before you,

18   Mr. Valerio was obviously present and we had a dialogue

19   with him before and after every day of those hearings to

20   discuss not only direct examination but the

21   cross-examination of each witness.

22           THE COURT:  Mr. Valerio, has Mr. La Pinta

23   accurately described the nature of his interactions and

24   Mr. Lato's interactions with you as relates to their

25   representation of you, is that accurate?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

                                                                7

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  I just want to see if there are any

3    objections to the presentence report and let's start with

4    the guidelines offense level, criminal history.

5          I don't think there are any objections to that

6    calculation.  I do want to address Mr. Lato's multiplicity

7    issue, but in terms of the calculation, level 47, criminal

8    history category I, do both sides agree that's a proper

9    calculation of the guidelines?

10         MR. LA PINTA:  Your Honor, with your permission

11   we'd like to kind of dissect our responsibilities here on

12   being joint counsel.

13         Mr. Lato is going to address the guidelines and

14   any legal matters since he authored all of the

15   submissions.  I'm going to deal with the PSR, family

16   matters and other facts regarding the proceeding, if

17   that's okay with you.

18         THE COURT:  That's fine with me.

19         Mr. Lato, I know you have an issue with the

20   multiplicity, but just in terms of the offense level and

21   criminal history, is there any objection to that?

22         MR. LATO:  No, your Honor.

23         THE COURT:  Does the government have any

24   objection to that?

25         MR. KABRAWALA:  No, Judge.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

8

1      THE COURT:  I don't know if the defense disputes

2  that and it's not material but I want it to be accurate

3  that Jane Doe number one was two years old at the time of

4  the offense and not three, is that accurate?

5      MR. LATO:  It is immaterial, your Honor, but let

6  me just hear from Mr. Valerio.

7      THE COURT:  Okay.

8      (There was a pause in the proceedings.)

9      MR. LATO:  Since we are not certain, we will not

10  object to what's in there.

11      THE COURT:  Three is in there and the government

12  says that's wrong, it's two.

13      MR. LATO:  Then I'll go with what the government

14  says.

15      THE COURT:  I wanted the record to be clear and

16  I want it to be accurate but it is immaterial, two versus

17  three.

18      So I adopt the offense level computation

19  contained in the presentence report in its entirety.  I'm

20  just going to summarize it for the record, but I adopt it

21  in its entirety.

22      For the grouping of what they consider group

23  one, which includes the conspiracy to commit sexual

24  exploitation of a child as relates to Jane Doe number 1

25  it's a base offense level 32.  Because she had not

9

1    attained the age of 12, four levels are added, because it

2    involved sexual contact with Jane Doe number one, two

3    levels are added, and because Mr. Valerio communicated

4    with Ms. Kalichenko via computer to persuade her to engage

5    in the sexually explicit conduct with Jane Doe number one,

6    two levels are added.  That's offense level 40 for that

7    group.

8            And then with respect to the second group,

9    counts 14 and 15, the attempted sexual exploitation of a

10   child, it's a base offense level 32, Jane Doe number two

11   was 6 years old at the time so four levels are added.  She

12   was related to the defendant, so two levels are added, and

13   that's an adjusted offense level of 38.  Under the

14   multicount adjustment, the combined adjusted offense level

15   is 42.

16           Because the defendant engaged in a pattern of

17   activity involving prohibited sexual conduct, five levels

18   are added, and, therefore, the offense level is 47 in

19   terms of 4B1.5B1, and there is no acceptance of

20   responsibility points.  The criminal history category, he

21   has one point from a 2006 conviction.  So he maintains

22   criminal history category I.

23           That results in a range under the chart of life,

24   and advisory range of life.  However, as the government

25   acknowledges, the defense obviously agrees, because there

10

1    is no count individually that carries a life sentence, the

2    law requires the court to whatever the statutory maximum

3    is of all the counts together becomes in effect the

4    advisory guideline range, it becomes a number.

5          The government asserted that that number just

6    adds up all the counts is 410 years, but as Mr. Lato --

7    I'll hear from the government, I think Mr. Lato is correct

8    that there are some attempt counts that are completely

9    subsumed in count two which is the actual sexual

10   exploitation of a child from April 1 of 2012 to November 1

11   of 2012. So I believe to sentence him on those attempts

12   which are counts nine through 13 would be a violation of

13   the double jeopardy clause.

14         So I believe given he was convicted of

15   count two, that the court should dismiss counts nine

16   through 13. Is there any objection to that?

17         MR. BODE: We would just ask, your Honor, that

18   that be without prejudice should there be some issue that

19   arises in the future and some other count falls by the

20   wayside that we would then ask those counts -- the jury

21   verdict be reinstated, so either dismissed without

22   prejudice or there be no sentence issued on those counts,

23   including not even the special assessment on that count.

24         THE COURT: I'm not issuing the special

25   assessment on those counts, but I will dismiss them

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

11

1    without prejudice if there were to turn out to be some

2    problem with count two.  I don't believe that the

3    dismissal should be with prejudice on those counts.  I

4    will dismiss them without prejudice, but I am not going to

5    impose any sentence on those counts.

6            So, Mr. Lato, I think correctly figured out the

7    math, which is the remaining counts have 260 years of

8    exposure.  So that becomes the effective advisory range or

9    number in this case.  Obviously pursuant to **United States**

10   **v Booker**, the sentencing guidelines are advisory.  They

11   are only one factor the court is to consider among all the

12   statutory factors and I'll now hear from both sides

13   regarding the factors or anything else they wish to say

14   starting with the defense.

15           I should ask you, I guess, do you have any

16   objections to the report?

17           MR. LATO:  No, your Honor.

18           THE COURT:  Does the government have any

19   objections to the report?

20           MR. KABRAWALA:  No, your Honor.

21           THE COURT:  I adopt all the information in the

22   presentence report as factual findings of the court in

23   addition to my findings at the Fatico hearing.

24           Go ahead.

25           MR. LATO:  May I have one moment to confer with

12

1    Mr. La Pinta?

2              THE COURT:  Sure.

3              (There was a pause in the proceedings.)

4              MR. LATO:  With the court's permission, your

5    Honor, Mr. La Pinta is going to start off.  There are

6    certain 3553 factors that he's better off addressing, some

7    that I'm better off addressing, if that's fine with the

8    court.

9              THE COURT:  That's fine.

10             I wanted to confirm with Mr. Valerio directly

11   that you have had sufficient time to discuss all the

12   documents, the presentence report, the addendum, the

13   recommendations and had sufficient time to discuss them

14   all with your attorneys.

15             THE DEFENDANT:  Yes.

16             THE COURT:  Go ahead, Mr. La Pinta.

17             MR. LA PINTA:  Thank you, Judge.  Do you mind if

18   I use the podium?

19             THE COURT:  That's up to you.

20             MR. LA PINTA:  Your Honor, before I begin please

21   note in court here today on behalf of Joseph Valerio is

22   his mom, Frances Valerio, his sister, Bernadette

23   Imperially, his uncle Gerolamo Valerio, his aunt, Dominica

24   Valerio, and his other uncle John Toussa, many of those

25   family members have written letters for your consideration

13

1  and I'm sure you understand and remember the family

2  dynamic from the prior proceedings involved in this case.

3       As you are aware, the Valerio family are

4  Sicilian immigrants.  Mr. Valerio's father, Phillipo

5  Valerio, migrated here as a young child, married his wife

6  Frances and raised their family, first I believe in the

7  Queens area, Brooklyn area and then moved to Long Island

8  where they raised their two children in Massapequa.

9       The family was raised under traditional Italian

10  family traditions, I'll say, traditions that as we all

11  stand members of our society here today were not

12  traditions that are acceptable to anybody.  They are

13  traditions that permeated the family through the acts of

14  severe domestic violence, at the hands of Mr. Valerio's

15  father, Phillipo.  We have gone to great lengths, your

16  Honor, to address these issues.  Dr. Barday also gave

17  great reference to those facts in his report, as we

18  believe they are very relevant in terms of understanding

19  the total picture of who Joseph Valerio is.

20       Joseph Valerio undoubtedly and his sister,

21  Bernadette, grew up under very, very difficult family

22  circumstances that have severely affected both of them as

23  adults.  They both witnessed severe spousal abuse at the

24  hands of their father on their mother, and Joseph Valerio

25  also experienced abuse at the hands of his father as well,

14

1    physical abuse and other abuse.

2           That's molded a young Joseph Valerio into the

3    man that he is today, and I don't say that in any type of

4    good way.  But I want you to know that besides all of the

5    very troubling facts and circumstances that you know

6    Joseph Valerio by, that there is good in Joseph Valerio.

7    One thing that has been consistent to me since coming on

8    to this case upon his arrest is the fact that his family

9    members are all very devoted to him and all categorize him

10   as nothing short of a committed, loving son, brother and

11   nephew.

12          As a young child he shared a very close

13   relationship with his mother, was her protector,

14   confronted his father on numerous occasions when

15   witnessing abuse that resulted in his abuse at the hands

16   of his father.  As most Italian immigrant families, what

17   was said in the house and what was done in the house

18   stayed in the house.  Nothing was spoken outside of the

19   house.  That would have been a sin against the family.

20          As a result, there was no intervention by

21   professionals.  There was no helping hand to help ease the

22   pain of the physical and other abuse that was going on in

23   that household, and it wreaked havoc on the two children.

24   Mr. Valerio graduated high school, attended college for a

25   short period, worked in a family business and was involved

15

1 in real estate for the better part of his adult life.

2 He's had many relationships, some of which you are well

3 aware of, that have all failed miserably.  Not only have

4 they failed miserably, but they were all permeated and

5 destructed by violence and sexual exploitation.

6   A good part of our presentation here today, your

7 Honor, and our submissions relies on Dr. Barday's

8 evaluation of Mr. Valerio.  He's undertaken a very

9 thorough evaluation, not only of Mr. Valerio, he's met

10 Mr. Valerio numerous times at the MDC and has employed a

11 number of different well known objective testing

12 techniques to provide the court with as thorough as

13 possible of an abstract regarding who Mr. Valerio is.

14   He's employed a number of tests such as the able

15 assessment for sexual interest, the HCR-20 evaluation, the

16 HCR-20, the static-99, in addition to spending time with

17 Mr. Valerio, I believe on three or four occasions at the

18 MDC over hours and hours of discussions.  Dr. Barday also

19 met with his mother Frances Valerio and sister Bernadette

20 and spoke with them independently about the upbringing in

21 the family in order to understand and draw an accurate

22 picture of what existed there and then.  He's also

23 conducted other collateral interviews and has given the

24 report that you have read.

25   Dr. Barday's opinion is that Joseph Valerio is

16

1  not a pedophile.  He does suffer from some severe profound
2  psychological ailments.  Page 12 of the report diagnoses
3  Joseph as having voyeuristic disorder, frotteuristic
4  disorder, antisocial personality traits and also has
5  commented on his excessive alcohol use and drug use,
6  meaning cocaine use, all being contributing factors in the
7  life of Joseph Valerio that has contributed to the conduct
8  that has brought him before the court here today.
9         Mr. Valerio also has serious and physical
10 ailments in his past.  He's a cancer survivor.  He had
11 surgery on the thyroid gland.  Most of that gland was
12 removed.  While in jail he's had a number of other
13 problems physically that he sought medical attention for,
14 and as we are all well aware, unfortunately, the MDC and
15 all of the jails aren't exactly the perfect environment to
16 obtain first-class medical care from.
17        But with all that said, in all candor, we face a
18 monumental obstacle here, your Honor, in terms of trying
19 to convince you to save this man's life.  What I mean by
20 saving his life is to provide for some day Joseph
21 Valerio's return to society.  Under the framework of the
22 facts of this case, it may be difficult to understand that
23 the redeeming qualities of this man has deserves freedom
24 one day in his life.
25        But we believe he does.  We believe that he does

17

1    deserve to come home from jail and to spend the rest of

2    his life with his family because what we have observed and

3    what Dr. Barday has mentioned in his report is that since

4    being incarcerated, since being interviewed and evaluated

5    by Dr. Barday, for the first time in his life I think

6    Joseph Valerio understands what he is about, understands

7    the sickness and problems that he's had.

8              And I think that Dr. Barday mentions and is

9    quite of common nature in my opinion having had dealings

10   with psychiatrists and representing clients in the past

11   that the first real step in rehabilitation is

12   understanding and appreciating the problems that one has

13   and accepting the conduct and consequences of it.  And I

14   will tell you firsthand that in the hours and hours and

15   hours that we have spent with Mr. Valerio at the MDC, I

16   can tell you that he's come to terms with who he is and

17   what he is.  He understands the nature of his crimes being

18   of disgusting, despicable acts.  He understands the

19   destruction that he's caused to not only the children

20   involved here but his family as well.

21             While no one will argue that the heavy hand of

22   the law must come down today, your Honor, we argue that

23   that heavy hand does not crush and destroy the rest of

24   Mr. Valerio's life.  We would ask that you consider

25   Dr. Barday's report, the unique family circumstances that

18

1    existed in the Valerio household, and understand that as

2    mitigating factors and how someone could be developed into

3    the person that would conduct this conduct.

4            So I'll leave you with one last thought.  I'd

5    like to think that each and every one of us here in our

6    society has both good and bad in them.  Sometimes the bad

7    overshadows the good and sometimes the good overshadows

8    the bad, and I don't envy your position in trying to come

9    up with an appropriate sentence in a case like this

10   because anyone that would know the facts and circumstances

11   here would instinctively want to incarcerate this man for

12   the rest of his life.

13           But I ask that you not do so, and that you

14   understand that there is good in Mr. Valerio and allow him

15   to continue to come back to society one day and hopefully

16   live his life then and there as a productive member of

17   society.

18           I'm going to continue and transfer the

19   presentation over to Mr. Lato.

20           THE COURT:  Thank you, Mr. La Pinta.

21           MR. LA PINTA:  Thank you.

22           MR. LATO:  I'm going to wait until you look up

23   because I know you were writing something.

24           THE COURT:  I'm writing.

25           MR. LATO:  Okay.

19

1           THE COURT:  Go ahead.   Thanks.

2           MR. LATO:  Because your Honor has read my

3    submissions I'm not going to be repetitive.

4           I just want to talk a little about general

5    deterrence and not about Mr. Valerio in particular.

6    Mr. La Pinta has done that somewhat and if he wishes to

7    continue afterward I'm sure your Honor will give him the

8    chance.  But all of this talk about 60, 50, 40 years it's

9    all nonsense as I point out in my letter because given

10   Mr. Valerio's life expectancy, anything 34 years or more

11   is a de facto life sentence.  So the question really

12   becomes should he die in jail.

13          And where I come from that is in terms of

14   general deterrence is that in the criminal justice system,

15   we assign greater penalties to the crimes we consider

16   harsher than others.  For instance, there is a reason why

17   murderers get life imprisonment, and other people

18   typically do not.  Why?  Because society has determined

19   that killing another human being is the most serious crime

20   and I'm leaving out other crimes such as treason which are

21   in the constitution.

22          What I wanted out in my letter is that if we

23   believe in general deterrence, here is the problem.  The

24   whole idea of general deterrence you want word to get out

25   there to would-be wrongdoers that certain behavior will

20

1   not be tolerated, and that's a good thing but one has to

2   be careful.  For instance, if, in fact, kidnapping were

3   automatically a life sentence, would-be kidnappers who

4   learn the law out there would say if I have a victim, what

5   do I lose by killing this victim?  And obviously if we are

6   talking about people with a history of sexual abuse where

7   there is no hope for these people, even though they didn't

8   kill the victims, these people are so dangerous they have

9   to be put away for life.

10          But is that really necessary with Mr. Valerio?

11  Is he really going to be a danger to people in their 70s?

12  Do we really want to get word out there that if you take

13  pictures of a young child naked, as horrible as it is, you

14  are going to get 40 or 50 years in jail?  What's going to

15  happen when these sentences start to become prevalent and

16  some lunatic out there who is photographing these kids

17  decides to kill that little child?  That's my big concern.

18  I'm not talking about Mr. Valerio.  I'm just talking about

19  general deterrence in particular.

20          And as I pointed out in the letter, Mr. La Pinta

21  and I always knew, even before the Fatico hearing, your

22  Honor was not going to give Mr. Valerio 15 years and your

23  Honor would not have gone to the trouble of rendering that

24  decision unless your Honor were considering a sentence

25  well above 15 years and I'm not going to speculate what

21

1    number your Honor has in mind.

2          But I think that under these circumstances, for

3    the reasons Mr. La Pinta stated and all of our

4    submissions, as bad as what Mr. Valerio did, in terms of

5    general deterrence I think it's shortsighted to give him a

6    life sentence, but that's my view and maybe I'm wrong.

