# 17-2371-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JOSEPH VALERIO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

LOUIS M. FREEMAN
FREEMAN, NOOTER & GINSBERG
*Attorneys for Defendant-Appellant*
75 Maiden Lane, Suite 503
New York, New York 10038
(212) 608-0808

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** iv-ix

**PRELIMINARY STATEMENT** 1

**JURISDICTIONAL STATEMENT** 2

**STATEMENT OF THE ISSUES** 2

**STANDARD OF REVIEW** 3

**SUMMARY OF THE ARGUMENT** 3-8

**STATEMENT OF THE CASE** 8-42

    A.   Hearing on the Motion to Suppress Statements — 10-14

    B.   The District Court's Decision Denying Valerio's Motion to Suppress — 15-16

    C.   The Government's Case Regarding Kalichenko's Videos — 17-21

    D.   The Government's Case Regarding Valerio's Niece — 21-22

    E.   The Defense Case — 22-23

    F.   Rule 29 Motion — 23-25

    G.   Jury Verdicts Regarding Crimes Charged and Forfeiture — 25

    H.   *Fatico* Hearing — 25-31

    I.   Mental Health Experts' Testimony Regarding Valerio — 32-37

    J.   The Government's Demand for a *De Facto* — 38-40

Life Sentence

K.     The District Court's Reasons for Imposing                40-42
       a De Facto Life Sentence

**ARGUMENT**                                                    42-80

POINT I        STATEMENTS ELICITED FROM                         42-52
               VALERIO BEFORE HE RECEIVED
               *MIRANDA* WARNINGS MUST BE
               SUPPRESSED BECAUSE HE WAS IN
               CUSTODY WHEN THE PRE-*MIRANDA*
               QUESTIONING OCCURRED

       A.      No Reasonable Person in Valerio's                43-46
               Circumstances Would Believe He Was Free
               to Refuse to Submit to Questioning.

       B.      Valerio's Freedom of Action Was Limited          46-52
               to the Degree Associated with A Formal
               Arrest.

POINT II       VALERIO'S POST-MIRANDA                           52-54
               STATEMENTS SHOULD BE
               SUPPRESSED

POINT III      MULTIPLE PROCEDURAL DEFECTS                      54-65
               RENDER VALERIO'S *DE FACTO* LIFE
               SENTENCE UNREASONABLE

       A.      The District Court's  Use of Uncharged           55-57
               Allegations to Punish Valerio Violated his
               right to a Jury Trial and his right to Due
               Process.

       B.      The District Court Erred by "Inviting"           57-61
                Kalichenko to Testify.

       C.      The District Court Used of the Wrong             61-65
               Benchmark.

POINT IV                THE *DE FACTO* LIFE SENTENCE IS         65-74
SUBSTANTIVELY UNREASONABLE

            A.    A *De Facto* Life Sentence is Not Warranted   66-71
by Valerio's Criminal History or the Goal of
Specific Deterrence.

            B.    A *De Facto*  Life Sentence Ignores and      71
Undermines the Goal of Rehabilitation.

            C.    A *De Facto* Life Sentence Undermines    71-72
The Goal Of General Deterrence.

            D.    A *De Facto* Life Sentence is Grossly     73-74
Disparate Treatment.

POINT V                THE SENTENCES IMPOSED ON        74-80
COUNTS TWO, THREE, FIVE,
FIFTEEN, SIX, SEVEN, AND EIGHT
VIOLATE THE DOUBLE JEOPARDY
CLAUSE

            A.    Count Two and Count Three are Essentially   75-76
the Same Offense

            B.    Count Fifteen is a Lesser Included Offense of   76-78
Count Five.

            C.    The Attempts Charged in Counts Six, Seven   78-79
and Eight Merged into the Completed Crime
Charged in Counts Two and Three.

            D.    Plain Error               79-80

CONCLUSION                           80

## Sources                                                                    ## Pages

United States Supreme Court

*Arizona v. Fulminante*,                                                          50
499 U.S. 279 (1991)

*Blackburn v. Alabama*,                                                          50
361 U.S. 199 (1960)

*Blakely v. Washington*,                                                         55, 56
542 U.S. 296 (2004)

*Haynes v. Washington*,                                                          51
373 U.S. 503 (1963)

*J.D.B. v. North Carolina*,                                                      49
564 U.S. 261, 262(2011)

*Miranda v. Arizona*,                                                            3, 43
384 U.S. 436 (1966)

*Oregon v. Elstad,*                                                             51
 470 U.S. 298 (1985)

*Seibert v. Missouri*,                                                          52
542 U.S. 600 (2004)

*Townsend v. Burke,*                                                            58
334 U.S. 736 (1948)

*Williams v. New York*,                                                         55
337 U.S. 241 (1949)

<u>United States Court of Appeals for the</u>
<u>Second Circuit</u>

*Tankleff v. Senkowski,*
135 F.3d 235 (2d Cir. 1998) .......................................... 43

*United States v. Ali,*
86 F.3d 275 (2d Cir. 1996) ........................................... 44

*United States v. Awadallah,*
436 F.3d 125 (2d Cir. 2006) .......................................... 65

*United States v. Brown,*
843 F.3d 74 (2d Cir. 2016) ........................... 42, 66, 71, 72

*United States v. Broxmeyer,*
699 F.3d 265 (2d Cir.2012) ............................................. 3

*United States v. Capers,*
627 F.3d 470 (2d Cir. 2010) ...................................... 52, 53

*United States v. Carr,*
557 F.3d 93 (2d Cir. 2009) ........................................... 65

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) ....................................... 3, 71

*United States v. Dorvee,*
616 F.3d 174 (2d Cir. 2010) ........................ 6, 61, 62, 63, 65, 66

*United States v. Fagans,*
406 F.3d 138 (2d Cir.2005) ........................................... 61

*United States v. Fatico,*
603 F.2d 1053 (2d Cir. 1979) ........................................ 26

*United States v. Faust,*
853 F.3d 39 (2d Cir.2017) ........................................... 52

*United States v. Giraldo*,                                      60
822 F.2d 205 (2d Cir. 1987)

*United States v. Hall*,                                         50
421 F.2d 540 (2d Cir. 1969)

*United States v. Handakas,*                                     79
286 F.3d 92 (2d Cir. 2002)

*United States v. Irving*,                                       76
554 F.3d 64 (2d Cir. 2009)

*United States v. Jenkins,*                              65, 68, 69, 70
854 F.3d 181 (2017)

*United States v. Marzano*,                              58, 59, 60
149 F.2d 923 (1945)

*United States v. Newton*,                               3, 43, 47
369 F.3d 659 (2d Cir. 2004)

*United States v.  Polouizzi*,                           3, 76, 77
564 F.3d 142 (2d Cir. 2009)

*United States v. Prescott,*                                    58
920 F.2d 139 (2d Cir. 1990)

*United States v. Pugliese,*                                    58
 805 F.2d 1117 (2d Cir. 1986)

*United States v. Robin,*                                       65
553 F.2d 8  (2d Cir. 1977)

*United States v. Romaszko*,                                    3
253 F.3d 757 (2d Cir. 2001)

*United States v. Thomas*,                                      75
893 F.2d 1066 (9th Cir. 1990)

*United States v. Ulbricht*,                                    42, 57
858 F.3d 71 (2d Cir. 2017)

Other United States Courts of Appeals

*United States v. Beaty*,                                       59
722 F.2d 1090 (3d Cir. 1983)

*United  States v. Benoit*,                                    76
 713 F.3d 1 (10th Cir. 2013)

*United States v. Bobb*,                                       76
577 F.3d 1366 (11th Cir. 2009)

*United States v. Cavazos*,                                    48
668 F.3d 190 (5th Cir. 2012)

*United States v. Craighead*,                                  44, 46, 48
539 F.3d 1073 (9th Cir. 2008)

*United States v. Davenport*,                                  76
519 F.3d 940 (9th Cir. 2008)

*United States v. Ehle*,                                       76
640 F.3d 689 (6th Cir. 2011)

*United States v. Goodwin*,                                    60
770 F2d 631 (7th Cir. 1985)

*United States v. Hashime*,                                    48
734 F.3d 278, 284 (4th Cir. 2013)

*United States Kapordelis*,                                    75
569 F.3d 1291 (11th Cir. 2009)

*United States v. Miller*,                                     76
527 F.3d 54 (3d Cir. 2008)

*United States v. Mittel–Carey*,                               48
493 F.3d 36 (1st Cir. 2007)

*United States v. Muhlenbruch*,
634 F.3d 987 (8th Cir. 2011)    76

*United States v. Samas*,
561 F.3d 108 (2d Cir.2009)    65

Other Courts

*United States v. Beiermann*,
599 F. Supp. 2d 1087 (N.D. Iowa 2009)    72

*United States v. D.M.*,
942 F. Supp.2d 327 (E.D.N.Y. 2013)    68

*United States v. McVicker,*
979 F. Supp. 2d 1154 (D. Oregon)    75

*United States v. RV*,
157 F.Supp.3d 207 (E.D.N.Y. 2016)    69

Constitutional Provisions

U.S.  Const. Amend. V    6, 54

U.S. Const.  Amend VI    6, 54

Statutes

18 U.S.C. § 2251    1, 8, 75

18 U.S.C. § 3553    3, 55

18 U.S.C. § 3553(a)    6, 38, 65, 71, 73

U.S.S.G. § 2G2.1    61, 62, 74

U.S.S.G. § 2G2.2    63

U.S.S.G. §4B1.5(b)(1)      61

U.S.S.G § 5G1.1(a)      6, 62, 63, 64

U.S.S.G. § 5G1.2(c)      63, 64

**Other Authorities**

Melissa Hamilton, *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?,* 22 Stan. L. & Pol'y Rev. 545, 546 (2011)      72

Deirdre M. Smith, *Dangerous Diagnoses, Risky Assumptions, And The Failed Experiment Of "Sexually Violent Predator" Commitment,* 67 Oklahoma Law Review 619 (2015)      69

Carol S. Streiker, *Lessons from Two Failures: Sentencing for Cocaine and Child Pornography under the Federal Sentencing Guidelines in the United States,* 76 Law & Contemp. Probs. 27 (2013).      72

Schmitt, G. et al., *Life Sentences in the Federal System,* U.S. Sentencing Comm'n (February 2015)      73

Alan Vinegrad, *The New Federal Sentencing Law,* 15 Fed. Sent. R. 310, 315 (June 2003)      61

Kathryn M. Zainey, *The Constitutional Infirmity Of The Current Federal Sentencing System: How The Use Of Uncharged And Acquitted Conduct To Enhance A Defendant's Sentence Violates Due Process,* 56 Loy. L. Rev. 375 (2010)      57

United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004)      68

United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017)      68

## PRELIMINARY STATEMENT

Appellant Joseph Valerio appeals a judgment dated July 31, 2018, and entered August 2, 2017, in the United States District Court for the Eastern District of New York (Bianco, J.), convicting him of conspiracy to sexually exploit a child [18 U.S.C. §§ 2251(e)]; two counts of sexual exploitation of a child [18 U.S.C. §§ 2251(a), 2251(e), 2]; one count of exploitation of a child to engage in sexually explicit conduct outside the United States [18 U.S.C. §§ 2251(c), 2251(e), 2]; transportation of child pornography [18 U.S.C. §§ 2252 (a)(1), 2252 (b)(1)), 2]; receipt of child pornography [18 U.S.C. §§ 2252(a)(2), 2252 (b)(1)]; and three counts of attempted sexual exploitation of a child [18 U.S.C. §§ 2251(e), 2].

Valerio was sentenced to an aggregate term of imprisonment of 60 years. On Count One (conspiracy to sexually exploit a child); Counts Two, Three and Fourteen (sexual exploitation of a child) and Counts Six, Seven, and Eight (attempt to sexually exploit a child), the District Court sentenced Valerio to the statutory maximum of 30 years on each count to run concurrently to each other. On Counts Four and Five (transportation of child pornography and receipt of child pornography), the District Court sentenced Valerio to 20 years imprisonment, the statutory maximum on each count, to run concurrently to each other but consecutively to the sentences imposed on Counts One, Two, Three, Six, Seven, Eight, and Fourteen. On Count Fifteen (possession of child pornography), the

1

District Court sentenced Valerio to the statutory maximum of 10 years, to run consecutively to the sentences imposed on the other counts for a total sentence of 60 years. (A389). In addition, Valerio forfeited the sum of $75,000.00, a computer, and an SD card.

Notice of Appeal was timely filed on August 2, 2017.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The jurisdiction of the District Court was premised upon 18 U.S.C. § 3231. Jurisdiction for the instant appeal is premised upon 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether statements elicited from Appellant before he received *Miranda* warnings must be suppressed because he was in custody when the pre-*Miranda* questioning occurred?

2. Whether Appellant's post-*Miranda* statements must be suppressed?

3. Whether multiple procedural defects render the *de facto* life sentence imposed upon Valerio unreasonable?

4. Whether the *de facto* life sentence imposed upon Valerio received is substantively unreasonable?

5. Whether the sentences imposed on Counts Two, Three, Five, Six, Seven, Eight, and Fifteen violate the Double Jeopardy Clause?

2

## STANDARD OF REVIEW

On an appeal from a district court's ruling that questioning was not "custodial" for the purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), that court's factual findings are reviewed for clear error and its legal conclusions are reviewed *de novo*. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004); *United States v. Romaszko*, 253 F.3d 757, 760 (2d Cir. 2001).

This Court reviews a sentence for procedural and substantive reasonableness under a "deferential abuse-of-discretion standard." *United States v. Broxmeyer*, 699 F.3d 265, 278 (2d Cir.2012) (*quoting United States v. Cavera*, 550 F.3d 180, 188 & n. 5 (2d Cir.2008).

Whether sentences imposed upon multiple counts of conviction violate the Double Jeopardy Clause is a question of law to be reviewed *de novo*. The Double Jeopardy arguments raised in Point V are subject to "plain error" review. *United States v. Polouizzi*, 564 F.3d 142 (2d Cir. 2009).

## SUMMARY OF THE ARGUMENT

Appellant Joseph Valerio raises a panoply of errors: (1) the denial of his motion to suppress statements that were obtained without *Miranda* warnings; (2) a series of procedural errors that undermined the integrity of the sentencing proceeding; (3) a sentence that is substantively unreasonable because it defeats the sentencing goals set forth in 18 U.S.C. §3553; and (4) sentences upon individual

counts that violate the Double Jeopardy Clause's prohibition against multiple punishments for the same offense. We discuss each of these errors *ad seriatim*.

After Olena Kalichenko provided the FBI with copies of pornographic videos of her daughter and e-mail correspondence with Valerio, his home was searched by a dozen law enforcement officers from the FBI and the Nassau and Suffolk County Police Departments. While his home was occupied by these agents, Valerio was questioned by four of them who, in anticipation of this interrogation, came prepared with copies of e-mails and at least one of Kalichenko's videos for use in their questioning. Valerio, who was little more than a prisoner in his own home, answered his interrogators' questions for an hour and thirty minutes before he received *Miranda* warnings. He then underwent additional questioning, although to avoid "upsetting him," the agents did not inform Valerio that he was under arrest until they had completed their search and were ready to leave.

The District Court denied Valerio's motion to suppress his statements because it concluded that (1) a reasonable person in Valerio's circumstances would not have concluded he was not free to leave the premises; and (2) in the alternative, any limitations upon Valerio's freedom of movement did not rise to the level of a formal arrest.

The District Court erred because substantial and essentially undisputed evidence regarding the circumstances in which Valerio was interrogated would

4

have led a reasonable person to conclude that he could not terminate the interrogation by walking away from his interrogators. During his interrogation, Valerio was confined to a single room in the company of four law enforcement officers, and the other rooms in his house were occupied by their fellow officers, leaving Valerio no place within his home to which he could retreat. Moreover, Valerio who was clad in a pair of pants and a tank top was not dressed to leave his house on a frigid January day.

The sheer number of police officers in his home; his isolation from the only other non-police personnel in his home (his girlfriend); and the fact he was effectively confined to single room; were conditions equivalent to the limitations imposed upon an arrestee. Thus, the only rational conclusion one could reach on the record before the District Court is that the circumstances in which Valerio was interrogated were custodial and that his interrogators should have given him *Miranda* warnings.

Because the statutes under which Valerio was convicted do not authorize a penalty of life imprisonment, the District Court deliberately imposed a term of years that would ensure that Valerio spent the rest of his life in prison. This *de facto* life sentence is procedurally and substantively unreasonable.

This *de facto* life sentence is procedurally unreasonable for three reasons. First, the District Court's finding that a life sentence was necessary to protect

5

women as well as children was premised in large part on testimony at a post-trial hearing by women who claimed to have been physically and sexually abused by Valerio. The District Court's reliance upon these uncharged allegations to impose a life sentence violated Valerio's Sixth Amendment right to a jury trial and Fifth Amendment right to Due Process.

Second, the District Court's "invitation" to Kalichenko to testify at this post-trial hearing compromised the integrity of the proceedings because it (1) interjected into the proceedings testimony from a witness that the Government deemed too unworthy of belief to call as its witness; (2) made the District Court an advocate; (3) resulted in the District Court passing upon the veracity of the very testimony it had interjected into the proceedings; and (4) could be misconstrued by Kalichenko as an implicit promise by the District Court of leniency if she testified.

Third, the District Court used the wrong Guideline as a benchmark for devising its sentence. Here as in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), the District Court erred by using a Guideline sentence range that exceeded the statutory maximum as the reference point for its sentencing decision. Instead, the District Court should have used the benchmark indicated by U.S.S.G §5G1.1(a), the statutory maximum sentence.

Viewed in light of the 18 U.S.C. § 3553(a), the *de facto* life sentence is substantively unreasonable on at least four grounds.

