# 17-2371

*To Be Argued By*:
ALLEN L. BODE

# United States Court of Appeals

## For the Second Circuit

❖

UNITED STATES OF AMERICA,

*Appellee,*

—against—

JOSEPH VALERIO,

*Defendant-Appellant.*

On Appeal From The United States District Court
For The Eastern District of New York

## BRIEF AND APPENDIX FOR THE UNITED STATES

RICHARD P. DONOGHUE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

DAVID C. JAMES,
ALLEN L. BODE,
AMEET B. KABRAWALA,
   *Assistant United States Attorneys,*
      *Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...........................................iv

PRELIMINARY STATEMENT...........................................1

STATEMENT OF FACTS.............................................3

I.   The Suppression Motion, Hearing and
    Decision.................................................4

    A.   The Suppression Hearing............................. 5

    B.   The District Court's Decision....................... 9

        1.   Pre-<u>Miranda</u> Statements......................... 9

        2.   Post-<u>Miranda</u> Statements....................... 11

II.  The Offense Conduct......................................11

III. Sentencing.............................................19

    A.   The PSR............................................ 19

        1.   The PSR and Initial
            Recommendation................................ 19

        2.   The Addendum and Revised
            Recommendation................................ 22

    B.   Valerio's Request for a <u>Fatico</u> Hearing............. 23

    C.   The <u>Fatico</u> Hearing................................. 23

        1.   Down.......................................... 24

        2.   Kalichenko.................................... 26

        3.   A.D........................................... 29

        4.   Psychological Testimony....................... 34

    D.   The District Court's <u>Fatico</u> Decision............... 35

    E.   The Sentencing Proceeding.......................... 36

F.    The Written Judgment and Statement
      of Reasons........................................ 44

ARGUMENT......................................................46

POINT ONE - THE DISTRICT COURT PROPERLY
            DENIED VALERIO'S MOTION TO
            SUPPRESS........................................46

I.   Applicable Law...........................................46

     A.    Standard of Review................................ 46

     B.    Custodial Interrogation........................... 46

II.  The District Court Correctly Held
     that Valerio Was Not in Custody
     Before Receiving Miranda Warnings.......................48

III. The District Court Correctly Concluded
     that Valerio's Post-Miranda Statements
     Were Voluntary..........................................57

POINT TWO - VALERIO'S SENTENCE WAS BOTH
            PROCEDURALLY AND SUBSTANTIVELY
            REASONABLE......................................57

I.   Legal Standard..........................................57

II.  Valerio's Sentence Was Procedurally
     Reasonable..............................................58

     A.    Consideration of Uncharged
           Assaults and Rapes................................ 58

     B.    The District Court Correctly
           Calculated the Guidelines......................... 62

III. The Sentence Was Substantively Reasonable.................65

IV.  There Is No Basis for Reassignment
     to a Different Judge.....................................68

POINT THREE - VALERIO'S MULTIPLICITY/DOUBLE
              JEOPARDY CLAIMS ARE WAIVED AND
              MERITLESS......................................70

I.   Applicable Law...........................................70

A.   Multiplicity/Double Jeopardy........................ 70

B.   Failure to Preserve a Multiplicity
     Claim........................................... 72

II.  Counts Two And Three Are Not Multiplicitous..............73

III. Valerio's Double Jeopardy Challenge
     to his Convictions on Counts Five
     and Fifteen Is Waived and Meritless.......................79

IV.  The Convictions on Counts Six through
     Eight Do Not Violate Double Jeopardy......................83

CONCLUSION................................................85

iv

TABLE OF AUTHORITIES

Page

CASES

Aparicio v. Artuz,
  269 F.3d 78 (2d Cir. 2001) .................................. 72

Apprendi v. New Jersey,
  530 U.S. 466 (2000) ........................................ 59

Blockburger v. United States,
  284 U.S. 299 (1932) ........................... 70, 71, 72, 76

Garrett v. United States,
  471 U.S. 773 (1985) ........................................ 71

Missouri v. Seibert,
  542 U.S. 600 (2010) .................................... 54, 55

Orozco v. Texas,
  394 U.S. 324 (1969) ........................................ 51

Rita v. United States,
  551 U.S. 338 (2007) ........................................ 58

Rutledge v. United States,
  517 U.S. 292 (1996) ........................................ 70

Stansbury v. California,
  511 U.S. 318 (1994) ........................................ 47

United States v. Akapo,
  420 F. App'x 42 (2d Cir. 2011) ............................ 51

United States v. Ali,
  68 F.3d 1468 (2d Cir. 1995), on reh'g, 86 F.3d 275 (2d Cir.
  1996) ..................................................... 52

United States v. Almonte,
  638 F. App'x 71 (2d Cir. 2016) ........................ 81, 84

United States v. Anson,
  304 F. App'x 1 (2d Cir. 2008) ............................. 79

United States v. Badmus,
  325 F.3d 133 (2d Cir. 2003) ............................... 51

United States v. Bastian,
  770 F.3d 212 (2d Cir. 2014) ................................. 78

United States v. Beal,
  No. 17-442, 2018 WL 1719074 (2d Cir. Apr. 9, 2018) .......... 53

United States v. Bowman,
  523 F. App'x 767 (2d Cir. 2013) ........................... 80

United States v. Bradley,
  812 F.2d 774 (2d Cir. 1987) ................................ 68

United States v. Cacace,
  796 F.3d 176 (2d Cir. 2015) ................................ 72

United States v. Capers,
  627 F.3d 470 (2d Cir. 2010) ................................ 54

United States v. Carter,
  489 F.3d 528 (2d Cir. 2007) ................................ 55

United States v. Cavazos,
  668 F.3d 190 (5th Cir. 2012) ............................... 50

United States v. Cavera,
  550 F.3d 180 (2d Cir. 2008) ..................... 57, 58, 66, 67

United States v. Cerreta,
  63 F. App'x 585 (2d Cir. 2003) ............................ 51

United States v. Chacko,
  169 F.3d 140 (2d Cir. 1999) ................................ 71

United States v. Conca,
  635 F.3d 55 (2d Cir. 2011) ................................. 57

United States v. Craighead,
  539 F.3d 1073 (9th Cir. 2008) .............................. 49

United States v. Davis,
  624 F.3d 508 (2d Cir. 2010) ................................ 67

United States v. Delacruz,
  862 F.3d 163 (2d Cir. 2017) ........................ 59, 62, 63

United States v. Dorvee,
  616 F.3d 174 (2d Cir. 2010) ............................ 64, 65

United States v. Duverge Perez,
  295 F.3d 249 (2d Cir. 2002) ................................. 62

United States v. Easley,
  942 F.2d 405 (6th Cir. 1991) ............................... 78

United States v. Eaton,
  954 F. Supp. 2d 646 (W.D. Mich. 2013) ...................... 52

United States v. Falso,
  293 F. App'x 838 (2d Cir. 2008) ........................... 10

United States v. Familetti,
  878 F.3d 53 (2d Cir. 2017) ............................ 53, 55

United States v. Faux,
  828 F.3d 130 (2d Cir. 2016) ....................... 46, 50, 53

United States v. Fernandez,
  443 F.3d 19 (2d Cir. 2006) ............................ 58, 67

United States v. FNU LNU,
  653 F.3d 144 (2d Cir. 2011) ............................... 47

United States v. Hamilton,
  548 F. App'x 728 (2d Cir. 2013) ........................... 67

United States v. Hashime,
  734 F.3d 278 (4th Cir. 2013) .............................. 50

United States v. Hester,
  674 F. App'x 31, (2d Cir. 2016),
  cert. denied, 137 S. Ct. 2203 (2017) .................. 79, 80

United States v. Holmes,
  44 F.3d 1150 (2d Cir. 1995) ............................... 71

United States v. Irving,
  554 F.3d 64 (2d Cir. 2009) ................................ 80

United States v. Jass,
  569 F.3d 47 (2d Cir. 2009) ................................ 67

United States v. Khalil,
  214 F.3d 111 (2d Cir. 2000) ........................... 71, 72

United States v. Kirsh,
  54 F.3d 1062 (2d Cir. 1995) ............................... 51

United States v. Malki,
  718 F.3d 178 (2d Cir. 2013) ................................. 57

United States v. McGowan,
  615 F. App'x 1 (2d Cir. 2015) .............................. 67

United States v. McLeod,
  251 F.3d 78 (2d Cir. 2001) ................................. 63

United States v. McVicker,
  979 F. Supp. 2d 1154 (D. Or. 2013) ..................... 75, 76

United States v. Mittel-Carey,
  493 F.3d 36 (1st Cir. 2007) ................................ 49

United States v. Moreno-Montenegro,
  553 F. App'x 29 (2d Cir. 2014) ............................ 73

United States v. Muhammad,
  824 F.2d 214 (2d Cir. 1987) ................................ 71

United States v. Newton,
  369 F.3d 659 (2d Cir. 2004) ........................... passim

United States v. Olano,
  507 U.S. 725 (1993) ........................................ 78

United States v. Ozbay,
  296 F. App'x 148 (2d Cir. 2008) ....................... 72, 78

United States v. Polouizzi,
  564 F.3d 142 (2d Cir. 2009) ................................ 73

United States v. Rahman,
  189 F.3d 88 (2d Cir. 1999) ................................. 64

United States v. Robin,
  553 F.2d 8 (2d Cir. 1977) .................................. 68

United States v. Romaszko,
  253 F.3d 757 (2d Cir. 2001) ................................ 52

United States v. Rosa,
  626 F.3d 56 (2d Cir. 2010) ................................. 67

United States v. Sinnott,
  523 F. App'x 807 (2d Cir. 2013) ....................... 72, 78

United States v. Thavaraja,
  740 F.3d 253 (2d Cir. 2014) ................................. 64

United States v. Thomas,
  274 F.3d 655 (2d Cir. 2001) ................................. 63

United States v. Thomas,
  893 F.2d 1066 (9th Cir. 1990) ......................... 74, 75

United States v. Ulbricht,
  858 F.3d 71 (2d Cir. 2017),
  petition for cert. filed (U.S. Dec. 22, 2017)
  (No. 17-950)....................................... 58, 59, 60

United States v. Vado,
  87 F. Supp. 3d 472 (S.D.N.Y. 2015) ......................... 51

United States v. Washington,
  861 F.2d 350 (2d Cir. 1988) ................................. 80

United States v. Whyte,
  630 F. App'x 104 (2d Cir. 2015) ............................ 72

Williams v. New York,
  337 U.S. 241 (1949) ........................................ 59

## STATUTES

18 U.S.C. § 924(c)............................................. 64

18 U.S.C. § 1461.............................................. 78

18 U.S.C. § 3661.............................................. 59

18 U.S.C. § 2251(a).................................... passim

18 U.S.C. § 2251(c).................................... passim

18 U.S.C. § 3553(a).................................... passim

18 U.S.C. § 3553(e)........................................... 61

28 U.S.C. § 144......................................... 68, 69

## RULES

Fed. R. Crim. P. 12(b)(3)..................................... 73

Fed. R. Crim. P. 52(b)....................................... 63

## SENTENCING GUIDELINES

U.S.S.G. § 1B1.3............................................. 60

U.S.S.G. § 5G1.1......................................... 62, 63

U.S.S.G. § 5G1.2..................................... 62, 63, 64

U.S.S.G. § 5K1.1............................................. 61

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 108-66 (2003),
  as reprinted in 2003 U.S.C.C.A.N. 683................... 74, 75

Restatement (Third) of Foreign Relations Law § 402........ 75-76

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 17-2371

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

JOSEPH VALERIO,

<u>Defendant-Appellant</u>.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Joseph Valerio appeals from a judgment, entered August 1, 2017, in the United States District Court for the Eastern District of New York (Bianco, J.), convicting him, following a jury trial, of ten counts related to the sexual exploitation of a child and to the transportation, receipt and possession of child pornography. The district court sentenced Valerio to a total of 720 months' imprisonment, lifetime supervised release, a $1,000

special assessment and forfeiture of computer equipment and $75,000. Valerio is currently incarcerated.

On appeal, Valerio argues that 1) the district court erred in refusing to suppress statements made by Valerio, 2) his sentence was procedurally and substantively unreasonable and 3) certain counts in indictment were multiplicitous and therefore that his convictions on those counts violate double jeopardy principles. As shown below, these claims are without merit and Valerio's conviction and sentence should be affirmed.

STATEMENT OF FACTS

This case arises from an investigation that began when a Ukrainian citizen, Olena Kalichenko,[1] disclosed to a Federal Bureau of Investigation ("FBI") agent in Ukraine that she had produced child pornography using her then two-year-old daughter ("Jane Doe #1") at the request of Valerio and had sent the child pornography to him in New York. During the ensuing investigation, law enforcement agents discovered Valerio had also produced child pornography using his then six-year-old niece ("Jane Doe #2").

Agents executed a search warrant at Valerio's residence on January 28, 2014. Following an interview, Valerio was arrested and charged via a complaint with sexual exploitation of Jane Doe #1. (A:6).[2] After the discovery of child pornography images of

---

[1] Kalichenko pled guilty to charges of conspiracy to sexually exploit a child, sexual exploitation of a child, transportation of child pornography and producing child pornography for importation into the United States. She is awaiting sentence. See United States v. Kalichenko, 14-CR-95 (JFB).

[2] "PSR," "Addendum," "Initial Recommendation," "Revised Recommendation," and "SOR" refer to the presentence report, the addendum to the PSR, the recommendations of the Probation Department, and the statement of reasons accompanying the judgment, respectively. The PSR, Addendum, Recommendations, and SOR have been filed with the Court under seal. References to "A," "SPA," "GA," "T" and "GX" are to Valerio's appendix, special appendix, the government's appendix, the trial transcript and the government's trial exhibits, respectively. Exhibits that contain contraband are not included in the government's appendix but will of course be provided to the Court upon request.

4

Jane Doe #2 from Valerio's residence, on February 25, 2014, Valerio was charged via a complaint with sexual exploitation of Jane Doe #2, and a second search warrant was executed on his residence. See United States v. Valerio, 14-MJ-00170 (GRB) (E.D.N.Y.).

On February 26, 2014, a federal grand jury in the Eastern District of New York handed down an indictment charging Valerio with the sexual exploitation of Jane Doe #1, as well as transportation, receipt and possession of child pornography. (A:7). Subsequently, Valerio was charged via a second superseding indictment on April 9, 2014, on which Valerio went to trial.[3] (A:9; GA:1-14).

I. The Suppression Motion, Hearing and Decision

On July 1, 2014, Valerio moved to suppress his statements made on the day of the warrant execution and his initial arrest.[4] (A:41-45).

---

[3] The Second Superseding Indictment originally contained sixteen counts. On November 4, 2014, the court granted the government's motion to dismiss Count Fourteen, charging attempted sexual exploitation of a child. (A:13). On November 12, 2014, the Court filed a redacted and renumbered indictment upon which Valerio was tried.

[4] Valerio also moved to suppress statements made on February 24, 2014, when he was arrested on the second complaint (A:123-24), which motion was also denied (A:185-86). He does not challenge that decision on this appeal.

5

A.    The Suppression Hearing

FBI Special Agent Steven Troyd testified that, on January 28, 2014, he and a team of eleven other FBI special agents and detectives executed a search warrant at Valerio's residence in Smithtown, New York.  The FBI had received information about Valerio from Kalichenko, who reported that she had sold Valerio child pornography.  Kalichenko gave the FBI copies of email exchanges with Valerio, as well as a video containing child pornography that she claimed to have sent him.  Based upon the allegations, Troyd obtained a search warrant on January 27, 2014. At the time the warrant was executed, Valerio was not charged by indictment or criminal complaint.  (A:49-52).

Agents executed the warrant at approximately 6:00 a.m. on January 28.  The agents were not uniformed but wore jackets that displayed FBI or police insignias, with ballistic armor underneath.  As agents knocked on the front door, Troyd called the home, and Valerio answered.  Troyd advised Valerio that the FBI was there to execute a search warrant and that he should open the door.  Valerio complied.  (A:52-54, 80).

Agent Troyd entered, walked with Valerio to the end of the entrance hallway, and repeated that the FBI was executing a search warrant.  Valerio did not protest and stood with Troyd at the base of the stairway while the search team conducted a protective sweep of the home.  None of the officers had guns drawn,

6

and Troyd did not see anyone carrying a long gun, rifle, or shotgun. He remained with Valerio during the sweep, which took approximately ten minutes because of the size of the home. The agents ultimately located one other individual, whom Valerio identified as his girlfriend, upstairs. (A:54-58).

Once the sweep ended, Valerio agreed to sit in the dining room and speak to the agents. Valerio sat at the head of the table and Troyd sat at the far end. Suffolk County Detective Rory Forrestal sat to Valerio's left. Special Agent Danielle Messineo sat to Forrestal's left, and Nassau County Detective Badalucco stood in the corner to Messineo's left. Nobody else was present during this interview. Valerio was not touched, restrained, or handcuffed. He was clothed, and no one drew a weapon on him. At one point during the interview, Valerio requested water and was given a coffee mug of water from the kitchen.[5] (A:58-62, 83-84).

Troyd explained that the officers were looking for evidence of child pornography. Valerio responded "that he was being extorted by" Kalichenko and had received Viber chat messages from her negotiating for money. Valerio was "dismayed [Kalichenko] was able to find his email address" to communicate via Viber, and

---

[5]    According to Troyd, although Valerio was not free to walk around the house during the search or to go back and forth from the kitchen to get water, he was free to go into the hallway adjacent to the dining room and to leave the house. (A 84-90).

7

Valerio "said he had contacted his attorney," Anthony LaPinta, "to speak with him in reference to the extortion." Valerio did not ask to speak with LaPinta at this point or say that he wanted to call a lawyer. (A:62-63, 86).

Troyd then showed Valerio an excerpt of a July 22, 2012 email exchange between Valerio and Kalichenko and asked whether Valerio had in fact directed Kalichenko to produce child pornography. Valerio said he had. Troyd then asked Valerio "if he had received that pornography in email." Valerio said he had. Troyd also asked Valerio whether he had received a DHL package from Kalichenko that contained a disk. Valerio "admitted that he had in fact received the package, but that he only recalled that it contained bubble wrap." (A:63-66, 91).

After Valerio made these statements, Troyd and Messineo agreed to contact the United States Attorney's Office about authorizing a complaint against Valerio. Troyd called Assistant United States Attorney Allen Bode, who authorized the complaint. Troyd and Messineo then agreed to advise Valerio of his <u>Miranda</u> rights.[6] At 7:55 a.m., Valerio signed an "Advice of Rights" form,

---

[6] On cross-examination, Troyd testified that, despite Kalichenko's allegations and the documentary evidence, he did not intend to arrest Valerio regardless of whether the search warrant revealed evidence of child pornography. Troyd did not believe he had probable cause to arrest at the time he entered the house, and he only decided to contact prosecutors after Valerio answered these questions. (A:89, 93-96).

8

acknowledging that he had read the form, understood his rights and was willing to answer questions without a lawyer present. (A:66).

Troyd continued the interview, first providing Valerio with copies of two email exchanges between him and Kalichenko, dated July 17 and July 22, 2012. Valerio admitted that he had sent these emails, but he declined Troyd's request to sign them. Valerio explained that he wanted the videos from Kalichenko because he had sent her thousands of dollars and "wanted something for his money." Troyd played part of a video provided by Kalichenko. Valerio admitted that he recognized Kalichenko and the child, but stated that he had not seen this particular video because he did not recognize the background in it as the same background in other videos sent to him by Kalichenko. (A:67-68).

Troyd asked Valerio to sign a written statement. Valerio declined and asked to speak to his attorney. Troyd stopped questioning Valerio or speaking with him about Kalichenko's allegations. He did not immediately tell Valerio that he was under arrest because he wanted Valerio to remain seated and calm. Once the officers had cleaned up the search warrant materials, collected the evidence, and loaded it in their cars, Troyd told Valerio that he was under arrest and asked him to stand up to be handcuffed. Valerio complied. The agents walked Valerio outside and proceeded to the courthouse in Central Islip, New York. (A:72-73).

B.    The District Court's Decision

On September 3, 2014, the district court orally denied
the suppression motion (A:125-26) and issued a written decision on
April 15, 2016 (A:173-86).  The court found that Valerio's pre-
Miranda statements on January 28, 2014, were non-custodial, and
thus did not require a Miranda warning, and were voluntary.  The
court also found that Valerio's post-Miranda statements were
voluntarily given following a valid waiver of his Miranda rights.
(A:180).

1.   Pre-Miranda Statements

In analyzing the facts regarding Valerio's pre-Miranda
statements, the court concluded that:

> [A] reasonable person in defendant's situation
> would have understood that he was free to end
> the interview and leave the house during the
> search based upon the following facts: (1) the
> interview took place in the familiar
> surroundings of defendant's home;
> (2) defendant knew the agents were there to
> conduct a search, and agents never told him
> that he was under arrest, or that he was not
> free to terminate the interview and leave the
> house; (3) agents did not brandish their
> weapons or handcuff defendant or touch him in
> any way; (4) agents were not blocking the
> defendant from leaving the house; and
> (5) agents did not say or do anything
> threatening, but rather conducted the
> interview of the defendant in a calm manner.

(A:180).

Alternatively, the court concluded that:

>[E]ven assuming _arguendo_ that a reasonable
>person would not have understood he was free
>to end the interview and leave the house, the
>defendant's freedom of action was not
>curtailed to a degree associated with formal
>arrest. Thus, no pre-arrest _Miranda_ warnings
>were necessary and the statements were
>voluntarily given.

(A:180-81) (emphasis in original).

In reaching this conclusion, the district court
recognized that this Court has held that "[a]bsent a formal arrest,
interrogations in the 'familiar surroundings of one's home [are]
generally not deemed custodial,' but under certain circumstances
may be." (A:181) (quoting United States v. Falso, 293 F. App'x
838, 839 (2d Cir. 2008) (quoting United States v. Newton, 369 F.3d
659, 675 (2d Cir. 2004)). In finding that this was not one of the
situations where questioning in the home was custodial, the
district court cited the following factors: (1) Valerio was not
directed, but was asked and agreed to go to the dining room to be
interviewed; (2) he was not ordered to answer any questions, and
the interview was conducted in a calm manner; (3) Valerio was never
told that he was not free to leave, was under arrest, or was to be
arrested upon the completion of the search, and he was never
handcuffed or otherwise physically restrained; (4) although twelve
law enforcement officers entered the house, only four were in the
dining room during the interview; the rest of the officers were in
other areas of the house conducting the search; (5) Valerio

willingly divulged information despite knowing the officers were searching for evidence of child pornography and remained calm throughout the interview; and (6) the duration of the interview (90 minutes) was not so long as to render it custodial under <u>Miranda</u>.  (A:181-84).

    2.  <u>Post-Miranda Statements</u>

The district court also denied suppression of Valerio's post-<u>Miranda</u> statements, finding that they were made following a valid waiver of his <u>Miranda</u> rights.  (A:185).  Specifically, the court found that Valerio was not physically restrained or threatened, prohibited from standing up or leaving, or subject to repeated or prolonged questioning.  Moreover, he did not request an attorney, had a calm demeanor and did not indicate that he did not understand the warnings or his rights.  (A:185).

## II.  <u>The Offense Conduct</u>

Valerio met his co-conspirator, Olena Kalichenko,[7] in the summer of 2011 via the website "ukrainiandate.com" and the two began corresponding via email.  (GX:562; PSR:¶¶20, 28).  Kalichenko visited Valerio in the summer of 2011 on Long Island and then returned to Ukraine.  (GX:11-19, 562; PSR:¶¶ 20, 28).  Between

---

[7]   Olena is also referred to in emails and texts with Valerio which were admitted as trial exhibits using the English variations "Helena" and "Elena."  (T:261).

2011 and 2013, Valerio sent money to Kalichenko in exchange for videos of Kalichenko engaging in sexually explicit activity with her two-year-old daughter,[8] Jane Doe #1. (T:427-28; GX:2-E, 10-A, 203, 206, 322; PSR:¶¶21, 23). Valerio asked for and received approximately 46 videos containing child pornography of Jane Doe #1 from Kalichenko between late 2011 and 2013. (GX:500; T:745; PSR:¶¶21; Addendum 1). In exchange, Valerio wired Kalichenko a total of $12,350. (GX:322, 10-A; T:366-68).

Numerous email and text communications between Valerio and Kalichenko were introduced at trial and set forth in the PSR. In these communications, Valerio gave specific instructions to Kalichenko as to how she should sexually abuse Jane Doe #1 in order to create child pornography for him and discussed payments to her for the child pornography, as well as threatening to cut her off should she stop making videos for him. (GX:2, 2B, 2D, 2E, 203, 205, 206, 208-31, 233, 235, 243, 247, 270, 501D, 504F, 555-61; PSR:¶¶28-32).

For example, on January 24, 2012, Valerio sent Kalichenko an email in which he told Kalichenko she had done a "Great Job!" and instructed her to resend several videos from the

---

[8] While at trial both parties referred to Jane Doe #1 as three years old at the time of the offenses, at the sentencing hearing, the government asserted and the defendant did not dispute that she was actually two years old at that time. (A:356).

13

day before as they were "too much memory at once to handle for the phone." (GX:559-A; PSR:¶29). He further instructed Kalichenko to entice Jane Doe #1:[9]

> ... keep[ing] her between your legs SAFELY"
> with your legs up around her, putting her toys
> "DOWN BY YOUR SWEET PUSSY" (from your belly
> down to your pussy). With you and her securely
> on the couch, bed or floor" YOU can use the
> cell phone camera with one hand grabbing your
> TITS with the other and from your EYE view
> down to your sweet pussy ... you will be
> recording [Jane Doe #1] playing by your
> sweetness below! .... AS SHE TOUCHES AND
> EXPLORES YOU! ... AS YOU CONTINUE TO INSERT
> THE TOYS BETWEEN YOUR LEGS!!.

(Id.).

In an email from Valerio to Kalichenko, on July 17, 2012, Valerio wrote:

> The videos you sent by cell phone camera are
> PERFECT" and there is NO need for the expense
> of another camera, when you have done a
> terrific job with the cell phone camera. I
> have a new cell phone which allows me to
> transfer your video to my email and the screen
> is bigger to view. Plus you can have endless
> video time per session with a cell phone
> camera. As far as the SCRIPT" ... do the same
> with our little [Jane Doe #1]'s DELICIOUS
> LITTLE PUSSY" - you know in the tub!
>
> the way you would eat her so sweet ... of
> course PANTYHOSE AND TIGHTS .... AS you two
> dance. Place toys inside your PUSSY" and have
> our little [Jane Doe #1] pull them out of your
> wet PUSSY ... EMMM"!

---

[9]     Spelling and punctuation are set forth as in the original communications.

> Tell me how you loved when you eat her little
> pussy and how WET your PUSSY was - CORRECT?.
>
> I told you how I cant wait to make hard luv to
> you ... as you eat our little [Jane Doe #1]
> delicous little pussy.

(GX:303-A; PSR:¶30).

In an email from Valerio to Kalichenko, on July 22, 2012, Valerio discussed having Kalichenko and Jane Doe #1 come and live in New York "BECAUSE YOU AND [Jane Doe #1] OFFER ME "SOMETHING DIFFERENT" ... that my other girls dont have or can't supply to me NOW" - So its [Jane Doe #1]" and you that fits that equations ... GOT IT?!" (GX:205; PSR:¶31). Valerio requested that Kalichenko sign a document giving him partial custody of Jane Doe #1 and stated that "I have a generous figure in mind to send you tomorrow early" when of course I receive that scan signed agreement regarding [Jane Doe #1]... I will send the cash EARLY"." (Id.) In describing his proposal, Valerio instructed Kalichenko:

> So in order for us to continue on this path
> ... YOU WILL SCAN THAT AGREEMENT SIGNED AND
> SENT TO ME BY TOMORROW! The agreement will
> state that you are giving me partial custody
> of [Jane Doe #1].... signed by you, SO NO
> MATTER WHERE YOU MAY GO ... I HAVE EQUAL
> CUSTODY OF [Jane Doe #1]! AND IT WILL BE LEGAL
> ANYWHERE IN THE WORLD". THIS MEANS I CAN COME
> TO ANY ONE COUNTRY TO PICK HER UP" ... But im
> sure that wont be necessary! because you know
> we have an agreement...And sincerely Helena
> you know how powerful I am from here to Europe.
> So we shall continue. Remember" I have
> ALREADY put down [Jane Doe #1] as my
> DEPENDANT! ... and wrote it off on my taxes,

> for the care I provided her like a daughter -
> SO SHE IS MINE" AS WELL AS YOURS.
>
>          \*     \*     \*
>
> ... I WANT MORE VIDEO OF YOU AND [Jane Doe
> #1]... GET HER TO PLAY OR EAT JUST EAT YOUR
> PUSSY!!!  AND SOME CELL VIDEO OF THE BOTH OF
> YOU IN TIGHTS ... I WANT TO SEE MORE. Try to
> get this to me ALL BY TOMORROW.

(Id.).

In an email on September 27, 2012, Valerio reacted as

follows when Kalichenko did not perform as he expected:

> Hey you listen now or this will be the last
> time ever!! ... WHERE" the fuck are you
> writting mails at 9:30PM when your daughter is
> suppose to be sick??! are you starting to be
> that sneaky bitch again?! .... if SO, I will
> drop you on your ASS"! "BETTER FUCKING
> EXPLAIN"!. First off I just gave you $1,200
> for your family and your going to fucking
> "WORK FOR IT"! not sit anywhere ALL FUCKING
> DAY! SENDING OUT EMAILS! ... Im asking YOU"
> now what the fuck do you do ALL DAY"? and you
> have PRODUCED NOTHING FOR ME!!!
>
> I want an explaination for ALL of this NOW!
> ... Each morning and night you will send me a
> CELL PHONE VIDEO OF YOU WAKING UP WITH YOUR
> DAUGHTER, WITH YOUR TITS IN HER MOUTH BEFORE
> YOU GO TO SLEEP AND WAKE UP! .... IF I DONT
> SEE THIS EACH DAY" I WILL DROP YOU ON YOUR
> ASS!!! YOU BEITER MAKE SURE YOU HAVE AN
> EXPLAINATION FOR THIS AND I NEED TWO FUCKING
> MODELS" TO SIGN THOSE APPLICATIONS READY FOR
> INTERVIEWS BY NEXT WEEK OR ELSE YOU WILL BE
> SORRY! ... YOU BETER WORK BITCH! AND YOU TELL
> THEM THAT THEY CAN GET PAID FOR THEIR WORK IN
> YOUR FUCKING COUNTRY .... THEN HERE IN THE
> USA!!! BETTER USE YOUR FUCKING IMAGINATION
> WHEN YOU SPEAK TO THESE BITHCES TO SIGN THEM
> UP AND GET THEIR PUSSYS HERE!! .... GOT
> IT?!!!!

> Lastly ... which may be the case for you! YOU
> GET ME THOSE PURCHASE RECEIPTS FOR ALL THOSE
> APPLIANCES AND FURNITURE AND YOU MAKE FUCKING
> SURE" I SEE THE SERIAL NUMBERS THAT MATCH ON
> EACH APPLIANCE PURCHASED ON A RECEIPT WITH THE
> COMPANY NAME!! – MOTHER FUCKER!! ..... GET TO
> WORK!!!

(GX:2E).

In November 2013, Kalichenko contacted the FBI in Kiev, Ukraine, reporting that she had made sexually explicit videos involving her daughter and sent them to Valerio in the United States and providing the FBI with emails from Valerio and a disk containing explicit videos of Kalichenko and Jane Doe #1 that she had sent to Valerio. (T:261, 270-72). As set forth above, that information led to the execution of a search warrant at Valerio's residence on January 28, 2014. (PSR:¶22).[10]

In addition to the recovery of communications and videos concerning Jane Doe #1, the search of Valerio's residence led to the discovery of digital devices. A computer forensic examination of these devices revealed child pornography images of Valerio's niece Jane Doe #2, approximately age six, in fetish outfits and in

---

[10] Indeed, messages sent via VIBER which were recovered in the search of Valerio's residence show that in December 2013, after she had reported Valerio to the FBI, Kalichenko told Valerio that he should have negotiated with her, that she was sending the videos she had made for him with her daughter to the FBI, and requesting he "negotiate" before she sends the rest to the FBI. (T:811-13, 861-62; GX:555).

17

various stages of undress including images focused on her genitals, which appeared red and inflamed, and images depicting her in sexually-suggestive positions. (GX:508-11, 515-16, 519-26, 528, 530, 532-39; PSR:¶¶25-26). After reviewing these images, agents recognized the setting as Valerio's basement and obtained a second warrant to search his residence. (T:436-38; PSR:¶26).

Valerio was rearrested on February 24, 2014, and charged via a complaint with the sexual exploitation of Jane Doe #2. (T:438-39). When informed that agents had discovered the pornographic pictures of his niece, Valerio stated, "I no longer have a family. I want to kill myself." (T:440-41).

On February 25, 2014, agents conducted a second search of Valerio's residence. (PSR:¶27). During the search, agents recovered a digital camera hidden in drop ceiling tiles in the basement, as well as two other cameras hidden in a clock and within a homemade platform that appeared to be used as a stage, pointed upward to capture images of anyone standing on it. (T:463-70, 472-75; GX:311, 323-24, 404; PSR:¶27) Agents also recovered costumes worn by Jane Doe #2 in the images, including fishnet stockings, a cheerleading outfit and blonde wig, as well as over a dozen packages of pantyhose and stockings, many in children's sizes. (T:450; GX:312, 335, 336, 338, 342, 343, 347; PSR:¶27).