7          THE COURT:  Mr. La Pinta, is there anything else

8    you want to add before I hear from Mr. Valerio?

9          MR. LA PINTA:  I don't.

10          I just neglected to mention to the court, it's

11    in the PSR, that he does have two children and while he

12    was a member of society has always provided financial and

13    emotional support for his children.  He's been as good of

14    a father as he could be and I don't want to not mention

15    that because I think that's important for your

16    consideration.

17          Thank you.

18          THE COURT:  Thank you.

19          Mr. Valerio, you also have the right to speak at

20    your sentence.  You can say anything you wish to say.

21          I obviously read the long letter that you

22    submitted, which was a good letter, but you also can say

23    anything you want to say today.  You can remain seated.

24          MR. LATO:  May we just have one moment, your

25    Honor.

22

1    THE COURT:  Yes.

2    (There was a pause in the proceedings.)

3    MR. LATO:  We are ready, your Honor.

4    THE COURT:  Go ahead, Mr. Valerio.

5    THE DEFENDANT:  Yes, your Honor.

6    I have been waiting for a long time, 40 months

7  now of incarceration to express my humbleness in all that

8  I have done wrong to my victims, and witnesses.  The

9  horrible heinous acts that I have committed, the innocence

10  in the children's lives that I look upon my own daughter

11  and my son and I came to grips of why I did such horrible,

12  horrible things to my victims and witnesses.

13    I was so consumed with addiction, drugs,

14  alcohol, mainly sexual addiction.  I had no control over

15  it at the time, your Honor, and I look back.  I cry many

16  nights for my victims, my family, and I feel the pain and

17  I can just imagine what I put them through at the time.

18  These are people that genuinely loved me and they put

19  their trust and their heart and soul into my hands and I

20  discarded all of that.  I took advantage of the love that

21  they gave me, the innocence that was there before me, and

22  I destroyed that.

23    My two adult victims loved me to the point where

24  they wanted to marry me.  I took that for granted, your

25  Honor, and I imagine each day that I sit in prison, the

23

1    thoughts that go through their minds about how they loved

2    me and how they trusted me, to want me to adopt one of my

3    victims' child, to place that trust in me and discard that

4    with all my sick, dark desires.

5            I'm soon to be a 51 year old man, your Honor.  I

6    think of my family each and every day.  I think of my

7    daughter which I will never see again in my life who is

8    now in a foreign country.  I had gotten to see my daughter

9    January of 2016 at MDC facility, I believe able just to

10   glance at her, and I thought about my victims' innocent

11   children, how they are so precious like my daughter, this

12   beautiful little child that I created with my

13   ex-girlfriend, her mother.  She genuinely loved me.

14           My victims put their trust in me, and I let them

15   down, and I feel for them like no other can feel for them.

16   I was consumed with sexual desire and that took over my

17   feelings for them.  The money that I had was a power over

18   them, was a tool in lieu for their sexual desires.

19           This is where I started to spin out of control.

20   After my father's death I experimented with many other

21   drugs, K 2, I was heavily on cocaine.  Wherein my

22   distorted way of thinking for that phase in time to think

23   of a child as a toy, to take away that child's innocence,

24   not even being in the same country, but ordering somebody

25   that I loved and she loved me as well, to direct her to do

24

1    something so horrible as that, I still can't come to grips

2    of where and how in my mind was functioning at that time,

3    your Honor.

4            But I think each and every day of my victims,

5    and I told both my attorneys where I went wrong, and I

6    should have married my ex-girlfriend.  Perhaps marriage

7    would have kept me on the righteous path, but I took them

8    for granted.  I took this control over them just the way

9    my father had control over me and my family, with the

10   abuse, with the demands, and with the physical desires and

11   the physical pain that was inflicted on me.

12           My father displayed these acts in front of me

13   with my mother, with my sister.  This made me an angry

14   young man developing into a man of many addictions.  Being

15   a musician I got involved in the drug scene, and I found

16   myself in a distorted world of fantasy.  I used women the

17   wrong way, and with Dr. Barday, he completely turned my

18   life around.

19           Other than my Uncle John being a social worker

20   who has counseled me in his own way, Dr. Barday was like a

21   revelation in my life.  The times that he visited me, I

22   was able to connect to where my addictions stem from, and

23   all the people that I hurt in my life.  He was able to

24   conclude where my trouble began and obviously where my

25   trouble ended today.

Case 17-2371, Document 36, 03/05/2018, 2249739, Page149 of 183

A-373

25

1        I want to be this rehabilitated man.  I am

2    willing, able and I'm ready, after 40 months of

3    incarceration, dealing with other inmates who knew of my

4    case, who have approached me and have assaulted me in

5    prison.  I felt this was part of my punishment for doing

6    the heinous acts to innocent children, to victims who love

7    me, who gave me their all, who proposed to me and wanted

8    family with me.

9        I plan, your Honor, to become a better

10   rehabilitated man.  That's my promise to you, your Honor,

11   my promise to my family, especially my mother who's been

12   there for me soon for 51 years of my life.  No other woman

13   has been there for me like my mother has, and that's the

14   bond we have.  We protected each other when it came to my

15   father's abuse.  We looked after each other.  We kept each

16   other calm and at peace when there was disorder and

17   destruction and abuse in my early childhood.

18       Your Honor, I ask of you, please, to consider

19   leniency on my sentence.  It's my promise to you, your

20   Honor, and the prosecutors, all law enforcement that gave

21   their time and everything that they have done to keep

22   order on the streets and they have done everything

23   possible to make sure that I'm removed from society and I

24   become a rehabilitated, righteous man.

25       I made a promise to God during my years of

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

26

1    incarceration when I reached the age of 50 to minister my

2    bible study classes.  I found in better rehabilitation

3    than the word of God, examples like Paul and Joseph who

4    dealt with wickedness and sin, and I have learned from

5    that, your Honor.  I put my head down in sorrow, your

6    Honor, being a fellow Italian American in shame, and I

7    feel the shame every time I come into this courtroom.  Law

8    enforcement that does their job well, I respect what they

9    do.

10              So, your Honor, I thank you for taking the time

11   to read my letter.  Please, your Honor, look deeply and

12   look past all my sins and please look at my family behind

13   me who are there for me, who are waiting for me, waiting

14   for that time to see a rehabilitated man.

15              Thank you, your Honor, for taking the time.

16              THE COURT:  Let me just say this, Mr. Valerio,

17   before I hear from the government.

18              I wasn't sure exactly what you were going to say

19   before I received your letter.  I know Dr. Barday had said

20   that you expressed some remorse in the last sessions that

21   he had with you, but I take your remorse at your word.  I

22   understand the childhood circumstances.  That seemed like

23   a horrific situation that you and your family were in with

24   your father.  I don't want you or your family to think I'm

25   not considering all those things.

27

1           I have considered all those things and remorse

2    is important.  Obviously I have to consider other things

3    as well, but I think it is important.  The first step

4    forward in any situation like this is to acknowledge the

5    wrongfulness of the conduct and to be willing to try to

6    change.  I do give you credit for that.

7           I'll hear from the government.

8           MR. KABRAWALA:  Since his arrest in January of

9    2014 and then his rearrest in February of 2014, we have

10   been witness in this courtroom to the path of destruction

11   that the defendant has left in his wake.

12          Judge, the government has asked for a 60-year

13   sentence and we don't do that lightly.  We are acutely

14   aware that that is a very significant sentence.  The

15   reason we are asking for that sentence and we join in

16   probation's recommendation of that sentence is simply that

17   the defendant is dangerous.  The defendant is dangerous

18   because he is deliberate.

19          We have seen in this courtroom the deliberation

20   with which Mr. Valerio has acted.  We have been witness to

21   the incident in 2005 that occurred at Splish Splash when

22   the defendant deliberately assaulted a woman in a wave

23   pool while he was on probation for that offense, the

24   defendant was found with videotapes that he had secretly

25   taped nannies and caretakers in his home who were unaware

28

1    they were being filmed.

2            He was deliberate when he sexually exploited the

3    two victims in this case, one being a two year old.  He

4    was deliberate when he convinced Kalichenko to make

5    sexually explicit videos of her own daughter.  He was

6    deliberate when he sexually exploited his six year old

7    niece and then convinced his family that he was taking

8    modelling, legitimately modelling photographs of his

9    niece.

10           He was deliberate when he chose to victimize the

11   woman known as AD.  He repeatedly abused her, made her

12   life a living hell.  Your Honor has read her letter that

13   was annexed to our May 8, 2017 letter.  Her life has been

14   completely transformed in a bad way because of the

15   defendant's involvement in her life.  He raped her

16   countless times.  He broke her teeth.  He knocked her out.

17           He was deliberate when he sexually assaulted and

18   repeatedly raped his coconspirator, Kalichenko.  He was

19   deliberate and dangerous when he tried to adopt a child

20   from the Ukraine even after the relationship with he and

21   Kalichenko terminated.

22           He tricked an au pair to come to the

23   United States on her gap year after she graduated from

24   high school in the United Kingdom.  He convinced her and

25   the agency for which she worked that he legitimately had a

29

1    daughter who needed care.  So she came here on her gap

2    year, only to learn immediately that the defendant did not

3    have a young child and that was only after the defendant

4    tried to convince her to wear fetish outfits and go to

5    some sort of sex party with him.  This is only a sampling

6    of what we know about.

7             Simply put, the defendant has shown there are no

8    limits to the lengths that he will go to deceive and trick

9    others and abuse others and exploit others.

10            A point about Dr. Barday.  Now, Dr. Barday's

11   evaluation in many ways is flawed.  Dr. Barday

12   acknowledged during his Fatico hearing testimony that he

13   had not fully accounted for the defendant's violent rape

14   of AD and of Kalichenko.  The court has credited the

15   testimony of AD and of Kalichenko and Lucy Down, and the

16   government has proven those acts by a preponderance of the

17   evidence.

18            The court should consider seriously Dr. Barday's

19   evaluation and his opinion, but the court should be

20   mindful that Dr. Barday found Mr. Valerio to be only a

21   moderate risk, which is still a substantial risk of

22   dangerousness and recidivism.  Once the court concluded

23   that the government proved the defendant's violent acts

24   towards AD and toward Kalichenko, that risk of recidivism

25   and dangerousness is only enhanced.

30

1       Finally, the defendant has asked for essentially
2   a second chance.  He's received that second chance
3   already.  He received it in 2005 when he was sentenced to
4   a mere term of probation for sexually assaulting a Long
5   Island woman in a wave pool.  He has demonstrated since
6   that time that he cannot be trusted, that he will
7   manipulate others, and that he is a danger to our
8   community.
9       Thank you.
10      THE COURT:  Thank you, Mr. Kabrawala.
11      I'm now going to state the sentence I intend to
12  impose and give the lawyers a final opportunity to make
13  any legal objection before imposing the sentence.
14      In considering this sentence I have carefully
15  gone through and considered all the factors set forth by
16  Congress in Section 3553(a), which include among others,
17  I'm not going to list all of them but I have considered
18  all of them, the nature and circumstances of the offense
19  and the history and characteristics of Mr. Valerio, the
20  need for the sentence imposed to reflect the seriousness
21  of the offense, to promote respect for the law, to provide
22  a just punishment for the offense, to afford adequate
23  deterrence to criminal conduct, and to protect the public
24  from further crimes by the defendant.
25      I have also considered the advisory sentencing

31

1   guidelines issued by the sentencing commission and the

2   applicable range or number in this case, the advisory

3   number as well as the applicable policy statements issued

4   by the sentencing commission.

5           I have also considered the need to avoid

6   unwarranted sentencing disparities among similarly

7   situated defendants and although it was not mentioned here

8   today in court, both sides briefed that issue fully in

9   their written submissions to the court and I certainly

10  have considered not only sentences that I have imposed,

11  but that other judges have imposed in this area of crime.

12          Having considered those factors and all the

13  factors I intend in my discretion to impose a total

14  sentence of 60 years in jail, 720 months, and I don't do

15  that instinctively or emotionally.  I do it with great

16  thought and pause and having reconsidered it several times

17  whether or not that's the appropriate sentence and I

18  conclude it is for the following reasons.

19          I'm not going to go into great detail about the

20  instant offense.  It's all in the presentence report.  It

21  all came out at the trial, but the instant offense

22  involved extremely violent conduct towards children.  It

23  showed the defendant to be a compelling danger to the

24  community, especially to children.  I think it's an

25  aggravating factor the way it was done in terms of the

32

1    defendant directing Ms. Kalichenko, scripting out how she

2    should abuse her two year old daughter in the Ukraine,

3    sending him multiple videos for money.

4         Those e-mails that the government noted in its

5    papers that contained promises, threats, treated her in

6    such a demeaning, degrading, humiliating way as an object

7    to make her completely dependent upon Mr. Valerio as he

8    noted today with money, other promises and threats so that

9    she would do his bidding, including exploit her own

10   infant, the extremely callous disregard for the well-being

11   of others is one that just shows extreme danger to

12   society.

13        I also note obviously that sexual exploitation

14   of the niece, how the basement was set up, the six year

15   old girl betraying the trust that was given to him as an

16   uncle and as the government noted deceiving and

17   manipulating people in order to satisfy his desires.  So

18   the counts of conviction demonstrate the defendant to be

19   extremely violent and dangerous and a clear and compelling

20   danger to the community especially to children at the

21   highest level.

22        I believe the level of danger is only further

23   confirmed by his history and characteristics as an

24   individual.  As the government noted we are not dealing

25   with a 20 year old individual who had a horrific abusive

33

1    childhood and is a young man trying to deal with that.

2    This is a man at the time of these crimes was in his late

3    40s, and his history and characteristics show that he is

4    not only a danger to children, but he's a danger to women

5    as well.

6         His 2006 conviction for attempted forcible

7    touching, although it was only a misdemeanor, it involved

8    grabbing and attempting to penetrate the genital area of

9    an adult female in a wave pool.  As the government noted,

10   his adjustment on supervision from that probation was

11   unsuccessful, problematic in many ways that are outlined

12   in the PSR that I won't repeat.  But he was given a chance

13   with treatment there and did not take that opportunity.

14   It only led to even more violent conduct in connection

15   with the instant offense as well as the other conduct that

16   I'm about to go into.

17        His extreme dangerousness was further

18   corroborated at the Fatico hearing.  As I said, those

19   women were completely credible to me.  I listened to them

20   testify.  I could hear it in their voice.  I could see it

21   in their eyes.  There was no question that those events

22   happened as they articulated.  AD testified to physical

23   and sexual abuse including rape, repeated threats to

24   killing her, being on a secluded road but grabbed by the

25   hair, smacking her head against the dashboard, telling her

34

1    tonight you are going to die.

2            She jumps out of the car.  Her daughter's in the

3    back seat, backs up, hits her in the head with the open

4    door.  I mean, this type of violent conduct I think shows

5    the level of dangerousness that Mr. Valerio has, and there

6    were other incidents as well including rape and when she

7    terminated finally the relationship with him, is when he

8    knocked her unconscious and broke her teeth and threatened

9    to kill her if she told the truth about what happened.

10           Ms. Kalichenko's testimony was also extremely

11   credible, and in many ways mirrored in some respects AD's

12   testimony in terms of how she was treated by Mr. Valerio

13   in terms of the violence and rape, and Ms. Downs, although

14   that didn't involve any type of sexual assault, I think

15   just corroborated the manipulativeness and deceptive

16   behavior Mr. Valerio has engaged in his life in order to

17   engage in this type of violent conduct towards women and

18   towards children.

19           So the counts of conviction and this history of

20   violence show him to be, which is clear to me he is an

21   extremely dangerous individual, that this court needs to

22   protect society from for the rest of his life.  I don't

23   believe there are any limits on what he would do to

24   satisfy his sexual desires to women or to children.  So

25   society needs to be protected.  I don't believe his level

A-383

35

1   of dangerousness will diminish over time.  I think his

2   risk of recidivism is extremely high.

3        I have considered general deterrence.  I won't

4   say it's the driving force in this sentence.  It is a

5   consideration and certainly this type of conduct should be

6   met with extremely severe sentences to send a message to

7   others out there victimizing children in the way that

8   Mr. Valerio did in this case.  So it is a factor, but the

9   primary factor is that this sentence needs to protect the

10  public because of the danger I view him as, and to reflect

11  the seriousness of the offense.

12       All that led me to conclude that 60 years

13  imprisonment, which is effectively a life sentence is

14  warranted, sufficient and no greater than is necessary to

15  reflect all of the factors.