6

First, the sentence is unwarranted by Valerio's Category I Criminal history and is far in excess of what is necessary for specific deterrence. The District Court ignored the fact that Valerio's risk of recidivism will decrease as a result of therapy, aging, and the stringent conditions of supervised release imposed upon sex offenders. Instead, the District Court subscribed to the myth that sex offenders have higher rates of recidivism than other offenders.

Second, the statutory goal of rehabilitation is defeated by a sentence that insures Valerio will die in prison. A *de facto* life sentence is a powerful disincentive for a prisoner seeking to rehabilitate himself, and it squanders whatever scarce financial resources the correctional system spends on rehabilitation.

Third, the *de facto* life sentence imposed upon Valerio runs counter to the statutory goal of general deterrence. It diverts public funds needed for the incarceration of others who have committed more heinous crimes – e.g., murderers – and it implies that these more heinous crimes are, in fact, no more serious than the crimes of which Valerio was convicted.

Fourth, as the United States Sentencing Commission's own statistics indicate, there is a gross disparity between the *de facto* life sentence Valerio received and sentences received by the vast majority of other federal inmates, including sex offenders.

7

In addition to being substantively and procedurally unreasonable, the sentences imposed on the individual counts violate the Double Jeopardy Clause.

Counts Two and Three allege substantially the same offense, a violation of 18 U.S.C. 2251. The only difference is that Count Three is premised upon a subsection of the statute that was added merely to clarify that the previous version of the statute applies to conduct that occurs outside the United States.

The sentences imposed on Count Five (receiving child pornography) and Count Fifteen (possession of child pornography) violate the Double Jeopardy Clause because possession is a lesser included offense of receiving child pornography, and the verdict on both counts here is based upon the same images, the images of Kalichenko's daughter that were on Valerio's computer.

Finally, Counts Six, Seven, and Eight – which charge attempts at sexual exploitation of Kalichenko's daughter – were simply steps on the way to the completed crime of sexual exploitation charged in Counts Two and Three. Consequently, the sentences imposed upon Counts Six, Seven, and Eight punish Valerio for the same crimes for which he has been sentenced under Counts Two and Three.

### STATEMENT OF THE CASE

In November 2013, Olena Kalichenko ("Kalichenko") walked into the United States Embassy in Kiev, Ukraine and provided FBI Agent Peter Angelini

with e-mail correspondence between herself and Appellant Joseph Valerio. That correspondence indicated that she had been sending him child pornography, i.e., videos of her engaging in sexual acts with "S.K.," her two-year-old daughter. Agent Angelini forwarded these materials to FBI agents in the United States who obtained a search warrant for Valerio's residence, 3 High Gate Drive, Smithtown, New York.

At 6:00 a.m. on January 28, 2014, twelve officers from the FBI and the Suffolk County and Nassau County Police Departments executed the search warrant. Valerio was also interrogated for several hours. At the conclusion of the search, he was arrested and handcuffed and later arraigned in the United States District Court for the Eastern District of New York on a complaint charging him with sexual exploitation of a child. Valerio was released on bond.

On February 24, 2014, Valerio was arrested again and charged with sexual exploitation of another child, his niece "S.I." Thereafter, his residence was searched a second time. He was subsequently indicted for conspiracy to sexually exploit a child and related substantive child pornography crimes involving S.K. and S.I. Valerio was remanded after the second arrest. He is currently serving his sentence in a federal penitentiary in Tucson, Arizona. His release date is May 19, 2066.

9

### A. Hearing on the Motion to Suppress Statements

In his affidavit in support of his motion to suppress, Valerio stated that during the search of his residence on January 28, 2014, he was questioned by several local detectives and FBI agents, three of whom were seated with him at his dining room table while two others stood by him. An agent or detective whom he believed to be a computer expert told Valerio, "among other things," that he was "going to be in a very dark place." Although this person "spoke in a soft voice," he "was in [Valerio's] face a lot." (A44).

The agents asked him about e-mails, and "[b]ased on all the circumstances, [Valerio] felt pressured, meaning that [he] had to answer their questions." (A44). The agents read him the *Miranda* warnings from a form "only sometime after the questioning began…. Based on the atmosphere, how things had already progressed," Valerio "felt compelled to continue to answer their questions." (A44).

On July 31, 2014, the District Court held an evidentiary hearing on Valerio's motion to suppress. The government called a single witness, FBI Agent Steven Troyd.

Troyd testified that at 6:00 a.m. on January 28, 2014, he and eleven law enforcement agents from the FBI and the Nassau County and Suffolk County Police Departments ("NCPD" and "SCPD" respectively) executed a search warrant at Valerio's residence. (A52-54, A79-81). "It was a very cold morning," and "it

10

had snowed a lot" the day before. (A52-53). Consequently, Troyd and his colleagues wore "raid jackets," – jackets that displayed the insignia of the law enforcement agency to which the wearer belonged – over their ballistic armor. (A52-54, A80-81).

Troyd called Valerio's cellphone and told him that agents were present outside his home to execute a search warrant. (A53-54). Valerio, who was clad in only long pants and a tank top, opened the front door and admitted the twelve law enforcement agents to his residence. (A55-56, A81). Troyd asked if anyone else was present in Valerio's residence. Valerio stated that his girlfriend, Jarmila Bereskova, was on the second floor.

No guns were displayed by the agents. Nor was Valerio handcuffed or subjected to any other physical restraints. However, when Valerio attempted to join Ms. Bereskova on the second floor, Troyd "asked" Valerio "to stay downstairs" with him, and Valerio complied. (A57-58, A102).

The agents completed their security sweep of Valerio's residence in approximately 10 minutes. However, even after the security sweep was completed, neither Valerio nor Ms. Bereskova was permitted to move about the house. (A56-57, A81-84, A86-87). Ms. Bereskova was confined to a family room on the first floor where Troyd's supervisor, Dawn Smallwood kept watch over her. (A59-

11

A61). Troyd asked Valerio to sit down at a table in dining room so Troyd could speak to him. (A83-84, A91-92).[1]

In the dining room, Troyd and Valerio were joined by FBI Agent Danielle Messineo, SCPD Detective Rory Forrestal, and NCPD Detective Balducco, who were there to assist Troyd in questioning Valerio. (A59-60, A85-86). Troyd's Supervisor, FBI Agent Dawn Smallwood – who stood in the hallway between the dining room and the family room where Bereskova was detained -- would walk past the dining room intermittently. However, Smallwood did not participate in the questioning. (A60-61).

Troyd told Valerio that the agents were searching his home for evidence of child pornography. In response to this news, Mr. Valerio replied that he was being extorted by a woman named Olena Kalichenko who was threatening to go to the police if he did not pay her. (A62).

Troyd read Valerio an excerpt from an e-mail that Troyd had "[i]n preparation for the interview . . . highlighted . . . so [he] could refer to it" (A64). The excerpt was a request for a video in which Kalichenko's daughter had oral contact with her mother's vagina. (A65). Troyd asked Valerio "if he had in fact directed Ms. Kalichenko to produce child pornography" and if he "had received that pornography in e-mail," and Valerio "said he did." (A65).

---

[1] A photograph of the dining room appears in the Appendix at A121.

Troyd also asked Valerio if he had received a DHL package from Kalichenko that contained a disk. Valerio replied that he had received a DHL package that contained only bubble wrap. (A65).

Troyd then interrupted the questioning to telephone the United States Attorney's office to ask "about authorizing a complaint for Mr. Valerio." (H21). After an Assistant "authorized a complaint," Troyd conferred with Agent Messineo and they decided that they had "to advise Mr. Valerio of his *Miranda* rights." (A66).

Thus, an hour-and-one-half after the agents had commenced questioning Valerio, they presented him with an advice of rights form that Valerio signed. Troyd also gave Valerio copies of e-mail exchanges dated July 17 and July 22, 2012 between Valerio and Ms. Kalichenko, and asked Valerio to read them. Troyd had already questioned Valerio about one of these e-mails before he was advised of his rights to remain silent and to have an attorney. (A97). The other e-mail was sent "in the same timeframe" as the e-mail about which Valerio was questioned prior to being read *Miranda* warnings (A97-98). Valerio admitted sending these e-mails. Troyd asked him to initial the e-mails. However, Valerio declined. (A66-67).

13

Troyd then had Valerio view on a laptop computer, a segment of a video that Kalichenko had given the FBI. According to Troyd, Valerio:

> admitted that he recognized Olena Kalichenko and the child in the video.

> But he stated he had not seen this particular video, and he knew that because he did not recognize the background in the video, and he had not seen that background in the other videos that Ms. Kalichenko had sent to him. (A68).

Troyd had no recollection of SCPD Detective Forrestal telling Valerio that he was "going to be in a very dark place." (A70-71). Troyd maintained that Forrestal was "very friendly" and "engaging and calm" when discussing the facts of the case with Mr. Valerio." (A71).

Questioning of Valerio ceased after he declined the agents' request to sign a written statement and asked instead "to speak to his attorney." (A72-73). Troyd acknowledged that the agents "didn't immediately tell Valerio he was arrested at the conclusion of the interview because we wanted him to remain seated and calm." (A72). However, once the agents "had everything concluded as far as the search warrant," the agents told Valerio that he was under arrest and handcuffed him. (A72). The agents "walked him out of the house in a jacket because it was very cold and snow [sic] on the ground." (A73).

14

B.  *The District Court's Decision Denying Valerio's Motion to Suppress*

The District Court found Agent Troyd's testimony regarding the facts "to be wholly credible" and, "to the extent it conflicted with Agent's Troyd's testimony," Valerio's affidavit was not credible.  (A180).

The District Court concluded that *Miranda* warnings were not required for the questioning that preceded Troyd's telephone call to the United States Attorney's office because:

> a reasonable person in defendant's situation would have understood that he was free to end the interview and leave the house during the search based upon the following facts: (1) the interview took place in the familiar surroundings of defendant's home; (2) defendant knew the agents were there to conduct a search, and agents never told him that he was under arrest, or that he was not free to terminate the interview and leave the house; (3) agents did not brandish their weapons or handcuff defendant or touch him in any way; (4) agents were not blocking the defendant from leaving the house; and (5) agents did not say or do anything threatening, but rather conducted the interview of the defendant in a calm manner.

The District Court also concluded:

> in the alternative that, even assuming *arguendo* that a reasonable person would not have understood he was free to end the interview and leave the house, the defendant's freedom of action was not curtailed to a degree associated with formal arrest. Thus, no pre-arrest *Miranda* warnings were necessary . . . A179-180.

15

The District Court's opinion outlined the reasoning that led to this latter conclusion noting:

> 1) The "interview" took place in "the familiar surroundings" of Valerio's home.
>
> 2) The agents did not tell that Valerio that he had to go to the dining room or submit to an interview or answer questions.
>
> 3) The absence of any evidence that any agents blocked his "exit from the dining room or residence."
>
> 4) No officer ever brandished a weapon during the interview or the search.
>
> 5) No officer touched the person of Valerio or spoke in a tone of voice that indicated noncompliance would result in the use of force.
>
> 6) Valerio was not handcuffed or subjected to other physical constraints. Nor was he told he was under arrest or not free to leave.
>
> 7) "A reasonable person in Valerio's position would have understood that the large number of agents in the residence related to the need to search his entire residence, and that they were not there to place him in custody."
>
> 8) Valerio responded to Agent Troyd's questions "despite knowing the officers were searching for evidence of child pornography, and remained calm throughout the interview—both before and after he signed the 'Advice of Rights' form."

C.    *The Government's Case Regarding Kalichenko's Videos*

At trial, the Government sought to prove that Kalichenko – who Valerio had met on an internet dating site – had, at Valerio's request and for her own pecuniary gain, created "custom-made home videos" of herself sexually molesting her daughter (T244).[2]  To this end, the Government proffered the testimony of FBI Agents Angelini and Troyd and SCPD Detective Forrestal, and e-mail correspondence and text messages between Valerio and Kalichenko.

The e-mail correspondence commenced on June 23, 2011, when Kalichenko, who was then in Dallas, Texas, responded to a letter from Valerio and suggested they meet.  (T705-708).  In subsequent e-mails, Valerio requested videos of Kalichenko engaging in deviant sexual activity with her daughter and described in detail specific conduct what he wished to see in the videos.  (T502, 510-514, 527, 534-535, 708-709, 743).

In other e-mails, Valerio sought to reassure Kalichenko of his concern for her and her child; spoke of giving Kalichenko and her daughter the opportunity to make a new life in the United States; and sought confirmation that she had received funds he had sent her.

_____

[2] Numbers preceded by "T" refer to pages in the *United States v. Joseph Valerio*, 14 CR 94 (JFB) trial transcripts.  The transcripts are dated as follows: November 4, 2014 (pages 209-392); November 5, 2014 (pages 393-567); November 6, 2014 (568-733); November 10, 2014 (pages 735-922); November 12, 2014 (pages 923-1078); and November 13, 2014 (pages 1079-1256).

Kalichenko's responses, which were sent from Kiev and Turkey, are filled with requests for money, and responses to and attempts to mollify Valerio's complaints and criticisms.  (T755).

Eventually, Valerio and Kalichenko had a falling out.  On November 8, 2013, Kalichenko walked into the United States embassy in Kiev, Ukraine, where she provided FBI Agent Peter Angelini with e-mail correspondence and other documents. (T260-263).  She subsequently forwarded via e-mail other documents to Angelini and eventually gave him a disk that contained videos. (T270-272).  The videos showed Kalichenko fondling her naked two-year-old daughter, and encouraging her daughter to touch Kalichenko's genitals. (T270-272).  Agent Angelini forwarded these materials to FBI agents in the United States, and they obtained a search warrant for Valerio's residence, 3 High Gate Drive, Smithtown, New York.

On cross-examination, FBI Agent Angelini acknowledged that Ms. Kalichenko had admitted sending a video to a boyfriend other than Valerio. (T277). Angelini also acknowledged that the FBI did not attempt to search Kalichenko's home, her cellphone, or other digital devices. (T275-277, 281).  Nor did the FBI request that local law enforcement in the Ukraine undertake such measures. (T276, 281).

18

A series of text messages between Kalichenko and Valerio on a cellphone seized during a search of Valerio's home on January 28, 2014, show that at roughly the same time Kalichenko was meeting with the FBI in the Ukraine, she was offering to cease helping the FBI if Valerio was willing "to negotiate."

Specifically, in a December 3, 2013 text message, Kalichenko asked Valerio what he thought about property in Dubai as an investment and chided for him for failing to negotiate with her "before the criminal case." (T673). Valerio responded by telling her never to call him again and threatening to report her to the police. (T683).

In a December 7, 2013 text message, Kalichenko told Valerio that she was "fed up with him" and sending the FBI all of the videos she had made with her daughter. She added that the videos were the "only piece needed to get a court to arrest" Valerio. (T684). When Valerio responded that Kalichenko should go to the police, she texted:

> I see you really don't want to recognize your mistakes and negotiate. Let's play hard ball then. (T813).

However, in a text message dated December 11, 2013, Kalichenko renewed her offer to withhold evidence from the FBI, if Valerio was willing to pay her:

> Joseph, I now have eight different videos I made for you not counting the one I sent through DHL. FBI is asking me every single day either I am sending additional evidence to them. I don't think you really understand how serious the matter is. I am asking you for the last time

19

> would you like me to provide to the police everything I
> have or would you like to negotiate? (T861-862).

FBI Agent Troyd testified about the January 28, 2014 search of Valerio's home and statements made by Valerio, and his account was supplement by testimony from SCPD Detective Rory Forrestal. (T419, 428-431, 659-660).

Forrestal, also testified as an expert witness regarding electronic devices that were seized from Valerio's home on January 28, 2014. On the hard drive of a computer found in Valerio's office on the second floor of his home, Forrestal found videos of Kalichenko and her child engaged in sexual activity as well as e-mails between Valerio and Kalichenko concerning these videos. (T745-751).[3]

On cross-examination, Forrestal acknowledged that these videos had never been played on this computer because they were found only in the in-box of the computer's mail program. Had they been played on this computer, they would also have been found in other places on the hard drive. (T817-819).

Forrestal also acknowledged that none of the videos attached to Kalichenko's e-mails to Valerio contained metadata that indicated when and where the video was made. (T838-839, 840-841). Nor could Forrestal tell just by watching the videos where and when they were made. (T838-839). Forrestal did

---

[3] In addition to the aforementioned computer, Forrestal examined six other computers, two 16 gigabyte memory cards, two cellphones, two cameras, and a camcorder seized from Valerio's home and found "nothing illegal" on them. (T799-803).

not conduct a forensic examination of the videos on the CD that Kalichenko had provided to Agent Angelini in Kiev. (T834). Moreover, Forrestal did not know if anyone else had examined the videos on that CD for a date stamp. (T834-835).

### D. The Government's Case Regarding Valerio's Niece

Forrestal recounted how he had retrieved a still image and remnants of videos that had been deleted from an SD card seized from Valerio's home on January 28, 2014. The images were written to that card by a Samsung Electronics HMX100 video camera that was found concealed behind a ceiling tile in the basement of Valerio's home. (T777). Among images that he was able to recover were images of a naked female child, who was identified as Valerio's niece.

From metadata written by the video camera to the SD card, Forrestal concluded that the images were written to the SD card between September 10, 2010 and January 19, 2011. (T788). On February 26, 2014, Forrestal also conducted a test of the video camera, by inserting a blank SD card into the camera to determine what date would be written to the SD card. (T787-789). The date written to the SD card was February 26, 2014. (T787-789).

Bernadette Imperiale, Valerio's sister, testified that in approximately 2010 or 2011, her daughter, who was then about six years old, had served as a photography model for Valerio. Her daughter would dress in various costumes, e.g., as a fairy, a cheerleader. (T615-616, 620). One of the photographs was

21

published in a Halloween magazine. (T623). Imperiale was present during some but not all of the photoshoots, which occurred in the basement of Valerio's home. (T619).

Imperiale met Kalichenko just once at Valerio's house. (T630-631). The meeting was in the summer, but she could not remember the year it occurred. (T631). Imperiale, Valerio, and Kalichenko were in the basement "taking pictures" of her daughter. When she and Valerio went upstairs to get something to eat, Kalichenko stayed in the basement to take more pictures. (T631-632).