18

Valerio's sister, Bernadette Imperiale, the mother of Jane Doe #2, testified at trial that, in 2010 to 2011, when Jane Doe #2 was approximately six years old, Valerio asked to have Jane Doe #2 model in order to make money. (T:615). Jane Doe #2 was dressed in costumes and the modeling took place in the basement of Valerio's residence. (T:616-19). "[A] couple of times," this modeling took place in the basement without Imperiale's being present. (T:619). Imperiale identified Jane Doe #2, as well as costumes and items in images recovered from Valerio's computer equipment. (T:620-23, 626-27). Imperiale was not aware of the hidden cameras recovered from the basement. (T:625-26). At trial, Imperiale claimed, for the first time, that on one occasion in the summer a few years earlier, Kalichenko had been present and had been left alone taking pictures of Jane Doe #2 in the basement.[11] (T:631-34).

---

[11] Valerio's mother also claimed at trial that Kalichenko had been alone taking pictures of Jane Doe #2 in the basement with Jane Doe #2 on one occasion in 2011 for 15-20 minutes. (T:936-38). However, the computer forensic evidence showed that the child pornography images of Jane Doe #2 had been created months earlier on September 10, 2010 and January 19, 2011 (i.e., before Valerio met Kalichenko). (T:770-89; GX:11-19, 507-10, 513, 515, 518-20, 562; PSR:¶39).

III.  Sentencing

    A.  The PSR

        1.  The PSR and Initial Recommendation

In October 2015, the U.S. Probation Department ("Probation") issued the PSR and Initial Recommendation. Probation found Valerio's total offense level to be 47 considering the sexual exploitation of Jane Does #1 and #2 pursuant to U.S.S.G. § 2G2.1, plus an enhancement for a pattern of activity involving prohibited sexual contact with a minor, pursuant to § 4B1.5(b)(1). (PSR:¶¶46-68). Valerio was assessed one criminal history point based upon his conviction for attempted forcible touching (discussed below) and found to be in criminal history category ("CHC") I. (PSR:¶¶70, 74-76). Based upon the total offense level of 47 and CHC I, Probation found the advisory Guideline imprisonment term was life.[12] (PSR:¶118).

The PSR indicated that Kalichenko reported that, during her time in the United States with Valerio before she sent the child pornography to him, Valerio told her that he had recordings of him having sex with various women, which were recorded without

---

[12]  In fact, as the district court later found, because none of the counts of conviction carried a statutory maximum sentence of life imprisonment, pursuant to U.S.S.G. § 5G1.1(c)(1), the advisory Guideline sentence would be the combined maximum statutory sentences for all the counts run consecutively. (GA:68-70).

their knowledge. Kalichenko reported that Valerio struck her, tried to rape her, and became infuriated when she threatened to call police. (PSR:¶20).

Valerio had a 2006 conviction for attempted forcible touching in violation of New York Penal Law § 130.52. Specifically, on August 26, 2005, Valerio approached a woman from behind while she was in a public pool with her two daughters. Valerio grabbed her crotch area and attempted to digitally penetrate her. Valerio pled guilty and was sentenced on August 14, 2006, to one year of probation. (PSR:¶70).

Valerio violated his probation less than two weeks after he was sentenced, when, on August 25, 2006, a search of Valerio's residence yielded numerous pornographic DVDs and video tapes, possessed in violation of a probation condition prohibiting possession of pornographic material, including video tapes created by Valerio of sexual encounters with women filmed without their knowledge or consent. Also recovered during the search were 11 knives, a rifle and ammunition, possessed in violation of a probation condition prohibiting possession of weapons during his supervision. (PSR:¶72).

Additionally, while on probation, Valerio incorporated businesses under the names Long Island Women's Coalition and Soft Touch Therapy Mobile Massage. Although initially reporting that

these were legitimate modeling and massage businesses, Valerio later admitted that they were means to create additional videos of women in varying stages of undress without their knowledge. (PSR:¶73).

During sex offender treatment as part of this probation, Valerio was given an assignment to write a statement about the crime from the perspective of his victim, demonstrating empathy for his victim. Valerio wrote, "I'm glad my sister called security and I'm glad I chose to have you arrested dripping wet in your shorts, because I am dripping wet every time I think of this time, but in tears." Valerio shared this statement at a group therapy session. (Id.).

Valerio told Probation that he was physically and sexually abused by his father between the ages of five and eleven years old. Valerio stated that his father attempted to anally penetrate him and also sexually abused his sister, which latter claim was corroborated by his sister. (PSR:¶¶83, 89).

Probation's Initial Recommendation was for concurrent sentences totaling 30 years on Counts One through Three, Six through Fourteen and Four and Five, plus a consecutive five year term on Count Fifteen for a total of 35 years. (Initial Recommendation).

22

2.  The Addendum and Revised Recommendation

On March 4, 2016, Probation issued the Addendum to the PSR and a Revised Recommendation.  The Addendum described the recovery of a laptop containing additional videos of Jane Doe #1, hidden cameras and surreptitiously-made VHS tapes.  (Addendum 1).[13]

In addition, Probation noted that the government had proffered details concerning Valerio's conduct regarding two other women, A.D. (listed in the Addendum as Jane Doe #3) and Lucy Down (listed in the Addendum as "Jane Doe #4"), which included violent rapes and Valerio's attempt to lure a young woman to the United States on the false pretense that he was hiring her as an au pair, respectively.[14]  (Addendum 1-4).

---

[13]    On January 6, 2016, Valerio's mother provided law enforcement officers with a plastic bag that had been found hidden inside of a drum set at Valerio's residence.  The bag contained a laptop computer, 19 VHS tapes, a covert digital video recorder, an alarm clock containing a hidden camera and an additional surveillance camera.  A forensic examination of the laptop revealed approximately 16 newly-discovered videos of Jane Doe #1 from April through November 2012, the time period during which Valerio had scripted and received child pornography from Kalichenko.  The VHS tapes contained what appeared to be covert recordings from Valerio's home showing numerous women using the bathroom, dressing and undressing and engaged in various other activities, seemingly unaware that they were being recorded.  (Addendum 1).

[14]    This information was proffered following Valerio's claim in the PSR that he had a "very good relationship" with A.D. and that she had left the United States solely due to a visa overstay. (PSR:¶87).

In view of the additional criminal conduct, Probation issued a Revised Recommendation of a 60-year sentence. (Revised Recommendation).

B.   Valerio's Request for a Fatico Hearing

At a pre-sentencing status conference on May 3, 2016, defense counsel stated that Valerio denied the allegations in the Addendum relating to A.D. and Down and requested a Fatico hearing as to those allegations. (GA:17-18).

The district court also informed the parties that in the context of Kalichenko's case, the court was aware that Kalichenko had alleged that Valerio had raped and been violent towards her, which allegations were similar to those of A.D. (GA:19). Defense counsel confirmed that Valerio disputed Kalichenko's allegations as well. (GA:20-21). The court then directed the government to reach out to counsel for Kalichenko and inform counsel that the court was inviting Kalichenko to testify regarding the allegations of abuse by Valerio. (GA:21).

C.   The Fatico Hearing

On July 25, 2016, September 26, 2016 and March 6, 2017, the district court held a Fatico hearing concerning the allegations of Valerio's conduct towards Down, Kalichenko and A.D., as well as psychological testimony proffered by Valerio.

1. <u>Down</u>

Lucy Down, the au pair hired by Valerio, who at the time of her testimony was 22 years old and living in the United Kingdom, and Jolene Leonardo, a former employee of the au pair company, testified on July 25, 2016. Down testified that, in 2012, after finishing college at the age of 18, she applied to an au pair agency in the United States. (A:189-90). Valerio contacted Down through the company's database to interview her for an au pair position. (A:190). On September 17, 2012, Valerio interviewed Down remotely via Skype. During that interview, Valerio told Down that she would be responsible for caring for his eight-year-old daughter Sylvia. (A:190-91).

On October 22, 2012, Down traveled to the United States to work for Valerio. (A:191). After an orientation and training program that lasted approximately five days, Valerio picked Down up in his car. (A:191-92). During the drive to Valerio's home, Valerio informed Down that Sylvia was not actually his child. When Down asked him why he needed an au pair, he said that he would explain later. (A:192). He also told her that he was planning to take her to a Halloween party and that he would like her to wear pantyhose with nothing else as a costume. (<u>Id.</u>).

Valerio took Down to his home on Long Island. After Valerio showed Down her bedroom, he asked if she would like a

drink.  (Id.).  While Down was sitting in the media room with a drink, Valerio entered wearing boxers and a tank top.  (Id.). Valerio sat next to Down for a few minutes and touched her hand, and Down then went upstairs to her room to go to sleep.  (A:192-93).  She awoke around 4 a.m. and contacted her father via e-mail. They then spoke over Skype and Down explained what had happened. Down's father contacted the au pair agency, which contacted Down and told her that someone would come to pick her up.  (A:193).

After that conversation, Valerio entered Down's room and noticed that she had been crying.  (Id.).  Down told him that she was homesick, and he left.  Down collected her belongings, went downstairs, and informed Valerio that she was leaving.  Valerio expressed shock and told Down to "grow up" and that he could offer her a lot of money.  (Id.).  Down felt intimidated.  (Id.).  After about 20 minutes, Leonardo arrived at Valerio's home to collect Down.  (A:193-94).  Valerio refused to answer Leonardo's questions about what had happened and closed the door to the house.  Down stayed at Leonardo's house for about a week and then returned to the United Kingdom.  (A:194).

Leonardo also testified that she had interviewed Valerio in 2012 at his home after he applied to employ an au pair.  Valerio told her that he and his wife shared joint custody of Valerio's

daughter Sylvia, who he said was in school at the time of the interview. (A:202-03).

      2. <u>Kalichenko</u>

      Kalichenko testified on July 25, 2016. She first met Valerio through a web site called UkranianDate.com that matched couples seeking marriage. She was looking for a husband and someone who could be a father to her daughter. (A:211).

      Kalichenko and Valerio met for the first time in June 2011 when she traveled to Long Island. Valerio picked her up at the airport and paid for her flight from Dallas, Texas. (<u>Id.</u>). Kalichenko met Valerio's son and stayed at Valerio's house for about 10 days. (A:212). At that time, he did not abuse her in any way; however, Kalichenko observed that Valerio seemed to have a temper. (<u>Id.</u>). While staying with Valerio, Kalichenko learned from her mother that she had placed Kalichenko's daughter in an orphanage in Ukraine, which Kalichenko mentioned to Valerio. (<u>Id.</u>).

      Kalichenko returned to Ukraine in July 2011. (<u>Id.</u>). Valerio purchased her plane ticket and communicated with her while she was in Ukraine, and he also sent Kalichenko money. (A:212-13). Kalichenko returned to the United States on September 2, 2011 to continue her relationship with Valerio, whom she was determined to marry. She stayed in the United States for

approximately two months and spent part of that time at Valerio's home. (A:213).

After about three weeks, Kalichenko left Valerio's home because he had physically and sexually abused her. (A:214). During the first instance of abuse, Valerio unexpectedly told Kalichenko that she had to leave his house. When she did not do so, Valerio forcibly removed Kalichenko's clothes, forced her to crawl on the floor, and called her insulting names. (Id.). Valerio also repeatedly slapped and penetrated Kalichenko with his hand and pulled her hair, forced her to perform oral sex on him after she refused to do so, and forced Kalichenko to engage in sexual intercourse. (A:214-15, 216). Kalichenko felt humiliated and in physical pain during this assault, which lasted approximately one to two hours. (A:215-16).

Kalichenko traveled to Seattle and stayed with someone she barely knew. (A:216). She did not report Valerio to the police because she still hoped that he could be a good father to her daughter. (A:217). She returned to Valerio's home in October after he contacted her via e-mail and asked her to come back. (Id.). Kalichenko decided to give Valerio a second chance and stayed with him for a few weeks. (Id.). Valerio paid for her flight from Seattle and told her that he would pick her up in Central Park in New York City, and he also instructed that she

wear a mini skirt and pantyhose without underwear. (A:217-18).
Kalichenko dressed as directed, and Valerio picked her up in
Central Park and drove her to Long Island. (A:218). After a
couple of hours of driving, he pulled to the side of the road and
sexually assaulted Kalichenko, tearing her clothes and causing her
physical pain. (A:218-19). After Valerio finished, he told
Kalichenko that he was sorry. She decided not to contact the
police because she still hoped that Valerio would prove to be a
good father to her daughter. (A:219).

On October 18, 2011, near the end of Kalichenko's stay
with Valerio, Kalichenko signed a written agreement with Valerio
that he drafted stating that she was entering into a "multiple
partner relationship" with him. (A:220). The agreement also said
that Kalichenko promised to obey Valerio's commands, and that
Valerio agreed to be gentle to her when not engaging in consensual
rough sexual intercourse. (Id.). Notwithstanding that agreement,
Kalichenko believed that Valerio's prior sexual assaults against
her were non-consensual. (Id.).

The agreement also said that Kalichenko would never
mention the word "police" in Valerio's home; Kalichenko believed
that Valerio included this language because he feared that she
would contact law enforcement about his assaults. (A:220). In
addition, Valerio sent Kalichenko e-mails asking for her help in

adopting a child from Ukraine by posing with him as a couple in return for a commission. (A:221). Kalichenko did not assist Valerio and sent his correspondence to the American consulate to make sure that he could not adopt a child from Ukraine or any other country. (Id.).

    3.  A.D.

A.D. testified on September 26, 2016. She was born and raised in South Africa. She has a nine-year-old son and a seven-year-old daughter. She has traveled to the United States several times from February to May 2008, June to October or November 2008, and December 2008 to March 2010. During all of those trips, A.D. stayed on Long Island and lived in houses owned by Valerio. (A:229).

A.D. met Valerio through a dating website called christiansingles.com in July or August of 2007 when she was pregnant with her son. (A:230). Valerio paid for her February 2008 flight to the United States, and she brought her son with her. (Id.). Valerio picked her up from the airport, gave her gifts, and treated her well at first. (Id.). Eventually, Valerio began losing his temper and, on one occasion, threw A.D. to the kitchen floor and choked and hit her while she screamed. (Id.). Valerio also began to make A.D. feel as though her son was a "burden" and that he "didn't want him around." (Id.). A.D.

returned to South Africa in May 2008 because she missed her mother. (A:231). In addition, Valerio had asked that she participate in some kind of a fashion show during which she would wear nothing but pantyhose, which made her uncomfortable, so she decided to leave the United States. (Id.).

When A.D. returned in June 2008, Valerio picked her up at the airport. (Id.). Another man helped A.D. carry her bags from the plane to the airport exit, and when Valerio saw him assist her, he became angry and grabbed the luggage away from the man. (Id.). After Valerio and A.D. arrived at Valerio's home, Valerio grabbed A.D. and forced her onto a couch. (A:232). He pushed her face down into a pillow and ripped her clothes off, telling her that he was in charge and leaving her in tears. (Id.). During this second visit, A.D. became pregnant by Valerio in or around July 2008, and returned to South Africa a few months later to see her mother. (A:232-33).

After A.D. came back to the United States for the third time, she gave birth to their daughter in April 2009, and Valerio refused to let her leave the country again despite the fact that her visa subsequently expired. (A:233). A.D. brought her son with her, but eventually asked her mother to come to the United States and bring him back to South Africa because A.D. believed that her son was not safe in Valerio's home. (Id.). While A.D.

was pregnant with their daughter, Valerio's abuse worsened, and he told her that she should get an abortion or fall down the stairs and die. In addition, because A.D. was not having sex with him, Valerio slapped her on one occasion, causing A.D. to fall and split her lip. (Id.). He also attempted to force her to have sexual intercourse on another occasion, choking and hitting A.D. while she begged him to stop, which he eventually did. (Id.).

After their daughter was born, Valerio's abuse of A.D. continued, and on another occasion, he tried to rape her and banged A.D.'s head against her bed's headboard while she held their daughter in her arms. (Id.). In addition, the sight of A.D. breastfeeding their daughter made Valerio angry, and he once threw a soda can at her head when he saw her doing so. (A:233-34). After an argument during the summer of 2009, A.D. called the police, and when two officers arrived and A.D. explained what had happened, one of the officer told her that she had probably provoked Valerio. (A:234). This stunned A.D. and led her to believe that Valerio was correct when he told her that no one would help her if she reported his abuse, and she declined to complete a formal police statement. (A:234, 242-43). Valerio also told A.D. that she could not leave the United States, and that if she did, he would send someone after her. (Id.). While A.D. lived with Valerio, he strictly monitored her interactions with other

people and refused to let her socialize outside of the home, although he eventually bought her a cell phone to use. (A:235-36). When Valerio left the house, he would lock A.D. inside and close the blinds. (A:236).

During the summer of 2009, Valerio physically assaulted A.D. on another occasion while he was driving her for an evening out. (A:234). After hitting her, Valerio stopped the car in a dark parking lot and told A.D. that she was going to die, and she jumped out of the car. (A:234-35). A.D. screamed for help, and Valerio grabbed her, put his hand over her mouth, and forced her back into the vehicle. (A:235). Due to these repeated incidents of abuse, A.D. left Valerio's home and went to a women's shelter called Brighter Tomorrows. (Id.). However, because the shelter was not comfortable and because Valerio convinced A.D. that conditions would improve if she returned, A.D. went back to live with Valerio. (Id.).

Two subsequent physical assaults caused A.D. to leave the United States for the third time. (A:236). The first incident occurred while Valerio was driving A.D. and was pulled over by two police officers for driving the wrong way on a one-way street. This angered Valerio, and after the police left, he drove A.D. to a beach, smashed her head against the car's dashboard, pulled her hair out, and screamed insults at her. (Id.). He also ripped

A.D.'s dress and raped her, and then drove her back to his house. (Id.). The second incident, which occurred in or around November 2009, happened when A.D. entered Valerio's home office. (Id.). He became angry and choked and punched her, causing A.D. to lose consciousness. (A:237). When A.D. awoke, she realized that her mouth was bloody and that Valerio had knocked some of her teeth loose. (Id.). Valerio allowed her to go to a dentist, but told A.D. that he would kill her if she told anyone about the assault. (Id.). The dentist referred A.D. to a surgeon, but despite the operation, which Valerio paid for, A.D.'s teeth have never returned to normal. (Id.).

Before A.D. returned to South Africa, she filed for custody of their daughter in a family court on Long Island. (Id.). Her custody petition documented Valerio's abusive behavior. (Id.). After filing for custody, A.D. left the United States on or about March 9, 2010 with their daughter after promising Valerio that she would eventually return. (A:237-38). A.D. agreed to come back to the United States because she was fearful that Valerio would send someone to retrieve her or hurt her family if she did not do so. (A:238). On or about October 4, 2010, Valerio e-mailed A.D. saying that he was going to travel to South Africa and forcibly take her daughter from her. (Id.). This convinced A.D.

that she had to return to the United States to protect her daughter from Valerio, which she did in January 2016.  (Id.).

When A.D. arrived in the United States, Agent Troyd met her at the airport.  A.D. spoke with Troyd and provided him with several e-mails and other documents documenting, inter alia, her visits to the dentist and the oral surgeon.  (A:238-39).

### 4.  Psychological Testimony

On March 6, 2017, the defense presented testimony from Valerio's retained forensic psychiatrist, Dr. Alexander Bardey (A:261-316), and social worker Maura Gordon (A:317-25).

Dr. Bardey opined that childhood sexual abuse suffered by Valerio, as well as drug use, had led him to an interest in improper sexual acts.  (A:268-86).  Dr. Bardey opined that Valerio remained a "moderate" risk of reoffending.  (A:286-87).  Dr. Bardey also found that Valerio had an interest in sadomasochistic and violent internet pornography which, if Valerio viewed in the future, would increase his risk of recidivism.  (A:300).

As Dr. Bardey conceded, however, this conclusion that Valerio was a "moderate" risk of dangerousness did not take into account sex crimes which the government proved at the Fatico hearing.  (A:305-08).  Specifically, Dr. Bardey did not account for Valerio's repeated, violent rapes of A.D. and Kalichenko. (A:307-08).  Dr. Bardey acknowledged on cross-examination that if

35

this conduct were included, Valerio would be at a higher risk of recidivism. (A:316). Notably, as Dr. Bardey admitted, Valerio had already recidivated when he committed the instant offenses, despite receiving sex offender therapy following his August 2006 conviction. (A:299-300).

Gordon testified regarding interviewing Valerio's sister, Bernadette Imperiale, who corroborated Valerio's claim of childhood abuse, as well as her own abuse by their father. (A:318-25).

D.   The District Court's Fatico Decision

By written decision dated June 1, 2017, the district court found, having evaluated the demeanor and credibility of the witnesses at the Fatico hearing, that:

> [T]he government has proven, by a
> preponderance of the evidence, that (1) the
> defendant physically and sexually assaulted
> Olena Kalichenko during the course of his
> relationship with her; (2) the defendant
> physically and sexually assaulted A.D. during
> his relationship with her; and (3) the
> defendant deceived another woman into
> believing that she was coming to his house
> from England to be an au pair, even though
> there was no child in his house.

(SPA:12).

Regarding the assaults and rapes of Kalichenko and A.D., the court indicated that it would consider this conduct "in connection with the Section 3553(a) factors—namely, the defendant's history of extremely dangerous and violent behavior

towards other individuals, and the need to protect the public from further crimes by the defendant." (SPA:12-13). Regarding Valerio's luring of Down to the United States, the court stated that it would consider this non-violent conduct as it "corroborat[ed] the testimony of Ms. Kalichenko and A.D. regarding the deceptive and manipulative conduct by the defendant during their respective relationships with him," but that, "[i]n any event, even if the Court did not consider the interactions with the au pair at all, it would reach the ... same conclusions with respect to Ms. Kalichenko and A.D." (SPA:13 n.3).

E.    The Sentencing Proceeding

On June 6, 2017, the parties appeared for sentencing. As to the Guidelines calculation, the parties agreed that Valerio had an offense level of 47 and criminal history category of I. (GA:66-67). As the court noted, this would carry an advisory range of life, however, because no count of conviction carried a life sentence, the advisory range became the sum of the statutory maximums of all the counts together. (GA:68-69). The court agreed with defense counsel that sentencing Valerio on Counts Nine through Thirteen would present a double jeopardy problem and dismissed those counts without prejudice on consent of the government. (GA:69-70). The court then adopted Valerio's position that the advisory Guidelines was the sum of the remaining counts – 260 years. (GA:70). Neither party objected to the PSR as so amended

and the court adopted the information in the PSR as factual findings of the court in addition to its <u>Fatico</u> findings. (<u>Id.</u>).

Defense counsel argued for a non-Guidelines sentence that would allow Valerio to be released at some point, citing Valerio's childhood abuse, the evaluation by Dr. Bardey and the support of his family. (GA:71-77). Valerio's counsel argued that based on Valerio's life expectancy, any sentence over 34 years would be a de facto life sentence. (GA:78). He further argued that in terms of general deterrence, if such sentences for child pornography production become prevalent an offender may decide to kill a victim instead. (GA:79).

Valerio also addressed the court, claiming that, although he had committed heinous acts, he had been consumed with drug, alcohol and sex addiction he was unable to control. (GA:81). He indicated he felt the pain he had put his victims through and his two adult victims (A.D. and Kalichenko) had loved and trusted him. Valerio indicated he had been "consumed with sexual desire and that took over my feelings for them. The money that I had was a power over them, a tool in lieu for their sexual desires." (GA:82). Valerio indicated that heavy cocaine use had distorted his thinking to the point where he thought of a child as a "toy" and "order[ed] somebody that I loved and she loved me as well, to direct her to do something so horrible as that." (GA:82-83).

Valerio expressed remorse and stated a desire for rehabilitation. (GA:84-85). The district court commented that Valerio's remorse appeared to be genuine and that it would consider his childhood circumstances, as well as other factors. (GA:85-86).

The government acknowledged that a 60-year sentence was very significant but argued it was appropriate, because Valerio was dangerous and his conduct was deliberate. (GA:86). The government argued that Valerio had deliberately assaulted a woman in 2005 at the water park and while on probation he had been found with videotapes where he had secretly taped nannies and caretakers in his home. (GA:86-87). Valerio had also deliberately sexually exploited the two-year-old victim by convincing the mother to make him videos and his six-year-old niece by convincing the family he was taking legitimate modeling photographs. (GA:87).

The government argued that Valerio was deliberate in his victimization of A.D., repeatedly raping her, breaking her teeth and knocking her unconscious. (Id.). The government pointed to A.D.'s letter of May 8, 2017, in which A.D. described how her life had been completely transformed by Valerio's conduct. (Id.).

The government argued that Valerio's conduct was deliberate when he sexually assaulted and repeatedly raped Kalichenko and when he tried to adopt a child from Ukraine even after they broke up. (Id.). Moreover, Valerio had tricked the

18-year-old au pair and her employer-agency, convincing them that he had a daughter in need of care, and then tried to get her to wear a fetish outfit to a party. (GA:87-88).

As to Dr. Bardey's testimony, the government noted that he had conceded that his finding that Valerio was a moderate risk to reoffend did not take into account Valerio's violent conduct toward A.D. and Kalichenko. (GA:88).

Finally, the government argued that Valerio had already been given a second chance when he received probation following the sexual assault at the wave pool and "[h]e ha[d] demonstrated since that time that he cannot be trusted, that he will manipulate others, and that he is a danger to our community." (GA:89).

The district court then imposed a sentence of 720 months, stating that it had "carefully gone through and considered all the factors set forth by Congress in Section 3553(a)." (GA:89-90). The court explained that it imposed that sentence "with great thought and pause and having reconsidered it several times." (GA:90).

The court noted that the offenses of conviction "showed the defendant to be a compelling danger to the community, especially to children." (Id.). Further, Valerio carried out the offense by treating Kalichenko "in such a demeaning, degrading, humiliating way as an object to make her completely dependent upon

Mr. Valerio ... so that she would do his bidding, including exploit her own infant." (GA:91). In addition, Valerio's exploitation of his six-year-old niece "betray[ed] the trust that was given to him as an uncle" and "deceiv[ed] and manipulate[ed] people in order to satisfy his desires." (Id.). Thus, "the counts of conviction demonstrate the defendant to be extremely violent and dangerous and a clear and compelling danger to the community especially to children at the highest level." (Id.).

The court remarked that "the level of danger is only further confirmed by" Valerio's history and characteristics. (Id.). Specifically, Valerio's "history and characteristics show that he is not only a danger to children, but he's a danger to women as well." (GA:92). The court cited Valerio's 2006 conviction for attempted forcible touching as well as the fact that Valerio's "adjustment on supervision from that probation was unsuccessful" and that Valerio "was given a chance with treatment there and did not take that opportunity." (Id.).

The court found that the evidence of Valerio's "extreme dangerousness was further corroborated at the Fatico hearing." (Id.). It found the women who testified "completely credible," commenting, "I listened to them testify. I could hear it in their voice. I could see it in their eyes. There was no question that those events happened as they articulated." (Id.). The court

referenced the testimony of A.D. and Kalichenko about Valerio's acts of physical and sexual violence. Further, the court found that Down's testimony "corroborated the manipulativeness and deceptive behavior Mr. Valerio has engaged in his life in order to engage in this type of violent conduct towards women and towards children." (GA:93).

In concluding its analysis of the offense conduct and Valerio's history and characteristics, the court remarked:

> So the counts of conviction and this history of violence show him to be, which is clear to me he is an extremely dangerous individual, that this court needs to protect society from for the rest of his life. I don't believe there are any limits on what he would do to satisfy his sexual desires to women or to children. So society needs to be protected. I don't believe his level of dangerousness will diminish over time. I think his risk of recidivism is extremely high.

> \*     \*     \*     \*

> All that led me to conclude that 60 years imprisonment, which is effectively a life sentence is warranted, sufficient and no greater than is necessary to reflect all of the factors.

(GA:93-94).

The court then reviewed Valerio's mitigation arguments. The court acknowledged that the defense had made "significant submissions," which it had considered, but that it did not "believe that a sentence less than the one I'm imposing would properly

balance all the factors." (GA:94). The court addressed Dr. Bardey's testimony, noting that Dr. Bardey had assessed Valerio as presenting a "moderate risk of reoffending," which the court found "obviously significant when you are talking about the type of activity that Mr. Valerio was involved in." (GA:95). However, the court found that Dr. Bardey's risk assessment was understated because it did not take into account the evidence of Valerio's violence to A.D. and Kalichenko that was presented at the <u>Fatico</u> hearing. Further, while Dr. Bardey opined that Valerio might be amenable to treatment, Valerio had "a chance to receive treatment many years ago and was unsuccessful." The court was unpersuaded by Dr. Bardey's suggestion that treatment might be more successful now because Valerio had finally shown some remorse for his conduct. The court found that the evidence of remorse was insufficient "to undo all the evidence ... of the violence that he's been involved in for a number of years, both to his children and to women." (GA:96-97).

The court rejected the defense's citation of other cases in the Eastern District of New York as support for an argument that the sentence would create unwarranted sentencing disparities. The court noted that all of the facts of those other cases were not before it and that it could not be sure whether they were "completely analogous" to this case. (GA:97). In any event, the

43

court noted that the government had cited other cases from the Eastern District of New York where defendants were sentenced to 60 years or longer.

Finally, the court acknowledged that it was "sensitive to" the defense argument that "sentences of life or the equivalent of life are usually reserved for murder." (GA:98). However, the court explained:

> I have never sentenced anyone to this amount of time that did not involve a murder, but I believe this is the extraordinary case, given the combination of factors and all the evidence before me, that an effective sentence of life is necessary to, among other things, protect the public from the dangerousness that I believe the defendant poses to the community, notwithstanding his words today.

(GA:98-99).

Following imposition of sentence, the district court affirmed that, if there were any issue with Counts Four, Five or Fifteen, the court would have considered consecutive sentences as to the counts involving both victims to accomplish the same 60-year sentence. (GA:105). The court specifically addressed this stating:

> . . . I know the guidelines is [260][15] years, the advisory range, but my sentence is not driven by the guidelines in this case.

---

[15] The transcript incorrectly reads "216," rather than "260," as was discussed at the outset of the sentencing proceeding.

> Regardless of what the guidelines were, that
> number is not inf1uencing me.
>
> It's based upon what I have seen in this
> case and reviewed during the trial, during the
> hearings. So this is not a case -- I know
> there are Second Circuit cases that talk about
> the guidelines sometimes for child pornography
> can be too severe for certain situations. I
> don't believe that this is a case where this
> guideline number is driving the sentence.
>
> But, yes, the answer to your question is
> yes, the sentence would be the same even in
> the absence of those counts.

(GA:105-06).

### F. The Written Judgment and Statement of Reasons

The SOR accompanying the district court's written judgment adopted the Guidelines calculation agreed to by the parties at the sentencing, finding an advisory Guidelines sentence of 3120 months (260 years). (SOR:1). In the SOR, the court noted the 60 year sentence was a below-Guidelines sentence and provided the following rider regarding its reasons for the sentence:

> Based upon the defendant's conduct in this
> case, and his history and characteristics, the
> Court does not believe that the defendant's
> dangerousness will dissipate over time and
> concludes that an effective life sentence (of
> 60 years) is necessary to protect the public
> from the defendant. The Court concludes, for
> reasons set forth in detail on the record,
> that the defendant's risk of recidivism is
> extremely high. Given the nature of his
> conduct and the harm that the defendant has
> caused by his conduct in this case, this
> sentence is also necessary to reflect the
> seriousness of the offense, to promote respect

>for the law, and to provide a just punishment
>for the offense.

(SOR:3, 5).  The court indicated that the sentence was intended to

be an effective life sentence given the "extremely serious nature

of the offenses" and "extreme level of danger" posed by Valerio's

history and characteristics.  (SOR:5).

ARGUMENT

POINT ONE

THE DISTRICT COURT PROPERLY
DENIED VALERIO'S MOTION TO SUPPRESS

Valerio claims that the district court erred in denying his motion to suppress his statements made in response to questioning during the search of his residence.  He argues that his pre-Miranda statements should have been suppressed because the questioning constituted custodial interrogation.  He further contends that, because of this alleged violation, his post-Miranda statements should have been suppressed as well.  These claims are without merit.

I.    Applicable Law

A.    Standard of Review

This Court reviews the district court's "factual findings for clear error" and "questions of law de novo."  United States v. Faux, 828 F.3d 130, 134 (2d Cir. 2016).  With respect to Miranda claims, findings of historical fact concerning the questioning are reviewed for clear error, but the conclusion as to whether a suspect was in custody is reviewed de novo.  See United States v. Newton, 369 F.3d 659, 668-69 (2d Cir. 2004)

B.    Custodial Interrogation

Miranda warnings are not required unless law enforcement agents interrogate a person who is in custody.  See id. at 669.