16       I do want to spend one moment on the arguments

17  in mitigation.  I don't want the fact that I adopted the

18  recommendation of the probation department and the

19  government to be viewed as I just cast aside the

20  significant submissions and letters and hearings.  I

21  considered all those things, but I don't believe that a

22  sentence less than the one I'm imposing would properly

23  balance all the factors.

24       First, I did consider the report and testimony

25  of Dr. Barday, but I don't believe it warrants a lower

36

1    sentence for several reasons.  He acknowledges in his

2    report on page 15 that the presence of manipulative

3    impulsive antisocial personality put Mr. Valerio at a

4    moderate risk of reoffending and dangerousness in the

5    presence of history substance abuse, legal impulsive

6    acting out of interpersonal chaos, further aggravates his

7    risk of hurting others.  These are corroborated by the

8    actuarial risk assessment tools he used.  So you have him

9    putting Mr. Valerio at a moderate risk which is obviously

10   significant when you are talking about the type of

11   activity that Mr. Valerio was involved in in terms of

12   reoffending.

13          But I believe that this understates the risk for

14   a couple of reasons.  The government pointed out that he

15   did not take into account the defendant's violence towards

16   Ms. Kalichenko or AD and at the hearing he said that in

17   his report he suggested one of the reasons he only put it

18   at moderate was because he hasn't threatened lives of

19   others, he hasn't caused his victims physical harm.  So he

20   was assuming facts that we know to be incorrect.

21          We know that he's threatened the lives of

22   others.  We know he has caused victims physical harm

23   including rape and sexual assaults and beating.  And he

24   conceded at page 58 of the hearing that I think the

25   government said if you assumed those things were true,

37

1   would his risk be even higher and I think he answered yes

2   and it's obvious that the risk would be higher and that's

3   why I conclude that it is higher.

4         He did mention treatment could help, but as the

5   government pointed out he did have a chance to receive

6   treatment many years ago and was unsuccessful.  Dr. Barday

7   does suggest the difference might be that Mr. Valerio now

8   has finally some remorse for his conduct.  I have some

9   concerns regarding that because prior to receiving his

10  letter and hearing his statement today his level of

11  remorse was extremely weak.

12        Even Dr. Barday acknowledged that he met with

13  the defendant for many years after the jury's verdict

14  which was in November of 2014, and met with him in

15  December of 2014, February, March and June of 2015, and

16  said that he didn't view his behavior as disturbing.  He

17  was not deeply troubled by this aspect of his sexuality,

18  but not motivated to deal with it.  So he had someone for

19  years even after his conviction was still in complete

20  denial that he had done anything that he should be dealing

21  with or be concerned about.

22        Dr. Barday did say that he finally made that

23  jump in one of the last meetings and obviously the letter

24  and the statements made in the courtroom do indicate a

25  level of remorse and I have considered that, but I don't

38

1    believe that even though Mr. Valerio obviously promised

2    that he would turn his life around, I don't believe that

3    that is sufficient to undo all the evidence before me of

4    the violence that he's been involved in for a number of

5    years, both to his children and to women.

6            I don't think there is any indication that his

7    level of danger would be significantly reduced.  At this

8    point, as we sit here today, to me it is way too

9    speculative just based upon his promise for me to conclude

10   that the danger, that compelling danger to society that I

11   believe exists will be diminished at any time during his

12   life.

13           So that's how I arrived at this sentence.  I

14   want to mention the sentencing disparity question.

15   Mr. Lato did point out that Judge Chen gave a 28-year

16   sentence to an individual Randazzo who was engaged in

17   similar type of sexual exploitation.  A 25-year sentence

18   was given by Judge Hurley to a guy named Wernick, and I

19   didn't go back to those cases to look at what their

20   history and characteristics were, whether they had the

21   violent acts that I have found existed in this defendant's

22   past, so I'm not sure if they are completely analogous to

23   the entire record before me.

24           In any event, assuming they were because there

25   are some sentences out there that are lower does not mean

39

1   that this factor is weighing in Mr. Valerio's favor.  The

2   government points out in a very long cite numerous

3   sentences of this severity are higher, including Judge

4   Feuerstein's 90-year sentence in the McGowan case, the

5   60-year sentence by Judge Mauskopf in the Brooks case, the

6   75-year sentence in the Schneider case.  I don't believe

7   the sentence is disproportional to other sentences for

8   similar type conduct as the court has found here.

9          The final thing I'll say is I am sensitive,

10  Mr. Lato spent a lot of time in his papers and mentioned

11  it today as well that sentences of life or the equivalent

12  of life are usually reserved for murder.  The Second

13  Circuit has tackled and discussed this issue in several

14  opinions over the past few years including United States v

15  Brown where Judge Pooler dissented making that point and

16  last week there was a case US v Ulbricht, that sentence

17  was imposed by Judge Forrest in a case it was a bit coin

18  case where certainly there were large amounts of drugs

19  involved but he was not convicted of any murder and the

20  Second Circuit again discussed that.

21          And I am sensitive to that.  I have never

22  sentenced anyone to this amount of time that did not

23  involve a murder, but I believe this is the extraordinary

24  case, given the combination of factors and all the

25  evidence before me, that an effective sentence of life is

40

1  necessary to, among other things, protect the public from

2  the dangerousness that I believe the defendant poses to

3  the community, notwithstanding his words today.

4       That's the sentence I intend to impose.  I don't

5  think it's necessary given the length of the sentence but

6  I am going to impose a lifetime supervised release.  If

7  somehow he were to get out for any reason, he certainly

8  should be on supervised release with all the conditions

9  that would be necessary to monitor his activity, even

10  though I don't expect that to happen.

11       I don't intend to impose a fine, although he

12  obviously has financial means, given the forfeiture in

13  this case and the other aspects of my sentence, I don't

14  believe an additional fine is necessary.

15       I intend to impose the special assessments

16  except on counts nine through 13 which I'm dismissing

17  without prejudice as multiplicitous, and I'm not ordering

18  any restitution.  And I intend to impose on the counts as

19  set forth in the recommendation to achieve a 60 year

20  sentence.

21       Is there any legal reason why I cannot impose

22  that sentence from the government's standpoint?

23            MR. KABRAWALA:  No, your Honor.

24            THE COURT:  From the defense standpoint?

25            MR. LA PINTA:  No, sir.

41

1          THE COURT:  It is the judgment of this court,

2     Mr. Valerio, in its discretion that you be sentenced to

3     the custody of the Attorney General through the

4     Bureau of Prisons to a total term imprisonment of 60 years

5     or 720 months, consisting of the following:

6          On counts one through three, six, seven, eight

7     and 14, I sentence you to the statutory maximum of 30

8     years on each count to run concurrently to each other.  On

9     counts four and five I sentence you to 20 years

10    imprisonment, the statutory maximum on each count which

11    will run concurrently to each other but consecutively to

12    the sentences imposed on the above counts and, finally, I

13    impose a ten-year sentence on count 15, again the

14    statutory maximum, to run consecutively to the sentences

15    that I have imposed on the other counts for a total

16    sentence of 60 years.

17         I impose lifetime supervised release to follow

18    any term of imprisonment should you get out with the

19    standard conditions and the following special conditions.

20         1.   You shall comply with the forfeiture

21    provision.

22         2.   You shall make full financial disclosure to

23    the probation officer.

24         3.   You shall comply with sex offender

25    registration requirements mandated by law.

42

1          4.   You shall participate in a mental health

2    treatment program which may include participation in a

3    treatment program for sexual disorders as approved by the

4    probation department.   The defendant shall contribute to

5    the cost of such services rendered and/or any psychotropic

6    medications prescribed to the degree you are reasonably

7    able, and shall cooperate in securing any applicable

8    third-party payment.

9          You shall disclose all financial information and

10   documents to the probation department to assess your

11   ability to pay.   As part of the treatment program for

12   sexual disorders, you shall participate in a polygraph

13   examination to obtain information necessary for risk

14   management and correctional treatment.

15         You shall refrain from contacting the victims of

16   the offense.

17         You will not associate with any child under the

18   age of 18 unless a responsible adult is present and you

19   have prior approval from the probation department.

20         Unless otherwise indicated in the treatment plan

21   provided by the sex offender treatment program, the

22   defendant is prohibited from viewing, owning or possessing

23   any obscene, pornographic or sexually stimulating visual

24   or auditory material including telephone, electronic

25   media, computer programs or computer services that have a

43

1   reasonably direct relationship to the offender's deviant

2   behavior pattern.

3           If the defendant cohabitats with an individual

4   who has minor children, the defendant will inform that

5   party of his prior criminal history concerning his sex

6   offense.  Moreover, he will notify the party of his

7   prohibition of associating with any children under the age

8   of 18, unless a responsible adult is present.

9           The next condition I'm going to tie only to the

10  definition, in order to avoid any issues with the Circuit

11  that's come up in past cases.

12          The defendant is not to use a computer, internet

13  capable device, or similar electronic device to access

14  pornography of any kind.  The term pornography shall

15  include images or video of adults or minors engaged in

16  sexually explicit conduct as that term is defined in Title

17  18, United States Code, Section 2256(2).  The defendant

18  shall not communicate via his computer with any individual

19  or group who promotes the sexual abuse of children.

20          The defendant shall also cooperate with the US

21  Probation Department's computer and internet monitoring

22  program.  Cooperation shall include, but not be limited

23  to, identifying computer systems, internet capable

24  devices, and/or similar electronic devices the defendant

25  has, and allowing the installation of monitoring software

44

1    and/or hardware on said devices at the defendant's

2    expense.

3         The defendant shall inform all parties that

4    access a monitored computer, or similar electronic device,

5    that the device is subject to search and monitoring.  The

6    defendant may be limited to possessing only one personal

7    internet capable device to facilitate our department's

8    ability to effectively monitor his internet related

9    activities.  The defendant shall also permit random

10   examinations of said computer systems, internet capable

11   devices, similar electronic devices, and related computer

12   media, such as CDs, under his control.

13        The defendant shall notify his employer of his

14   computer-related offense if his job requires computer

15   access with internet capability.

16        The defendant shall not possess a firearm,

17   ammunition or destructive device.

18        The defendant shall submit his person, property,

19   house, residence, vehicle, papers, computers, as defined

20   in 18 USC, Section 1030(E)(1), other electronic

21   communications or data storage devices or media, or office

22   to a search conducted by a United States Probation

23   Officer.  Failure to submit to a search may be grounds for

24   revocation of release.

25        The defendant shall warn any other occupants

45

1   that the premises may be subject to searches pursuant to

2   this condition.  An officer may conduct a search pursuant

3   to this condition only when reasonable suspicion exists

4   that the defendant has violated a condition of his

5   supervision and that the areas to be searched contain

6   evidence of this violation.  Any search must be conducted

7   at a reasonable time and in a reasonable manner.

8           I order a special assessment of I believe $1,000

9   having dismissed counts nine through 13, $100 on each of

10  the remaining ten counts, and I order forfeiture as set

11  forth in the final order of forfeiture including the

12  desktop computer, the SD card, and the $75,000 in

13  substitute for the Highgate Drive premises.

14          I impose no fine or restitution.

15          Mr. Valerio, I need to advise you of your right

16  to appeal the conviction and sentence.  If you are unable

17  to pay the cost of appeal you may apply for leave to

18  appeal in forma pauperis.  If you cannot afford an

19  attorney, one will be appointed on appeal to represent

20  you.  The notice of appeal must be filed within 14 days of

21  the judgment of conviction.

22          I have dismissed counts nine through 13 without

23  prejudice.

24          Does the government move to dismiss the open

25  counts in the underlying indictment?

```
                                                              46
 1              MR. KABRAWALA:  So moved, Judge.

 2              THE COURT:  The open counts in the underlying

 3      original indictment are dismissed.

 4              Are there any other issues from the government

 5      for today?

 6              MR. BODE:  Just one thing I would ask your Honor

 7      to put on the record.

 8              Obviously the court was cognizant of the

 9      lifetime advisory, the 216 I think was the advisory

10      guideline range that the court found, advisory guideline

11      sentence and the court structured the sentence to

12      accomplish that 30 and 20 consecutive and a ten

13      consecutive.

14              If for some reason there were an issue with

15      counts four, five, and 15, am I safe in assuming that the

16      court would have considered consecutive sentences as to

17      victim one and victim two to accomplish the same 60-year

18      sentence?

19              THE COURT:  Yes.

20              MR. BODE:  Thank you.

21              THE COURT:  My sentence you might have meant

22      something else with respect to the guidelines.  I know the

23      guidelines is 216 years, the advisory range, but my

24      sentence is not driven by the guidelines in this case.

25      Regardless of what the guidelines were, that number is not
```

47

1    influencing me.

2          It's based upon what I have seen in this case

3    and reviewed during the trial, during the hearings.  So

4    this is not a case -- I know there are Second Circuit

5    cases that talk about the guidelines sometimes for child

6    pornography can be too severe for certain situations.  I

7    don't believe that this is a case where this guideline

8    number is driving the sentence.

9          But, yes, the answer to your question is yes,

10   the sentence would be the same even in the absence of

11   those counts.

12         MR. BODE:  Thank you, your Honor.

13         THE COURT:  Anything from the defense?

14         MR. LATO:  Yes.

15         Just with respect to designation.  Given that

16   Mr. Valerio's family is on Long Island will your Honor

17   recommend to the Bureau of Prisons that to the extent they

18   can to designate him to a facility as close as possible to

19   Long Island?

20         THE COURT:  Yes.

21         I will designate that.  I will also recommend

22   that he receive treatment in the jail as well.  I won't

23   mention, I didn't mention this in my reasoning, obviously

24   I don't dispute the fact that his family loves him.  He

25   has their support, and that he's done good things for his

A-396

48

1    family.

2          But he had that family all along when he engaged

3    in this dangerous and violent conduct.  The fact that he

4    may be good to his family doesn't mean that he can't at

5    the same time pose an extreme danger to other individuals

6    which I believe he poses.  I did consider that as well.

7          Thank you.

8          (The matter concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,000** [1] - 45:8
**$100** [1] - 45:9
**$75,000** [3] - 4:7, 4:10, 45:12

**1**

**1** [4] - 8:24, 10:10, 41:20
**100** [2] - 1:13, 1:21
**1030(E)(1** [1] - 44:20
**11722** [2] - 1:14, 1:21
**1180** [1] - 1:21
**12** [2] - 9:1, 16:2
**13** [5] - 10:12, 10:16, 40:16, 45:9, 45:22
**14** [3] - 9:9, 41:7, 45:20
**1418** [1] - 4:10
**15** [6] - 9:9, 20:22, 20:25, 36:2, 41:13, 46:15
**18** [4] - 42:18, 43:8, 43:17, 44:20
**1:15** [1] - 1:7
**1st** [3] - 4:15, 5:22, 6:3

**2**

**2** [2] - 23:21, 41:22
**20** [3] - 32:25, 41:9, 46:12
**2005** [2] - 27:21, 30:3
**2006** [2] - 9:21, 33:6
**2012** [2] - 10:10, 10:11
**2014** [4] - 27:9, 37:14, 37:15
**2015** [1] - 37:15
**2016** [1] - 23:9
**2017** [2] - 1:6, 28:13
**216** [2] - 46:9, 46:23
**2256(2)** [1] - 43:17
**25** [1] - 5:16
**25-year** [1] - 38:17
**25th** [1] - 3:5
**260** [1] - 11:7
**28-year** [1] - 38:15

**3**

**3** [1] - 41:24
**30** [3] - 5:16, 41:7, 46:12
**32** [2] - 8:25, 9:10
**34** [1] - 19:10
**3553** [1] - 12:6
**3553(a** [3] - 4:23, 6:9, 30:16
**38** [1] - 9:13

**4**

**4** [1] - 42:1
**40** [5] - 9:6, 19:8, 20:14, 22:6, 25:2
**40s** [1] - 33:3
**410** [1] - 10:6

**42** [1] - 9:15
**47** [2] - 7:7, 9:18
**4B1.5B1** [1] - 9:19

**5**

**50** [3] - 19:8, 20:14, 26:1
**51** [2] - 23:5, 25:12
**58** [1] - 36:24

**6**

**6** [2] - 1:6, 9:11
**60** [7] - 3:1, 19:8, 31:14, 35:12, 40:19, 41:4, 41:16
**60-year** [3] - 27:12, 39:5, 46:17
**631** [2] - 1:21, 1:21
**6th** [1] - 3:8