Records maintained by Homeland Security showed that an "Olena Kalichenko" had entered the United States on February 23, 2010 and departed on March 14, 2010. (T383). On June 4, 2011, Kalichenko arrived in Dallas, Texas and departed from JFK on July 7, 2011. (T384). Kalichenko entered the United States again on August 15, 2011 and September 2, 2011. (T385-286). Homeland Security had no record of departure dates related to her August 15 and September 15, 2011 arrival dates. (T386).

### E. The Defense Case

The defense focused upon the lack of evidence that Kalichenko's videos were "custom-made" for Valerio, asking the jurors to find that Kalichenko had produced her videos on her own initiative and possibly prior to her first contact with Valerio.

The defense's computer expert, Scott Gibbs, explained that to falsify the date on which data was written to the SD card examined by Forrestal, all one had to do was change the date setting on the camera used to take the image. (T892-894). Moreover, it was impossible for an expert to determine if the dates that appear on an SD card retrieved from Valerio's home were produced by such a ploy. (T892-894).

Frances Valerio, Valerio's mother, remembered seeing Kalichenko in her son's home about three times in 2011. (T936, 941). On one of those occasions, Frances Valerio, Ms. Imperiale, and Kalichenko were in the basement while Valerio was videotaping her granddaughter, who was dressed in a fairy costume. When a food delivery arrived, Valerio, his mother, and his sister went to the main floor, leaving her granddaughter alone with Kalichenko. (T937-938).

### F. Rule 29 Motion

Defense counsel moved for a judgment of acquittal based on the Government's failure to prove Valerio's guilt beyond a reasonable doubt. (A141). In addition, defense counsel maintained that the conduct underlying the attempt counts were not sufficiently substantial steps in the commission of a crime to constitute an attempt. He offered the following analogy:

> By way of analogy, a person wants another person to commit a bank robbery and sends the person to a bank on five separate occasions, and for whatever reason the

23

> person goes to the bank and doesn't do a robbery that day. And each time the person goes to the bank it is certainly an overt act in terms of the actual bank robbery. But at the end when the person commits a bank robbery, it would seem unfair to categorize the five trips to the bank as five separate attempts. It is better to say attempt to a bank robbery and leave it to the jury as to whether it was one attempt or one completion of a crime. And that completes my presentation, your Honor. (A143).

The District Court found that the conduct underlying each attempt count was sufficient to constitute a substantial step toward the completion of the crime of the sexual exploitation of a minor. (A163-168). At that point, defense counsel observed, "With respect to the multiplicity that you touched upon, . . . assuming conviction on substantive counts, the attempts occur within the same time frame would have to be merged at sentencing." (A168-169).

Ultimately, the District Court agreed with defense counsel regarding the merger of the sexual exploitation attempt counts into the completed crime of sexual exploitation:

> Certainly I think Mr. Lato is correct, the Government might even concede this if there were a conviction on the sexual exploitation counts. Certainly an attempt to commit a crime and a completed crime would create a double jeopardy problem if someone were sentenced on both. If there is any doubt on that, U.S. v. Rust, Eighth Circuit case, 650 F.2d, a 1981 case, where they said it is also clear that defendant may not be convicted in both the attempt and the completed crime because all the elements of the attempt were included in the completed offense and a dual conviction would amount to double jeopardy.

24

> Based upon the Second Circuit decision in Zvi, I think the appropriate remedy here if there were a conviction on both the substantive crimes and the attempted counts would be to vacate the attempted accounts to avoid a double jeopardy problem but we'll deal with that if that occurs. (A171).

## G. Jury Verdicts Regarding Crimes Charged and Forfeiture

The jury convicted Valerio of Count One[4] [conspiracy to sexually exploit a child]; Count Two [sexual exploitation of a child (S.K.)]; Count Three [sexual exploitation of a child outside the United States (S.K.)]; Count Fourteen [sexual exploitation of a child (S.I.)]; and Counts Six, Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen [attempt to sexually exploit a child (S.K.)].

Immediately after the guilty verdict on these counts, the jury deliberated on the forfeiture allegation in the indictment, and returned a verdict forfeiting Valerio's Smithtown home, and the computer and SD card on which child pornography was found. The Government and Valerio subsequently entered into a stipulation pursuant to which he paid $75,000.00 instead of losing his home.

## H. Fatico Hearing

After the Government sought the inclusion in the Presentence Report of various allegations regarding Valerio's relationships with and/or conduct towards

---

[4] The count numbers cited here are from the redacted indictment submitted to the jury, a copy of which appears in the Appendix at A146.

25

several women, including Kalichenko, the District Court ordered a *Fatico*[5] hearing to which Kalichenko was "invited" by the District Court to testify regarding allegations of abuse by Valerio. Kalichenko, who had pleaded guilty to child pornography charges, had made these abuse allegations during her own case and was awaiting sentencing by the District Court. (A188).

The Government – which had not sought her testimony – was directed by the District Court to undertake the direct examination of Kalichenko. (A188). The Government acceded to this request, but the Government's lawyer had Kalichenko state on the record that he had not met with her to prepare her testimony and that the Government had not promised her leniency in return for her testimony (A211). Nevertheless, Kalichenko also acknowledged to the Government's lawyer that she was testifying in hopes of obtaining leniency when the District Court sentenced her.[7] (A210-211).

---

[5] *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979).

[7] When defense counsel asked her a similar question on cross-examination, Kalichenko denied that she was seeking leniency and claimed that she was surprised by and had not sought the District Court's "invitation" to testify. (A226). However, just prior to her testimony, the District Court noted that he was aware she was seeking leniency on the basis of Valerio's mistreatment of her, but cautioned her to confine testimony to violence or threats of violence by Valerio:

> I know that there are other aspects of your interactions with Mr. Valerio that you have testified about at the hearing that we had and maybe you want to bring to my attention for purpose of your own sentencing, but at least

26

Kalichenko testified that she met Valerio through an internet dating website where she was searching for a husband. (A211).  In June 2011, while she was in Dallas, Texas, she contacted him, and he invited her to stay at his home in Long Island.  (A211, A222).

She stayed with Valerio approximately ten days to two weeks.  Valerio seemed a "credible person" who had a good relationship with his son (A212, A222).  He sometimes became angry or jealous for "no reason." (A212).  However, this behavior did not dissuade her from pursuing a relationship with him. (A212-213).  Valerio paid for her return ticket to the Ukraine, and they continued their budding relationship over the telephone.  (A213).

In September 2011, Kalichenko returned to the United States.  (A222).  She stayed at Valerio's home for three weeks until he became angry and demanded that she leave immediately. (A214).  When she asked to stay a few more days until she could find a place to go to, he sexually assaulted her. (A214-216, A222-223).    A few days later, Kalichenko left to stay with a male acquaintance in Seattle.  However, in the second week of October, after Valerio had invited her to return, she went back to him.[8]  (A216-217).

---

for purposes of direct examination, those are the issues
that I want focused on today.  (A210).

[8] He picked her up in Manhattan. (A217-218).   On the drive back to Long Island, Valerio pulled over to the side of the road, stuck his hand into her vagina,

27

Kalichenko stayed with Valerio until approximately the end of October, when she returned to the Ukraine. During that time she suffered no other instances of nonconsensual sex or physical abuse. (A220). At some point during this interval, Valerio and Kalichenko entered into a multiple partner relationship contract. (A219). The contract obligated her to obey Valerio, and Valerio to "be a good man and a gentle man with his partner when not engaging in consensual rough sexual intercourse." (A220).

Upon her return to the Ukraine, Kalichenko sent Valerio an e-mail asserting that she wanted to continue their relationship. (A224). She began making and sending videos of herself and daughter to Valerio.

In July 2013, Valerio requested that Kalichenko help him adopt a child from the Ukraine. (A221). Instead, Kalichenko sent a letter to the American consulate to thwart such an adoption (A221).

Asked on cross-examination if, in December 2013, she threatened to go to the FBI if Valerio did not pay her money, Kalichenko claimed that she had told Valerio that she intended to file a civil lawsuit against him. (A225). Kalichenko acknowledged that when she was arrested by FBI Agents Troy and Messineo, she did not tell them she had been abused either physically or sexually by Valerio,

---

and kept it there while he masturbated. (A218-219). After his "discharge," he apologized to her. (A219, A223).

although she maintained that at some point she told an FBI agent about that abuse. (A226). When asked if she had performed oral sex on her own daughter, Kalichenko refused to answer. (A223).

A.D. of Johannesburg, South Africa[9] testified that she met Valerio on a Christian dating website in August 2007. (A229-230, A240). In 2008, A.D. and her then three-month-old son went to visit Valerio. (A230). Valerio initially treated them warmly. However, as time passed, Valerio would become angry with her and complain about her son. (A230). On one occasion, he tripped her (A230, A241). On another occasion, Valerio hit and choked her because he did not like way she had thanked him for taking her to the beach. (A230).

Upon her return to the United States after a visit to her mother in South Africa, Valerio became angry when he noticed that another man was carrying A.D.'s luggage. (A231). Later at his home, Valerio tore her clothes off and "had his way with her." (A232). On another occasion, after the neighbors had witnessed them arguing, he accused her of having "put on a show." (A232, A240).

After A.D. became pregnant by Valerio, he suggested that she terminate the pregnancy. (A233, A243). On several occasions, he assaulted her and/or tried to force her to have sex with him. (A233). After she gave birth to their daughter, Valerio objected to A.D. breastfeeding the child, and they argued over A.D.

---

[9] To protect her privacy, the lower court referred to her by her initials, and we continue that practice in this brief.

wanting to visit her mother in South Africa. (A233). After one such argument, she called the police. However, the police officers who responded to the call suggested that she had provoked Valerio, and they did not intervene. (A234, A241).[10]

Thereafter, an altercation occurred in a car after A.D. became upset because Valerio canceled plans to take her to a concert. (A234). Valerio assaulted her, stopped the car in a parking lot, and told her she was going to die. (A234). A.D. got out of the car, and as she was trying to retrieve her daughter from the back seat, she was knocked to the ground. (A243). Valerio put her back in the car and drove her home. (A235). The following day, A.D. went to a women's shelter where she stayed for a few weeks before she returned to live with Valerio. (A235).

A similar incident occurred after Valerio was stopped by two female police officers for driving the wrong way down a one-way street. Angered by this stop, he drove her to a beach area where he beat and raped her and then drove her home. (A236).

On another occasion, Valerio punched AD in the mouth breaking her teeth because she had entered his home office – a room that no one was allowed enter – to bring him something to eat or drink. (A237). He agreed to take her to a dentist

---

[10] On cross-examination, A.D. acknowledged that no physical abuse occurred during this argument, and that she had refused to provide a statement to police. (A242-243).

only if she told the dentist she was accidentally hit with a baseball bat while playing with her children.  (A237).

After this last incident, A.D. decided to leave with her daughter for South Africa. (A237-238).  Valerio let her go only after she promised that she would return.  (A237-238).

A.D. acknowledged that in January 2015, she came to the United States to visit the home of Valerio's mother Frances.   A.D. also took her daughter by Valerio to visit him at the Metropolitan Detention Center.  (A239-240).  During 2015, A.D. received a series of money transfers from Frances Valerio totaling $31,265.00, which A.D. used to support her children.  (A240-241, A245).

Lucy Down testified that in October 2012, she was hired through an agency as an *au pair* for Mr. Valerio's daughter.  During the drive to his home, Valerio informed her that he did not have any children.  He also spoke about a Halloween party that he wanted her to attend dressed in nothing but panty hose. (A233, A238-239).  After Down arrived at Valerio's home, she informed the *au pair* agency of her misgivings about Valerio, and the agency sent a representative to pick her up. (A234-235, A241).  Valerio seemed surprised by Down's departure, and he told her that she should grow up and that she could have made a lot of money. (A234).

*I.    Mental Health Experts' Testimony Regarding Valerio*

Dr. Alexander Bardey, M.D., a board certified clinical and forensic psychiatrist met with Valerio six times during which he interviewed him extensively and administered a number of psychological tests including actuarial tests that predict the likelihood of recidivism. (A262-266).   Dr. Bardey also interviewed Valerio's mother and sister, and an uncle who is a licensed social worker therapist.   Dr. Bardey submitted an extensive report to the District Court and testified under oath.

Dr. Bardey testified that Valerio's father, Philippo, had sodomized him on a regular basis, sometimes weekly, and would fondle Valerio while he was in the shower. (A268).   "Mr. Valerio reported that he had been the victim of sexual abuse on 200 occasions between the ages of 5 and 11." (A343).   The sexual abuse continued until Valerio "grew big enough and strong enough to fight off his father's sexual advances." (A274-275).   However, emotional and verbal abuse continued well into Valerio's twenties. (A274). Valerio's sister and mother confirmed that from his teenage years onwards Valerio had a number of altercations with his father.   (A275).

Valerio also reported that his sister had been sexually abused by their father. His sister confirmed to Dr. Bardey that her father had sodomized her and that she

32

had witnessed her father physically and emotionally abuse her mother and brother. (A271, A290).

As a child, Mr. Valerio was diagnosed as dyslexic. He had to repeat the first grade and did fairly poor academically for years thereafter.

Valerio became sexualized at a very early age. By age eleven, he was masturbating, and by age twelve, he was trying to engage others in sexual behavior. (A272). Such behavior, Dr. Bardey testified, "would be consistent with someone who has been exposed early on to some sort of inappropriate sexual behavior." (A272).

By middle school or early high school, Valerio began to abuse marijuana and alcohol and then "rapidly moved on" to cocaine, pills, and hallucinogens. (A273). He became a fairly significant substance abuser and sought assistance from his uncle, a licensed social worker. (A273).

Paralleling Valerio's substance abuse was a growing interest in internet pornography, featuring violent behaviors such as S&M ("Sadomasochism") and bondage. That interest eventually translated into what Valerio looked for in sexual partners. (A274). He became involved with various "kinky sexual behaviors including, threesomes and social gatherings involving sex." (A276).

Valerio worked for many years in his father's tile business. He also started buying real estate rental properties as well as homes that he repaired and sold at a

33

profit. (A276).  He also ran a credit repair business, and some of those clients got him more involved with drugs and sexual activities.  (A276-277).

In his early twenties, Valerio was injured in an automobile accident and "went out on a Workers' Compensation Leave." (A278).  He became addicted to pain killers, and since he was idle, he spent even more time watching pornography. (A278).

Dr. Bardey opined that Valerio did not have "a very intense attraction to minors under the age of 13 which would be the definition of pedophilia according to our DSM V." (A284).  Valerio's primary interest was bondage and S&M pornography, and not child pornography.  Objective testing confirmed that Valerio was interested in "young women, not under the age of 14." (A279).

Dr. Bardey believed that Valerio suffered from two "paraphilias, which are sexual behavior disorders": (1) frotteurism, which Dr. Barden defined as "rubbing up and touching" strangers; and (2) voyeurism, which Dr. Barden defined as "enjoying watching women unbeknownst to them in compromising positions." (A294).

In addition, Valerio exhibited anti-social personality traits, specifically a lack of empathy for others, a tendency to use people as a means to an end, and an absence of any feelings of remorse or guilt. (A294-295).  Dr. Bardey noted that in

their initial sessions, Valerio "had very little understanding that what he had done was wrong." (A281).

Dr. Bardey stated that Valerio's sexual disorders, substance abuse, and anti-social personality traits were related to the sexual abuse he suffered as a child:

> Early sexual abuse can have impact on the development of your brain. It can have an impact on your emotional development. It can have an impact on your manifesting issues with drugs, alcohol and other psychiatric disorders. (A296).

In addition, Dr. Bardey noted in his testimony and in an extensive report submitted to the District Court, that Valerio's childhood experience of seeing his father abuse his mother had:

> translated into his own anger toward women and then sexualized anger towards women. So it very much accounted for it. (A314).

In the course of their meetings, Dr. Bardey "saw an evolution" in Valerio. (A281, A295). Valerio began to show remorse and to talk of himself as someone who needed to change. (A281, A295). Dr. Bardey believed that the changes he saw in Valerio were genuine. (A281-282).

Based upon "his evaluation and the results of the various actuarial risk assessment tools that he employed," Dr. Bardey estimated that Valerio posed a

"moderate risk of reoffending."[11]  Dr. Bardey explained that Valerio's progression to the point where he was beginning to view his behavior as wrong and felt regret for what he had done indicated that Valerio could respond positively to treatment. (A286-287).  The purpose of such treatment would be to help Valerio realize the traumatizing effect his behavior had on other people and to teach him techniques for impulse control and avoidance of places and situations that would facilitate inappropriate sexual behavior.  (A287).

At the conclusion of his testimony, Dr. Bardey also noted that Valerio had informed him that he had had thyroid cancer. (A315).  As acknowledged in the presentence report, medical records confirm that in 2003, half of Valerio's thyroid was surgically removed, and he underwent radiation treatment. (Pre-Sentence Report ¶ 94).

Maura Gordon, a social worker with a certification in trauma, testified that she had conducted a pyscho-social evaluation of Valerio's sister, Bernadette Imperiale, and his mother, Frances Valerio.

Imperiale told Gordon that from age four to age eight she was sexually abused by her father.  He would enter her room when she was trying to sleep and

---

[11] On cross-examination, Dr. Bardey explained that the actuarial tables considered only crimes for which an individual had been convicted.  Consequently, Kalichenko's and A.D.'s allegations of rape were not included in the objective risk assessments. (A308).  However, assuming *arguendo* that Kalichenko's and A.D.'s rape allegations were true, targeted sex offender treatment could still reduce the risk of recidivism. (A313-314).

attempt to penetrate her with his penis. (A320). He threatened to harm her if she told anyone about this abuse. (A320).