47

The test for whether a defendant was in custody is an objective one that asks (1) "whether a reasonable person would have thought he was free to leave," id. at 672; and, if not, (2) whether there has been a formal arrest or a reasonable person in defendant's position would have understood himself or herself "to be subjected to the restraints comparable to those associated with a formal arrest," id. at 671 (citation and internal quotation marks omitted). Whether a person is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

Relevant circumstances include: "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion[,]" and the "nature of the questions asked." United States v. FNU LNU, 653 F.3d 144, 153 (2d Cir. 2011). "[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." Newton, 369 F.3d at 675 (citation omitted).

## II. The District Court Correctly Held that Valerio Was Not in Custody Before Receiving Miranda Warnings

The district court did not commit clear error in making its findings of fact and it correctly determined that the facts as found showed that Valerio was not "in custody" when he voluntarily spoke with law enforcement agents at his home. After fully crediting Agent Troyd's testimony, and discrediting Valerio's contrary assertions, the court concluded that a reasonable person in Valerio's "situation would have understood that he was free to end the interview and leave the house" and, in any event, his "freedom of action was not curtailed to a degree associated with formal arrest." (A:180). The court correctly reasoned that (1) the interview took place in the familiar surroundings of Valerio's home; (2) Valerio knew the agents were there to conduct a search, and agents never told him that he was under arrest, or that he was not free to terminate the interview and leave the house; (3) the interview commenced only after Troyd asked Valerio if he would sit in the dining room and speak with the agents and Valerio agreed; (4) agents did not brandish their weapons or handcuff Valerio, and they did not physically touch or threaten him; (5) agents were not blocking Valerio from leaving the house; and (6) agents did not say or do anything threatening, but rather

49

conducted the interview in a "calm" manner. These circumstances support the finding that Valerio was not in custody.

Valerio's reliance on United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008), is misplaced. There, eight law enforcement officers entered Craighead's home, some with unholstered firearms. See id. at 1085. Two of the officers escorted Craighead to "a back storage room" and closed the door behind him. Id. at 1086. An agent wearing a "raid vest," who was "visibly armed," "stood silent with his back to the door facing the suspect." Id. The interrogation occurred in "the dark recess of the back storage room," id. at 1087, with Craighead "sitting on a box or a chair grabbed from another room," id. at 1089. The court commented that such circumstances diverge sharply from "[a]n interview conducted in a suspect's kitchen, living room, or bedroom," which "might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." Id. at 1088. Craighead thus bears little resemblance to this case.

Other out-of-circuit cases cited by Valerio also involved significantly more coercive circumstances than this case. For example, Valerio cites United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007), in which a suspect "confronted with an unholstered gun in his darkened bedroom" and interrogated

for at least 90 minutes was found to have been in custody. Similarly, in United States v. Hashime, 734 F.3d 278, 280-81 (4th Cir. 2013), the court found that a defendant was in custody during the execution of a residential search warrant where 15 to 30 agents, "equipped with a battering ram[,]" entered his home with a great show of force, woke him up while he was sleeping naked, got him out of bed at gun point, led him downstairs and outside in his boxer shorts, separated him from his family, and then interviewed him for three hours in a small basement storage room. In United States v. Cavazos, 668 F.3d 190, 191-92, 194 (5th Cir. 2012), a defendant was found to be in custody where he was awakened by agents banging on his door and shining flashlights through his window, roused from his bed by fourteen agents and officers executing a search warrant, handcuffed, and separated from his family during questioning.

Valerio argues that limitations such as being separated from his girlfriend or not being permitted to walk into his kitchen indicate that his freedom was curtailed to a degree associated with formal arrest. (Br.45). However, this Court has repeatedly declined to find that a suspect questioned in his own home is in custody even where he "cannot move freely about[.]" (Id.). See, e.g., Faux, 828 F.3d at 137, 138-39 (defendant was not in custody even though she "was not permitted to move freely about her home

during the two-hour interrogation [and] agents accompanied her to the bathroom and to her bedroom to fetch a sweater"); United States v. Akapo, 420 F. App'x 42, 44 (2d Cir. 2011) ("Although two of the agents asked [defendant] to stand near the doorway while three other agents searched the apartment, this was a reasonable request given the small size of his apartment, and on balance did not result in a custodial situation."); United States v. Badmus, 325 F.3d 133, 139 (2d Cir. 2003) (defendant was not in custody despite agents' three-hour presence in his apartment and being "asked to stay seated in the living room" and not being permitted "to move freely about" the apartment); United States v. Cerreta, 63 F. App'x 585, 587 (2d Cir. 2003) (questioning in bedroom by two agents with door closed but not locked or blocked did not amount to custodial interrogation); United States v. Kirsh, 54 F.3d 1062, 1067 (2d Cir. 1995) (defendant, who was "still in pajamas" and not handcuffed, was not in custody even though she was told she could not enter her apartment while search was being conducted).

Indeed, "[o]nly in extreme or unusual circumstances have courts held that suspects interrogated in their homes were restricted to a degree comparable to that of an individual placed under formal arrest." United States v. Vado, 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) (citing cases); see, e.g., Orozco v. Texas, 394 U.S. 324, 327 (1969) (officer testified that suspect "was under

arrest and not free to leave when he was questioned in his bedroom"); Newton, 369 F.3d at 677 (suspect was handcuffed); United States v. Romaszko, 253 F.3d 757, 759 (2d Cir. 2001) (suspect "asked to leave or attempted to stand up" at least five times "and was told that she could not").

In addition, Valerio claims that Troyd's thorough preparation for the search, such as by having emails and a video available to show Valerio, created an "inherently coercive environment." (Br.51). Valerio's argument lacks merit. Showing a defendant "evidence of his guilt" is not relevant to the custody analysis unless "the presentation of such evidence would make a reasonable person feel that he was not free to leave." See United States v. Eaton, 954 F. Supp. 2d 646, 652 (W.D. Mich. 2013) (agents' act of showing defendant images of child pornography seized from his email account had "no bearing on the custody analysis"); but cf. United States v. Ali, 68 F.3d 1468, 1473 (2d Cir. 1995) (remanding to determine if, when defendant was asked to step away from boarding area at airport, had his travel documents confiscated, and was surrounded by seven officers who asked "questions [which] suggested that the officers already knew [defendant] had weapons in his baggage and that they were not about to let him go at all," he was in custody), on reh'g, 86 F.3d 275 (2d Cir. 1996) (ruling defendant was in custody). While showing

53

Valerio an email between him and Kalichenko (notably after he admitted to knowing Kalichenko and being "extorted" by her) may have indicated that Valerio was suspected of criminal involvement, it did not make the interview custodial.

Accordingly, consistent with recent precedent of this Court, Valerio was not in custody for purposes of triggering Miranda warnings. See United States v. Familetti, 878 F.3d 53, 61-62 (2d Cir. 2017) (defendant was not in custody because the officers had questioned him in his bedroom in a conversational tone, he was not restrained, and the agents' weapons were not drawn); Faux, 828 F.3d at 138-39 (defendant was not in custody where she was interviewed for hours at her home, was not handcuffed, was never told she was not free to leave, and officers did not display weapons or otherwise threaten or use physical force against her); see also United States v. Beal, No. 17-442, 2018 WL 1719074, at *3 (2d Cir. Apr. 9, 2018) (summary order) (defendant, who was questioned at his place of business, was not in custody where he was questioned in a "conversational tone" by agents, he was not restrained, the officers were in plain clothes and their weapons were not visible, and agents did not physically block or prevent him from leaving). The district court thus correctly concluded that Valerio was not in custody for purposes of Miranda, and his statements were properly not suppressed.

III. The District Court Correctly
     Concluded that Valerio's
     Post-Miranda Statements Were Voluntary

Valerio also challenges the post-Miranda statements he gave to agents while seated in his dining room during the search of his residence. He contends that Troyd deliberately employed a "two-step interrogation process" designed to undermine his Miranda protections. (Br.52-53). Valerio's argument lacks merit.

When a suspect is twice interrogated, once before being given a Miranda warning and once after, courts evaluate "whether the officers employed a 'deliberate, two-step strategy, predicated upon violating Miranda during an extended interview,' and if so, whether 'specific, curative steps' were taken to obviate the violation that occurred." United States v. Capers, 627 F.3d 470, 477 (2d Cir. 2010) (internal citations omitted) (quoting Missouri v. Seibert, 542 U.S. 600, 621 (2010) (Kennedy, J., concurring)). In determining whether the "officers' actions are sufficiently indicative of a deliberate circumvention of Miranda" courts review "the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness ...." Id. at 478-79. Objective factors include "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the

timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Seibert, 542 U.S. at 615; accord United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007).

As a threshold matter, as explained above, Valerio's pre-Miranda statements were lawfully obtained. Thus, there is no predicate for finding that the agents engaged in an improper two-step process. See Familetti, 878 F.3d at 62 ("Because Familetti was not subject to a pre-warning custodial interrogation, we do not reach his corollary argument regarding a deliberate two-step interrogation").

Moreover, there is no evidence that the agents and officers involved in Valerio's interview intended to employ a two-step process to obtain Valerio's post-Miranda confession. Troyd, whose testimony the district court fully credited, began the interview at approximately 6:15 a.m. by advising Valerio why agents were in his home – to execute a search warrant. After asking whether Valerio would speak to agents, Valerio initially claimed that he was "being extorted" by Kalichenko. Troyd inquired further and showed Valerio a July 22, 2012 email that Kalichenko had provided to law enforcement. After approximately an hour, it became clear to Troyd that Valerio had incriminated himself. Troyd

then spoke with another agent and called the United States
Attorney's Office to determine if it would authorize the filing of
a criminal complaint against Valerio. At 7:55 a.m., Troyd gave
Valerio the <u>Miranda</u> warnings.

After <u>Mirandizing</u> Valerio, Troyd's questioning changed
in scope and was for a limited duration. He briefly asked Valerio
about a second email and showed Valerio a segment of a video
provided to Kalichenko. Troyd terminated the post-<u>Miranda</u>
questioning when, in response to a request to sign a written
statement, Valerio asked to speak with a lawyer. Accordingly,
although there was continuity in police personnel and only a brief
hiatus between the two interviews, there is no evidence that the
agents deliberately sought to violate Valerio's <u>Miranda</u> rights so
that they could thereafter take advantage of that claimed violation
in securing a <u>Miranda</u> waiver and additional incriminating
statements.

POINT TWO

VALERIO'S SENTENCE WAS BOTH
PROCEDURALLY AND SUBSTANTIVELY REASONABLE

I.  Legal Standard

A sentence must be procedurally and substantively reasonable. This Court has identified procedural error where a district court:

> (1) fails to calculate the Guidelines range;
> (2) is mistaken in the Guidelines calculation;
> (3) treats the Guidelines as mandatory;
> (4) does not give proper consideration to the
> [18 U.S.C.] § 3553(a) factors; (5) makes
> clearly erroneous factual findings; (6) does
> not adequately explain the sentence imposed;
> or (7) deviates from the Guidelines range
> without explanation.

United States v. Conca, 635 F.3d 55, 62 (2d Cir. 2011) (citation and quotation marks omitted). In reviewing a sentence for such procedural errors, this Court applies "'a particularly deferential form of abuse-of-discretion review.'" United States v. Malki, 718 F.3d 178, 182 (2d Cir. 2013) (quoting United States v. Cavera, 550 F.3d 180, 187-88 & n.5 (2d Cir. 2008) (en banc)).

In determining whether a sentence is substantively reasonable, this Court will "not substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case." Cavera, 550 F.3d at 189. Instead, the Court will "set aside a district court's substantive determination only in exceptional cases where the

trial court's decision cannot be located within the range of permissible decisions." Id. (internal quotation marks and citation omitted, emphasis in Cavera). "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006), abrogated on other grounds by Rita v. United States, 551 U.S. 338 (2007).

## II. Valerio's Sentence Was Procedurally Reasonable

Valerio argues that the district court committed procedural error because: (1) it considered the uncharged assaults and rapes of A.D. and Kalichenko; (2) it invited Kalichenko to testify regarding her allegations of abuse; and (3) it used the wrong "benchmark" for sentencing. (Br.54-65). These arguments are meritless.

### A. Consideration of Uncharged Assaults and Rapes

There is no merit to Valerio's contention that the district court's consideration of evidence of the uncharged assaults and rapes of A.D. and Kalichenko violated his right to a jury trial. (Br.55-57). "A district court may consider as part of its sentencing determination uncharged conduct proven by a preponderance of the evidence as long as that conduct does not increase either the statutory minimum or maximum available punishment." United States v. Ulbricht, 858 F.3d 71, 128 (2d Cir.

2017) (citing cases), petition for cert. filed (U.S. Dec. 22, 2017) (No. 17-950). The district court's findings concerning the assaults and rapes of A.D. and Kalichenko did not increase Valerio's statutory sentencing range and therefore did not implicate Valerio's jury trial right. Valerio appears to argue for an exception to this rule where a sentencing court considers facts that supply "the impetus for [a] de facto life sentence" (Br.56), but cites no authority recognizing such an exception.

Valerio's due process claim fares no better. "[I]t has long been established that the Due Process Clause does not restrict a court with respect to the type of information it may consider for purposes of sentencing." United States v. Delacruz, 862 F.3d 163, 175 (2d Cir. 2017) (citing Williams v. New York, 337 U.S. 241, 246 (1949), and Apprendi v. New Jersey, 530 U.S. 466, 481 (2000)). Indeed, federal sentencing law provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," 18 U.S.C. § 3661.

Citing Ulbricht, 858 F.3d at 125-29, Valerio argues that A.D. and Kalichenko's testimony was unfairly inflammatory. (Br.57). However, this case is distinguishable from Ulbricht,

where the government introduced evidence of six drug-related deaths at the sentencing of a defendant convicted of operating an online marketplace that sold illegal drugs.  While not finding that the admission of this evidence was error, see id. at 126, the Court questioned the need for the evidence given its emotional impact and the fact that "the harms of the drug trade were obvious," id.

By contrast, Valerio's treatment of A.D. and Kalichenko was not an "obvious" consequence of the charged conduct.  Moreover, the district court found that this evidence was relevant to the Section 3553(a) sentencing factors — "namely, the defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public from further crimes by the defendant" and Valerio's "deceptive and manipulative conduct."[16]  (SPA 12-13).  The evidence also rebutted Valerio's claim to Probation that he had a "very good relationship" with A.D. and that she had left the country due to visa problems. (PSR:¶87).  Finally, the evidence was no more inflammatory than

---

[16]  The district court also noted that this conduct was also arguably "'relevant conduct' because it could be viewed as being in preparation for, and inextricably intertwined with, his subsequent conspiracy with Ms. Kalichenko to sexually exploit her child in the Ukraine and to produce child pornography with her child at his direction.  U.S.S.G. §§ 1B1.3(a)(1)(A), (3)." (SPA 13, n.2).

the charged conduct involving sexual exploitation of a toddler through Valerio's manipulation of her mother and of his niece through a fake modeling scheme.

### B.   The District Court Properly Invited the Testimony of Kalichenko

Valerio claims that the district court improperly invited Kalichenko to testify concerning allegations she had made in the context of her criminal case.  Valerio speculates that the government did not call Kalichenko because it deemed her "lacking in candor" and "unworthy of belief." (Br.58, 61).  This argument ignores the record.  By letter and at the outset of the July 25, 2016 hearing, the government expressed concern that, if the government were to call Kalichenko, she might qualify for a lesser sentence pursuant to U.S.S.G. § 5K1.1 or 18 U.S.C. § 3553(e). (GA:58-59; A:188).  Given the seriousness of Kalichenko's own criminal conduct, which involved sexually abusing her two-year-old daughter, it is obvious why the government did not want Kalichenko to qualify for a sentence reduction.

The issue of Kalichenko's allegations arose in the context of Valerio's request for a <u>Fatico</u> hearing as to the allegations of similar rapes and violent conduct towards A.D. (GA:19).  Valerio denied both allegations. (GA:17-21).  The allegations of both Kalichenko and A.D. were already before the court in the PSR and Addendum. (PSR:¶20; Addendum 1-3).

The law accords district judges "broad discretion" in deciding what procedures to employ to resolve disputed facts at sentencing. United States v. Duverge Perez, 295 F.3d 249, 254 (2d Cir. 2002). It was within the district court's discretion to consider Kalichenko's allegations and order a Fatico hearing. See Delacruz, 862 F.3d at 171, 175-76 (district court properly sua sponte ordered evidentiary hearing relating to past drug dealing and robbery conspiracy alleged in PSR and disputed by defendant). Finally, as discussed above, the district court made detailed factual findings pursuant to Section 3553(a) regarding the relevance of this testimony to "the defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public from further crimes by the defendant." (SPA 12-13).

B. The District Court Correctly
   Calculated the Guidelines

Valerio claims that the district court used an incorrect "benchmark" in sentencing him. (Br.61-65). Although Valerio concedes that the district court applied the uncontested Guidelines range of 260 years (Br.62), he argues that U.S.S.G. § 5G1.2(c) limits the application of U.S.S.G. § 5G1.1(a) (Br.63-64) and therefore, because a sentence "in the realm of, or starting at, 30 years" was adequate to achieve total punishment, this should

63

have been the "benchmark." (Id.). Valerio misreads the Guidelines.

Initially, because Valerio did not raise this objection at sentencing, his claim should be reviewed for plain error. See Fed. R. Crim. P. 52(b). To obtain relief, Valerio must show "(1) error, (2) that is plain, ... (3) that affect[s] [his] substantial rights" and that "(4) ... seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Thomas, 274 F.3d 655, 667 (2d Cir. 2001) (en banc) (internal quotation marks and citations omitted). Valerio's claim cannot survive plain error review.

Valerio's argument is contrary to this Court's decision in United States v. McLeod, 251 F.3d 78, 83 (2d Cir. 2001), which provided the following guidance:

> The correct method of imposing sentences on multiple counts has three steps:
>
> (1) The sentencing judge determines the "total punishment" to be imposed by selecting an appropriate punishment within the range resulting from application of all relevant provisions of the Guidelines. U.S.S.G. § 5G1.2(b).
>
> (2) The sentencing judge imposes the "total punishment" on each count, unless the "total punishment" would exceed the statutory maximum for any one count, id., in which event the statutory maximum is imposed on that count, id. § 5G1.1(a).
>
> (3) The sentencing judge compares the "total punishment" to the highest statutory maximum

64

of all the counts of which the defendant has been convicted, id. § 5G1.2(c)-(d), and determines whether the sentences run concurrently or consecutively based on the comparison:

> (a) If the "total punishment" is less than that highest maximum, the sentences on all counts are imposed to run concurrently, id. § 5G1.2(c), unless some applicable provision of law requires consecutiveness, see, e.g., 18 U.S.C. § 924(c) (mandatory minimum sentences for certain firearms offenses run consecutively with all other sentences).

> (b) If the "total punishment" is more than that highest maximum, the sentences are imposed to run consecutively but only to the extent necessary to produce an aggregate sentence equal to the "total punishment." Id. § 5G1.2(d); see United States v. Rahman, 189 F.3d 88, 155 (2d Cir. 1999).

Id. (emphasis in original); see also United States v. Thavaraja 740 F.3d 253, 257 n.3 (2d Cir. 2014); U.S.S.G. § 5G1.2, Application Note 1 ("If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment.").

Valerio correctly notes that, in United States v. Dorvee, 616 F.3d 174, 181-82 (2d Cir. 2010), this Court held that the district court had erred in considering a Guidelines range of 262-327 months where the statutory maximum for the count of conviction was 240 months. Id. However, the defendant in Dorvee

was convicted of only one count, see id. at 176, and thus the multiple-count provisions of the Guidelines did not apply.

Valerio also notes that the sentence that he deems adequate, a sentence "in the realm of, or starting at, 30 years," was consistent with Probation's Initial Recommendation. (Br.64). However, the Initial Recommendation of a total sentence of 35 years was made prior to and without the benefit of disclosure of the additional conduct, the Fatico hearing, the parties' submissions and the extensive analysis of the sentencing factors conducted by the district judge at sentencing.

## III. The Sentence Was Substantively Reasonable

Valerio argues that his sentence is substantively unreasonable, claiming it violates the parsimony clause of 18 U.S.C. § 3553(a)(2) and was not warranted by the relevant sentencing factors. (Br.65-74). Valerio's arguments are meritless.

Under the parsimony clause, a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a)(2). In "exceptional" cases, "where the trial court's decision cannot be located within the range of permissible decisions," this Court may overturn a procedurally reasonable sentence as substantively

unreasonable.  Cavera, 550 F.3d at 189 (internal quotation marks
omitted).

As the district court properly found in its detailed
oral and written findings, the effective life sentence here was
necessary to protect the public based upon the serious nature of
the offenses, Valerio's violent history and high risk of
recidivism, and the court's determination that Valerio's
dangerousness would not "dissipate over time." (GA:89-99; SOR:5).
In arguing otherwise, Valerio cherry-picks portions of the record
while ignoring the totality of the circumstances and the district
court's detailed findings.

For example, Valerio notes that Dr. Bardey found that
Valerio was not a pedophile. (Br.66).  But that assessment
provides little comfort given that Valerio directed and paid for
the molestation of a two year old by his co-conspirator, whom he
had repeatedly and violently raped.  Moreover, Dr. Bardey admitted
that, if he had considered the rapes and violence shown at the
Fatico hearing, Valerio would no longer present a "moderate" risk
of reoffending, but rather a higher risk. (A:316).

Valerio argues that his 60-year sentence is "grossly
disparate to the typical sentence imposed on other child
pornography offenders," citing Sentencing Commission statistics as
to the percentage of such cases in which de facto life sentences

are imposed. (Br.73-74). Where, as here, the parties briefed the issue and the district court explicitly considered and addressed disparity in imposing sentence, this Court "will not second guess the weight it assigns to [such argument] 'as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented.'" United States v. McGowan, 615 F. App'x 1, 4 (2d Cir. 2015) (quoting Fernandez, 443 F.3d at 32).

This Court has repeatedly upheld as substantively reasonable consecutive sentences in other child pornography production cases involving multiple victims even though the sentences were the equivalent of a life sentence. See id. (90 years — consecutive 30 year sentences for production involving three victims); United States v. Hamilton, 548 F. App'x 728, 729-30 (2d Cir. 2013) (150 years — 360 months on each count of production of child pornography to run consecutively); see also United States v. Davis, 624 F.3d 508, 510 (2d Cir. 2010) (120 years); United States v. Rosa, 626 F.3d 56, 60-61 (2d Cir. 2010) (120 years); United States v. Jass, 569 F.3d 47, 50 (2d Cir. 2009) (65 years and 115 years).

In sum, this is not one of the "exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." Cavera, 550 F.3d at 189 (internal quotation marks and citation omitted). While Valerio's sentence

is severe, so too were his crimes. Accordingly, Valerio's challenge to the substantive reasonableness of his sentence fails.

IV. <u>There Is No Basis for Reassignment to a Different Judge</u>

Finally, Valerio argues that, if remanded, the case should be reassigned to another judge. (Br.64-65). There is no basis for this request.

> As a general rule, even when a sentencing judge has been shown to have held erroneous views or made incorrect findings ... resentencing before a different judge is required only in the rare instance in which the judge's fairness or the appearance of the judge's fairness is seriously in doubt.

<u>United States v. Bradley</u>, 812 F.2d 774, 782 n.9 (2d Cir. 1987) (citing <u>United States v. Robin</u>, 553 F.2d 8, 10 (2d Cir. 1977) (per curiam) (en banc)). The <u>Robin</u> Court set forth the standards to determine "whether further proceedings should be conducted before a different judge."

> Absent proof of personal bias requiring recusation, Title 28 U.S.C. [§] 144, the principal factors ... are (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

553 F.2d at 10.

Here, even assuming that error occurred, none of the relevant factors supports remanding to a different judge. Valerio does not allege, nor could he, that Judge Bianco acted with personal bias requiring recusal under 28 U.S.C. § 144. Moreover, remand to another judge would result in waste and duplication because Judge Bianco conducted the trial and the <u>Fatico</u> hearing. Finally, there is no basis to suggest that, upon remand, the judge would have substantial difficulty in putting out of his mind previously expressed views or findings determined to be erroneous or evidence that must be rejected.

POINT THREE

VALERIO'S MULTIPLICITY/DOUBLE
JEOPARDY CLAIMS ARE WAIVED AND MERITLESS

Valerio argues that he was charged with the same offenses in more than one of the counts in the indictment and that his convictions on those counts therefore violate double jeopardy principles.  Specifically, Valerio claims 1) Counts Two and Three, charging sexual exploitation of Jane Doe #1 pursuant to 18 U.S.C. §§ 2251(a) and 2251(c), respectively, charge the same offense; 2) Count Fifteen (possession of child pornography) is a lesser included offense of Count Five (receipt of child pornography); and 3) Counts Six, Seven and Eight (attempted sexual exploitation) merge into Counts Two and Three (sexual exploitation).  (Br.74-79).  Valerio's claims should be rejected.

I.   Applicable Law

A.   Multiplicity/Double Jeopardy

The Fifth Amendment's Double Jeopardy Clause prohibits courts from meting out multiple punishments for the same criminal conduct unless Congress intended such multiple punishments.  See Rutledge v. United States, 517 U.S. 292, 297 (1996); Blockburger v. United States, 284 U.S. 299, 304 (1932).  In protecting against multiple punishments for the same offense, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."

United States v. Khalil, 214 F.3d 111, 117 (2d Cir. 2000) (internal quotation marks omitted) (quoting Garrett v. United States, 471 U.S. 773, 793 (1985)). Thus, a defendant's double jeopardy rights are violated by conviction on multiplicitous charges, i.e., where the indictment "charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999) (citing, inter alia, United States v. Holmes, 44 F.3d 1150, 1153-54 (2d Cir. 1995)).

To determine "whether convictions under separate sections of the federal criminal law, arising from the defendant's involvement in a single event or a common series of events violate double jeopardy principles," this Court reviews three factors: "the language of the statutes, how those statutes fare under the Blockburger test, and express congressional intent, if any, on the issue of multiple punishments." United States v. Muhammad, 824 F.2d 214, 217-18 (2d Cir. 1987). Under Blockburger, this Court must determine "whether there are two offenses or only one [by] whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. "[I]f each section requires proof of at least one fact that the other does not, there are two offenses, and it is presumed that the legislature intended to authorize prosecution and punishment under both. In that circumstance, the

72

imposition of multiple punishments does not violate the Double Jeopardy Clause." Khalil, 214 F.3d at 118. "Lesser-included offenses and their greater offense are considered a single offense, and may not be punished separately." United States v. Whyte, 630 F. App'x 104, 109 (2d Cir. 2015) (citing Blockburger, 284 U.S. at 304).

   B.   Failure to Preserve a Multiplicity Claim

      This Court has treated the failure to raise a multiplicity/double jeopardy claim in district court as a waiver, precluding appellate review. See United States v. Sinnott, 523 F. App'x 807, 809 (2d Cir. 2013) (noting that "'the constitutional protection against double jeopardy is a personal right and, like other constitutional rights, can be waived if it is not timely interposed at trial.'") (quoting Aparicio v. Artuz, 269 F.3d 78, 96 (2d Cir. 2001)); United States v. Ozbay, 296 F. App'x 148, 150 (2d Cir. 2008) ("Because none of the defendants raised these multiplicity challenges prior to trial ... we find the multiplicity challenges waived and decline to review them on appeal."); see also United States v. Cacace, 796 F.3d 176, 186 (2d Cir. 2015) (noting that government "advances forceful arguments" that defendant's failure to raise multiplicity/double jeopardy claim

73

before trial constituted waiver, but finding it unnecessary to resolve issue).[17]

In other cases, however, the Court has treated such claims as reviewable for plain error when raised for the first time on appeal. See United States v. Moreno-Montenegro, 553 F. App'x 29, 30 (2d Cir. 2014) (citing United States v. Polouizzi, 564 F.3d 142, 153–54 (2d Cir. 2009)).

II. Counts Two And Three Are Not Multiplicitous

Section 2251(a), which was charged in Count Two, provides in relevant part:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in ... any sexually explicit conduct for the purpose of producing any visual depiction of such conduct ... shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or

---

[17]  Fed. R. Crim. P. 12(b)(3)(B)(ii), as amended effective December 1, 2014, expressly requires a multiplicity claim to be raised before trial.  However, the trial in this case began on November 4, 2014, before the amended rule became effective.

74

affecting interstate or foreign commerce or mailed.

Section 2251(c), which was charged in Count Three, provides in relevant part:

> (1) Any person who, in a circumstance described in paragraph (2), employs, uses, persuades, induces, entices, or coerces any minor to engage in ... any sexually explicit conduct outside of the United States, its territories or possessions, for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e).
>
> (2) The circumstance referred to in paragraph (1) is that—
>
> > (A) the person intends such visual depiction to be transported to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail; or
> >
> > (B) the person transports such visual depiction to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail.

Section 2251(c) was passed in 2003 as part of the "PROTECT Act" "to stop efforts by producers of child pornography to avoid criminal liability based on the fact that the child pornography was produced outside of the United States, but intended for use inside the United States." H.R. Conf. Rep. No. 108-66, at 62-63 (2003), as reprinted in 2003 U.S.C.C.A.N. 683, 697. The House Conference report cited United States v. Thomas, 893 F.2d

1066 (9th Cir. 1990), which rejected a defendant's claim that Section 2251(a) did not apply to extraterritorial acts. See id. at 1068-69. However, in upholding the conviction, the court also relied upon the fact that the defendant was an American national and that "[i]nternational law permits a country to apply its statutes to extraterritorial acts of its nationals." Id. at 1069. The court noted that "out of respect for other nations, courts should not unnecessarily construe a congressional statute in a way that violates international law." Id. Thomas thus left open the possibility that Section 2251(a) would not apply to the extraterritorial acts of a foreign national. Section 2251(c) closed that potential gap in coverage where the child pornography was intended to be transported or was transported to the United States.

In asserting that Sections 2251(a) and 2251(c) are "essentially the same crime," Valerio cites United States v. McVicker, 979 F. Supp. 2d 1154, 1173 (D. Or. 2013). (Br.75). However, McVicker expressly recognized that the statutes are not redundant. As the court stated:

> McVicker argues that the extraterritorial application of § 2251(a) renders § 2251(c) redundant. That is not necessarily so. The Court notes that § 2251(c), with its focus on the perpetrator's intent to target the United States' market, tracks more closely the "effects principle" of jurisdiction under international law. See Restatement (Third) of

> Foreign Relations Law § 402, cmt. d.  In light
> of Congress's extensive legislation in this
> field, it is reasonable to conclude that
> Congress intended prosecutors to be able to
> use the broader provisions of § 2251(a)
> whenever possible but to use § 2251(c) when
> the application of § 2251(a) might conflict
> with principles of international law — for
> example, when the United States could not
> assert jurisdiction based on the defendant's
> nationality, as it can here.

Id. (footnotes omitted).

Moreover, Sections 2251(a) and 2251(c) satisfy the
Blockburger test because "each provision requires proof of a fact
which the other does not." 284 U.S. at 304. Specifically, Section
2251(c), but not Section 2251(a), requires that the criminal
conduct occur "outside of the United States, its territories or
possessions." On the other hand, Section 2251(a) requires that,
at the time of the offense, the defendant must "know[] or ha[ve]
reason to know that such visual depiction will be transported or
transmitted using any means or facility of interstate or foreign
commerce or in or affecting interstate or foreign commerce or
mailed." By contrast, Section 2251(c) requires that a defendant
"intends such visual depiction to be transported to the United
States, its territories or possessions, by any means, including by
using any means or facility of interstate or foreign commerce or
mail" but does not require the defendant to have had such intent
at the time the visual depiction was created.

In addition, as alternate jurisdictional bases, Section 2251(a) requires either that a "visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer," or that the "visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce."  Section 2251(c), on the other hand, requires that "the person transports such visual depiction to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail."  In sum, Section 2251(c) does not allow use of interstate and foreign materials as a jurisdictional basis and requires that "the person" charged did the transporting, while Section 2251(a) allows for jurisdiction based on materials used to produce the child pornography and does not require that the person charged did the actual transporting.  Under Blockburger, the statutes each require proof of a fact the other does not.

Moreover, even apart from the elements of the two statutes, the factual allegations underlying the offenses charged in Counts Two and Three were different.  Although mailings can provide a jurisdictional predicate under both Section 2251(a) and Section 2251(c), Count Three, as alleged in the indictment and

described in the court's charge, included mailings but Count Two did not. (GA:2-4, 49-52). Moreover, at trial, the government introduced evidence and argued to the jury that Valerio had received child pornography on disks via common courier (GA:27, 29-30, 31-34, 44-45)[18] as well as by email. Because Count Three alleged mailings and Count Two did not, the jury would have relied on the mailing of the disks as a basis for conviction on Count Three and the email transmissions as a basis for conviction on Count Two.

In any event, Valerio concedes that he did not raise a multiplicity objection to these counts in district court. Under this Court's decisions in Sinnott, 523 F. App'x at 809, and Ozbay, 296 F. App'x at 150, that constitutes a waiver. At a minimum, plain error review applies. The proposition that Section 2251(a) and Section 2251(c) are "essentially the same crime" is not "clear under current law" as the plain error rule requires. United States v. Olano, 507 U.S. 725, 734 (1993). That standard cannot be satisfied where "the law in this Circuit remains silent on the issue" even where the argument is supported by some out-of-circuit cases. United States v. Bastian, 770 F.3d 212, 221 (2d Cir. 2014).