**7**

**70s** [1] - 20:11
**712-6106** [1] - 1:21
**712-6122** [1] - 1:21
**720** [2] - 31:14, 41:5
**75-year** [1] - 39:6

**8**

**8** [1] - 28:13
**8th** [1] - 3:2

**9**

**90-year** [1] - 39:4

**A**

**ability** [2] - 42:11, 44:8
**able** [6] - 15:14, 23:9, 24:22, 24:23, 25:2, 42:7
**absence** [1] - 47:10
**abstract** [1] - 15:13
**abuse** [16] - 13:23, 13:25, 14:1, 14:15, 14:22, 20:6, 24:10, 25:15, 25:17, 29:9, 32:2, 33:23, 36:5, 43:19
**abused** [1] - 28:11
**abusive** [1] - 32:25
**acceptable** [1] - 13:12
**acceptance** [1] - 9:19
**accepting** [1] - 17:13
**access** [3] - 43:13, 44:4, 44:15
**accomplish** [2] - 46:12, 46:17
**account** [1] - 36:15
**accounted** [1] - 29:13
**accurate** [5] - 6:25, 8:2, 8:4, 8:16, 15:21
**accurately** [1] - 6:23

**achieve** [1] - 40:19
**acknowledge** [1] - 27:4
**acknowledged** [2] - 29:12, 37:12
**acknowledges** [2] - 9:25, 36:1
**acted** [1] - 27:20
**acting** [1] - 36:6
**activities** [1] - 44:9
**activity** [3] - 9:17, 36:11, 40:9
**acts** [8] - 13:13, 17:18, 22:9, 24:12, 25:6, 29:16, 29:23, 38:21
**actual** [1] - 10:9
**actuarial** [1] - 36:8
**acutely** [1] - 27:13
**AD** [6] - 28:11, 29:14, 29:15, 29:24, 33:22, 36:16
**AD's** [1] - 34:11
**add** [1] - 21:8
**added** [6] - 9:1, 9:3, 9:6, 9:11, 9:12, 9:18
**addendum** [4] - 2:23, 5:11, 5:19, 12:12
**addiction** [2] - 22:13, 22:14
**addictions** [2] - 24:14, 24:22
**addition** [2] - 11:23, 15:16
**additional** [1] - 40:14
**address** [3] - 7:6, 7:13, 13:16
**addressing** [2] - 12:6, 12:7
**adds** [1] - 10:6
**adequate** [1] - 30:22
**adjusted** [2] - 9:13, 9:14
**adjustment** [2] - 9:14, 33:10
**adopt** [5] - 8:18, 8:20, 11:21, 23:2, 28:19
**adopted** [1] - 35:17
**adult** [5] - 15:1, 22:23, 33:9, 42:18, 43:8
**adults** [2] - 13:23, 43:15
**advantage** [1] - 22:20
**advise** [1] - 45:15
**advisory** [10] - 9:24, 10:4, 11:8, 11:10, 30:25, 31:2, 46:9, 46:10, 46:23
**affected** [1] - 13:22
**afford** [2] - 30:22, 45:18
**afternoon** [5] - 2:5, 2:8, 2:9, 2:10, 2:13
**age** [4] - 9:1, 26:1, 42:18, 43:7
**agency** [1] - 28:25
**aggravates** [1] - 36:6
**aggravating** [1] - 31:25
**ago** [2] - 3:12, 37:6
**agree** [2] - 3:21, 7:8
**agrees** [1] - 9:25
**ahead** [4] - 11:24, 12:16,

19:1, 22:4
**ailments** [2] - 16:2, 16:10
**alcohol** [2] - 16:5, 22:14
**ALLEN** [1] - 1:13
**Allen** [1] - 2:6
**allow** [1] - 18:14
**allowing** [1] - 43:25
**Ameet** [1] - 2:5
**AMERICA** [1] - 1:3
**America** [1] - 2:2
**American** [1] - 26:6
**ammunition** [1] - 44:17
**amount** [3] - 4:5, 4:10, 39:22
**amounts** [1] - 39:18
**analogous** [1] - 38:22
**angry** [1] - 24:13
**annexed** [1] - 28:13
**answer** [1] - 47:9
**answered** [2] - 5:24, 37:1
**ANTHONY** [1] - 1:16
**Anthony** [1] - 2:11
**antisocial** [2] - 16:4, 36:3
**appeal** [5] - 45:16, 45:17, 45:18, 45:19, 45:20
**appearance** [1] - 2:3
**APPEARANCES** [1] - 1:11
**appearing** [1] - 2:11
**applicable** [3] - 31:2, 31:3, 42:7
**apply** [1] - 45:17
**appointed** [1] - 45:19
**appreciating** [1] - 17:12
**approached** [1] - 25:4
**appropriate** [3] - 6:7, 18:9, 31:17
**approval** [1] - 42:19
**approved** [1] - 42:3
**April** [2] - 3:5, 10:10
**area** [4] - 13:7, 31:11, 33:8
**areas** [1] - 45:5
**argue** [2] - 17:21, 17:22
**arguments** [1] - 35:16
**arises** [1] - 10:19
**arrest** [2] - 14:8, 27:8
**arrived** [1] - 38:13
**articulated** [1] - 33:22
**aside** [1] - 35:19
**aspect** [1] - 37:17
**aspects** [1] - 40:13
**assault** [1] - 34:14
**assaulted** [3] - 25:4, 27:22, 28:17
**assaulting** [1] - 30:4
**assaults** [1] - 36:23
**asserted** [1] - 10:5
**assertions** [1] - 6:1
**assess** [1] - 42:10
**assessment** [5] - 10:23, 10:25, 15:15, 36:8, 45:8

**assessments** [1] - 40:15
**assign** [1] - 19:15
**associate** [1] - 42:17
**associating** [1] - 43:7
**assume** [1] - 3:20
**assumed** [1] - 36:25
**assuming** [3] - 36:20, 38:24, 46:15
**attached** [1] - 3:18
**attaches** [1] - 3:8
**attachments** [2] - 3:3, 3:6
**attained** [1] - 9:1
**attempt** [1] - 10:8
**attempted** [2] - 9:9, 33:6
**attempting** [1] - 33:8
**attempts** [1] - 10:11
**attended** [1] - 14:24
**attention** [2] - 6:14, 16:13
**ATTORNEY** [1] - 1:12
**Attorney** [1] - 41:3
**attorney** [2] - 4:6, 45:19
**attorneys** [2] - 12:14, 24:5
**au** [1] - 28:22
**auditory** [1] - 42:24
**aunt** [1] - 12:23
**AUSA** [1] - 1:13, 2:6
**authored** [1] - 7:14
**automatically** [1] - 20:3
**avoid** [2] - 31:5, 43:10
**aware** [7] - 4:3, 6:7, 6:16, 13:3, 15:3, 16:14, 27:14

**B**

**backs** [1] - 34:3
**bad** [5] - 18:6, 18:8, 21:4, 28:14
**balance** [1] - 35:23
**Barday** [15] - 13:16, 15:18, 17:3, 17:5, 17:8, 24:17, 24:20, 26:19, 29:10, 29:11, 29:20, 35:25, 37:6, 37:12, 37:22
**Barday's** [7] - 3:6, 5:5, 15:7, 15:25, 17:25, 29:10, 29:18
**base** [2] - 8:25, 9:10
**based** [3] - 3:20, 38:9, 47:2
**basement** [1] - 32:14
**beating** [1] - 36:23
**beautiful** [1] - 23:12
**become** [3] - 20:15, 25:9, 25:24
**becomes** [4] - 10:3, 10:4, 11:8, 19:12
**BEFORE** [1] - 1:9
**began** [1] - 24:24
**begin** [1] - 12:20
**behalf** [2] - 3:7, 12:21
**behavior** [4] - 19:25, 34:16, 37:16, 43:2

**behind** [1] - 26:12
**bench** [1] - 4:4
**Bernadette** [3] - 12:22, 13:21, 15:19
**betraying** [1] - 32:15
**better** [5] - 12:6, 12:7, 15:1, 25:9, 26:2
**BIANCO** [1] - 1:9
**bible** [1] - 26:2
**bidding** [1] - 32:9
**big** [1] - 20:17
**bit** [1] - 39:17
**BODE** [6] - 1:13, 2:8, 10:17, 46:6, 46:20, 47:12
**Bode** [1] - 2:7
**bond** [1] - 25:14
**Booker** [1] - 11:10
**BRIDGET** [1] - 1:12
**brief** [1] - 5:13
**briefed** [1] - 31:8
**broke** [2] - 28:16, 34:8
**Brooklyn** [1] - 13:7
**Brooks** [1] - 39:5
**brother** [1] - 14:10
**brought** [1] - 16:8
**Brown** [1] - 39:15
**Bureau** [2] - 41:4, 47:17
**business** [1] - 14:25
**BY** [1] - 1:13

**C**

**calculation** [3] - 7:6, 7:7, 7:9
**callous** [1] - 32:10
**calm** [1] - 25:16
**cancer** [1] - 16:10
**candor** [1] - 16:17
**cannot** [3] - 30:6, 40:21, 45:18
**capability** [1] - 44:15
**capable** [5] - 6:5, 43:13, 43:23, 44:7, 44:10
**car** [1] - 34:2
**card** [1] - 45:12
**care** [2] - 16:16, 29:1
**careful** [1] - 20:2
**carefully** [1] - 30:14
**caretakers** [1] - 27:25
**carries** [1] - 10:1
**case** [24] - 2:1, 3:22, 6:6, 11:9, 13:2, 14:8, 16:22, 18:9, 25:4, 28:3, 31:2, 35:8, 39:4, 39:5, 39:6, 39:16, 39:17, 39:18, 39:24, 40:13, 46:24, 47:2, 47:4, 47:7
**cases** [3] - 38:19, 43:11, 47:5
**cast** [1] - 35:19
**CAT** [1] - 1:25
**categorize** [1] - 14:9

**category** [3] - 7:8, 9:20, 9:22
**caused** [3] - 17:19, 36:19, 36:22
**CDs** [1] - 44:12
**Central** [3] - 1:5, 1:14, 1:21
**certain** [4] - 8:9, 12:6, 19:25, 47:6
**certainly** [4] - 31:9, 35:5, 39:18, 40:7
**chance** [5] - 19:8, 30:2, 33:12, 37:5
**change** [1] - 27:6
**chaos** [1] - 36:6
**characteristics** [5] - 4:22, 30:19, 32:23, 33:3, 38:20
**chart** [1] - 9:23
**check** [2] - 4:6, 4:10
**Chen** [1] - 38:15
**child** [14] - 8:24, 9:10, 10:10, 13:5, 14:12, 20:13, 20:17, 23:3, 23:12, 23:23, 28:19, 29:3, 42:17, 47:5
**child's** [1] - 23:23
**childhood** [3] - 25:17, 26:22, 33:1
**children** [20] - 5:2, 5:3, 13:8, 14:23, 17:19, 21:11, 21:13, 23:11, 25:6, 31:22, 31:24, 32:20, 33:4, 34:18, 34:24, 35:7, 38:5, 43:4, 43:7, 43:19
**children's** [1] - 22:10
**chose** [1] - 28:10
**Circuit** [4] - 39:13, 39:20, 43:10, 47:4
**circumstances** [8] - 6:5, 13:22, 14:5, 17:25, 18:10, 21:2, 26:22, 30:18
**cite** [1] - 39:2
**class** [1] - 16:16
**classes** [1] - 26:2
**clause** [1] - 10:13
**clear** [4] - 4:13, 8:15, 32:19, 34:20
**CLERK** [1] - 2:1
**clients** [1] - 17:10
**close** [2] - 14:12, 47:18
**cocaine** [2] - 16:6, 23:21
**coconspirator** [1] - 28:18
**Code** [1] - 43:17
**cognizant** [1] - 46:8
**cohabitats** [1] - 43:3
**coin** [1] - 39:17
**collateral** [1] - 15:23
**college** [1] - 14:24
**combination** [1] - 39:24
**combined** [1] - 9:14
**coming** [1] - 14:7
**commented** [1] - 16:5

**commission** [2] - 31:1, 31:4
**commit** [1] - 8:23
**committed** [2] - 14:10, 22:9
**common** [1] - 17:9
**communicate** [1] - 43:18
**communicated** [1] - 9:3
**communications** [1] - 44:21
**community** [4] - 30:8, 31:24, 32:20, 40:3
**compelling** [1] - 31:23
**complete** [3] - 31:23, 32:19, 38:10
**complete** [1] - 37:19
**completely** [6] - 10:8, 24:17, 28:14, 32:7, 33:19, 38:22
**comply** [2] - 41:20, 41:24
**computation** [1] - 8:18
**computer** [13] - 9:4, 42:25, 43:12, 43:18, 43:21, 43:23, 44:4, 44:10, 44:11, 44:14, 45:12
**computer-related** [1] - 44:14
**computers** [1] - 44:19
**conceded** [1] - 36:24
**concern** [1] - 20:17
**concerned** [1] - 37:21
**concerning** [1] - 43:5
**concerns** [1] - 37:9
**conclude** [5] - 24:24, 31:18, 35:12, 37:3, 38:9
**concluded** [2] - 29:22, 48:8
**concurrently** [2] - 41:8, 41:11
**condition** [4] - 43:9, 45:2, 45:3, 45:4
**conditions** [3] - 40:8, 41:19
**conduct** [19] - 9:5, 9:17, 16:7, 17:13, 18:3, 27:5, 30:23, 31:22, 33:14, 33:15, 34:4, 34:17, 35:5, 37:8, 39:8, 43:16, 45:2, 48:3
**conducted** [4] - 6:17, 15:23, 44:22, 45:6
**confer** [1] - 11:25
**confirm** [2] - 4:9, 12:10
**confirmed** [1] - 32:23
**confronted** [1] - 14:14
**Congress** [1] - 30:16
**connect** [1] - 24:22
**connection** [2] - 3:14, 33:14
**consecutive** [3] - 46:12, 46:13, 46:16
**consecutively** [2] - 41:11, 41:14
**consequences** [1] - 17:13
**consider** [11] - 4:21, 6:10, 8:22, 11:11, 17:24, 19:15, 25:18, 27:2, 29:18, 35:24, 48:6
**consideration** [3] - 12:25, 21:16, 35:5

**considered** [11] - 27:1, 30:15, 30:17, 30:25, 31:5, 31:10, 31:12, 35:3, 35:21, 37:25, 46:16
**considering** [3] - 20:24, 26:25, 30:14
**consistent** [1] - 14:7
**consisting** [1] - 41:5
**conspiracy** [1] - 8:23
**constitution** [1] - 19:21
**consumed** [2] - 22:13, 23:16
**contact** [1] - 9:2
**contacting** [1] - 42:15
**contain** [2] - 5:1, 45:5
**contained** [4] - 4:2, 6:1, 8:19, 32:5
**continue** [3] - 18:15, 18:18, 19:7
**contribute** [1] - 42:4
**contributed** [1] - 16:7
**contributing** [1] - 16:6
**control** [5] - 22:14, 23:19, 24:8, 24:9, 44:12
**convicted** [2] - 10:14, 39:19
**conviction** [7] - 9:21, 32:18, 33:6, 34:19, 37:19, 45:16, 45:21
**convince** [2] - 16:19, 29:4
**convinced** [3] - 28:4, 28:7, 28:24
**cooperate** [2] - 42:7, 43:20
**cooperation** [1] - 43:22
**copy** [2] - 2:21, 3:17
**correct** [2] - 3:24, 10:7
**correctional** [1] - 42:14
**correctly** [1] - 11:6
**corroborated** [3] - 33:18, 34:15, 36:7
**cost** [2] - 42:5, 45:17
**counsel** [3] - 2:3, 3:16, 7:12
**counseled** [1] - 24:20
**count** [9] - 10:1, 10:9, 10:15, 10:19, 10:23, 11:2, 41:8, 41:10, 41:13
**countless** [1] - 28:16
**country** [2] - 23:8, 23:24
**counts** [27] - 9:9, 10:3, 10:6, 10:8, 10:12, 10:15, 10:20, 10:22, 10:25, 11:3, 11:5, 11:7, 32:18, 34:19, 40:16, 40:18, 41:6, 41:9, 41:12, 41:15, 45:9, 45:10, 45:22, 45:25, 46:2, 46:15, 47:11
**couple** [1] - 36:14
**court** [26] - 2:21, 3:16, 6:10, 6:15, 10:2, 10:15, 11:11, 11:22, 12:8, 12:21, 15:12, 16:8, 21:10, 29:14, 29:18, 29:19, 29:22, 31:8, 31:9, 34:21, 39:8, 41:1, 46:8,