Asked if Imperiale's allegations might be fabrications to aid her brother, Gordon replied that Bernadette's affect while describing this abuse was "very flat." (A320). She seemed to be very removed from her emotions when talking about her life and the violence that she had observed, and such behavior was "the normal type of thing when there is sexual abuse involved in a young person's life." (A320).

In addition, Imperiale admitted that when she was in her teens and twenties, she feared that her father would react violently if she had any physical interaction with boys. Gordon noted that such fears were consistent with a history of sexual abuse. (A319, A321-322). Also, Frances Valerio told Gordon that she had seen her husband in bed once with Bernadette. (A321-322). For all of these reasons, Gordon believed that it was more likely than not that the abuse Imperiale described had actually occurred. (A320).

Frances Valerio, whom Gordon was counseling, acknowledged that her husband had physically and sexually abused her as well as their children. (A322). The physical abuse that Frances Valerio had suffered was corroborated by a scar that went into the top of her lip and by Bernadette who had witnessed this abuse. (A325).

*J.      The Government's Demand for a De Facto Life Sentence*

The Government argued that the Sentencing Guidelines called for the imposition of an "Effective Life Sentence." Government Sentencing Memorandum, District Court Docket Entry 144, filed May 8, 2017 (hereinafter "GSM") at 9. Although it acknowledged that Valerio's crimes of conviction did not authorize a sentence of life imprisonment, the Government claimed nevertheless that an effective life sentence was warranted because the Guidelines sentence was "410 years, an effective life sentence."

According to the Government, the Guidelines indicated such a benchmark because Valerio "has a total offense level of 47 and criminal history category of I, which would result in an advisory range of imprisonment of life." GSM at 9. Although none of the crimes of conviction authorized life imprisonment, the Guidelines' benchmark of a life sentence could nevertheless be achieved by stacking the terms of years imposed on the counts of a conviction to produce an aggregate sentence that would ensure that Valerio spent the rest of his life in prison. GSM at 9.

The Government also maintained that an effective life sentence was appropriate under the sentencing factors set out 18 U.S.C. § 3553 (a). In essence, the Government argued that Valerio's child pornography conviction demonstrated he was willing to go to any lengths "to satisfy his criminal desires." Comparing

38

him to pedophiles, the Government claimed that "sexual predators," pose a higher rate of recidivism than other offenders, asserting that "even into old age, their urge to engage in illegal sex remains acute." GSM at 13.

The Government also argued that imposition of the mandatory statutory minimum sentence "would result in inequity whereby the defendant would receive a sentence commensurate with offenders who did not exploit multiple children over a period of years." GSL at 13.

Defense counsel noted that the Government's 410-year estimate was premised was upon a mistaken expectation that Valerio would be sentenced on all the counts upon which he was convicted. Defendant's Sentencing Memorandum Supplement, District Court Docket Number 147, filed June 6, 2017 (hereinafter "DSM"), at 2, n.2. However, defense counsel argued (A141-142, A168-169), and the District Court ultimately ruled (A171, A358), that Counts Nine through Thirteen should be dismissed because they merged into Count Two. If the remaining counts were stacked, as the Government argued they should be, that would produce a total sentence of 260 years, which was still not an appropriate sentence for Valerio. DSM at 2 & n. 2.

Defense counsel noted that assuming a life expectancy of 77.4 years, good time credits, and credit for his time in jail prior to imposition of sentence, even 34 years would be a life sentence for Valerio. DSM at 2 & n. 1. However, the main

39

thrust of defense counsel's argument was that a *de facto* life sentence was not warranted regardless of whether it was 34 years or 35 years (the total sentence originally recommended by the Probation Department); or the 60 year total sentence recommended in the amended presentence report. (A367). DSM at 1-2.

Defense counsel argued *inter alia* that, as Dr. Bardey had concluded, Valerio was not a pedophile. Valerio's mental disorders and substance abuse problems were the result of the sex abuse he had suffered and witnessed as a child. (A361-362). Moreover, Valerio had begun to recognize the causes of his anti-social behavior. Consequently, defense counsel and Valerio pleaded for a sentence that would allow him to eventually rejoin society. (A366, A370-374).

### K. The District Court's Reasons for Imposing a De Facto Life Sentence

The District Court assumed that the advisory Guideline, or benchmark sentence, was 260 years – the total sentence the District Court calculated by stacking the sentences on the counts remaining after dismissal of the attempt counts that merged into Count Two. (A358-359).

The primary reason the District Court gave for imposing a *de facto* life sentence was its belief that the evidence at trial "demonstrate[d] the defendant to be extremely violent and dangerous and a clear and compelling danger to the community," in particular children and women. (A378-382).

The District Court also found that Valerio's 2006 misdemeanor conviction for attempted forcible touching of a woman in a wave pool, and the testimony of Kalichenko and A.D. at the *Fatico* hearing, regarding physical and sexual assaults and death threats, demonstrated that he was a danger to women as well as children. The District Court opined that there were no limits on what Valerio would do "to satisfy his sexual desires to women or to children" and that his level of dangerousness would not diminish over time. (A382-383).

The District Court believed that Dr. Bardey had underestimated the risk of recidivism because he had not taken into account Valerio's violence towards Ms. Kalichenko or A.D. (A384-385); Valerio had sex offender treatment after his 2006 conviction but had still re-offended (A385); Valerio committed the crimes of conviction when he was a relatively mature man; and it had taken several years and sessions with Dr. Bardey before Valerio began to experience any feeling of remorse for his actions. (A386).

The District Court added that it had also considered general deterrence. While it was not "the driving force" behind its sentence, the District Court believed that "extremely severe sentences should be imposed to "send a message to others out there victimizing children in the way that Mr. Valerio did in this case." (A383).

The District Court also maintained that the sentence imposed was not disproportionately harsh compared to other cases cited by defense counsel,

41

although it admitted that it had not examined the facts of those cases. It also noted that the Government had cited cases where even longer sentences had been imposed. Finally, the District Court stated that it was aware of this Court's cases expressing concern about the imposition of life sentences in non-capital cases, i.e., *United States v. Brown*, 843 F.3d 74 (2d Cir. 2016) and *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017), and it acknowledged that it had "never sentenced anyone to this amount of time that did not involve a murder." (A387). However, the District Court maintained that "60 years imprisonment, which is effectively a life sentence is warranted, sufficient and no greater than is necessary." (A383).

## ARGUMENT

## POINT I

### STATEMENTS ELICITED FROM VALERIO BEFORE HE RECEIVED *MIRANDA* WARNINGS MUST BE SUPPRESSED BECAUSE HE WAS IN CUSTODY WHEN THE PRE-*MIRANDA* QUESTIONING OCCURRED

At 6:00 a.m. on a cold January day, a dozen law enforcement officers from three different agencies descended upon Valerio's home to execute a search warrant. Isolated from the only other occupant of his home, his girlfriend, Valerio was questioned for an hour and thirty minutes by a team of four law enforcement law officers who confronted him with e-mail exchanges between himself and Kalichenko to elicit an admission that Valerio had received child pornography from her that she had created at his request. Only after Valerio had acquiesced, did

42

the law enforcement agents advise him of his rights to remain silent and to the assistance of counsel. They then continued their questioning to have him reiterate the incriminating admissions they had obtained prior to giving him *Miranda* warnings.

It is established beyond cavil that a person who is "in custody" must, prior to questioning by law enforcement agents, be advised of his right to remain silent and to have the assistance of an attorney, the advice which has come to be known as the "*Miranda* warnings." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998). Statements which are not preceded by *Miranda* warnings are not admissible on the prosecutor's case in chief. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

As the following paragraphs will demonstrate, a reasonable person in Valerio's circumstances would not conclude that he could have refused to answer the questions posed to him by law enforcement agents who had occupied his home and that Valerio was subjected to such significant, arrest-like limitations upon his liberty as to render, the questioning that occurred custodial. Consequently, his questioners were obligated to advise him of his right to remain silent and to the assistance of counsel.

A. *No Reasonable Person in Valerio's Circumstances Would Believe He Was Free to Refuse to Submit to Questioning.*

"A person is in custody for purposes of *Miranda* if a reasonable person in the suspect's shoes would not have felt free to leave under the circumstances." *United States v. Ali*, 86 F.3d 275, 276 (2d Cir. 1996) (internal punctuation and citation omitted). Indeed, even without an actual arrest, an accused is "in custody" when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *Id*.

The District Court's conclusion that a reasonable person in Valerio's circumstances would have concluded that he was free to end questioning by law enforcement simply by leaving his home[12] runs counter to the facts of this case, common sense, and reason.

First, leaving one's home is hardly a viable way to exercise one's right to refuse to speak law enforcement. One's home is the most constitutionally protected place on earth. Consequently, the right to terminate the interrogation by walking away from one's interrogators is hollow if the one place that the individual cannot retreat to, or exclude law enforcement from, is his own home. *United States v. Craighead*, 539 F.3d 1073, 1082-83 (9th Cir. 2008).

---

[12] The District Court's focus, on the issue of whether a reasonable person would have felt free to leave his own home, implicitly concedes that Valerio could not have ejected his interrogators from his home.

Second, a man who cannot move freely about his own home is not at liberty to take the far more radical step of leaving it. The District Court simply ignored substantial and essentially undisputed evidence that Valerio was not free to move about within his own home. Consequently, the District Court's conclusion that there was nothing keeping Valerio in his house ignores overwhelming evidence to the contrary.

Indeed, Agent Troyd's testimony establishes that, from the time twelve law enforcement agents entered his home, Valerio was deprived of his freedom of movement. When agents first entered his residence and Valerio attempted to go to the second floor where Ms. Bereskova, his girlfriend, was, Troyd stopped him from doing so. Similarly, when, during the course of the questioning in the dining room, Valerio wanted water, he was not permitted to go to his own kitchen to get it.

The District Court's claim that no one blocked Valerio from leaving the dining room and exiting his home is dubious. Troyd's testimony establishes that his supervisor, Agent Dawn Smallwood, was standing in the hallway between the family room and the dining room and "intermittently she would walk past the dining room" while Valerio was being questioned. (A60-61).

Although Troyd suggested in his testimony that once in the hallway, Valerio, would have had access to the front door, Valerio, who was wearing only long pants and a tank top, lacked the proper clothing to leave his home. Troyd testified that

45

the weather was so cold that the search party wore jackets over their ballistic armor, and that when Valerio was finally removed from his home, the agents put a jacket on him because of the cold. Thus, the inclement weather made it highly unlikely that a reasonable person in Valerio's circumstances would have considered leaving the house a viable means of ending questioning by law enforcement agents.

Just because an individual decides not to attempt to eject twelve law enforcement officers from his home or to defy their orders that he remain in a specific part of his home, we cannot assume he or she does not meet *Miranda's* definition of custody. "[W]hen the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out." *Craighead*, 539 F.3d at 1084-1085.

### B. Valerio's Freedom of Action Was Limited to the Degree Associated with A Formal Arrest.

Under existing precedents, the question of whether a reasonable person in Mr. Valerio's circumstances would have considered himself free to terminate all questioning by leaving his home is "a necessary, but not determinative, first step" in assessing whether he was in custody for the purposes of *Miranda*. This is especially the case in circumstances like Mr. Valerio's where questioning takes place simultaneously with the execution of a search warrant. In such cases, a court must ask:

46

> whether, in addition to not feeling free to leave, a
> reasonable person would have understood his freedom of
> action to have been curtailed to a degree associated with
> formal arrest. Only if the answer to this second question
> is yes was the person 'in custody' for practical purposes,
> and entitled to the full panoply of protections prescribed
> by *Miranda*.

*Newton*, 369 F.3d at 672.

The District Court's finding that a reasonable person in Valerio's circumstances would not have understood his freedom of action to have been curtailed to a degree associated with formal arrest defies logic and common sense.

First, the District Court ignored the complete loss of personal autonomy and privacy that resulted from the presence of twelve law enforcement agents from three different law enforcement agencies in Valerio's home. Instead, the District Court suggested that a reasonable person would have known that a dozen law officers were there merely to search his home and would not have inferred from their presence that he was about to be arrested.[13]

*Miranda* warnings are not only required when a person believes that he is, or is about to be, arrested, but also when circumstances are such that the person experiences the same loss of liberty and autonomy as an arrestee. Consequently, even if Valerio assumed that the only reason for the presence of so many law

---

[13] The District Court's assumption that a reasonable person knows or can even estimate how many law enforcement officers it takes to execute a search warrant is patently unreasonable.

47

enforcement officers in his house was that the search required that many officers, he was still entitled to *Miranda* warnings due to the loss of personal autonomy caused by their presence:

> When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation.

*Craighead*, 539 F.3d at 1084-1085. *See also United States v. Mittel–Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (in-home interrogation custodial where, *inter alia*, search conducted early in the morning by eight officers, and officers exercised physical control over defendant); *United States v. Hashime*, 734 F.3d 278, 284 (4th Cir. 2013) (officers presence everywhere in suspect's home and controlling what occupants could do and where they could go militated in favor of finding that interrogation was custodial); *United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012) (entry of large number agents early in the morning and continual monitoring of Cavazos's subsequent movement about his home contributed to custodial nature of questioning).

As noted above, Agent Troyd's testimony establishes that Valerio was not even permitted to get himself a glass of water while he was being questioned in the dining room. He was kept isolated from the only other person in his house who was not a law enforcement officer, his girlfriend, Ms. Bereskova. Nor would he have had access to any part of his home – except perhaps the hallway between the

48

dining and the family room where Ms. Bereskova was confined, and even there he would still have remained under the watchful eye of Troyd's supervisor, Agent Dawn Smallwood.

Second, the District Court construed Valerio's apparent calmness and responsiveness to his interlocutors as an indication that the circumstances in which was questioned were not custodial. However, the Supreme Court has emphasized:

> the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant. The test, in other words, involves no consideration of the actual mindset of the particular suspect subjected to police questioning.

*J.D.B. v. North Carolina*, 564 U.S. 261, 262 (2011).

Consequently, the District Court erred by inferring from Valerio's calm mental state that the circumstances of Valerio's interrogation were not custodial.

For similar reasons, it is irrelevant whether Agent Troyd or his colleagues began their questioning with the intent to arrest Valerio. What matters is not the state of mind of Troyd and other law enforcement agents but how their conduct towards Valerio would have been interpreted by a reasonable man in his circumstances.

The District Court also erroneously placed considerable weight upon the fact that Valerio was not handcuffed or subjected to other physical restraints or touched during questioning; no weapons were displayed; and no verbal threats were

49

directed at him.  Although such conduct would undoubtedly have served to further impress upon Valerio that he was no longer the master of his own house, such theatrics were unnecessary given the restrictions to which he was already subject. "[C]oercion can be mental as well as physical, and the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (*quoting Blackburn v. Alabama*, 361 U.S. 199, 206 2d 242 (1960).

Finally, the District Court erred by finding that Troyd's belief that he lacked probable cause to arrest Valerio somehow dispelled the custodial aura of Troyd's questioning.  Clearly, Troyd's state of mind regarding the presence or absence of probable cause could not have been known to Valerio, who was obviously not a mind reader.

However, Troyd must have realized that the search warrant issued for Valerio's home implied there was sufficient evidence to convince a magistrate that there was probable cause to believe that evidence implicating Valerio in the production and possession of child pornography would be found in Valerio's home. This is significant because "[t]he more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda*, and vice versa." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969).

Moreover, Troyd's arrival at Valerio's residence fully prepared and armed with e-mails and videos to conduct a full-blown interrogation of Valerio as well as the length of the pre-*Miranda* questioning would have communicated to any person in Valerio's shoes that Troyd and the three other law enforcement agents questioning him were not there to engage in small talk or to indulge their personal curiosity about the e-mails. Their interrogation tactics created exactly the sort of inherently coercive environment that *Miranda* warnings are intended to prevent or at least dispel.

Indeed, the questioning of Valerio occurred under such coercive circumstances that his statements "cannot be said to be the voluntary product of a free and unconstrained will, as required by the Fourteenth Amendment." *Haynes v. Washington*, 373 U.S. 503, 514 (1963). *Oregon v. Elstad*, 470 U.S. 298, 304 (1985). *Haynes v. Washington*, 373 U.S. 503, 514 (1963). Therefore, they are inadmissible under a Due Process analysis as well as the broader prophylactic rule of *Miranda*.

To recapitulate, all statements that Valerio made before he received the *Miranda* warnings should have been suppressed because they are the product of custodial questioning and are involuntary even under a Due Process analysis. Furthermore, for the reasons stated in Point II *infra*, the statements Valerio made

51

from the time he received *Miranda* warnings until the time he was removed from his home should also have been suppressed.

## POINT II

### VALERIO'S POST-*MIRANDA* STATEMENTS MUST BE SUPPRESSED

If interrogators deliberately employ a two-step interrogation process to circumvent *Miranda*, post-warning statements must be excluded, unless curative measures are taken before the post- warning statement is made. *Seibert v. Missouri,* 542 U.S. 600, 605–606 (2004) (plurality opinion); *United States v. Faust*, 853 F.3d 39, 48 (2d Cir. 2017); *United States v. Capers*, 627 F.3d 470, 474 (2d Cir. 2010).

A court must "review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *Capers*, 627 F.3d at 479. Such objective factors include "the timing, setting, and completeness of the pre-warning interrogation; the continuity of police personnel; and the overlapping content of the pre-warning and post-warning statements; and subjective factors such as the testimony of interrogators regarding their intent." *Capers*, 627 F.3d at 478. The Government bears the burden of disproving deliberateness. *Capers*, 627 F.3d at 479.

A consideration of these objective factors compels the conclusion that Agent Troyd deliberately used a two-step strategy. Delaying the *Miranda* warnings until

52

after Troyd had elicited a confession ensured Valerio would not invoke his rights to remain silent and the assistance of counsel until after the assertion of those rights would be an exercise in futility.