---

[18] The disks were sent by a private courier service (DHL), which also counts as a "mailing." See United States v. Easley, 942 F.2d 405, 406 (6th Cir. 1991) (UPS shipment was a mailing pursuant to 18 U.S.C. § 1461 which prohibits mailing obscene materials).

Valerio has not cited (and we are not aware of) any decisions from other circuits that support his interpretation, let alone any such decisions from this Court.  Accordingly, Valerio fails to show plain error.

## III. Valerio's Double Jeopardy Challenge to his Convictions on Counts Five and Fifteen Is Waived and Meritless

Valerio contends that his convictions for receipt and possession of child pornography violated the Double Jeopardy Clause because possession (charged in Count 15) is a lesser-included offense of receipt of child pornography (charged in Count 5), and the government failed to distinguish between the images he possessed and those he received.  (Br.76-78).

This Court rejected an identical claim in United States v. Hester, 674 F. App'x 31, (2d Cir. 2016), cert. denied, 137 S. Ct. 2203 (2017), holding that, "[a]ssuming arguendo that the possession of child pornography is a lesser-included offense of receiving and distributing it, we hold that [defendant] waived his Double Jeopardy claim by failing to request an instruction that directed the jury to base its receiving-and-distributing conviction on different images or videos than its possession conviction."  Id. at 34. (citing, inter alia, United States v. Anson, 304 F. App'x 1, 5-6 (2d Cir. 2008) ("Because Anson did not request an instruction that would have ensured that the jury did

not consider an improper basis for his conviction, he has waived this Double Jeopardy claim."), and United States v. Washington, 861 F.2d 350, 352 (2d Cir. 1988) ("We have held in a series of cases that where an impermissible basis of conviction arises from an insufficiency of evidence and a valid basis remains on an alternative theory, a defendant must request the trial judge not to submit the invalid basis to the jury or else the objection will be deemed waived.")).

Valerio likewise did not request an instruction requiring the jury to base its verdict on the receiving charge in Count Five on different images than those underlying its verdict on the possession charge in Count Fifteen. Accordingly, as in Hester, Valerio's claim is waived.

Even if Valerio's double jeopardy claim were not waived, he cannot establish that there was error. Where a defendant is convicted of separate counts for the receipt and possession of child pornography, there is no double jeopardy violation where each count is based on different files or images. See, e.g., United States v. Irving, 554 F.3d 64, 79 (2d Cir. 2009) ("If the jury's verdict on [receipt] and [possession] were based on different images, there was no double jeopardy violation in the entry of judgment on both counts."); United States v. Bowman, 523 F. App'x 767, 769 (2d Cir. 2013) ("There is no double jeopardy

problem where the receipt and possession counts of a conviction were based upon different files."); see also United States v. Almonte, 638 F. App'x 71, 74 (2d Cir. 2016) (rejecting double jeopardy argument where respective convictions for possession and receipt "could have been based on different images or videos").

Here, the evidence established that images of both Jane Doe #1 and Jane Doe #2 were recovered from Valerio's possession. Only the images of Jane Doe #1 were received in interstate commerce. The images of Jane Doe #2 were produced in Valerio's basement (and violated the statute because they were made using equipment that had travelled in interstate commerce). Valerio attempts to limit the possession count solely to the Jane Doe #1 images based upon his interpretation of the government's closing argument. Valerio emphasizes that the government referred to the computer in discussing the possession count and did not refer to the SD Card where the images of Jane Doe #2 were recovered. (Br.77). Valerio's argument ignores, however, that immediately following this statement, the government referred to possession also encompassing the images of Jane Doe #2, stating that January 28, 2014 was "the date that the defendant possessed the child pornography involving both of the young girls." (T:986) (emphasis added). Moreover, the government's possession theory was not presented solely in closing argument, but also in opening and

during the trial. For instance, in opening, the government directly linked the possession count to the images of Jane Doe #2, stating:

> For the defendant's actions involving his niece here in Smithtown, he is charged with sexually exploiting a child. And the defendant is also charged with possessing child pornography.

(GA:25).

Thereafter, the government presented evidence that the SD Card was possessed by Valerio on January 28, 2014, that it contained images of Jane Doe #2 and, significantly, that the SD Card had been manufactured outside the United States, establishing the jurisdictional basis for the possession count as to these images. (GA:36-42). The district court noted in denying Valerio's Rule 29 motion that it was "sufficient if the jury credits that evidence for the jury to rationally find that the defendant possessed child pornography on his computer and on the SD card and that they were his." (GA:47).

In sum, by failing to request an instruction, Valerio has waived any claim that possession is a lesser-included crime of receipt, and, in any event, the possession and receipt convictions did not violate the Double Jeopardy Clause.

IV.  The Convictions on Counts Six through
     Eight Do Not Violate Double Jeopardy

Valerio argues that his convictions on Counts Six, Seven
and Eight, which charge the attempted sexual exploitation of Jane
Doe #1, violate double jeopardy principles.    (Br.78-80).
Specifically, Valerio claims that, although these attempts
occurred "before the time frame" of the sexual exploitation counts,
they "were nevertheless steps along the way to the completion" of
the sexual exploitation of Jane Doe #1.  (Br.79).

Initially, Valerio argues that his claim was preserved
by the (successful) defense motion to dismiss the other attempt
counts that were within the same time period, Counts Nine through
Thirteen.  (Br.79).  But failing to raise an objection to certain
counts cannot be cured by an objection to other counts.  If
anything, a court would justifiably assume that, if only certain
counts are objected to, the remaining counts are unobjectionable.
Accordingly, this claim should also be treated as waived or subject
to plain error review.

In any event, the attempts underlying the counts now at
issue were distinct and were not steps along the way to a completed
crime.  Each of the attempt counts related to a specific email
introduced into evidence wherein Valerio directed and scripted the
abuse he demanded Kalichenko perform on Jane Doe #1.  (GA:53-57).
For example, in an email on January 23, 2012, Valerio demands child

84

pornography videos of Jane Doe #1 from Kalichenko. (GA:53-54). The following morning, Valerio acknowledges that he received videos the previous day but asks Kalichenko to resend them because they used too much memory for his cellphone. (GA:56-57). He then gives her direction on how to make the child pornography videos. (Id.). Later, on January 24, 2012, Valerio provides a Western Union payment number and requests more videos that he describes in detail. (GA:55). In sum, these attempts succeeded prior to the commencement of the conduct charged in Counts Two and Three.

85

<u>CONCLUSION</u>

For the reasons stated, the judgment of the district court should be affirmed.

Dated:      Brooklyn, New York
            June 4, 2018

                              Respectfully submitted,

                              RICHARD P. DONOGHUE,
                              <u>United States Attorney</u>,
                              <u>Eastern District of New York</u>.

            By:   _____/s/_____
                  ALLEN L. BODE
                  Assistant U.S. Attorney


DAVID C. JAMES,
ALLEN L. BODE,
<u>Assistant United States Attorneys</u>,
     (<u>Of Counsel</u>).

CERTIFICATE CONCERNING TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 18,198 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  However, this Court has granted the government's motion for permission to file an oversized brief of no more than 18,279 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated:  Brooklyn, New York
        June 4, 2018

                                    _____/s/_____
                                    DAVID C. JAMES
                                    Assistant U.S. Attorney

A P P E N D I X

TABLE OF CONTENTS

Page

Superseding Indictment,
 Filed Nov. 12, 2014.........................................GA 1

Transcript of Proceedings,
 May 3, 2016...............................................GA 15

Excerpts from Transcript of Trial

Nov. 4, 2014..............................................GA 24

Nov. 5, 2014..............................................GA 26

Nov. 6, 2014..............................................GA 28

Nov. 10, 2014.............................................GA 35

Nov. 12, 2014.............................................GA 43

Nov. 13, 2014.............................................GA 48

Government Exhibits

GX 558....................................................GA 53

GX 559....................................................GA 55

GX 559-A..................................................GA 56

Gov't Letter Concerning Fatico Hearing,
 Dated July 11, 2016 ......................................GA 58

Transcript of Sentencing,
 June 6, 2017.............................................GA 60

PSS:ALB/ABK
F.# 2014R00151

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

JOSEPH VALERIO,

            Defendant.

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 14-094 (S-2)(JFB)
(T. 18, U.S.C., §§
2251(a), 2251(c), 2251(e),
2252(a)(1), 2252(a)(2),
2252(b)(1), 2252(a)(4)(B),
2252(b)(2), 2 and 3551
et seq.)

- - - - - - - - - - - - - - - -X

THE GRAND JURY CHARGES:

COUNT ONE
(Conspiracy to Sexually Exploit a Child)

    1.  On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally conspire to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, an individual whose identity is known to the Grand Jury, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and

2

foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, to wit: one or more mobile telephones, digital cameras and digital media disks, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e) and 3551 et seq.)

COUNT TWO
(Sexual Exploitation of a Child)

2.   On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and

3

transmitted using materials that had been mailed, shipped and
transported in and affecting interstate and foreign commerce by any
means, to wit: one or more mobile telephones, digital cameras and
digital media disks, and such visual depictions were actually
transported and transmitted using a means and facility of interstate
and foreign commerce and which were in and affecting interstate and
foreign commerce.

(Title 18, United States Code, Sections 2251(a), 2251(e),
2 and 3551 et seq.)

COUNT THREE
(Sexual Exploitation of a Child)

3.   On or about and between April 1, 2012 and November
1, 2012, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant JOSEPH
VALERIO, together with others, did knowingly and intentionally
employ, use, persuade, induce, entice and coerce a minor, to wit:
Jane Doe #1, to engage in sexually explicit conduct outside of the
United States, its territories and possessions, for the purpose of
producing one or more visual depictions of such conduct, intending
that such visual depictions would be transported and transmitted to
the United States, its territories and possessions, using a means
and facility of interstate and foreign commerce and mail, and which
visual depictions were actually transported and transmitted to the

4

United States, its territories and possessions, using a means and facility of interstate and foreign commerce and mail.

(Title 18, United States Code, Sections 2251(c), 2251(e), 2 and 3551 et seq.)

## COUNT FOUR
### (Transportation of Child Pornography)

4.    On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally transport and ship, using a means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, one or more visual depictions, to wit: images depicting Jane Doe #1 engaged in sexually explicit conduct, the production of such visual depictions having involved the use of a minor engaging in sexually explicit conduct, and such visual depictions were of such conduct.

(Title 18, United States Code, Sections 2252(a)(1), 2252(b)(1), 2 and 3551 et seq.)

## COUNT FIVE
### (Receipt of Child Pornography)

5.    On or about and between April 1, 2012 and November 1, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH

5

VALERIO, together with others, did knowingly and intentionally receive one or more visual depictions, to wit: images depicting Jane Doe #1 engaged in sexually explicit conduct, using a means and facility of interstate and foreign commerce and which visual depictions had been mailed, and shipped and transported in and affecting interstate and foreign commerce, the production of such visual depictions having involved the use of one or more minors engaging in sexually explicit conduct and such visual depictions were of such conduct.

(Title 18, United States Code, Sections 2252(a)(2), 2252(b)(1), 2 and 3551 et seq.)

COUNT SIX
(Attempted Sexual Exploitation of a Child)

6.   On or about January 23, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and

6

transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT SEVEN
(Attempted Sexual Exploitation of a Child)

7.    On or about January 24, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras,

7

digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

<u>COUNT EIGHT</u>
(Attempted Sexual Exploitation of a Child)

8.    On or about March 28, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of

8

interstate and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

<u>COUNT NINE</u>
(Attempted Sexual Exploitation of a Child)

9.    On or about April 4, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate

9

and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

<u>COUNT TEN</u>
(Attempted Sexual Exploitation of a Child)

10.  On or about July 16, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of interstate

10

and foreign commerce and which were in and affecting interstate and
foreign commerce, contrary to Title 18, United States Code, Section
2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551
et seq.)

COUNT ELEVEN
(Attempted Sexual Exploitation of a Child)

11.   On or about July 22, 2012, within the Eastern District
of New York and elsewhere, the defendant JOSEPH VALERIO, together
with others, did knowingly and intentionally attempt to employ, use,
persuade, induce, entice and coerce a minor, to wit: Jane Doe #1,
to engage in sexually explicit conduct, for the purpose of producing
one or more visual depictions of such conduct, knowing and having
reason to know that such visual depictions would be transported and
transmitted using a means and facility of interstate and foreign
commerce and which were in and affecting interstate and foreign
commerce, which visual depictions were produced and transmitted
using materials that had been mailed, shipped and transported in and
affecting interstate and foreign commerce by any means, including
by one or more mobile telephones, digital cameras, digital media
disks and computer, and such visual depictions were actually
transported and transmitted using a means and facility of interstate

11

and foreign commerce and which were in and affecting interstate and foreign commerce, contrary to Title 18, United States Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551 et seq.)

COUNT TWELVE
(Attempted Sexual Exploitation of a Child)

12.  On or about September 6, 2012, within the Eastern District of New York and elsewhere, the defendant JOSEPH VALERIO, together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #1, to engage in sexually explicit conduct, for the purpose of producing one or more visual depictions of such conduct, knowing and having reason to know that such visual depictions would be transported and transmitted using a means and facility of interstate and foreign commerce and which were in and affecting interstate and foreign commerce, which visual depictions were produced and transmitted using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by one or more mobile telephones, digital cameras, digital media disks and computer, and such visual depictions were actually transported and transmitted using a means and facility of

12

interstate and foreign commerce and which were in and affecting
interstate and foreign commerce, contrary to Title 18, United States
Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551
et seq.)

COUNT THIRTEEN
(Attempted Sexual Exploitation of a Child)

13.  On or about September 27, 2012, within the Eastern
District of New York and elsewhere, the defendant JOSEPH VALERIO,
together with others, did knowingly and intentionally attempt to
employ, use, persuade, induce, entice and coerce a minor, to wit:
Jane Doe #1, to engage in sexually explicit conduct, for the purpose
of producing one or more visual depictions of such conduct, knowing
and having reason to know that such visual depictions would be
transported and transmitted using a means and facility of interstate
and foreign commerce and which were in and affecting interstate and
foreign commerce, which visual depictions were produced and
transmitted using materials that had been mailed, shipped and
transported in and affecting interstate and foreign commerce by any
means, including by one or more mobile telephones, digital cameras,
digital media disks and computer, and such visual depictions were
actually transported and transmitted using a means and facility of

13

interstate and foreign commerce and which were in and affecting
interstate and foreign commerce, contrary to Title 18, United States
Code, Section 2251(a).

(Title 18, United States Code, Sections 2251(e), 2 and 3551
et seq.)

COUNT FOURTEEN
(Sexual Exploitation of a Child)

14.   On or about and between September 10, 2010 and January
19, 2011, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant JOSEPH
VALERIO did knowingly and intentionally employ, use, persuade,
induce, entice and coerce a minor, to wit: Jane Doe #2, an individual
whose identity is known to the Grand Jury, to engage in sexually
explicit conduct, for the purpose of producing one or more visual
depictions of such conduct, which visual depictions were produced
and transmitted using materials that had been mailed, shipped and
transported in and affecting interstate and foreign commerce by any
means, to wit: one or more digital cameras, memory cards and computer
equipment, and such visual depictions were actually transported and
transmitted using a means and facility of interstate and foreign
commerce and which were in and affecting interstate and foreign
commerce.

(Title 18, United States Code, Sections 2251(a), 2251(e)
and 3551 et seq.)

14

COUNT FIFTEEN
(Possession of Child Pornography)

15.   On or about January 28, 2014, within the Eastern District of New York, the defendant JOSEPH VALERIO did knowingly and intentionally possess matter containing one or more visual depictions, to wit: images in digital files, in and affecting interstate and foreign commerce, and which visual depictions had been mailed, and shipped and transported using a means and facility of interstate and foreign commerce, and which were produced using materials which had been mailed, and so shipped and transported, the production of such visual depictions having involved the use of one or more minors engaging in sexually explicit conduct, and such visual depictions were of such conduct.

(Title 18, United States Code, Sections 2252(a)(4)(B), 2252(b)(2) and 3551 et seq.)

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


-------------------------------X

UNITED STATES OF AMERICA,        :
                                      CR-14-0094
        -against-                :
                                   United States Courthouse
JOSEPH VALERIO,                  :  Central Islip, New York

            Defendant.           :  May 3, 2016
                                    10:00 a.m.
-------------------------------X


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

For the Government:        BRIDGET M. ROHDE, ESQ.
                           UNITED STATES ATTORNEY
                           610 Federal Plaza
                           Central Islip, New York 11722
                           BY:  ALLEN BODE, ESQ.



For the Defendant:         LEONARD LATO, ESQ.
                           ANTHONY M. LaPINTA, ESQ.
                           200 Vanderbilt Motor Parkway
                           Suite C17
                           Hauppauge, New York 11788




Official Court Reporter:   Ellen S. Combs, CSR
                           100 Federal Plaza - Suite 1180
                           Central Islip, New York 11722
                           Phone (631) 712-6107
                           ellencombs@hotmail.com


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY CAT

Ellen S. Combs, CSR
Official Court Reporter

2

1     (The following took place at 10:49 a.m.)

2     THE CLERK:  Calling case 14-CR-0094.

3     Counsel, please state your appearance for the

4  record.

5     MR. BODE:  Allen Bode for the government.

6     MR. LATO:  Leonard Lato and Anthony LaPinta for

7  the defendant.

8     THE COURT:  Good morning.  The defendant is

9  present as well.

10     As you know we had this scheduled for

11  sentencing.  I know obviously you're not in a position to

12  go forward today.  But there is one issue I wanted to

13  discuss.

14     I'm checking the addendum that was issued by the

15  Probation Department.  But first let me just see what the

16  defense has regarding -- I think I signed an order

17  allowing a psychiatric exam to be done in March.

18     MR. LATO:  You did, your Honor.  But because of

19  the addendum the additional information we had Dr. Barday,

20  the psychiatrist, go back a second time to re-interview

21  Mr. Valerio.  And that's why we have these additional

22  delays from our end.

23     In fact we contacted Dr. Barday one or two days

24  ago before we knew it was going to be on today.  We've

25  retained him now a second time going back a month or two

3

1    months ago.  We need that addendum because we're coming up

2    on a year and-a-half on sentencing and we want to go

3    forward on this.  So that's where we are on that.  And we

4    have a prospective sentencing date, I believe July 29th,

5    if that is okay with the court.

6          And you know that with respect to the addendum

7    we are going to have a Fatico Hearing.  My guess is that

8    is why we're here today, as your Honor knows.

9          THE COURT:  Well, that is why I do intend to

10   have a Fatico Hearing with respect to this.  Obviously

11   these are significant allegations.  The probation

12   department as you know issued a revised recommendation

13   with a much higher recommendation based upon that

14   information.

15         So if Mr. Valerio is in fact disputing the facts

16   contained in that addendum, I think we have to have a

17   hearing.  So, is he disputing those facts?

18         MR. LATO:  Yes, your Honor, completely.  Not

19   with respect to anything with respect to the additional

20   videos.  Because what I understand is that materially it's

21   the same as the prior videos.  For instance, there is no

22   -- conduct.  What it really comes down to is the

23   materially new information is the alleged assault of this

24   Jane Doe individual which Mr. Valerio denies ever

25   occurred.  It's not a he says, she says.  He denies it

4

1  completely.

2         We had that conversation with Mr. LaPinta and I

3  at the MDC when the addendum came out.  I went over it

4  with Mr. Valerio again this morning to make sure that his

5  position is the same.  It is the same.  He disputes it.

6  It did not happen.

7         THE COURT:  Okay.  So what I want the government

8  to do is a couple of things.

9         First of all, I know you were speaking to Jane

10  Doe number 3.  But I'm just looking at, the situation

11  occurred with Jane Doe number 4 is something that the

12  court should entertain considering that evidence as well.

13         So I want you to obviously to prepare for both

14  of those.  What I want the government to do is to contact

15  both of those individuals, if you haven't done so already.

16  I want you to tell them we're having a hearing and see

17  whether they would be willing to testify.

18         MR. BODE:  I'm just gonna warn the court,

19  hopefully the July 9th date will be okay.  But my guess is

20  it will require another date.  They're both outside the

21  United States.  So if your Honor -- unless hearsay is

22  allowed -- I think it shouldn't be a problem.  But I just

23  worry about the date.

24         THE COURT:  If they're willing to voluntarily

25  come here.

5

1       MR. BODE:  I don't think so for South Africa.  I

2   don't know.  I'm just going to bring the issue and we'll

3   let the court know as soon as we know something which

4   would be in the next couple of weeks here.  We'll figure

5   out how, you know, what their availability is, what their

6   inclination is, and what if any legal process is required.

7       THE COURT:  Okay.  The second thing is, if for

8   any reason one or both of them are unavailable, the Second

9   Circuit said a judge can consider hearsay.  The government

10  can also seek to corroborate that hearsay.

11      So if for whatever reason we have to rely on

12  those statements or some sworn statement that's not going

13  to be subject to confrontation, the government would

14  obviously need to try to corroborate.

15      MR. BODE:  Yes, your Honor.  I spoke to

16  Mr. Kabrawala already, so we're --

17      THE COURT:  And the last thing that I'm

18  considering, and I don't know if the defense even knows

19  this.  But in the context of Ms. Kalichenko's case, she

20  made allegations of rape and other violent conduct by

21  Mr. Valerio.  So I'm going to have to reach out to her if

22  she wants to testify at the Fatico Hearing.  I'm going to

23  allow her to testify as well because some of the things

24  that she alleges are similar to at least what Jane Doe 3

25  has said.

6

1      MR. LATO:  Now your Honor, with respect to that.

2  Did that happen at the time of her plea?  Is that on the

3  record?  Because obviously I know that the probation

4  report probably has not been done on her.  And I wouldn't

5  be privy to that as well, even though Mr. LaRusso, her

6  attorney, is my colleague.  I would think that if she had

7  made these allegations, well she has made them.  I need to

8  see them so we can properly confront them.

9      THE COURT:  I don't believe it was at her plea,

10  but leading up to her plea there was a trial.  And one of

11  things she claimed was duress.  And she made an allegation

12  that she was raped by Mr. Valerio.

13      MR. BODE:  We have minutes on that if I recall

14  when she testified.

15      THE COURT:  Yes, she did testify at the hearing.

16  But I don't know if it came out at the hearing or after,

17  if Mr. LaRusso proffered that.

18      MR. LATO:  I'll speak to Mr. Kabrawala about

19  that, your Honor.  I'll take a look as soon as possible

20  what if anything there is and I will reach out to

21  Mr. LaRusso as well.

22      THE COURT:  Okay.  That is all I have for today.

23  I don't know if there is anything else we can discuss.

24      MR. LATO:  Judge, if I could just note.

25  Mr. Valerio's position, while your Honor was saying that

Ellen S. Combs, CSR
Official Court Reporter

GA021

7

1   spoke to Bode, I turned to Mr. Valerio and asked, Are you

2   disputing the facts of what the judge just said?

3          And he said, Yes.

4          So based upon that, obviously your Honor I know

5   must at least actually have considered what Ms. Kalichenko

6   said subject to any defense, whether the government failed

7   to, whether the government wants to proceed.

8          So if Mr. Bode and Mr. Kabrawala can give us the

9   information, we'll go over it with Mr. Valerio.  And then

10  we'll have to see what the government wants to pursue at

11  that Fatico Hearing.  But based upon what your Honor said,

12  the chances are we may have to pursue it even if the

13  government says, well, we're not going pursue it, your

14  Honor has brought it up on your Honor's own.

15         THE COURT:  Yes.  I'm not asking the government

16  if they want to pursue it.  I already heard the

17  allegation.  I want to hear from her if she is willing to

18  testify.  So I'm asking Mr. Bode to reach out to

19  Mr. LaRusso, tell him that I'm inviting her to testify

20  regarding any alleged abuse she claims that she suffered

21  at the hands of Mr. Valerio.  Okay?

22         MR. LATO:  In light of this, your Honor, the

23  next date, I may have misspoken when I said July 29th,

24  maybe June 27th.  I know Ms. Savona has the accurate date.

25         But if your Honor just wants to have a hearing

Ellen S. Combs, CSR
Official Court Reporter

1    on that date, hearing and sentencing, because --

2         THE COURT:  No, just a hearing.

3         MR. LATO:  Okay.

4         THE COURT:  Obviously if it turns out there is

5    not going to be testimony, then maybe I'll reconsider

6    that.  But, no.  I don't think so.  I think either way I

7    think we'll just, we have to establish the factual issues.

8    Okay?

9         MR. LaPINTA:  Judge may I ask one other

10   question.  I'm trying project the scheduling for the

11   summer.  Is it fair to say that if the Fatico Hearing does

12   take place in July that the sentencing would not take

13   place for at least a month or so?

14        THE COURT:  Yes, probably be in September.

15        MR. LaPINTA:  Okay, thank you.

16        MR. BODE:  What is the date?

17        THE CLERK:  I don't think we --

18        MR. BODE:  27th or 29th, both appear to be --

19        THE COURT:  We'll do the 27th.  Okay?

20        (There was a pause in the proceedings.)

21        THE COURT:  Can we do the 25th, Monday, instead?

22        THE CLERK:  July 25th.

23        MR. LaPINTA:  Yes.

24        THE COURT:  And Mr. Bode, see if you can get

25   back to me about Jane Doe number 3 and Jane Doe number 4.

9

1          MR. BODE:  We'll put it in a letter.

2          THE COURT:  All right, thank you.

3          Have a good day.

4          (The proceedings were concluded at 10:59 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

209

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,            :    14 CR 0094

      v.                               :    U.S. Courthouse
                                     Central Islip, N.Y.
JOSEPH VALERIO,                       :
                                     TRANSCRIPT OF TRIAL
           Defendant.    :
                                     November 4, 2014
------------------------------X    10:05 a.m.

BEFORE:

      HONORABLE JOSEPH F.  BIANCO, U.S.D.J.
          and a jury

APPEARANCES:

For the Government:    LORETTA E. LYNCH
                    United States Attorney
                    100 Federal Plaza
                    Central Islip, New York 11722
                    By:  AMEET B. KABRAWALA, ESQ.
                        ALLEN BODE, ESQ.
                        Assistants, U.S. Attorney


For the Defendant:    ANTHONY LaPINTA, ESQ.
                    LEONARD LATO, ESQ.
                    35 Arkay Drive - Suite 200
                    Hauppauge, New York 11788


Court Reporter:    HARRY RAPAPORT
                  OWEN M. WICKER
                  United States District Court
                  100 Federal Plaza
                  Central Islip, New York 11722
                  (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

## Opening Statement/Kabrawala

### 250

1 pictures of his niece.
2 Do you know where they found that? They found
3 that hidden in the ceiling above the basement ceiling.
4 Agents had to take apart the ceiling, and they found it
5 there.
6 Now, for his actions the defendant is charged in
7 a 15-count criminal indictment, as to ███████ the toddler
8 in the Ukraine. The defendant is charged with a
9 conspiracy to sexually exploit the child, transportation
10 of child pornography, receipt of child pornography and
11 also attempted sexual exploitation of a child for emails
12 that the defendant sent to the Ukraine to Kalichenko
13 directing the videos of Kalichenko molesting her daughter.
14 For the defendant's actions involving his niece
15 here in Smithtown, he is charged with sexually exploiting
16 a child. And the defendant is also charged with
17 possessing child pornography.
18 Now, as the prosecution, we have the burden of
19 proving the defendant guilty beyond a reasonable doubt.
20 And we will meet that burden by presenting you with
21 evidence in the form of witnesses, documents and physical
22 evidence.
23 First and foremost, as you know from jury
24 selection, in order to decide the facts of this case it
25 will be necessary for you to see the images and the videos

## Opening Statement/Kabrawala

### 251

1 that this defendant created or caused to be created.
2 Now, while it is troubling to view these images,
3 they speak for themselves. You will see the videos that
4 the defendant created in response to his emails, following
5 his script, that Kalichenko created. And you will see the
6 sexually explicit images of the defendant's young niece
7 taken in his basement.
8 You will also hear testimony from
9 Special Agent Steven Troyd who will testify about the two
10 searches and what his team found during the searches, and
11 where they found it.
12 You will see the computer that the defendant
13 used to communicate with Kalichenko. You will see the
14 Samsung digital memory card. You will see the Samsung
15 video camera that the defendant used to film his niece.
16 You will learn where it was found. You will see the
17 basement. You will see the basement ceiling panel tiles
18 taken off where the camera was found. And you will see a
19 receipt showing that the defendant purchased the Samsung
20 video camera and digital memory card and that they were
21 shipped to him.
22 You will also see the hidden cameras, costumes,
23 costumes that the defendant dressed his niece with.
24 Agent Troyd will recount for you the defendant's
25 confession, that he admitted directing Kalichenko to make

## Opening Statement/Lato

### 252

1 child pornography with her toddler, and he -- that he paid
2 her to do so.
3 You will also see the money trail in the form of
4 Western Union wire transfers showing the defendant paid
5 Kalichenko thousands of dollars, just like he admitted.
6 Now, ladies and gentlemen, the facts of this
7 case are clear.
8 At the end of the trial we will ask you to
9 return a verdict, the only verdict that is consistent with
10 those facts. We will ask you to hold the defendant
11 accountable for his actions and find him guilty on all
12 counts.
13 Thank you.
14 THE COURT: Members of the jury, as I said
15 before, the government has the burden of proof at all
16 times, therefore the defendant does not need to make an
17 opening statement. But I am advised that the defendant
18 wishes to give an opening statement.
19 Mr. Lato, you may proceed.
20 MR. LATO: Thank you, your Honor.
21 Good morning, ladies and gentlemen.
22 My name is Leonard Lato, as Judge Bianco has
23 already said. And I will be trying this case with my
24 co-counsel, Anthony M. LaPinta, the taller of the two
25 gentlemen at the table. And there is Mr. Joseph Valerio,

## Opening Statement/Lato

### 253

1 the defendant a couple of chairs away.
2 The question in this case is not what, but who.
3 A person produced child pornography videos with
4 a toddler. Mr. Kabrawala said that, and the defense
5 agrees with that. But that person, contrary to what
6 Mr. Kabrawala said, was not Joseph Valerio. That person
7 may have been Olena Kalichenko.
8 If Olena Kalichenko, she produced the videos not
9 in the United States but in the Ukraine.
10 Joseph Valerio has never been to the Ukraine.
11 As Mr. Kabrawala stated, another video or other
12 videos were made of a young girl, Mr. Valerio's niece. We
13 agree with that, meaning "we," the defense.
14 But that person, once again, was not Joseph
15 Valerio. That person, once again, may have been Olena
16 Kalichenko.
17 Because as Mr. Valerio was never to the Ukraine,
18 Ms. Kalichenko has been to the United States and has been,
19 and has stayed in Mr. Valerio's house.
20 It is not Mr. Valerio, and it only may be
21 Ms. Kalichenko.
22 Why the uncertainty?
23 Because the government's investigation was
24 incomplete.
25 The government searched Mr. Valerio's house.

393

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,    :   14 CR 0094

      v.               :   U.S. Courthouse
                          Central Islip, N.Y.
JOSEPH VALERIO,          :

                        TRANSCRIPT OF TRIAL
           Defendant.   :

                        November 5, 2014
-------------------------------X  9:45 a.m.

BEFORE:

      HONORABLE JOSEPH F.  BIANCO, U.S.D.J.
           and a jury

APPEARANCES:

For the Government:  LORETTA E. LYNCH
                  United States Attorney
                  100 Federal Plaza
                  Central Islip, New York 11722
                  By:  AMEET B. KABRAWALA, ESQ.
                      ALLEN BODE, ESQ.
                      Assistants, U.S. Attorney


For the Defendant:  ANTHONY LaPINTA, ESQ.
                  LEONARD LATO, ESQ.
                  35 Arkay Drive - Suite 200
                  Hauppauge, New York 11788


Court Reporter:     HARRY RAPAPORT
                  OWEN M. WICKER
                  United States District Court
                  100 Federal Plaza
                  Central Islip, New York 11722
                  (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

Troyd-Direct/Kabrawala

418

1 Do you see it?
2 A  Yes.
3 Q  Is that a true and correct copy of the email you just
4 referred to in your testimony?
5 A  Yes, it is.
6 MR. KABRAWALA:  The government moves to admit.
7 MR. LATO:  No objection.
8 THE COURT:  303 is admitted.
9 (Whereupon, Government's Exhibit 303 was
10 received in evidence.)
11 MR. KABRAWALA:  I will publish it.
12 (At this time a document was exhibited on
13 courtroom screen.)
14 Q  Would you describe what the message information is,
15 the from and the to and also the details.
16 A  Certainly.
17 The from portion of the email says Joe Valerio,
18 from                        sent Sunday, July 22, 2012, at
19 10:28 p.m., to
20 The subject being forward, reference forward --
21 excuse me, forward, return forward.  Where's
22 information and the other stuff and Svetas, S-V-E-T-A-S.
23 Q  You said you read a particular portion of the email.
24 Would you describe which portion you read to the defendant
25 during the interview with him in the dining room?