46:10, 46:11, 46:16
**COURT** [42] - 1:1, 1:9, 2:9, 2:13, 2:18, 3:20, 3:24, 4:1, 4:7, 4:13, 5:9, 6:22, 7:2, 7:18, 7:23, 8:1, 8:7, 8:11, 8:15, 10:24, 11:18, 11:21, 12:2, 12:9, 12:16, 12:19, 18:20, 18:24, 19:1, 21:7, 21:18, 22:1, 22:4, 26:16, 30:10, 40:24, 41:1, 46:2, 46:19, 46:21, 47:13, 47:20
**Court** [1] - 1:20
**court's** [1] - 12:4
**Courthouse** [1] - 1:5
**courtroom** [4] - 26:7, 27:10, 27:19, 37:24
**CR-14-94** [1] - 1:4
**created** [1] - 23:12
**credible** [3] - 4:20, 33:19, 34:11
**credit** [1] - 27:6
**credited** [1] - 29:14
**crime** [2] - 19:19, 31:11
**crimes** [5] - 17:17, 19:15, 19:20, 30:24, 33:2
**criminal** [8] - 7:4, 7:7, 7:21, 9:20, 9:22, 19:14, 30:23, 43:5
**cross** [1] - 6:21
**cross-examination** [1] - 6:21
**crush** [1] - 17:23
**cry** [1] - 22:15
**custody** [1] - 41:3

**D**

**danger** [13] - 20:11, 30:7, 31:23, 32:11, 32:20, 32:22, 33:4, 35:10, 38:7, 38:10, 48:5
**dangerous** [7] - 20:8, 27:17, 28:19, 32:19, 34:21, 48:3
**dangerousness** [8] - 4:23, 29:22, 29:25, 33:17, 34:5, 35:1, 36:4, 40:2
**dark** [1] - 23:4
**dashboard** [1] - 33:25
**data** [1] - 44:21
**dated** [2] - 5:22, 6:3
**daughter** [7] - 22:10, 23:7, 23:8, 23:11, 28:5, 29:1, 32:2
**daughter's** [1] - 34:2
**days** [1] - 45:20
**de** [1] - 19:11
**deal** [3] - 7:15, 33:1, 37:18
**dealing** [3] - 25:3, 32:24, 37:20
**dealings** [1] - 17:9
**dealt** [1] - 26:4

**death** [1] - 23:20
**deceive** [1] - 29:8
**deceiving** [1] - 32:16
**December** [1] - 37:15
**deceptive** [1] - 34:15
**decides** [1] - 20:17
**decision** [1] - 20:24
**deeply** [2] - 26:11, 37:17
**DEFENDANT** [4] - 3:25, 7:1, 12:15, 22:5
**Defendant** [2] - 1:7, 1:16
**defendant** [34] - 4:22, 9:12, 9:16, 27:11, 27:17, 27:22, 27:24, 29:2, 29:3, 29:7, 30:1, 30:24, 31:23, 32:1, 32:18, 37:13, 40:2, 42:4, 42:22, 43:3, 43:4, 43:12, 43:17, 43:20, 43:24, 44:3, 44:6, 44:9, 44:13, 44:16, 44:18, 44:25, 45:4
**defendant's** [6] - 28:15, 29:13, 29:23, 36:15, 38:21, 44:1
**defendants** [2] - 3:21, 31:7
**defense** [7] - 3:4, 3:16, 8:1, 9:25, 11:14, 40:24, 47:13
**defined** [2] - 43:16, 44:19
**definition** [1] - 43:10
**degrading** [1] - 32:6
**degree** [1] - 42:6
**deliberate** [7] - 27:18, 28:2, 28:4, 28:6, 28:10, 28:17, 28:19
**deliberately** [1] - 27:22
**deliberation** [1] - 27:19
**demands** [1] - 24:10
**demeaning** [1] - 32:6
**demonstrate** [1] - 32:18
**demonstrated** [1] - 30:5
**denial** [1] - 37:20
**department** [6] - 2:23, 2:25, 35:18, 42:4, 42:10, 42:19
**Department's** [1] - 43:21
**department's** [1] - 44:7
**dependent** [1] - 32:7
**described** [1] - 6:23
**deserve** [1] - 17:1
**deserves** [1] - 16:23
**designate** [2] - 47:18, 47:21
**designation** [1] - 47:15
**desire** [1] - 23:16
**desires** [5] - 23:4, 23:18, 24:10, 32:17, 34:24
**desktop** [1] - 45:12
**despicable** [1] - 17:18
**destroy** [1] - 17:23
**destroyed** [1] - 22:22
**destructed** [1] - 15:5
**destruction** [3] - 17:19,

25:17, 27:10
**destructive** [1] - 44:17
**detail** [4] - 5:14, 5:25, 6:14, 31:19
**determined** [1] - 19:18
**deterrence** [8] - 19:5, 19:14, 19:23, 19:24, 20:19, 21:5, 30:23, 35:3
**developed** [1] - 18:2
**developing** [1] - 24:14
**deviant** [1] - 43:1
**device** [6] - 43:13, 44:4, 44:5, 44:7, 44:17
**devices** [6] - 43:24, 44:1, 44:11, 44:21
**devoted** [1] - 14:9
**diagnoses** [1] - 16:2
**dialogue** [1] - 6:18
**die** [2] - 19:12, 34:1
**difference** [1] - 37:7
**different** [1] - 15:11
**difficult** [2] - 13:21, 16:22
**diminish** [1] - 35:1
**diminished** [1] - 38:11
**direct** [3] - 6:20, 23:25, 43:1
**directing** [1] - 32:1
**directly** [1] - 12:10
**discard** [1] - 23:3
**discarded** [1] - 22:20
**disclose** [1] - 42:9
**disclosure** [1] - 41:22
**discretion** [2] - 31:13, 41:2
**discuss** [3] - 6:20, 12:11, 12:13
**discussed** [3] - 4:14, 39:13, 39:20
**discussions** [1] - 15:18
**disgusting** [1] - 17:18
**dismiss** [4] - 10:15, 10:25, 11:4, 45:24
**dismissal** [1] - 11:3
**dismissed** [4] - 10:21, 45:9, 45:22, 46:3
**dismissing** [1] - 40:16
**disorder** [3] - 16:3, 16:4, 25:16
**disorders** [2] - 42:3, 42:12
**disparities** [1] - 31:6
**disparity** [1] - 38:14
**displayed** [1] - 24:12
**disproportional** [1] - 39:7
**dispute** [1] - 47:24
**disputes** [1] - 8:1
**disregard** [1] - 32:10
**dissect** [1] - 7:11
**dissented** [1] - 39:15
**distorted** [2] - 23:22, 24:16
**DISTRICT** [3] - 1:1, 1:1, 1:9
**disturbing** [1] - 37:16

**document** [3] - 3:15, 6:2, 6:15
**documentation** [2] - 2:18, 3:10
**documents** [4] - 5:3, 5:24, 12:12, 42:10
**Doe** [5] - 8:3, 8:24, 9:2, 9:5, 9:10
**domestic** [1] - 13:14
**Dominica** [1] - 12:23
**done** [9] - 5:14, 14:17, 19:6, 22:8, 25:21, 25:22, 31:25, 37:20, 47:25
**door** [1] - 34:4
**double** [1] - 10:13
**doubt** [1] - 6:13
**down** [3] - 17:22, 23:15, 26:5
**Down** [1] - 29:15
**downs** [1] - 34:13
**Dr** [22] - 3:6, 5:5, 13:16, 15:7, 15:18, 15:25, 17:3, 17:5, 17:8, 17:25, 24:17, 24:20, 26:19, 29:10, 29:11, 29:18, 29:20, 35:25, 37:6, 37:12, 37:22
**draw** [1] - 15:21
**Drive** [1] - 45:13
**driven** [1] - 46:24
**driving** [2] - 35:4, 47:8
**drug** [2] - 16:5, 24:15
**drugs** [3] - 22:13, 23:21, 39:18
**during** [5] - 25:25, 29:12, 38:11, 47:3
**dynamic** [1] - 13:2

**E**

**e-mails** [1] - 32:4
**early** [1] - 25:17
**ease** [1] - 14:21
**EASTERN** [1] - 1:1
**effect** [1] - 10:3
**effective** [2] - 11:8, 39:25
**effectively** [2] - 35:13, 44:8
**eight** [1] - 41:6
**either** [1] - 10:21
**electronic** [6] - 42:24, 43:13, 43:24, 44:4, 44:11, 44:20
**emotional** [1] - 21:13
**emotionally** [1] - 31:15
**employed** [2] - 15:10, 15:14
**employer** [1] - 44:13
**ended** [1] - 24:25
**enforcement** [2] - 25:20, 26:8
**engage** [2] - 9:4, 34:17
**engaged** [5] - 9:16, 34:16, 38:16, 43:15, 48:2
**enhanced** [1] - 29:25

**entire** [1] - 38:23
**entirety** [2] - 8:19, 8:21
**entitled** [1] - 3:17
**environment** [1] - 16:15
**envy** [1] - 18:8
**equivalent** [1] - 39:11
**escrow** [1] - 4:6
**especially** [2] - 25:11, 31:24, 32:20
**ESQ** [3] - 1:12, 1:16, 1:16
**essentially** [1] - 30:1
**estate** [1] - 15:1
**evaluated** [1] - 17:4
**evaluation** [5] - 15:8, 15:9, 15:15, 29:11, 29:19
**event** [1] - 38:24
**events** [1] - 33:21
**evidence** [4] - 29:17, 38:3, 39:25, 45:6
**ex** [2] - 23:13, 24:6
**ex-girlfriend** [2] - 23:13, 24:6
**exactly** [2] - 16:15, 26:18
**examination** [3] - 6:20, 6:21, 42:13
**examinations** [1] - 44:10
**examples** [1] - 26:3
**except** [1] - 40:16
**excess** [1] - 5:16
**excessive** [1] - 16:5
**existed** [3] - 15:22, 18:1, 38:21
**exists** [2] - 38:11, 45:3
**expect** [1] - 40:10
**expectancy** [1] - 19:10
**expense** [1] - 44:2
**experienced** [1] - 13:25
**experimented** [1] - 23:20
**explain** [1] - 6:8
**explaining** [1] - 5:25
**explicit** [3] - 9:5, 28:5, 43:16
**exploit** [2] - 29:9, 32:9
**exploitation** [6] - 8:24, 9:9, 10:10, 15:5, 32:13, 38:17
**exploited** [2] - 28:2, 28:6
**exposure** [1] - 11:8
**express** [1] - 22:7
**expressed** [1] - 26:20
**extent** [1] - 47:17
**extraordinary** [1] - 39:23
**extreme** [3] - 32:11, 33:17, 48:5
**extremely** [8] - 31:22, 32:10, 32:19, 34:10, 34:21, 35:2, 35:6, 37:11
**eyes** [1] - 33:21

**F**

**face** [1] - 16:17
**facilitate** [1] - 44:7

**facility** [2] - 23:9, 47:18
**fact** [6] - 4:16, 14:8, 20:2, 35:17, 47:24, 48:3
**facto** [1] - 19:11
**factor** [5] - 11:11, 31:25, 35:8, 35:9, 39:1
**factors** [13] - 4:24, 6:10, 11:12, 11:13, 12:6, 16:6, 18:2, 30:15, 31:12, 31:13, 35:15, 35:23, 39:24
**facts** [8] - 4:21, 6:5, 7:16, 13:17, 14:5, 16:22, 18:10, 36:20
**factual** [2] - 6:1, 11:22
**failed** [2] - 15:3, 15:4
**failure** [1] - 44:23
**falls** [1] - 10:19
**families** [1] - 14:16
**family** [30] - 7:15, 12:25, 13:1, 13:3, 13:6, 13:9, 13:10, 13:13, 13:21, 14:8, 14:19, 14:25, 15:21, 17:2, 17:20, 17:25, 22:16, 23:6, 24:9, 25:8, 25:11, 26:12, 26:23, 26:24, 28:7, 47:16, 47:24, 48:1, 48:2, 48:4
**fantasy** [1] - 24:16
**father** [10] - 13:4, 13:15, 13:24, 13:25, 14:14, 14:16, 21:14, 24:9, 24:12, 26:24
**father's** [2] - 23:20, 25:15
**Fatico** [7] - 2:24, 4:18, 6:17, 11:23, 20:21, 29:12, 33:18
**favor** [1] - 39:1
**Fax** [1] - 1:21
**FCRR** [1] - 1:20
**February** [2] - 27:9, 37:15
**Federal** [2] - 1:13, 1:21
**feelings** [1] - 23:17
**fellow** [1] - 26:6
**felt** [1] - 25:5
**female** [1] - 33:9
**fetish** [1] - 29:4
**Feuerstein's** [1] - 39:4
**few** [1] - 39:14
**figured** [1] - 11:6
**filed** [1] - 45:20
**filings** [1] - 5:4
**filmed** [1] - 28:1
**final** [6] - 3:17, 3:21, 4:2, 30:12, 39:9, 45:11
**finally** [5] - 30:1, 34:7, 37:8, 37:22, 41:12
**financial** [4] - 21:12, 40:12, 41:22, 42:9
**findings** [4] - 4:16, 4:19, 11:22, 11:23
**fine** [7] - 5:6, 7:18, 12:7, 12:9, 40:11, 40:14, 45:14
**firearm** [1] - 44:16

**first** [6] - 13:6, 16:16, 17:5, 17:11, 27:3, 35:24
**first-class** [1] - 16:16
**firsthand** [1] - 17:14
**five** [3] - 9:17, 41:9, 46:15
**flawed** [1] - 29:11
**follow** [1] - 41:17
**following** [3] - 31:18, 41:5, 41:19
**force** [1] - 35:4
**forcible** [1] - 33:6
**foreign** [1] - 23:8
**forfeiture** [3] - 3:12, 3:17, 3:22, 4:1, 4:2, 40:12, 41:20, 45:10, 45:11
**form** [1] - 4:5
**forma** [1] - 45:18
**Forrest** [1] - 39:17
**forth** [4] - 4:18, 30:15, 40:19, 45:11
**forward** [1] - 27:4
**four** [5] - 9:1, 9:11, 15:17, 41:9, 46:15
**framework** [1] - 16:21
**Frances** [3] - 12:22, 13:6, 15:19
**freedom** [1] - 16:23
**front** [1] - 24:12
**frotteuristic** [1] - 16:3
**full** [1] - 41:22
**fully** [3] - 4:20, 29:13, 31:8
**functioning** [1] - 24:2
**future** [1] - 10:19

**G**

**gap** [2] - 28:23, 29:1
**general** [7] - 19:4, 19:14, 19:23, 19:24, 20:19, 21:5, 35:3
**General** [1] - 41:3
**genital** [1] - 33:8
**genuinely** [2] - 22:18, 23:13
**Gerolamo** [1] - 12:23
**girl** [1] - 32:15
**girlfriend** [2] - 23:13, 24:6
**given** [12] - 4:5, 6:13, 10:14, 15:23, 19:9, 32:15, 33:12, 38:18, 39:24, 40:5, 40:12, 47:15
**glance** [1] - 23:10
**gland** [2] - 16:11
**God** [2] - 25:25, 26:3
**government** [26] - 4:6, 4:17, 4:19, 7:23, 8:11, 8:13, 9:24, 10:5, 10:7, 11:18, 26:17, 27:7, 27:12, 29:16, 29:23, 32:4, 32:16, 32:24, 33:9, 35:19, 36:14, 36:25, 37:5, 39:2, 45:24, 46:4

**Government** [1] - 1:12
**government's** [2] - 3:2, 40:22
**grabbed** [1] - 33:24
**grabbing** [1] - 33:8
**graduated** [2] - 14:24, 28:23
**granted** [2] - 22:24, 24:8
**great** [4] - 13:15, 13:17, 31:15, 31:19
**greater** [2] - 19:15, 35:14
**grew** [1] - 13:21
**grips** [2] - 22:11, 24:1
**grounds** [1] - 44:23
**group** [4] - 8:22, 9:7, 9:8, 43:19
**grouping** [1] - 8:22
**guess** [1] - 11:15
**guideline** [4] - 10:4, 46:10, 47:7
**guidelines** [1] - 6:9, 7:4, 7:9, 7:13, 11:10, 31:1, 46:22, 46:23, 46:24, 46:25, 47:5
**guy** [1] - 38:18