The post-warning questioning concerned the same topics that were covered in the pre-warning questioning and added little to the admissions that Valerio made prior to receiving the *Miranda* warnings. Indeed, Valerio's post-*Miranda* statements were virtually the same as his pre-*Miranda* statements. One of the two e-mails about which Valerio was questioned after he received the *Miranda* warnings was the same e-mail about which he had been questioned before he received the *Miranda* warnings. The other e-mail came from the same time frame.

Exactly the same police personnel conducted the pre-warning and the post-warning questioning, and both the pre-warning and the post-warning questioning occurred in the same location. There was no substantial break in time between the pre-warning and the post-warning questioning.

As for the subjective factors, the reason Troyd proffered for delaying *Miranda* warnings – his alleged uncertainty as to whether he had probable cause to arrest Valerio – is simply no excuse for the delaying the *Miranda* warnings. There is no exception to *Miranda* that permits delaying the warnings until after police have decided whether they have probable cause to arrest a suspect subjected to custodial questioning. C*apers,* 627 F.3d at 480-481. Consequently, the statements

53

Valerio made after he finally received *Miranda* warnings should have been suppressed.

To recapitulate, the absence of *Miranda* warnings renders Valerio's pre-warning and post-warning statements inadmissible on the Government's direct case. Because the Government relied upon both Valerio's statements as compelling evidence of his guilt, the District Court's failure to grant Valerio's suppression motion may not be dismissed as mere harmless error. The Court should vacate his convictions and preclude the admission of those statements at any retrial.

## POINT III

### MULTIPLE PROCEDURAL DEFECTS RENDER VALERIO'S *DE FACTO* LIFE SENTENCE UNREASONABLE

Valerio's *de facto* life sentence is procedurally unreasonable for three reasons. First, it is premised in large part on highly inflammatory testimony about mistreatment of adult women that either preceded or is collateral to Valerio's crimes of conviction. The District Court's reliance upon these uncharged allegations to impose a life sentence violated Valerio's Sixth Amendment right to a jury trial and his Fifth Amendment right to Due Process. Second, the District Court's "invitation" to Olena Kalichenko to testify at this *Fatico* hearing made that court a partisan and compromised the integrity of the proceedings. Third, the

District Court's choice of the wrong Guideline as a benchmark practically ensured the imposition of a substantively unreasonable sentence.

> A. *The District Court's Use of Uncharged Allegations to Punish Valerio Violated his right to a Jury Trial and his right to Due Process.*

Although *Williams v. New York*, 337 U.S. 241 (1949) and 18 U.S.C. § 3553 permit a sentencing court to consider a wide range of information that was not presented to a jury, they do not grant a court *carte blanche* to punish a defendant for transgressions that the Government has not proved to a jury beyond a reasonable doubt.

As Justice Scalia explained in his opinion for the Court in *Blakely v. Washington*, 542 U.S. 296, 305-306 (2004), the right to a jury trial is:

> no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.

Moreover, requiring that certain facts used to increase a defendant's sentence beyond a statutory maximum be admitted by the defendant or proved to a jury beyond a reasonable doubt ensures that "the judge's authority to sentence derives wholly from the jury's verdict." *Blakely,* 542 U.S at 306.  Without that restriction:

> a judge could sentence a man for committing murder even if the jury convicted him only of illegally

55

> possessing the firearm used to commit it– or of making an illegal lane change while fleeing the death scene. Not even *Apprendi*'s critics would advocate this absurd result. Cf. *530 U.S., at 552-553, 147 L. Ed. 2d 435, 120 S. Ct. 2348* (O'Connor, J., dissenting). The jury could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish.

*Blakely,* 542 U.S at 306-307.

Although strictly speaking, Valerio's sentence does not exceed a statutory sentence, in a practical sense it does. The term of years imposed by the District Court constitutes a *de facto* life sentence, even though the statutes under which he was convicted do not carry a penalty of life imprisonment.

Moreover, the impetus for this *de facto* life sentence is supplied in large part by acts which were never proven beyond a reasonable doubt. Consequently, the District Court's reliance upon uncharged conduct implicates a panoply of procedural Due Process rights, including the guarantee that he could not be adjudicated guilty of these offenses except upon proof beyond a reasonable doubt.

Allowing courts to enhance a sentence on the basis of uncharged transgressions not proven to a jury is fundamentally unfair because it enables:

> prosecutors to circumvent the criminal justice system by declining to formally charge a defendant with certain conduct yet introducing evidence of that conduct at sentencing. The prosecutor escapes the burden of proving such conduct beyond a reasonable doubt, while

56

at the same time obtains the punitive benefit as if the conduct had been proven–essentially achieving a "double conviction"–because the sentencing court will almost always rely on that conduct.

Kathryn M. Zainey, *The Constitutional Infirmity Of The Current Federal Sentencing System: How The Use Of Uncharged And Acquitted Conduct To Enhance A Defendant's Sentence Violates Due Process*, 56 Loy. L. Rev. 375, 400 (2010).

In *United States v. Ulbricht*, 858 F.3d 71, 125-129 (2d Cir. 2017), this Court declined to a find that a sentencing court's decision to consider uncharged crimes violated that defendant's rights. Nevertheless, this Court also disapproved of (1) prosecutors offering "emotionally wrenching" and inflammatory evidence of uncharged crimes to elevate a sentence; and (2) sentencing courts admitting such evidence and using it for that purpose. The District Court here failed to heed this admonition. To the extent A.D.'s and Kalichenko's testimony about physical and sexual abuse unrelated to the crimes of conviction were a consideration in the District Court's decision to impose a *de facto* life sentence, it was error.

### B. The District Court Erred by "Inviting" Kalichenko to Testify.

Although the Government argued that Valerio's alleged physical abuse of Kalichenko was a factor that militated in favor of a life sentence, it declined to call her as a witness to prove such abuse. The District Court, however, "invited her to testify" at a *Fatico* hearing about such abuse.

As Judge Learned Hand counseled, "it is seldom very desirable, for a judge to call and examine a witness whom the parties do not wish to call." *United States v. Marzano*, 149 F.2d 923, 925 (2d Cir. 1945). The instant case demonstrates the wisdom of that advice.

First, "as *Townsend v. Burke*, 334 U.S. 736 (1948), recognizes, due process requires that a convicted person not be sentenced on 'materially untrue' assumptions or 'misinformation.'" *United States v. Pugliese*, 805 F.2d 1117, 1123 (2d Cir. 1986). Consequently, a sentencing court has an obligation "to assure itself that the information upon which it relies when fixing sentence is reliable and accurate." *Pugliese*, 805 F.2d at 1124; *United States v. Prescott*, 920 F.2d 139, 143 (2d Cir. 1990).

Kalichenko was so lacking in candor that the Government's decision not to use her as a witness was all but inevitable.[14] Indeed, the Government's lawyer conducted the direct examination of Kalichenko at the *Fatico* hearing only because the Court requested him to do so. Significantly, that lawyer had Kalichenko confirm that the Government had not even met with her to discuss her testimony.

---

[14] The Government did not state why it had declined to call Kalichenko as a witness at the *Fatico* hearing. However, the trial evidence showed that at roughly the same time she was "cooperating" with the FBI in Kiev, Kalichenko told Valerio that she would stop providing videos to the FBI if he were willing to pay her for her silence. That is exactly the sort of behavior that would normally result in the Government rejecting an offer to cooperate or to revoke an existing cooperation agreement with a defendant.

Just as a prosecutor has a duty not to introduce evidence that is likely to be false, a sentencing judge has a duty not to rely on such evidence. Here the District Court not only relied upon unreliable evidence, it introduced that evidence – i.e., Kalichenko's testimony – despite the obvious red flags raised by the Government's unwillingness to call her as its witness.

Second, a trial judge's isolated questioning to clarify ambiguities is one thing; however, "a trial judge cannot assume the mantle of an advocate." *United States v. Beaty*, 722 F.2d 1090, 1095 (3d Cir. 1983). Kalichenko's *Fatico* hearing testimony, however, was not aimed at clarifying prior testimony. Her primary function was to provide testimony about uncharged crimes that could be used to support a harsher sentence for Valerio. In this regard, her function was that of prosecution witness, even though the Government had declined to call her. For this reason, the District Court by "inviting" Kalichenko to testify assumed the mantle of an advocate, a role that is "inconsistent with that detachment and aloofness which courts have again and again demanded, particularly in criminal trials." *Marzano*, 149 F.2d at 926.

Third, the District Court's "invitation" to Kalichenko was improper because "[p]rosecution and judgment are two quite separate functions in the administration of justice; they must not merge." *Marzano*, 149 F.2d at 926. Ultimately, the District Court had to decide the credibility of Kalichenko's *Fatico* hearing

59

testimony and the weight it should be given.[15] However, as Judge Hand observed in *Marzano*, the same person should not be entrusted with these two incompatible functions.

Fourth, when a court "invites" a defendant, who the court will sentence, to testify on a matter of concern to the court, that "invitee" is likely to construe such an "invitation" as something more than a mere suggestion that she should testify.

Indeed, such an "invitation" carries with it the possibility of a longer sentence if it is declined and leniency if it is accepted. Consequently, courts should avoid giving such "invitations." *Cf. United States v. Goodwin*, 770 F.2d 631, 636-637 (7th Cir. 1985) (disapproving judge's advice to defendant that her only chance at acquittal was to testify and noting that it bordered on coercion). *United States v. Giraldo*, 822 F.2d 205 (2d Cir. 1987) (the district court improperly used a 40-year sentence – which it vacated after a recalcitrant witness reversed his refusal to testify – to coerce the witness to testify).

At the *Fatico* hearing, Kalichenko testified that the Government had made her no promises. However, she also acknowledged that she was testifying in hopes of obtaining leniency when the District Court sentenced her on the child pornography crimes to which she had pleaded guilty. (A210-211).

---

[15] Not surprisingly, the District Court decided that the witness it had "invited" to testify was "extremely credible" (A382).

60

In summary, the District Court's "invitation" to Kalichenko to testify compromised the integrity of the proceedings because it (1) interjected into the proceedings testimony from a witness that the Government apparently deemed too unworthy of belief to call as its witness; (2) made the District Court an advocate; (3) resulted in the District Court passing upon the veracity of the very testimony it had interjected into the proceedings; and (4) could be misconstrued by Kalichenko as an implicit promise by the District Court of leniency if she testified.

###### C. *The District Court Used the Wrong Benchmark.*

Where a district court uses an incorrect Guidelines calculation as a benchmark for calculating or devising a non-Guidelines sentence it commits a procedural error reviewable by this Court. *United States v. Dorvee*, 616 F.3d 174, 181-182 (2d Cir. 2010); *United States v. Fagans*, 406 F.3d 138, 141 (2d Cir.2005).

Applying U.S.S.G. §2G2.1, the United States Probation Department set Valerio's Combined Adjusted Offense Level at 42, and as a consequence of U.S.S.G. §4B1.5(b)(1), it added five more levels, which resulted in a Total Offense Level of 47.[16] The highest level on the sentencing table is 43, which calls for a

---

[16] This offense level is typical of the grossly inflated offense levels produced by the child pornography guidelines which, unlike the Guidelines for other offenses, are not the product of the Sentencing Commission's research and technical expertise. *Dorvee*, 616 F.3d at 184-185, citing Alan Vinegrad, *The New Federal Sentencing Law*, 15 Fed. Sent. R. 310, 315 (June 2003) (child pornography Guidelines were

sentence of life. United States Sentencing Commission, *Guidelines Manual* (2014), Chapter 5, p. 400.

Although none of the statutes under which Valerio was convicted authorized a life sentence, the Government argued, and the Court ultimately agreed, that the life sentence indicated in the sentencing chart should provide guidance or serve as an advisory sentence or benchmark that indicated that Valerio should receive an effective sentence of life. The District Court ultimately concluded that the advisory Guidelines, or benchmark sentence, was 260 years (A358-359), a number it achieved by stacking all the sentences to be imposed on each count on which it would sentence Valerio.

In fact, the advisory sentence or benchmark sentence here is not a life sentence as the Government and the Court extrapolated from U.S.S.G. §2G2.1 and the sentencing chart. The correct benchmark is found in U.S.S.G §5G1.1(a), which provides:

> Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, **the statutorily authorized maximum sentence shall be the guideline sentence.** (emphasis supplied).

Indeed, the Government and the District Court here made the same mistake that led this Court to vacate the sentence in *Dorvee*. In that case the District Court

---

virtually dictated by Congress who marginalized the role of the Sentencing Commission in the federal sentencing process).

found that U.S.S.G. §2G2.2 required a sentence of 262 to 327 months, a range which exceeded the maximum sentence authorized by the statute under which the defendant was convicted. Nevertheless, the sentencing court in *Dorvee* used the 262-to-327-months range as a benchmark or reference point for the sentence it imposed. This Court, however held, in sum and substance, that U.S.S.G §5G1.1(a) made the statutory maximum sentence the Guidelines or advisory sentence or benchmark sentence. Consequently, the sentencing court's use of the Guidelines sentencing range that exceeded the statutory maximum (262 to 327months) as the starting point for its sentencing decision rendered the sentence procedurally unreasonable. *Dorvee*, 616 F.3d at 181.

This Court's decision in *Dorvee* establishes beyond cavil that the Guidelines benchmark or sentence in this case is provided by U.S.S.G § 5G1.1(a). [17] Furthermore, § 5G1.1(a) must be read in tandem with U.S.S.G. § 5G1.2(c), which provides:

> If the sentence imposed **on the count carrying the highest statutory maximum** is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law. (emphasis supplied).

---

[17] Moreover, using a Guidelines range beyond the statutory maximum as the benchmark for sentencing is logically inconsistent with Congress' decision to set the statutory maximum sentence below any benchmark or advisory sentence indicated by the Guidelines.

U.S.S.G. §5G1.2(c).

The application of U.S.S.G §5G1.1(a) and U.S.S.G. §5G1.2(c) would produce a benchmark sentence in the realm of, or starting at, 30 years. Indeed, the Probation Department's initial recommendation was a sentence to a total term of 35 years.[18]

In summary, the District Court committed a procedural error when it used 260 years to life as a benchmark for imposing a *de facto* sentence of life imprisonment.

* * *

Because the errors outlined above render Valerio's sentence procedurally unreasonable, this Court should vacate his sentence. Moreover, this matter should be remanded to a different judge for resentencing because the judge who sentenced Valerio (1) "would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected"; and, (2) "reassignment is advisable to preserve the appearance of justice." *United States v.*

---

[18] The Probation Department's initial recommended sentence was 30 years on Counts 1 through 3 and 6 through 14 to run concurrently; 20 years on Counts 4 and 5 to run concurrently to the sentence imposed upon Counts 1 through 3 and 6 through 14; five years on Count 15 to run consecutively to the sentences imposed on the other counts. *See*, Pre-Sentence Report, U.S. Probation Department Sentencing Recommendation.

*Awadallah,* 436 F.3d 125, 135 (2d Cir. 2006); *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (*per curiam*).

## POINT IV

### THE DE FACTO LIFE SENTENCE VALERIO RECEIVED IS SUBSTANTIVELY UNREASONABLE

Review of a sentence for substantive reasonableness is governed by the factors set forth in 18 U.S.C. §3553(a), including the need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence to criminal conduct; and protect the public from further crimes of the defendant. *United States v. Jenkins*, 854 F.3d 181, 187 (2017); *United States v. Carr*, 557 F.3d 93, 107 (2d Cir. 2009).

In addition, a sentence is reviewed for compliance with 18 U.S.C. §3553(a)'s "parsimony clause," which requires a sentencing court to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" in 18 U.S.C. §3553(a)(2). *Dorvee*, 616 F.3d at 182-183; *United States v. Samas*, 561 F.3d 108, 110 (2d Cir.2009). In assessing whether a sentence complies with the § 3553(a)'s "parsimony clause," this Court must:

> look to 'the nature and circumstances of the offense and the history and characteristics of the defendant,' 18 U.S.C. § 3553(a)(1), as well as 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,' 18 U.S.C. § 3553(a)(6), and the Guidelines themselves, 18 U.S.C. § 3553(a)(5).

*Dorvee*, 616 F.3d at 182-183.

A review of the Valerio's *de facto* life sentence in light of these factors demonstrates that it is substantively unreasonable.

### A.   A De Facto Life Sentence is Not Warranted by Valerio's Criminal History or the Goal of Specific Deterrence.

The sentence imposed here is substantively unreasonable because the District Court failed to offer a valid reason why a sentence lower than a *de facto* life sentence was necessary to deter Valerio from future criminal activity involving women and children.  Indeed, none of the justifications proffered by the District Court justify imprisoning Valerio for the rest of his life.

Although Valerio's exploitation of his niece and Kalichenko's daughter and his treatment of women is highly disturbing, a sentencing court confronted with conduct "that generates an especially strong, visceral revulsion," must exercise "special care" to guard its objectivity.  *United States v. Brown*, 843 F.3d 74, 86 (2d Cir. 2016) (Sack, J. concurring). Similarly, given the emotional reaction child pornography and assaults on women evoke, this Court "must be particularly assiduous in assuring objectivity and propriety in assessing the sentence imposed." *Brown*, 843 F.3d at 86.

 The District Court all but ignored Dr. Bardey's uncontroverted opinion that Valerio is not a pedophile. There is no evidence that Valerio himself sought to

engage in sexual relations with his niece or Kalichenko's daughter. Significantly, no victim impact statement was submitted for Valerio's niece or Kalichenko's daughter. Moreover, reported decisions of this Court show that children have been subjected to far worse treatment than the two children who were photographed or video-taped in this case.

Valerio's Guidelines Criminal History Category of I, is hardly a basis for life imprisonment. Nevertheless, the District Court asserted harsher punishment was warranted because the crimes of conviction were committed not by some callow youth but by a seemingly mature man. However, the fact that Valerio had, with the exception of a single misdemeanor conviction, no other convictions was actually a factor that militated against a *de facto* life sentence, a penalty that is usually reserved for hardened offenders with a lengthy criminal history that precludes all likelihood of rehabilitation.