Troyd-Direct/Kabrawala

419

1 A  On the second page, the second paragraph.
2 Q  Okay.
3 Why don't you read aloud the portion that you
4 read for the defendant on that day.
5 A  I was actually able to see some girls come in their
6 pantyhose.  Speaking of which I want video of you and
7      Get her to play or eat, just eat your pussy.
8 Q  Now, after you read that portion to the defendant,
9 what, if anything, did the defendant say?
10 A  I asked the defendant if he sent this email.
11 He said, yes, this was his email.
12 He further indicated that he had directed Olena
13 Kalichenko to produce child pornography, and that he had
14 in fact received that child pornography in the emails.
15 Q  Did the defendant say who was depicted in the email
16 that he received?
17 A  Yes.
18 Q  Who is that?
19 A  That was Olena Kalichenko and her daughter.
20 Q  Did the defendant admit to anything else aside from
21 admitting that he had directed the production of child
22 pornography and received it by email?
23 A  Yes.
24 I asked him if he received any disks via DHL.
25 He responded he had in fact received a package.

Troyd-Direct/Kabrawala

420

1 It did not contain a disk.  It only contained bubble wrap,
2 and he received it from Olena Kalichenko.
3 Q  He claimed the package that was sent by DHL -- DHL is
4 a courier like FedEx?
5 A  Yes.  Similar to UPS or FedEx.
6 Q  All right.
7 He claimed that he received the FedEx -- the DHL
8 from Olena Kalichenko and it only contained bubble wrap?
9 A  That's correct.
10 Q  Did there come a time you provided the defendant with
11 what is commonly referred to as the Miranda warnings?
12 A  Yes.
13 Q  And I want you to take a look at
14 Government's Exhibit 304.
15 A  Yes.
16 Q  Do you recognize that document?
17 A  Yes.
18 Q  What is it?
19 A  An advice of rights form commonly referred as FD 395.
20 Q  It is a standard form that you carry around with the
21 FBI?
22 A  Yes.
23 Q  And it is a form that essentially contains the
24 Miranda warnings, is that fair to say?
25 A  Yes.

Troyd-Direct/Kabrawala

421

1 Q  Is that a true and correct copy of the Miranda
2 warnings form that you read out to the defendant and
3 provided him in that dining room on January 28th, 2014?
4 A  Yes.
5 MR. KABRAWALA:  Move to admit, Judge.
6 MR. LATO:  No objection.
7 THE COURT:  304 is admitted.
8 (Whereupon, Government's Exhibit 304 was
9 received in evidence.)
10 MR. KABRAWALA:  I will now publish
11 Government's Exhibit 304.
12 (At this time a document was exhibited on
13 courtroom screen.)
14 Q  I want you to describe the form, and why don't you go
15 ahead and read the entire form aloud.  It is pretty short.
16 A  The entire form is advice of rights.  In the upper
17 right-hand corner it says place:  Smithtown, New York.
18 Date, January 28th, 2014.
19 Time is blank.
20 The subtitle is, your rights.
21 Then it goes to say, before we ask you any
22 questions, you must understand your rights.
23 You have the right to remain silent.
24 Anything you say can be used against you in
25 court.

568

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,          :       14 CR 0094

     v.                          :       U.S. Courthouse
                                    Central Islip, N.Y.
JOSEPH VALERIO,                     :
                                    TRANSCRIPT OF TRIAL
         Defendant.      :
                                    November 6, 2014
-------------------------------X       9:30 a.m.

BEFORE:

       HONORABLE JOSEPH F.  BIANCO, U.S.D.J.
               and a jury


APPEARANCES:

For the Government:     LORETTA E. LYNCH
                     United States Attorney
                     100 Federal Plaza
                     Central Islip, New York 11722
                     By:  AMEET B. KABRAWALA, ESQ.
                          ALLEN BODE, ESQ.
                          Assistants, U.S. Attorney


For the Defendant:     ANTHONY LaPINTA, ESQ.
                     LEONARD LATO, ESQ.
                     35 Arkay Drive - Suite 200
                     Hauppauge, New York 11788


Court Reporter:        HARRY RAPAPORT
                     OWEN M. WICKER
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

Forrestal-Direct/Kabrawala

659

1    Q    Did you see anyone draw weapons at the defendant?

2    A    No.

3    Q    Did anyone restrain the defendant, hold him down?

4    A    No.

5    Q    Did anyone raise their voices at the defendant?

6    A    No.

7    Q    Did you raise your voice at the defendant?

8    A    No.

9    Q    So did the defendant admit that he directed Olena

10   Kalichenko to produce child pornography with her daughter?

11   A    Yes.

12            MR. LaPINTA:  Objection.

13            THE COURT:  Sustained.  Sustained as to form.

14   Q    What, if anything, did the defendant admit?

15            MR. LaPINTA:  Objection.

16            THE COURT:  Sustained as to form.

17   Q    What, if anything, did the defendant say during the

18   interview in general to you?

19   A    In general he stated that Olena Kalichenko -- that he

20   directed her to reach out and make child pornography

21   images of her daughter.

22   Q    Did he say he received those images?

23   A    He did.

24   Q    What did he say?

25   A    Specifically, I don't remember specifically what he

Forrestal-Direct/Kabrawala

660

1   said.  But I do remember him admitting that he received

2   the child pornographic videos from her.

3           And then the other thing I specifically recall

4   him saying is that he did receive a DHL, DVU, quote,

5   unquote.

6   Q    He claimed that the DHL package was empty?

7           MR. LaPINTA:  Objection to the form of the

8   question.

9           MR. KABRAWALA:  Withdrawn.

10          THE COURT:  Sustained.

11  Q    Do you recall the defendant being Mirandized, that

12  is, being advised of his rights?

13  A    I do.

14  Q    Showing you what is admitted as 304,

15  Government's Exhibit 304, do you recognize this document?

16          (At this time a document was exhibited on

17  courtroom screen.)

18  A    Yes.

19  Q    This is an advice of rights form?

20  A    It is.

21  Q    Is your signature on it?

22  A    It is.

23  Q    Did you witness this being signed by the defendant?

24  A    I did.

25  Q    Did he waive his rights and agree to speak to law

Forrestal-Direct/Kabrawala

716

1              (Handed to the witness.)

2    Q    Is this 561?

3    A    Yes.

4    Q    Is that a true and correct copy of the email taken

5    from inbox 1 dot DBX from that computer?

6    A    It is.

7              MR. KABRAWALA:  Move to admit.

8              MR. LATO:  One moment, please.

9              (Whereupon, at this time there was a pause in

10   the proceedings.)

11             MR. LATO:  No objection.

12             THE COURT:  561 is admitted.

13             (Whereupon, Government's Exhibit 561 was

14   received in evidence.)

15             MR. KABRAWALA:  I will not publish it at this

16   time.

17   Q    I will show you Government's Exhibit 566.

18             Again, is that a true and correct extraction of

19   an email from the inbox that has been entered into

20   evidence as Government's Exhibit 550?

21   A    Yes.

22             MR. KABRAWALA:  Move to admit 566.

23             MR. LaPINTA:  No objection.

24             THE COURT:  566 is admitted.

25             (Whereupon, Government's Exhibit 566 was

Forrestal-Direct/Kabrawala

717

1    received in evidence.)

2              MR. KABRAWALA:  I will publish it.  And I will

3    read it.

4              Joseph, I have just checked the package,

5    tracking number is -- and there is a package number ending

6    in 6006.  If you go to www.DHL.com.

7    Q    Is that fair to say that that is what it says?

8    A    Yes.

9    Q    By the way, that DHL number I just read, that was in

10   an email on that computer; is that right?

11   A    Yes, it was.

12             (Counsel confer.)

13             MR. KABRAWALA:  Can we have a sidebar, Judge?

14

15             (Whereupon, at this time the following took

16   place at the sidebar.)

17             MR. KABRAWALA:  We discussed at a pretrial

18   conference the admission of this, at which time this was

19   obviously provided with a certification from DHL.

20             There is nothing that has changed.  This should

21   come in as a self-authenticating document.

22             THE COURT:  I remember that conference.

23             MR. BODE:  I have the minutes if you need.

24             THE COURT:  I remember it.

25             MR. LATO:  There is no question that the bulk of

Forrestal-Direct/Kabrawala

718

1    the document should come in.  My only request is the

2    following:

3           With respect to the portion that says DVD disk,

4    we don't know if that was written by Ms. Kalichenko as a

5    co-conspirator statement made in the course of a

6    conspiracy, or if it was written by someone at DHL based

7    upon examination.

8           That is the only question I have.  Because if in

9    fact it was written by somebody from DHL based upon what

10   Olena Kalichenko said --

11          MR. KABRAWALA:  It doesn't matter because it is

12   taken in the regular course of business.

13          THE COURT:  The issue is whether or not it

14   should come in as a co-conspirator statement, I think

15   there is a sufficient basis to allow it.  You can make

16   that argument, but I will allow it.

17          MR. LATO:  As I was saying it, I think I agree,

18   anyway.  So that is myself saying I agree.

19

20          (Whereupon, at this time the following takes

21   place in open court.)

22          MR. KABRAWALA:  The government moves to admit

23   Government's Exhibit 201.

24          THE COURT:  Any objection?

25          MR. LATO:  No, your Honor.

Forrestal-Direct/Kabrawala

719

1    THE COURT:  201 is admitted.

2    (Whereupon, Government's Exhibit 201 was

3  received in evidence.)

4    MR. KABRAWALA:  Publishing it.

5    (At this time a document was exhibited on

6  courtroom screen.)

7  Q    This is a DHL bill of lading, the weigh bill.

8    Do you see the tracking number on top?

9  A    Yes.

10  Q    Is it the same tracking number as the tracking number

11  in the last email; is that right?

12  A    Yes.

13  Q    Contents?

14  A    DVD disk.

15  Q    Contact name, Kalichenko O.

16  A    That's correct.

17  Q    Delivery address?

18  A    ███████████████████  Smithtown, New York.

19  Q    Contact name, Joseph Valerio?

20  A    Correct.

21  Q    Date is 26-04-12.

22    What does that tell you?

23  A    April 26th, 2012.

24  Q    They write things differently across the pond?

25  A    They do.

735

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,        :    14 CR 0094

     v.                         :    U.S. Courthouse
                                Central Islip, N.Y.

JOSEPH VALERIO,                   :
                                TRANSCRIPT OF TRIAL

         Defendant.      :
                                November 10, 2014
------------------------------X    9:30 a.m.

BEFORE:

       HONORABLE JOSEPH F.  BIANCO, U.S.D.J.
             and a jury


APPEARANCES:

For the Government:    LORETTA E. LYNCH
                   United States Attorney
                   100 Federal Plaza
                   Central Islip, New York 11722
                   By:  AMEET B. KABRAWALA, ESQ.
                       ALLEN BODE, ESQ.
                       Assistants, U.S. Attorney


For the Defendant:    ANTHONY LaPINTA, ESQ.
                  LEONARD LATO, ESQ.
                  35 Arkay Drive - Suite 200
                  Hauppauge, New York 11788


Court Reporter:    HARRY RAPAPORT
               OWEN M. WICKER
               United States District Court
               100 Federal Plaza
               Central Islip, New York 11722
               (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

Forrestal - Direct/Kabrawala

764

1          Subject:  Happy big third birthday, ▬▬▬▬

2    Woaw, yeah.

3    Q    Is it fair to say that it appears to be a birthday

4    greeting?

5          MR. LATO:  Objection.

6          THE COURT:  Sustained.

7    Q    Please read the e-mail.

8    A    Happy third birthday, ▬▬▬▬    Love and kisses always

9    from Dadda Valeria, sister ▬▬▬▬  ▬▬▬▬  grandma, Aunt

10   Bernadette, Uncle ▬▬▬▬  cousins ▬▬▬▬  and ▬▬▬▬  and the

11   rest.  We love you.  See you soon.

12         MR. KABRAWALA:  Thank you.

13   Q    In addition to the computer, computer hard drive

14   specifically, and the cell phone you already testified

15   about, did you conduct any forensic analysis on any other

16   computer or computer-related device?

17   A    Yes.

18   Q    What other device?

19   A    I examined the SD card.

20   Q    SD?

21   A    Yes.

22   Q    What does SD stands for?

23   A    SD cards are storage data, and they are small cards

24   used in cameras, cell phones and other devices.

25   Q    Showing you what has been admitted in evidence as

Forrestal - Direct/Kabrawala

765

1    Government's Exhibit 405.

2            Is this an item that you conducted a forensic

3    analysis on?

4    A    It is.

5    Q    And that's the memory card, the SD card?

6    A    Yes.

7    Q    Who is it made by?

8    A    This is made by Samsung.

9    Q    And you can take it out of the bag if you would like.

10           How do you know that you reviewed that exhibit

11   in particular?

12   A    I put my initials on the face of the SD card, "RFF."

13   Q    Turn it around and describe what it says.

14   A    This is a request for a set of glasses.  At the end

15   it says --

16           MR. LAPINTA:  Objection.

17           MR. KABRAWALA:  I'll take it and put it in the

18   overhead.

19           MR. LAPINTA:  I object to any reference what is

20   said or listed on the document.

21           THE COURT:  Do you want to approach?

22           (Whereupon, at this time the following took

23   place at the sidebar.)

24           (Continued.)

25

Forrestal - Direct/Kabrawala

766

1           MR. KABRAWALA:  (Handing.)

2           We had this discussion about trade encryptions

3    during the pretrial conference, and it was very clear that

4    counsel conceded it is appropriate for the witness to read

5    aloud what is on that document.

6           MR. LAPINTA:  Is it in evidence yet?

7           MR. KABRAWALA:  It is in evidence.

8           MR. LAPINTA:  You had him -- you asked him who

9    made the document.

10          MR. BODE:  No.

11          THE COURT:  Let's not argue about it.

12          You have no objection to him reading it?

13          MR. LAPINTA:  Right.

14          THE COURT:  Okay.

15          (End of sidebar conference.)

16          (Continued.)

17

18

19

20

21

22

23

24

25

Forrestal - Direct/Kabrawala

767

1   BY MR. KABRAWALA:

2   Q    Is there a country written on that exhibit?

3   A    There is.

4   Q    What does it say?

5   A    It says Korea.

6             MR. KABRAWALA:  Thank you.

7             Your Honor, may we take a quick break?

8             THE COURT:  How long do you need, a minute or

9   two?  I would rather not take the morning break this

10  early.

11            MR. KABRAWALA:  Just one minute.

12            THE COURT:  How much longer do you have of this

13  witness?

14            MR. KABRAWALA:  30 minutes, 45 minutes.

15            THE COURT:  I just want to go to 11:15, so just

16  take a minute, and we'll just wait.

17            MR. KABRAWALA:  Fine.

18  Q    Handing you what is marked as Government's

19  Exhibit 507 through 539.

20            Whatever is not in the binder will be on this?

21  A    Yes.

22  Q    I'll show it to you on the screen as we proceed

23  through this.

24  A    Okay.

25  Q    Showing you what has been marked as Government's

Forrestal - Direct/Kabrawala

768

1   Exhibit 505.

2   A      Yes.

3   Q      Do you recognize what that disk is?

4   A      Yes.

5   Q      What is it?

6   A      A disk that I created that contains a PowerPoint

7   presentation that I made for presentation here in court.

8   Q      Did you make that presentation to assist us and the

9   jury in understanding your testimony?

10  A      Yes.

11  Q      Does it contain images that you took from the memory

12  card that you just testified about, Government's

13  Exhibit 405?

14  A      Yes.

15  Q      And are the exhibits, Government's Exhibit 507

16  through 539, contained within the disk that you just

17  testified about?

18  A      Yes.

19          MR. KABRAWALA:  The Government moves to admit

20  Exhibits 507 through 539, as well as 505.

21          MR. LATO:  One moment, please.

22          No objection.

23          THE COURT:  505, 507 through 539, are all

24  admitted.

25          (Whereupon, Government Exhibits 505 and 507

Forrestal - Direct/Kabrawala

769

1    through 539 were received in evidence.)

2            MR. KABRAWALA:  I will now show you everything

3    just using the screen.

4            THE WITNESS:  All right.

5            MR. KABRAWALA:  I'm publishing Government's

6    Exhibit 507 -- withdrawn.

7            I'll actually take it down.

8    BY MR. KABRAWALA:

9    Q    What, if anything, did you do once you received the

10   SD card, memory card?

11   A    I ran a forensic analysis on the card.

12   Q    Walk us through that, please.

13   A    Somewhat similar to the other ways we examine digital

14   media.  In this case we take the SD card and put it in a

15   tool called -- it is called a write block.  This one is a

16   Digital Intelligence card reader write block.  We put it

17   in there and apply the same process creating an image, and

18   we add it to our forensic job that we're doing.

19   Q    Did you create a forensic image of the memory card?

20   A    Yes, I did.

21   Q    And it did an exact bit-by-bit copy of that memory

22   card, Government's Exhibit 402?

23   A    It did.

24   Q    Did you recover any images on that memory card?

25   A    I did.

Forrestal - Direct/Kabrawala

770

1   Q    How did you go about recovering imaging from

2   Government's Exhibit 402?

3   A    The forensic software EnCase, E-N-C-A-S-E,

4   automatically displays some images that are readily

5   apparent on the SD card.

6          We would then recover the videos.  There were

7   videos on this particular SD card, and we would attempt to

8   review them to see whether there were images within that

9   we could recover, directly visible.

10  Q    So you used software called EnCase?

11  A    Yes.

12  Q    Using that software, what, if anything, did you find?

13  A    I did.  I found a number of images that had been

14  deleted that contained videos, that when you played the

15  videos there was a frame of the picture left.

16  Q    You found videos but they were deleted, and all you

17  could see is a still frame of the video?

18  A    Correct.

19  Q    Was that the same with respect to still images, that

20  is, photographs?

21  A    I recovered a still image from the SD card that was

22  located on it, yes.

23  Q    And I think you testified about your experience using

24  EnCase earlier last week; is that true?

25  A    True.

923

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,       :    14 CR 0094

       v.                        :    U.S. Courthouse
                                   Central Islip, N.Y.
JOSEPH VALERIO,                  :

                                   TRANSCRIPT OF TRIAL

             Defendant.     :

                                   November 12, 2014
-------------------------------X    9:30 a.m.

BEFORE:

        HONORABLE JOSEPH F. BIANCO, U.S.D.J.
                and a jury


APPEARANCES:

For the Government:    LORETTA E. LYNCH
                      United States Attorney
                      100 Federal Plaza
                      Central Islip, New York 11722
                      By:  AMEET B. KABRAWALA, ESQ.
                          ALLEN BODE, ESQ.
                          Assistants, U.S. Attorney


For the Defendant:    ANTHONY LaPINTA, ESQ.
                      LEONARD LATO, ESQ.
                      35 Arkay Drive - Suite 200
                      Hauppauge, New York 11788


Court Reporter:    HARRY RAPAPORT
                      OWEN M. WICKER
                      STEPHANIE PICOZZI
                      United States District Court
                      100 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.


*OWEN WICKER, RPR*
*OFFICIAL COURT REPORTER*

| Plaintiff's Closing Argument | Plaintiff's Closing Argument |
|---|---|

**960**

1 　　And then he says: You can use the cell phone
2 camera with one hand, grab your tits with the other, and
3 from your eye view down to your sweet pussy, you will be
4 recording███.
5 　　He's showing her how to hold the camera, very
6 specific in his demands.
7 　　Then what does he say? This will be like a
8 French short film. We'll come up with a title.
9 　　All right. So now we're up a couple months to
10 March 15, 2012.
11 　　He says -- Government's Exhibit 208: When I
12 look back at the videos you made of you and███
13 together, I said to myself, this can be very good if she
14 can comply to my demands and not challenge them.
15 　　Okay. The bottom line is that you'll have to do
16 all I ask you to.
17 　　If he doesn't intend her to make videos, why
18 would he say that? Why would he say, you have to do all I
19 ask you to?
20 　　He very clearly intends for these videos to be
21 made and e-mailed to him.
22 　　This is another e-mail. It is also charged as
23 an attempt. It is from March 28, 2012. Again, you can
24 read the e-mail. They are all in evidence. You can ask
25 for them.

*Owen M. Wicker, RPR*
*Official Court Reporter*

**962**

1 Do the videos with███the way I want. This is all the
2 preparation you will need here in NY with███so it's
3 best that you get used to it.
4 　　That's an attempt charge (indicating).
5 　　How do you know he's serious? Look at his
6 language. There it is, in all caps.
7 　　By the way, look at the date of that e-mail,
8 Government's Exhibit 560. April 4, 2012, e-mail. Right?
9 　　Look at the next e-mail, two days later,
10 Government's Exhibit 564. This is to A███████D
11 You heard about A███████today.
12 　　What does the defendant say? Happy third
13 birthday,███.
14 　　She's the defendant's daughter who lives in
15 South Africa with her mother. Love and kisses always from
16 daddy.
17 　　He calls███████'s sister. Grandma
18 Bernadette, cousins███and███.
19 　　Does that sound familiar? This is the
20 defendant's own e-mail account he's sending two days after
21 he sent Government's Exhibit 560.
22 　　Now, Government's Exhibit 216. This is the same
23 month, April of 2012. What does the defendant say?
24 　　Helena, I looked at your videos. I'll give you
25 credit for some.

*Owen M. Wicker, RPR*
*Official Court Reporter*

| Plaintiff's Closing Argument | Plaintiff's Closing Argument |
|---|---|

**961**

1 　　He says: Yes, of course it is good to see
2 little███growing up nice and firm. Of course, being
3 that I have control over███I want to see her in
4 blonde, long hair, and as for you. Right?
5 　　Then he says -- describes what he wants. I will
6 send out $100. To who and where do you want me to send
7 it?
8 　　Now, in Government's Exhibit 211, Mr. Egan,
9 Robert Egan from Cablevision, testified about the IP
10 address, internet protocol address. You remember what he
11 said. This IP address beginning in 2004, that could only
12 have been sent from the tristate area. Could not have
13 originated from abroad or even outside of the tristate
14 area.
15 　　And by the way, Government's Exhibit 211
16 mentions long blonde hair. Does that sound familiar?
17 　　(Indicating.)
18 　　April 4, 2012, this is a few days later. This
19 is another attempt to charge. What does the defendant
20 say?
21 　　Listen, Helena, I'm glad to see the smile on
22 your daughter's face from the gift she got from the money
23 I sent.
24 　　Then he says what he wants to see on video
25 (indicating). He says: There is a price for everything.

*Owen M. Wicker, RPR*
*Official Court Reporter*

**963**

1 　　"I looked at your videos." He's seen the
2 videos. He asks for them; he gets them. He asked for
3 more, gets more. He paid money.
4 　　What does he do that day?
5 　　Government's Exhibit 332, the summary chart from
6 Western Union -- sorry, he doesn't do it that day. Two
7 days later.
8 　　What does he do? He sends money.
9 　　Now, later that month, Government's Exhibit 556,
10 this is an e-mail from Olena Kalichenko to the defendant.
11 Tracking number is -- this is in reference to a DHL
12 package, ends in 6006.
13 　　She says: I have made a copy of the disk just
14 in case.
15 　　Then she talks about it in the next paragraph,
16 things that she wants to buy herself. I want to buy
17 myself a new Nokia phone. It's a better camera and can be
18 connected -- and it says: I will be able to send you
19 videos from my new cell phone cam directly to your e-mail.
20 We'll make plenty of videos for you from the new phone.
21 Passionate kisses, Helena and███.
22 　　DHL package tracking number that's in the
23 e-mail, it's right here (indicating). That's April 27.
24 　　Well, you saw the packing slip. It's the same tracking
25 number from Kalichenko, that's Olena Kalichenko, to

*Owen M. Wicker, RPR*
*Official Court Reporter*

## Plaintiff's Closing Argument

964

1  Sevastopol, Ukraine.  DVD disk, the contents.
2  Where is it addressed to?  Joseph Valerio,
3  ▇▇▇▇▇  Smithtown, New York.
4  What is the date?  April 26, 2012.
5  Now, how do you know if this is the defendant's
6  e-mail?
7  How do you know that he's using his e-mail
8  account?
9  Well, you saw the e-mails from April that we
10  just went through.
11  What happens on April 25, 2012?
12  Government's Exhibit 567.  This is an estimate
13  for landscaping.  It starts off by saying:  Hi, Joe, it
14  was a pleasure meeting you yesterday.
15  And there's a landscaping bill.  You heard
16  testimony it was a landscaping estimate for over $7,000.
17  That's how you know the defendant is using his e-mail
18  account.
19  Of course you know it is an e-mail account that
20  is registered to the defendant, or at least somebody with
21  the same name and address as the defendant.
22  What does 200-A say?  That was introduced by
23  Mr. Egan.  Cablevision provided these records in response
24  to a subpoena from the Government.
25  200-A says:  Information for an e-mail address

*Owen M. Wicker, RPR*
*Official Court Reporter*

## Plaintiff's Closing Argument

965

1  ▇▇▇▇▇
2  Who is the subscriber?  Joe Valerio.
3  What is his address?  ▇▇▇▇▇
4  Smithtown, New York.
5  There's even a phone number.
6  This was a Cablevision subscriber from August
7  23, 2002, to March 19, 2014, about 12 years.  And you also
8  heard that thousands of dollars were paid to maintain this
9  account over that 12-year period.
10  Now, if there is any doubt that this is the
11  defendant's e-mail address, you also saw records from
12  Western Union where each of the transactions -- that the
13  Western Union records say that the person with the same
14  exact name, home address, telephone number and e-mail
15  address sent over $12,000 to someone named Olena
16  Kalichenko in Ukraine and sometimes in Turkey.  These are
17  all ▇▇▇▇▇
18  Why?  Because the defendant asked for videos,
19  paid money for the videos, got videos and asked for more.
20  Now, how else do you know that it is the
21  defendant sending e-mails?
22  This is an e-mail from Joe Valerio to Elena
23  Kalichenko dated July 3, 2012.  What do they talk about?
24  He says he has a family time-share at Gurney's
25  out in Long Island; that he was in Brighton Beach; that

*Owen M. Wicker, RPR*
*Official Court Reporter*

## Plaintiff's Closing Argument

966

1  he'll think of Kalichenko.
2  What is the date of this?  July 3, 2012, the day
3  before Independence Day, the 4th of July.  That is
4  somebody who lives in the United States.  That's not
5  someone logging into his account in Ukraine.  That is
6  someone who is local, so local that you see that in
7  Government's Exhibit 225, a July 12, 2012 e-mail, you see
8  that the defendant -- he says:  You and I split our times
9  in Smithtown and the Hamptons, of course, and ▇▇▇▇▇
10  And he goes on to say:  I closed the business
11  deal.  He's talking about properties in Nassau County, in
12  Brooklyn, Suffolk County, homes and buildings.  He has
13  homes in Smithtown and Hamptons, jointly owned co-op, and
14  a time-share in Montauk.  All in New York.
15  He's so local and so plugged in that he knows
16  real estate values.  He's talking about real estate values
17  in Queens and Staten Island.  This isn't somebody who is
18  hacking into his account from overseas.  This is the
19  defendant writing these e-mails and talking about all his
20  properties.
21  And we submit the defendant is bragging about
22  everything he does and all of his business opportunities
23  and homes in the Hamptons and Smithtown and Montauk.  He's
24  bragging.
25  Why is he bragging?  Because he wants those

*Owen M. Wicker, RPR*
*Official Court Reporter*

## Plaintiff's Closing Argument

967

1  videos with ▇▇▇▇▇  He wants to impress Kalichenko
2  because he's going to keep her tethered.  And he'll send
3  her money, and she'll make videos, and he'll ask for more.
4  He even says:  It can easily be sent to my e-mail address
5  after filming.
6  Now, again, these are all more e-mails showing
7  that the defendant lives in the United States, not abroad.
8  He's asking her in Government's Exhibit 210 -- telling
9  her, when you arrive in the US -- right?  He knows she's
10  abroad too.  Because when you arrive back in Istanbul,
11  Turkey.  Sending her money from New York to Turkey, to
12  Ukraine.
13  He says:  Where do you want the money wired to?
14  When you are back home in the Ukraine?
15  Now, that brings us back to Government's
16  Exhibit 205.  This is the July 16, 2012, e-mail.
17  Midsummer 2012.
18  Now, July 16th and July 22, 2012, they are all
19  contained within Government's Exhibit 205.  They are both
20  separately charged as attempts.
21  You heard from Special Agent Steven Troyd of the
22  FBI that the defendant confessed to sending both of these
23  e-mails when they met with him in his house.  Not only did
24  the defendant confess to sending those 2-E-mails in July
25  of 2012, but Detective Rory Forrestal conducted forensic

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

984

1       Now, how do we know that the defendant agreed
2  with Kalichenko?
3       Well, even though the Government doesn't have to
4  show that the defendant agreed to anything in writing, we
5  have writings, we have the e-mails, the dozens of e-mails
6  that the defendant sent to Kalichenko, right?
7       We also have Government's Exhibit 214, April 12,
8  2012, e-mail.             What does he say?
9       He says: Remember my words. You will need to
10  do all I ask you in video with     when you are with
11  her. This unique situation separates you from the rest I
12  have here.
13       What does he say in capital letters? "Do you
14  now understand what I'm telling you?"
15       How does he end the e-mail? "Do we understand
16  each other?"
17       What does she write back to him? What does
18  Kalichenko say in her April 12th reply from the same day?
19       Yes, Joseph, we do understand each other.
20  Delivering new videos of     the exact way you request.
21       Right, that's the agreement. If there was any
22  doubt that there is an agreement, there's proof,
23  Government's Exhibit 214, which is in evidence.
24       Oh, and by the way, that same day the defendant
25  sent her money. So if there was any doubt -- again, do we

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

**Plaintiff's Closing Argument**

986

1  whether he knowingly had a visual depiction of a minor
2  engaged in sexually explicit conduct shipped or
3  transported in interstate or foreign commerce. Right.
4       And how do we know that he knew that sexually
5  explicit videos of     would be transported? He asked
6  for them. And he knew that     was a minor. He wanted
7  very specific sex acts to be performed on her, and that's
8  what he got. Got them all sent straight to his inbox via
9  the internet.
10       Receipt of child pornography. This is the same
11  analysis as transportation but instead focuses whether the
12  defendant received it, knowingly received child
13  pornography images.
14       You know that he did. It's undisputed that
15  there were child pornography videos on his computer, sent
16  to him by Kalichenko in response to his e-mail, the videos
17  he paid for. This is the same analysis as I've already
18  discussed.
19       And how do you know that he possessed it?
20  Again, he asked for it; he got it; paid for it. It was
21  all on the computer, and it was on the defendant's one on
22  January 28, 2014, the day of the first search warrant.
23  That's when the computer was taken. That's what the
24  indictment says as the date that the defendant possessed
25  the child pornography involving both of the young girls.