## H

**hair** [1] - 33:25
**hand** [3] - 14:21, 17:21, 17:23
**handed** [1] - 3:16
**hands** [5] - 13:14, 13:24, 13:25, 14:15, 22:19
**hardware** [1] - 44:1
**harm** [2] - 36:19, 36:22
**harsher** [1] - 19:16
**havoc** [1] - 14:23
**HCR-20** [2] - 15:15, 15:16
**head** [3] - 26:5, 33:25, 34:3
**health** [1] - 42:1
**hear** [7] - 8:6, 10:7, 11:12, 21:8, 26:17, 27:7, 33:20
**hearing** [10] - 2:25, 4:18, 6:17, 11:23, 20:21, 29:12, 33:18, 36:16, 36:24, 37:10
**hearings** [3] - 6:19, 35:20, 47:3
**heart** [1] - 22:19
**heavily** [1] - 23:21
**heavy** [2] - 17:21, 17:23
**heinous** [2] - 22:9, 25:6
**hell** [1] - 28:12
**help** [2] - 14:21, 37:4
**helpful** [1] - 5:7
**helping** [1] - 14:21
**hesitation** [1] - 6:12
**high** [3] - 14:24, 28:24, 35:2
**higher** [4] - 37:1, 37:2, 37:3, 39:3
**highest** [1] - 32:21

**Highgate** [1] - 45:13
**himself** [1] - 5:20
**history** [14] - 4:22, 7:4, 7:8, 7:21, 9:20, 9:22, 20:6, 30:19, 32:23, 33:3, 34:19, 36:5, 38:20, 43:5
**hits** [1] - 34:3
**home** [2] - 17:1, 27:25
**Honor** [44] - 2:10, 3:25, 4:3, 5:12, 7:1, 7:10, 7:22, 8:5, 10:17, 11:17, 11:20, 12:5, 12:20, 13:16, 15:7, 16:18, 17:22, 19:2, 19:7, 20:22, 20:23, 20:24, 21:1, 21:25, 22:3, 22:5, 22:15, 22:25, 23:5, 24:3, 25:9, 25:10, 25:18, 25:20, 26:5, 26:6, 26:10, 26:11, 26:15, 28:12, 40:23, 46:6, 47:12, 47:16
**HONORABLE** [1] - 1:9
**hope** [1] - 20:7
**hopefully** [1] - 18:15
**horrible** [5] - 20:13, 22:9, 22:11, 22:12, 24:1
**horrific** [2] - 26:23, 32:25
**hours** [6] - 5:17, 15:18, 17:14, 17:15
**house** [5] - 14:17, 14:18, 14:19, 44:19
**household** [2] - 14:23, 18:1
**human** [1] - 19:19
**humbleness** [1] - 22:7
**humiliating** [1] - 32:6
**Hurley** [1] - 38:18
**hurt** [1] - 24:23
**hurting** [1] - 36:7

## I

**idea** [1] - 19:24
**identifying** [1] - 43:23
**images** [1] - 43:15
**imagine** [2] - 22:17, 22:25
**immaterial** [2] - 8:5, 8:16
**immediately** [1] - 29:2
**immigrant** [1] - 14:16
**immigrants** [1] - 13:4
**Imperially** [1] - 12:23
**important** [3] - 21:15, 27:2, 27:3
**impose** [12] - 11:5, 30:12, 31:13, 40:4, 40:6, 40:11, 40:15, 40:18, 40:21, 41:13, 41:17, 45:14
**imposed** [6] - 30:20, 31:10, 31:11, 39:17, 41:12, 41:15
**imposing** [3] - 6:15, 30:13, 35:22
**imprisonment** [6] - 3:1, 19:17, 35:13, 41:4, 41:10,

41:18
**impulsive** [2] - 36:3, 36:5
**incarcerate** [1] - 18:11
**incarcerated** [2] - 5:17, 17:4
**incarceration** [3] - 22:7, 25:3, 26:1
**incident** [1] - 27:21
**incidents** [1] - 34:6
**include** [5] - 3:6, 30:16, 42:2, 43:15, 43:22
**includes** [1] - 8:23
**including** [10] - 3:9, 10:23, 32:9, 33:23, 34:6, 36:23, 39:3, 39:14, 42:24, 45:11
**incorrect** [1] - 36:20
**independently** [1] - 15:20
**indicate** [1] - 37:24
**indicated** [1] - 42:20
**indication** [1] - 38:6
**indictment** [2] - 45:25, 46:3
**individual** [6] - 32:24, 32:25, 34:21, 38:16, 43:3, 43:18
**individually** [1] - 10:1
**individuals** [1] - 48:5
**infant** [1] - 32:10
**inflicted** [1] - 24:11
**influencing** [1] - 47:1
**inform** [2] - 43:4, 44:3
**information** [3] - 11:21, 42:9, 42:13
**initial** [3] - 2:23, 3:5, 5:18
**inmates** [1] - 25:3
**innocence** [3] - 22:9, 22:21, 23:23
**innocent** [2] - 23:10, 25:6
**installation** [1] - 43:25
**instance** [2] - 19:16, 20:2
**instant** [3] - 31:20, 31:21, 33:15
**instinctively** [2] - 18:11, 31:15
**intend** [7] - 4:21, 30:11, 31:13, 40:4, 40:11, 40:15, 40:18
**interactions** [2] - 6:23, 6:24
**interest** [1] - 15:15
**internet** [7] - 43:12, 43:21, 43:23, 44:7, 44:8, 44:10, 44:15
**interpersonal** [1] - 36:6
**intervention** [1] - 14:20
**interviewed** [1] - 17:4
**interviews** [1] - 15:23
**investigation** [2] - 2:22, 5:18
**involve** [2] - 34:14, 39:23
**involved** [10] - 9:2, 13:2, 14:25, 17:20, 24:15, 31:22, 33:7, 36:11, 38:4, 39:19
**involvement** [1] - 28:15

**involving** [1] - 9:17
**Island** [4] - 13:7, 30:5, 47:16, 47:19
**Islip** [3] - 1:5, 1:14, 1:21
**issue** [4] - 4:15, 4:23, 7:7, 7:19, 10:18, 31:8, 39:13, 46:14
**issued** [3] - 10:22, 31:1, 31:3
**issues** [3] - 13:16, 43:10, 46:4
**issuing** [1] - 10:24
**Italian** [3] - 13:9, 14:16, 26:6

## J

**jail** [6] - 16:12, 17:1, 19:12, 20:14, 31:14, 47:22
**jails** [1] - 16:15
**Jane** [5] - 8:3, 8:24, 9:2, 9:5, 9:10
**January** [2] - 23:9, 27:8
**jeopardy** [1] - 10:13
**JFB** [1] - 1:4
**job** [2] - 26:8, 44:14
**John** [2] - 12:24, 24:19
**join** [1] - 27:15
**joined** [1] - 2:6
**joint** [1] - 7:12
**JOSEPH** [2] - 1:6, 1:9
**Joseph** [14] - 2:2, 12:21, 13:19, 13:20, 13:24, 14:2, 14:6, 15:25, 16:3, 16:7, 16:20, 17:6, 26:3
**judge** [1] - 27:12
**JUDGE** [1] - 1:9
**Judge** [12] - 2:5, 2:16, 3:19, 7:25, 12:17, 38:15, 38:18, 39:3, 39:5, 39:15, 39:17, 46:1
**judges** [1] - 31:11
**judgment** [4] - 3:18, 3:22, 41:1, 45:21
**jump** [1] - 37:23
**jumps** [1] - 34:2
**June** [6] - 1:6, 3:8, 4:15, 5:22, 6:3, 37:15
**jury** [1] - 10:20
**jury's** [1] - 37:13
**justice** [1] - 19:14

## K

**KABRAWALA** [9] - 2:5, 2:16, 3:15, 4:9, 7:25, 11:20, 27:8, 40:23, 46:1
**Kabrawala** [2] - 2:6, 30:10
**Kalichenko** [9] - 9:4, 28:4, 28:18, 28:21, 29:14, 29:15, 29:24, 32:1, 36:16
**Kalichenko's** [1] - 34:10

**keep** [1] - 25:21
**kept** [2] - 24:7, 25:15
**kidnappers** [1] - 20:3
**kidnapping** [1] - 20:2
**kids** [1] - 20:16
**kill** [3] - 20:8, 20:17, 34:9
**killing** [3] - 19:19, 20:5, 33:24
**kind** [2] - 7:11, 43:14
**Kingdom** [1] - 28:24
**knocked** [2] - 28:16, 34:8
**known** [2] - 15:11, 28:11

**L**

**LA** [14] - 1:16, 2:10, 2:17, 3:23, 4:3, 4:8, 5:8, 5:12, 7:10, 12:17, 12:20, 18:21, 21:9, 40:25
**large** [1] - 39:18
**last** [4] - 18:4, 26:20, 37:23, 39:16
**late** [1] - 33:2
**Lato** [12] - 2:12, 4:15, 5:15, 5:20, 7:13, 7:19, 10:6, 10:7, 11:6, 18:19, 38:15, 39:10
**LATO** [14] - 1:16, 7:22, 8:5, 8:9, 8:13, 11:17, 11:25, 12:4, 18:22, 18:25, 19:2, 21:24, 22:3, 47:14
**Lato's** [3] - 3:8, 6:24, 7:6
**law** [7] - 10:2, 17:22, 20:4, 25:20, 26:7, 30:21, 41:25
**lawyers** [1] - 30:12
**layperson** [1] - 6:7
**learn** [2] - 20:4, 29:2
**learned** [1] - 26:4
**leave** [2] - 18:4, 45:17
**leaving** [1] - 19:20
**led** [3] - 2:24, 33:14, 35:12
**left** [1] - 27:11
**legal** [5] - 6:6, 7:14, 30:13, 36:5, 40:21
**legitimately** [2] - 28:8, 28:25
**length** [1] - 40:5
**lengths** [2] - 13:15, 29:8
**leniency** [1] - 25:19
**Leonard** [1] - 2:12
**LEONARD** [1] - 1:16
**less** [1] - 35:22
**letter** [14] - 3:6, 3:8, 3:9, 19:9, 19:22, 20:20, 21:21, 21:22, 26:11, 26:19, 28:12, 28:13, 37:10, 37:23
**letters** [3] - 3:9, 12:25, 35:20
**level** [17] - 7:4, 7:7, 7:20, 8:18, 8:25, 9:6, 9:10, 9:13, 9:14, 9:18, 32:21, 32:22, 34:5, 34:25, 37:10, 37:25,

38:7
**levels** [6] - 9:1, 9:3, 9:6, 9:11, 9:12, 9:17
**lieu** [1] - 23:18
**life** [35] - 9:23, 9:24, 10:1, 15:1, 16:7, 16:19, 16:20, 16:24, 17:2, 17:5, 17:24, 18:12, 18:16, 19:10, 19:11, 19:17, 20:3, 20:9, 21:6, 23:7, 24:18, 24:21, 24:23, 25:12, 28:12, 28:13, 28:15, 34:16, 34:22, 35:13, 38:2, 38:12, 39:11, 39:12, 39:25
**lifetime** [3] - 40:6, 41:17, 46:9
**lightly** [1] - 27:13
**limited** [2] - 43:22, 44:6
**limits** [2] - 29:8, 34:23
**list** [1] - 30:17
**listened** [1] - 33:19
**live** [1] - 18:16
**lives** [3] - 22:10, 36:18, 36:21
**living** [1] - 28:12
**Lombardi** [1] - 1:20
**look** [7] - 18:22, 22:10, 22:15, 26:11, 26:12, 38:19
**looked** [1] - 25:15
**lose** [1] - 20:5
**love** [2] - 22:20, 25:6
**loved** [6] - 22:18, 22:23, 23:1, 23:13, 23:25
**loves** [1] - 47:24
**loving** [1] - 14:10
**lower** [2] - 35:25, 38:25
**Lucy** [1] - 29:15
**lunatic** [1] - 20:16

**M**

**mails** [1] - 32:4
**maintain** [1] - 5:5
**maintains** [1] - 9:21
**man** [12] - 14:3, 16:23, 18:11, 23:5, 24:14, 25:1, 25:10, 25:24, 26:14, 33:1, 33:2
**man's** [1] - 16:19
**management** [1] - 42:14
**mandated** [1] - 41:25
**manipulate** [1] - 30:7
**manipulating** [1] - 32:17
**manipulative** [1] - 36:2
**manipulativeness** [1] - 34:15
**manner** [1] - 45:7
**March** [1] - 37:15
**marriage** [1] - 24:6
**married** [2] - 13:5, 24:6
**marry** [1] - 22:24
**Marshal's** [1] - 4:11
**Massapequa** [1] - 13:8

**material** [2] - 8:2, 42:24
**math** [1] - 11:7
**matter** [1] - 48:8
**matters** [3] - 6:6, 7:14, 7:16
**Mauskopf** [1] - 39:5
**maximum** [4] - 10:2, 41:7, 41:10, 41:14
**McGowan** [1] - 39:4
**MDC** [5] - 5:17, 15:10, 15:18, 16:14, 17:15, 23:9
**mean** [4] - 16:19, 34:4, 38:25, 48:4
**meaning** [2] - 6:2, 16:6
**means** [1] - 40:12
**meant** [1] - 46:21
**mechanical** [1] - 1:24
**media** [3] - 42:25, 44:12, 44:21
**medical** [2] - 16:13, 16:16
**medications** [1] - 42:6
**meetings** [1] - 37:23
**member** [2] - 18:16, 21:12
**members** [3] - 12:25, 13:11, 14:9
**memorandum** [3] - 3:5, 5:21, 6:3
**mental** [1] - 42:1
**mention** [6] - 21:10, 21:14, 37:4, 38:14, 47:23
**mentioned** [3] - 17:3, 31:7, 39:10
**mentions** [1] - 17:8
**mere** [1] - 30:4
**message** [1] - 35:6
**met** [6] - 5:15, 15:9, 15:19, 35:6, 37:12, 37:14
**might** [2] - 37:7, 46:21
**migrated** [1] - 13:5
**mind** [3] - 12:17, 21:1, 24:2
**mindful** [1] - 29:20
**minds** [1] - 23:1
**minister** [1] - 26:1
**minor** [1] - 43:4
**minors** [1] - 43:15
**mirrored** [1] - 34:11
**misdemeanor** [1] - 33:7
**miserably** [2] - 15:3, 15:4
**mitigating** [1] - 18:2
**mitigation** [1] - 35:17
**modelling** [1] - 28:8
**moderate** [4] - 29:21, 36:4, 36:9, 36:18
**molded** [1] - 14:2
**mom** [1] - 12:22
**moment** [4] - 5:13, 11:25, 21:24, 35:16
**moments** [1] - 4:4
**money** [4] - 4:5, 23:17, 32:3, 32:8

**monitor** [2] - 40:9, 44:8
**monitored** [1] - 44:4
**monitoring** [3] - 43:21, 43:25, 44:5
**months** [5] - 3:12, 22:6, 25:2, 31:14, 41:5
**monumental** [1] - 16:18
**moreover** [1] - 43:6
**most** [4] - 5:19, 14:16, 16:11, 19:19
**mother** [7] - 13:24, 14:13, 15:19, 23:13, 24:13, 25:11, 25:13
**motivated** [1] - 37:18
**move** [1] - 45:24
**moved** [2] - 13:7, 46:1
**MR** [40] - 2:5, 2:8, 2:10, 2:16, 2:17, 3:15, 3:23, 4:3, 4:8, 4:9, 5:8, 5:12, 7:10, 7:22, 7:25, 8:5, 8:9, 8:13, 10:17, 11:17, 11:20, 11:25, 12:4, 12:17, 12:20, 18:21, 18:22, 18:25, 19:2, 21:9, 21:24, 22:3, 27:8, 40:23, 40:25, 46:1, 46:6, 46:20, 47:12, 47:14
**multicount** [1] - 9:14
**multiple** [1] - 32:3
**multiplicitous** [1] - 40:17
**multiplicity** [2] - 7:6, 7:20
**murder** [3] - 39:12, 39:19, 39:23
**murderers** [1] - 19:17
**musician** [1] - 24:15
**must** [3] - 17:22, 45:6, 45:20

**N**

**naked** [1] - 20:13
**named** [1] - 38:18
**names** [2] - 5:1, 5:3
**nannies** [1] - 27:25
**nature** [4] - 6:23, 17:9, 17:17, 30:18
**necessary** [7] - 20:10, 35:14, 40:1, 40:5, 40:9, 40:14, 42:13
**need** [3] - 30:20, 31:5, 45:15
**needed** [1] - 29:1
**needs** [3] - 34:21, 34:25, 35:9
**neglected** [1] - 21:10
**nephew** [1] - 14:11
**never** [2] - 23:7, 39:21
**NEW** [1] - 1:1
**New** [3] - 1:5, 1:14, 1:21
**next** [2] - 5:6, 43:9
**niece** [3] - 28:7, 28:9, 32:14
**nights** [1] - 22:16
**nine** [5] - 10:12, 10:15,