There is no evidence whatsoever to support the notion that Valerio is so completely totally and absolutely incapable of rehabilitation or that the risk of recidivism is so great that a *de facto* life sentence is warranted. To the contrary, Dr. Bardey's assessment indicates that with appropriate treatment the risk of recidivism is not so high as to warrant incarceration for the rest of Valerio's life.

Moreover, specific deterrence is achieved not by lifetime incarceration but "through treatment and supervision, extensive probationary conditions, and a host

of collateral consequences which defendant will face for the rest of his life." *U.S. v. D.M.*, 942 F. Supp.2d 327, 346 (E.D.N.Y. 2013). The District Court failed to explain why the stringent conditions of supervised release currently imposed upon sex offenders like Valerio would not be sufficient to protect women and children.

In addition, the District Court's conclusion that Valerio would inevitably repeat his crimes is refuted by "widely available, definitive research demonstrating that recidivism substantially decreases with age."[19] *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017), citing U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (hereinafter "Measuring Recidivism),* available at http://www. ussc.gov/sites/default/files/pdf/research–and–publications/research–publications/ 2004/200405_Recidivism_Criminal_History.pdf.  That research shows that individuals like Valerio "with a Criminal History Category I between ages 41 to 50 have a 6.9% recidivism rate, as opposed to a 29.5% recidivism rate for Category I offenders under 21."[20] *Jenkins,* 854 F.3d at 192; *Measuring Recidivism*, Exhibit 9,

---

[19] Ironically, the District Court cited the fact that Valerio's crimes occurred later in his life as a factor that warranted imprisonment for the rest of his life.  (A380-381).

[20] A more recent study by the Sentencing Commission confirms the findings in the study cited by this Court in *Jenkins*.  U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) at p. 3 ("For offenders in Criminal History Category I, the rearrest rate ranged from 53.0 percent for offenders younger than age 30 at the time of release to 11.3 percent for offenders age 60 or older.").

Primary Definition Recidivism Rates for General Demographic Variables, by Criminal History Category, Gender, Age at Sentencing, and Race.

Although the Government seems to have persuaded the District Court that sex offenders are an exception to the general rule that risk of recidivism decreases as an offender ages, studies regarding recidivism rates for child pornography and other sex offenders of every age dispel the myth they pose a higher rate of recidivism than other offenders. They may have lower rates of recidivism than those who commit different crimes. Deirdre M. Smith, *Dangerous Diagnoses, Risky Assumptions, And The Failed Experiment Of "Sexually Violent Predator" Commitment*, (hereinafter "*Dangerous Diagnoses*"), 67 Oklahoma Law Review 619, 671-672 (2015) (contrary to a common assumption, the recidivism rate among sex offenders for committing a future sex offense is actually quite low). *United States v. RV*, 157 F.Supp.3d 207, 240 (E.D.N.Y. 2016). And, to state the obvious, the offender in *Jenkins*, whom this Court concluded posed a lesser risk of recidivism because of his age, was sentenced for a child pornography offense.

The paraphilias that Dr. Bardey identified are not, as the District Court assumed and the Government argued, a predictor of future dangerousness. To the contrary, "statistical analysis reveals the absence of a strong correlation between a paraphilia and sexual violence." *Dangerous Diagnoses*, 67 Oklahoma Law Review at 676 & n. 368.

69

Equally erroneous is the District Court's conclusion that Valerio poses a higher risk of recidivism because it had taken him a few years and multiple sessions with Dr. Bardey to begin to realize that he had serious mental and emotional disorders that he needed to address. This Court rejected a similar argument in *Jenkins* where the sentencing judge asserted Jenkins' refusal to accept responsibility, his attempts to blame others, and his disrespect for the law indicated that he posed a greater risk of recidivism.  This Court noted that the Sentencing Commission's statistics on age and recidivism includes offenders "who accepted responsibility as well as those who did not," and consequently the Sentencing Commission's data demonstrated a lower recidivism risk than the sentencing judge assumed. *Jenkins,* 854 F.3d at 192.

Furthermore, given the severity of the abuse he had suffered and witnessed and the amount of time that Valerio had suffered with little or no therapeutic intervention, it is hardly surprising that Valerio only gradually began to realize the root causes of is anti-social behavior and to form the resolve to address them.[21]

Similarly, Valerio's misdemeanor conviction and his purported failure to take advantage of the sex offender treatment that he was required to undergo does not "bear the weight assigned it under the totality of circumstances in the case."

---

[21] Considering the longstanding nature of his problems, an instantaneous realization, or sudden epiphany, would have raised doubts about its sincerity.

*Cavera*, 550 F.3d at 191. The inadequacy of that course of treatment to address Valerio's psychological problems does not mean that additional treatment will be unsuccessful.

      B.   *A De Facto Life Sentence Ignores and Undermines the Goal of Rehabilitation.*

The District Court's *de facto* sentence of life imprisonment does not comport with 18 U.S.C. § 3553 (a)(2)(D)'s requirement that a sentencing court consider the need to provide a defendant medical care or other correctional treatment "in the most effective manner."

The District Court did recommend that Valerio receive mental health treatment in prison. (A395). However, a sentence that ensures that Valerio will die in prison is a powerful disincentive for him to overcome the psychological problems that are the impetus for his anti-social behavior. "It is a sentence that 'means denial of hope,' that 'good behavior and character improvement are immaterial,' that 'whatever the future might hold in store for the mind and spirit ..., [he] will remain in prison for the rest of his days.'" *Brown*, 843 F.3d at 92 (Pooler, J., dissenting).

      C.  *A De Facto Life Sentence Undermines The Goal of General Deterrence.*

The District Court acknowledged that general deterrence, although not "the driving force," was nevertheless, a factor that in its decision. (A378). However, if

71

"general deterrence" means preventing crime, a *de facto* life sentence thwarts, albeit unintentionally, that goal.

> If child pornographers:

>> are subjected to longer prison sentences than necessary for the purposes of public safety, public monies and resources expended upon incarceration are wasted. In addition, if sentences are disproportionately severe to the crime committed, notions of fairness and justice are compromised.

Melissa Hamilton, The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?, 22 Stan. L. & Pol'y Rev. 545, 546 (2011); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1103-1104 (N.D. Iowa 2009) (noting the lack of any evidence that harsher sentences have reduced the flow of child pornography on the Internet). *See also*, Carol S. Streiker, *Lessons from Two Failures: Sentencing for Cocaine and Child Pornography under the Federal Sentencing Guidelines in the United States*, 76 Law & Contemp. Probs. 27, 37 (2013). *See also Brown*, 843 F.3d at 92 (Pooler, J., dissenting) (*quoting United States v. Newsom*, 402 F.3d 780, 785–786 (7th Cir. 2005)) (treating sex offenders more harshly than other more culpable offenders frustrates the goal of marginal deterrence, the basic premise of which is "that the harshest sentences should be reserved for the most culpable behavior.").

D. *A De Facto Life Sentence is Grossly Disparate Treatment.*

18 U.S.C. §3553(a)(1), requires a sentencing court to "avoid unwarranted sentence disparities among defendants." However, the *de facto* life sentence Valerio received is grossly disparate to the typical sentence imposed on other child pornography offenders.

First, as a recent report from the United States Commission indicates, *de facto* life sentences – which the report defines as a sentence of 470 months or longer – are rare:

> As of January 2015, there were 1,983 offenders in the BOP system serving a sentence of incarceration of 470 months or longer. They accounted for 1.1 percent of all federal sentenced offenders.

Schmitt, G. et al., *Life Sentences in the Federal System*, U.S. Sentencing Comm'n (February 2015) (hereinafter "*Life Sentences*"), at p. 10 (footnote omitted).

Indeed, *de facto* life sentences are rare even in child pornography cases, "accounting for just 2.9 percent of all child pornography sentences." *Life Sentences* at p. 11.

Second, the term of years imposed by the District Court –assuming Valerio lives long enough to complete that sentence – still exceeds the typical sentence for his crimes. According to the United States Sentencing Commission's Interactive Sourcebook, the mean sentence imposed where the primary Guideline is U.S.S.G.

§ 2G2.1 is 311 months and the median sentence is 240 months. U.S. Sentencing Comm'n, Interactive Sourcebook, available at https://isb.ussc.gov/Login.[23]

* * *

For the above-stated reasons, this Court should vacate the sentence imposed upon Valerio, and for reasons stated in Point III, *supra*, at 64, he should be resentenced by a different judge.

## POINT V

### THE SENTENCES IMPOSED ON COUNTS TWO, THREE, FIVE, FIFTEEN, SIX, SEVEN, AND EIGHT VIOLATE THE DOUBLE JEOPARDY CLAUSE

The sentences on Counts Two and Three violate the Double Jeopardy Clause because they punish Valerio twice for the same offense. The sentences imposed on Count Five (receiving child pornography) and Count Fifteen (possession of child pornography) violate the Double Jeopardy Clause because possession is a lesser included offense of receiving child pornography, and the verdict on both counts is based upon the same images, the images of S.K. that were on Valerio's computer. Finally, Counts Six, Seven, and Eight – which charge attempts to sexually exploit S.K. – were simply steps on the way to the completed crime of sexual exploitation charged in Counts Two and Three. Consequently, the

---

[23] According to the Sentencing Commission's website, this data is from the Commission's fiscal year 2016 Datafile, USSCFY2016.

sentences imposed upon Counts Six, Seven, and Eight, punish Valerio for the same crimes for which he has been sentenced under Counts Two and Three.

### A. *Count Two and Count Three are Essentially the Same Offense.*

The only difference between Count Two and Count Three is that Count Two is premised upon 18 U.S.C. §2251(a) while Count Three is premised upon 18 U.S.C. §2251(c). However, 18 U.S.C. §2251(a) and 18 U.S.C. §2251(c) are essentially the same crime. *United States v. McVicker,* 979 F. Supp. 2d 1154, 1173 (D. Oregon). Section 2251(c) . . . largely proscribes the same conduct as § 2251(a), except that it specifically targets conduct "outside of the United States, its territories or possessions.").

Both §2251(a) and §2251(c) criminalize the exploitation of a child that occurs outside the United States. Although §2251(a) does not explicitly state that it applies to violations committed outside the United States, courts have held that it does. *United States v. Thomas*, 893 F.2d 1066, 1069 (9th Cir. 1990); *United States Kapordelis*, 569 F.3d 1291, 1306 (11th Cir. 2009).

Section 2251(c), was added by Congress in 2003 to clarify the extraterritorial scope of §2251(a) and thereby put an end to efforts by producers of child pornography to avoid criminal liability by claiming that their child pornography was produced outside of the United States. *McVicker,* 979 F. Supp. at 1173, citing H.R. Conf. Rep. No. 108-66, at 62-63 (2003).

75

Because Counts Two and Three punish Valerio twice for the same offense, the judgment of conviction on one of those counts should be vacated and the underlying count should be dismissed.

### B. Count Fifteen is a Lesser Included Offense of Count Five.

The sentence imposed under Count Fifteen (possession of child pornography) violates the Double Jeopardy Clause because it punishes Valerio twice for conduct encompassed by Count Five (receipt of child pornography).

A number of this Court's sister circuits have held that Congress did not intend to authorize prosecution for both receipt and possession based on the same underlying pornographic material. *See United States v. Benoit*, 713 F.3d 1, 16 (10th Cir. 2013); *United States v. Ehle*, 640 F.3d 689, 698 (6th Cir. 2011); *United States v. Muhlenbruch*, 634 F.3d 987, 1003 (8th Cir. 2011); *United States v. Bobb*, 577 F.3d 1366, 1373-74 (11th Cir. 2009); *United States v. Miller*, 527 F.3d 54, 72 (3d Cir. 2008); *United States v. Davenport*, 519 F.3d 940, 947 (9th Cir. 2008). While this Court has not yet squarely held that possession of child pornography is a lesser included offense of receiving child pornography, it has found the reasoning of these circuits persuasive. *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009); *United States v. Irving*, 554 F.3d 64 (2d Cir. 2009).

Count Fifteen alleged that Valerio possessed child pornography on January 28, 2014.   In its closing argument, the Government argued that the jury could convict Valerio of Count Fifteen on the basis of the images found on his computer:

> And how do you know that he possessed it?  Again, he asked for it; he got it; paid for it. It was all on the computer, and it was on the defendant's one on January 28, 2014, the day of the first search warrant. That's when the computer was taken. That's what the indictment says as the date that the defendant possessed the child pornography involving both of the young girls.  (T986).

The images on Valerio's computer were the same images that provided the basis for his conviction on Count Five (receipt of child pornography), the images of S.K. he received from Kalichenko.   On the other hand, the images of S.I. were found on an SD card, not the computer as the Government erroneously asserted in its closing argument.   Consequently, the jury could not have convicted Valerio of Count Fifteen on the basis of S.I. images that were not on the computer.  And, in an abundance of caution, we note that the verdict on Count Fifteen cannot be explained away on the basis of a theory never submitted to the jury – i.e. that the jury could convict on the basis of on images of S.I. on an SD card.  *United States v. Polouizzi*, 564 F.3d 155, n. 5, citing *Chiarella v. United States*, 445 U.S. 222, 236-37, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980) (noting that "we cannot affirm a criminal conviction on the basis of a theory not presented to the jury").

Furthermore, in the absence of a clear and unambiguous indication to the contrary, possession is a continuing crime, and multiple violations of the statute cannot be concocted by charging multiple counts covering different time periods. Valerio cannot be punished twice for pornography he received and therefore possessed between April 1, 2012 and November 1, 2012, simply because he still possessed that material on January 28, 2014.

### C. The Attempts Charged in Counts Six, Seven and Eight Merged into the Completed Crime Charged in Counts Two And Three.

"[A] defendant may be charged with committing a completed offense and with attempting to commit the same offense, and those charges may be submitted to the trier of fact if evidence supports both offenses. It is also clear, however, that a defendant may not be convicted of both the attempt and the completed crime, because all the elements of the attempt are included in the completed offense and a dual conviction would amount to double jeopardy." *United States v. Rust*, 650 F.2d 927, 928 (8th Cir. 1981). The District Court correctly concluded that Counts Nine through Thirteen – which charged attempts to exploit S.K. – were included in Count Two – which charges sexual exploitation of a child as a completed offense.[24] Consequently, the District Court, citing *Rust*, ultimately dismissed those counts.

---

[24] In an abundance of caution, we note that the attempts charged in Counts Nine through Thirteen are also included in Count Three.

However, Counts Six, Seven, and Eight – also charged attempts to sexually exploit S.K. that occurred on January 23 and 24, 2012, and March 28, 2012. Although those attempts occurred before the time frame alleged in Count Two (April 1, 2012 and November 1, 2012), Counts Six, Seven, and Eight were nevertheless steps along the way to the completion of the completed crime alleged in Count Two, sexual exploitation of S.K. Therefore, Counts Six through Eight should also have been dismissed.

### D. Plain Error

Although trial counsel preserved the argument that the counts charging an attempt to exploit S.K. merged into Count Two, he did not, argue that Count Fifteen is a lesser included offense of Count Five. Nor did trial counsel argue that Counts Two and Three charge the same crime. However, this Court has "often found multiple convictions for a single statutory violation to constitute plain error although [it has] not previously addressed specifically whether the conduct at issue was intended by Congress to be a single statutory violation." *Poliuzzi*, 564 at 156. (matter in brackets supplied). *See also United States v. Handakas,* 286 F.3d 92, 99 (2d Cir. 2002) ("Because we find no precedential or statutory support for the multiple structuring charges, conviction on two separate counts constituted an 'error' that is 'plain.'").

\* \* \*

79

For the above stated reasons, and the reasons stated at Point III, *supra*, at 64, the Court should remand this matter to the District Court and a different judge with instructions to vacate the sentences imposed upon Counts Three, Six, Seven, Eight, and Fifteen and to dismiss those counts.