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

**Plaintiff's Closing Argument**

985

1  have an agreement? I understand exactly what you are
2  saying. And by the way, here's the money.
3       How else do we know that the defendant conspired
4  with Kalichenko? Because she actually sends him the
5  videos, right, just as he demands it.
6       She didn't say, get lost. She says, here's the
7  videos just like you asked for.
8       When he got the videos, again, what did he do?
9       We all know what he did. He asks for more, and
10  he paid her.
11       We've also discussed attempts. There's eight
12  separate attempts, all linked to specific e-mails that the
13  defendant sent to Kalichenko. They are all very specific,
14  and they are all in evidence, and we reviewed all of them
15  today. But needless to say, they speak loudly and clearly
16  what the defendant intends.
17       Transportation of child pornography, Count 4 of
18  the indictment. And again, the indictment is just a
19  charge. The defendant is charged with transporting child
20  pornography.
21       The Government can meet its burden of
22  establishing this charge by showing that the defendant
23  aided and abetted in the transportation of child
24  pornography.
25       In essence, you are required to determine

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

**Plaintiff's Closing Argument**

987

1       Now, in conclusion. Based on all the evidence,
2  the Government submits to you it has proven the defendant
3  guilty beyond a reasonable doubt on all of the charges.
4       We want to thank you for your patience and
5  attention during these last two weeks. I realize that
6  this has not been an easy trial, and it certainly is not
7  an easy trial to be selected as jurors on.
8       You've been asked to hear some deeply disturbing
9  e-mails and language and see some even more disturbing
10  videos and images.
11       So, again, we want to thank you for your
12  service.
13       We've gone through all of the evidence. The
14  case and the facts are clear.
15       You were selected as jurors because of your
16  willingness to consider all of the evidence, to scrutinize
17  it, to hold the Government to its burden. As you begin
18  your deliberations, we ask that you use your reason and
19  your common sense, that same common sense that guides you
20  every single day of your lives.
21       When you listen to the law that the Judge
22  explains and you use your common sense as it applies to
23  the facts, we believe that you will see that there's only
24  one reasonable conclusion that can be drawn from the
25  evidence, that is, that the defendant is guilty on each

*Owen M. Wicker, RPR*
*Official Court Reporter*

GA047

---

**1068**

1  notes.  I was going start to put my Rule 29 ruling on the
2  record.  I may finish that tomorrow.
3              (Pause)
4              THE COURT:  I will put at least part of the
5  Court's ruling on the record.  If I don't finish in the
6  next 15 minutes or so, I will complete it tomorrow while
7  the jury is deliberating.
8              As I said before, I am denying the Rule 29
9  motion by the defense and I want to state the reasons for
10  that now.
11              First, with respect to the motion, the standard
12  is well settled for Rule 29 the Court should grant the
13  motion if it concludes that no rational trier of fact will
14  find the defendant guilt beyond a reasonable doubt based
15  on the evidence presented at the trial.  It's in the rule
16  itself as well as United States v. Jackson, 335 F. 3d,
17  170, page 180, Second Circuit 2003.  And the standard for
18  evaluating that conviction must be upheld under Rule 29 or
19  allowed to go to the jury after viewing the evidence in
20  the light most favorable to the government and drawing all
21  reasonable inferences in its favor, any rationale trier of
22  fact could have found the essential element of the crime
23  beyond a reasonable doubt; United States v. Medina, 944 F.
24  2d, 60, page 66, Second Circuit 1991.
25              Quoting in Supreme Court:

*Stephanie Picozzi, CRR, RPR*
*Official Court Reporter*

---

**1069**

1              In analyzing the efforts, the Second Circuit
2  emphasizes, pieces of evidence must be viewed not in
3  isolation but in conjunction and the jury's verdict may be
4  based on circumstantial evidence; United States v.
5  D'Amato, 39 F.3d, 1249, at page 1256, Second Circuit 1954.
6  And also Second Circuit emphasized, credibility of
7  witnesses with the jury rather than the Court to
8  determine; United States v. Strauss, 999, F.2d 692, page
9  696, Second Circuit 1993.
10              That is the standard the Court has applied here
11  and concludes that for each of the counts of the
12  indictment, there is more than sufficient evidence for the
13  jury, if the government's evidence is credited and all
14  reasonable inferences are drawn in favor of the government
15  from that evidence, to rationally convict the defendant on
16  each and every count of the indictment.
17              I won't go through all the details of the
18  evidence.  In summary, the two searches of the defendant's
19  home, including the SD card in the computer hard drive,
20  the Western Union records, the e-mails and defendant's
21  statements to law enforcement in terms of the major
22  categories of proof that the government offered are
23  sufficient if the jury credits that evidence for the jury
24  to rationally find that the defendant possessed child
25  pornography on his computer and on the SD card and that

*Stephanie Picozzi, CRR, RPR*
*Official Court Reporter*

---

**1070**

1  they were his.  They could rationally find e-mails were
2  sent to him, to Ms. Kalichenko and that the child
3  pornography involving ███ was received by him.  They
4  could similarly conclude based upon that evidence that as
5  was noted by the government in the summation, specific
6  e-mail conspiracy issues, that there is an agreement
7  between Kalichenko and the defendant that she would
8  exploit, sexually exploit, ███ in videotapes sent to
9  the defendant in exchange for money.
10              The jury can also rationally find based on
11  e-mails and other evidence in the case that by paying for
12  the videos and providing the script for the videos that he
13  aided and abetted the exploitation of ███ in the
14  Ukraine outside the United States.  The issue obviously
15  that was raised by the defense with respect to whether or
16  not the videos were preexisting, again, if the evidence is
17  construed most favorably to the government in terms of
18  what was being requested in the e-mails, what was received
19  back in those e-mails in therms of the videos, the timing
20  of the videos, all the evidence, the circumstantial
21  evidence viewed most favorably to the government can
22  support a rational finding those videos were not
23  preexisting but were made only after the defendant made
24  the request for the videos to be produced.
25              In terms of the charge involving the niece, the

*Stephanie Picozzi, CRR, RPR*
*Official Court Reporter*

---

**1071**

1  jury could rationally find based upon the location of the
2  images and the control over the house, the camera and the
3  other circumstantial evidence presented with respect to
4  that, the circumstance surrounding the image, the
5  testimony of the sister, not the images themselves but
6  defendant's involvement for filming the daughter for
7  modeling purposes, if all that circumstantial evidence is
8  taken together, the jury viewed those favorably to the
9  government, the jury can certainly rationally find Mr.
10  Valerio sexually exploited his niece and produced the
11  images found on the SD card and adduced the niece to
12  engage in sexually-explicit conduct and can rationally
13  find in the government's favor on that count as well.
14              I want to focus more particular on Mr. Lato's
15  specific argument as relates to whether or not there is
16  sufficient proof for each of the attempt counts
17  constituting an attempt and whether or not those counts
18  are multiplicitous of a sexual exploitation count which I
19  understand is your argument.
20              MR. LATO:  Yes, your Honor.
21              THE COURT:  First I want to focus on whether or
22  not there is sufficient proof of attempt, sufficient proof
23  on each charge for there to be attempt as that is defined
24  under the law.
25              And I spent some time yesterday going through

*Stephanie Picozzi, CRR, RPR*
*Official Court Reporter*

1079

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,           :     14 CR 0094

     v.                            :     U.S. Courthouse
                                      Central Islip, N.Y.
JOSEPH VALERIO,                      :

               Defendant.     :     TRANSCRIPT OF TRIAL

                           November 13, 2014
------------------------------X     9:30 a.m.

BEFORE:

        HONORABLE JOSEPH F. BIANCO, U.S.D.J.
              and a jury

APPEARANCES:

For the Government:    LORETTA E. LYNCH
                      United States Attorney
                      100 Federal Plaza
                      Central Islip, New York 11722
                      By:  AMEET B. KABRAWALA, ESQ.
                          ALLEN BODE, ESQ.
                          Assistants, U.S. Attorney


For the Defendant:    ANTHONY LaPINTA, ESQ.
                      LEONARD LATO, ESQ.
                      35 Arkay Drive - Suite 200
                      Hauppauge, New York 11788


Court Reporter:    HARRY RAPAPORT
                   OWEN M. WICKER
                   United States District Court
                   100 Federal Plaza
                   Central Islip, New York 11722
                   (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**Jury Charge**

**1084**

1  Count Two of the indictment reads as follows:
2  Reading from the indictment.
3  On or about and between April 1, 2012, and
4  November 1, 2012, both dates being approximate and
5  inclusive, within the Eastern District of New York and
6  elsewhere, the defendant Joseph Valerio, together with
7  others did knowingly and intentionally, employ, use,
8  persuade, induce, entice and coerce a minor, to wit, Jane
9  Doe #1 to engage in sexually explicit conduct for the
10  purpose of producing one or more visual depictions of such
11  conduct, knowing and having reason to know that such
12  visual depictions would be transported and transmitted
13  using a means and facility of interstate and foreign
14  commerce and which were in and affecting interstate and
15  foreign commence which visual depictions were produced and
16  transmitted using materials that had been mailed, shipped
17  and transported in and affecting interstate and foreign
18  commerce by any means, to wit, one or more mobile
19  telephones, digital cameras and digital media disks, and
20  such visual depictions were actually transported and
21  transmitted using a means and facility of interstate and
22  foreign commerce and which were in and affecting
23  interstate and foreign commerce.
24  Count Fourteen of the indictment reads as
25  follows:

**Jury Charge**

**1085**

1  On or about and between September 10, 2010 and
2  January 19, 2011, both dates being approximate and
3  inclusive, within the Eastern District of New York and
4  elsewhere, the defendant Joseph Valerio did knowingly and
5  intentionally employ, use, persuade, induce, entice and
6  coerce a minor, to wit, Jane Doe #2, an individual whose
7  identity is known to the grand jury, to engage in sexually
8  explicit conduct, for the purpose of producing one or more
9  visual depictions of such conduct which visual depictions
10  were produced and transmitted using materials that had
11  been mailed, shipped and transported in and affecting
12  interstate and foreign commerce by any means, to with: One
13  or more digital cameras, memory cards and computer
14  equipment, and such visual depictions were actually
15  transported and transmitted using a means and facility of
16  interstate and foreign commerce and which were in and
17  affecting interstate and foreign commerce.
18  Counts Two and Fourteen of the indictment charge
19  the defendant with violating section 2251(a) of Title 18
20  of the United States Code.  That section provides in
21  relevant part, now quoting from the statute, any person
22  would employs, uses, persuades, induces, entices or
23  coerces any minor to engage in any sexually explicit
24  conduct for the purpose of producing any visual depiction
25  of such conduct or for the purpose of transmitting a live

**Jury Charge**

**1086**

1  visual depiction of such conduct shall be guilty of a
2  crime if such person knows or has reason to know that such
3  visual depiction will be transported or transmitted, in or
4  affecting interstate or foreign commerce or mailed, if
5  that visual depiction was produced or transmitted using
6  materials that have been mailed, shipped or transported in
7  or affecting interstate or foreign commerce by any means,
8  including by computer, or if such visual depiction has
9  actually been transported or transmitted in or affecting
10  interstate or foreign commerce or mailed, end quote.
11  I'll move to the elements of the offense.
12  In order to prove the defendant guilty of
13  sexually exploiting a child the Government must prove each
14  of the following three elements beyond a reasonable doubt.
15  First:  That the individual with the initials ▇
16  who is identified as Jane Doe #1 in Count Two of the
17  indictment and the individual with the initials ▇ who is
18  identified as Jane Doe #2 in Count 14 of the indictment,
19  were under the age of 18 when the visual depictions were
20  made;
21  Second:  That the defendant used or employed or
22  persuaded or induced or enticed or coerced ▇ and ▇ to
23  take part in sexually explicit conduct for the purpose of
24  producing or transmitting a visual depiction of that
25  conduct, and.

**Jury Charge**

**1087**

1  Third:  That the visual depiction was mailed or
2  actually transported or transmitted in or affecting
3  interstate or foreign commerce or that the defendant knew
4  or had reason to know that the visual depiction would be
5  mailed or transported or transmitted in or affecting
6  interstate or foreign commerce or that the visual
7  depiction was produced using materials that had been
8  mailed or transported in or affecting interstate or
9  foreign commerce.  I will explain each of the elements in
10  more detail.
11  First element of sexual exploitation of a child:
12  Age of minor.
13  The first element of Count Two that the
14  Government must prove beyond a reasonable doubt is that ▇
15  was less than 18 years of age at the time of the acts
16  alleged in the indictment.  And with respect to Count
17  Fourteen, the Government must prove beyond a reasonable
18  doubt that ▇ was less than 18 years old at the time of
19  the acts alleged in the indictment.
20  Second element of sexual exploitation of a
21  child:  Visual depiction of sexually explicit conduct.
22  The second element of Count 2 that the
23  Government must prove beyond a reasonable doubt that the
24  defendant, together with others, used or employed or
25  persuaded or induced or enticed or coerced ▇ to take part

## Jury Charge

**1088**

1 in sexually explicit conduct for the purpose of producing
2 or transmitting a visual depiction of that conduct.
3 As I will explain in greater detail in a few
4 moments, the Government can meet its burden of proof on
5 Count 2 by proving that the defendant did the acts charged
6 himself, or by proving that he aided and abetted another
7 person to sexually exploit ▆▆▆.
8 As to Count 14 the Government must prove beyond
9 a reasonable doubt that the defendant used or employed or
10 persuaded or induced or enticed or coerced ▆▆▆ to take part
11 in sexually explicit conduct for the purpose of producing
12 or transmitting a visual depiction of that conduct.
13 The words "used" and "employed" are words of
14 common usage, and I instruct you to interpret these words
15 by using your common sense. The words persuade, induce
16 and entice are in effect synonyms, which convey the idea
17 of leading or moving another by persuasion or influence,
18 as to some action, state of mind, etc., or to bring about,
19 produce or cause.
20 The word "induce" also means to stimulate the
21 occurrence of or cause.
22 The word "coerce" means to compel by force,
23 intimidation or authority, without regard for individual
24 desire or volition.
25 The word "producing" in this context means

## Jury Charge

**1089**

1 producing, directing, manufacturing, issuing, publishing,
2 or advertising.
3 A "visual depiction" includes any photograph,
4 film, video or picture, including undeveloped film and
5 videotape, and data stored on computer disk or by
6 electronic means which is capable of conversion into a
7 visual image.
8 A "visual depiction" includes videos and images
9 transmitted via live web cam even where such images are
10 not stored permanently.
11 You may consider all of the evidence concerning
12 the defendant's conduct when deciding whether the
13 Government has proven that the defendant acted for the
14 purpose of producing or transmitting a visual depiction of
15 the sexually explicit conduct, or aiding and abetting
16 another person to do so, as the case may be for Count 2.
17 Definition of sexually explicit.
18 Sexual explicit conduct means actual or
19 simulated sexual intercourse, including genital-genital,
20 oral-genital, digital-genital, anal-genital, or oral-anal,
21 whether between persons of the same or opposite sex;
22 bestiality; masturbation; sadistic; or masochistic abuse
23 or lascivious exhibition or the genitals or pubic area of
24 any person.
25 The term "lascivious exhibition" means a

## Jury Charge

**1090**

1 depiction which displays or brings to view to attract
2 notice to the genitals or pubic area of children in order
3 to excite lustfulness or sexual stimulation in the viewer.
4 Not every exposure of the genital or pubic area
5 constitutes a lascivious exhibition. You should consider
6 the following questions:
7 A. Whether the focal point of the visual
8 depiction is on the child's genitals or pubic area or
9 whether there is some other focal area;
10 B. Whether the setting of the visual depiction
11 makes it appears to be sexually suggestive, for example,
12 in a place or pose generally associated with sexual
13 activity;
14 C. Whether the child is displayed in an
15 unnatural pose, or in inappropriate attire, considering
16 the age of the child;
17 D. Whether the child is fully or partially
18 clothed, or nude, although nudity is not in and of itself
19 lascivious;
20 E. Whether the visual depiction suggests sexual
21 coyness or a willingness to engage in sexual activity.
22 F. Whether the visual depiction is intended or
23 designed to elicit a sexual response in the viewer.
24 Of course in order for a visual depiction to be
25 lascivious all six factors need to the to be present and

## Jury Charge

**1091**

1 the list of factors is not mandatory, exclusive or
2 exhaustive. Instead, you must determine whether the
3 visual depiction is lascivious based on its overall
4 content, taking into account the age of the minor. It is
5 for you to decide the weight or lack of weight to be given
6 to these or any other factors you find relevant.
7 In deciding whether the Government has proven
8 that the defendant acted for the purpose of producing or
9 transmitting a visual depiction of the sexually explicit
10 conduct, you may consider all of the evidence concerning
11 his conduct. While the Government must prove that he
12 acted with the purpose of producing a visual depiction of
13 sexually explicit conduct, it is not required that the
14 Government prove that the visual depiction of that conduct
15 was actually produced.
16 The third element of sexual exploitation of a
17 child: Effect on interstate commerce.
18 The third element of sexual exploitation of a
19 child that the Government must prove beyond a reasonable
20 doubt is that the visual depiction was transported or
21 transmitted in or affecting interstate or foreign commerce
22 or using a facility of interstate and foreign commerce or
23 that the defendant knew or had reason to know that the
24 visual depiction would be mailed or transported in or
25 affecting interstate or foreign commerce, or that the

**Jury Charge**

**1092**

1  visual depiction was produced using materials that had
2  been mailed, shipped and transported in and affecting
3  interstate and foreign commerce.
4      Simply stated, the phrase "transported or
5  transmitted in or affecting interstate or foreign
6  commerce" means that the materials used to produce the
7  visual depiction had previously moved from one state to
8  another or between the United States and another country.
9      I instruct you that transmissions of photographs
10  or video by means of the internet constitutes
11  transportation in interstate commerce. However, you must
12  find beyond a reasonable doubt that the specific depiction
13  in question was actually transmitted by means of the
14  internet, or that the defendant knew or had reason to know
15  that the visual depiction would be transmitted by the
16  internet.
17      Additionally, if a visual depiction of sexually
18  explicit conduct as I have defined that term, is stored on
19  a digital camera, other type of recording device or
20  digital media disk, and the camera, recording device or
21  digital media disk crosses from one state to another, that
22  is sufficient to satisfy the interstate commerce element.
23      Furthermore, it is sufficient to satisfy the
24  interstate or foreign commerce element if the visual
25  depiction of sexually explicit conduct is recorded or

**Jury Charge**

**1093**

1  stored on a device that was made either outside of the
2  State of New York or in a foreign country.
3      I'm now moving to Count 3. Sexual exploitation
4  of a child outside the United States.
5      Count 3 of the indictment charges the defendant
6  with sexual exploitation of a child, namely Jane Doe #1,
7  occurring outside of the United States.
8      Count 3 of the indictment reads as follows.
9      Reading from the indictment.
10      On or about and between April 1, 2012, and
11  November 1, 2012, both dates being approximate and
12  inclusive, within the Eastern District of it New York and
13  elsewhere, the defendant Joseph Valerio together with
14  others, did knowingly and intentionally employ, use,
15  persuade, induce, entice, and coerce a minor, to wit, Jane
16  Doe #1 to engage in sexually explicit conduct outside of
17  the United States, its territories and possessions, for
18  the purpose of producing one or more visual depictions of
19  such conduct intending that such visual depictions would
20  be transmitted and transmitted to the United States, its
21  territories and possessions, using a means and facility of
22  interstate and foreign commerce and mail, and which visual
23  depictions were actually transported and transmitted to
24  the United States, its territories and possessions, using
25  a means and facility of interstate and foreign commerce

**Jury Charge**

**1094**

1  and mail.
2      Count 3 of the indictment charges the defendant
3  with violating section 2251(c) of Title 18 of the United
4  States Code. That section provides in relevant part,
5  quoting the statute.
6      Any persons who employs, uses, persuades,
7  induces, entices or coerces any minor to engage in or who
8  has a minor assist any other person to engage in, any
9  sexually explicit conduct outside the United States, its
10  territories or possessions for the purpose of producing
11  any visual depiction of such conduct, intending such
12  visual depiction to be transported to the United States,
13  its territories or possessions, by any means, including by
14  using any means or facility of interstate or foreign
15  commerce or mail, or transporting such visual depiction to
16  the United States, its territories or possessions, by any
17  means, including by using any means or facility of
18  interstate or foreign commerce or mail shall be guilty of
19  a crime.
20      In order to prove the defendant guilty of
21  sexually exploiting a child, the Government must prove
22  each of the follow four elements beyond a reasonable
23  doubt.
24      First that the individual with the initials ▓▓▓
25  who was identified in the indictment as Jane Doe #1 was

**Jury Charge**

**1095**

1  under the age of 18 years at the time of the acts alleged
2  in the indictment.
3      Second, that the defendant, together with other
4  person, either employed, used, persuaded, induced,
5  enticed, or coerced ▓▓▓ to engage in sexually explicit
6  conduct outside the United States, its territories or
7  possessions as I've already defined those materials to
8  you, or (b), had ▓▓▓ assist another person or persons to
9  engage in sexually explicit conduct outside the United
10  States, its territories, or possessions;
11      Third, that the defendant did so for the purpose
12  of producing a visual depiction of such conduct, as I have
13  already defined the term "visual depiction" and;
14      Fourth, that the defendant, (a) intended such
15  visual depiction to be transported to the United States,
16  its territories, or possessions by any means, including by
17  using mail or by any means or facility of interstate or
18  foreign commerce or (b) the defendant did transport or
19  aided and abetted another person in transporting such
20  visual depiction to the United States, its territories or
21  possessions by any means, including by using mail or any
22  means of facility of interstate or foreign commerce, as I
23  have already defined those terms for you.
24      As I mentioned earlier and as I will explain in
25  greater detail momentarily, the Government can meet its

## Jury Charge

**1096**

1 burden of proof on Count 3 by proving that the defendant
2 did the acts charged himself, or by proving that he aided
3 and abetted another person to carry out such acts.
4 If you find from your consideration of all the
5 evidence that the Government as proved each of these
6 elements beyond a reasonable doubt as to Count 3, then you
7 should find the defendant guilty of that charge.
8 If, on the other hand, you find from your
9 consideration of all the evidence that the Government has
10 failed to prove any one of these elements beyond a
11 reasonable doubt as to Count 3, then you should find the
12 defendant not guilty of that charge.
13 I will now give you an instruction regarding
14 aiding and abetting.
15 With respect to certain counts in the
16 indictment, I instruct you that the Government can meet
17 its burden of proof either by proving that the defendant
18 did the acts charged himself or by proving that he aided
19 and abetted another person in carrying out the acts
20 charged: those counts are Counts 2 and 3, charging the
21 defendant with sexual exploitation of a child; Count 4,
22 charging the defendant with transportation of child
23 pornography; and Count 5, charging the defendant with
24 receipt of child pornography.
25 I have already instructed you on Counts 2 and 3

## Jury Charge

**1098**

1 is the intentionally and knowing participation in the
2 unlawful act by furthering it in some way.
3 Before you can convict a defendant on the ground
4 that he aided and abetted the commission of the crimes
5 charged, you must first find beyond a reasonable doubt
6 that another person committed that crime.
7 In order to aid or abet another to commit a
8 crime, it is necessary that the defendant willfully and
9 knowingly associate himself in some way with the criminal
10 venture, that he participate in it out of a desire to make
11 the crime succeed, that is, a defendant must have the
12 specific intent of furthering the criminal offense through
13 some action on his part.
14 The mere presence of a defendant where a crime
15 is being committed, even coupled with knowledge that a
16 crime is being committed or the mere acquiescence by the
17 defendant in the criminal conduct of others, even with
18 guilty knowledge, is not sufficient to establish aiding
19 and abetting. An aider and abetter must have some
20 interest in the criminal venture. That interest need not
21 be a financial one, but you may consider the presence or
22 absence of a financial interest in making your
23 determination.
24 In other words, if one, fully aware of what he
25 is doing, plays a significant role in facilitating a

## Jury Charge

**1097**

1 and I will instruct you on Counts 4 and 5 in a moment.
2 Let me now take time now to explain to you the
3 law concerning aiding and abetting.
4 The Government is relying on aiding and abetting
5 under section 2(a) of Title 18 of the United States Code
6 which provides that, reading from the statute, whoever
7 commits an offense against the United States or aids,
8 abets, counsels, commands, induces or procures its
9 commission, is punishable as a principal, end of quote.
10 Accordingly, even if the defendant did not
11 personally do every act constituting an offense you may
12 find that he committed that offense if the Government
13 proves beyond a reasonable doubt that he aided and abetted
14 the offense. This means that if you find that the
15 defendant knowingly and willfully aided and abetted
16 another person in the commission of a crime, he is as
17 guilt as if he personally committed it.
18 Under the aiding and abetting statute, it is not
19 necessary for the Government to show that a defendant
20 himself physically committed the crime with which he is
21 charged in order for the Government to sustain its burden
22 of proof.
23 A person who aids or abets another to commit an
24 offense is just as guilty of that offense as if he
25 committed it himself. The essence of aiding and abetting

## Jury Charge

**1099**

1 transaction prohibited by law, he is equally guilty with
2 the person who directly performs the illegal acts, even
3 though the latter played a much greater or major part in
4 the preparation of the crime.
5 To determine whether the defendant aided and
6 abetted the commission of the crime charged, ask
7 yourselves these questions.
8 Did he participate in the crime charged as
9 something he wished to bring about?
10 Did he associate himself with the criminal
11 venture knowingly and willfully?
12 Did he seek by his actions to make the criminal
13 venture succeed?
14 If your answer to each of these questions is
15 "yes" then the defendant is an aider and abettor and
16 therefore guilty of the crime charged just as if he
17 himself had actually committed it.
18 If on the other hand your answer as to any of
19 these questions is "no," then the defendant is not an
20 aider and abettor under 18 USC section 2(a), and you must
21 find him guilty of the crime under consideration as an
22 aider and abettor under section 2(a).
23 I'm now moving to Counts 6, 7, 8, 9, 10, 11, 12,
24 and 13: Attempted sexual exploitation of a child.
25 I will now explain to you the law that applies

| | |
|---|---|
| **From:** | JOSEPH VALERIO < ████████████████ > |
| **Sent:** | Monday, January 23, 2012 3:13 PM |
| **To:** | elena kalichenko |
| **Subject:** | Fw: your mail |

GOVERNMENT
EXHIBIT
**558**
14 CR 94 (JFB)

REMEMBER" im a busy man and im OUT! half the time...cell phone correspondences are better for me! Helena listen now!, I want to know from you where you are able to send email out at 9:45pm! ...then I want to know what keeps YOU at that internet place ALL day till dark! when I " WARNED" you not to write to others on my dime $ at my cost!...thirdly" how is it that my texting goes through to Valeria in Rome and Julia in Russsia and NOT YOU?? and you dont receive mine??, maybe it means something for YOU"! not me because you know who I have in my live you know who's coming...and going, as I will have more in between..till my day. So if your going to work at an agency then you can send me some profiles and work on getting me a girl here as well"...just for the time being to visit and then go back. Julia is getting much too serious in her words" - so I'll have to soften her up when she comes..so she's not broken hearted..but she wants it! regardless". I know you much longer so DONT worry! I see how hard you are trying and that means alot to me, I will say yes to the visa process! but you have more to prove to me in this time and more video! I would like to start either application, of course whichever is the fastest and most complete!.. the cost for me whether it works or not is no problem!, even if we have a change of heart or plans.I have plans for you over here..seeing how sexually charged YOU are in those videos..with ████ .I can do alot with YOU! and you will both listen...its very nice! My mouth waters and my cock is hard for this!. We will have ample time ahead so yu will need to follow these steps below, as I will go ahead with ONE of the visa applications this week..just to make sure you are "Still worthy" of this great decision on my part to change your "lives" and take care of you both. You will follow these steps: 1. You show me where you sleep on that couch by cell video, before you go to sleep...I want to see the sheets your pillow and blanket there. Then you say goodnight by showing me your tits!! then you go to sleep or have ████ next to you...hold closely! with your tits in her mouth! each night before bed!..this is your way of saying goodnight to your Master" 2. You ONLY" GO! to the Internet place monday, wednesday, friday! - when your there" you start with an email to me, and when you leave" - BEFORE DARK! you send me one when you leave! You will also send me your "SKYPE" contacts...of course if there is nothing to hide" you show! - I promise NOT to contact those FEMALE friends. If its a MALE friend!..then OUR" contact will be OVER!. Female friends of yours - No problem" anyone else" BIG PROBLEM! you show me! 3. If you go to work? I need the name of the company and the people who employ you there. At the first chance you have excess to the Data base of women...WHO ARE ONLY" INTERESTED IN COMING TO NY" you then send me the beautiful Blondes who are 18 - 26 years of age...who are CLEAN", nice figure! - WHO WANT TO COME TO NY ONLY!. Lets work on getting some here for our business as well - we'll take care of them" there are plenty of homes and places for them to stay...im the head man here, for whom they will meet first. 4. The videos are getting more and more creative by YOU" with ████ and how you incorparate the toys in the&nbp videos are very creative. Here in America" BREAST FEEDING" or JUST BABY SUCKING ON TITS" is very popular!...So you keep up the good work eachday and experiment more with YOUR TITS" with ████ and try to keep her in between your legs"..as SHE plays with HER toys" by your PUSSY. Im sure just the FEEL" of those toys she plays with"...JUST TOUCHES YOUR PUSSY! - AND IM SURE YOU WILL CUM ( Just keep her secure on the floor or couch - "Playing in between your legs - NAKED!" she is bound to TOUCH YOUR PUSSY if YOU PUT THE TOYS BETWEEN YOUR STOMACH AND PUSSY"... Today I will send out some money! BECAUSE YOU KNOW WHO IS TAKING CARE OF YOU!!. So follow my steps and obey my orders above" and beyond"! - If you disagree to ANY of these steps! THEN THAT MEANS YOU ARE NOT WORTHY OF MY HONOR" TO PROCEED WITH THE FIANCEE VISA". Good work so far and I would like to continue this relationship till then if there are NO disagreements to the steps above then I will proceed...in the meantime" YOU STAY SAFE AND CLEAN AWAY FROM TROUBLE" believe me I will find out and I when I do..,, THERE WILL BE TOTAL SILENCE ON MY PART"...THATS WHEN YOU KNOW ITS OVER. So lets get to work"...

Joseph, I came to check an email from you but dint see anything. I sent you 6 vidoes today, hope you got them, I am -10 hrn now on my cell phone, every time I am sending you videos from my cell phone I usually spend $7-$8 a day so of course I am out of cash now. Lets move forward with a fiancee visa, ok. We need you, Joseph!!!!!!We spent lots of time and energy on building these relations, I want to keep them!

GA054

I will stay here for 30-40 mins to check an answer from you then I will go home, ok.

Kiss you
Helena

23 января 2012, 00:30 от JOSEPH VALERIO <░░░░░░░░░░░>:

   YOU SEE BIITCH 9:45 PM STILL AT THE INTERNET PLACE!! ...HOW IS THAT POSSIBLE??! THAT" WAS ANOTHER THING I WARNED YOU ABOUT BITCH!...BUT YOUR STILL THERE CHECKING YOUR MAIL FROM OTHER PROSPECTS....WITH MY MONEY YOU BITCH!...THEN YOU CRY TO ME  THAT YOU HAVE NO MORE MONEY!!! BUT YOUR SITTING THERE AT MY COST TO WRITE TO OTHER DICKS! ...AS YOUR BACK UP!! - I'D HAVE  YOUR FUCKING HEAD! IF EVER CAUGHT YOU HERE! SO BEST YOU STAY AWAY FOR GOOD!!. FUNNY BITCH" HOW IM ABLE TO TEXT MY VAL AND JULIA"...WITH NO PROBLEM!! I THINK ITS A SIGN BITCH!..YOUR A TROUBLED INDIVIDUAL! AND HERE", IF YOU WERE EVER TO CAUSE ANY TROUBLE...YOU'D BE FINISHED!  FOUND A JOB? LISTEN BITCH " THEN GO TO WORK!!...AND SUPPORT YOUR PATHETIC LIFE AND YOUR FAMILY!! AND GET OUTTA MY LIFE!...SEND ME SOME PROFILES AND GET A ME ANOTHER PUSSY" HERE! AND YOU WILL GET PAID!! BUT IT'S ALL BULLSHIT! FROM YOU AND THIS SO" CALLED JOB AT A DATING AGENCY! - THEN TAKE THE JOB BITCH AND GET ON WITH IT!, NO NEED TO TELL ME ONE THING IN A LETTER...THEN TELL ME ANOTHER THING IN A TEXT MESG... YOU THINK YOUR DEALING WITH A MINDLESS MAN??! - IM AT GENIUS LEVEL! ...BRILLIANT, STRONG, HANDSOME, ARTIST, ATHLETIC - ITS WAY" PAST YOUR LEVEL! I MAY BE SOME WIZARD! , AND YOU JUST INDICATED THAT YOU DONT TRUST ME ANYMORE!! - SO" BITCH! I DONT TRUST YOU !. HOW CAN A BITCH LIKE YOU THINK YOU HAVE OPTIONS WHEN A MAN LIKE ME OFFERS YOU" A F-1 VISA!!! AND YOU TELL ME!.." I WILL HAVE TOO MUCH CONTROL OVER YOU" WHAT DID YOU THINK WAS GOING TO BE BITCH?? YOU HAVE CONTROL?? - YOUR FUCKING OUT OF YOUR MIND BITCH!!. I GOT ALL I NEED IN MY LIFE! AND IM NOT ABOUT TO PUT MY LIFE, MY FINANCES OR YOUR LIFE! AT RISK, BECAUSE YOUR CAPABLE OF BEING PUT AT ISK"...BECAUSE YOUR FULL OF DANGER AND IM NOT THE MAN TO FOOL AROUND WITH BITCH! - THEN ITS DANGEROUS FOR YOU!!!. YOUR TIME IS UP...UNLESS, YOU WANT TO BE IN THE STREET!.GET ME MORE FUCKING VIDEO OF YOUR DAUGHTER ON YOUR TITS PLAYING!! AND PUT SOME OF THOSE TOYS ON YOUR STOMACH!! SO SHE PLAYS OVER BY YOUR PUSSY!!! USING THE CELL PHONE CAMERA!!....YOU WONT SEE MONEY BITCH" FOR A VIDEO CAMERA...NO FUCKING WAY!!! GET ME SOME REALLY RACEY" CELL PHONE VIDEO...YOU AND YOUR DAUGHTER - TONIGHT!!! OR I DROP YOU COMPLETELY" IN THE STREETS!! ANOTHER THING!!...MONDAY AND WEDNESDAY!! ARE THE ONLY DAYS YOU SPEND AT THAT PLACE!! ...1 HOUR MAXIUM BITCH! ON THE INTERNET A DAY - GOT IT!! OR I WILL DROP YOU!!!! YOU AND YOUR FAMILY WILL BE  FUCKED  FOR LIFE!!!