40:16, 45:9, 45:22
**nonsense** [1] - 19:9
**note** [2] - 12:21, 32:13
**noted** [5] - 32:4, 32:8, 32:16, 32:24, 33:9
**nothing** [2] - 14:10, 14:18
**notice** [1] - 45:20
**notify** [2] - 43:6, 44:13
**notwithstanding** [1] - 40:3
**November** [2] - 10:10, 37:14
**number** [17] - 8:3, 8:24, 9:2, 9:5, 9:10, 10:4, 10:5, 11:9, 15:11, 15:14, 16:12, 21:1, 31:2, 31:3, 38:4, 46:25, 47:8
**numerous** [5] - 5:17, 5:23, 14:14, 15:10, 39:2

## O

**object** [2] - 8:10, 32:6
**objection** [4] - 7:21, 7:24, 10:16, 30:13
**objections** [4] - 7:3, 7:5, 11:16, 11:19
**objective** [1] - 15:11
**obscene** [1] - 42:23
**observed** [1] - 17:2
**obstacle** [1] - 16:18
**obtain** [2] - 16:16, 42:13
**obvious** [1] - 37:2
**obviously** [16] - 5:5, 6:16, 6:18, 9:25, 11:9, 20:5, 21:21, 24:24, 27:2, 32:13, 36:9, 37:23, 38:1, 40:12, 46:8, 47:23
**occasions** [2] - 14:14, 15:17
**occupants** [1] - 44:25
**occurred** [1] - 27:21
**OF** [3] - 1:1, 1:3, 1:8
**offender** [2] - 41:24, 42:21
**offender's** [1] - 43:1
**offense** [21] - 7:4, 7:20, 8:4, 8:18, 8:25, 9:6, 9:10, 9:13, 9:14, 9:18, 27:23, 30:18, 30:21, 30:22, 31:20, 31:21, 33:15, 35:11, 42:16, 43:6, 44:14
**Office** [1] - 4:12
**office** [1] - 44:21
**officer** [2] - 41:23, 45:2
**Officer** [1] - 44:23
**Official** [1] - 1:20
**old** [8] - 8:3, 9:11, 23:5, 28:3, 28:6, 32:2, 32:15, 32:25
**once** [2] - 3:18, 29:22
**one** [29] - 3:15, 8:3, 8:23, 9:2, 9:5, 9:21, 11:11, 11:25, 14:7, 16:24, 17:12, 17:21, 18:4, 18:5, 18:15, 20:1,

21:24, 23:2, 28:3, 32:11, 35:16, 35:22, 36:17, 37:23, 43:16, 44:6, 45:19, 46:6, 46:17
**open** [3] - 34:3, 45:24, 46:2
**opinion** [7] - 4:15, 5:21, 6:1, 6:4, 15:25, 17:9, 29:19
**opinions** [1] - 39:14
**opportunity** [2] - 30:12, 33:13
**order** [13] - 3:17, 3:21, 4:1, 4:2, 6:3, 15:21, 25:22, 32:17, 34:16, 43:10, 45:8, 45:10, 45:11
**ordering** [2] - 23:24, 40:17
**original** [1] - 46:3
**otherwise** [1] - 42:20
**outfits** [1] - 29:4
**outlined** [1] - 33:11
**outside** [1] - 14:18
**overshadows** [1] - 18:7
**own** [4] - 22:10, 24:20, 28:5, 32:9
**owning** [1] - 42:22

## P

**p.m** [1] - 1:7
**page** [3] - 16:2, 36:2, 36:24
**pain** [3] - 14:22, 22:16, 24:11
**pair** [1] - 28:22
**papers** [3] - 32:5, 39:10, 44:19
**part** [6] - 3:22, 4:21, 15:1, 15:6, 25:5, 42:11
**participate** [2] - 42:1, 42:12
**participation** [1] - 42:2
**particular** [3] - 6:3, 19:5, 20:19
**parties** [2] - 2:20, 44:3
**party** [4] - 29:5, 42:8, 43:5, 43:6
**past** [7] - 5:20, 16:10, 17:10, 26:12, 38:22, 39:14, 43:11
**path** [2] - 24:7, 27:10
**pattern** [2] - 9:16, 43:2
**Paul** [2] - 1:20, 26:3
**pauperis** [1] - 45:18
**pause** [4] - 8:8, 12:3, 22:2, 31:16
**pay** [2] - 42:11, 45:17
**payment** [3] - 4:4, 4:10, 42:8
**peace** [1] - 25:16
**pedophile** [1] - 16:1
**penalties** [1] - 19:15
**penetrate** [1] - 33:8
**people** [8] - 19:17, 20:6, 20:7, 20:8, 20:11, 22:18, 24:23, 32:17
**perfect** [1] - 16:15

**perhaps** [1] - 24:6
**period** [1] - 14:25
**permeated** [2] - 13:13, 15:4
**permission** [2] - 7:10, 12:4
**permit** [1] - 44:9
**person** [2] - 18:3, 44:18
**personal** [1] - 44:6
**personality** [2] - 16:4, 36:3
**persuade** [1] - 9:4
**Ph** [1] - 1:21
**phase** [1] - 23:22
**Phillipo** [2] - 13:4, 13:15
**photographing** [1] - 20:16
**photographs** [1] - 28:8
**physical** [8] - 14:1, 14:22, 16:9, 24:10, 24:11, 33:22, 36:19, 36:22
**physically** [1] - 16:13
**picture** [2] - 13:19, 15:22
**pictures** [1] - 20:13
**Pinta** [11] - 2:11, 5:9, 6:22, 12:1, 12:5, 12:16, 18:20, 19:6, 20:20, 21:3, 21:7
**PINTA** [14] - 1:16, 2:10, 2:17, 3:23, 4:3, 4:8, 5:8, 5:12, 7:10, 12:17, 12:20, 18:21, 21:9, 40:25
**place** [1] - 23:3
**plan** [2] - 25:9, 42:20
**Plaza** [2] - 1:13, 1:21
**podium** [1] - 12:18
**point** [7] - 9:21, 19:9, 22:23, 29:10, 38:8, 38:15, 39:15
**pointed** [3] - 20:20, 36:14, 37:5
**points** [2] - 9:20, 39:2
**policy** [1] - 31:3
**polygraph** [1] - 42:12
**pool** [3] - 27:23, 30:5, 33:9
**Pooler** [1] - 39:15
**pornographic** [1] - 42:23
**pornography** [3] - 43:14, 47:6
**pose** [1] - 48:5
**poses** [2] - 40:2, 48:6
**position** [1] - 18:8
**possess** [1] - 44:16
**possessing** [2] - 42:22, 44:6
**possession** [1] - 4:11
**possible** [3] - 15:13, 25:23, 47:18
**power** [1] - 23:17
**precious** [1] - 23:11
**prejudice** [7] - 10:18, 10:22, 11:1, 11:13, 11:4, 40:17, 45:23
**premises** [2] - 45:1, 45:13
**prepared** [1] - 5:3
**preponderance** [1] - 29:16

**prescribed** [1] - 42:6
**presence** [2] - 36:2, 36:5
**present** [3] - 6:18, 42:18, 43:8
**presentation** [2] - 15:6, 18:19
**presentence** [9] - 2:22, 2:24, 5:10, 5:18, 7:3, 8:19, 11:22, 12:12, 31:20
**prevalent** [1] - 20:15
**primary** [1] - 35:9
**prison** [2] - 22:25, 25:5
**Prisons** [2] - 41:4, 47:17
**Probation** [2] - 43:21, 44:22
**probation** [10] - 2:23, 2:25, 27:23, 30:4, 33:10, 35:18, 41:23, 42:4, 42:10, 42:19
**probation's** [1] - 27:16
**problem** [2] - 11:2, 19:23
**problematic** [1] - 33:11
**problems** [3] - 16:13, 17:7, 17:12
**proceed** [1] - 2:15
**proceeding** [1] - 7:16
**Proceedings** [1] - 1:24
**proceedings** [4] - 8:8, 12:3, 13:2, 22:2
**produced** [1] - 1:25
**productive** [1] - 18:16
**professionals** [1] - 14:21
**profound** [1] - 16:1
**program** [5] - 42:2, 42:3, 42:11, 42:21, 43:22
**programs** [1] - 42:25
**prohibited** [2] - 9:17, 42:22
**prohibition** [1] - 43:7
**promise** [5] - 25:10, 25:11, 25:19, 25:25, 38:9
**promised** [1] - 38:1
**promises** [2] - 32:5, 32:8
**promote** [1] - 30:21
**promotes** [1] - 43:19
**proper** [1] - 7:8
**properly** [1] - 35:22
**property** [1] - 44:18
**proposed** [1] - 25:7
**prosecutors** [1] - 15:20
**protect** [4] - 30:23, 34:22, 35:9, 40:1
**protected** [2] - 25:14, 34:25
**protector** [1] - 14:13
**proved** [1] - 29:23
**proven** [1] - 29:16
**provide** [3] - 15:12, 16:20, 30:21
**provided** [3] - 3:17, 21:12, 42:21
**provision** [1] - 41:21
**PSR** [3] - 7:15, 21:11, 33:12

**psychiatrists** [1] - 17:10
**psychological** [1] - 16:2
**psychotropic** [1] - 42:5
**public** [2] - 30:23, 35:10, 40:1
**punishment** [2] - 25:5, 30:22
**pursuant** [3] - 11:9, 45:1, 45:2
**put** [10] - 4:18, 20:9, 22:17, 22:18, 23:14, 26:5, 29:7, 36:3, 36:17, 46:7
**putting** [1] - 36:9

**Q**

**qualities** [1] - 16:23
**Queens** [1] - 13:7
**questions** [3] - 5:23, 5:24, 6:7
**quite** [2] - 6:4, 17:9

**R**

**raised** [3] - 13:6, 13:8, 13:9
**Randazzo** [1] - 38:16
**random** [1] - 44:9
**range** [7] - 9:23, 9:24, 10:4, 11:8, 31:2, 46:10, 46:23
**rape** [5] - 29:13, 33:23, 34:6, 34:13, 36:23
**raped** [2] - 28:15, 28:18
**reached** [1] - 26:1
**read** [5] - 15:24, 19:2, 21:21, 26:11, 28:12
**ready** [3] - 2:15, 22:3, 25:2
**real** [2] - 15:1, 17:11
**really** [4] - 19:11, 20:10, 20:11, 20:12
**rearrest** [1] - 27:9
**reason** [5] - 19:16, 27:15, 40:7, 40:21, 46:14
**reasonable** [3] - 45:3, 45:7
**reasonably** [2] - 42:6, 43:1
**reasoning** [1] - 47:23
**reasons** [5] - 21:3, 31:18, 36:1, 36:14, 36:17
**receipt** [1] - 4:9
**receive** [3] - 3:11, 37:5, 47:22
**received** [4] - 5:10, 26:19, 30:2, 30:3
**receiving** [2] - 4:14, 37:9
**recently** [1] - 5:19
**recidivism** [3] - 29:22, 29:24, 35:2
**recommend** [2] - 47:17, 47:21
**recommendation** [5] - 2:23, 3:1, 27:16, 35:18, 40:19
**recommendations** [5] - 5:10,

5:19, 12:13
**reconsidered** [1] - 31:16
**record** [8] - 2:4, 4:13, 5:14, 6:12, 8:15, 8:20, 38:23, 46:7
**recorded** [1] - 1:24
**redacted** [1] - 5:2
**redeeming** [1] - 16:23
**reduced** [1] - 38:7
**reference** [1] - 13:17
**referenced** [1] - 4:15
**reflect** [3] - 30:20, 35:10, 35:15
**refrain** [1] - 42:15
**regard** [1] - 5:14
**regarding** [5] - 6:14, 7:16, 11:13, 15:13, 37:9
**regardless** [1] - 46:25
**registration** [1] - 41:25
**rehabilitated** [4] - 25:1, 25:10, 25:24, 26:14
**rehabilitation** [2] - 17:11, 26:2
**reinstated** [1] - 10:21
**related** [5] - 4:16, 9:12, 44:8, 44:11, 44:14
**relates** [2] - 6:24, 8:24
**relationship** [4] - 14:13, 28:20, 34:7, 43:1
**relationships** [1] - 15:2
**release** [4] - 40:6, 40:8, 41:17, 44:24
**relevant** [1] - 13:18
**relies** [1] - 15:7
**relying** [1] - 6:15
**remain** [1] - 21:23
**remaining** [2] - 11:7, 45:10
**remember** [1] - 13:1
**remorse** [6] - 26:20, 26:21, 27:1, 37:8, 37:11, 37:25
**removed** [2] - 16:12, 25:23
**render** [1] - 6:10
**rendered** [1] - 42:5
**rendering** [1] - 20:23
**reoffending** [2] - 36:4, 36:12
**repeat** [2] - 4:18, 33:12
**repeated** [1] - 33:23
**repeatedly** [2] - 28:11, 28:18
**repetitive** [1] - 19:3
**report** [21] - 2:22, 2:24, 3:6, 5:5, 5:10, 5:18, 7:3, 8:19, 11:16, 11:19, 11:22, 12:12, 13:17, 15:24, 16:2, 17:3, 17:25, 31:20, 35:24, 36:2, 36:17
**Reporter** [1] - 1:20
**represent** [1] - 45:19
**representation** [1] - 6:25
**representing** [1] - 17:10

**requirements** [1] - 41:25
**requires** [2] - 10:2, 44:14
**reserved** [1] - 39:12
**residence** [1] - 44:19
**respect** [8] - 3:11, 4:20, 9:8, 26:8, 30:21, 46:22, 47:15
**respects** [1] - 34:11
**responsibilities** [1] - 7:11
**responsibility** [1] - 9:20
**responsible** [2] - 42:18, 43:8
**rest** [4] - 17:1, 17:23, 18:12, 34:22
**restitution** [2] - 40:18, 45:14
**result** [1] - 14:20
**resulted** [1] - 14:15
**results** [1] - 9:23
**return** [1] - 16:21
**revelation** [1] - 24:21
**review** [1] - 2:18
**reviewed** [2] - 3:7, 47:3
**revised** [1] - 2:25
**revocation** [1] - 44:24
**righteous** [2] - 24:7, 25:24
**risk** [12] - 29:21, 29:24, 35:2, 36:4, 36:7, 36:8, 36:9, 36:13, 37:1, 37:2, 42:13
**RMR** [1] - 1:20
**road** [1] - 33:24
**ROHDE** [1] - 1:12
**run** [3] - 41:8, 41:11, 41:14

**S**

**safe** [1] - 46:15
**sampling** [1] - 29:5
**satisfy** [2] - 32:17, 34:24
**save** [1] - 16:19
**saving** [1] - 16:20
**scene** [1] - 24:15
**Schneider** [1] - 39:6
**school** [2] - 14:24, 28:24
**scripting** [1] - 32:1
**SD** [1] - 45:12
**seal** [2] - 5:1, 5:4
**search** [5] - 44:5, 44:22, 44:23, 45:2, 45:6
**searched** [1] - 45:5
**searches** [1] - 45:1
**seat** [1] - 34:3
**seated** [2] - 2:12, 21:23
**secluded** [1] - 33:24
**second** [3] - 9:8, 30:2
**Second** [3] - 39:12, 39:20, 47:4
**secretly** [1] - 27:24
**Section** [3] - 30:16, 43:17, 44:20
**securing** [1] - 42:7
**see** [6] - 5:21, 7:2, 23:7, 23:8, 26:14, 33:20