## CONCLUSION

**FOR THE REASONS STATED IN POINTS I AND II, THIS COURT SHOULD REVERSE VALERIO'S CONVICTION AND SUPPRESS THE STATEMENTS ELICITED FROM HIM DURING THE SEARCH OF HIS HOME. FOR THE REASONS STATED IN POINTS III AND IV, THIS COURT SHOULD VACATE THE *DE FACTO* LIFE SENTENCE IMPOSED ON VALERIO AND REMAND THIS MATTER TO A DIFFERENT JUDGE FOR RESENTENCING. FOR THE REASONS STATED IN POINT FIVE, THIS COURT SHOULD REMAND THIS MATTER TO A DIFFERENT JUDGE WITH INSTRUCTIONS TO VACATE THE SENTENCES IMPOSED UPON COUNTS THREE, SIX, SEVEN, EIGHT, AND FIFTEEN AND TO DISMISS THOSE COUNTS.**

Respectfully Submitted,

<u>Date</u>: March 5, 2018

/s/ Louis M. Freeman
Louis M. Freeman
Freeman, Nooter & Ginsberg
75 Maiden Lane, Suite 503
New York, NY 10038
(212) 608-0808

*Attorneys for Appellant-Defendant*

80

## CERTIFICATE OF COMPLIANCE

Excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 18, 279 words.  On Friday, March 2, 2018, undersigned counsel made a motion to the Second Circuit Court of Appeals requesting permission to file an oversized brief.  That motion is pending approval.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
    March 5, 2018

/s/ Louis M. Freeman
Louis M. Freeman

# Special Appendix

**i**

## TABLE OF CONTENTS

**Page**

Final Order of Forfeiture, undated ............................. SPA-1

Judgment, dated June 6, 2017, Appealed From ......... SPA-4

*U.S. v. Valerio*, decided June 1, 2017, filed in U.S.
District Court, Eastern District of New York,
Case No. 14-CR-94 ................................................. SPA-11

SPA-1

SLR:LDM
F. #2014R00151

FILED
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 3 1 2017 ☆

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

     - against -

JOSEPH VALERIO,

         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

<u>FINAL ORDER OF FORFEITURE</u>

14-CR-0094 (S-2) (JFB)

WHEREAS, on or about November 13, 2014, the defendant, Joseph Valerio (the "Defendant"), was convicted, after a jury trial, of all counts of the Superseding Indictment;

WHEREAS, on November 20, 2014, this Court entered a Preliminary Order of Forfeiture (the "Preliminary Order") pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, finding that all right, title and interest in (i) one V Premier desktop computer, serial number P80003011134; (ii) one 4 gigabyte SD Card, no serial number; and  (iii) the real property and premises located at 3 High Gate Drive, Smithtown, New York 11787, together with its respective buildings, appurtenances, improvements, fixtures, attachments, and easements, designated as District 473400, Section 50, Block 5 and Lot 23 on the Suffolk County Tax Map (the "High Gate Drive Premises"), are forfeitable to the United States, pursuant to 18 U.S.C. § 2253(a), as property that constitutes: (a) visual depictions described in 18 U.S.C. §§ 2251, 2251A, 2252, 2252A, 2252B or 2260, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced,

SPA-2

transported, mailed, shipped or received in violation of such sections; (b) property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offenses; (c) property, real or personal, used or intended to be used to commit or to promote the commission of said offense or property traceable to such property; and/or (d) as substitute assets pursuant to 21 U.S.C. § 853(p);

WHEREAS, legal notice of the forfeiture was published in this district on the official government website, www.forfeiture.gov, for thirty (30) consecutive days beginning December 23, 2014 through and including January 21, 2015 (Docket no. 105); and

WHEREAS, on or about April 24, 2015, after entry of the Preliminary Order, the Defendant entered into a Stipulation and Amended Preliminary Order of Forfeiture (the "Stipulation") only as to the High Gate Drive Premises, wherein the defendant would pay the government the sum of seventy-five thousand dollars and no cents ($75,000.00) (the "Forfeited Funds") as a substitute res in lieu of the High Gate Drive Premises; and

WHEREAS, no third party has filed with the Court any petition or claim in connection with the Seized Assets and the Forfeited Funds and the time to do so under 21 U.S.C. § 853(n)(2) has expired.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that pursuant to 18 U.S.C. § 2253(a) and 21 U.S.C. § 853(p), the Preliminary Order and the Stipulated and Amended Preliminary Order of Forfeiture, all right, title, and interest in the Seized Assets and the Forfeited Funds are hereby condemned, forfeited, and vested in the United States of America.

United States v. Joseph Valerio 14-CR-0094 (S-2) (JFB)
Final Order of Forfeiture
2

SPA-3

IT IS FURTHER ORDERED that the United States Marshals Service and/or the Federal Bureau of Investigation, or their duly authorized agents and/or contractors be, and hereby are, directed to dispose of the Seized Assets and the Forfeited Funds in accordance with all applicable laws and regulations.

IT IS FURTHER ORDERED that the United States District Court for the Eastern District of New York shall retain jurisdiction over this case for the purpose of enforcing the Preliminary Order and this Final Order of Forfeiture and any supplemental orders of forfeiture as may be necessary.

IT IS FURTHER ORDERED that the Clerk of Court shall enter final judgment of forfeiture to the United States in accordance with the terms of this Final Order and the Preliminary Order of Forfeiture.

IT IS FURTHER ORDERED that the Clerk of Court shall send by inter-office mail five (5) certified copies of this executed Final Order of Forfeiture to Asset Forfeiture Paralegal Brian Gappa, United States Attorney's Office, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722.

Dated: Central Islip, New York
~~June~~ ___, 2017
July 31

SO ORDERED:

_____
HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>Joseph Valerio | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:  CR 14-0094<br>USM Number:  83257-053<br><br>Anthony LaPinta, 200 Vanderbilt Pkwy, Hauppauge<br>Defendant's Attorney |

*FILED*
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 06 2017 ★

LONG ISLAND OFFICE

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1, 2,3,4,5,6,7,8,14, and15
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2251(e) | Conspiracy to commit sexual exploitation of a child. | 11/1/2012 | 1 |
| 18 U.S.C. § 2251(a),<br>18 U.S.C. § 2251(e) | Sexual Exploitation of a child. | 11/1/2012 | 2 |

The defendant is sentenced as provided in pages 2 through ____7____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   9-13 & Underlying Indictment   ☐ is   ☑ are dismissed on the motion of the United States.

        It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/6/2017
Date of Imposition of Judgment

Signature of Judge

Joseph F. Bianco, U.S.D.J.
Name and Title of Judge

7/31/2017
Date

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 1A

|  |  |  | Judgment—Page | 2 | of | 7 |
|---|---|---|---|---|---|---|

DEFENDANT:  Joseph Valerio
CASE NUMBER:  CR 14-0094

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2251(c), | | | |
| 18 U.S.C. § 2251(e) | Sexual Exploitation of a child. | 11/1/2012 | 3 |
| 18 U.S.C. § 2252(a)(1), | | | |
| 18 U.S.C. § 2252(b)(1) | Transportation of child pornography. | 11/1/2012 | 4 |
| 18 U.S.C. § 2252(a)(2), | | | |
| 18 U.S.C. §2252(b)(1) | Receipt of child pornography. | 11/1/2012 | 5 |
| 18 U.S.C. § 2251(e) | Attempted sexual exploitation of a child. | 1/23/2012 | 6 |
| 18 U.S.C. § 2251(e) | Attempted sexual exploitation of a child. | 1/24/2012 | 7 |
| 18 U.S.C. § 2251(e) | Attempted sexual exploitation of a child. | 3/28/2012 | 8 |
| 18 U.S.C. §§ 2251(a) | | | |
| and (e) | Sexual exploitation of a child. | 1/19/2011 | 14 |
| 18 U.S.C. §§ 2252(a)(4) | | | |
| (B) and (b)(2) | Possession of child pornography. | 1/28/2014 | 15 |

SPA-6

AO 245B (Rev. 11/16)   Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __3__ of __7__

DEFENDANT:  Joseph Valerio
CASE NUMBER:  CR 14-0094

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

720 months, consisting of the following: 30 years on Counts 1,2,3,6,7,8 and 14, to run concurrently to each other; 20 years on Counts 4 and 5, to run concurrently to each other and consecutively to the other remaining counts; 10 years, to run consecutively to all other counts.

☑ The court makes the following recommendations to the Bureau of Prisons:

That the defendant be designated as close as possible to Long Island.
That the defendant receive sex offender treatment in jail.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m.  ☐ p.m.  on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-7

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
                Sheet 3 — Supervised Release

|  | Judgment—Page | 4 | of | 7 |
|---|---|---|---|---|

DEFENDANT:   Joseph Valerio
CASE NUMBER:   CR 14-0094

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :    Lifetime

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you
       pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA-8

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment—Page | 5 | of | 7 |

DEFENDANT:  Joseph Valerio
CASE NUMBER: CR 14-0094

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

SPA-9

AO 245B(Rev. 11/16)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page __6__ of __7__

DEFENDANT: Joseph Valerio
CASE NUMBER: CR 14-0094

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall comply with the Forfeiture Provision.

2. The defendant shall make full financial disclosure to the probation officer.

3. the defendant shall comply with the sex offender registration requirements mandated by law.

4. the defendant shall participate in a mental health treatment program, which may include participation in a treatment program for sexual disorders, as approved by the Probation Department. The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment. The defendant shall disclose all financial information and documents to the Probation Department to assess his ability to pay. As part of the treatment program for sexual disorders, the defendant shall participate in a polygraph examination(s) to obtain information necessary for risk management and correctional treatment.

5. The defendant shall refrain from contacting the victims of the offense.

6. The defendant will not associate with any child(ren) under the age of 18, unless a responsible adult is present and he has prior approval from the Probation Department.

7. Unless otherwise indicated in the treatment plan provided by the sex offender treatment program, the defendant is prohibited from viewing, owning or possessing any obscene, pornographic, or sexually stimulating visual or auditory material including telephone, electronic media, computer programs, or computer services that have a reasonably direct relationship to the offender's deviant behavior pattern.

8. If the defendant cohabits with an individual who has minor children, the defendant will inform that other party of his prior criminal history concerning his sex offense. Moreover, he will notify the party of his prohibition of associating with any child (ren) under the age of 18, unless a responsible adult is present.

9. The defendant is not to use a computer, Internet capable device, or similar electronic device to access pornography of any kind. The term "pornography" shall include images or video of adults or minors engaged in "sexually explicit conduct" as that term is defined in Title 18, United States Code, Section 2256(2). The defendant shall not communicate via his computer with any individual or group who promotes the sexual abuse of children. The defendant shall also cooperate with the U.S. Probation Department's Computer and Internet Monitoring program. Cooperation shall include, but not be limited to, identifying computer systems, Internet capable devices, and/or similar electronic devices the defendant has access to, and allowing the installation of monitoring software/hardware on said devices, at the defendant's expense. The defendant shall inform all parties that access a monitored computer, or similar electronic device, that the device is subject to search and monitoring. The defendant may be limited to possessing only one personal Internet capable device, to facilitate our department's ability to effectively monitor his/her Internet related activities. The defendant shall also permit random examinations of said computer systems, Internet capable devices, similar electronic devices, and related computer media, such as CDs, under his control.

10. The defendant shall notify his employer of his computer related offense, if his job requires computer access with Internet capability.

11. The defendant shall not possess a firearm, ammunition, or destructive device.

12. The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

SPA-10

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT: Joseph Valerio
CASE NUMBER: CR 14-0094

Judgment — Page  7  of  7

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __1,000.00__  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    See attached order.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

SPA-11

 Neutral

As of: February 22, 2018 7:46 PM Z

## *United States v. Valerio*

United States District Court for the Eastern District of New York

June 1, 2017, Decided; June 1, 2017, Filed

No 14-CR-94 (JFB)

**Reporter**

2017 U.S. Dist. LEXIS 84118 *

UNITED STATES OF AMERICA, VERSUS JOSEPH VALERIO, Defendant.

**Prior History:** *United States v. Valerio, 9 F. Supp. 3d 283, 2014 U.S. Dist. LEXIS 45790 (E.D.N.Y., Apr. 1, 2014)*

## Core Terms

daughter, pair, sentencing, child pornography, sexual, sexual assault, violent, interview, witnesses, credible, picked, assaults, arrived, exploit, physically, uncharged, happened, traveled, airport, driving, e-mail, pulled

**Counsel:** [*1] For The government: Allen Lee Bode and Ameet B. Kabrawala, Assistant United States Attorneys, United States Attorney's Office for the Eastern District of New York, Brooklyn, New York.

For Defendant: Anthony M. LaPinta of Reynolds, Caronia, Gianelli, Hagney, LaPinta & Hargraves, Hauppauge, New York.

**Judges:** JOSEPH F. BIANCO, United States District Judge.

**Opinion by:** JOSEPH F. BIANCO

## Opinion

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge:

On November 13, 2014, a jury convicted defendant Joseph Valerio ("defendant" or "Valerio") of one count of conspiracy to sexually exploit a child, in violation of *18 U.S.C. § 2251(e)*; three counts of sexually exploiting a child, in violation of *18 U.S.C. §§ 2251(a)*, *(c)*, and *(e)*; seven counts of attempted sexual exploitation of a child, in violation of *18 U.S.C. § 2251(e)*; one count of transporting child pornography, in violation of *18 U.S.C. §§ 2252(a)(1)* and *(b)(1)*; one count of receiving child pornography, in violation of *18 U.S.C. §§ 2252(a)(2)* and *(b)(1)*; and one count of possessing child

United States v. Valerio

pornography, in violation of *18 U.S.C. §§ 2252(a)(4)(B)* and *(b)(2)*. (ECF No. 95.) Sentencing has been scheduled for June 6, 2017.

In March 2016, the Probation Department submitted an Addendum to the Presentence Report, advising the Court, *inter alia*, that the government had provided information about (1) a women (referred to herein by her **[*2]** initials "A.D.") who had advised the government that, during a romantic relationship that she had with the defendant, the defendant had physically and sexually assaulted her; and (2) another women who had been hired by the defendant as an au pair through an agency, only to learn when she arrived to the United States from England that there was no child in his home for whom to provide care. In addition, during the course of the proceedings involving co-conspirator Olena Kalichenko, the Court became aware that Ms. Kalichenko was asserting that the defendant sexually assaulted her during their relationship, which also involved Ms. Kalichenko producing child pornography of her daughter in the Ukraine at the defendant's request. *See, e.g., United States v. Olena Kalichenko*, March 17, 2011 Hearing, ECF No. 87, at 9.[1]

Although this alleged additional conduct by the defendant did not involve child pornography, the Court determined that this alleged uncharged violent conduct, which the defendant disputes, may constitute "relevant conduct" under *Section 1B1.3 of the United States Sentencing Guidelines* and/or would be facts that the Court in its discretion could consider as part of the statutory sentencing factors, including the defendant's history **[*3]** and characteristics and the need to protect the public from further crimes of the defendant, pursuant to *18 U.S.C. § 3553(a)* ("*Section 3553(a)*"). Thus, the Court held a *Fatico* hearing on July 25 and September 26, 2016 (ECF Nos. 126, 129) regarding the disputed conduct. *See United States v. Fatico, 579 F.2d 707 (2d Cir. 1978)*, cert. denied, *444 U.S. 1073, 100 S. Ct. 1018, 62 L. Ed. 2d 755 (1979)*.

As set forth in more detail below, having conducted that evidentiary hearing, including an evaluation of the demeanor and credibility of the witnesses, the Court finds that the government has proven, by a preponderance of the evidence, that (1) the defendant physically and sexually assaulted Olena Kalichenko during the course of his relationship with her; (2) the defendant physically and sexually assaulted A.D. during his relationship with her; and (3) the defendant deceived another woman into believing that she was coming to his house from England to be an au pair, even though there was no child in his house. Although the Court has considered the various arguments in the defendant's written submission as to why the witnesses' testimony was not credible, the Court finds those arguments unpersuasive based upon the Court's own evaluation of the witnesses' credibility at the hearing. In addition, to the extent that there is any suggestion **[*4]** that the alleged violent acts recounted by the witnesses were consensual (based, for example, on a "contract" that Ms. Kalichenko signed), the Court similarly finds those suggestions unpersuasive in light of the credible testimony of the victims.

Accordingly, at sentencing, the Court intends to consider the defendant's physical and sexual assaults of Ms. Kalichenko and A.D. in connection with the *Section 3553(a)* factors—namely, the defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public

---

[1] In this Memorandum and Order, in an effort to protect the privacy of an alleged victim of a sexual assault, the Court refers to the witness "A.D." by her initials. However, given the unique status of Ms. Kalichenko as a charged co-conspirator with respect to the production of child pornography, any effort to protect her identity is futile and, thus, the Court has not redacted her name.

United States v. Valerio

from further crimes by the defendant.[2] Finally, although the defendant's conduct towards the au pair was not violent and the Court does not consider it in that regard, the Court finds that the credible testimony regarding the circumstances surrounding the defendant's interactions with the au pair serves to corroborate the testimony of Ms. Kalichenko and A.D. regarding the deceptive and manipulative conduct by the defendant during their respective relationships with him.[3]

I. APPLICABLE LAW

Pursuant to *18 U.S.C. § 3661*, Congress has made clear that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted **[*5]** of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Supreme Court has emphasized that, "[a]s a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which in may come." *Witte v. United States, 515 U.S. 389, 398, 115 S. Ct. 2199, 132 L. Ed. 2d 351 (1995)* (citation omitted). The Second Circuit has further explained that "in the post-*Booker* advisory Guidelines regime, the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines range themselves." *United States v. Thavaraja, 740 F.3d 253, 262 (2d Cir. 2014)*. Consideration of a broad range of conduct may include uncharged or even acquitted conduct, *United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994)*, as long as the government proves the conduct by a preponderance of the evidence, *United States v. Vaughn, 430 F.3d 518, 526 (2d Cir. 2005)*. *See also United States v. Ulbricht, 858 F.3d 71, 2017 U.S. App. LEXIS 9517, 2017 WL 2346566, at *38 (2d Cir. May 31, 2017)* ("A district court may consider as part of its sentencing determination uncharged conduct proven by a preponderance of the evidence as long as

In light of this discretion, numerous courts have considered uncharged violent conduct by a defendant at sentencing in determining, *inter alia*, his "history and characteristics" and/or the degree to which there is **[*6]** a need "to protect the public from further crimes of the defendant" pursuant to *18 U.S.C. §§ 3553(a)(1)* and *(a)(2)(C)*. *See, e.g.*, *United States v. Robinson, 520 F. App'x 20, 22-23 (2d Cir. 2013)* (affirming, in a robbery case, the court's consideration at sentencing of the defendant's involvement in shooting death of a victim in an unrelated case); *United States v. Wilbers, 442 F. App'x 491, 495 (11th Cir. 2011)* (holding that district court did not abuse its discretion in considering the defendant's prior past domestic violence arrests in sentencing him for possession of ammunition by a convicted felon); *United States v. Jordan, 435 F.3d 693, 697 (7th Cir. 2006)* (affirming sentence where district court considered, among other things, the defendant's prior sexual abuse of his own daughter and the creation and

---

[2] The Court notes that the defendant's conduct towards Ms. Kalichenko is arguably "relevant conduct" because it could be viewed as being in preparation for, and inextricably intertwined with, his subsequent conspiracy with Ms. Kalichenko to sexually exploit her child in the Ukraine and to produce child pornography with her child at his direction. *U.S.S.G. §§ 1B1.3(a)(1)(A)*, *(3)*; *United States v. Wernick, 691 F.3d 108, 115 (2d Cir. 2012)*; *see also United States v. Ahders, 622 F.3d 115, 120 (2d Cir. 2010)* (affirming finding that uncharged molestation of two minors was relevant to conviction for child pornography production because it " it occurred during the period that [the defendant] was producing pornographic images"). However, the Court concludes that the defendant's violent conduct towards Ms. Kalichenko, along with his violent conduct towards A.D., is more appropriately treated under the particular circumstances of this case as part of his "history and characteristics" under ***Section 3553(a)(1)*** and the need to protect the public from further crimes by the defendant under ***Section 3553(a)(2)(C)***.