OUR

GA055

**GOVERNMENT EXHIBIT**
**559**
14-CR-94 (JFB)

**From:** JOSEPH VALERIO ▓▓▓▓▓▓▓▓▓▓>

**Sent:** Tuesday, January 24, 2012 11:59 PM

**To:** elena kalichenko

**Cc:** JOSEPH VALERIO

**Subject:** This covers it...and here it begins"


Helena you have nothing to worry about, as we both know you have high levels of education that some would never achieve... Its the system both here and there in which we try to "crack the code" as we both achieved form different spectrums. You will always carry your education with you like a Golden medallion!, which will never tarnish!. Look for today with whom surround you, like your beautiful little daughter, your Mother. Just think" maybe its life just telling you for now, to relish the joy of motherhood. You are doing all your expected to do in my eye's and you just need to maintain that with me...and I will continue to take care of you and your family, you have earned my praise and respect to carry on a relationship with you" to hopefully a higher degree. Today will be wednesday, so you had to come in purposely for the MTCN# and then you will leave before dark" as planned. The next day your able to go to the internet place is Friday - are we clear on this? Thursday you relax at home with ▓▓▓▓▓ getting her to play more with YOU and exploring YOUR body more down below to your sweetness. Remember" when ▓▓▓▓▓ comes to you and touches you...its really" me who is touching you or in Fantasy" this little beautiful creature who wants to probe you and touch a "real human" for the first time! ( close your eye's and let her explore...every crevice of your nipples and pussy") Put some juice on your nipples" and make her SUCK THOSE NICE TITS"! as you lay there in deep emotional relaxtion...and Finally this little beautiful creature has taken over YOUR BODY" - with oral pleasure...( apply something sweet from the store" - sweet juice or candy on your nipples and your sweet pussy" to play with). Get this ALL" on video for Thursday - relaxation day! - DONT hold back" REMEMBER" its ME!...so let yourself go!! - I will have you in my mouth tomorrow!!...to taste your sweet nectar juice from your sweet PUSSY!!. - ITS ME YOU SEE! ITS ME YOU HEAR IN ! ITS ME WHO TOUCHES YOU! - THROUGH ▓▓▓▓▓ I will check into your Skype account dear, thank you for sharing that with me ...as you are FULLY aware of who's in my life" and when they come, stay or go". You will always know". Andrey I respect him, the Father of your child and I will not interfere with that contact. So your converstaions are commonly about what" if I might add with Andrey? - im asking because you still have him as a contact for the obvious reason" he's the father of your daughter!. This much I will understand...but not daily conversations with him or I will interfere!. Try to see whats wrong with your cell phone as far as receiving texts..im gettting your texts and videos so that part is fine! . Thursday", you will use that day " primarily" FOR VIDEO'S WITH ▓▓▓▓▓ - ALL WITH HER! FROM MANY ANGLES!...FROM YOUR TITS TO YOUR CUTE TOES" AND EVERY CREVICE TO BE EXPLORED! ALL VIDEO'S! - MAKE THIS COUNT! ...THESE ARE THE ONE'S THAT WILL!!... I KISS YOU ALL OVER! FOR EVERY INCH ▓▓▓▓▓ EXPLORES....AS SHE LANDS ON YOUR " PLANET HELENA".SHE WILL EXPLORE YOUR VALLEY'S, MOUNTAINS, CURVES AND YOUR WET"JUICY BUSH! WITH AMPLE FRUIT OF NECTAR....LET HER TOUCH THOSE MOIST CREVICES"!! EMM" DA!...IM SO HARD! Here my sweet pussy slave" is the MTCN# 836-142-4419 Be Safe" wherever you go! and remember to put on a good show! On friday we'll discuss our Dating



Agency...to get at least one or two girls here"... I kiss YOU! and want to have you so BAD!!

GA056

GOVERNMENT
EXHIBIT

**559-A**

14-CR-94 (JFB)

**From:**   JOSEPH VALERIO  <​                                          ​>

**Sent:**   Tuesday, January 24, 2012 10:24 AM

**To:**   elena kalichenko

**Subject:**   Fw: Fwd[2]: your mail


Yes my sweet nymph puss"... give me ALL the details about this venture today, get your phone checked out!...because we wont be able to communicate like this everday on the internet. The next day you can go check your mails is friday, REMEMBER" as per my last instructions to YOU" which you need to look over still and agree to. Try to resend those videos from yesterday MOVOO042 , MV """46 , MV """49 , MV """52, MV """53, ALL of them again", seems there was too much memory at once to handle for the phone...Very nice one's with you and          ! Great Job! You see your bonding very well with          ..as you can see my energy is flowing through          onto YOU" do YOU feel it?..its coming from ME! as she touches and explores your breasts, then to touch you below"...as you keep her between your legs SAFELY" with your legs up around her, putting her toys "DOWN BY YOUR SWEET PUSSY" ( from your belly down to your pussy). With you and her securely on the couch, bed or floor" YOU can use the cell phone camera with one hand grabbing your TITS with the other and from your EYE view down to your sweet pussy...you will be recording          playing by your sweetness below!....AS SHE TOUCHES AND EXPLORES YOU!...AS YOU CONTINUE TO INSERT THE TOYS BETWEEN YOUR LEGS!!. This will be like a French short film" - We will work on a title my sweeties". I just got your mesg now about the job"..Sorry it did not work out for you. Hope you didn't sign up for the agency as a MEMBER?!! - NOW?. Somethings as we know are not meant to work out, like this job interview for instance and some other things are meant to be. So you gave it your best shot" and dont worry" I rather see you do something more creative and "YOU HAVE. So we will get this visa going here...you can relax, and develop          to be one GREAT HAPPY little girl. Im here to help you along the way till you are both here" The thing with Julia, I just have to make her understand that her and I cant be serious for now together..it will be hard" for her but she understands and knows already who I have FIRST in my life"...she still wants to come regardless of who. She will just come only  to visit. I think ALL I may need from you is          's information. I have a copy of your passport, so I think that is all for now. Let me get to the western union place later because aparantly all transactions to the Ukraine..by phone or online" "THEY" suspect HIGH FRAUD ACTIVITY! in the Ukraine!...So on my way back from my meetings I'll have to stop at one of their locations...Nothing is simple in the Ukraine I guess these days!..So I will get the money out to you later sometime!! - its best you leave that place after this mesg...and keep it at 3 days a week like I said to save money!!! and leave before dark - SO YOU BEST LEAVE NOW" AND DONT SIT THERE ALL NIGHT!! YOU WILL SEND ME YOUR SKYPE" CONTACT PAGE OR GIVE ME YOUR PASSOWORD TO CHECK!!
YES MY BELOVED MASTER!

Joseph, I just came to Internet place to check an email from you at 11, yesterday when I left there was nothing from you yet, I have an appointment today at noon, with that agency so I am going now.......I will come back later in the evening and I will tell you what is that agency about and more details........I didnt get any MTCN number from you and I cant send you any videos tonight cause I am -10 hrn, when I get the cash you get a couch, more vidoes with          and the rest.

Ok I am leaving now and I will come back later around 6-7 pm my time to send you a response.

Kisses
Helena


-------- Пересылаемое сообщение --------
От кого: JOSEPH VALERIO                                      >
Кому: elena kalichenko <​                             ​>
Дата: 24 января 2012, 00:22
Тема: Fw: your mail

GA057

  Before you start to do ANY work, you give me the name of the company and the employers name or number...I want to make sure this is what it is" and what company it is?... if I plan to continue to support my two interests. I have plans a head for you both! so careful in your decision making! DONT LET IT SPOIL YOUR PLANS! DO YOU HEAR ME?? - your response" should be YES" my Master! If you understand me correctly! and do fix that phone...so you get my response QUICK" and when im on the road! - not at home!

Joseph, there is nothing from you, I am leaving in 5 mins..........I am planning to go tom start that job at dating agency, I have to feed my family but I will get the first salary only in a month.......I think we should proceed with the Fiancee visa CAUSE I WANT TO BE WITH YOU!!!!!!!!!

KISSES
HELENA AND ███████
BE SAFE


23 января 2012, 00:30 от JOSEPH VALERIO ████████████████>:

  YOU SEE BIITCH 9:45 PM STILL AT THE INTERNET PLACE!! ...HOW IS THAT POSSIBLE??! THAT" WAS ANOTHER THING I WARNED YOU ABOUT BITCH!...BUT YOUR STILL THERE CHECKING YOUR MAIL FROM OTHER PROSPECTS....WITH MY MONEY YOU BITCH!...THEN YOU CRY TO ME THAT YOU HAVE NO MORE MONEY!!! BUT YOUR SITTING THERE AT MY COST TO WRITE TO OTHER DICKS! ...AS YOUR BACK UP!! - I'D HAVE YOUR FUCKING HEAD! IF EVER CAUGHT YOU HERE! SO BEST YOU STAY AWAY FOR GOOD!!. FUNNY BITCH" HOW IM ABLE TO TEXT MY VAL AND JULIA"...WITH NO PROBLEM!! I THINK ITS A SIGN BITCH!..YOUR A TROUBLED INDIVIDUAL! AND HERE", IF YOU WERE EVER TO CAUSE ANY TROUBLE...YOU'D BE FINISHED! FOUND A JOB? LISTEN BITCH " THEN GO TO WORK!!...AND SUPPORT YOUR PATHETIC LIFE AND YOUR FAMILY!! AND GET OUTTA MY LIFE!...SEND E SOME PROFILES AND GET A ME ANOTHER PUSSY" HERE! AND YOU WILL GET PAID!! BUT IT'S ALL BULLSHIT! FROM YOU AND THIS SO" CALLED JOB AT A DATING AGENCY! - THEN TAKE THE JOB BITCH AND GET ON WITH IT!, NO NEED TO TELL ME ONE THING IN A LETTER...THEN TELL ME ANOTHER THING IN A TEXT MESG... YOU THINK YOUR DEALING WITH A MINDLESS MAN??! - IM AT GENIUS LEVEL! ...BRILLIANT, STRONG, HANDSOME, ARTIST, ATHLETIC - ITS WAY" PAST YOUR LEVEL! I MAY BE SOME WIZARD! , AND YOU JUST INDICATED THAT YOU DONT TRUST ME ANYMORE!! - SO" BITCH! I DONT TRUST YOU !. HOW CAN A BITCH LIKE YOU THINK YOU HAVE OPTIONS WHEN A MAN LIKE ME OFFERS YOU" A F-1 VISA!!! AND YOU TELL ME!.." I WILL HAVE TOO MUCH CONTROL OVER YOU" WHAT DID YOU THINK WAS GOING TO BE BITCH?? YOU HAVE CONTROL?? - YOUR FUCKING OUT OF YOUR MIND BITCH!!. I GOT ALL I NEED IN MY LIFE! AND IM NOT ABOUT TO PUT MY LIFE, MY FINANCES OR YOUR LIFE! AT RISK, BECAUSE YOUR CAPABLE OF BEING PUT AT RISK"...BECAUSE YOUR FULL OF DANGER AND IM NOT THE MAN TO FOOL AROUND WITH BITCH! - THEN ITS DANGEROUS FOR YOU!!!. YOUR TIME IS UP...UNLESS, YOU WANT TO BE IN THE STREET!.GET ME MORE FUCKING VIDEO OF YOUR DAUGHTER ON YOUR TITS PLAYING!! AND PUT SOME OF THOSE TOYS ON YOUR STOMACH!! SO SHE PLAYS OVER BY YOUR PUSSY!!! USING THE CELL PHONE CAMERA!!....YOU WONT SEE MONEY BITCH" FOR A VIDEO CAMERA...NO FUCKING WAY!!! GET ME SOME REALLY RACEY" CELL PHONE VIDEO...YOU AND YOUR DAUGHTER - TONIGHT!!! OR I DROP YOU COMPLETELY" IN THE STREETS!! ANOTHER THING!!...MONDAY AND WEDNESDAY!! ARE THE ONLY DAYS YOU SPEND AT THAT PLACE!! ...1 HOUR MAXIUM BITCH! ON THE INTERNET A DAY - GOT IT!! OR I WILL DROP YOU!!!! YOU AND YOUR FAMILY WILL BE FUCKED FOR LIFE!!!



GA058



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

ALB:ABK
F.#2014R00151

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 11, 2016

By ECF and Interoffice Mail

The Honorable Joseph F. Bianco
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re:     United States v. Joseph Valerio
         Criminal Docket No. 14-0094 (JFB)

Dear Judge Bianco:

The government respectfully submits this letter in advance of the <u>Fatico</u> hearing scheduled for July 25, 2016.  Defense counsel have previously been advised of the following.

Presently, the government intends to call at least two witnesses, both of whom reside in foreign countries, to testify about matters raised in the Presentence Investigation Report and that bear upon factors the Court may properly consider under Title 18, United States Code, Section 3553(a).  The government expects that these witnesses' testimony will be completed on July 25, as they are scheduled to return to their respective home countries on July 26.  The government will provide defense counsel and the Court with copies of any exhibits and Section 3500 disclosures in advance of the hearing.[1]

Additionally, the government will also request that the United States Marshals Service produce Olena Kalichenko, should the Court seek to hear from her regarding her interactions and dealings with the defendant.  Counsel for Ms. Kalichenko has indicated that she will voluntarily testify at the Court's request.  As the Court may recall, however, the government has no agreement whatsoever with Ms. Kalichenko and the government does not—and cannot—compel her to testify.  The government has advised Ms. Kalichenko's counsel that any testimony she voluntarily offers will not constitute "substantial assistance"

_____

[1] The government may call additional witnesses and will provide any Section 3500 disclosures in advance of the hearing.

in the investigation or prosecution of any other person, within the meaning of Section 5K1.1 of the United States Sentencing Guidelines or Section 3553(e), or any other similar provision of law, or otherwise be a basis to sentence Kalichenko below the mandatory minimum terms of imprisonment applicable in her case.

      Finally, the undersigned Assistant United States Attorney is scheduled to travel overseas on a work assignment starting on July 26, 2016, and returning on July 31, 2016.  Accordingly, should the presentation of evidence during the <u>Fatico</u> hearing require more than one day—such as to accommodate any defense presentation or Ms. Kalichenko's testimony—the government will, at the appropriate time, respectfully request to continue the hearing to the week of August 1, 2016, or thereafter.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:    <u>/s/ Ameet B. Kabrawala</u>
Ameet B. Kabrawala
Assistant U.S. Attorney
(718) 254-6001

cc:    Anthony M. LaPinta, Esq.
Leonard Lato, Esq.
Counsel for Defendant

Robert P. LaRusso, Esq.
Counsel for Olena Kalichenko

Ms. Lisa Langone
U.S. Probation Department

1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    --------------------------------X

4    UNITED STATES OF AMERICA,
                                    :    CR-14-94
                                         (JFB)
5         -against-                :    United States Courthouse
                                         Central Islip, New York
6    JOSEPH VALERIO,
                                    :    June 6, 2017
7                 Defendant.             1:15 p.m.
     --------------------------------X

8

9                 TRANSCRIPT OF SENTENCING
           BEFORE THE HONORABLE JOSEPH F. BIANCO
           UNITED STATES DISTRICT COURT JUDGE
10

11   APPEARANCES:

12   For the Government:      BRIDGET M. ROHDE, ESQ.
                              UNITED STATES ATTORNEY
13                                 BY: ALLEN BODE, AUSA
                              100 Federal Plaza
14                            Central Islip, New York 11722

15

16   For the Defendant:      ANTHONY LA PINTA, ESQ.
                             LEONARD LATO, ESQ.
17

18

19

20
     Official Court Reporter:   Paul J. Lombardi, RMR, FCRR
21   Ph. (631) 712-6106         100 Federal Plaza - Suite 1180
     Fax (631) 712-6122         Central Islip, New York 11722
22

23

24
                 Proceedings recorded by mechanical stenography.
25                    Transcript produced by CAT.

                     Paul J. Lombardi, RMR, FCRR
                     US District Court Reporter

2

1          THE CLERK:  Calling case United States of

2    America v Joseph Valerio.

3          Counsel please state your appearance for the

4    record.

5          MR. KABRAWALA:  Good afternoon, Judge.  Ameet

6    Kabrawala for the United States.  I'm joined by AUSA Allen

7    Bode.

8          MR. BODE:  Good afternoon.

9          THE COURT:  Good afternoon.

10          MR. LA PINTA:  Good afternoon, your Honor.

11          Appearing for Mr. Valerio, Anthony La Pinta and

12    Leonard Lato.  Mr. Valerio is seated to my right.

13          THE COURT:  Good afternoon.

14          As you know, we are here for sentencing.  Are

15    both sides ready to proceed?

16          MR. KABRAWALA:  Yes, Judge.

17          MR. LA PINTA:  Yes.

18          THE COURT:  I want to review what documentation

19    I have because I want to make sure I have everything

20    that's been submitted by the parties and also make sure

21    you have a copy of everything that's before the court.

22          I have the presentence investigation report, the

23    initial probation department recommendation, the addendum

24    to the presentence report, which led to the Fatico

25    hearing, I have the revised probation department

3

1    recommendation which is a total of 60 years imprisonment.

2    I have the government's May 8th sentencing submission

3    which has various attachments.

4           In terms of what I have from the defense, I have

5    the initial sentencing memorandum of April 25th with

6    attachments which include Dr. Barday's report and letter

7    on Mr. Valerio's behalf, and earlier today I reviewed

8    Mr. Lato's supplemental letter of June 6th which attaches

9    various letters including a letter from Mr. Valerio.  I

10   believe that's all I have in terms of documentation, and

11   also I did receive a stipulation with respect to the

12   forfeiture which I signed several months ago.

13          Is there anything else I should have in

14   connection with the sentencing?

15          MR. KABRAWALA:  There is one other document that

16   we handed up to the court today, defense counsel has been

17   provided a copy.  It's entitled final order of forfeiture.

18          It should be attached to the judgment once it's

19   signed, Judge.

20          THE COURT:  I assume based upon the stipulation

21   that the defendants agree to this final order of

22   forfeiture as part of the judgment in this case?

23          MR. LA PINTA:  Yes, sir.

24          THE COURT:  Is that correct, Mr. Valerio?

25          THE DEFENDANT:  Yes, your Honor.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

4

1     THE COURT:  I will order the forfeiture as

2  contained in the final order of forfeiture.

3     MR. LA PINTA:  You should be aware, your Honor,

4  that today moments before you took the bench a payment in

5  the amount of that money was given over by the form of an

6  attorney escrow check to the government.

7     THE COURT:  That's $75,000?

8     MR. LA PINTA:  Yes.

9     MR. KABRAWALA:  I can confirm receipt of a

10  payment for the amount of $75,000, it's check No. 1418,

11  and I'm in possession of it to the United States Marshal's

12  Office.

13     THE COURT:  Again, so the record is clear, I

14  did, as we had discussed after receiving the submissions,

15  issue a June 1st opinion which Mr. Lato referenced in his

16  supplement where I made findings of fact as it related to

17  the testimony of the various witnesses that the government

18  put forth at the Fatico hearing and I won't repeat those

19  findings here, but I found the government witnesses to be

20  fully credible in every respect with respect to their

21  testimony and I intend to consider those facts as part of

22  the history and characteristics of the defendant, as well

23  as on the issue of dangerousness under the 3553(a)

24  factors.

25          I would just ask, I know things have been

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

5

1   submitted to me under seal because they contain names of

2   children.  I would just ask that redacted versions of the

3   documents be prepared taking out the names of the children

4   because I don't think all the filings should be under seal

5   and obviously if you want to maintain Dr. Barday's report

6   that would be fine, but if you could do that in the next

7   week or so that would be helpful.

8           MR. LA PINTA:  Yes, sir.

9           THE COURT:  Mr. La Pinta, has Mr. Valerio

10  received the presentence report, the two recommendations

11  and the addendum?

12          MR. LA PINTA:  Yes, your Honor.

13          If I may just take a brief moment and spread on

14  the record in detail what we have done in that regard.

15          Mr. Lato and I have met with Mr. Valerio

16  probably in excess of 25 to 30 times since he's been

17  incarcerated in the MDC.  We have spent numerous hours

18  going over the initial presentence investigation report,

19  the addendum, and the recommendations and most recently

20  this weekend, this past weekend, Mr. Lato, himself, went

21  to see Mr. Valerio and did go over your memorandum opinion

22  dated June 1st with him.

23          He's asked numerous questions about all the

24  documents.  We have answered those questions.  We have

25  taken a lot of time and detail in explaining not only the

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

1    factual assertions contained therein, but in our opinion

2    the significance and meaning of each and every document,

3    in particular your memorandum and order dated June 1st.

4         I'm of the opinion that Mr. Valerio is quite

5    capable of understanding the facts and circumstances of

6    his case.  When it comes to legal matters that maybe a

7    layperson is not aware of he's asked appropriate questions

8    and we have taken the time to explain to him the

9    sentencing guidelines, how it works and all of the 3553(a)

10   factors that the court is now going to consider and render

11   in a sentence.

12        So I state on the record without any hesitation

13   or doubt that Mr. Valerio has been given much time, much

14   attention and much detail regarding each and every

15   document that the court is relying on in imposing

16   sentence, not just that but as you are obviously aware

17   through the Fatico hearing conducted before you,

18   Mr. Valerio was obviously present and we had a dialogue

19   with him before and after every day of those hearings to

20   discuss not only direct examination but the

21   cross-examination of each witness.

22        THE COURT:  Mr. Valerio, has Mr. La Pinta

23   accurately described the nature of his interactions and

24   Mr. Lato's interactions with you as relates to their

25   representation of you, is that accurate?

7

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  I just want to see if there are any

3     objections to the presentence report and let's start with

4     the guidelines offense level, criminal history.

5          I don't think there are any objections to that

6     calculation.  I do want to address Mr. Lato's multiplicity

7     issue, but in terms of the calculation, level 47, criminal

8     history category I, do both sides agree that's a proper

9     calculation of the guidelines?

10          MR. LA PINTA:  Your Honor, with your permission

11     we'd like to kind of dissect our responsibilities here on

12     being joint counsel.

13          Mr. Lato is going to address the guidelines and

14     any legal matters since he authored all of the

15     submissions.  I'm going to deal with the PSR, family

16     matters and other facts regarding the proceeding, if

17     that's okay with you.

18          THE COURT:  That's fine with me.

19          Mr. Lato, I know you have an issue with the

20     multiplicity, but just in terms of the offense level and

21     criminal history, is there any objection to that?

22          MR. LATO:  No, your Honor.

23          THE COURT:  Does the government have any

24     objection to that?

25          MR. KABRAWALA:  No, Judge.

8

1    THE COURT:  I don't know if the defense disputes

2  that and it's not material but I want it to be accurate

3  that Jane Doe number one was two years old at the time of

4  the offense and not three, is that accurate?

5    MR. LATO:  It is immaterial, your Honor, but let

6  me just hear from Mr. Valerio.

7    THE COURT:  Okay.

8    (There was a pause in the proceedings.)

9    MR. LATO:  Since we are not certain, we will not

10  object to what's in there.

11    THE COURT:  Three is in there and the government

12  says that's wrong, it's two.

13    MR. LATO:  Then I'll go with what the government

14  says.

15    THE COURT:  I wanted the record to be clear and

16  I want it to be accurate but it is immaterial, two versus

17  three.

18    So I adopt the offense level computation

19  contained in the presentence report in its entirety.  I'm

20  just going to summarize it for the record, but I adopt it

21  in its entirety.

22    For the grouping of what they consider group

23  one, which includes the conspiracy to commit sexual

24  exploitation of a child as relates to Jane Doe number 1

25  it's a base offense level 32.  Because she had not

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

9

1    attained the age of 12, four levels are added, because it

2    involved sexual contact with Jane Doe number one, two

3    levels are added, and because Mr. Valerio communicated

4    with Ms. Kalichenko via computer to persuade her to engage

5    in the sexually explicit conduct with Jane Doe number one,

6    two levels are added. That's offense level 40 for that

7    group.

8          And then with respect to the second group,

9    counts 14 and 15, the attempted sexual exploitation of a

10   child, it's a base offense level 32, Jane Doe number two

11   was 6 years old at the time so four levels are added. She

12   was related to the defendant, so two levels are added, and

13   that's an adjusted offense level of 38. Under the

14   multicount adjustment, the combined adjusted offense level

15   is 42.

16         Because the defendant engaged in a pattern of

17   activity involving prohibited sexual conduct, five levels

18   are added, and, therefore, the offense level is 47 in

19   terms of 4B1.5B1, and there is no acceptance of

20   responsibility points. The criminal history category, he

21   has one point from a 2006 conviction. So he maintains

22   criminal history category I.

23         That results in a range under the chart of life,

24   and advisory range of life. However, as the government

25   acknowledges, the defense obviously agrees, because there

10

1   is no count individually that carries a life sentence, the

2   law requires the court to whatever the statutory maximum

3   is of all the counts together becomes in effect the

4   advisory guideline range, it becomes a number.

5        The government asserted that that number just

6   adds up all the counts is 410 years, but as Mr. Lato --

7   I'll hear from the government, I think Mr. Lato is correct

8   that there are some attempt counts that are completely

9   subsumed in count two which is the actual sexual

10  exploitation of a child from April 1 of 2012 to November 1

11  of 2012. So I believe to sentence him on those attempts

12  which are counts nine through 13 would be a violation of

13  the double jeopardy clause.

14       So I believe given he was convicted of

15  count two, that the court should dismiss counts nine

16  through 13. Is there any objection to that?

17       MR. BODE: We would just ask, your Honor, that

18  that be without prejudice should there be some issue that

19  arises in the future and some other count falls by the

20  wayside that we would then ask those counts -- the jury

21  verdict be reinstated, so either dismissed without

22  prejudice or there be no sentence issued on those counts,

23  including not even the special assessment on that count.

24       THE COURT: I'm not issuing the special

25  assessment on those counts, but I will dismiss them

11

1    without prejudice if there were to turn out to be some

2    problem with count two.  I don't believe that the

3    dismissal should be with prejudice on those counts.  I

4    will dismiss them without prejudice, but I am not going to

5    impose any sentence on those counts.

6          So, Mr. Lato, I think correctly figured out the

7    math, which is the remaining counts have 260 years of

8    exposure.  So that becomes the effective advisory range or

9    number in this case.  Obviously pursuant to **United States**

10   **v Booker**, the sentencing guidelines are advisory.  They

11   are only one factor the court is to consider among all the

12   statutory factors and I'll now hear from both sides

13   regarding the factors or anything else they wish to say

14   starting with the defense.

15         I should ask you, I guess, do you have any

16   objections to the report?

17         MR. LATO:  No, your Honor.

18         THE COURT:  Does the government have any

19   objections to the report?

20         MR. KABRAWALA:  No, your Honor.

21         THE COURT:  I adopt all the information in the

22   presentence report as factual findings of the court in

23   addition to my findings at the Fatico hearing.

24         Go ahead.

25         MR. LATO:  May I have one moment to confer with

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

12

1    Mr. La Pinta?

2              THE COURT:  Sure.

3              (There was a pause in the proceedings.)

4              MR. LATO:  With the court's permission, your

5    Honor, Mr. La Pinta is going to start off.  There are

6    certain 3553 factors that he's better off addressing, some

7    that I'm better off addressing, if that's fine with the

8    court.

9              THE COURT:  That's fine.

10             I wanted to confirm with Mr. Valerio directly

11   that you have had sufficient time to discuss all the

12   documents, the presentence report, the addendum, the

13   recommendations and had sufficient time to discuss them

14   all with your attorneys.

15             THE DEFENDANT:  Yes.

16             THE COURT:  Go ahead, Mr. La Pinta.

17             MR. LA PINTA:  Thank you, Judge.  Do you mind if

18   I use the podium?

19             THE COURT:  That's up to you.

20             MR. LA PINTA:  Your Honor, before I begin please

21   note in court here today on behalf of Joseph Valerio is

22   his mom, Frances Valerio, his sister, Bernadette

23   Imperially, his uncle Gerolamo Valerio, his aunt, Dominica

24   Valerio, and his other uncle John Toussa, many of those

25   family members have written letters for your consideration

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

13

1  and I'm sure you understand and remember the family

2  dynamic from the prior proceedings involved in this case.

3         As you are aware, the Valerio family are

4  Sicilian immigrants.  Mr. Valerio's father, Phillipo

5  Valerio, migrated here as a young child, married his wife

6  Frances and raised their family, first I believe in the

7  Queens area, Brooklyn area and then moved to Long Island

8  where they raised their two children in Massapequa.

9         The family was raised under traditional Italian

10  family traditions, I'll say, traditions that as we all

11  stand members of our society here today were not

12  traditions that are acceptable to anybody.  They are

13  traditions that permeated the family through the acts of

14  severe domestic violence, at the hands of Mr. Valerio's

15  father, Phillipo.  We have gone to great lengths, your

16  Honor, to address these issues.  Dr. Barday also gave

17  great reference to those facts in his report, as we

18  believe they are very relevant in terms of understanding

19  the total picture of who Joseph Valerio is.

20         Joseph Valerio undoubtedly and his sister,

21  Bernadette, grew up under very, very difficult family

22  circumstances that have severely affected both of them as

23  adults.  They both witnessed severe spousal abuse at the

24  hands of their father on their mother, and Joseph Valerio

25  also experienced abuse at the hands of his father as well,

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

14

1  physical abuse and other abuse.

2       That's molded a young Joseph Valerio into the

3  man that he is today, and I don't say that in any type of

4  good way.  But I want you to know that besides all of the

5  very troubling facts and circumstances that you know

6  Joseph Valerio by, that there is good in Joseph Valerio.

7  One thing that has been consistent to me since coming on

8  to this case upon his arrest is the fact that his family

9  members are all very devoted to him and all categorize him

10 as nothing short of a committed, loving son, brother and

11 nephew.

12      As a young child he shared a very close

13 relationship with his mother, was her protector,

14 confronted his father on numerous occasions when

15 witnessing abuse that resulted in his abuse at the hands

16 of his father.  As most Italian immigrant families, what

17 was said in the house and what was done in the house

18 stayed in the house.  Nothing was spoken outside of the

19 house.  That would have been a sin against the family.

20      As a result, there was no intervention by

21 professionals.  There was no helping hand to help ease the

22 pain of the physical and other abuse that was going on in

23 that household, and it wreaked havoc on the two children.

24 Mr. Valerio graduated high school, attended college for a

25 short period, worked in a family business and was involved

15

1   in real estate for the better part of his adult life.

2   He's had many relationships, some of which you are well

3   aware of, that have all failed miserably.  Not only have

4   they failed miserably, but they were all permeated and

5   destructed by violence and sexual exploitation.

6        A good part of our presentation here today, your

7   Honor, and our submissions relies on Dr. Barday's

8   evaluation of Mr. Valerio.  He's undertaken a very

9   thorough evaluation, not only of Mr. Valerio, he's met

10  Mr. Valerio numerous times at the MDC and has employed a

11  number of different well known objective testing

12  techniques to provide the court with as thorough as

13  possible of an abstract regarding who Mr. Valerio is.

14       He's employed a number of tests such as the able

15  assessment for sexual interest, the HCR-20 evaluation, the

16  HCR-20, the static-99, in addition to spending time with

17  Mr. Valerio, I believe on three or four occasions at the

18  MDC over hours and hours of discussions.  Dr. Barday also

19  met with his mother Frances Valerio and sister Bernadette

20  and spoke with them independently about the upbringing in

21  the family in order to understand and draw an accurate

22  picture of what existed there and then.  He's also

23  conducted other collateral interviews and has given the

24  report that you have read.

25       Dr. Barday's opinion is that Joseph Valerio is

16

1   not a pedophile.  He does suffer from some severe profound

2   psychological ailments.  Page 12 of the report diagnoses

3   Joseph as having voyeuristic disorder, frotteuristic

4   disorder, antisocial personality traits and also has

5   commented on his excessive alcohol use and drug use,

6   meaning cocaine use, all being contributing factors in the

7   life of Joseph Valerio that has contributed to the conduct

8   that has brought him before the court here today.

9           Mr. Valerio also has serious and physical

10   ailments in his past.  He's a cancer survivor.  He had

11   surgery on the thyroid gland.  Most of that gland was

12   removed.  While in jail he's had a number of other

13   problems physically that he sought medical attention for,

14   and as we are all well aware, unfortunately, the MDC and

15   all of the jails aren't exactly the perfect environment to

16   obtain first-class medical care from.

17           But with all that said, in all candor, we face a

18   monumental obstacle here, your Honor, in terms of trying

19   to convince you to save this man's life.  What I mean by

20   saving his life is to provide for some day Joseph

21   Valerio's return to society.  Under the framework of the

22   facts of this case, it may be difficult to understand that

23   the redeeming qualities of this man has deserves freedom

24   one day in his life.

25           But we believe he does.  We believe that he does

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

17

1    deserve to come home from jail and to spend the rest of

2    his life with his family because what we have observed and

3    what Dr. Barday has mentioned in his report is that since

4    being incarcerated, since being interviewed and evaluated

5    by Dr. Barday, for the first time in his life I think

6    Joseph Valerio understands what he is about, understands

7    the sickness and problems that he's had.

8          And I think that Dr. Barday mentions and is

9    quite of common nature in my opinion having had dealings

10   with psychiatrists and representing clients in the past

11   that the first real step in rehabilitation is

12   understanding and appreciating the problems that one has

13   and accepting the conduct and consequences of it.  And I

14   will tell you firsthand that in the hours and hours and

15   hours that we have spent with Mr. Valerio at the MDC, I

16   can tell you that he's come to terms with who he is and

17   what he is.  He understands the nature of his crimes being

18   of disgusting, despicable acts.  He understands the

19   destruction that he's caused to not only the children

20   involved here but his family as well.

21         While no one will argue that the heavy hand of

22   the law must come down today, your Honor, we argue that

23   that heavy hand does not crush and destroy the rest of

24   Mr. Valerio's life.  We would ask that you consider

25   Dr. Barday's report, the unique family circumstances that

18

1  existed in the Valerio household, and understand that as

2  mitigating factors and how someone could be developed into

3  the person that would conduct this conduct.

4        So I'll leave you with one last thought.  I'd

5  like to think that each and every one of us here in our

6  society has both good and bad in them.  Sometimes the bad

7  overshadows the good and sometimes the good overshadows

8  the bad, and I don't envy your position in trying to come

9  up with an appropriate sentence in a case like this

10  because anyone that would know the facts and circumstances

11  here would instinctively want to incarcerate this man for

12  the rest of his life.