**send** [1] - 35:6
**sending** [1] - 32:3
**sensitive** [2] - 39:9, 39:21
**sentence** [54] - 6:11, 6:16, 10:1, 10:11, 10:22, 11:5, 18:9, 19:11, 20:3, 20:24, 21:6, 21:20, 25:19, 27:13, 27:14, 27:15, 27:16, 30:11, 30:13, 30:14, 30:20, 31:14, 31:17, 35:4, 35:9, 35:13, 35:22, 36:1, 38:13, 38:16, 38:17, 39:4, 39:5, 39:6, 39:7, 39:16, 39:25, 40:4, 40:5, 40:13, 40:20, 40:22, 41:7, 41:9, 41:13, 41:16, 45:16, 46:11, 46:18, 46:21, 46:24, 47:8, 47:10
**sentenced** [3] - 30:3, 39:22, 41:2
**sentences** [10] - 20:15, 31:10, 35:6, 38:25, 39:3, 39:7, 39:11, 41:12, 41:14, 46:16
**sentencing** [11] - 2:14, 3:2, 3:5, 3:14, 6:9, 11:10, 30:25, 31:1, 31:4, 31:6, 38:14
**SENTENCING** [1] - 1:8
**serious** [2] - 16:9, 19:19
**seriously** [1] - 29:18
**seriousness** [2] - 30:20, 35:11
**services** [2] - 42:5, 42:25
**sessions** [1] - 26:20
**set** [4] - 30:15, 32:14, 40:19, 45:10
**seven** [1] - 41:6
**several** [4] - 3:12, 31:16, 36:1, 39:13
**severe** [5] - 13:14, 13:23, 16:1, 35:6, 47:6
**severely** [1] - 13:22
**severity** [1] - 39:3
**sex** [4] - 29:5, 41:24, 42:21, 43:5
**sexual** [20] - 8:23, 9:2, 9:9, 9:17, 10:9, 15:5, 15:15, 20:6, 22:14, 23:16, 23:18, 32:13, 33:23, 34:14, 34:24, 36:23, 38:17, 42:3, 42:12, 43:19
**sexuality** [1] - 37:17
**sexually** [8] - 9:5, 28:2, 28:5, 28:6, 28:17, 30:4, 42:23, 43:19
**shall** [19] - 41:20, 41:22, 41:24, 42:1, 42:4, 42:7, 42:9, 42:12, 42:15, 43:14, 43:18, 43:20, 43:22, 44:3, 44:9, 44:13, 44:16, 44:18,

44:25

**shame** [2] - 26:6, 26:7
**shared** [1] - 14:12
**short** [2] - 14:10, 14:25
**shortsighted** [1] - 21:5
**show** [2] - 33:3, 34:20
**showed** [1] - 31:23
**shown** [1] - 29:7
**shows** [2] - 32:11, 34:4
**Sicilian** [1] - 13:4
**sick** [1] - 23:4
**sickness** [1] - 17:7
**sides** [4] - 2:15, 7:8, 11:12, 31:8
**signed** [2] - 3:12, 3:19
**significance** [1] - 6:2
**significant** [3] - 27:14, 35:20, 36:10
**significantly** [1] - 38:7
**similar** [6] - 38:17, 39:8, 43:13, 43:24, 44:4, 44:11
**similarly** [1] - 31:6
**simply** [2] - 27:16, 29:7
**sin** [2] - 14:19, 26:4
**sins** [1] - 26:12
**sister** [4] - 12:22, 13:20, 15:19, 24:13
**sit** [2] - 22:25, 38:8
**situated** [1] - 31:7
**situation** [2] - 26:23, 27:4
**situations** [1] - 47:6
**six** [3] - 28:6, 32:14, 41:6
**smacking** [1] - 33:25
**social** [1] - 24:19
**society** [12] - 13:11, 16:21, 18:6, 18:15, 18:17, 19:18, 21:12, 25:23, 32:12, 34:22, 34:25, 38:10
**software** [1] - 43:25
**someone** [2] - 18:2, 37:18
**sometimes** [3] - 18:6, 18:7, 47:5
**somewhat** [1] - 19:6
**son** [2] - 14:10, 22:11
**soon** [2] - 23:5, 25:12
**sorrow** [1] - 26:5
**sort** [1] - 29:5
**sought** [1] - 16:13
**soul** [1] - 22:19
**special** [5] - 10:23, 10:24, 40:15, 41:19, 45:8
**speculate** [1] - 20:25
**speculative** [1] - 38:9
**spend** [2] - 17:1, 35:16
**spending** [1] - 15:16
**spent** [3] - 5:17, 17:15, 39:10
**spin** [1] - 23:19
**Splash** [1] - 27:21
**Splish** [1] - 27:21

**spoken** [1] - 14:18
**spousal** [1] - 13:23
**spread** [1] - 5:13
**stand** [1] - 13:11
**standard** [1] - 41:19
**standpoint** [2] - 40:22, 40:24
**start** [3] - 7:3, 12:5, 20:15
**started** [1] - 23:19
**starting** [1] - 11:14
**state** [3] - 2:3, 6:12, 30:11
**statement** [1] - 37:10
**statements** [2] - 31:3, 37:24
**STATES** [4] - 1:1, 1:3, 1:9, 1:12
**States** [9] - 1:5, 2:1, 2:6, 4:11, 11:9, 28:23, 39:14, 43:17, 44:22
**static-99** [1] - 15:16
**statutory** [5] - 10:2, 11:12, 41:7, 41:10, 41:14
**stayed** [1] - 14:18
**stem** [1] - 24:22
**stenography** [1] - 1:24
**step** [2] - 17:11, 27:3
**still** [3] - 24:1, 29:21, 37:19
**stimulating** [1] - 42:23
**stipulation** [2] - 3:11, 3:20
**storage** [1] - 44:21
**streets** [1] - 25:22
**structured** [1] - 46:11
**study** [1] - 16:24
**subject** [2] - 44:5, 45:1
**submission** [1] - 3:2
**submissions** [7] - 4:14, 7:15, 15:7, 19:3, 21:4, 31:9, 35:20
**submit** [2] - 44:18, 44:23
**submitted** [3] - 2:20, 5:1, 21:22
**substance** [1] - 36:5
**substantial** [1] - 29:21
**substitute** [1] - 45:13
**subsumed** [1] - 10:9
**suffer** [1] - 16:1
**sufficient** [4] - 12:11, 12:13, 35:14, 38:3
**suggest** [1] - 37:7
**suggested** [1] - 36:17
**Suite** [1] - 1:21
**summarize** [1] - 8:20
**supervised** [3] - 40:6, 40:8, 41:17
**supervision** [2] - 33:10, 45:5
**supplement** [1] - 4:16
**supplemental** [1] - 3:8
**support** [2] - 21:13, 47:25
**surgery** [1] - 16:11
**survivor** [1] - 16:10
**suspicion** [1] - 45:3

**system** [1] - 19:14
**systems** [2] - 43:23, 44:10

**T**

**tackled** [1] - 39:13
**taped** [1] - 27:25
**techniques** [1] - 15:12
**teeth** [2] - 28:16, 34:8
**telephone** [1] - 42:24
**ten** [3] - 41:13, 45:10, 46:12
**ten-year** [1] - 41:13
**term** [5] - 30:4, 41:4, 41:18, 43:14, 43:16
**terminated** [2] - 28:21, 34:7
**terms** [14] - 3:4, 3:10, 7:7, 7:20, 9:19, 13:18, 16:18, 17:16, 19:13, 21:4, 31:25, 34:12, 34:13, 36:11
**testified** [1] - 33:22
**testify** [1] - 33:20
**testimony** [7] - 4:17, 4:21, 29:12, 29:15, 34:10, 34:12, 35:24
**testing** [1] - 15:11
**tests** [1] - 15:14
**THE** [46] - 1:9, 2:1, 2:9, 2:13, 2:18, 3:20, 3:24, 3:25, 4:1, 4:7, 4:13, 5:9, 6:22, 7:1, 7:2, 7:18, 7:23, 8:1, 8:7, 8:11, 8:15, 10:24, 11:18, 11:21, 12:2, 12:9, 12:15, 12:16, 12:19, 18:20, 18:24, 19:1, 21:7, 21:18, 22:1, 22:4, 22:5, 26:16, 30:10, 40:24, 41:1, 46:2, 46:19, 46:21, 47:13, 47:20
**therefore** [1] - 9:18
**therein** [1] - 6:1
**thinking** [1] - 23:22
**third** [1] - 42:8
**third-party** [1] - 42:8
**thorough** [2] - 15:9, 15:12
**thoughts** [1] - 23:1
**threatened** [3] - 34:8, 36:18, 36:21
**threats** [3] - 32:5, 32:8, 33:23
**three** [5] - 8:4, 8:11, 8:17, 15:17, 41:6
**thyroid** [1] - 16:11
**tie** [1] - 43:9
**Title** [1] - 43:16
**today** [18] - 3:7, 3:16, 4:4, 12:21, 13:11, 14:3, 15:6, 16:8, 17:22, 21:23, 24:25, 31:8, 32:8, 37:10, 38:8, 39:11, 40:3, 46:5
**together** [1] - 10:3
**tolerated** [1] - 20:1
**tonight** [1] - 34:1

**took** [6] - 4:4, 22:20, 22:24, 23:16, 24:7, 24:8
**tool** [1] - 23:18
**tools** [1] - 36:8
**total** [5] - 3:1, 13:19, 31:13, 41:4, 41:15
**touching** [1] - 33:7
**Toussa** [1] - 12:24
**toward** [1] - 29:24
**towards** [5] - 29:24, 31:22, 34:17, 34:18, 36:15
**toy** [1] - 23:23
**traditional** [1] - 13:9
**traditions** [4] - 13:10, 13:12, 13:13
**traits** [1] - 16:4
**TRANSCRIPT** [1] - 1:8
**Transcript** [1] - 1:25
**transfer** [1] - 18:18
**transformed** [1] - 28:14
**treason** [1] - 19:20
**treated** [2] - 32:5, 34:12
**treatment** [10] - 33:13, 37:4, 37:6, 42:2, 42:3, 42:11, 42:14, 42:20, 42:21, 47:22
**trial** [2] - 31:21, 47:3
**trick** [1] - 29:8
**tricked** [1] - 28:22
**tried** [2] - 28:19, 29:4
**trouble** [3] - 20:23, 24:24, 24:25
**troubled** [1] - 37:17
**troubling** [1] - 14:5
**true** [1] - 36:25
**trust** [4] - 22:19, 23:3, 23:14, 32:15
**trusted** [2] - 23:2, 30:6
**truth** [1] - 34:9
**try** [1] - 27:5
**trying** [3] - 16:18, 18:8, 33:1
**turn** [2] - 11:1, 38:2
**turned** [1] - 24:17
**two** [19] - 5:10, 8:3, 8:12, 8:16, 9:2, 9:6, 9:10, 9:12, 10:9, 10:15, 11:2, 13:8, 14:23, 21:11, 22:23, 28:3, 32:2, 46:17
**type** [8] - 14:3, 34:4, 34:14, 34:17, 35:5, 36:10, 38:17, 39:8
**typically** [1] - 19:18

**U**

**Ukraine** [2] - 28:20, 32:2
**Ulbricht** [1] - 39:16
**unable** [1] - 45:16
**unaware** [1] - 27:25
**Uncle** [1] - 24:19
**uncle** [3] - 12:23, 12:24,

A-406

10

32:16
**unconscious** [1] - 34:8
**under** [12] - 4:23, 5:1, 5:4,
9:13, 9:23, 13:9, 13:21,
16:21, 21:2, 42:17, 43:7,
44:12
**underlying** [2] - 45:25, 46:2
**understates** [1] - 36:13
**undertaken** [1] - 15:8
**undo** [1] - 38:3
**undoubtedly** [1] - 13:20
**unfortunately** [1] - 16:14
**unique** [1] - 17:25
**UNITED** [4] - 1:1, 1:3, 1:9,
1:12
**United** [10] - 1:5, 2:1, 2:6,
4:11, 11:9, 28:23, 28:24,
39:14, 43:17, 44:22
**unless** [4] - 20:24, 42:18,
42:20, 43:8
**unsuccessful** [2] - 33:11,
37:6
**unwarranted** [1] - 31:6
**up** [9] - 3:16, 10:6, 12:19,
13:21, 18:9, 18:22, 32:14,
34:3, 43:11
**upbringing** [1] - 15:20
**US** [2] - 39:16, 43:20
**USC** [1] - 44:20

## V

**Valerio** [65] - 2:2, 2:11, 2:12,
3:9, 3:24, 5:9, 5:15, 5:21,
6:4, 6:13, 6:18, 6:22, 8:6,
9:3, 12:10, 12:21, 12:22,
12:23, 12:24, 13:3, 13:5,
13:19, 13:20, 13:24, 14:2,
14:6, 14:24, 15:8, 15:9,
15:10, 15:13, 15:17, 15:19,
15:25, 16:7, 16:9, 17:6,
17:15, 18:1, 18:14, 19:5,
20:10, 20:18, 20:22, 21:4,
21:8, 21:19, 22:4, 26:16,
27:20, 29:20, 30:19, 32:7,
34:5, 34:12, 34:16, 35:8,
36:3, 36:9, 36:11, 37:7,
38:1, 41:2, 45:15
**VALERIO** [1] - 1:6
**Valerio's** [8] - 3:7, 13:4,
13:14, 16:21, 17:24, 19:10,
39:1, 47:16
**various** [3] - 3:3, 3:9, 4:17
**vehicle** [1] - 44:19
**verdict** [2] - 10:21, 37:13
**versions** [1] - 5:2
**versus** [1] - 8:16
**via** [2] - 9:4, 43:18
**victim** [4] - 20:4, 20:5, 46:17
**victimize** [1] - 28:10

**victimizing** [1] - 35:7
**victims** [12] - 20:8, 22:8,
22:12, 22:16, 22:23, 23:14,
24:4, 25:6, 28:3, 36:19,
36:22, 42:15
**victims'** [2] - 23:3, 23:10
**video** [1] - 43:15
**videos** [2] - 28:5, 32:3
**videotapes** [1] - 27:24
**view** [3] - 21:6, 35:10, 37:16
**viewed** [1] - 35:19
**viewing** [1] - 42:22
**violated** [1] - 45:4
**violation** [2] - 10:12, 45:6
**violence** [6] - 13:14, 15:5,
34:13, 34:20, 36:15, 38:4
**violent** [9] - 29:13, 29:23,
31:22, 32:19, 33:14, 34:4,
34:17, 38:21, 48:3
**visited** [1] - 24:21
**visual** [1] - 42:23
**voice** [1] - 33:20
**voyeuristic** [1] - 16:3

## W

**wait** [1] - 18:22
**waiting** [3] - 22:6, 26:13
**wake** [1] - 27:11
**warn** [1] - 44:25
**warranted** [1] - 35:14
**warrants** [1] - 35:25
**wave** [3] - 27:22, 30:5, 33:9
**ways** [3] - 29:11, 33:11,
34:11
**wayside** [1] - 10:20
**weak** [1] - 37:11
**wear** [1] - 29:4
**week** [2] - 5:7, 39:16
**weekend** [2] - 5:20
**weighing** [1] - 39:1
**well-being** [1] - 32:10
**Wernick** [1] - 38:18
**wherein** [1] - 23:21
**whole** [1] - 19:24
**wickedness** [1] - 26:4
**wife** [1] - 13:5
**willing** [2] - 25:2, 27:5
**wish** [2] - 11:13, 21:20
**wishes** [1] - 19:6
**witness** [3] - 6:21, 27:10,
27:20
**witnessed** [1] - 13:23
**witnesses** [4] - 4:17, 4:19,
22:8, 22:12
**witnessing** [1] - 14:15
**woman** [4] - 25:12, 27:22,
28:11, 30:5
**women** [6] - 24:16, 33:4,
33:19, 34:17, 34:24, 38:5

**word** [4] - 19:24, 20:12, 26:3,
26:21
**words** [1] - 40:3
**worker** [1] - 24:19
**works** [1] - 6:9
**world** [1] - 24:16
**would-be** [2] - 19:25, 20:3
**wreaked** [1] - 14:23
**writing** [2] - 18:23, 18:24
**written** [2] - 12:25, 31:9
**wrongdoers** [1] - 19:25
**wrongfulness** [1] - 27:5

## Y

**year** [10] - 23:5, 28:3, 28:6,
28:23, 29:2, 32:2, 32:14,
32:25, 40:19, 41:13
**years** [24] - 3:1, 8:3, 9:11,
10:6, 11:7, 19:8, 19:10,
20:14, 20:22, 20:25, 25:12,
25:25, 31:14, 35:12, 37:6,
37:13, 37:19, 38:5, 39:14,
41:4, 41:8, 41:9, 41:16,
46:23
**YORK** [1] - 1:1
**York** [3] - 1:5, 1:14, 1:21
**young** [7] - 13:5, 14:2, 14:12,
20:13, 24:14, 29:3, 33:1

A-407

# UNITED STATES DISTRICT COURT
for the
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 14-CR-94-JFB |
| Joseph Valerio, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**NOTICE OF APPEAL**

Notice is hereby given that Joseph Valerio, the defendant in the captioned case, hereby appeals to the United States Court of Appeals for the Second Circuit from the final judgment (conviction and sentence) entered in this action on August 1, 2017. According to the judgment, the judgment was "filed" on June 6, 2017, and was signed by the district judge on July 31, 2017. According to the docket sheet, the judgment was "entered" on August 1, 2017.


Date:   August 1, 2017


*Leonard Lato*
Leonard Lato
Attorney for Defendant
200 Motor Parkway, Suite C-17
Hauppauge, NY   11788
Email: leonardlato@yahoo.com
Telephone: (631) 655-5008