[3] In any event, even if the Court did not consider the interactions with the au pair at all, it would reach the that conduct does not increase either the statutory minimum or maximum available punishment."). same conclusions with respect to Ms. Kalichenko and A.D.

SPA-14

United States v. Valerio

possession of child pornography for which he was not charged); *United States v. Amirault, 224 F.3d 9, 13-15 (1st Cir. 2000)* (where a defendant was convicted of possessing child pornography, sentencing court could consider his sexual assaults against his two minor sisters-in-law twenty years earlier).

II. FINDINGS OF FACT

At the July 25, 2016 *Fatico* hearing, the government presented the testimony of Lucy Down ("Down"), an au pair who was hired to work for defendant; Jolene Leonardo ("Leonardo"), who worked for the au pair agency; and co-conspirator Olena Kalichenko ("Kalichenko"). In addition, at the September 26, 2016 hearing, the government presented the **[\*7]** testimony of A.D., the mother of Valerio's daughter. Defendant did not call any witnesses during the *Fatico* hearing. Having conducted the evidentiary hearing, including evaluating the credibility of the witnesses, the Court finds the testimony of the government's witnesses to be fully credible, and that the government has proven the facts summarized below by a preponderance of the evidence.

A. Down

At the time of her testimony, Down was 22-years old and living in the United Kingdom. (*United States v. Valerio*, 14-CR-94 (JFB), Tr. of July 25, 2016 Hr'g at 8.) In 2012, after finishing college at the age of 18, Down decided to travel to the United States and applied to an au pair company called GAP 360, which was known as InterExchange in the United States. (*Id.* at 9-10.) Valerio contacted Down through the company's database to interview her for an au pair position. (*Id.* at 10-11.) On or about September 17, 2012, Valerio interviewed Down remotely via Skype. (*Id.* at 13-14.) During that interview, Valerio told Down that he had a daughter named Sylvia who was 8-years old, and that Down would be responsible for caring for her. (*Id.* at 14-15.)

On or about October 22, 2012, Down traveled to the United States to begin work for Valerio as an au pair. (*Id.* at 17.) After an orientation and training program that lasted approximately five days, Valerio picked Down up in his car. (*Id.* at 17-18.) During the drive to Valerio's home, he informed Down that Sylvia was not actually his child, and when Down asked him why he needed an au pair, he said that he would explain everything later. (*Id.* at 17-18.) He also told her that he was **[\*8]** planning to take her to a Halloween party and mentioned that he would like her to wear pantyhose with nothing else as a costume. (*Id.* at 20.)

Following a meal, Valerio took Down to his home on Long Island. (*Id.* at 19.) After Valerio showed Down her bedroom, he asked if she would like a drink. (*Id.* at 20-21.) While Down was sitting in the media room with a drink, Valerio entered wearing boxers and a tank top. (*Id.* at 21.) Valerio sat next to Down for a few minutes and touched her hand, and Down then went upstairs to her room to go to sleep. (*Id.* at 21-22, 57.) She awoke around 4 a.m. and contacted her father via e-mail. (*Id.* at 22-23.) They then spoke over Skype and Down explained what had happened with Valerio. (*Id.* at 23.) Down's father contacted GAP 360, and Down received a Skype call from an employee named Emma Larby, who told Down that someone would come to pick her up. (*Id.* at 23-24.)

After that conversation, Valerio entered Down's room and noticed that she had been crying. (*Id.* at 24.) Down told him that she was homesick, and he left. (*Id.*) Down collected her belongings, went downstairs, and informed Valerio that she was leaving. (*Id.* at 24-25.) Valerio expressed shock and told Down to grow up and that he could offer her a lot of money. (*Id.* at 25.) Down felt intimidated by his behavior. (*Id.* **[\*9]** ) After about 20 minutes, Leonardo arrived at Valerio's home to collect Down. (*Id.* at 26.) Valerio refused to answer Leonardo's questions about what had happened and closed the door to the house. (*Id.*) Down stayed at Leonardo's house for about a week and then returned to the United Kingdom. (*Id.*)

United States v. Valerio

## B. Leonardo

Leonardo used to be employed by an au pair company called InterExchange Incorporated. (*Id.* at 59.) She served as a local coordinator in Suffolk County on Long Island and was responsible for liaising between au pairs and their host families. (*Id.*)

In 2012, Leonardo interviewed Valerio at his home after he applied to employ an au pair. (*Id.* at 60.) He told her that he and his wife shared joint custody of Valerio's daughter Sylvia, who he said was in school at the time of the interview. (*Id.* at 61-62.) Based on her discussion with Valerio, Leonardo characterized him as organized, easy-going, patient, and intellectual. (*Id.* at 69.) Leonardo also believed that Valerio's home reflected the typical living arrangement of an average family. (*Id.* at 69-70.) She had no doubts that Valerio and his home were suitable for an au pair, although she personally found him to be "creepy." (*Id.* at 71.) However, none of the paperwork that Leonardo completed following the interview indicated that she felt uncomfortable with Valerio. (*Id.* at 86.)

Following the interview and Down's placement with Valerio, Leonardo received a phone call from Down's international coordinator, who said that Down was very upset and wanted to leave Valerio's home. (*Id.* at 72.) Leonardo was also told that there was no child living in Valerio's home. (*Id. [*10]* ) When Leonardo arrived at Valerio's house, Down was waiting at the door with her belongings. (*Id.* at 72-73.) Valerio was standing next to Down and closed the door behind her without explaining to Leonardo what had happened. (*Id.* at 73.) Leonardo never spoke to Valerio after that interaction. (*Id.* at 74.)

## C. Kalichenko

Following Valerio's conviction, Kalichenko pled guilty to charges of conspiracy to sexually exploiting a child, sexual exploitation of a child, transportation of child pornography, and producing child pornography for importation into the United States. (*Id.* at 94-95; *see also United States v. Kalichenko*, 14-CR-95 (JFB), ECF No. 91.) Kalichenko first met Valerio through a web site called UkranianDate.com that matched couples seeking marriage. (Tr. of July 26, 2016 Hr'g at 96.) She was looking for a husband and someone who could be a father to her daughter. (*Id.*)

Kalichenko and Valerio met in person for the first time in or around June 2011 when she traveled to Long Island. (*Id.* at 97.) Valerio picked her up at the airport and paid for her flight from Dallas, Texas. (*Id.*) Kalichenko met Valerio's son and stayed at Valerio's house for about 10 days. (*Id.* at 99.) At that time, she thought he was an honest person, and he did not abuse **[*11]** her in any way; however, Kalichenko observed that Valerio seemed to have a temper. (*Id.* at 99-101.) While staying with Valerio, Kalichenko learned from her mother that she had placed Kalichenko's daughter in an orphanage in the Ukraine, which Kalichenko mentioned to Valerio. (*Id.* at 99.) After that visit, Kalichenko returned to the Ukraine in August 2011. (*Id.* at 101.) Valerio purchased her plane ticket and communicated with her while she was in the Ukraine, and he also sent Kalichenko money. (*Id.* at 101-02.)

Kalichenko returned to the United States on or around September 2, 2011 to continue her relationship with Valerio, whom she was determined to marry. (*Id.* at 103-04.) She stayed in the United States for approximately two months and spent part of that time at Valerio's house. (*Id.* at 105.) After three weeks of living with Valerio, Kalichenko departed his home for Seattle because he physically and sexually abused her. (*Id.* at 106.) During the first instance of abuse, Valerio unexpectedly told Kalichenko that she had to leave his house. (*Id.* at 107.) When she did not do so, Valerio pulled Kalichenko's clothes off of her, forced her to crawl on the floor, and called her insulting names. (*Id.* at 108-09.) Valerio also repeatedly

United States v. Valerio

slapped and penetrated Kalichenko with his hand and pulled **[\*12]** her hair; forced her to perform oral sex on him after she refused to do so; and forced Kalichenko to engage in sexual intercourse. (*Id.* at 109-13, 115-16.) Kalichenko felt humiliated and was in physical pain during this assault, which lasted approximately one to two hours. (*Id.* at 110-11, 115.) Afterwards, Kalichenko returned to her room and cried, and she then left Valerio's home. (*Id.* at 116.)

While in Seattle, Kalichenko stayed with a contact that she barely knew. (*Id.* at 117.) She chose not to report Valerio to the police because she still held out hope that he could be a good father to his daughter. (*Id.* at 119-20.) She eventually returned to Valerio's home in October 2011 after he contacted her via e-mail and asked her to come back. (*Id.* at 120-21.) Kalichenko decided to give Valerio a second chance and stayed with him for a few weeks. (*Id.* at 121.) Valerio paid for her flight from Seattle and told her that he would pick her up in Central Park in New York City, and he also instructed that she wear a mini dress or mini skirt and pantyhose without underwear. (*Id.* at 122.) Kalichenko dressed as directed, and Valerio picked her up in Central Park and drove her to Long Island. (*Id.* at 123.) After a few hours of driving, he pulled to the side of the road and sexually assaulted Kalichenko, tearing **[\*13]** her clothes and causing her physical pain. (*Id.* at 124-26.) After Valerio finished, he told Kalichenko that he was sorry. (*Id.* at 127-28.) She decided not to contact the police because she still hoped that Valerio would prove to be a good father to her daughter. (*Id.* at 128.)

On or about October 18, 2011, near the end of Kalichenko's stay with Valerio, Kalichenko signed a written agreement with Valerio that he drafted stating that she was entering into a "multiple partner relationship" with him. (*Id.* at 130.) The agreement also said that Kalichenko promised to obey Valerio's commands, and that Valerio agreed to be gentle to her when not engaging in consensual rough sexual intercourse. (*Id.* at 131.) Notwithstanding that agreement, Kalichenko believed that Valerio's prior sexual assaults against her were non-consensual because, among other things, she begged him to stop.[4] (*Id.* at 131-32.) The agreement also said that Kalichenko would never mention the word "police" in Valerio's home, and Kalichenko believed that Valerio included this language because he feared that she would contact law enforcement about his assaults. (*Id.* at 132-33.) In addition, Valerio sent Kalichenko e-mails asking her to help him adopt a child from the Ukraine by posing with him as a couple in **[\*14]** return for a commission. (*Id.* at 134-37.) Kalichenko did not assist Valerio and sent his correspondence to the American consulate to make sure that he could not adopt a child from the Ukraine or any other country. (*Id.* at 137.)

D. A.D.

A.D. was born and raised in South Africa. (*United States v. Valerio*, 14-CR-94 (JFB), Tr. of Sept. 26, 2016 Hr'g at 3.) She has a nine-year old son and a seven-year old daughter. (*Id.* at 4.) She has traveled to the United States several times from February to May 2008; June to October or November 2008; and December 2008 to March 2010. (*Id.* at 4-5.) During all of those visits, A.D. stayed on Long Island and lived in houses owned by Valerio. (*Id.* at 5.)

A.D. met Valerio through a dating web site named christiansingles.com in or around July or August of 2007 when she was pregnant with her son. (*Id.* at 6.) Valerio paid for her February 2008 flight to the United States, and she brought her son with her. (*Id.* at 7.) Valerio picked her up from the airport, gave her

---

[4] To the extent it is suggested that the agreement demonstrates these particular incidents were somehow consensual, the Court credits Kalichenko's testimony that these were non-consensual assaults. As discussed below, the Court also reaches the same conclusion regarding A.D.'s testimony.

United States v. Valerio

gifts, and treated her well at first. (*Id.* at 7-8.) Eventually, Valerio began losing his temper and, on one occasion, threw A.D. to the kitchen floor and choked and hit her while she screamed. (*Id.* at 8.) Valerio also began expressing his annoyance with her son and the amount of time **[\*15]** A.D. spent caring for him. (*Id.* at 9.) A.D. returned to South Africa in May 2008 because she missed her mother. (*Id.* at 12.) In addition, Valerio had asked that she participate in some kind of fashion show during which she would wear nothing but pantyhose, and this made her uncomfortable, so she decided to leave the United States for the time-being. (*Id.*)

When A.D. returned in June 2008, Valerio picked her up at the airport. (*Id.* at 13.) Another man helped A.D. carry her bags from the plane to the airport exit, and when Valerio saw him assist her, he became angry and grabbed the luggage away from the man. (*Id.* at 13-14.) After Valerio and A.D. arrived at Valerio's home, Valerio grabbed A.D. and forced her onto a couch. (*Id.* 14.) He covered her face with a pillow and ripped her clothes off, telling her that he was in charge and leaving her in tears. (*Id.*) During this second visit, A.D. became pregnant from Valerio in or around July 2008, and returned to South Africa a few months later to see her mother. (*Id.* at 17.)

After A.D. came back to the United States for the third time, she gave birth to their daughter in April 2009, and Valerio refused to let her leave the country again despite the fact that her visa subsequently expired. (*Id.* at 18.) A.D. **[\*16]** brought her son with her, but eventually asked her mother to come to the United States and bring him back to South Africa because A.D. believed that her son was not safe in Valerio's home. (*Id.* at 19.) While A.D. was pregnant with their daughter, Valerio's abuse worsened and he told her that she should get an abortion or fall down the stairs and die. (*Id.*) In addition, because A.D. was not having sex with him, Valerio slapped her on one occasion, causing A.D. to fall and split her lip. (*Id.* at 20.) He also attempted to force sexual intercourse on another occasion, choking A.D. while she begged him to stop, which he eventually did. (*Id.*)

After their daughter was born, Valerio's abuse of A.D. continued, and on another occasion, he tried to rape her and banged A.D.'s head against her bed's headboard while she held their daughter in her arms. (*Id.* at 21.) In addition, the sight of A.D. breastfeeding their daughter made Valerio angry, and he once threw a soda can at her head when he saw her doing so. (*Id.* at 20-21.) After a verbal argument during the summer of 2009, A.D. called the police, and when two officers arrived and A.D. explained what had happened, one of the officer told her that she had probably provoked Valerio. (*Id.* at 22-24 **[\*17]** .) This stunned A.D. and led her to believe that Valerio was correct when he told her that no one would help her if she reported his abuse, and she declined to complete a formal police statement. (*Id.* at 24, 57-58.) Valerio also repeatedly told A.D. that she could not leave the United States, and that if she did, he would send someone after her. (*Id.*) While A.D. lived with Valerio, he strictly monitored her interactions with other people and refused to let her socialize outside of the home, although he eventually bought her a cell phone to use. (*Id.* at 29-30.) When Valerio left the house, he would lock A.D. inside and close the blinds. (*Id.* at 30-31.)

During the summer of 2009, Valerio physically assaulted A.D. on another occasion while he was driving her for an evening out. (*Id.* at 25.) After hitting her, Valerio stopped the car in a dark parking lot and told A.D. that she was going to die, and she jumped out of the car. (*Id.* at 25-26.) A.D. screamed for help, and Valerio grabbed her, put his hand over her mouth, and forced her back into the vehicle. (*Id.* at 26.) Due to these repeated incidents of abuse, A.D. left Valerio's home and went to a women's shelter called Brighter Tomorrows. (*Id.* at 27-28.) However, because the shelter was not comfortable and because Valerio

SPA-18

United States v. Valerio

convinced A.D. that conditions would improve if she returned, A.D. went back to live with Valerio. (*Id.* at 27.)

Two subsequent physical assaults caused A.D. to leave the United States for the third time. (*Id.* at 31.) The first incident occurred while Valerio was driving A.D. and was pulled over by two police officers for driving on the wrong side of the road. (*Id.* at 31-32.) This angered Valerio, and after the police left, he drove A.D. to **[*18]** a beach, smashed her head against the car's dashboard, pulled her hair back, and screamed insults at her. (*Id.* at 32.) He also ripped A.D.'s dress, and then drove her back to his house. (*Id.* at 32-33.) The second incident, which occurred in or around November 2009, happened when A.D. entered Valerio's home office. (*Id.* at 33.) He became angry and choked and punched her, causing A.D. to lose consciousness. (*Id.* at 34.) When A.D. awoke, she realized that her mouth was bloody and that Valerio had knocked some of her teeth loose. (*Id.*) Valerio allowed her to go to a dentist, but told A.D. that he would kill her if she told anyone about the assault. (*Id.* at 34-35.) The dentist referred A.D. to a surgeon, but despite the operation, which Valerio paid for, A.D.'s teeth have never returned to normal. (*Id.* at 35.)

Before A.D. returned to South Africa, she filed for custody of their daughter in a family court on Long Island. (*Id.* at 36-37.) Her custody petition documented Valerio's' abusive behavior. (*Id.* at 37.) After filing for custody, A.D. left the United States on or about March 9, 2010 with their daughter after promising Valerio that she would eventually return. (*Id.* at 37-38.) A.D. agreed to come back to the United States because she was fearful that Valerio would send someone **[*19]** to retrieve her or hurt her family if she did not do so. (*Id.* at 38.) On or about October 4, 2010, Valerio e-mailed A.D. saying that he was going to travel to South Africa and forcibly take her daughter from her. (*Id.* at 39-40.) This convinced A.D. that she had to return to the United States to protect her daughter from Valerio, which she did in January 2016. (*Id.* at 40.)

When A.D. arrived in the United States, Federal Bureau of Investigation Special Agent Steven Troyd met her at the airport. (*Id.* at 40.) A.D. spoke with Special Agent Troyd and provided him with several e-mails documenting, *inter alia*, her visits to the dentist and the oral surgeon. (*Id.* at 40-44.)

III. CONCLUSION

Based on the foregoing findings of fact, the Court intends to consider at sentencing the defendant's physical and sexual assaults of Kalichenko and A.D. in connection with the *Section 3553(a)* factors— namely, the defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public from further crimes of the defendant.

SO ORDERED.

JOSEPH F. BIANCO

United States District Judge

Dated: June 1, 2017

Central Islip, NY