13        But I ask that you not do so, and that you

14  understand that there is good in Mr. Valerio and allow him

15  to continue to come back to society one day and hopefully

16  live his life then and there as a productive member of

17  society.

18        I'm going to continue and transfer the

19  presentation over to Mr. Lato.

20        THE COURT:  Thank you, Mr. La Pinta.

21        MR. LA PINTA:  Thank you.

22        MR. LATO:  I'm going to wait until you look up

23  because I know you were writing something.

24        THE COURT:  I'm writing.

25        MR. LATO:  Okay.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

1          THE COURT:  Go ahead.  Thanks.

2          MR. LATO:  Because your Honor has read my

3     submissions I'm not going to be repetitive.

4          I just want to talk a little about general

5     deterrence and not about Mr. Valerio in particular.

6     Mr. La Pinta has done that somewhat and if he wishes to

7     continue afterward I'm sure your Honor will give him the

8     chance.  But all of this talk about 60, 50, 40 years it's

9     all nonsense as I point out in my letter because given

10    Mr. Valerio's life expectancy, anything 34 years or more

11    is a de facto life sentence.  So the question really

12    becomes should he die in jail.

13         And where I come from that is in terms of

14    general deterrence is that in the criminal justice system,

15    we assign greater penalties to the crimes we consider

16    harsher than others.  For instance, there is a reason why

17    murderers get life imprisonment, and other people

18    typically do not.  Why?  Because society has determined

19    that killing another human being is the most serious crime

20    and I'm leaving out other crimes such as treason which are

21    in the constitution.

22         What I wanted out in my letter is that if we

23    believe in general deterrence, here is the problem.  The

24    whole idea of general deterrence you want word to get out

25    there to would-be wrongdoers that certain behavior will

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

20

1    not be tolerated, and that's a good thing but one has to

2    be careful. For instance, if, in fact, kidnapping were

3    automatically a life sentence, would-be kidnappers who

4    learn the law out there would say if I have a victim, what

5    do I lose by killing this victim? And obviously if we are

6    talking about people with a history of sexual abuse where

7    there is no hope for these people, even though they didn't

8    kill the victims, these people are so dangerous they have

9    to be put away for life.

10       But is that really necessary with Mr. Valerio?

11   Is he really going to be a danger to people in their 70s?

12   Do we really want to get word out there that if you take

13   pictures of a young child naked, as horrible as it is, you

14   are going to get 40 or 50 years in jail? What's going to

15   happen when these sentences start to become prevalent and

16   some lunatic out there who is photographing these kids

17   decides to kill that little child? That's my big concern.

18   I'm not talking about Mr. Valerio. I'm just talking about

19   general deterrence in particular.

20       And as I pointed out in the letter, Mr. La Pinta

21   and I always knew, even before the Fatico hearing, your

22   Honor was not going to give Mr. Valerio 15 years and your

23   Honor would not have gone to the trouble of rendering that

24   decision unless your Honor were considering a sentence

25   well above 15 years and I'm not going to speculate what

21

1   number your Honor has in mind.

2          But I think that under these circumstances, for

3   the reasons Mr. La Pinta stated and all of our

4   submissions, as bad as what Mr. Valerio did, in terms of

5   general deterrence I think it's shortsighted to give him a

6   life sentence, but that's my view and maybe I'm wrong.

7          THE COURT:  Mr. La Pinta, is there anything else

8   you want to add before I hear from Mr. Valerio?

9          MR. LA PINTA:  I don't.

10         I just neglected to mention to the court, it's

11  in the PSR, that he does have two children and while he

12  was a member of society has always provided financial and

13  emotional support for his children.  He's been as good of

14  a father as he could be and I don't want to not mention

15  that because I think that's important for your

16  consideration.

17         Thank you.

18         THE COURT:  Thank you.

19         Mr. Valerio, you also have the right to speak at

20  your sentence.  You can say anything you wish to say.

21         I obviously read the long letter that you

22  submitted, which was a good letter, but you also can say

23  anything you want to say today.  You can remain seated.

24         MR. LATO:  May we just have one moment, your

25  Honor.

22

1    THE COURT:  Yes.

2    (There was a pause in the proceedings.)

3    MR. LATO:  We are ready, your Honor.

4    THE COURT:  Go ahead, Mr. Valerio.

5    THE DEFENDANT:  Yes, your Honor.

6    I have been waiting for a long time, 40 months

7    now of incarceration to express my humbleness in all that

8    I have done wrong to my victims, and witnesses.  The

9    horrible heinous acts that I have committed, the innocence

10   in the children's lives that I look upon my own daughter

11   and my son and I came to grips of why I did such horrible,

12   horrible things to my victims and witnesses.

13   I was so consumed with addiction, drugs,

14   alcohol, mainly sexual addiction.  I had no control over

15   it at the time, your Honor, and I look back.  I cry many

16   nights for my victims, my family, and I feel the pain and

17   I can just imagine what I put them through at the time.

18   These are people that genuinely loved me and they put

19   their trust and their heart and soul into my hands and I

20   discarded all of that.  I took advantage of the love that

21   they gave me, the innocence that was there before me, and

22   I destroyed that.

23   My two adult victims loved me to the point where

24   they wanted to marry me.  I took that for granted, your

25   Honor, and I imagine each day that I sit in prison, the

23

1   thoughts that go through their minds about how they loved

2   me and how they trusted me, to want me to adopt one of my

3   victims' child, to place that trust in me and discard that

4   with all my sick, dark desires.

5           I'm soon to be a 51 year old man, your Honor.  I

6   think of my family each and every day.  I think of my

7   daughter which I will never see again in my life who is

8   now in a foreign country.  I had gotten to see my daughter

9   January of 2016 at MDC facility, I believe able just to

10  glance at her, and I thought about my victims' innocent

11  children, how they are so precious like my daughter, this

12  beautiful little child that I created with my

13  ex-girlfriend, her mother.  She genuinely loved me.

14          My victims put their trust in me, and I let them

15  down, and I feel for them like no other can feel for them.

16  I was consumed with sexual desire and that took over my

17  feelings for them.  The money that I had was a power over

18  them, was a tool in lieu for their sexual desires.

19          This is where I started to spin out of control.

20  After my father's death I experimented with many other

21  drugs, K 2, I was heavily on cocaine.  Wherein my

22  distorted way of thinking for that phase in time to think

23  of a child as a toy, to take away that child's innocence,

24  not even being in the same country, but ordering somebody

25  that I loved and she loved me as well, to direct her to do

24

1     something so horrible as that, I still can't come to grips

2     of where and how in my mind was functioning at that time,

3     your Honor.

4              But I think each and every day of my victims,

5     and I told both my attorneys where I went wrong, and I

6     should have married my ex-girlfriend.  Perhaps marriage

7     would have kept me on the righteous path, but I took them

8     for granted.  I took this control over them just the way

9     my father had control over me and my family, with the

10    abuse, with the demands, and with the physical desires and

11    the physical pain that was inflicted on me.

12             My father displayed these acts in front of me

13    with my mother, with my sister.  This made me an angry

14    young man developing into a man of many addictions.  Being

15    a musician I got involved in the drug scene, and I found

16    myself in a distorted world of fantasy.  I used women the

17    wrong way, and with Dr. Barday, he completely turned my

18    life around.

19             Other than my Uncle John being a social worker

20    who has counseled me in his own way, Dr. Barday was like a

21    revelation in my life.  The times that he visited me, I

22    was able to connect to where my addictions stem from, and

23    all the people that I hurt in my life.  He was able to

24    conclude where my trouble began and obviously where my

25    trouble ended today.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

25

1         I want to be this rehabilitated man. I am

2 willing, able and I'm ready, after 40 months of

3 incarceration, dealing with other inmates who knew of my

4 case, who have approached me and have assaulted me in

5 prison. I felt this was part of my punishment for doing

6 the heinous acts to innocent children, to victims who love

7 me, who gave me their all, who proposed to me and wanted

8 family with me.

9         I plan, your Honor, to become a better

10 rehabilitated man. That's my promise to you, your Honor,

11 my promise to my family, especially my mother who's been

12 there for me soon for 51 years of my life. No other woman

13 has been there for me like my mother has, and that's the

14 bond we have. We protected each other when it came to my

15 father's abuse. We looked after each other. We kept each

16 other calm and at peace when there was disorder and

17 destruction and abuse in my early childhood.

18         Your Honor, I ask of you, please, to consider

19 leniency on my sentence. It's my promise to you, your

20 Honor, and the prosecutors, all law enforcement that gave

21 their time and everything that they have done to keep

22 order on the streets and they have done everything

23 possible to make sure that I'm removed from society and I

24 become a rehabilitated, righteous man.

25         I made a promise to God during my years of

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

26

1    incarceration when I reached the age of 50 to minister my

2    bible study classes.  I found in better rehabilitation

3    than the word of God, examples like Paul and Joseph who

4    dealt with wickedness and sin, and I have learned from

5    that, your Honor.  I put my head down in sorrow, your

6    Honor, being a fellow Italian American in shame, and I

7    feel the shame every time I come into this courtroom.  Law

8    enforcement that does their job well, I respect what they

9    do.

10            So, your Honor, I thank you for taking the time

11   to read my letter.  Please, your Honor, look deeply and

12   look past all my sins and please look at my family behind

13   me who are there for me, who are waiting for me, waiting

14   for that time to see a rehabilitated man.

15            Thank you, your Honor, for taking the time.

16            THE COURT:  Let me just say this, Mr. Valerio,

17   before I hear from the government.

18            I wasn't sure exactly what you were going to say

19   before I received your letter.  I know Dr. Barday had said

20   that you expressed some remorse in the last sessions that

21   he had with you, but I take your remorse at your word.  I

22   understand the childhood circumstances.  That seemed like

23   a horrific situation that you and your family were in with

24   your father.  I don't want you or your family to think I'm

25   not considering all those things.

27

1          I have considered all those things and remorse

2     is important.  Obviously I have to consider other things

3     as well, but I think it is important.  The first step

4     forward in any situation like this is to acknowledge the

5     wrongfulness of the conduct and to be willing to try to

6     change.  I do give you credit for that.

7          I'll hear from the government.

8          MR. KABRAWALA:  Since his arrest in January of

9     2014 and then his rearrest in February of 2014, we have

10    been witness in this courtroom to the path of destruction

11    that the defendant has left in his wake.

12         Judge, the government has asked for a 60-year

13    sentence and we don't do that lightly.  We are acutely

14    aware that that is a very significant sentence.  The

15    reason we are asking for that sentence and we join in

16    probation's recommendation of that sentence is simply that

17    the defendant is dangerous.  The defendant is dangerous

18    because he is deliberate.

19         We have seen in this courtroom the deliberation

20    with which Mr. Valerio has acted.  We have been witness to

21    the incident in 2005 that occurred at Splish Splash when

22    the defendant deliberately assaulted a woman in a wave

23    pool while he was on probation for that offense, the

24    defendant was found with videotapes that he had secretly

25    taped nannies and caretakers in his home who were unaware

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

28

1    they were being filmed.

2         He was deliberate when he sexually exploited the

3    two victims in this case, one being a two year old.  He

4    was deliberate when he convinced Kalichenko to make

5    sexually explicit videos of her own daughter.  He was

6    deliberate when he sexually exploited his six year old

7    niece and then convinced his family that he was taking

8    modelling, legitimately modelling photographs of his

9    niece.

10        He was deliberate when he chose to victimize the

11   woman known as AD.  He repeatedly abused her, made her

12   life a living hell.  Your Honor has read her letter that

13   was annexed to our May 8, 2017 letter.  Her life has been

14   completely transformed in a bad way because of the

15   defendant's involvement in her life.  He raped her

16   countless times.  He broke her teeth.  He knocked her out.

17        He was deliberate when he sexually assaulted and

18   repeatedly raped his coconspirator, Kalichenko.  He was

19   deliberate and dangerous when he tried to adopt a child

20   from the Ukraine even after the relationship with he and

21   Kalichenko terminated.

22        He tricked an au pair to come to the

23   United States on her gap year after she graduated from

24   high school in the United Kingdom.  He convinced her and

25   the agency for which she worked that he legitimately had a

29

1    daughter who needed care. So she came here on her gap

2    year, only to learn immediately that the defendant did not

3    have a young child and that was only after the defendant

4    tried to convince her to wear fetish outfits and go to

5    some sort of sex party with him. This is only a sampling

6    of what we know about.

7            Simply put, the defendant has shown there are no

8    limits to the lengths that he will go to deceive and trick

9    others and abuse others and exploit others.

10           A point about Dr. Barday. Now, Dr. Barday's

11   evaluation in many ways is flawed. Dr. Barday

12   acknowledged during his Fatico hearing testimony that he

13   had not fully accounted for the defendant's violent rape

14   of AD and of Kalichenko. The court has credited the

15   testimony of AD and of Kalichenko and Lucy Down, and the

16   government has proven those acts by a preponderance of the

17   evidence.

18           The court should consider seriously Dr. Barday's

19   evaluation and his opinion, but the court should be

20   mindful that Dr. Barday found Mr. Valerio to be only a

21   moderate risk, which is still a substantial risk of

22   dangerousness and recidivism. Once the court concluded

23   that the government proved the defendant's violent acts

24   towards AD and toward Kalichenko, that risk of recidivism

25   and dangerousness is only enhanced.

30

1    Finally, the defendant has asked for essentially

2    a second chance.  He's received that second chance

3    already.  He received it in 2005 when he was sentenced to

4    a mere term of probation for sexually assaulting a Long

5    Island woman in a wave pool.  He has demonstrated since

6    that time that he cannot be trusted, that he will

7    manipulate others, and that he is a danger to our

8    community.

9        Thank you.

10       THE COURT:  Thank you, Mr. Kabrawala.

11       I'm now going to state the sentence I intend to

12   impose and give the lawyers a final opportunity to make

13   any legal objection before imposing the sentence.

14       In considering this sentence I have carefully

15   gone through and considered all the factors set forth by

16   Congress in Section 3553(a), which include among others,

17   I'm not going to list all of them but I have considered

18   all of them, the nature and circumstances of the offense

19   and the history and characteristics of Mr. Valerio, the

20   need for the sentence imposed to reflect the seriousness

21   of the offense, to promote respect for the law, to provide

22   a just punishment for the offense, to afford adequate

23   deterrence to criminal conduct, and to protect the public

24   from further crimes by the defendant.

25       I have also considered the advisory sentencing

31

1    guidelines issued by the sentencing commission and the

2    applicable range or number in this case, the advisory

3    number as well as the applicable policy statements issued

4    by the sentencing commission.

5         I have also considered the need to avoid

6    unwarranted sentencing disparities among similarly

7    situated defendants and although it was not mentioned here

8    today in court, both sides briefed that issue fully in

9    their written submissions to the court and I certainly

10   have considered not only sentences that I have imposed,

11   but that other judges have imposed in this area of crime.

12        Having considered those factors and all the

13   factors I intend in my discretion to impose a total

14   sentence of 60 years in jail, 720 months, and I don't do

15   that instinctively or emotionally. I do it with great

16   thought and pause and having reconsidered it several times

17   whether or not that's the appropriate sentence and I

18   conclude it is for the following reasons.

19        I'm not going to go into great detail about the

20   instant offense. It's all in the presentence report. It

21   all came out at the trial, but the instant offense

22   involved extremely violent conduct towards children. It

23   showed the defendant to be a compelling danger to the

24   community, especially to children. I think it's an

25   aggravating factor the way it was done in terms of the

32

1   defendant directing Ms. Kalichenko, scripting out how she

2   should abuse her two year old daughter in the Ukraine,

3   sending him multiple videos for money.

4       Those e-mails that the government noted in its

5   papers that contained promises, threats, treated her in

6   such a demeaning, degrading, humiliating way as an object

7   to make her completely dependent upon Mr. Valerio as he

8   noted today with money, other promises and threats so that

9   she would do his bidding, including exploit her own

10  infant, the extremely callous disregard for the well-being

11  of others is one that just shows extreme danger to

12  society.

13      I also note obviously that sexual exploitation

14  of the niece, how the basement was set up, the six year

15  old girl betraying the trust that was given to him as an

16  uncle and as the government noted deceiving and

17  manipulating people in order to satisfy his desires.  So

18  the counts of conviction demonstrate the defendant to be

19  extremely violent and dangerous and a clear and compelling

20  danger to the community especially to children at the

21  highest level.

22      I believe the level of danger is only further

23  confirmed by his history and characteristics as an

24  individual.  As the government noted we are not dealing

25  with a 20 year old individual who had a horrific abusive

33

1   childhood and is a young man trying to deal with that.

2   This is a man at the time of these crimes was in his late

3   40s, and his history and characteristics show that he is

4   not only a danger to children, but he's a danger to women

5   as well.

6           His 2006 conviction for attempted forcible

7   touching, although it was only a misdemeanor, it involved

8   grabbing and attempting to penetrate the genital area of

9   an adult female in a wave pool.  As the government noted,

10  his adjustment on supervision from that probation was

11  unsuccessful, problematic in many ways that are outlined

12  in the PSR that I won't repeat.  But he was given a chance

13  with treatment there and did not take that opportunity.

14  It only led to even more violent conduct in connection

15  with the instant offense as well as the other conduct that

16  I'm about to go into.

17          His extreme dangerousness was further

18  corroborated at the Fatico hearing.  As I said, those

19  women were completely credible to me.  I listened to them

20  testify.  I could hear it in their voice.  I could see it

21  in their eyes.  There was no question that those events

22  happened as they articulated.  AD testified to physical

23  and sexual abuse including rape, repeated threats to

24  killing her, being on a secluded road but grabbed by the

25  hair, smacking her head against the dashboard, telling her

34

1   tonight you are going to die.

2          She jumps out of the car. Her daughter's in the
3   back seat, backs up, hits her in the head with the open
4   door. I mean, this type of violent conduct I think shows
5   the level of dangerousness that Mr. Valerio has, and there
6   were other incidents as well including rape and when she
7   terminated finally the relationship with him, is when he
8   knocked her unconscious and broke her teeth and threatened
9   to kill her if she told the truth about what happened.

10         Ms. Kalichenko's testimony was also extremely
11  credible, and in many ways mirrored in some respects AD's
12  testimony in terms of how she was treated by Mr. Valerio
13  in terms of the violence and rape, and Ms. Downs, although
14  that didn't involve any type of sexual assault, I think
15  just corroborated the manipulativeness and deceptive
16  behavior Mr. Valerio has engaged in his life in order to
17  engage in this type of violent conduct towards women and
18  towards children.

19         So the counts of conviction and this history of
20  violence show him to be, which is clear to me he is an
21  extremely dangerous individual, that this court needs to
22  protect society from for the rest of his life. I don't
23  believe there are any limits on what he would do to
24  satisfy his sexual desires to women or to children. So
25  society needs to be protected. I don't believe his level

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

35

1    of dangerousness will diminish over time.  I think his

2    risk of recidivism is extremely high.

3         I have considered general deterrence.  I won't

4    say it's the driving force in this sentence.  It is a

5    consideration and certainly this type of conduct should be

6    met with extremely severe sentences to send a message to

7    others out there victimizing children in the way that

8    Mr. Valerio did in this case.  So it is a factor, but the

9    primary factor is that this sentence needs to protect the

10   public because of the danger I view him as, and to reflect

11   the seriousness of the offense.

12        All that led me to conclude that 60 years

13   imprisonment, which is effectively a life sentence is

14   warranted, sufficient and no greater than is necessary to

15   reflect all of the factors.

16        I do want to spend one moment on the arguments

17   in mitigation.  I don't want the fact that I adopted the

18   recommendation of the probation department and the

19   government to be viewed as I just cast aside the

20   significant submissions and letters and hearings.  I

21   considered all those things, but I don't believe that a

22   sentence less than the one I'm imposing would properly

23   balance all the factors.

24        First, I did consider the report and testimony

25   of Dr. Barday, but I don't believe it warrants a lower

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

1   sentence for several reasons.  He acknowledges in his

2   report on page 15 that the presence of manipulative

3   impulsive antisocial personality put Mr. Valerio at a

4   moderate risk of reoffending and dangerousness in the

5   presence of history substance abuse, legal impulsive

6   acting out of interpersonal chaos, further aggravates his

7   risk of hurting others.  These are corroborated by the

8   actuarial risk assessment tools he used.  So you have him

9   putting Mr. Valerio at a moderate risk which is obviously

10  significant when you are talking about the type of

11  activity that Mr. Valerio was involved in in terms of

12  reoffending.

13       But I believe that this understates the risk for

14  a couple of reasons.  The government pointed out that he

15  did not take into account the defendant's violence towards

16  Ms. Kalichenko or AD and at the hearing he said that in

17  his report he suggested one of the reasons he only put it

18  at moderate was because he hasn't threatened lives of

19  others, he hasn't caused his victims physical harm.  So he

20  was assuming facts that we know to be incorrect.

21       We know that he's threatened the lives of

22  others.  We know he has caused victims physical harm

23  including rape and sexual assaults and beating.  And he

24  conceded at page 58 of the hearing that I think the

25  government said if you assumed those things were true,

1   would his risk be even higher and I think he answered yes

2   and it's obvious that the risk would be higher and that's

3   why I conclude that it is higher.

4         He did mention treatment could help, but as the

5   government pointed out he did have a chance to receive

6   treatment many years ago and was unsuccessful. Dr. Barday

7   does suggest the difference might be that Mr. Valerio now

8   has finally some remorse for his conduct. I have some

9   concerns regarding that because prior to receiving his

10   letter and hearing his statement today his level of

11   remorse was extremely weak.

12         Even Dr. Barday acknowledged that he met with

13   the defendant for many years after the jury's verdict

14   which was in November of 2014, and met with him in

15   December of 2014, February, March and June of 2015, and

16   said that he didn't view his behavior as disturbing. He

17   was not deeply troubled by this aspect of his sexuality,

18   but not motivated to deal with it. So he had someone for

19   years even after his conviction was still in complete

20   denial that he had done anything that he should be dealing

21   with or be concerned about.

22         Dr. Barday did say that he finally made that

23   jump in one of the last meetings and obviously the letter

24   and the statements made in the courtroom do indicate a

25   level of remorse and I have considered that, but I don't

38

1    believe that even though Mr. Valerio obviously promised

2    that he would turn his life around, I don't believe that

3    that is sufficient to undo all the evidence before me of

4    the violence that he's been involved in for a number of

5    years, both to his children and to women.

6            I don't think there is any indication that his

7    level of danger would be significantly reduced.  At this

8    point, as we sit here today, to me it is way too

9    speculative just based upon his promise for me to conclude

10   that the danger, that compelling danger to society that I

11   believe exists will be diminished at any time during his

12   life.

13           So that's how I arrived at this sentence.  I

14   want to mention the sentencing disparity question.

15   Mr. Lato did point out that Judge Chen gave a 28-year

16   sentence to an individual Randazzo who was engaged in

17   similar type of sexual exploitation.  A 25-year sentence

18   was given by Judge Hurley to a guy named Wernick, and I

19   didn't go back to those cases to look at what their

20   history and characteristics were, whether they had the

21   violent acts that I have found existed in this defendant's

22   past, so I'm not sure if they are completely analogous to

23   the entire record before me.

24           In any event, assuming they were because there

25   are some sentences out there that are lower does not mean

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

39

1   that this factor is weighing in Mr. Valerio's favor.  The

2   government points out in a very long cite numerous

3   sentences of this severity are higher, including Judge

4   Feuerstein's 90-year sentence in the McGowan case, the

5   60-year sentence by Judge Mauskopf in the Brooks case, the

6   75-year sentence in the Schneider case.  I don't believe

7   the sentence is disproportional to other sentences for

8   similar type conduct as the court has found here.

9        The final thing I'll say is I am sensitive,

10  Mr. Lato spent a lot of time in his papers and mentioned

11  it today as well that sentences of life or the equivalent

12  of life are usually reserved for murder.  The Second

13  Circuit has tackled and discussed this issue in several

14  opinions over the past few years including United States v

15  Brown where Judge Pooler dissented making that point and

16  last week there was a case US v Ulbricht, that sentence

17  was imposed by Judge Forrest in a case it was a bit coin

18  case where certainly there were large amounts of drugs

19  involved but he was not convicted of any murder and the

20  Second Circuit again discussed that.

21       And I am sensitive to that.  I have never

22  sentenced anyone to this amount of time that did not

23  involve a murder, but I believe this is the extraordinary

24  case, given the combination of factors and all the

25  evidence before me, that an effective sentence of life is

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

40

1    necessary to, among other things, protect the public from

2    the dangerousness that I believe the defendant poses to

3    the community, notwithstanding his words today.

4         That's the sentence I intend to impose.  I don't

5    think it's necessary given the length of the sentence but

6    I am going to impose a lifetime supervised release.  If

7    somehow he were to get out for any reason, he certainly

8    should be on supervised release with all the conditions

9    that would be necessary to monitor his activity, even

10   though I don't expect that to happen.

11        I don't intend to impose a fine, although he

12   obviously has financial means, given the forfeiture in

13   this case and the other aspects of my sentence, I don't

14   believe an additional fine is necessary.

15        I intend to impose the special assessments

16   except on counts nine through 13 which I'm dismissing

17   without prejudice as multiplicitous, and I'm not ordering

18   any restitution.  And I intend to impose on the counts as

19   set forth in the recommendation to achieve a 60 year

20   sentence.

21        Is there any legal reason why I cannot impose

22   that sentence from the government's standpoint?

23        MR. KABRAWALA:  No, your Honor.

24        THE COURT:  From the defense standpoint?

25        MR. LA PINTA:  No, sir.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

41

1     THE COURT:  It is the judgment of this court,

2   Mr. Valerio, in its discretion that you be sentenced to

3   the custody of the Attorney General through the

4   Bureau of Prisons to a total term imprisonment of 60 years

5   or 720 months, consisting of the following:

6         On counts one through three, six, seven, eight

7   and 14, I sentence you to the statutory maximum of 30

8   years on each count to run concurrently to each other.  On

9   counts four and five I sentence you to 20 years

10  imprisonment, the statutory maximum on each count which

11  will run concurrently to each other but consecutively to

12  the sentences imposed on the above counts and, finally, I

13  impose a ten-year sentence on count 15, again the

14  statutory maximum, to run consecutively to the sentences

15  that I have imposed on the other counts for a total

16  sentence of 60 years.

17        I impose lifetime supervised release to follow

18  any term of imprisonment should you get out with the

19  standard conditions and the following special conditions.

20        1.  You shall comply with the forfeiture

21  provision.

22        2.  You shall make full financial disclosure to

23  the probation officer.

24        3.  You shall comply with sex offender

25  registration requirements mandated by law.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

GA101

42

1          4.  You shall participate in a mental health

2    treatment program which may include participation in a

3    treatment program for sexual disorders as approved by the

4    probation department.  The defendant shall contribute to

5    the cost of such services rendered and/or any psychotropic

6    medications prescribed to the degree you are reasonably

7    able, and shall cooperate in securing any applicable

8    third-party payment.

9          You shall disclose all financial information and

10   documents to the probation department to assess your

11   ability to pay.  As part of the treatment program for

12   sexual disorders, you shall participate in a polygraph

13   examination to obtain information necessary for risk

14   management and correctional treatment.

15         You shall refrain from contacting the victims of

16   the offense.

17         You will not associate with any child under the

18   age of 18 unless a responsible adult is present and you

19   have prior approval from the probation department.

20         Unless otherwise indicated in the treatment plan

21   provided by the sex offender treatment program, the

22   defendant is prohibited from viewing, owning or possessing

23   any obscene, pornographic or sexually stimulating visual

24   or auditory material including telephone, electronic

25   media, computer programs or computer services that have a

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

43

1    reasonably direct relationship to the offender's deviant

2    behavior pattern.

3          If the defendant cohabitats with an individual

4    who has minor children, the defendant will inform that

5    party of his prior criminal history concerning his sex

6    offense.  Moreover, he will notify the party of his

7    prohibition of associating with any children under the age

8    of 18, unless a responsible adult is present.

9          The next condition I'm going to tie only to the

10   definition, in order to avoid any issues with the Circuit

11   that's come up in past cases.

12         The defendant is not to use a computer, internet

13   capable device, or similar electronic device to access

14   pornography of any kind.  The term pornography shall

15   include images or video of adults or minors engaged in

16   sexually explicit conduct as that term is defined in Title

17   18, United States Code, Section 2256(2).  The defendant

18   shall not communicate via his computer with any individual

19   or group who promotes the sexual abuse of children.

20         The defendant shall also cooperate with the US

21   Probation Department's computer and internet monitoring

22   program.  Cooperation shall include, but not be limited

23   to, identifying computer systems, internet capable

24   devices, and/or similar electronic devices the defendant

25   has, and allowing the installation of monitoring software

44

1    and/or hardware on said devices at the defendant's

2    expense.

3            The defendant shall inform all parties that

4    access a monitored computer, or similar electronic device,

5    that the device is subject to search and monitoring.  The

6    defendant may be limited to possessing only one personal

7    internet capable device to facilitate our department's

8    ability to effectively monitor his internet related

9    activities.  The defendant shall also permit random

10   examinations of said computer systems, internet capable

11   devices, similar electronic devices, and related computer

12   media, such as CDs, under his control.

13           The defendant shall notify his employer of his

14   computer-related offense if his job requires computer

15   access with internet capability.

16           The defendant shall not possess a firearm,

17   ammunition or destructive device.

18           The defendant shall submit his person, property,

19   house, residence, vehicle, papers, computers, as defined

20   in 18 USC, Section 1030(E)(1), other electronic

21   communications or data storage devices or media, or office

22   to a search conducted by a United States Probation

23   Officer.  Failure to submit to a search may be grounds for

24   revocation of release.

25           The defendant shall warn any other occupants

45

1    that the premises may be subject to searches pursuant to

2    this condition.  An officer may conduct a search pursuant

3    to this condition only when reasonable suspicion exists

4    that the defendant has violated a condition of his

5    supervision and that the areas to be searched contain

6    evidence of this violation.  Any search must be conducted

7    at a reasonable time and in a reasonable manner.

8           I order a special assessment of I believe $1,000

9    having dismissed counts nine through 13, $100 on each of

10   the remaining ten counts, and I order forfeiture as set

11   forth in the final order of forfeiture including the

12   desktop computer, the SD card, and the $75,000 in

13   substitute for the Highgate Drive premises.

14         I impose no fine or restitution.

15         Mr. Valerio, I need to advise you of your right

16   to appeal the conviction and sentence.  If you are unable

17   to pay the cost of appeal you may apply for leave to

18   appeal in forma pauperis.  If you cannot afford an

19   attorney, one will be appointed on appeal to represent

20   you.  The notice of appeal must be filed within 14 days of

21   the judgment of conviction.

22         I have dismissed counts nine through 13 without

23   prejudice.

24         Does the government move to dismiss the open

25   counts in the underlying indictment?

46

1        MR. KABRAWALA:  So moved, Judge.

2        THE COURT:  The open counts in the underlying

3   original indictment are dismissed.

4        Are there any other issues from the government

5   for today?

6        MR. BODE:  Just one thing I would ask your Honor

7   to put on the record.

8        Obviously the court was cognizant of the

9   lifetime advisory, the 216 I think was the advisory

10  guideline range that the court found, advisory guideline

11  sentence and the court structured the sentence to

12  accomplish that 30 and 20 consecutive and a ten

13  consecutive.

14       If for some reason there were an issue with

15  counts four, five, and 15, am I safe in assuming that the

16  court would have considered consecutive sentences as to

17  victim one and victim two to accomplish the same 60-year

18  sentence?

19       THE COURT:  Yes.

20       MR. BODE:  Thank you.

21       THE COURT:  My sentence you might have meant

22  something else with respect to the guidelines.  I know the

23  guidelines is 216 years, the advisory range, but my

24  sentence is not driven by the guidelines in this case.

25  Regardless of what the guidelines were, that number is not

47

1    influencing me.

2         It's based upon what I have seen in this case

3    and reviewed during the trial, during the hearings.  So

4    this is not a case -- I know there are Second Circuit

5    cases that talk about the guidelines sometimes for child

6    pornography can be too severe for certain situations.  I

7    don't believe that this is a case where this guideline

8    number is driving the sentence.

9         But, yes, the answer to your question is yes,

10   the sentence would be the same even in the absence of

11   those counts.

12             MR. BODE:  Thank you, your Honor.

13             THE COURT:  Anything from the defense?

14             MR. LATO:  Yes.

15        Just with respect to designation.  Given that

16   Mr. Valerio's family is on Long Island will your Honor

17   recommend to the Bureau of Prisons that to the extent they

18   can to designate him to a facility as close as possible to

19   Long Island?

20             THE COURT:  Yes.

21        I will designate that.  I will also recommend

22   that he receive treatment in the jail as well.  I won't

23   mention, I didn't mention this in my reasoning, obviously

24   I don't dispute the fact that his family loves him.  He

25   has their support, and that he's done good things for his

48

1    family.

2           But he had that family all along when he engaged

3    in this dangerous and violent conduct.  The fact that he

4    may be good to his family doesn't mean that he can't at

5    the same time pose an extreme danger to other individuals

6    which I believe he poses.  I did consider that as well.

7           Thank you.

8           (The matter concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter